1  LATHAM & WATKINS LLP
   Ryan R. Owens (Bar No. 269370)
2  *ryan.owens@lw.com*
   650 Town Center Drive, 20th Floor
3  Costa Mesa, California 92626-1925
   Telephone:  +1.714.540.1235
4  Facsimile:  +1.714.755.8290

5  LATHAM & WATKINS LLP
   Lawrence J. Gotts (*pro hac vice*)
6  *lawrence.gotts@lw.com*
   555 Eleventh Street, NW
7  Suite 1000
   Washington, D.C. 20004-1304
8  Telephone: +1.202.637.2200
   Facsimile: +1.202.637.2201

9
   LATHAM & WATKINS LLP
10 Julie M. Holloway (Bar No. 196942)
   *julie.holloway@lw.com*
11 505 Montgomery Street
   Suite 2000
12 San Francisco, CA 94111-6538
   Telephone: +1.415.395.8123
13 Facsimile: +1.415.395.8095

14

15 Attorneys for Defendant-Counterclaim Plaintiff
   *Seoul Semiconductor Co., Ltd.*

16
                   UNITED STATES DISTRICT
17
               NORTHERN DISTRICT OF CALIFORNIA
18

19 ENPLAS DISPLAY DEVICE
   CORPORATION; ENPLAS TECH
20 SOLUTIONS, INC.; and ENPLAS (U.S.A.),
   INC.,                                          CASE NO. 3:13-CV-05038-NC
21
                    Plaintiffs and               **SEOUL SEMICONDUCTOR CO., LTD.'S**
22                  Counter-Defendants,          **OPENING CLAIM CONSTRUCTION**
                                                 **MEMORANDUM**
23        v.
                                                 **Judge:       Hon. Nathanael Cousins**
24 SEOUL SEMICONDUCTOR CO., LTD.,
                                                 **Trial Date: None set**
25                  Defendant and
                    Counterclaim Plaintiff.
26

27

28

Page

I.       INTRODUCTION ....................................................................................... II

II.      LAW OF CLAIM CONSTRUCTION ....................................................... 2

III.     '554 PATENT DISPUTED TERMS ........................................................... 2

         A.   "Cusp" (Claims 30, 31, 33-37, 41-43) ............................................ 2

         B.   "Totally Internally Reflecting" (Claim 30) ...................................... 3

         C.   "Illumination Coupler Embedded In An Interior Region of Said
              Waveguide" .................................................................................... 4

         D.   "TIR Surface" (Claims 7, 30, 31, 33-35) ......................................... 6

         E.   "Substantially Flat Light Travel Channel" (Claim 7) ....................... 7

         F.   "Waveguide" (Claims 1, 2-4, 6-9, 11-13, 19, 20, 23) ....................... 7

         G.   Secondary '554 Patent Disputed Terms ........................................... 8

              1.   "Edge" (Claims 28, 30) ........................................................ 8

              2.   "Generally parallel top and bottom surfaces" (Claim 1) ............ 9

              3.   "Display elements"  (Claims 4, 13, 21) ................................ 10

              4.   "Said LED having an end" (Claim 7) .................................... 11

              5.   "Optical waveguiding layer" / "Waveguiding layer" .............. 11

              6.   "Lens element" (Claim 19) ................................................. 12

              7.   Claim 3 of the '554 Patent ................................................. 13

IV.      '209 PATENT DISPUTED TERMS .......................................................... 14

         A.   "About a Perimeter of the Cavity" (Claims 1, 5, 6, 15) .................... 15

         B.   "Aperture Which Opens Into Said Cavity" (Claims 1, 5, 6, 15) ........ 17

         C.   "Shielding Elements" (Claims 1, 5, 6, 15) ..................................... 18

         D.   "Shielding the Light Emitters" (Claim 22) ..................................... 20

         E.   The Secondary '209 Patent Disputed Terms ................................... 22

              1.   "Directing light rays" (Claim 20) ........................................ 22

              2.   "Perimeter" (Claims 1, 20) ................................................. 22

              3.   "Around the perimeter of the aperture" (Claim 20) ................. 23

              4.   "Exposing multiple facets of said light emitters to said
                   cavity" (Claim 22) ........................................................... 24

V.       CONCLUSION .......................................................................................... 25

Page(s)

**CASES**

Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.,
   340 F.3d 1298 (Fed. Cir. 2003)...................................................................... 10

Arlington Inds., Inc. v. Bridgeport Fittings, Inc.,
   345 F.3d 1318, 1327 (Fed. Cir. 2003).......................................................... 15, 16

Board of Trustees of Leland Stanford Jr. Univ. v. Roche Molecular Systems, Inc.,
   528 F. Supp. 2d 967 (N.D. Cal. 2007) ...................................................... 9, 11, 12

CBT Flint Partners, LLC v. Return Path, Inc.,
   654 F.3d 1353 (Fed. Cir. 2011)...................................................................... 14

Chimie v. PPG Indus., Inc.,
   402 F.3d 1371 (Fed. Cir. 2005)............................................................. 5, 14, 17

Lamoureux v. AnazaoHealth Corp.,
   669 F. Supp. 2d 227 (D. Conn. 2009) ........................................................... 10

Liebel-Flarsheim Co. v. Medrad, Inc.,
   358 F.3d 898 (Fed. Cir. 2004) ....................................................................... 19

Nalco Co. v. Turner Design, Inc.,
   2014 WL 3385698 (N.D. Cal. June 25, 2014) ........................................ 1, 2, 12

Personalized Media Comms. v. Int'l Trade Comm'n,
   161 F.3d 696 (Fed. Cir. 1998)....................................................................... 19

Phillips v. AWH Corp.,
   415 F.3d 1303 (Fed. Cir. 2005)............................................................. 15, 16, 19

Seattle Box. Co., Inc. v. Inds. Crating & Packing, Inc.,
   731 F.2d 818 (Fed. Cir. 1984)....................................................................... 16

U. S. Surgical Corp. v. Ethicon, Inc.,
   103 F.3d 1554 (Fed. Cir. 1997)..................................................................... 12

Vitronics Corp. v. Conceptronics, Inc.,
   90 F.3d 1576 (Fed. Cir. 1996).................................................................. 15, 23

# I.     INTRODUCTION

The parties identified in their Joint Claim Construction Statement ("JCCS") [Dkt. No. 69] nine terms whose construction would be the most significant to resolution of this case.  Six of these disputes involve claim terms from U.S. Patent No. 6,473,554 ("the '554 patent") while the remaining three disputes involve claim terms from U.S. Patent No. 6,007,209 ("the '209 patent").[1]  Seoul Semiconductor Co., Ltd.'s ("SSC's") constructions of these nine significant terms are firmly grounded in what one of ordinary skill in the art would understand the claim terms to mean based upon the plain meaning of the disputed claim terms and the intrinsic evidence.  In contrast, Enplas' proposed constructions stray from, and often contradict, the plain meaning and intrinsic evidence.  Enplas also attempts to limit the meaning of the disputed terms to preferred embodiments and relies heavily and improperly on dictionary definitions, something this Court and the Federal Circuit have cautioned against.  *See, e.g.*, *Nalco Co. v. Turner Design, Inc.*, 2014 WL 3385698, at *2 (N.D. Cal. June 25, 2014) (Cousins, M.J.) ("Ordinary and customary meaning is not the same as a dictionary definition.").

In addition to the nine key claim construction disputes, there are twelve additional terms listed in the charts for the JCCS, including a "term" proposed by Enplas that is the entirety of claim 3 of the '554 patent and combines the constructions of at least five different terms within claim 3.  Thus, there are actually sixteen additional terms that allegedly require construction. Enplas proposed nearly all of these additional terms for construction and they relate to peripheral issues.  Although SSC addresses the sixteen additional terms below, in the limited space available, SSC proposes that the claim construction process would be better served by the Court limiting its review (at least at this juncture) to the nine key disputes chosen by the parties and not construing the remaining sixteen terms.  Twenty-five claim construction disputes for a two-patent case is excessive.  Regardless, if the Court considers the sixteen additional terms, Enplas' constructions for these terms again deviate from plain meaning, contradict the intrinsic evidence, import preferred embodiments, and rely heavily on extrinsic evidence.

---

[1] The '554 patent is attached as Exhibit A; the '209 patent as Exhibit B.

## II.     LAW OF CLAIM CONSTRUCTION

This Court is familiar with the law of claim construction and this memorandum incorporates by reference the overview of claim construction principles found in this Court's recent opinion in *Nalco Co.*, 2014 WL 3385698, at *2-3.

## III.    '554 PATENT DISPUTED TERMS[2]

The '554 patent , entitled "Lighting Apparatus Having Low Profile," describes and claims an improved low profile lighting apparatus that can be used for backlighting a display. ('554 patent, Abstract.)  In some embodiments, the low profile lighting apparatus is designed to redirect light laterally from a central light source, such as a light emitting diode.  (*See id*. at Figure 24.)  This beneficially allows light from the light emitting diode to be spread throughout the apparatus before exiting the top surface.  (*Id*.)

### A.     "Cusp" (Claims 30, 31, 33-37, 41-43)

| Term | SSC's  Construction | Enplas' Construction |
|------|---------------------|----------------------|
| "cusp" | "a pointed, contoured, or rounded area where two curves meet" | "pointed end or part where two curves meet" |

The dispute is whether a "cusp" may be "pointed, contoured, or rounded" (SSC's position) or must always be "pointed" (Enplas' position).  SSC's construction is consistent with the use of the term  "cusp" in the '554 patent's specification and claims.  The specification describes a "cusp" as being created in the area where two curved surfaces meet.  ('554 patent, 2:53-61 ("symmetric [] nonplanar, curved surfaces . . . form a cusp"); 14:52-55 ("symmetric pair of curved surfaces 86, 88 joined at the elongated cusp 82a").)  The specification also states that the "cusp" may have a "contoured" or "rounded" tip.  ('554 patent, 14:1-7 (the surface 80 forming the TIR cusp region 76 is "contoured"); 14:44-47 ("The tip of the elongated cusp 82 may be rounded to provide controlled leakage of light from the light source").)  Consistent with the specification, the claims explicitly recite "cusps" that are "contoured" or "rounded."  ('554 patent, claims 34, 42 ("wherein said cusp is contoured to permit leakage of light"); claims 35, 43

---

[2] The parties have agreed to the constructions of the four terms included in Exhibit C.  SSC proposes that the Court adopt these constructions.

1   ("wherein said cusp is rounded to permit leakage of light").)  Because SSC's construction is

2   supported by the intrinsic evidence, including the specification and claims, it should be adopted.

3          In contrast to SSC's construction, Enplas' construction of "cusp" as "a pointed end or

4   part where two curves meet" directly contradicts the use of "cusp" in the '554 patent.  The '554

5   patent never uses the word "pointed" to describe a "cusp," although SSC agrees that there are

6   disclosed embodiments of the "cusp" that are likely pointed.  (*Id*. at 13:33-35 ("cusp" is an

7   "equiangular spiral").  But as discussed above, the specification and claims explicitly allow the

8   "cusp" to also be "contoured" or "rounded."  Enplas' construction would render claims 34, 35,

9   42, and 43 meaningless: a "cusp" cannot be "pointed" and "rounded" at the same time.  Thus,

10  Enplas' construction must be rejected as inconsistent with the intrinsic evidence.

11  **B.      "Totally Internally Reflecting" (Claim 30)**

12

| Term | SSC's Construction | Enplas' Construction |
|------|--------------------|--------------------|
| "totally internally reflecting" | "reflecting by total internal reflection" | "reflecting all light" |

13         The dispute here is whether the term "totally internally reflecting" refers to reflection

14  occurring through the phenomenon of total infernal reflection (SSC's position) or to all light

15  being reflected (Enplas' position).  SSC's construction is consistent with the use of "totally

16  internally reflecting" in claim 30 to specify that at least some light rays are being reflected

17  through total internal reflection: "the curving TIR surface **totally internally reflecting** light rays

18  such that reflected light rays propagate from the TIR surface towards the edge of the optical

19  element." ('554 patent, claim 30.)  This is consistent with the specification, which uses the

20  related terms "totally internally reflected" and "totally internally reflects" in describing surfaces

21  that can reflect light rays through total internal reflection (as to which the parties have agreed

22  upon a construction in Exhibit C).  ('554 patent, 7:39-43 ("It will be appreciated that light rays

23  incident on the top surface 56 at an angle of incidence . . . at least equal to a critical angle will be

24  totally internally reflected toward the bottom surface 58."); 14:1-4 (cusp region "totally

25  internally reflects substantially all light rays directly emitted by the light source 44").)

26         Enplas' construction of "totally internally reflecting" as "reflecting all light" is based

27  solely on stringing together separate, non-technical dictionary definitions of "totally," "internal,"

28

1   and "reflect." (JCCS, Ex. C at 4-5.) To the extent Enplas is arguing through its construction that

2   the TIR surface must reflect **<u>all</u>** light rays incident on the surface, such an interpretation is

3   directly contradicted by claims dependent on claim 30 that recite TIR surfaces that allow some

4   light to "leak" through. ('554 patent, claim 33 ("said TIR surface is leaking such that some light

5   emitted by the LED is transmitted therethrough"); claim 34 ("cusp is contoured to permit leakage

6   of light through said TIR surface"); claim 35 ("cusp is rounded to permit leakage of light through

7   said TIR surface"); *see also* 14:62-64 ("the surface 80 should be contoured to be a less than

8   perfect internal reflector so that a significant portion of the incident light leaks through the

9   surface 80").) Because a "TIR surface" must be allowed in some claimed embodiments to "leak"

10   light, Enplas' construction of "totally internally reflecting" to require that a "TIR surface" reflect

11   "all light" cannot be correct and should be rejected.

12   **C.    "Illumination Coupler Embedded In An Interior Region of Said Waveguide"**

| Term | SSC's  Construction | Enplas' Construction |
|------|--------------------|--------------------|
| "illumination coupler embedded in an interior region of said waveguide" | "the illumination coupler is in a central region of said waveguide" | "the illumination coupler is located on the inside of the waveguide (i.e., interior region) and is completely enveloped by (i.e., embedded in) the waveguide" |

16         This term appears in claim 1. The dispute here is whether the "illumination coupler" is in

17   a central region of the waveguide when viewed from above (SSC's position) or whether it is

18   completely inside the waveguide. Only SSC's construction is supported by the intrinsic

19   evidence. The '554 patent never describes an illumination coupler that is "located on the inside

20   of the waveguide" or that is "completely enveloped" by the waveguide as required by Enplas'

21   construction. Instead, the specification and claims consistently describe and show the

22   illumination coupler as being in a central region of an optical device. ('554 patent, Abstract

23   ("Another embodiment of the waveguide includes a **central region** of reduced thickness that

24   redirects light propagating within the waveguide."); 10:50-51 ("The dimple 74 is preferably

25   **centrally located** with respect to the periphery of the waveguide"); 15:40-43 ("an illumination

26   coupling element 136 is **centrally located**"); claim 38 (the optical element "converges to a

27   location in a **central portion** of the optical element").)

28

1      The specification uses "interior region" synonymously with "central region" to describe

2   the center of an object when looking from above.  ('554 patent, 15:57-59 ("a single LED could

3   be located in the interior region of a circular waveguide").)  Thus, in the context of claim 1, the

4   term "interior region" describes a central region of the waveguide, not a region inside the

5   waveguide:  "a waveguide having an **illumination coupler embedded in an interior region** of

6   said waveguide, said illumination coupler adapted to receive light from a **point source within**

7   **said interior region**, and to direct light between generally parallel top and bottom surfaces

8   **outside said interior region**."  This is consistent with all of the described embodiments, such as

9   the embodiment from Figures 15 (in isometric form) and 16 (in profile), shown in annotated

10  form here:

11

12

13   

14

15

16

17

18

19

20

21      Enplas' construction would have the anomalous consequence that claim 1 would fail to

22   read on any embodiment in the '554 patent.  *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371,

23   1377 (Fed. Cir. 2005) ("[A] construction that would not read on the preferred embodiment would

24   rarely if ever be correct and would require highly persuasive evidentiary support.") (internal

25   quotation marks omitted).  Thus, SSC's construction should be adopted.

26

27

28

D.    **"TIR Surface" (Claims 7, 30, 31, 33-35)**

| Term | SSC's Construction | Enplas' Construction |
|---|---|---|
| "TIR surface" | "a surface angled with respect to a light source to increase total internal reflection within a device" | "a surface configured for total internal reflection" |

The dispute here is between a construction that describes, consistent with the intrinsic evidence, how the "TIR surface" increases total internal reflection (SSC's construction) and a construction that through the use of the unhelpful and vague term "configured" fails to describe how the "TIR surface" increases total internal reflection (Enplas' construction). The '554 patent specification describes "TIR surfaces" as those surfaces of a TIR region that "curve toward [an] LED [] to receive impingement of light from the LED." ('554 patent, 16:17-20.) The claims also describe the "TIR surface" as "having a curvature which totally internally reflects light rays" (claim 28) or being a "curving TIR surface totally internally reflecting light rays" (claim 30). But as discussed above, the "TIR surface" need not reflect all light incident upon it since the claims specifically recite that the "TIR surface" can be "leaky such that some light emitted by the LED is transmitted therethrough." (*See id*. at claim 33; *see also* 14:62-64 ("the surface 80 should be contoured to be a less than perfect internal reflector so that a significant portion of the incident light leaks through the surface 80").) SSC's construction is consistent with all of the intrinsic evidence and should be adopted.

In contrast, Enplas' construction of "TIR surface" as "a surface configured for total internal reflection" is vague and would be unhelpful to a jury. SSC's construction explains specifically how the "TIR surface" increases total internal reflection within a device, consistent with the intrinsic evidence, but Enplas' construction provides no guidance on how a surface would be "configured for total internal reflection." Enplas' construction also could mistakenly lead the jury to conclude that all light must be totally internally reflected from the TIR surface; but as noted above such an interpretation is unsupported by the intrinsic evidence, including the specification and claims. Enplas' construction should be rejected.

E.     "Substantially Flat Light Travel Channel" (Claim 7)

| Term | SSC's Construction | Enplas' Construction |
|---|---|---|
| "substantially flat light travel channel" | "a portion of the waveguide that has some deviation from complete flatness and through which light may propagate" | "a channel through which light propagates that may have some deviation from complete flatness" |

The dispute here is whether the "substantially flat light travel channel" is a "portion of the waveguide" (SSC's proposal) or the entirety of the waveguide (Enplas' proposal).  In the context of claim 7, the "substantially flat light travel channel" must be a portion of the waveguide.  Claim 7 recites that the "waveguide for light" defines the "substantially flat light travel channel."  But claim 7 goes on to recite that a "surface on the waveguide [is] curving toward the LED" and that this surface defines "a cusp directed toward the LED."  The "cusp" region, with its curving surface, must be a different portion of the waveguide than the "substantially flat light travel channel."  Claims dependent on claim 7 also make clear that the waveguide has portions other than the "light travel channel" portion.  ('554 patent, claim 9 ("said waveguide has a body and said surface is concave adjacent the waveguide body"); claim 10 ("said surface is concave toward said channel").)

In sum, the intrinsic evidence confirms that the "substantially flat light travel channel" is just one portion of the waveguide, consistent with SSC's construction.   SSC's construction should therefore be adopted.

F.     "Waveguide" (Claims 1, 2-4, 6-9, 11-13, 19, 20, 23)

| Term | SSC's Construction | Enplas' Construction |
|---|---|---|
| "waveguide" | "an optical device that redirects light" | "a structure capable of guiding electromagnetic radiation (e.g., light) in a direction parallel to the waveguide's longitudinal axis, while substantially confining the light to a region within its surfaces" |

The dispute here is whether the term "waveguide" should be construed consistent with its broad use in the intrinsic evidence to describe optical devices that redirect light (SSC's position) or should be limited to a definition from the extrinsic evidence (Enplas' position).  SSC's construction is the only one supported by the intrinsic evidence.  For example, the '554 patent specification consistently describes the "waveguides" of the invention as being optical devices

1  that redirect light.  ('554 patent, Abstract ("the waveguide includes a central region of reduced

2  thickness that redirects light propagating within the waveguide"); 1:60-63 ("The waveguide

3  further comprises a light ejector on one of the top or bottom surface configured to redirect light

4  propagating between the surfaces towards the top surface for transmission therethrough.");

5  10:37-40 ("The top surface 56 of the waveguide 42*b* includes a depressed region or dimple 74

6  that redirects light rays propagating in the waveguide 42*b*"); *see also* 6:50-53 (waveguide for

7  "redirecting light"); 11:1-6 (waveguide "redirects light").)  The claims also consistently describe

8  the "waveguide" as being involved in directing light.  ('554 patent, claim 1 ("waveguide" has an

9  "illumination coupler" adapted to "direct light"); claim 7 ("waveguide for light" has a surface for

10  "re-directing such light").)

11      In contrast to the intrinsic evidence supporting SSC's construction, Enplas' construction

12  of "waveguide" as "a structure capable of guiding electromagnetic radiation (e.g., light) in a

13  direction parallel to the waveguide's longitudinal axis, while substantially confining the light to a

14  region within its surfaces" relies primarily on extrinsic evidence that is inconsistent with the use

15  of "waveguide" within the '554 patent.  (*See* JCCS at Appendix C, 2.)  All of the waveguides

16  described in the '554 patent are for "use as a backlight for illuminating a display."  ('554 patent,

17  Abstract.)  Thus, they must emit light, not substantially confine it as Enplas alleges.

18      Because it is supported by the intrinsic evidence, SSC's construction of "waveguide"

19  should be adopted.

20  **G.    Secondary '554 Patent Disputed Terms**

21      **1.    "Edge" (Claims 28, 30)**

22

| Term | SSC's Construction | Enplas' Construction |
|------|--------------------|-----------------------|
| "edge" | No construction necessary, or in the alternative, "a surface that forms an edge" | "the line of intersection of two surfaces" |

23

24      The term "edge" appears in claim 28 of the '554 patent in the following context:  "an

25  optical element having **generally parallel top and bottom opposing sides** and an **edge**

26  **extending between the top and bottom opposing sides**."  The use of "edge" in claim 30 is

27  similar: "an optical element having **top and bottom opposing sides** and an **edge** extending

28  **between the top and bottom opposing sides**."  SSC proposes that "edge" needs no construction

in this context.  *Board of Trustees of Leland Stanford Jr. Univ. v. Roche Molecular Systems, Inc.*, 528 F. Supp. 2d 967, 976 (N.D. Cal. 2007) (no construction necessary for terms "neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution history").  In the alternative, SSC proposes that "edge" be construed as "a surface that forms an edge."  This makes sense in the context of the claim 28 where the "edge" extends between two generally parallel top and bottom opposing sides.  "Edge" should be construed the same in claim 30 where the "edge" again extends between top and bottom opposing sides.

Enplas proposes that "edge" be construed to mean the "the line of intersection of two surfaces."  This construction makes no sense in the context of claims 28 and 30.  If the top and bottom opposing sides in claim 28 are generally parallel, they cannot converge at the edge to create something akin to a sharp knife edge.  Nor does it make sense to construe "edge" one way in claim 28 and another way in claim 30.  Furthermore, there are no embodiments in the '554 patent where two opposing surfaces converge on the sides to intersect and make a knife-like edge.  Instead, all of the embodiments, like those shown in profile in Figures 3, 4, 4B, 4C, 9, 11, 13, 16, 18, and 24, have an edge surface between top and bottom opposing sides.  And the specification consistently describes "edges" as having a "thickness" and being a "side or edge surface."  '554 patent, 2:31-33("the thickness at the peripheral edge is substantially different than the thickness in a region intermediate opposing sides of the peripheral edge"); 6:67 – 7:1 ("A side or edge surface 60 extends between the top and bottom surfaces 56, 58, along the periphery of the waveguide 42.")  Thus, Enplas' construction limiting "edge" to a knife-like intersection of two surfaces has no support in the intrinsic evidence and should be rejected.

### 2.    "Generally parallel top and bottom surfaces" (Claim 1)

| Term | SSC's  Construction | Enplas' Construction |
|---|---|---|
| "generally parallel top and bottom surface" | "top and bottom surfaces that may have some amount of deviation from exactly parallel" | "two surfaces oriented at the top and bottom of the waveguide, which surfaces are equidistant at substantially all points and do not converge or diverge" |

The dispute here is over the meaning of "generally parallel."  SSC proposes that "generally parallel top and bottom surfaces" be construed as "top and bottom surfaces that may

1    have some amount of deviation from exactly parallel."  The Federal Circuit has held that "the

2    ordinary meaning of the phrase 'generally parallel' envisions some amount of deviation from

3    exactly parallel."  *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.,* 340 F.3d 1298,

4    1310-11 (Fed. Cir. 2003).  And *Anchor Wall* has been cited often for the proposition that

5    "generally" in a claim allows for "some amount of deviation."  *See, e.g.*, *Lamoureux v.*

6    *AnazaoHealth Corp.*, 669 F. Supp. 2d 227, 259 (D. Conn. 2009) ("In the context of claim

7    construction, use of the adverb 'generally' is to account for 'some degree of deviation from

8    exact.'").  Consistent with these decisions, "generally parallel" should be construed to allow

9    "some amount of deviation from exactly parallel."  Enplas' construction has no basis in the '554

10   patent or the law.  It should be rejected.

3.    **"Display elements"  (Claims 4, 13, 21)**

| Term | SSC's  Construction | Enplas' Construction |
|------|---------------------|----------------------|
| "display elements" | "pattern of structures that alter the angle of incidence" | "structures that permit the internally reflected light rays that would otherwise continue to propagate and remain confined in the waveguide, to exit from the waveguide" |

The first dispute here is over whether "display elements" is a pattern of structure (SSC's

position) or can include randomly arrayed structures (Enplas' position).  The '554 specification

always describes and shows the display elements as a "pattern of structures."  ('554 patent,

Figures 4, 4A, 4B, 4C, 5-7, 11, 15, 16, 16A, 24, 26-30; 2:61-63; 3:2-4.)  The specification also

explains, consistent with SSC's construction, that the display elements function because they

"alter the angle of incidence of light" allowing light that would normally be totally internally

reflected to escape.   (*Id*. at 6:50-64.)

The second dispute is whether Enplas' understanding of "waveguide" should be imported

into "display elements."  SSC's position is that the meaning of "waveguide" is a different dispute

and should be addressed separately.  Enplas' construction  seeks to import its construction of

"waveguide" into the construction of "display elements."  Regardless, for the reasons discussed

above, Enplas' construction of "waveguide" is too narrow and fails to align with the use of

"waveguide" in the intrinsic evidence.  Thus, SSC's construction should be adopted.

#### 4.    "Said LED having an end" (Claim 7)

| Term | SSC's  Construction | Enplas' Construction |
|------|---------------------|----------------------|
| "said LED having an end" | No construction necessary, or in the alternative, "said LED having an outer surface" | "the lengthwise terminus of an LED that is longer than it is wide or broad" |

The dispute here is over what "end" means.  SSC proposes that "end" does not need construction given that a jury would not have difficulty understanding what it means. *Stanford Univ.*, 528 F. Supp. 2d at 976 (no construction necessary for terms "neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution history").  In the alternative, SSC proposes that "end" be construed as an "outer surface."  In the context of claim 7, the term "end" is used to describe the portion of the LED that is "terminating": "said LED having an end termination in alignment with said cusp."  The "outer surface" of the LED is the portion terminating and SSC's construction thus makes sense in the context of claim 7: "said LED having an [outer surface] terminating in alignment with said cusp."

Enplas' construction, based primarily on a dictionary definition (JCCS at Ex. C, 10.), imposes a shape on the LED that is not required by the intrinsic evidence.  Furthermore, Enplas' construction is confusing and redundant in the context of claim 7:  "said LED having an [the lengthwise terminus of an LED that is longer than it is wide or broad] terminating in alignment with said cusp."  Enplas' construction has  no intrinsic support and should be rejected.  SSC's construction, which makes sense in the context of claim 7 and is supported by the intrinsic evidence, should be adopted.

#### 5.    "Optical waveguiding layer" / "Waveguiding layer"

| Term | SSC's  Construction | Enplas' Construction |
|------|---------------------|----------------------|
| "optical waveguiding layer" | "a layer of material that redirects light" | "waveguiding structure that lies over or under another structure and is a type of waveguiding layer that guides radiation in the visible and near-visible portions of the spectrum by means of total internal reflection" |
| "waveguiding layer" | "a layer of material that redirects light" | "a waveguiding structure that lies over or under another structure" |

The first dispute here is whether "optical waveguide layer" and "waveguiding layer" should have the same construction (SSC's position) or different constructions (Enplas' position).

The term "optical waveguiding layer" appears in claim 13 of the '554 patent while "waveguiding layer" appears in claims 13, 14, 19, and 20.  Claim 13 clearly uses "waveguiding layer" to refer back to the "optical waveguiding layer": "said waveguide is an **optical waveguiding layer** . . . including display elements formed on **_said_ waveguiding layer**."  SSC proposes that both of these terms be construed as "a layer of material that redirects light" consistent with SSC's construction of "waveguide" above.  Inexplicably, Enplas proposes to construe "optical waveguiding layer" differently than "waveguiding layer" although claim 13 establishes that they both refer to the same layer.  The should be construed the same.

The second dispute is over which terms should be construed in "optical waveguiding layer" and "waveguiding layer."  SSC's position is that a jury could understand the meanings of "optical" and "layer" in this context and thus no construction is necessary for these terms in order for a jury to understand them. *Stanford Univ.,* 528 F. Supp. 2d at 976 (no construction necessary for terms "neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution history").  In contrast, "waveguiding" should be construed, consistent with SSC's construction of "waveguide" above, because this term would be unfamiliar to a jury.  Enplas' constructions unhelpfully replace "optical" and "layer" with cherry-picked dictionary definitions while failing to construing "waveguiding."  Enplas' unhelpful constructions should be rejected. *U. S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction is not "an obligatory exercise in redundancy").

### 6.    "Lens element" (Claim 19)

| Term | SSC's  Construction | Enplas' Construction |
|---|---|---|
| "lens element" | No construction necessary, or in the alternative, "an element that acts as a lens" | "structure having optical power" |

A juror would understand the meaning of "lens element" in context and therefore no construction is needed. *Nalco Co.*, 2014 WL 3385698, at * 7 ("The Court finds that a juror, given the context of the patent, could understand the meaning of 'programming' to a person of ordinary skill in the art").  In the alternative, if the Court feels it must be construed, SSC proposes that "lens element" be construed as "an element that acts as a lens."  This construction

gives the term its full ordinary meaning and does not impose narrow limits on the nature of a "lens," as Enplas' construction does.

Enplas proposes that "lens element" be construed as a "structure having optical power," relying on the statement in the specification that "[t]he optical power of the lens element 90 is caused by a refractive index differential between an air gap surrounding the LED 140, the LED 140, the transparent optical coupling agent, and the waveguide 132." ('554 patent, 16:29-33.) But this statement makes clear that the optical power of the lens element "is caused" by its relationship with other elements of the optical device. The specification says nothing about whether the "lens element" itself has must have optical power, nor does the specification define "lens element" as a "structure having optical power." Indeed, the specification states that the "lens element" need only "optionally be either convex or concave" (16:39-40), and therefore could potentially be a flat lens, without optical power.

### 7.    Claim 3 of the '554 Patent

| Term | SSC's Construction | Enplas' Construction |
|------|--------------------|----------------------|
| "3. The illumination device of claim 2, comprising a point source of light disposed at least partially within a cavity in said waveguide, said cavity being adjacent to said total internal reflecting surface." | "The illumination device of claim 2, comprising the point source of claim 1 disposed at least partially within a cavity in said waveguide, said cavity being adjacent to said total internal reflecting surface" | "a second point source of light is at least partially inserted into a hole or space in the waveguide, which hole or space is close or near, sharing a border, wall, or point with the surface that reflects all light" |

Enplas proposes to construe the entirety of claim 3 as one long term. (JCCS, Ex. C at 10.) Enplas' construction actually combines its proposed constructions of at least five separate terms appearing in claim 3, including "a point source of light," "disposed at least partially within," "cavity," "adjacent," and "total internal reflecting surface." It is impractical and confusing to merge all of these issues in a single, combined construction. SSC proposes a construction for a "point source of light" but otherwise takes the position that none of the other four terms in claim 3 require construction. Enplas' proposed constructions of those terms are unneeded and unhelpful.

1    As for the dispute over "point source of light," it is helpful to understand that claim 3
2    depends on claim 2, which in turn depends on claim 1.  Claim 1 recites that the "illumination
3    coupler [is] adapted to receive light **from a point source** within said interior region" and that the
4    illumination coupler comprises an interface "configured to reflect light rays emitted **by the point**
5    **source**."  Enplas proposes that when claim 3 refers to "**a** point source of light disposed at least
6    partially within a cavity in said waveguide," that claim 3 is introducing "a second point source of
7    light" and is not referring to the "point source of light" already introduced in claim 1.  But the
8    such a construction would cause claim 3 to not read on any preferred embodiment in the '554
9    patent.  *Chimie*, 402 F.3d at 1377 ("[A] construction that would not read on the preferred
10   embodiment would rarely if ever be correct and would require highly persuasive evidentiary
11   support.") (internal quotation marks omitted).  The use of "**a** point source of light" in claim 3
12   rather than "**the** point source of light" (referring to the point source of light of claim 1) is an
13   obvious error that should be corrected.  *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d
14   1353, 1358 (Fed. Cir. 2011) *citing I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 442
15   (1926) (well-settled that a district court may correct an obvious error in a patent claim).

16   **IV.    '209 PATENT DISPUTED TERMS**

17       The '209 patent, entitled "Light Source for Backlighting," describes and claims an
18   improved backlight for a display such as a liquid crystal display.  The backlight includes a
19   housing, which has a cavity formed by the bottom and side interior walls.  ('209 patent, at
20   1:45-48.)  The cavity has an aperture, through which the light is emitted to the display panel.  (*Id*.
21   at 1:48-49.)  The improved backlight uses a combination of light emitting devices, such as LEDs,
22   and shielding elements, which are arranged to direct the emitted light "such that the emitted light
23   is substantially uniformly distributed throughout the cavity, thereby eliminating bright spots (i.e.,
24   'hot spots') in the display panel." (*Id*. at 1:50-55.)

25       The '209 patent specification discloses certain preferred embodiments.  And as with the
26   '554 patent, Enplas again seeks to import limitations from these preferred embodiments.  For
27   example, in "the preferred embodiment," the "shielding element" comprises "an opaque baffle"
28   that is reflective.  (*Id*. at 5:20-39.)  Enplas seeks to limit the claimed shielding elements to

opaque, reflective baffles.  Also in the preferred embodiment, as shown in Figures 3-5, the

housing includes a partial top wall around the periphery.  The partial top wall forms what the

patent calls a "viewing aperture portion."  (*Id*. at 4:52-57.)  Enplas seeks to import this "viewing

aperture portion" into the claims.

Enplas' proposed constructions are improper.  The Federal Circuit has repeatedly warned

against importing limitations from the specification into the claims.  *Phillips v. AWH Corp.*, 415

F.3d 1303, 1312-13 (Fed. Cir. 2005); *Arlington Inds., Inc. v. Bridgeport Fittings, Inc.*, 345 F.3d

1318, 1327 (Fed. Cir. 2003).  Nothing in the intrinsic evidence justifies doing so in this case.

SSC's proposed constructions, which reflect the plain meaning of the claim terms, consistent

with their use in the specification, should be adopted.

## A.  "About a Perimeter of the Cavity" (Claims 1, 5, 6, 15)

| Term | SSC's Construction | Enplas' Construction |
|---|---|---|
| "about a perimeter of the cavity" | "in the vicinity of the border area of the cavity" | This term is indefinite.  In the alternative: "within the cavity around the perimeter of the aperture and outside the viewing aperture portion" |

The dispute here is over the meaning of "about."  SSC's proposed construction for the

term "about a perimeter of the cavity" – "in the vicinity of the border area of the cavity" – is

simply the "ordinary and customary meaning."  *Phillips*, 415 F.3d at 1312-13.  The "perimeter of

the cavity" is the "border area of the cavity."  The term "about" indicates that the first series of

LEDs is in the vicinity of, or near, the border area of the cavity.  Ex. D (MERRIAM-WEBSTER

DICTIONARY, def'n "about").  This is consistent with the depiction of the location of the first

series of LEDs (labeled 12) in Figures 3, 4, and 5 – they are near the border area of the cavity.

*Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("it is always

necessary to review the specification to determine whether the inventor has used any terms

inconsistent with their ordinary meaning").  Thus, the intrinsic evidence confirms that SSC's

proposed construction is correct.

Enplas asserts that this term is rendered indefinite by the term "about."  It is

well-established that a "word of degree," such as "about," is not indefinite if the patent provides

"some standard for measuring that degree."  *Seattle Box. Co., Inc. v. Inds. Crating & Packing,*

1    *Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984).  That is, a person of ordinary skill in the art must be

2    able to understand what is claimed when the claim is read in light of the specification.  *Id*.  Here,

3    the patent explains that the first series of LEDs located "about the perimeter of the cavity" must

4    illuminate the aperture "inward from its perimeter." ('209 patent, at 4:23-26.)  Specifically, it

5    must illuminate the portion of the aperture that is not illuminated by the second series of LEDs.

6    (*Id*. at 4:63-64.)  These functional requirements are sufficient for a person of ordinary skill in the

7    art to understand the location of the first series of LEDs.

8            Alternatively, Enplas proposes a construction that imports limitations from the preferred

9    embodiments – requiring the LEDs to be located, not only "within the cavity," but also "around

10   the perimeter of the aperture and outside the viewing aperture area."  Nothing in the plain

11   language of the claims or in the specification justifies these limitations.  Here, Enplas is simply,

12   and improperly, attempting to limit the claims to preferred embodiments of Figures 3-5.  The

13   "viewing aperture area" is "the portion of the cavity that lies directly beneath the aperture."  (*Id*.

14   at 4:52-57.)  This "portion" exists only when the cavity includes a partial top wall, as shown in

15   Figures 3-5.  ( *Id*. at 4:52-57.)  The claim expressly describes "a cavity formed by diffusively

16   reflective bottom and side surfaces," and says nothing about any partial top surface.  (*Id.* at

17   8:4-5.)  The specification similarly describes the cavity as being formed by "bottom and side

18   interior surfaces."

19           The Federal Circuit has repeatedly warned against importing limitations from the

20   specification into the claims.  *Phillips*, 415 F.3d at 1312-13; *Arlington*, 345 F.3d at 1327.

21   Nothing in the intrinsic evidence justifies importing this limitation from preferred embodiments

22   into the claim.  The claim expressly states that the cavity is "formed by diffusively reflective

23   bottom and side surfaces," and makes no mention of any top surface.  ('209 patent, at 8:4-5.)

24   The specification similarly describes "a housing having a cavity formed by diffusively reflective

25   bottom and side interior surfaces."  (*Id*. at 1:45-48.)  The cavity is thus described and claimed

26   without any partial top wall defining a "viewing aperture portion."  Enplas' proposed

27   construction, which imports a "viewing aperture portion" from a preferred embodiment, should

28   be rejected.

1      Enplas also seeks to narrowly define the term "perimeter" as "border or outer boundary

2 of a two-dimensional figure" – requiring the LEDs to be at the outer boundary of the cavity.

3 This would **exclude** the preferred embodiments: as illustrated in Figures 4 and 5, the LEDs 12

4 are not at the outer boundary of the cavity. Rather, they are **near** the outer boundary – as

5 required by SSC's proposed construction. A proposed construction that excludes the preferred

6 embodiment is rarely, if ever, correct. *Chimie*, 402 F.3d at 1377 ("[A] construction that would

7 not read on the preferred embodiment would rarely if ever be correct and would require highly

8 persuasive evidentiary support.") (internal quotation marks omitted).

9      Enplas' proposed construction thus improperly imports limitations from the preferred

10 embodiments, and at the same time improperly excludes those embodiments. For both these

11 reasons, it should be rejected.

12     **B.**     **"Aperture Which Opens Into Said Cavity" (Claims 1, 5, 6, 15)**

| Term | SSC's Construction | Enplas' Construction |
|------|--------------------|----------------------|
| "aperture which opens into said cavity" | "an opening in one side of the housing into said cavity" | "opening in one side of the housing formed by the mouth of the cavity and defining a viewing aperture portion of the cavity" |

16      The dispute here is over the meaning of "aperture" in the context of "aperture which

17 opens into said cavity." SSC's proposed construction for this term is simply the plain meaning:

18 "an opening in one side of the housing into said cavity." An "aperture," both in ordinary English

19 and in the context of optics, is an opening. (*See*, *e.g.*, Ex. E (OXFORD ENGLISH DICTIONARY,

20 def'ns 3 and 4), Ex. F (WEBSTER'S NEW WORLD COLLEGE DICTIONARY, def'ns 1 and 2), Ex. G

21 (AMERICAN HERITAGE DICTIONARY, def'n 1).) Claim 1 explains that the aperture "opens into

22 said cavity," further confirming that the aperture is an opening. This plain meaning is consistent

23 with the consistent use of the term "aperture" in the specification, to describe an opening in the

24 housing. (*See*, *e.g.*, '209 patent, at 3:31-35, 3:61-65, Figures 4-5.) SSC's proposed construction

25 is therefore correct.

26      Enplas, once again, seeks to limit the claims to a preferred embodiment: an opening

27 "defining a viewing aperture portion of the cavity." This "viewing aperture portion" – a term

28 that does not appear in the claims – "refers to the **portion** of the cavity that lies directly beneath

the aperture." (*Id*. at 4:52-57.)  As discussed above, this "portion" – and thus the "viewing

aperture portion" – exists only when the cavity includes a partial top wall.  The preferred

embodiments of Figures 4 and 5, for example, include a partial top wall, around the periphery of

the aperture.  This partial top wall is not required by either the claim language or the

specification.  To the contrary, the claim recites "a cavity formed by . . . bottom and top

surfaces." (*Id*. at 8:4-5.)  The specification also describes the cavity as having "internal side

walls, an internal bottom wall, and an aperture." (*Id*. at 2:44-48.)  The partial top wall of Figures

4 and 5 – and the resulting "viewing aperture portion" – are merely features of the preferred

embodiments and are not properly read into the claims.

## C.     "Shielding Elements" (Claims 1, 5, 6, 15)

| Term | SSC's  Construction | Enplas' Construction |
|---|---|---|
| "shielding elements" | "structures that direct light" | § 112 ¶ 6.  In the alternative: "baffles that prevent light emitted by the light emitting devices from directly illuminating the aperture by reflecting such light before it exits the cavity" |

The dispute here is whether "shielding elements" should be construed consistent with its

use in the '209 patent specification (SSC's position) or should be limited to a specific preferred

embodiment within the specification (Enplas' position).  SSC's proposed construction of

"shielding element" is simply the plain meaning – a structure that directs light.  The specification

explains that the shielding elements, for example baffles, reflect some or all of the light emitted

by the light emitting devices, so as to provide a substantially uniform distribution of emitted

light. ('209 patent, at 2:6-9, 5:31-49, 8:34-37, 10:21-23.)  The shielding elements thus direct

light.  The patent similarly describes "directing light rays emitted by plural light sources . . . such

that the light existing the aperture is substantially uniform." (*Id*. at 2:48-52.)  The specification

describes various shielding elements.  For example, in one preferred embodiment, the shielding

element is opaque. (*Id. at* 5:20-22.)  However, the shielding element is not required to be opaque

– for example, a shielding element may reflect "substantially all," not all, the light emitted by an

LED. (*Id*. at 10:21-23.)  Such a shielding element could be a transparent structure that reflects

and refracts light.

1    Enplas seeks to limit the "shielding elements" to a preferred embodiment: "*opaque*

2  baffles," under its means-plus-function theory or, alternatively, "baffles that *prevent* light

3  emitted by the light emitting devices from directly illuminating the aperture by reflecting such

4  light before it exits the cavity."  Enplas' means-plus-function theory is not supported by the

5  claim language.  First, the claim does not use "means-plus-function" terminology – which is

6  "central to the analysis."  *Personalized Media Comms. v. Int'l Trade Comm'n*, 161 F.3d 696, 703

7  (Fed. Cir. 1998).  Second, the claim recites the term "element," which is, by definition, a

8  constituent part of a structure.  The claim therefore recites sufficient structure such that 35

9  U.S.C. § 112 does not apply.  *Id*.  Furthermore, even if it did, the shielding elements would not

10  be limited to "opaque baffles" – a preferred embodiment that is mentioned exactly *once* in the

11  specification.  ('209 patent, at 5:20-22.)  "Baffle," as the Federal Circuit has noted, is a broad

12  generic term.  *Phillips*, 415 F.3d at 1324.  There is no basis for concluding that baffles are, by

13  definition, opaque.  Enplas' alternate theory likewise attempts to limit the claims to preferred

14  embodiments that "prevent" light from directly illuminating the aperture "by reflecting such

15  light."

16    In either case, Enplas' proposed construction limits the "shielding elements" to baffles,

17  specifically, and furthermore to baffles that do not permit *any* light to directly illuminate the

18  aperture, *i.e.*, opaque baffles, or baffles that reflect *all* light.  The intrinsic evidence confirms that

19  this construction is incorrect.  Specifically, the dependent claims confirm that the shielding

20  elements are not limited to baffles, much less opaque baffles or baffles that reflect all light.  As

21  the Federal Circuit has repeatedly explained, an independent claim is given broader scope than

22  its dependent claim – otherwise, the dependent claim is redundant.  *Phillips*, 415 F.3d at 1324

23  (internal citation omitted); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910

24  (Fed. Cir. 2004) ("doctrine of claim differentiation is at its strongest" where "the limitation

25  sought to be 'read into' an independent claim already appears in the dependent claim").  Here,

26  independent claim 1 recites "shielding elements," and dependent claim 2 limits those "shielding

27  elements" to "a series of baffles" that are interposed between the second series of light emitting

28

1   devices and the aperture.  Dependent claim 3 adds a similar limitation, with respect to the first

2   series of light emitting devices.  Thus, the shielding elements are not limited to "baffles."

3          Furthermore, the shielding elements cannot be limited to "opaque baffles" that reflect

4   light.  As noted above, the term "opaque" appears exactly once in the patent, in connection with

5   "the preferred embodiment."  ('209 patent, at 5:20-22.)  There are many descriptions of shielding

6   elements and baffles that are not limited to "opaque baffles," or baffles that reflect all light.  (*Id.*

7   at Abstract, 1:50-51, 1:60-67, 2:6-13, 4:16-26.)  For example, the specification states that in "the

8   preferred embodiment," the baffles "prevent the LEDs from being ***viewed*** through the aperture,"

9   and from "***directly*** illuminating the aperture."  (*Id.* at 1:60-67, 2:8-12.)  This merely means that

10  the baffles are interposed between the LEDs and the aperture.  It does not follow that the baffles

11  are opaque, or that they reflect all the light from the LEDs.  If the baffles were semi-translucent,

12  for example, this would "prevent the LEDs from being ***viewed***," and from "***directly*** illuminating

13  the aperture."  However, such semi-translucent baffles would not be opaque, and would not

14  reflect all the emitted light.

15         The dependent claims further confirm that the "shielding elements" need not be opaque

16  or reflect all the emitted light.  For example, dependent claims 2 and 3 recite that "at least a

17  portion of each baffle" is "interposed" between light emitting devices and the aperture, "whereby

18  the shielded emitting devices are not ***directly viewable*** through the aperture."  Again, if the

19  baffles in question were semi- translucent, some light would be permitted to pass through, but

20  the shielded emitting devices would nonetheless not be "directly viewable."  Thus, even the

21  dependent claims do not requires the shielding elements to be "opaque."

22          Simply stated, where the patentee intended to refer to "baffles" he did so in both the

23  specification and claims.  But here, he chose broader language for use in the claims.  Clearly,

24  independent claim 1 does not impose this requirement.

25  **D.      "Shielding the Light Emitters" (Claim 22)**

| Term | SSC's  Construction | Enplas' Construction |
|---|---|---|
| "shielding the light emitters" | "positioning structures that direct light from the light emitters" | "interposing baffles that prevent light emitted by the light emitters from directly illuminating the aperture by reflecting such light before it exits the cavity" |

1    As with "shielding elements," the dispute here is whether "shielding the light emitters"

2    should be construed consistent with its use in the '209 patent specification (SSC's position) or

3    should be limited to a specific preferred embodiment within the specification (Enplas' position).

4    SSC's proposed construction for this term, "positioning structures that direct light from the light

5    emitters," is simply the plain meaning of the term, when read in light of the specification.  The

6    purpose of "shielding" the light emitters, as the specification makes clear, is to direct light from

7    the emitting devices "such that the emitted light is substantially uniformly distributed throughout

8    the cavity, thereby eliminating bright spots (i.e., 'hot spots') in the display panel." ('209 patent,

9    at 1:51-55.)  The patent explains that this requires "directing light rays emitted by" the emitting

10   devices, "such that the light exiting the aperture is substantially uniform in intensity and color."

11   (*Id*. at 2:48-52.)  Therefore, the light emitters are shielded so as to direct the light rays from the

12   light emitters in order to obtain the desired uniformity of light.

13   Enplas seeks, again, to limit the claim to a preferred embodiment:  "interposing ***baffles***

14   that ***prevent*** light emitted by the light emitters from directly illuminating the aperture by

15   reflecting such light before it exits the cavity."  Enplas seeks to limit the claim to "interposing

16   baffles" – which is not required by the plain meaning of the claim language, nor, as explained

17   above in connection with "shielding elements," by the specification. The intrinsic evidence,

18   including the dependent claims, confirms that the invention is not limited to interposing

19   "baffles," as discussed above – the patent discloses "shielding elements," and baffles are merely

20   a preferred embodiment.  Enplas further seeks to narrowly limit the claim to require that the

21   baffles "prevent" light emitted from illuminating the aperture "by reflecting such light."  This

22   ignores the plain language of claim 22:  "shielding the light emitters so that ***substantially all*** light

23   emitted by said light emitters is reflected at least once."  The claim thus expressly states that

24   some amount of light will ***not*** be reflected.  Enplas thus ignores the claim language, and

25   improperly seeks to limit the claim to a preferred embodiment.

26

27

28

E.    **The Secondary '209 Patent Disputed Terms**

1.    **"Directing light rays" (Claim 20)**

| Term | SSC's  Construction | Enplas' Construction |
|------|---------------------|----------------------|
| "directing light rays" | "changing the direction of light rays" | "causing the light rays to be reflected such that they do not directly illuminate the aperture" |

SSC's proposed construction, "changing the direction of light rays," is, on its face, simply the plain meaning of this term.  Because the specification does not provide any special definition of "directing light rays," this plain meaning is the correct construction.

Enplas' proposed construction "causing the light rays to be reflected  such that they do not directly illuminate the aperture," improperly seeks to limit the claim to require reflection of all light, and to exclude refraction.  All that the claim language requires is that "the light exiting the aperture is substantially uniform in intensity and color." ('209 patent, at 9:24-27.)  Nothing in this language requires that all the light is reflected, and that none of it directly illuminates the aperture.  Similarly, the specification describes "shielding elements" that "are positioned such that the emitted light is substantially uniformly distributed throughout the cavity, thereby eliminating bright spots." (*Id*. at 1:51-55.)  The intrinsic evidence thus does not limit "directing light rays" to reflection, nor does it exclude directing light rays by refraction.  Enplas is improperly attempting to limit the claim to the preferred embodiment, which uses opaque, reflecting baffles. (*Id*. at 5:20-22, 5:30-38.)

2.    **"Perimeter" (Claims 1, 20)**

| Term | SSC's  Construction | Enplas' Construction |
|------|---------------------|----------------------|
| "perimeter" | "border area" | "border or outer boundary of a two-dimensional figure" |

SSC's proposed construction "border area," is the plain meaning of "perimeter" and is consistent with how the term "perimeter" is used in the claims and in the specification.  For example, claim 22 recites light sources "around the perimeter of the cavity."  As shown in Figures 3, 4, and 5, these light sources, labeled 12, are in the border areas of the cavity.  That is, they are relatively close to, but not immediately adjacent to, the outer boundary of the cavity.

Enplas' proposed construction, "border or outer boundary of a two-dimensional figure," improperly ignores the way "perimeter" is used in the patent.  Enplas' proposed construction would require the claimed light sources "around the perimeter of the aperture" (claim 20) or "about a perimeter of the aperture" (claim 1) to be located at the border or outer boundary of the aperture.  This would exclude the preferred embodiment, shown in Figures 3, 4 and 5, in which the light sources are illustrated as being near, but not immediately adjacent to, the outer boundary of the aperture.  ('209 patent, at 2:48-52, Figures 3, 4 and 5.)  Such a construction "is rarely, if ever, correct."  *Vitronics*, 90 F.3d at 1583-84.  Enplas' construction should be rejected.

### 3.    "Around the perimeter of the aperture" (Claim 20)

| Term | SSC's  Construction | Enplas' Construction |
|------|---------------------|----------------------|
| "around the perimeter of the aperture" | "around the border area of the aperture" | "around the perimeter of the aperture outside the viewing aperture portion of the cavity" |

SSC's proposed construction, "around the border area of the aperture," is correct for the same reasons its proposed construction of "perimeter," discussed above, is correct.  The perimeter of the aperture is simply the border area.  As shown in Figures 3, 4, and 5, in the preferred embodiment, the LEDs are illustrated as being in the border area – not immediately adjacent to the border.  A narrower construction would exclude this preferred embodiment.

Enplas' proposed construction, "around the perimeter outside the viewing aperture portion of the cavity," is incorrect for the same reasons as its proposed construction for "about a perimeter of the cavity," discussed above.  Enplas is improperly seeking to import limitations from the preferred embodiment of Figures 3, 4, and 5, in which the cavity includes a partial top wall, around the periphery of the aperture, which defines a "viewing aperture portion."  ('209 patent, at 4:52-57, Figures 3, 4 and 5.)  This partial top wall is not required by either the claim language – which defines the cavity as having "internal side walls, an internal bottom wall, and an aperture" – or the specification.  At the same time, Enplas' overly-narrow construction of "perimeter," discussed above, excludes the preferred embodiment.

4.     "Exposing multiple facets of said light emitters to said cavity" (Claim 22)

| Term | SSC's Construction | Enplas' Construction |
|---|---|---|
| "exposing multiple facets of said light emitters to said cavity" | "exposing multiple flat surfaces of said light emitters directly or indirectly to said cavity" | "exposing more than one light-emitting face of each of said light emitters directly to said cavity (e.g., without use of directional reflectors or a housing)" |

SSC's proposed construction, "exposing multiple flat surfaces of said light emitters directly or indirectly to said cavity," is simply the plain meaning of the term.  A "facet" is simply a flat surface, and "exposing" is broad enough to embrace both direct and indirect exposure – that is, exposure with no housing, or a through a housing.  This plain meaning is consistent with the way the term is used in the claim, as well as the descriptions in the specification.  The claim states that the multiple facets are exposed "such that said light emitters emit light in multiple directions within the cavity."  '209 patent, at 10:18-20.  That is, the purpose of exposing multiple facets of the light emitters is to cause light to be emitted in multiple directions within the cavity. This will occur whether that exposure is direct, i.e., without any housing, or indirect, i.e., through a housing.  The specification explains that in a preferred embodiment, the LEDs "comprise tiny cubes of solid state material that emit light."  Id. at 5:49-50.  The specification explains that "the emission is allowed to propagate multidirectionally from plural faces or facets of the solid-state cubes," which "enhances the uniformity of the intensity of light."  Id. at 5:50-56.  Such multidirectional emission will occur whether the facets are exposed to the cavity directly or indirectly.  Thus, SSC's proposed construction is the plain meaning, and is consistent with the intrinsic evidence.

Enplas' proposed construction is "exposing more than one light-emitting face of each of said light emitters directly to said cavity (e.g., without use of directional reflectors or a housing)."  Here, once again, Enplas seeks to limit the claims to the preferred embodiment. There is no basis in the claim language for limiting the exposure to "direct" exposure, or requiring that the light emitters do not use direction reflectors or a housing.  The description in the specification, of LEDs without directional reflectors or a housing is specifically described as "the preferred embodiment."  '209 patent, at 5:20-21, 5:49-56.  As the Federal Circuit has

1    repeatedly affirmed, limitations from the preferred embodiments should not be imported into the

2    claims.  Enplas' proposed construction should therefore be rejected.

3         SSC's proposed construction is the plain meaning, and given the absence of any special

4    definition in the specification, it is the correct construction.

5    **V.    CONCLUSION**

6         For the foregoing reasons, SSC respectfully requests the Court to adopt its proposed

7    constructions of the disputed claim terms.

8
     Dated:  September 19, 2014                    LATHAM & WATKINS LLP
9

10                                                 /s/ Ryan R. Owens
                                                   Ryan R. Owens
11                                                 Larry J. Gotts
                                                   Julie M. Holloway
12

13                                                 Attorneys for Defendant-Counterclaim
                                                   Plaintiff
14                                                 *Seoul Semiconductor Co., Ltd.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28