# EXHIBIT 1

LATHAM & WATKINS LLP
Ryan R. Owens (Bar No. 269370)
*ryan.owens@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626-1925
Telephone: +1.714.540.1235
Facsimile: +1.714.755.8290

LATHAM & WATKINS LLP
Bob Steinberg (Bar No. 126407)
*bob.steinberg@lw.com*
355 South Grand Avenue
Los Angeles, CA 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

LATHAM & WATKINS LLP
Lawrence J. Gotts (*pro hac vice*)
*lawrence.gotts@lw.com*
Elizabeth M. Roesel (*pro hac vice*)
*elizabeth.roesel@lw.com*
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

Attorneys for Defendant-Counterclaim Plaintiff
*Seoul Semiconductor Co., Ltd.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ENPLAS DISPLAY DEVICE CORPORATION; ENPLAS TECH SOLUTIONS, INC.; and ENPLAS (U.S.A.), INC.,

Plaintiffs and Counter-Defendants,

v.

SEOUL SEMICONDUCTOR CO., LTD.,

Defendant and Counterclaim Plaintiff.

CASE NO. 3:13-CV-05038-NC

**SEOUL SEMICONDUCTOR CO., LTD.'S DISCLOSURE OF ASSERTED CLAIMS AND INFRINGEMENT CONTENTIONS PURSUANT TO PATENT LOCAL RULES 3-1 AND 3-2**

Pursuant to Patent Local Rules 3-1 and 3-2, Defendant and Counter-Plaintiff Seoul Semiconductor Co., Ltd. ("SSC") serves its Disclosure of Asserted Claims and Preliminary Infringement Contentions ("Disclosure") regarding infringement of U.S. Patent Nos. 6,473,554 ("the '554 Patent") and 6,007,209 ("the '209 Patent") (collectively the "Patents-in-Suit.").

SSC bases this Disclosure on its current knowledge, understanding, and belief as to the facts and information available as of the date of this Disclosure. SSC has not yet completed its investigation, collection of information, discovery, or analysis relating to this action, and additional discovery, including discovery from Plaintiffs and Counter-Defendants Enplas Display Device Corporation ("EDD"); Enplas Tech Solutions, Inc. ("ETS"); and Enplas (U.S.A.), Inc. ("EnplasUSA") (collectively and individually, "Enplas") and third parties, may require SSC to amend, revise, and/or supplement this Disclosure or any accompanying exhibits. SSC thus specifically reserves the right to amend, revise, and/or supplement this Disclosure and/or any accompanying exhibits if needed in accordance with this Court's Scheduling Order and/or any other Orders of record in this matter, Patent Local Rule 3-6, and/or Federal Rules of Civil Procedure 26(e) as additional documents and information become available and as discovery and investigation proceed. SSC reserves the right to supplement, modify, or amend this Disclosure and exhibits to include additional products or services used, sold, made, or offered for sale in or imported into the United States by Enplas. This Disclosure is made without prejudice to any position SSC may take with respect to claim construction, and SSC reserves the right to assert claim constructions different from what may be inferred from this Disclosure. SSC further reserves its right to supplement this Disclosure and exhibits based on the Court's claim construction. SSC further reserves the right to introduce and use such supplemental materials at trial.

SSC provides the information below and in the infringement charts attached as Exhibits A through J as well as the accompanying documents, in order to comply with Patent Local Rule 3-1 and 3-2 only. As with the rest of this Disclosure, SSC reserves the right to supplement its claim charts to allege other theories of infringement, including under the Doctrine of Equivalents, contributory infringement, and further grounds of direct or induced infringement,

based on SSC's continuing investigation during the course of discovery, and following the Court's claim construction order. The information is not an admission regarding the scope of any claims or the proper construction of those claims or any terms contained therein. The production of documents accompanying this Disclosure is not an admission that such documents are admissible or that SSC has waived any objections regarding the admissibility of such documents. SSC reserves the right to supplement its production of documents accompanying this disclosure upon identification or receipt of additional documents, including documents from third parties.

## I. ASSERTED CLAIMS—PATENT LOCAL RULE 3-1(a)

*"Each claim of each patent in suit that is allegedly infringed by each opposing party, including for each claim the applicable statutory subsections of 35 U.S.C. § 271 asserted;"*

Pursuant to Patent Local Rule 3-1(a), SSC identifies the following claims of the Patents-in-Suit as being infringed by the Enplas:

| Patent | Asserted Claims | Applicable Statute |
|---|---|---|
| '554 Patent | 1, 2, 6 | 35 U.S.C. § 271(a) and (b) |
| '554 Patent | 3, 4, 7-9, 11-13, 19, 20, 23, 30-31, 33-37, 38, 39, 41-43, 45-48 | 35 U.S.C. § 271(b) and (c) |
| '209 Patent | 1, 5, 6, 20, 22 | 35 U.S.C. § 271(b) and (c) |

SSC specifically reserves the right to amend, revise, and/or supplement its asserted claims and statutory bases as it acquires additional information about Enplas's sales and marketing activities, the Accused Instrumentalities (referenced below) and other products made, used, offered for sale, imported and/or sold by Enplas and its direct and indirect customers, and as additional Accused Instrumentalities are identified.

## II. ACCUSED INSTRUMENTALITIES -- PATENT LOCAL RULE 3-1(b)

*"Separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of*

*which the party is aware. This identification shall be as specific as possible. Each product, device, and apparatus shall be identified by name or model number, if known. Each method or process shall be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process;"*

Pursuant to Patent Local Rule 3-1(b), SSC identifies the following apparatuses, products, devices, processes, methods, acts, or other instrumentalities (collectively, "Accused Instrumentality" or "Accused Instrumentalities") that SSC currently believes infringe the Patents-in-Suit:

| Patent | Asserted Claims | Accused Instrumentalities |
|---|---|---|
| '554 Patent | 1, 2, 6 | Enplas lenses for use with light-emitting diodes (LEDs), including, but not limited to, Enplas part numbers: #4922, #9827, #9845, #9853A, #9854D, #9854E, #9879, and lenses having a shape similar to one or more of these lenses ("Accused Enplas Lenses") and products containing one or more Accused Enplas Lenses |
| '554 Patent | 3, 4, 7-9, 11-13, 19, 20, 23, 30-31, 33-37, 38, 39, 41-43 and 45-48 | Products containing at least one LED and at least one Accused Enplas Lens, including, but not limited to, ceiling lights, substrates on which one or more LEDs and Accused Enplas Lenses is mounted, LED strips for use in backlight units (BLUs), BLUs, liquid crystal displays (LCDs), and LCD televisions and monitors |
| '209 Patent | 1, 5, 6, 20, 22 | BLUs, LCDs, and LCD televisions and monitors that contain one or more LEDs and one or more Accused Enplas Lenses, including, but not limited to, the following products:<br><br>JVC EM32TS<br>LG 42LN5400<br>Panasonic TC-L32B6<br>RCA 32B30RQ<br>Samsung UN40FH6030<br>Sanyo DP42D23<br>Seiki SE40FH03<br>Sharp 32LE450U<br><br>including the use and method of manufacture of such products |

# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ENPLAS DISPLAY DEVICE CORPORATION; ENPLAS TECH SOLUTIONS, INC.; and ENPLAS (U.S.A.), INC.,<br><br>Plaintiff and Counterclaim Defendants,<br><br>v.<br><br>SEOUL SEMICONDUCTOR CO., LTD.,<br><br>Defendant and Counterclaim Plaintiff. | CASE NO. 3:13-CV-05038-NC |

**EXPERT REPORT OF DUNCAN T. MOORE ON INFRINGEMENT OF U.S. PATENT NOS. 6,473,554 AND 6,007,209**

## IX. THE ACCUSED PRODUCTS

43. For ease of reference, in this report I collectively refer to Enplas's accused products, systems, and/or services as "Accused Lens Products."

44. Accused Lens Products refers to Enplas lenses model numbers: #9830, #9845, #9849, #9853A, #9854D, #9854E, and #9879. I understand from counsel that these lenses belong to a family of lenses referred to as the "Light Enhancer Cap" or "LE-Cap" product family. I also understand from counsel, SSC, the infringement contentions served in this case, and supporting documents that each of these lenses were found in televisions purchased in the United States.

45. I understand from counsel that the Accused Lens Products are lenses that are specifically designed for use with light-emitting diodes ("LEDs") in backlighting television displays. The LEDs used in back-lighting are very bright and without some type of shielding would create bright spots on a television display. The Accused Lens Products redirect the light emitted by the LEDs laterally. The Accused Lens Products redirect the LED light through a combination of refraction, Fresnel reflection, and total internal reflection.

46. SSC removed light bars and lenses from the televisions discussed above and had them sent to Breault Research Organization, Inc. ("BRO") for analysis. BRO is an ISO certified optical engineering services and software company located in Tucson, Arizona. BRO uses its own proprietary software, such as ASAP®, for illumination and imagining performance simulations. ASAP® is an unconstrained, non-sequential ray-tracing program for modeling physical optics, stray light, imaging, and illumination systems. I understand that it is used worldwide. I have met with Dr. Kevin Garcia, the Chief Technology Officer of BRO, to discuss the analysis of the lenses and direct further analysis.

47. To analyze the Enplas lenses, BRO performed the following tasks. First, BRO visually inspected the lenses on the LED light bars as well as

individual lenses. For lenses attached to light bars, BRO examined the lenses microscopically, photographed the lenses, and noted the position of the lenses on the light bar. BRO also measured the center to center distance between each lens on the light bar and measured the distance from the top of the LED to the bottom of the lens. The distance between the LED top and the optic bottom were measured using Artus Corporation (www.artuscorp.com) color coded shim stock.

48. Second, for each lens BRO had surface profilometry performed by an external contractor and internally by BRO personnel in order to create a quantified representation of each of the lenses' surfaces for use in its optical simulation software. Specifically, BRO contracted with Advanced Coordinate Technology ("ACT") in Denver, Colorado (http://www.actdenver.com/) to measure the surface profile of the convex top, bottom cavity, and periodic structure for each of the lenses using a Nikon LK V HA (High Accuracy) Bridge Coordinate Measuring Machine ("CMM") with a Renishaw TP20, Standard Force, 0.05 mm stylus. This CMM uses a micro-stylus to calculate points every 0.05mm on the surface of the lenses. The method to achieve the profile measurement involved aligning the stylus to a planar surface on the optic and then orienting the alignment to one of the three lobes around the optic's outside edge. The CMM scanned a profile along a planar section to establish alignment. The point measurement spacing was adjusted and the CMM scanned the profile along the optic's cross sections in orthogonal directions. After the scan the software compensated the touch points from the center of the stylus to the surface. The results were reported as coordinate pairs of radial and sagittal displacement. BRO also measured the surface profiles of certain test optics at the BRO facility using a point source microscope prior to measurements of the optics at ACT. These measurements were used to corroborate the ACT measurements.

49. The figure below shows one of the Enplas lenses being analyzed using ACT's CMM.



Additional dimensional measurements of the optics were performed with Mitutoyo Digital Calipers (Model Number CD-S8"CP and Model Number C-6"CP).

50. BRO also contracted the J.A. Woollam Company, Inc. (http://www.jawoollam.com/) to measure the refractive index of a sampling of the lenses using reflective ellipsometry with an M-2000 Focused Beam Spectroscopic Ellipsometer. These measurements established that the lenses had a refractive index of approximately 1.49 consistent with the material being in the acrylic family, and most likely being polymethyl methacrylate (PMMA). (*See* Exhibit S.) Several of the optical surfaces have roughened surface features. The roughened surface features were matched against Standex Engraving Corporation's Mold-Tech's Visual Texture Master Plaques. This information was later used to create appropriate surface roughness models for the simulation.

51. BRO entered the CMM surface profile measurements from ACT into the ASAP optical simulation software and fitted the coordinate pair data to a series of piecewise 20th order polynomials in order to construct computer models of each lenses' top and inner cavity surfaces. The top and inner cavity surface profile fits

had sub-micron maximum error departure from data and even smaller RMS deviations. BRO used the ACT measurements of the bottom periodic structure to construct in software an arrayed model of the periodic structure. BRO also incorporated other surface dimensions measured in the laboratory by BRO and ACT. The refractive index of material was modeled as PMMA based on the reflective ellipsometry data. Roughened surfaces of the optics were simulated with models from ASAP's scatter library of bi-directional scattering distribution functions (BSDF). These models are measured data of Mold-Tech's Visual Texture Master Plaques fit to a Harvey-Shack BSDF equation and matching the texture of the roughened optical surfaces references. In ASAP, the surfaces of the models were configured for Fresnel reflection and refraction calculations on specular and roughened surfaces as required for a wide variety of simulations. The light sources were simulated as simple ray, ray fan, or an extended Lambertian emitter to represent an LED depending upon the simulation requirement.

52. A ray trace is a vector representation of the propagation of light as a series of lines (vectors) normal to the wave front of a point source. Sources of light in optical and illumination systems are simulated by a series of lines or rays representing light propagation from one optical element surface to another. A ray trace involves intersecting the ray with a surface. Appropriate optical transformations such as refraction and reflection are applied at surface interfaces having a different refractive index thereby changing the direction of the ray. The top convex portion of the optical element was simulated as a rotationally symmetric polynomial surface curve fitted to the coordinate measured data. The bottom center concave portion of the illumination optic was also simulated as a rotationally symmetric polynomial surface curve fitted to the coordinate measured data.

## X. <u>SUMMARY OF ISSUES AND CONCLUSION</u>

53. In the sections and subsections of my report, I cite to non-exclusive supporting evidence. Given that the asserted claims in the patent-in-suit involve several identical or substantially identical claim elements, the cited evidence has cross applicability. For brevity, this report does not repeat all cites across the identical or substantially identical claim elements. However, all cited evidence for a particular claim element (or similar claim element), naturally has cross-applicability, even if not expressly noted.

## XI. Claims of the '554 Patent

54. As explained in detail below, the Enplas Accused Lens Products as sold, imported, and used meet the limitations of the claims 1, 2, 6, 30, 31, 33-37 of the '554 Patent. These asserted claims read as follows:

> 1. An illumination device, comprising:
>
> a waveguide having an illumination coupler embedded in an interior region of said waveguide, said illumination coupler adapted to receive light from a point source within said interior region, and to direct light between generally parallel top and bottom surfaces outside said interior region, said illumination coupler comprising a refractive index interface which is inclined relative to at least one of said top and bottom surfaces said interface being configured to reflect light rays emitted by the point source which propagate along a line that forms less than the critical angle of total internal reflection with respect to a line lying in one of said top and bottom surfaces, such that light rays which would otherwise pass out of said waveguide are captured for propagation between said top and bottom surfaces.
>
> 2. The illumination device of claim 1, wherein said illumination coupler comprises a surface configured for total internal reflection of light incident thereon.
>
> 6. The illumination device of claim 1, wherein the waveguide and illumination coupler are integrally formed from a single piece of material.
>
> 30. An optical apparatus, comprising:
>
> a light emitting diode (LED);
>
> an optical element having top and bottom opposing sides and an edge extending between the top and bottom opposing sides, said LED mounted at a predetermined location beneath a central portion of said optical element such that light from the LED enters the optical element, said optical element including a TIR surface spaced from said bottom side and extending from a point above the LED outwardly towards said edges, said TIR surface positioned to receive light emitted by the LED, said TIR

surface curving towards the LED so as to form a cusp above the LED, the curving TIR surface totally internally reflecting light rays such that reflected light rays propagate from the TIR surface towards the edge of the optical element.

31. The optical apparatus of claim 30, wherein said TIR surface is circularly symmetric.

33. The optical apparatus of claim 30, wherein said TIR surface is leaky such that some light emitted by the LED is transmitted therethrough.

34. The optical apparatus of claim 33, wherein said cusp is contoured to permit leakage of light through said TIR surface.

35. The optical apparatus of claim 34, wherein said cusp is rounded to permit leakage of light through said TIR surface.

36. The optical apparatus of claim 30, wherein said optical element comprises polymeric material.

37. The optical apparatus of claim 36, wherein said optical element comprises material selected from the group comprising acrylic, polycarbonate, and silicone.

### A. Claim 1

55. Based on my analysis, I have concluded that the Enplas Accused Lens Products meets the limitations of claim 1 of the ’554 Patent.

#### a. “An illumination device, comprising”

56. To the extent the preamble is a limitation, it is my opinion that each Enplas Accused Lens Product is an “illumination device.” The bases for this opinion are set forth on page 1 of Exhibit C (#9830); page 1 of Exhibit D (#9845); page 1 of Exhibit E (#9849); page 1 of Exhibit F (#9853A); page 1 of Exhibit G (#9854D); page 1 of Exhibit H (#9854E); and page 1 of Exhibit I (#9879).

#### b. “a waveguide having an illumination coupler embedded in an interior region of said waveguide”

57. It is my opinion that each Enplas Accused Lens Product is “a waveguide having an illumination coupler embedded in an interior region of said waveguide.” The bases for this opinion are set forth on pages 2-6 of Exhibit C (#9830); pages 2-6 of Exhibit D (#9845); pages 2-6 of Exhibit E (#9849); pages 2-

page 7 of Exhibit J (#4922 - RCA); page 7 of Exhibit K (#9845 - Panasonic); page 7 of Exhibit L (#9849 - Samsung); page 7 of Exhibit M (#9853A - Sharp); page 7 of Exhibit N (#9854D - Seiki); page 7 of Exhibit O (#9854E - JVC); page 7 of Exhibit P (#9879 - LG); and page 7 of Exhibit Q (#9879 - Sanyo).

## XIII. ADDITIONAL TECHNICAL ANALYSIS

### A. Infringement by Other Enplas Lenses

83. All of the lenses reviewed above have the same general shape including similarly shaped top and bottom indentations as well as generally parallel top and bottom surfaces around the edge of the lenses. All of these lenses were also designed for and ultimately used in direct-type BLUs for backlighting LCD televisions. My analysis herein includes all Enplas lenses for direct backlighting of LCD televisions that I had access to and all demonstrated similar optical properties as reflected in the analysis from BRO.

84. I understand from discussions with Mr. Kyung Hee Ye at SSC that Enplas sells other lenses in the Light Enhancer Cap product family that have the same general shape, including substantially similar shaped top and bottom indentations as well as generally parallel top and bottom surfaces around the edge of the lenses. These lenses are also used in backlighting LCD televisions in a direct-type BLU. I am not aware of any lens Enplas sells in the Light Enhancer Cap product family used for backlighting LCD televisions that does not infringe the ’554 patent claims discussed above. Specifically, in all the lenses reviewed adding the top indentation ensured that the top surface was angled in a way that certain light rays were totally internally reflected that would not have been totally internally reflected if the surface was flat or convex. Similarly, in all the lenses reviewed the bottom indentation refracted light in such a way that light rays struck the top surface at greater angles of incidence than they would have without the bottom indentation.

85. Similarly, all of the Enplas lenses that I reviewed were used to backlight LCD televisions ultimately incorporated into a television that infringed claim 20 of the ’209 patent when operated. These lenses are designed for use in direct-type BLUs that will most likely consist of (1) a cavity with a back wall, side walls, and an aperture; (2) rows of LED light bars with the Enplas lenses arrayed on the back wall of a cavity including LEDs around the perimeter of the cavity; (3) a diffuser film above the aperture, and (4) a brightness enhancing film above the diffuser. I am not aware of any Enplas lenses incorporated into LCD televisions for direct-type backlighting that would not infringe claim 20.

**B. <u>Scope of the ’199 Patent</u>**

86. I have been asked to analyze and compare the claims of U.S. Patent No. 6,647,199 (“the ’199 patent”) in relation to the claims of the ’554 patent. The ’199 patent is a divisional application from application number 08/936,171—the same application that led to the ’554 patent. Thus, the ’199 patent shares the same specification as the ’554 patent but has very different claims. The ’199 patent has two independent claims. Independent claim 1 and its dependent claims 2-10 describe a lighting apparatus consisting of a device that emits light along with an optical cavity with diffusive reflective surfaces and an output region through which light from the cavity passes. ’199 patent at 18:63-67. The light emitting device is positioned so as to be hidden from direct view through the output region. *Id*. at 19:1-3. Independent claim 11 and its dependent claims 12-14 describe a method for illuminating a room using an apparatus similar to that described in claims 1-10. Thus, the claims in my view primarily relate to general lighting. Although the apparatus of claims 1-10 could optionally be used for backlighting a display panel it would not cover direct-type backlighting (where the light emitting devices are not hidden from direct view) or even necessarily edge-type backlighting (where the optical cavity is not formed by diffusive reflective surfaces). Thus, the ’199 patent would have more limited coverage than the claims of the ’554 patent.

Dated: August 28, 2015

By: ------------------------------------------------

Duncan T. Moore___

# EXHIBIT 3

HIGHLY CONFIDENTIAL
VIDEO DEPOSITION
DUNCAN T. MOORE, Ph.D.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

----------------------------------------
ENPLAS DISPLAY DEVICE CORPORATION;
ENPLAS TECH SOLUTIONS, INC.; and
ENPLAS (U.S.A.), INC.,
Plaintiffs and
Counterclaim Defendants,

- vs - Case No.
3:13-CV-05038-NC
SEOUL SEMICONDUCTOR CO., LTD.,

Defendant and
Counterclaim Plaintiff.
----------------------------------------

Video deposition of DUNCAN T. MOORE, Ph.D., taken pursuant to the Federal Rules of Civil Procedure, at the Monroe County Bar Association, 1 West Main Street, Rochester, New York, on October 23, 2015, commencing at 8:54 a.m., before LORI K. BECK, CSR, RDR, CRR, Notary Public.

APPEARANCES: NAGASHIMA & HASHIMOTO,
By MARC R. LABGOLD, ESQ.,
Of Counsel,
12005 Sunrise Valley Drive,
Suite 203,
Reston, Virginia 20191,
(703) 901-8860,
mlabgold@labgoldlaw.com,
Appearing for the Plaintiffs and
Counterclaim Defendants.

LATHAM & WATKINS, LLP,
By RYAN R. OWENS, ESQ.,
650 Town Center Drive, 20th Floor,
Costa Mesa, California 92626-1925,
(714) 540-1235,
ryan.owens@lw.com,
Appearing for the Defendant and
Counterclaim Plaintiff.

PRESENT: KEN WILLIAMSON, AGCV, CCVS,
Videographer

Q. So my point being is that when we look at this TIR surface as you've indicated here in blue on page 22 of Moore Exhibit 16, other than the area which is circled, there is no TIR.

A. That's correct.

Q. Now, the last thing in your infringement opinion, if we could refer back to Moore Exhibit 1 at page 28.

Now, here you seem to conclude that -- well, in paragraph 84, you say:

"I'm not aware of any lens Enplas sells in the Light Enhancer Cap product family used for backlighting LCD televisions that does not" -- "that does not infringe the '554 patent."

Do you see that?

A. Yes.

Q. Other than the lenses that were analyzed in the BRO report, are you aware of any other Enplas lenses?

A. I am not.

Q. What is your basis for saying that other lenses would be infringing?

MR. OWENS: Objection, form.

THE WITNESS: My discussions with Mr. Ye,

HIGHLY CONFIDENTIAL - Duncan T. Moore, Ph.D.

Y-E.

BY MR. LABGOLD:

Q. Are there particular characteristics of those lenses that are common to the ones that you've actually analyzed that can support your broad assertion that a lens you haven't analyzed would be infringing?

MR. OWENS: Objection, form. Can you point to the place where he actually makes that statement?

MR. LABGOLD: Well, this whole thing is "Infringement by Other Enplas Lenses."

THE WITNESS: Line -- it's section 84, approximately line 7. Yes, approximately line 7.

I'm just not aware of any that don't.

BY MR. LABGOLD:

Q. So what's meant by "infringement by other Enplas lenses"?

A. I think it was just to indicate to -- that of all the things we saw, they all infringed of this class of lenses.

Q. Is it intended to include others than the ones specifically identified in paragraph 18 of your report? That's on page 5.

HIGHLY CONFIDENTIAL - Duncan T. Moore, Ph.D.

A. Those are the ones I have -- BRO has modelled for me.

Q. Right, and so I'm saying this section is -- identifies infringement by other Enplas lenses, so I just want to know -- I mean, you make references to the discussion with Mr. Ye, that there's other lenses in the family that have these --

A. Right, and that's --

Q. -- shapes and characteristics.

A. And that's all I know.

Q. And is it your conclusion that if they have the same -- same basic shapes and characteristics, they, too, would be infringing?

A. Probably.

Q. Well -- well --

A. Well, I mean, until --

Q. Let me just clarify. Is it your opinion that they would probably be infringing, or is that probably your opinion?

I'm just clarifying the answer, what the "probably" applies to.

A. Until I actually measure the lenses or have BRO measure the lenses, I cannot sit here and

say, "Yes, they do."
Q. Because subtle changes in the lenses could have significant effects on their performance, correct?
A. If they change the curvatures or the thicknesses or the materials, then we'd have to go back and analyze some of those.
Q. If you look back on paragraph 18, do you know why lens number 4922 was not accused of infringement of the '554 patent?
A. I don't remember. I did at one point, but I don't remember sitting here.
Q. Do you recall whether it has a similar shape to the other ones?
A. I don't remember.
Q. Was there a determination made that the 4922 did not infringe the '554 patent?
A. I don't remember.
MR. LABGOLD: I have no further questions.
MR. OWENS: I don't have any redirect.
(Proceedings of 10/23/15 were then concluded at 11:48 a.m. on DVD Number 2.)

* * *