# Exhibit 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ENPLAS DISPLAY DEVICE CORPORATION; ENPLAS TECH SOLUTIONS, INC.; and ENPLAS (U.S.A.), INC., <br><br>       Plaintiff and Counterclaim Defendants, <br><br>   v. <br><br> SEOUL SEMICONDUCTOR CO., LTD., <br><br>       Defendant and Counterclaim Plaintiff. | CASE NO. 3:13-CV-05038-NC |

**REBUTTAL TO EXPERT REPORT OF CLIFFORD R. POLLOCK
BY DUNCAN T. MOORE**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................1

II.     SUMMARY AND BASIS FOR MY OPINIONS ............................................1

III.    THE '554 PATENT ............................................................................................2

IV.     THE '209 PATENT ............................................................................................3

V.      LEGAL STANDARDS ......................................................................................5

VI.     THE LEVEL OF ORDINARY SKILL IN THE ART....................................6

VII.    GENERAL REMARKS......................................................................................7

VIII.   ANALYSIS – THE '554 PATENT ...................................................................8

        A.      U.S. Patent No. 3,774,021 ("Johnson") ................................................8
                1.      Independent Claim 1 ....................................................................8
                2.      Independent Claim 30 ................................................................15
                3.      Independent Claim 38 ................................................................16
                4.      Obviousness ................................................................................18
        B.      JP56-141304 ("Koito") ........................................................................19
                1.      Independent Claim 1 ..................................................................20
                2.      Independent Claim 30 ................................................................23
                3.      Independent Claim 38 ................................................................25
                4.      Obviousness ................................................................................27
        C.      JP 61-127186 ("Sharp")........................................................................29
                1.      Independent Claim 1 ..................................................................29
                2.      Independent Claim 30 ................................................................32
                3.      Independent Claim 38 ................................................................35
                4.      Obviousness ................................................................................36
        D.      U.S. Pat. No. 4,638,343 ("Althaus")...................................................38
                1.      Independent Claim 1 ..................................................................38
                2.      Independent Claim 30 ................................................................41
                3.      Independent Claim 38 ................................................................44
                4.      Obviousness ................................................................................45
        E.      S63-127161 ("JP '161")........................................................................46
                1.      Independent Claim 1 ..................................................................46
                2.      Independent Claim 30 ................................................................49
                3.      Independent Claim 38 ................................................................51
                4.      Obviousness ................................................................................52
        F.      H06-011365 ("Stanley")........................................................................53
                1.      Independent Claim 1 ..................................................................53

2.      Independent Claim 30 ...................................................................55
3.      Independent Claim 38 ...................................................................57
4.      Obviousness ...................................................................................58
G.      H08-255934 ("Hayashi") ........................................................................59
1.      Independent Claim 1 .....................................................................59
2.      Independent Claim 30 ...................................................................62
3.      Independent Claim 38 ...................................................................65
4.      Obviousness ...................................................................................66
H.      U.S. Patent No. 5,577,493 ("Parkyn") ..................................................67
1.      Independent Claim 1 .....................................................................68
2.      Independent Claim 30 ...................................................................70
3.      Independent Claim 38 ...................................................................71
I.      INDEFINITENESS AND ENABLEMENT .........................................71

IX.     ANALYSIS – THE '209 PATENT ....................................................................74

A.      U.S. Pat. No. 5,684,354 ("Gleckman") ..................................................74
B.      Obviousness ...........................................................................................77

X.      SECONDARY CONSIDERATIONS ................................................................85

XI.     CONCLUSION .................................................................................................86

I.      <u>INTRODUCTION</u>

I have been retained as an expert witness by the law firm of Latham & Watkins on behalf

Seoul Semiconductor, Inc. ("SSC") in the above captioned case.  I submit this report in

compliance with the requirements of Rule 26(a)(2) of the Federal Rules of Civil Procedure.  I

expect to testify at trial regarding matters discussed in this report.

II.     <u>SUMMARY AND BASIS FOR MY OPINIONS</u>

I conclude that the prior art mentioned in the Expert Report of Dr. Clifford R. Pollock

does not invalidate claims 1-4, 6, 30-31, 33-39, 41-43, and 45-48 of U.S. Pat. No. 6,473,554

("the '554 patent"), or claim 20 of U.S. Pat. No. 6,007,209 ("the '209 patent").  In my opinion

the prior art does not contain all the elements or steps of the asserted claims and therefore does

not anticipate any of the claims.  It is also my opinion that the asserted claims would not have

been obvious because the prior art does not disclose all the elements or steps of the claims and

because there is no teaching or motivation to combine the prior-art references, particularly in

view of the secondary considerations of non-obviousness.

Based on my preparation in connection with this matter and my experience in the field of

geometric optics, I have developed an understanding of the subject matter of the patents-in-suit.

Specifically, I have studied the claims, specification, and prosecution history of the patents-in-

suit.  I understand the claims of the patents-in-suit and the subject matter covered by those

claims.  I expect to testify concerning issues pertaining to the subject matter of the patents-in-

suit, the claims of the patents-in-suit, and the prior art, including the art listed by Dr. Pollock in

his report.  I may also provide a tutorial on the background technology relating to the patents-in-

suit during the Court's claim construction hearing.  A copy of my Curriculum Vitae was attached

as Exhibit B to my Expert Report on Infringement.

I have reviewed the documents provided in Dr. Pollock's report.  Because Dr. Pollock's report contains many conclusory statements unaccompanied by detailed analysis, I reserve the right to amend my report based on additional analysis that may be provided by Dr. Pollock.  A list of the documents and materials that I have reviewed in preparing this opinion is attached as Exhibit A.

Based on my review of these documents and materials as well as my experience in the field of optical waveguides, I have developed an understanding of the prior art as it relates to claims 1-4, 6, 30-31, 33-39, 41-43, and 45-48 of the '554 patent, and claim 20 the '209 patent.  I will testify concerning the technology, operation, performance, characteristics, design, architecture, and functions of the prior art as it relates to the claims of the patents-in-suit.

III.   THE '554 PATENT

The '554 patent is titled "Lighting Apparatus Having Low Profile" and issued on October 29, 2002. It discloses a "low profile lighting apparatus that is particularly advantageous for use as a backlight for illuminating a display."  ('554 patent, Abstract.) Generally, the disclosed inventions are designed for use with LEDs. (*Id*. at 13:28-51.)  The lighting apparatus has a curved top surface that forms a cusp above an LED. (Id.) This surface is designed to reflect at least a portion of the light from the LED through total internal reflection (*Id*. at 13:53-15:3.)  The figures below show one embodiment of the '554 patent in the three-quarters and side-view perspectives.



(’554 Patent, Figs. 15, 16.)

The figures above show an embodiment designed to reflect substantially all of the light

emitted by an LED.  Because a cusp region that totally internally reflected all light from an LED

placed below it would create a dark spot, the ’554 patent teaches that the surface can be

contoured “so that a significant portion of the incident light leaks through the surface.”  (*Id.* at

14:58-64.)

IV.    THE ’209 PATENT

The ’209 patent is titled “Light Source for Backlighting” and issued on Dec. 28, 1999.  It

discloses methods for backlighting displays, such as flat panel monitors.  (’209 patent, 1:3-5.)

The disclosed methods are designed to provide uniform illumination across the entire area of the

display. (*Id.* at 1:31-42.)  One embodiment of the ’209 patent, which corresponds to asserted

claim 20, is described as follows:

> The invention also encompasses a method of backlighting a
> display panel comprising the step of producing illumination from a

substantially lambertian light source having a cavity with internal side walls, an internal bottom wall, and an aperture. The producing step comprises the step of directing light rays emitted by plural light sources mounted on the cavity bottom surface and around the perimeter of the aperture into the cavity such that the light exiting the aperture is substantially uniform in intensity and color. The method also includes the steps of using a diffuser to diffuse light from the substantially lambertian light source and using a brightness-enhancing film to concentrate the diffused light into a predetermined angular range without significantly reducing the uniformity of the diffused light, and directing the concentrated, diffused light onto the display panel.

(*Id*. at 2:44-58.)  The figure below shows a side-view and top-down view of one embodiment of the '209 invention.



FIG. 3

Accordingly, one of ordinary skill in the art of the patents in suit would be someone with an undergraduate degree in optical engineering, electrical engineering, or physics with at least three years of relevant experience in optical design for LEDs.

## VII.  GENERAL REMARKS:

The prior art mentioned in Dr. Pollock's Expert Report does not invalidate claims 1-4, 6, 30-31, 33-39, 41-43, and 45-48 of the '554 patent, or claim 20 of the '209 patent.  The analysis section below sets forth my reasoning per prior art reference.   It should be noted however, that throughout his expert report Dr. Pollock trivializes the optical problem being solved by the '554 and '209 patents, frequently asserting that changing the lighting source or shape of the lens would have been obvious.  However, as evidenced by the plethora of patents and scholarly articles in the field of optics, changing a lighting source or structure to be illuminated fundamentally changes the optical problem to be solved.  Dr. Pollock further ignores the evolution of backlighting technology over the years, and applies impermissible hindsight analysis to each prior art reference.

Specifically, with respect to the '554 patent, Dr. Pollock identifies problems that existed in different generations of backlighting displays, and summarily states that it would have been obvious to apply solutions from later generations of backlighting displays, when each of these developments are only apparent in hindsight.  For instance, in earlier generations of backlighting displays, the "white spots" generated by lighting sources was generally ignored, resulting in the traditional dot matrix display.  In later generations, angled TIR surfaces were introduced, resulting in dark spots, which were ineffective for backlighting an LCD or any other display which required adequate uniformity.  In newer generations, the angled TIR surfaces include contoured leakage portions, to remove dark spots and provide a uniform distribution of light.  As

the prior art references cited by Dr. Pollock are earlier generation optical elements, none of the references recognize or address the problem of dark spots.

With respect to the '209 patent, Dr. Pollock similarly ignores the evolution of backlighting displays over the last two decades.  Specifically, there has been a shift in both the type of lighting sources used, as well as the manner these sources are used to illuminate the display.  Previously, cathode fluorescent lamps (CCFLs), external electrode fluorescent lamps (EEFLs), field emitting lamps (FELs), and flat fluorescent lamps (FFLs) were used as backlighting unit light sources.  LEDs began to replace these sources, but did not completely dominate the field until size, energy, and cost advancements increased their utility.  Similarly, the manner in which these lighting sources illuminated the display changed through each successive generation, shifting from fluorescent lamps on the side, to smaller lighting sources on the bottom paired with a myriad of wide diffusion techniques, and back to smaller lighting sources on the side for thinner displays.  The backlighting field continues to evolve to this day, and to assert that the advancement of the next generation should have been obvious in all previous generations, is to apply impermissible hindsight and misrepresent the tremendous amount of effort and design that has resulted through these evolutionary stages.

VIII.   <u>ANALYSIS – THE '554 PATENT</u>

### A.  U.S. Patent No. 3,774,021 ("Johnson")

Johnson does not render any of the claims of the '554 patent invalid.  Johnson discusses an LED module with a dome encapsulant designed for backlighting telephone dials.  This is entirely distinct from the Total Internal Reflection waveguides described in the '554 patent.

#### 1.  Independent Claim 1

Claim 1 of the '554 patent requires "a waveguide having an *illumination coupler* embedded in an interior region of said waveguide."  In his expert report, Dr. Pollock points to the

space into which the diodes and lead frame are embedded as the illumination coupler.  (Exhibit

A of Plaintiffs' Opening Expert Report, at 2.)



(Johnson, Fig. 1.)  (showing the LED with dome encapsulant)

However, encapsulating the LED completely eliminates the need for an illumination

coupler, as the lighting source is integrally formed into the waveguide itself, and thus requires no

"coupling" element.  In each instance where the '554 patent describes the  illumination coupler,

it comprises at a hole, a cavity, or a similar element for connecting or "coupling" the light source

to the waveguide, combined with a curvilinear surface for directing the light waves through the

waveguide.  For example:

> In one embodiment, the illumination coupler includes one or more
> semiconductor light emitting devices.  A portion of the optical
> waveguiding layer has a pair of symmetric (a)  *nonplanar, curved
> surfaces*, or (b) *a plurality of fiat, planar surfaces approximating
> the nonplanar, curved surface.*  The pair of symmetric surfaces
> form a cusp lying on the axis of the one or more semiconductor
> light emitting devices to produce total internal reflection of light
> from the one or more semiconductor light emitting devices into the
> waveguiding layer

('554 Patent,  2:51-61.)

> The illumination coupler of this embodiment is integrally formed with the waveguide from a single piece of transparent material, and the reflecting surface is uncoated. *A point source of light is disposed at least partially, preferably fully, within a cavity* formed in the waveguide adjacent the total internal reflecting surface.

('554 Patent, 3:31-36.)

In Fig. 21 of the '554 Patent, the illumination coupling element is shown as a strip of LEDs being connected or "coupled" to the planar waveguide so as to produce and couple illumination. ('554 Patent, 15:43-45.)  ("The illumination coupling element 136 *produces* and *couples* illumination from LEDs 140 into the waveguide 132.")



('554 Patent, Fig. 21.)

Fig. 24  of the '554 patent shows a cross sectional view of the embodiment shown in Fig. 21, where the illumination coupler is shown as consisting of the bottom lens cavity 90 for insertion of the LED, and a top TIR portion 150 to receive the impingement of light:



*Fig. 24*

('554 Patent, Fig. 24).

As shown in FIG. 24, the illumination coupling element 136 comprises a TIR region 150 having *curvilinear surfaces* 152, 154 similar to surfaces 86 and 88 described above with respect to FIGS. 14 and 15.  The *surfaces 86 and 88 curve toward the LED* 140 to receive impingement of light from the LED 140. The surfaces 86 and 88 are TIR surfaces with respect to such impingement of light. As shown, the surfaces 86, 88 form a cusp directed toward the LED 140 with the LED 140 having an end terminating in alignment with the cusp to direct substantially all light from the LED directly toward and adjacent the cusp.  Later embodiments referencing an illumination coupler discuss the same curvilinear TIR region:

> Upon illumination through the   waveguide 132c and the waveguiding cylinders 302, and  in combination with *illumination couplers, such as a TIR region described above*, the extractive display elements 300 produce a particularly bright, point-like (or line-like) light pattern at the apexes (or vertexes) of the solid polygons.

('554 Patent, 17:20-25) (discussing the curvilinear TIR portion of the illumination coupler)

This curvilinear surface, as opposed to a  rigid v-shaped surface, allows for better coupling of the light into the waveguide, and further allows for adaptation of the coupler to provide for adequate leakiness by altering the shape of the curve as desired.   Additionally, in every embodiment that describes the illumination coupler, the coupler uses the coupling cavity as

a lens, utilizing the refractive index differential between the air gap surrounding the LED, the

LED itself, and the transparent optical coupling agent:

> The illumination coupling element 136 desirably includes a l*ens element* 90 that is integrally formed with the surface of the waveguide that is adjacent to the LED 140. The optical power of the lens element 90 is caused by a refractive index differential between an *air gap* surrounding the LED 140, the LED 140, the transparent optical coupling agent, and the waveguide 132.

('554 Patent, 16:27-33.)

The '554 patent elaborates on how the optical lens element of the illumination coupler

utilizes the air gap between the LED and the waveguide to aid in refraction, and that this lens

element 90 of the illumination coupler may be convex or concave:

> In this embodiment of the waveguide 132, the transparent optical coupling agent and the material of the LED 140 preferably all have an index of refraction of about 1.5.  An *air gap around the LED* 140 defines a volume with a refractive index of about 1.0 to cause refraction of light.  *The lens element 90 may optionally be either convex or concave*.

('554 Patent, 16:33-38.)

Furthermore, in contrast to mere resin molded LED caps, the '554 patent consistently

shows the coupling element as the portion which holds ("couples") the LEDs, which is a

*separate* element from the waveguide itself:



('554 Patent, Fig. 25.)

The '554 patent further elaborates that the coupling element is a distinctly separate element from the waveguide body when it states that the coupling element may be integrally formed with the waveguide, or modularly inserted into a hole or recess within the waveguide. ('554 Patent, 16:63-66)  ("The coupling element 148 may either be integrally formed with the waveguide 132a or it may be modularly inserted 65 into a corresponding hole or recess in the waveguide 132a so that light is injected through the sides of the hole and perpendicular thereto.")

To be clear, when the '554 patent discusses integrally forming the coupling element with the waveguide, it is not contemplating an encapsulant molded around an LED, but rather the coupling element which holds the LED being integrally formed with the waveguide.

> For a modular configuration, LEDs 140 are desirably first mounted onto the coupling element 148 and then the coupling element 148 is inserted into the hole or recess in the waveguide…*If the coupling element 148 is integrally formed in the waveguide 132a, the LEDs 140 are inserted directly into the hole or recess in the waveguide.*

('554 Patent, 16:63-17:9.)

Dr. Pollock recognizes this need for a bottom lens element and reflection surface in his invalidity analysis for the prior art references JP '161 and Koito:



(Koito, Fig. 2.) (annotations added, showing the bottom lens and top reflective portion identified by Dr. Pollock)



(Exhibit E of Dr. Pollock's Expert Report, at 2) (citing JP '161, Fig. 7) (annotations added by Dr. Pollock, pointing to bottom cavity as part of the illumination coupler)

In Johnson however, and in any of the other resin molded prior art references cited by Dr. Pollock, there is no bottom coupling element.  Thus, as Johnson discloses an LED module with a dome encapsulant, which requires no coupling element due to the LED being integrally formed within the waveguide, Johnson does not anticipate claim 1 of the '554 patent, or any subsequent dependent claims.

14

2.   Independent Claim 30

Johnson further does not anticipate claim 30 or any subsequent dependent claims of the '554 patent.  Claim 30 of the '554 patent requires, among other things, an LED, an optical element, and "said LED mounted at a predetermined location *beneath* a central portion of said optical elements such that light from the LED enters the optical element."  As the optical element in Johnson is merely an encapsulant molded around the LED (and not a separate lens above the LED), the LED cannot be "mounted at a predetermined location *beneath* a central portion of said optical elements."  This is apparent in Exhibit A of  Dr. Pollock's Expert Report, where he attempts to draw a red line straight through the center of the waveguide itself:



(Johnson, Fig. 1.) (annotations added showing LED mounted inside the optical element)

An LED being beneath an optical element, rather than  molded into the element, is important when dealing with very bright (and thus hot) LEDs that are used for LCD backlighting.  Furthermore, as evidenced above and emphasized below, Johnson fails to disclose the LED mounted beneath a  *central* portion of the optical element:



Central Portion

(Johnson, Fig. 1.) (annotations added showing LED mounted *off-center* of the optical element)

The LEDs disclosed in Johnson are instead positioned off-center, to direct light into the parabolic curves of the top surface.  Thus, as Johnson discloses an LED module integrally formed inside the waveguide itself, and positioned off center, Johnson does not anticipate claim 30 of the '554 patent, or any subsequent dependent claims.

3.   Independent Claim 38

Johnson does not anticipate claim 38 or any subsequent dependent claims of the '554 patent.  Claim 38 of the '554 patent requires:

An optical apparatus, comprising:

a light emitting diode (LED);

an optical element positioned to receive light from the light emitting diode, element comprised of a refractive index interface having a curved shape that is symmetrical about an axis and converges to a location in a central portion of the optical element, said location and said light emitting diode lying substantially on said axis, said interface being shaped and positioned relative to said LED to reflect a substantial portion of light from said LED in a direction transverse to said axis.

16

As discussed above, and emphasized below, Johnson does not have "said light emitting diode lying substantially on said axis," as the LEDs are mounted off center, to direct light into the focal point of the parabolic curves:



(Johnson, Fig. 1.) (annotations added showing LED mounted *off-center* of the central axis)

Johnson further fails to disclose "said interface being shaped and positioned relative to said LED to reflect a **substantial** portion of light from said LED in a direction transverse to said axis."  Instead, Johnson is designed to reflect *all* light into the waveguide, clarifying that the light ray escaping the top central portion is a miniscule amount that is the result of a less than perfect molding technique due to "fabrication considerations."  (Johnson, 2:32-37.)  Johnson further details how to ensure that *all* light is captured inside the waveguide, stating that such a result is possible by:

> ensuring that *all* rays, emanating from the light emitting element, strike the top edge of the light guide, where it interfaces with the internally reflecting dome of the light emitting element, at an angle greater than the critical angle and are thereby reflected on the first pass.

(Johnson, 3:37-42.)

Thus, as Johnson discloses an LED positioned *off center* inside an optical device specifically designed to reflect *all* light, Johnson does not anticipate claim 38 of the '554 patent, or any subsequent dependent claims.

### 4.   Obviousness

With regard to obviousness, Dr. Pollock's report fails to provide analysis for why claim 38 of the '554 patent would have been obvious in light of the additional prior art.  Instead, Dr. Pollock summarily concludes that each reference is directed towards "a lighting apparatus for directing light," while ignoring the fundamentally different purposes and physical structures of each reference.  (Exhibit A of Dr. Pollock's Expert Report, at 37-44.)

Specifically, Stanley, Hayasha, and Althaus merely disclose resin molded LED caps, which do not capture light inside a waveguide, but rather just emit (or receive in the case of Althaus) light around the circumference of the optical device.  Koito similarly fails to disclose a waveguide, whereby the light is captured for propagation, but also fails to even disclose an optical apparatus designed to work with an LED (and instead discloses a lighting system for incandescent bulbs, such as stage lighting):



(Koito, Figs. 4, 5, 7, 8.)

Furthermore, Johnson teaches away from combining these references (to place the LED substantially on the axis of the refractive index interface), as the invention is specifically concerned with *eliminating* the light lost through the central portion, and thus the LED is intentionally shifted off axis to direct like into the focal point of the parabolic reflectors, rather than letting it escape through the central indentation.  (*See, e.g*., Johnson, Fig. 1.)

Thus, as none of Dr. Pollock's cited obviousness references actually disclose a waveguide, and Johnson in fact teaches away from centrally located LEDs, a person of ordinary skill in the art would not have been motivated to create the invention of claim 38 of the '554 patent based upon this combination of references.

### B.  JP56-141304 ("Koito")

Koito does not render any of the claims of the '554 patent invalid.  Koito discusses a light filter that is disposed inside a device and placed between a light source within that device and the member of the device to be lighted.

19

Koito however, as discussed above in the obviousness analysis for Johnson, is specifically

designed for use with incandescent bulbs, and fails to disclose any LED:



(Koito, Figs. 4, 5, 7, 8.)

Koito further fails to disclose "said interface being shaped and positioned relative to said

LED to reflect a ***substantial*** portion of light from said LED in a direction transverse to said

axis," instead disclosing that the device "mostly totally reflects" the light laterally.  (Koito, at 1.)

As Koito is not designed, nor concerned about eliminating dark spots, due to being completely

unrelated to LCD backlighting, Koito is not designed to allow a portion of the light through the

refractive index interface, and is instead designed to reflect most, if not all of the light emitted by

the light source.  For this reason, Dr. Pollock is similarly unable to point to any disclosure of a

contoured or rounded cusp to permit leakage of light, as required by claims 42 and 43 of the '554

patent.

Thus, because Koito does not disclose an LED, or a refractive index interface being

shaped and positioned relative to said LED to reflect a ***substantial*** portion of light from said

LED in a direction transverse to said axis, Koito does not anticipate claim 38 of the '554 patent, or any subsequent claims.

### 4.   Obviousness

With regard to obviousness, Dr. Pollock's report fails to provide analysis for why claim 30, 38, or any subsequent dependent claims of the '554 patent would have been obvious in light of the additional prior art.  Instead, Dr. Pollock summarily concludes that each reference is directed towards "a lighting apparatus for directing light," while ignoring the fundamentally different purposes and physical structures of each reference.  (Exhibit B of Dr. Pollock's Expert Report, at 17-20.)  Specifically, Althaus, Hayashi, Stanley, and Johnson don't disclose a separate lens at all, but rather a shaped epoxy molding around an LED.  None of these references teach or suggest a *waveguide* wholly separate from an LED, and in fact many of the references directly teach various methods for molding the resin cap *directly* onto the LED, in no way suggesting a separate waveguide.  Parkyn is even more dissimilar, disclosing an apparatus which requires multiple lenses for the required diffusion, and thus clearly not teaching or suggesting a single waveguide accomplishing this task.

As discussed above, it is clear that Koito is directed towards solving diffusion problems occurring from traditional incandescent bulbs.  The luminosity distribution pattern and required lens shape for a traditional incandescent bulb results in a vastly dissimilar diffusion problem than the much smaller point source of an LED:

 

Koito fails to teach, in any way, how one would change the optical configuration to work with a fundamentally different light source, particularly an LED.  Furthermore, as indicated in the figures above, incandescent bulbs do not have the same narrow angular illumination range as LEDs, which is why Koito doesn't recognize the problem of dark spots in TIR surfaces.  This dark spot problem is particularly important to overcome when creating a backlighting unit for LCDs, as dark and bright spots are readily apparent on the viewing screen if not properly eliminated.  Thus, to assert that it would have been obvious to combine references to overcome this non-existent problem, would be to apply impermissible hind-sight.

Additionally, to assert that a lighting source can be arbitrarily changed in an invention specifically designed for that light source is to fundamentally misunderstand or misrepresent the optical dynamics involved, and nowhere in the Koito reference does the patent teach or suggest this is the case.  Therefore, a person of ordinary skill in the art would not have been motivated to create the invention of claims 30,  38, or any subsequent dependent claim of the '554 patent based upon this combination of references.

**translucent member 4, not the light without being reflected at all since emitting from the light emitting diode**.

('JP 161 at 6.)

Furthermore, JP '161 does not disclose or discuss the problem of dark spots.  The dark spot problem is particularly important to overcome when creating a backlighting unit for LCDs, as dark and bright spots are readily apparent on the viewing screen if not properly eliminated.  To assert that these other prior art references could have been combined to overcome a problem that is not even recognized or discussed in the JP '161 specification, or any of the prior art,  is to apply impermissible hindsight.  Therefore, a person of ordinary skill in the art would not have been motivated to create the invention of claim 30 of the '554 patent based upon this combination of references.

### F.   H06-011365 ("Stanley")

Stanley does not render any claims of the '554 patent invalid.  Similar to Johnson, Sharp, and Althaus, Stanley discusses an encapsulated LED molded within a resin lens.  This is entirely distinct from the Total Internal Reflection waveguides described in the '554 patent.

#### 1.   Independent Claim 1

As mentioned above when discussing Johnson, claim 1 of the '554 patent requires "a waveguide having an *illumination coupler* embedded in an interior region of said waveguide."  Additionally, as discussed above in the Johnson analysis, this illumination coupler is comprised of a curvilinear TIR surface for reflecting the light into the waveguide, and a cavity portion acting as a lens for refracting the light into the waveguide.  These combined coupling elements work to "couple" the light in a novel manner that solved many of the light uniformity problems previously encountered in this field.  In his expert report, Dr. Pollock merely cites the resin

molding around the LED as evidence of an illumination coupler, essentially reading out this limitation of the claim, as the waveguide itself becomes the coupler:



(Exhibit F of Plaintiffs' Opening Expert Report, at 2-3.) (showing a resin lens molded directly around the LED)

However, as discussed above in the Johnson analysis, encapsulating the LED completely eliminates the need for an illumination coupler, as the lighting source is integrally formed into the waveguide itself, and thus requires no "coupling" element.  Thus, as Stanley discloses an LED module within an encapsulant, which requires no coupling element due to the LED being integrally formed within the waveguide, Stanley does not anticipate claim 1 of the '554 patent, or any subsequent dependent claims.

Furthermore, as discussed above in the Koito analysis section, claim 1 also requires a waveguide with *generally parallel top and bottom surfaces* for the specific purpose of reflecting light such that it is *captured for propagation between said top and bottom surfaces*.  Stanley however, does not disclose these *generally parallel top and bottom surfaces*, and Dr. Pollock did not point to any such surface in his report or accompanying exhibits.  As Stanley discloses a lens which cuts off almost immediately after the curved top portion, the top portion of the lens being anything but parallel with the bottom portion:

54



【図2】

(Stanley, Fig. 2.) (annotations added, showing lack of generally parallel top and bottom surfaces)

Furthermore, as the optical element disclosed in Stanley cuts off almost immediately after the angled surface, Stanley fails to disclose a *waveguide* at all,  as the light is not captured inside for propagation, but is instead allowed to exit the lens after the initial reflection.  Thus, as Stanley fails to disclose an illumination coupler, or a *waveguide* with *generally parallel top and bottom surfaces* such that light is *captured for propagation between said top and bottom surfaces*, Stanley does not anticipate claim 1 of the '554 patent, or any subsequent dependent claims.

2.   Independent Claim 30

Stanley does not invalidate claim 30 or any subsequent dependent claims of the '554 patent.  As discussed during the analysis of Johnson, claim 30 of the '554 patent requires, among other things, an LED, an optical element, and "said LED mounted at a predetermined location *beneath* a central portion of said optical elements such that light from the LED enters the optical element."  As the optical element in Stanley is merely an encapsulant molded around the LED (and not a separate lens above the LED), the LED cannot be "mounted at a predetermined location *beneath* a central portion of said optical elements."

This is apparent in Exhibit F of  Dr. Pollock's Expert Report, where he fails to point to *any* disclosure of an LED mounted at a predetermined location *beneath* a central portion of said optical elements, instead merely pointing to the resin molding around the lens:



(Stanley, Fig. 2.) (annotations added, showing the LED mounted inside the optical element, not *beneath* the optical element)

Thus, as Stanley fails to disclose an LED "mounted at a predetermined location *beneath* a central portion of said optical element,"  Stanley does not anticipate claim 1 of the '554 patent, or any subsequent dependent claims.

With regards to dependent claim 33, Dr. Pollock fails to point to any disclosure of a TIR surface that is "leaky such that some light emitted by the LED is transmitted therethrough."  In fact, the portions of the Stanley specification cited in Dr. Pollock's invalidity chart clearly state that the LED does not radiate light through the roof via any leakage, but is designed specifically to reflect all light around the circumference of the lens.  (Exhibit F of Dr. Pollock's Expert Report, at 45) (citing Stanley, at [0012]) ("As constructed, the light emitting diode 1 according to the present device irradiates light in all *circumferential* directions.")

Furthermore, with regards to dependent claims 34 and 35, Dr. Pollock fails to point to any disclosure of a contoured or rounded cusp, to permit the leakage of light through a TIR

surface.  As discussed above, my understanding is that the Court has construed a cusp to mean "an area where two curves meet."  Due to Stanley failing to disclose any leakage whatsoever, Stanley clearly fails to disclose a contoured or rounded cusp to facilitate such leakage.

Even if Stanley disclosed leakage, which it does not,  the area where the two curves meet above the LED is never disclosed as being contoured or rounded, to permit the leakage of light:



(Stanley Fig. 2.) (annotations added, showing the area where the two curves meet is not contoured or rounded to permit leakage of light)

### 3.   Independent Claim 38

Stanley does not anticipate claim 38 or any subsequent dependent claims of the '554 patent.  As discussed above in Johnson and subsequent references, claim 38 of the '554 patent requires, among other things, a refractive index interface "being shaped and positioned relative to said LED to reflect a ***substantial*** portion of light from said LED in a direction transverse to said axis."  As discussed above in the analysis for claim 33, Stanley is designed to reflect *all* light laterally, not just a substantial portion.  (Exhibit F of Dr. Pollock's Expert Report, at 45) (citing Stanley, at [0012]) ("As constructed, the light emitting diode 1 according to the present device irradiates light in *all circumferential* directions.")  Similar to Johnson and the previous

references, Stanley is not concerned with the appearance of dark spots and is designed to reflect *all* light laterally.

Thus, as Stanley does not disclose a refractive index interface "being shaped and positioned relative to said LED to reflect a ***substantial*** portion of light from said LED in a direction transverse to said axis," Stanley does not anticipate claim 38 of the '554 patent, or any subsequent claims.  Furthermore, with regards to dependent claim 42 and 43 of the '554 patent, Stanley fails to disclose the refractive index interface containing a cusp which is contoured or rounded as explained above in the claim 30 and dependent claim analysis.

### 4.   Obviousness

With regard to obviousness, Dr. Pollock's report fails to provide analysis for why claims 4, 33-35, 37, 42 and 43 of the '554 patent would have been obvious in light of the additional prior art.  Instead, Dr. Pollock summarily concludes that each reference is directed towards "a lighting apparatus for directing light," while ignoring the fundamentally different purposes and physical structures of each reference.  (Exhibit F of Dr. Pollock's Expert Report, at 46-73.)  As mentioned in previous sections, the Johnson, Koito, Hayashi, and Rohm reference do not disclose a separate lens at all, but rather a shaped epoxy molding around an LED.  None of these references teach or suggest a waveguide wholly separate from an LED, and in fact many of the references directly teach various methods for molding the resin cap *directly* onto the LED, in no way suggesting a separate waveguide.  Parkyn is even more dissimilar, disclosing an apparatus which requires multiple lenses for the required diffusion, and thus clearly not teaching or suggesting a single waveguide accomplishing this task.

With respect to display elements on top or bottom surfaces, or a leaky TIR surface, Stanley actually teaches away from said display elements or any leaky TIR portion, even stating that the invention is particularly for "radiating light to all peripheries in a *horizontal* direction."

(Stanley, Industrial Application.)  Furthermore, as Stanley is directed towards horizontal light direction, it does not disclose or discuss the problem of dark spots.  This dark spot problem is particularly important to overcome when creating a backlighting unit for LCDs, as dark and bright spots are readily apparent on the viewing screen if not properly eliminated.  To assert that these other prior art references could have been combined to overcome a problem that is not even recognized or discussed in the Stanley specification, or any of the other prior art references,  is to apply impermissible hindsight.

Therefore, a person of ordinary skill in the art would not have been motivated to create the invention of claims 30 and 38 of the '554 patent, or subsequent dependent claims, based upon this combination of references.

### G.  H08-255934 ("Hayashi")

Hayashi does not render any claims of the '554 patent invalid.  Similar to Johnson, Sharp, Althaus, and Stanley, Hayashi discusses an encapsulated LED molded within a resin lens. This is entirely distinct from the Total Internal Reflection waveguides described in the '554 patent.

#### 1.   Independent Claim 1

As mentioned above when discussing Johnson, claim 1 of the '554 patent requires "a waveguide having an *illumination coupler* embedded in an interior region of said waveguide." Additionally, as discussed above in the Johnson analysis, this illumination coupler is comprised of a curvilinear TIR surface for reflecting the light into the waveguide, and a cavity portion acting as a lens for refracting the light into the waveguide.  These combined coupling elements work to "couple" the light in a novel manner that solved many of the light uniformity problems previously encountered in this field.  In his expert report, Dr. Pollock merely cites the resin molding around the LED as evidence of an illumination coupler, essentially reading out this limitation of the claim, as the waveguide itself becomes the coupler:

XI.    <u>CONCLUSION</u>

The conclusions  rendered in this report could be modified at a later date if new, relevant information were obtained during the discovery process or at trial.  In addition, the opinions rendered in this report could be modified following the Court's claim construction hearing or other proceedings interpreting any claims discussed in this report.  I also may be asked to respond to opinions or issues raised by other experts.  I reserve the right to amend this report under such conditions or other appropriate circumstances.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 7, 2015

By: _____

Duncan T. Moore

**Exhibit A**

I have reviewed and relied on the following documents in my expert report:

1) U.S. Patent No. 6,007,209

2) Prosecution History for U.S. Patent No. 6,007,209

3) U.S. Patent No. 6,473,554

4) Prosecution History for U.S. Patent No. 6,473,554

5) Plaintiffs' ("Enplas") Invalidity Contentions Pursuant to Local Patent Rules 3-3 and 3-4

6) Exhibits A-M to Plaintiffs' Invalidity Contentions Pursuant to Local Patent Rules 3-3 and 3-4

7) August 28, 2015 Expert Report of Clifford R. Pollock, Ph.D.

8) Exhibits A-N to the August 28, 2015 Expert Report of Clifford R. Pollock, Ph.D.

9) All prior art cited and relied upon in the August 28, 2015 Expert Report of Clifford R. Pollock, Ph.D.

10) Teledyne licensing and purchase agreements. (SSC0044367-SSC0044429.)

11) June 11, 2015 Deposition of Takeshi Murano.

12) Optical Analysis of the 9830 lens. (SSC0045477.)

13) Enplas Financial Reports. (SSC0043266-SSC0044149.)