**Volume 1**

**Pages 1 - 132**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

ENPLAS DISPLAY DEVICE        )
CORPORATION; ENPLAS TECH     )
SOLUTIONS, INC.;  and ENPLAS )
(U.S.A.), INC.,              )
                            )
          Plaintiffs,        )
                            )
  VS.                        )        **NO. C 13-5038 NC**
                            )
SEOUL SEMICONDUCTOR CO., LTD., )
                            )
          Defendant.         )
                            )

San Francisco, California
Monday, March 14, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

NAGASHIMA & HASHIMOTO
12005 Sunrise Valley Drive - Suite 203
Reston, Virginia  20191
**BY:  MARC R. LABGOLD, ATTORNEY AT LAW**
**PATRICK J. HOEFFNER, ATTORNEY AT LAW**

SHAW KELLER LLP
300 Delaware Avenue - Suite 1120
Wilmington, Delaware  19801
**BY:  JOHN W. SHAW, ATTORNEY AT LAW**
**JEFFREY T. CASTELLANO, ATTORNEY AT LAW**
**ANDREW E. RUSSELL, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    Rhonda Aquilina, CSR No. 9956, RMR, CRR
                    Official Reporters

**APPEARANCES**:    (CONTINUED)

For Defendant:

                        LATHAM & WATKINS
                        555 Eleventh Street, N.W. - Suite 1000
                        Washington, D.C.   20004
                   BY:  **LAWRENCE J. GOTTS, ATTORNEY AT LAW**

                        LATHAM & WATKINS LLP
                        650 Town Center Drive - 20th Floor
                        Costa Mesa, California   92626
                   BY:  **RYAN R. OWENS, ATTORNEY AT LAW**

                        LATHAM & WATKINS LLP
                        140 Scott Drive
                        Menlo Park, California 94025
                   BY:  **MICHELLE P. WOODHOUSE, ATTORNEY AT LAW**

                        LATHAM & WATKINS LLP
                        John Hancock Tower - 27th Floor
                        200 Clarendon Street
                        Boston, Massachusetts  02116
                   BY:  **CHARLES H. SANDERS, ATTORNEY AT LAW**


Also Present:          **Takaaki Nagashima**
                       **Yukihiko Ohnuki**
                       **Jennifer Jonak**
                       **Kibum Nam**
                       **Yudae Han**

**I N D E X**

Monday, March 14, 2016 - Volume 1

|                                | PAGE | VOL. |
|--------------------------------|------|------|
| Jury Voir Dire                 | 45   | 1    |
| Preliminary Jury Instructions  | 102  | 1    |

Monday - March 14, 2016                              9:35 a.m.

**P R O C E E D I N G S**

---oOo---

(Proceedings were heard out of presence of prospective jurors:)

THE COURT:  Welcome to trial.  Let's get appearances by all of our counsel, and we'll talk about some logistics and prepare for our jurors entry into the courtroom.

MR. LABGOLD:  Good morning, Your Honor.  Marc Labgold from Nagashima & Hashimoto representing EDD.

THE COURT:  Good morning.  And introduce all your team, please.

MR. LABGOLD:  Yes.  I have with me Mr. Shaw.

THE COURT:  Good morning.

MR. SHAW:  Good morning, Your Honor.

MR. LABGOLD:  Mr. Hoeffner.

MR. HOEFFNER:  Good morning.

THE COURT:  Good morning.

MR. LABGOLD:  Mr. Castellano.

MR. CASTELLANO:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. LABGOLD:  And Mr. Russell.

MR. RUSSELL:  Good morning, Your Honor.

THE COURT:  Good morning, all.

MR. LABGOLD:  Thank you.

THE COURT:  And any client representatives in the

audience that I should --

MR. LABGOLD: Yes, I'd like to introduce --

THE COURT: Why don't you --

MR. LABGOLD: Mr. Nagashima is present. Sorry about that.

Mr. Nagashima.

THE COURT: Good morning, Mr. Nagashima.

MR. LABGOLD: And then Mr. Ohnuki is a representative of the client.

THE COURT: Good morning. Welcome.

All right. And on the Seoul Semiconductor side. Good morning.

MR. GOTTS: Good morning. Larry Gotts for Seoul Semiconductor. With me today are Ryan Owens.

THE COURT: Good morning.

MR. OWENS: Good morning.

MR. GOTTS: Charles Sanders.

MR. SANDERS: Good morning, Your Honor.

THE COURT: Good morning.

MR. GOTTS: Bradley Hyde.

MR. HYDE: Good morning, Your Honor.

THE COURT: Good morning.

MR. GOTTS: Michelle Woodhouse.

THE COURT: Good morning.

MR. GOTTS: We also have Jenny Jonak from the Jonak

Law Group, who is present, Your Honor.

THE COURT:  Good morning.

MR. GOTTS:  And for the client, we have Dr. Nam, the client representative.

THE COURT:  Good morning, Dr. Nam.  Welcome.

MR. GOTTS:  And Mr. Yudae Han, who's in-house counsel for Seoul Semiconductor.

And just so you know, we have Chris Schmoller who is our hot-seat guy, our tech guy.

THE COURT:  Good morning.  Welcome.

MR. GOTTS:  Thank you.  I think I've got everybody, Your Honor.

THE COURT:  All right.  And so let's talk about some logistics.  I see you've got us wired into the 21st Century here with screens and video setup.  Thank you for doing that in advance, and thank you for introducing the tech team because they are going to be a very important participant in our trial.

I will rely upon you to work together to make it all work since I don't know how it's all working now.  And if there are problems, as often occur with technology as we go along, we'll be patient and work through the issues, and always plan to have a plan B in case the plan A does not work out.  We'll try to use -- at all times -- use our jurors' time efficiently, and that includes if there's a technology problem, that we find a way forward quickly and keep on moving forward.

Are there any technology issues that you know of now? Any problems with the way things are working?

MR. GOTTS: No problem, Your Honor. We were -- and I think counsel agrees -- we were thinking of asking the jurors to not use the first two seats only because they might be blocked by the podium from the screen. So we just were hoping we could shift the jurors over by one seat, if that's okay with Your Honor.

THE COURT: And are there any presentation issues for the *voir dire* stage, or you're saying that's for the opening statements and beyond?

MR. GOTTS: That would be for openings and for trial, opening statements and trial.

THE COURT: That does make sense. As you -- the challenges are being able to see the screen and making sure things are blown up enough so that they can see the screen from far across.

Now, will they be able to see on their monitors the same information that's on the screen?

MR. LABGOLD: Yes, Your Honor.

MR. GOTTS: Yes, Your Honor.

THE COURT: All right. So that is very helpful and thank you for setting that up.

The consequence of moving away is they're a little farther from the witness, but the advantage of that can be, if the

podium is roughly where it is now, they can see both witness and counsel asking the questions.

So that's something we'll discuss with them, and it may depend in part on their preference in seeing it on the small screen versus the big screen and their interest in seeing the witness.

How are we for -- so that's a good suggestion, and we'll sort of discuss that with the jurors once they're selected.

How are we on interpretation needs?  Have we got interpreters ready to go, and will you be using them during the *voir dire* stage at all?

**MR. LABGOLD:**  No need during *voir dire*.

**MR. GOTTS:**  That's right.  No, Your Honor.

**THE COURT:**  All right.  And then for witnesses starting tomorrow, you've got them in place and ready to go, no controversies or disputes about who's doing it and when?

**MR. LABGOLD:**  No controversy.

**MR. GOTTS:**  No, Your Honor.

**MR. LABGOLD:**  That's all been arranged.

**THE COURT:**  And has the technology for that been tested by you at all?

**MR. LABGOLD:**  The only technology is hopefully they don't, like, lose their voice.

**THE COURT:**  Well, we --

**MR. LABGOLD:**  We'll just have to -- the one thing I

would ask, all kidding aside, is that we're going to need to kind of figure out how to position because most of the time the interpreter likes to be, you know, proximal to the witness.

THE COURT: So we've used a wireless set up before at times for the translation. Now, if we have multiple interpretations going on at the same time -- one of the questions is: Are we going to have multiple language interpretations simultaneously? If not, it's much less complicated.

MR. LABGOLD: No. It will be -- if it's a witness that's speaking in Korean, they'll give their answer and then we'll hear the answer but not simultaneous.

THE COURT: All right. We had a trial here last week. We put two chairs at the witness stand together with the interpreter wanting to be very close to the witness, so we can try that or something a little bit different.

MR. LABGOLD: That should work well.

THE COURT: And we can experiment, after the jury has been selected, with how to do that.

We have two court reporters, Jo Ann Bryce and Rhonda Aquilina, who will be working with us. Thank you for your assistance.

Particularly during the phases that are being translated, it's very important for me and everyone to go slowly enough so that it be both translated and reported accurately.

One other -- just jumping around a little bit on logistics, I don't know if I reminded you of the -- we have more attorneys than judges here, so unless I'm going to call for a judicial backup to assist me, which I'm not planning to, we have a one-attorney-objecting-at-a-time rule for each side. So whoever is doing the examination of a witness or doing the cross-examination of a witness, that's the attorney who is designated for the objections.

So even if you feel very passionately that there should be an objection, pass your note to the person who's in that role, and they will do the objection so that we don't have a record of 10 people at a time objecting and the court reporter trying to write down who is saying what simultaneously.

MR. LABGOLD:  Thank you, Your Honor.

THE COURT:  Any objection?

MR. GOTTS:  No objection, Your Honor.  A question.

THE COURT:  Yes.

MR. GOTTS:  And maybe Your Honor is going to address that, but with regard to objections where we don't want to speak in front of the jury, what's Your Honor's procedure on sidebar and your thoughts and preferences in that regard?

THE COURT:  Good question.  My thoughts are that I prefer not to have sidebars, and that I will do what I can to avoid having a sidebar because from a juror perspective, they don't know what we're doing or why we're doing it, and it's

using their time when they would all like to be doing something else with their time.

So one of the reasons we're talking now is so we can anticipate objections that might come up with witnesses; and if we can't resolve them outside the presence of the jury before or after, then we may have some discussion in front of the jury.

I'm going to have a strong preference against having a sidebar during examination if it's something that could have been brought up before the examination or could be brought up after the examination.  And so if someone requests a sidebar, my very likely response will be to defer that until an upcoming break.

We will have breaks because there are potential for juror questions.  So at the conclusion of an examination, I'm going to take at least a few-minute break for everyone to stretch their legs; and during that time period, if there is some issue that needed to be addressed outside the presence of the jury, that will be a time we can bring it up.

That means that our court reporters don't get a break if we're having a discussion during every break, and so that's a problem too.  So I want to be sensitive to their needs.  The conclusion is, if there's something we know is going to be an issue before a witness takes the stand, let's bring it up then. That's my preference.

If we have to have a sidebar, then I will call for one, but you should not expect that if it could have been brought up ahead of time and was not that I'm going to be enthusiastic about it.

Does that answer your question?

MR. GOTTS:  Yes.  Thank you, Your Honor.

THE COURT:  Very well.

And if we have them, of course, we have to have the court reporter able to hear it but the jury not, and that's part of the reason not to have them, is that the set up for that is not great.  We've got some equipment over here.  We will -- you know, very likely what I'll do is I'll excuse the jury if we had to have a sidebar and just have it in open court with them in their jury room.

Let's talk about our -- yes, Mr. Labgold?

MR. LABGOLD:  In that regard, if we have a situation, just so I know the Court's preference, if, for example, the question, let's say it's hearsay, do you want us to just voice "Objection" without stating the basis and wait for you to ask what the basis is?

THE COURT:  Good question.  If you have an objection, my preference would be that you stand and object and say "Objection" and the basis of your objection, not with a complete argument of all the 10 reasons supporting the objection unless I ask for further explanation as to

elaboration of the reasons.

MR. LABGOLD: Okay.

THE COURT: So object and the reasons for it; and ordinarily I will make a ruling on the spot as to whether the objection is sustained or overruled; and if a response from the other side is needed, I will look at the other side to invite that, and I may say that I'd like to have a further response.

It's not impermissible to have some colloquy in front of the jury about objections, but it just is a waste of time to have a lot. So that's the objective, is to minimize the amount of objecting that goes on in front of the jury.

MR. LABGOLD: Thank you, Your Honor.

THE COURT: We have 39 jurors who have responded to the summons and have either completed the questionnaire at this point or are almost finished with the questionnaire, and those are being copied by you I know, and you'll be quickly reviewing them.

I have excused one juror for cause this morning who reported that she had a medical appointment at 11:00 o'clock, and it was for something requiring surgery. So with that information, I excused her for cause without her appearing in the courtroom. So I think that moves down to 38, which should be more than sufficient, I believe, for us to get a jury of eight.

A reminder that -- or not a reminder, but we'll seat them

back row to front row, and then across the front, and then probably into the second row of the courtroom. You don't yet have the order that they're coming in, but we will assign them a number as they come in, and they'll be seated in that order.

It's the first eight jurors who are sort of, quote/unquote, in the box. So if there were no either for cause or peremptory challenges to the first eight jurors identified, those will be the eight jurors in the trial. And you should keep that in mind as you make your determinations of both your questions and your for-cause strikes, at least to focus on the first eight and then after that.

I anticipate that I will probably question the first 20 jurors first, so we'll sort of put our attention on the first 20, and we'll see if we're able to pick a jury out of the first 20, meaning we will ask -- you'll have the questionnaires for all 38, but you will not have an opportunity to examine the next 18 unless we go through 20 and it's not enough jurors.

My prognostication, based on the type of cases, is that we can pick a jury from 20, but I'll know a little more after we read the questionnaires to see if they express some bias or not. So I might modify that estimate once I read the first 20 questionnaires to see if they say something about their inability to be here for the entire two weeks. But that's my plan.

We have a -- just sticking with the topic of jury

selection -- we have a microphone, which we can use.  Most jurors prefer not to use it; and if you can hear okay, we will probably go without the microphone unless someone is soft spoken and needs the help.  Of course, the *voir dire* process is for you.  So if you can't hear what they're saying, please let me know and we'll deploy the microphone to assist that process.

As soon as we have the copies, I'll give you a little bit of time to review them hoping that by 11:00 o'clock, we will begin the -- that will be my rough guess as to when we might start the *voir dire* process.

We'll go through the first 20 jurors with them each doing some short speaking, mostly repetitive of their questionnaire topics.  I will do some additional *voir dire* of each of those 20 jurors, and I'll give each side an opportunity to do about 20 minutes of *voir dire*, again focused on the 20 jurors in the box.  If it turns out that 20 was not sufficient, we'll sort of go through that process again for the next group that fills in.

I expect that we will finish that process before lunch. And, of course, that process ends with each side getting three strikes without cause being required.

We'll take a lunch break, we'll swear in the jurors, I'll give the opening instructions, and then move on to the opening statements.

How long does each side anticipate their opening statements being?

**MR. LABGOLD:**  Your Honor, about 30 minutes.

**MR. GOTTS:**  Probably closer to 45 minutes, Your Honor.

**THE COURT:**  All right.  I think that should give us -- thank you for those estimates -- that should give us time to get them in today, and then we'd start with the first witnesses tomorrow morning at 9:00 a.m.

You may have experienced, and I gave you notice last week, about the lines getting into the building.  They didn't seem too long today.  Fortunately the rain seems to have blown through, so that should aid our logistics of getting the jurors into the building on time during the trial.  So that is a good sign.  And they come in through a separate entrance to assist them getting into and out of the building.

A reminder for the -- both for the witnesses and also for clients who are here.  It's a small building in the sense that there's one lunchroom, and there's not a lot of places for the jury to congregate in the building other than the second floor lunch area.  So it's very important, the jurors don't know all of your clients and witnesses, to stay away from the jurors and not have any inadvertent run-ins coming into the building or on the second floor while coming in.

If you have not discovered the 18th floor attorney lounge already, I recommend that for counsel and clients as a place to congregate when you're not here in court.

Any issues with witness schedules?  You have stipulated

and I have granted your request as far as when you're alerting each other to the order of things.  Any problems with that process so far?

MR. LABGOLD:  Not at all.

MR. GOTTS:  No, Your Honor.

THE COURT:  Very well.  So we'll keep working together on that; and if something comes up, let me know and we'll get it resolved.

I think there was one counsel on the list of counsel who had not been admitted *pro hac vice* last week, and I didn't see one, but it wasn't -- I don't think it's someone who's here before us, so I'll defer that issue and look it up.

You should be prepared to, when the jury comes in, to introduce your trial teams, your client, your client representatives, so that the jury knows who they are.  We do that in part so that we don't have an inadvertent run-in in the lunchroom with someone who they don't appreciate is part of the trial, and also to begin our search for any conflicts that might preclude them from participating in the trial.

I don't want a long corporate history of each party, but you can tell them who you represent and some basic information so that they can be familiar with who they are as well as your law firms and counsel.

If there's -- well, let me ask this:  Are there any attorneys who are participating in the trial who are not here

today?

**MR. LABGOLD:**  Not for us, Your Honor.

**MR. GOTTS:**  No, Your Honor.

**THE COURT:**  All right.  So we don't need to introduce anyone who's not here, but please do introduce your teams for our jury.

Are we ready for the presentation during the preliminary instructions of the Court's patent video?

**MR. GOTTS:**  Yes, Your Honor.  I'm told we do.

**THE COURT:**  All right.  Outstanding.  So you're ready to press "play" at the given moment, and that will be on their small screens as well as the large screen?

All right.  That will be an early test of our courtroom video capability.

And I understand that the parties have agreed by stipulation that you do not want the jury during the deliberation phase at the end to have the court's computer; right?  You're going to use paper copies of the materials?

**MR. LABGOLD:**  That's correct, Your Honor.

**MR. GOTTS:**  Yes, Your Honor.

**THE COURT:**  And there were a number of spreadsheets that were submitted as exhibits that were at one point part of what the jury was going to consider.  Are you still going to be presenting those to the jury; and if so, what format are they going to be shown?

**MR. LABGOLD:** What we've agreed is that if they -- if a spreadsheet is shown, whatever they're shown and the testimony refers to, a screen shot of that so they'll have the relevant information that actually forms the evidentiary record and not the rest of it.

**THE COURT:** Not the rest of it. So if it's shown here in court, you're going to have a screen shot of -- you'll have a paper copy of that to give to the jury?

**MR. LABGOLD:** Yeah. We'll have to -- you know, with the Court's indulgence, we'll have to figure out a mechanism. The tech people will catch the screen capture in court, and then we'll -- we can move those in, as a mechanical matter, either at the end of the day or the beginning of the next day.

**THE COURT:** That sounds good. My deputy keeps a running scorecard of things that are in evidence; but for examples like that where there's one page of a multiple-page exhibit and we don't want to take the time to keep going over Bates numbers, I will rely upon the parties. Especially this is an area where there should not be disagreement as to what was shown, you keep track and we can sort of check with each other as the trial goes along to make sure that there's no dispute as to what was shown.

**MR. LABGOLD:** Absolutely.

**THE COURT:** At the end, of course, it's very important that we have agreement as to what was shown and what the jury

is going to consider.  So I'll put the burden on the parties in the first place to keep track of what you want the jury to see, and to -- there's always a rush at the end, but to make sure that we're only giving them the things that are in evidence and not things that are not in evidence.

There's also, I forgot, along with the patent video an exhibit of the model patent, is that something that we --

MR. GOTTS:  I thought that was attached to Your Honor's preliminary instructions, if I'm not mistaken, but I --

THE COURT:  All right.  I've got to dig that out, so I'll find that.

MR. GOTTS:  If not, I'm sure we can find it, but we need to go get it.

THE COURT:  Let me check.  I'll look for that.

All right.  Our schedule is unchanged from my perspective. Wednesday we're going to be dark while I'm down in San Jose, otherwise we are clear and good to go for this courtroom for the trial.

Any other scheduling issues?

MR. LABGOLD:  No, Your Honor.

MR. GOTTS:  Sort of, Your Honor.  The -- and I think both sides have discussed this issue, and this relates to the timing of objections.  I know the process, because we're here in San Francisco rather than San Jose, was we were doing that

earlier so that we can get the objections to Your Honor; but it does create a bit of a logistic problem with regard to Thursday morning and Monday morning because we're dark on Wednesday. And I may not exactly have this right, so somebody will correct me.

But the parties were hoping that Your Honor could -- the Court could hear any objections Thursday morning for Thursday since we won't be here on Wednesday.  We'll be exchanging our objections on Wednesday night, if I have that right.  And, likewise, we have sort of the same problem with Monday since, you know, the night before is Sunday.  So --

THE COURT:  When on Wednesday are you making objections?

MR. GOTTS:  Do you know?

(Counsel conferring.)

MR. GOTTS:  Maybe Ms. Woodhouse ought to handle this because she's got the logistics down better than I have.

THE COURT:  Ms. Woodhouse, you have the floor.

MS. WOODHOUSE:  Thank you, Your Honor.

So our schedule for exchanging objections is we're identifying witnesses two days before.  So if, for example, a witness to be disclosed or to testify on Thursday would be disclosed Tuesday night, we're providing objections to those demonstratives and exhibits the following morning at 9:00 a.m. So that would be on Wednesday morning.

**THE COURT:** To each other?

**MS. WOODHOUSE:** Correct.

**THE COURT:** All right.

**MR. LABGOLD:** And then that allows us to bring up any issue with the Court that afternoon that would be coming up the following morning.

**MS. WOODHOUSE:** Correct.

**MR. GOTTS:** And you were mentioning Sunday as well.

**MS. WOODHOUSE:** And we actually have discussed this, Your Honor, and we thought that if this was something you would prefer, that we could argue them in San Jose or try and do them on the telephone on Wednesday, but we still come to the question about what to do on Monday.

**THE COURT:** Very good. Let's take it one day at a time. Let's -- just give me a moment to...

(Pause in proceedings.)

**THE COURT:** All right. I would say let's tentatively plan for a 4:00 o'clock phone call on Wednesday to talk about objections that would be relevant to Thursday.

Now, if you want to drive to San Jose to see me in person, I can't preclude you from doing so. That's a lot of transportation and logistics that I don't think are necessary, but it's your money. So if you want to come to San Jose, that's where I'll be. If you want to participate by phone, that, I think, will be totally fine.

**MR. LABGOLD:**  Thank you, Your Honor.  I think telephonically would be preferable for all.

**MS. WOODHOUSE:**  Yeah.  Thank you, Your Honor.

**MR. LABGOLD:**  Thank you for the invitation.

**THE COURT:**  Very good.  In the public interest as well to avoid more traffic on the freeway in between.

All right.  So that will be our plan.  We can talk -- we'll talk more end of Tuesday about, you know, what we contemplate for that, but let's figure that in.

And as to Monday, same thing.  Let's talk later and wait to see the volume of objections and see how things are getting resolved.

There's several categories of objections I want to take up now, and there might be more issues that you want to discuss, and that is primarily what I view as being Enplas' objections to some of the translations of Seoul documents -- Seoul Semiconductor documents.

And I don't know if these objections are ones that are made as a place keeper kind of waiting to see what actually is going to be presented to the jury, or if they're ones that we need to resolve right now.  But when it comes to translations into Korean or Japanese, I am very poorly positioned to resolve a dispute about what a character means, and so it's going to be impossible for me to resolve an objection like that live in front of the jury.

So that's a category that, if we haven't resolved by now, we need to get it resolved and the parties need to work together to get it resolved. So tell me the status of that.

MR. LABGOLD: With regard to some of them that have been the more pressing, obviously there are documents on each party's list that are there because they know they're going to use them and other ones they might have to use. So the ones that are the more pressing we've actually had some replacements -- I think that's one or two of them -- and so it's been agreed upon between the parties which version will be used.

We'll continue in that fashion. At this point I don't think that there's any that are imminent, but --

THE COURT: All right. And from the Seoul Semiconductor side?

MS. WOODHOUSE: I think we agree with that, and we'll continue to meet and confer and work with them.

THE COURT: All right. So that will be a category where I do expect you to meet and confer and to resolve it, because, you know -- and I want to be fair to both parties, of course, but if it's a situation where everyone's objecting to everyone else's translations, then I'll just exclude all the exhibits because I can't resolve that type of an objection.

I'd be happy to exclude -- I'd be happy to consider the objection if it's made ahead of time and we can get an expert

witness to testify as to what it means, but we're not going to have time for that.

MR. LABGOLD:  And, Your Honor, to the extent there is a problem in that regard, I think at this point there's -- I think there's one or two documents where we might be submitting an alternate translation for consideration; but to the extent that there's a difference --

THE COURT:  How am I going to solve that?

MR. LABGOLD:  To the other side for meet and confer.

And then to the extent that there's an issue, what I would suggest is that -- I realize the Court can't resolve it, and neither can I effectively since I don't read either of those languages.  So typically what we've done in the past is just the party has to address it with the witness and with the witness referring to the native-language document giving their testimony as to what they believe it is.  And if it's -- obviously this is a witness who's seen this document before. So if they wrote the document, they're in the best position to be able to say what it is they wrote from both parties' perspective, and it's then up to the official court interpreter to translate their language.  And to the extent that there's any conflict between what's written and what's said, we kind of have to -- we'll work through it.

THE COURT:  And there is, of course, an instruction to the jury about their consideration of official translations,

and it's a possibility that one or more of our jurors will speak one of the languages that are being spoken that is not English.  So we'll know more about that once we've gone through the *voir dire* process to see if that's a consideration as well.

MR. LABGOLD:  I don't see that as being one of our biggest issues.

THE COURT:  All right.

MR. LABGOLD:  Hopefully it will be nonexistent.

THE COURT:  Very good.  That will be super.

All right.  Then why don't you each tell me what you think are the biggest issues, what are issues we might resolve on matters of law that have not been resolved yet.

MR. LABGOLD:  We have issues that will be coming up in the opening.  Both parties have objections that I believe we're at the point now we've met and conferred as much as possible, and I think, you know, the remaining issues will have to be resolved.

There's some slides, and we just got an answer with regard to a couple of the titles, and we don't have a problem with changing the titles.

There's one slide that there's a problem, from their perspective, that we don't believe exists, but --

THE COURT:  I'm sorry to interrupt.  These are concerns with showing of exhibits that are objected to, or demonstrative arguments that there's objection to, or both?

**MR. LABGOLD:** In our case, it's -- well, it's a little bit bigger because last night when we got their opening statement, included in the 77-page opening statement slide deck and then demonstratives Mr. Moore has put in new evidence that we haven't seen before and which is not in -- excuse me, Dr. Moore -- that was not in his expert report, and it goes to some of the exact same issues which were addressed in the *Daubert* motion, at his deposition, in his second expert report, in the supplemental report.

And now last night for the first time we're seeing new ray trace composites and other data that's been deleted, although the witness has defended that it should -- they're issues put before the Court, was that there was nothing wrong with it, that it was fine and that the declarations justifying it and the Court kept it in.

But now we're finding ourselves on the eve of trial having to deal with yet again another changed expert position, and so this is significant enough that we filed a motion to strike because this is new information as it's presented that is not in his expert report, and it changes.  It changes the overall lay of the land for reasons that we've objected to in the beginning of his report, and it changes the strategy.

At this point in time I don't know what he's going to say because we've argued what his -- what was wrong with his position.  What came back is that there was nothing wrong with

that when we both in the context of *Daubert* and motion to strike and now during the meet and confer -- which I did not participate in, but my colleagues can address it -- basically is, "Well, it's not a problem because in one form or another this has been presented, and so it's just kind of mix and match and so we can present it that way."

But this is presented in a way that is not what he's said before.  One of the issues, Your Honor might recall, was that in this -- we had the issue with regard to the overall shape and whether the profilometry was correct, and that's what resulted in Dr. Moore putting in the replacement report.

One of the other things that we were objecting to was the gap between the lens and the LED, and we said that that was not accurate, didn't reflect the products and so, therefore, that should have been excluded.

And the third category was with respect to the LED because the LEDs were -- all had a circle that was 2.5 millimeters in diameter, and it necessitated that it was at that size because he had measurements which were 1.25 off center.

So, by mathematical calculation, although I'm not the best at math, I even get that one right.  In order to take a 1.25 measurement, it has to be 2.5.  At his deposition he had identified that, "Well, we just ran these numbers and that's fine."  And, you know, he didn't, you know, consider whether or not it existed in the actual device.

**THE COURT:**  All right.  In the interest of time, let me stop you there.

So you object to the use in opening statement of what you assert to be new opinions from Dr. Moore?

**MR. LABGOLD:**  Yes.

**THE COURT:**  Let me hear from SSC as to --

**MR. GOTTS:**  Thank you, Your Honor.  Mr. Owens will handle this issue.

**MR. OWENS:**  Your Honor, this is briefly --

**THE COURT:**  Come up.

**MR. OWENS:**  Do you want me to come up here?

**THE COURT:**  Yes, please.

And just for all parties to know, the microphones are helpful for a few reasons.  One, when the jury is here, for the jury to hear; also for our court reporter to hear; and it is transmitted other places in the building, so people are listening in and they want to be able to hear what you have to say.

**MR. OWENS:**  Great.

So, Your Honor, we're revisiting an issue that we've discussed several times.  We had a declaration that was submitted with our response to their *Daubert* report where Professor Moore explained that he had BRO do ray traces at certain diameters.  You may recall this at a 2.0 diameter, 2.2, and 2.5.  And the reports that BRO did had the ray traces at

all of those diameters separately, and those are in BRO reports they're not objecting to.  Those will get into evidence.

For those, they -- there's a composite of all three of them that shows the ranges from 2.0 to 2.5, and that's what he included in his actual exhibits to his expert report.

But in his declaration, he explained that he selected that range from 2.0 to 2.5 so he could account for any range of LED, and that's in his declaration.  They sought to strike that, and we discussed this at length at the December 9th hearing.

Mr. Gotts explained that he selected that range so that he could account for any type of LED, and then we have that data in BRO so that we could decide if we wanted an LED less than 2.5, that we could just show that data.

THE COURT:  Sorry to interrupt.  When is Dr. Moore going to testify?

MR. OWENS:  He is going to testify possibly the end of tomorrow or Thursday.  He'd finish on Thursday.

THE COURT:  All right.  I'm going to be instructing the jury multiple times that what the attorneys say is not evidence, and that they'll be determining the case based on the evidence that's presented to them.  So I am not going to strike your -- without having seen your deck, I'm not going to strike it ahead of time because if you say something that is excluded from the case, then the jury will note the difference between what you expected the evidence will show -- and that's what an

opening statement is -- and what actually is in evidence.

So as of the moment, that objection is overruled, and I'll consider it further before Dr. Moore's testimony whether I want to say something more about what's going to come.

MR. OWENS:  Thank you, Your Honor.

THE COURT:  Mr. Labgold, are there any further issues concerning the opening statements and *voir dire*, just focusing on that phase of the case, that I need to take up?

MR. SHAW:  Your Honor, while Mr. Labgold is looking at that question, will you take cause questions for jurors at the end of the *voir dire* questioning?

THE COURT:  We will -- yes.  We will take a break, give the jurors -- give them a break, and then we'll discuss the for cause.

MR. SHAW:  Thank you, Your Honor.

THE COURT:  Again, for the first 20.

MR. SHAW:  Yes.

MR. GOTTS:  Your Honor, should we be responding to this motion to strike, or do you want to do this on the record at some point?

THE COURT:  On the record at some point.

MR. GOTTS:  Okay.

THE COURT:  But that's my ruling for today.  I've overruled the objection to their concerns about opening statement.

MR. GOTTS:  Right.  I think we're going to see the same objection again in Dr. Moore's papers.

THE COURT:  And I'll give you an opportunity to respond to it.

MR. GOTTS:  Thank you, Your Honor.

MR. LABGOLD:  With regard to the -- I'm sorry.  I'll approach.

THE COURT:  Yes.

MR. LABGOLD:  With regard to the remaining objections, they are all going to fall into a similar type of category where it's new issues that haven't been disclosed or new positions that have not been disclosed.  Some of them are actually a new position, one of which I think is more pressing than others because it kind of taints the story.

With regard to their -- they're going to present a timeline, and in the timeline they're going to talk about the interaction between the two parties.  And at a certain point in the timeline, they are now taking a position that Enplas had shorted SSC on supply and collaborates with SSC's competitors, and this is a theory that has never even been in the case.

It doesn't have to do with the issue of infringement.  You can't prove infringement because somebody didn't sell you something if you shorted the supply, and this is clearly just prejudicial information.  Obviously it doesn't go to the validity either.

So the underlying -- the overarching issues, which the jury's here to decide, this is a brand new accusation that EDD -- and I don't have a copy of the slide, but can I hand you up mine?

THE COURT:  You both seem to have copies of the slides, which I don't have.  That makes it a little challenging to rule on things which you possess and I do not.  So if you have copies.

MR. LABGOLD:  If I can hand that up.

THE COURT:  Please do.

MR. GOTTS:  Your Honor, with all due respect, we have a corrected set which has already addressed this.

THE COURT:  I will accept your corrected set.

MR. GOTTS:  Okay.

MR. LABGOLD:  Has this issue been addressed?

MR. GOTTS:  May I approach?

THE COURT:  You may.  And as far as approaching goes, everybody can approach witnesses without asking as long as you're being friendly to them.

MR. GOTTS:  Thank you.

THE COURT:  Lily, I'm going to pass this back.

MR. GOTTS:  Maybe we can pull that up, Your Honor.  It might be easier if you want to see --

THE COURT:  No.  I'm not going to resolve it here.

MR. GOTTS:  We changed the language on that slide,

Your Honor.  I don't have my copy now, but we did change the language.

THE COURT:  All right.

MR. LABGOLD:  Now we may all be in the dark.  So the slide that I was looking at was, for example, 1025.

MR. GOTTS:  Yeah.  We had indicated, Your Honor, last night that we were going to change that, which we did do, but I don't know that they've seen the corrected deck yet.

THE COURT:  All right.  They can --

MR. LABGOLD:  We have not.

THE COURT:  Get a copy for them.

All right.  Any other of your highest priority issues, Mr. Labgold?

MR. LABGOLD:  Two other -- two other issues.  We have the issue on the admissibility of whether there's someone who can talk about the purchases in the U.S.

THE COURT:  Yes.

MR. LABGOLD:  And they're putting in -- there are several slides in the deck that basically state where exactly these purchases were made.  And, for example, if you look at their Slide Number 34, there's a nice color picture which shows which TV, which model.

THE COURT:  My version is now black on that slide.

MR. GOTTS:  Yes, Your Honor.  Again, I think that we -- we want to argue that point.  We've pulled that for

purposes of having something to do if we have a dispute.

Mr. Sanders can argue the objection, but we should -- can we pull the actual slide so that the judge can see what it looks like?

MR. LABGOLD:  Before the --

MR. GOTTS:  It's that slide, Your Honor.

Here we go.  It's on the screen now.

MR. LABGOLD:  So our position is that before they should be -- the jury should be hearing that they bought this TV and where they bought it and which TV and such, they can make the statement that the evidence will show that the televisions were bought, and then they can -- then we'll go through the process as normal.

But this seems to me getting the information all the way down the path that whether they get it in or not, the jury will already know that where allegedly these TVs came from.

THE COURT:  It is just going to be allegedly because something shown on a slide is not evidence, and I will tell the jury that.

MR. LABGOLD:  Okay.

THE COURT:  From both sides, the fact that you put it in an opening slide does not make it a fact.

MR. LABGOLD:  And the last issue is that there's an animation, which goes to a -- kind of a morphing of what's shown in the patent to what's in our product, and there is no

evidence that will be presented that there was a product that looked like something in the patent and that my client changed theirs to its current form.

The purpose of the video, I'm assuming, is to say, "This is the patent and this is what leaky TIR looks like with a rounded cusp," but it is misleading in laying the premise that it started off as one product and goes to the other.  And they can simply make the argument that this is what's shown in the patent.

THE COURT:  Where is this animation?

MR. GOTTS:  We can pull it up, Your Honor.

(Pause in proceedings.)

MR. GOTTS:  Here we go, Your Honor.  That's it.

MR. LABGOLD:  And, again, there's nothing in the patent that shows the resulting figure with that soft depression.  It starts off with a figure that is what's seen in the patent with a cusp, and we believe it's prejudicial and misleading because it seems to say that this is what the patent's teaching, and the patent doesn't have that teaching nor does our product morph from one to the other.

THE COURT:  All right.  What's the response on that?

MR. GOTTS:  So, Your Honor --

THE COURT:  Where does the animation come from on the record?

MR. GOTTS:  Okay.  The animation is something that

Dr. Pelka is going to explain as what he understands his invention to be.  In the context of leaky TIR, what the patent tells you is that -- if you go back to --

THE COURT:  Was the animation in his initial report?  Was it in his deposition?

MR. GOTTS:  He's the inventor, Your Honor, and this is talking about his invention.

THE COURT:  Yeah, but when was it created?

MR. GOTTS:  It was created as a demonstrative for trial, Your Honor.

THE COURT:  All right.  It's excluded.  In the category of surprise, that's excluded.

MR. LABGOLD:  And --

MR. GOTTS:  Your Honor, can I -- can I -- there might be -- this is not -- this is the inventor talking about his invention in his patent.  It is not -- it was no surprises.  It's the inventor himself.

THE COURT:  If it's a new animation that's been disclosed on the eve of trial that's illustrative of what his invention is, it's a surprise; and if it was disclosed back at the time of his report, that would be --

MR. GOTTS:  That's my point.  He didn't do a report, Your Honor.

THE COURT:  -- or earlier in the case, earlier than today.  Then the other party has a chance to respond to it and

create their own animation, but animations that are made at this phase that are of material -- you know, it's the patent.

MR. GOTTS: But, Your Honor, the agreement between the parties was animations would be exchanged last night. This was no surprise. That was the actual stipulation.

THE COURT: They were exchanged, but there was an objection to it. All right. So now we have to -- I assume it was exchanged on time, but there's an objection to it, and the objection is that it's not something that was in -- that's in -- it's not in the patent; right? I mean, the animation itself is a demonstrative being made, and it's an important demonstrative.

MR. GOTTS: So I assume, Your Honor, we can still use other nonanimated demonstratives; is that right?

THE COURT: Yes. I'm not excluding all animation, but this one, given the significance of that animation and the importance of that witness and this testimony, I'm going to exclude it.

MR. GOTTS: Okay. Thank you, Your Honor.

MR. LABGOLD: Thank you, Your Honor.

In that regard, since this will head something off, as you recall, they were moving to make sure that I didn't try to use Dr. Pelka as an expert, and that you -- I don't want to mischaracterize the Court's ruling; I'm not doing that for the record -- but in general terms, which we were planning

absolutely to abide by, is that he's an inventor.  He can talk about his patent.  He can talk about what's disclosed in his patent or any of the patents that he's actually an author -- I mean, that's his work -- as long as we have foundational evidence just like it would be in any fact witness, but that he's not to be here offering opinions.

And with regard to -- the animation was one, but they have additional evidence that's going to come up where we believe it's him acting as an expert; and as the inventor, it's one of those situations where if we can't ask him the expert questions, then -- and we didn't want to -- we clearly want both sides to have to abide by that.

THE COURT:  Well, yes.

MR. GOTTS:  Your Honor, we fully intend to abide by that.  Dr. Pelka's testimony, just so Your Honor understands, is going to be that he first came up with this pointed full TIR-type lens; and in the context of some work that he did on behalf of a client of his where he needed leaky TIR to resolve dark spots, he rounded that contour.  And he will have demonstrative evidence explaining what that is, but it's not expert testimony.

And Your Honor's order of March 7th says expressly, "The inventor can explain how he developed the claimed invention," and that's precisely what these demonstratives go to, Your Honor.

THE COURT:  All right.  I want to give Seoul Semiconductor a chance to raise any legal issues that you think I should be resolving because I want to get our jurors in here.

MR. GOTTS:  Yeah, I understand, Your Honor.

I guess we do -- we would like a clarification.  We're okay with the rest of the demonstratives other than the animation; is that right?

THE COURT:  I didn't hear an objection to anything else.

MR. GOTTS:  Okay.  Thank you, Your Honor.

The only other objection we have is one that relates to -- I think they fixed the titles, so I think we have a remaining objection, Your Honor, to Enplas' Slide Number 7.

THE COURT:  And can I get a copy of Enplas'?

MR. GOTTS:  Yes.  I'm going to give it to Your Honor.

THE COURT:  Thank you.

MR. GOTTS:  Here it is, Your Honor.

And this is new evidence.  We've never seen this before either, Your Honor, and we've been told -- I think I've got this right -- it doesn't reflect any Enplas product.  It's got a problem with, first of all, the characterization is argumentative in terms of what this lens is.  This lens is nothing that's in the case.  It's not an accused product, and we think it's inappropriate for opening statement and, frankly, inappropriate for any witness.

We've been very strongly held to the accused products in this case, and now to be having products that are not accused come in from Enplas we think would be inappropriate.

THE COURT:  All right.  Let me ask Enplas what the purpose of that slide is.

MR. LABGOLD:  The purpose of the slide is twofold. One is to let them see what a ray trace of the type that Enplas runs looks like, and that this represents the way that the ray trace runs.

This figure actually is -- half of it was already in the tutorial along with the two -- almost every picture that was in here, pictures of lenses that we've already resolved the issue on.  These are the same pictures that were in the tutorial, and it's basically just to explain to the jury what they're going to see and what it's going to look like, and this is demonstrative and just how the lens works.

MR. GOTTS:  So, Your Honor, first of all, the tutorial is not evidence and it's not in the expert report.  And they have all sorts of ray tracings in their expert report they could have picked out and used.  They didn't have to create something new here.  This is the same sort of surprise issue, Your Honor, that -- I don't know why we're seeing this now.

THE COURT:  I agree.  So I'm not precluding you from showing ray tracings, and I think ray tracings were in reports, and you can come up with one to show the jury, but let's use

one that's been -- is going to be in evidence rather than a new demonstrative.

MR. LABGOLD: Absolutely, Your Honor.

THE COURT: So for the same reasons that the Pelka animation is excluded, I will exclude this from opening statements.

MR. LABGOLD: Thank you, Your Honor.

MR. GOTTS: Thank you, Your Honor.

THE COURT: All right. I want to take a break now and see if we have our questionnaires and give you a chance to review them.

There were some fact stipulations, which I think the parties gave me, and I wasn't able to find them in ECF this morning. So just some homework to do in the next half hour, if you can dig those out and think about when you want -- it's not going to be during the *voir dire* stage -- you know, when you want me to share them with the jury. Is it going to be at the beginning --

MR. GOTTS: That was one of my questions, Your Honor.

THE COURT: -- is it in the middle, is it going to be at the end? Just think about when you want to -- if we do it all at once, would it make more sense to do it in parts? Just some things to think about.

All right. We'll come back at 11:00 o'clock. And if you can give me copies of the questionnaires as soon as you have

them, we'll resume.  Thank you.

MR. LABGOLD:  Thank you, Your Honor.

(Recess taken at 10:25 a.m.)

(Proceedings resumed at 12:12 p.m.)

(Proceedings were heard out of presence of the jury:)

THE COURT:  Good afternoon now.  Please be seated.  On the record.  Jurors are not present.  We've received the questionnaire.  Both parties have a copy of it, and the jurors will be here in a moment.

I have the following jurors identified as among those that I find to strike for cause without speaking to them.  I'm going to read you their names now and see if you have any objections to striking them for cause.

This is not intended to be the exclusive list of for-cause strikes, it's the ones identified in my first pass-through.  And I'll entertain from you additional for-cause strikes later, but I wanted to get these jurors out of the way first just to avoid the time that might be necessary to question them.

So they are Gary Fralick, Jessica Dilley, D-I-L-L-E-Y, David MacDonald, Sarah Elizabeth Lynn, Wei He, H-E, Christian Pienkny, P-I-E-N-K-N-Y, and Wilber Omar Castro, C-A-S-T-R-O.  Each of those jurors expressed hardship to participate in the trial during the period that has been specified, except for Juror Pienkny, who expressed bias in favor of one party to the case, and expressed it repeatedly in a way that I think further

examination is not necessary.

For SSC, any objection to the for-cause strikes that I have suggested?

**MR. GOTTS:** No, your Honor.

**THE COURT:** And for Enplas, any objection to the for-cause strikes that I suggested?

**MR. LABGOLD:** No, your Honor.

**THE COURT:** All right. So we will not call -- if those jurors come into the courtroom, we're not going to call them up into the seats to be examined, so I will not ask them any questions. When we get to the first break, I will likely excuse them in addition to any others that are going to be excused at the same time.

So we will seat them -- my deputy will seat them, skipping by those we're not calling, and we will still put them in the same order. I may refer to the jurors by number, because I have a list of them by number. You don't have the same list, so I'm not trying to confuse you by doing that. The order that they will be seated will be the order of priority, so the first juror in the first seat will be -- kind of go 1 through 8 that way (indicating).

All right. I think let's bring them down.

(Proceedings were heard in the presence of the prospective jury panel:)

Counsel, while you're standing, I'm going to call 16 in

the box first.  Now that I've excused them for cause we've cut a little closer, so we'll question 16 jurors first.

(Jurors enter courtroom.)

JURY VOIR DIRE

**THE COURT:**  Welcome, ladies and gentlemen.  We're here for the jury selection in the case of Enplas Display Device Corporation versus Seoul Semiconductor Corporation Limited.

My name is Nathanael Cousins.  I am a magistrate judge here in the Northern District of California, and this is my courtroom.  Thank you very much for your patience and being here already for many hours this morning.  I know you've come, some of you, through rain in the morning, there's a time change to deal with, and today is traditionally the day for completion of basketball pools across the country.  Despite that, you've persevered already, and I very much appreciate your time in being here.

In a moment I'm going to tell you about the case, introduce you to the lawyers and their clients, and then we're going to seat you in a particular order and ask you some additional questions beyond those that you have filled out in your questionnaires.  From there, we'll be selecting a fair and impartial jury to sit in this civil trial.

So that -- I'll actually skip the part of seating you in a particular order so you can be more comfortable being seated in the leather seats.  My courtroom deputy will read out the names

of the first 16 jurors, and I'll ask the first person called to sit in the back right seat, and then to fill across there are seven seats there.  The eighth juror will be in the second row across, and then we'll have two more jurors just to sit in the front row.

THE CLERK:  Robert Portillo.

THE COURT:  You're going to take the upper right-hand seat there.

THE CLERK:  James Martin, Junko Kobashikawazago, Stephen Barany, Armin Flores, James Roberts, Niranjanaben Patel.

THE COURT:  Has been excused.

THE CLERK:  Oh, sorry, Your Honor.

THE COURT:  David Lowe, Kathleen McCormick.

And Ms. McCormick, you'll be in a our front row there, front seat.

THE CLERK:  Jimmy Fong, Jeffrey Seifried, Eric Naki, James Kushner, Matthew Gil, Alan Ber, Sharon Casebeer.

THE COURT:  And if Ms. Casebeer can squeeze in there at the very front row, and if you could move over just a few seats.

THE CLERK:  Po Sing Chan.

THE COURT:  Ms. Casebeer, could I have you sit at the very far end and have everyone move down?  Thank you.  And Mr. Chan can go next to you there.

All right.  So those are our first 16 jurors, but I'm going to speak to everyone who has been called for jury selection.

Today is an opportunity for you to participate in our democracy, and our democracy is a participatory democracy, in other words, it's a contact sport, and today you're coming directly into contact with our democracy.  It's so important that it's in the Constitution.  The Seventh Amendment, the Bill of Rights guarantees the right to a jury trial in civil disputes over $20, and this is a civil dispute, not a criminal dispute between parties, and it's necessary for a jury of the community to come together to resolve this civil dispute.

There's a second part of the Constitution that is implicated by this trial, and that's the right to patents Article 1 section 8 clause 8 of the Constitution says: Congress has the power to promote the Progress of Science and the useful Arts by securing for limited Times to Authors and Inventors the exclusive Right to the respective Writings and Discoveries.

This case is a case about a patent -- patents, actually, and whether those patents have been infringed or not.  What we're doing today is selecting a fair and impartial jury of eight persons to represent the community in this lawsuit.  I'm going to ask the parties to introduce their parties and their teams of attorneys.  The party that is the patent holder is

Seoul Semiconductor, and I'll ask Mr. Gotts to introduce his team and his client.

**MR. GOTTS:**  Thank you, Your Honor.

Ladies and gentlemen, my name is Larry Gotts.  I'm with the law firm of Latham & Watkins, and we have our team here.  And I'm proud to be representing here today Seoul Semiconductor, a South Korean company who is a world leader in LED technology, which is involved in this case.

With me from my law firm today are Ms. Michelle Woodhouse, Mr. Charles Sanders, and Mr. Ryan Owens, and back over there Bradley Hyde, and also from another law firm that's working with us, Ms. Jenny Jonak from the Jonak Law Group.  We also have some of our client folks.  I left out -- we have one of our tech persons working here.  Actually, he's not in the room now, but his name is Chris Schmoller.

From our client we also have today the Chief Technology Officer Dr. Kibum Nam, and in-house counsel for Seoul Semiconductor Yudae Han.  And others who are not in the room are Dr. Pelka, who is the inventor on these patents, and you'll hear from him.  We also have two expert witnesses, Dr. Duncan Moore, who is a technical expert witness, and Ms. Julie Davis, who will be a financial expert witness.

Thank you very much.

**THE COURT:**  Mr. Gotts and Mr. Labgold will introduce his team for Enplas Display Device Corporation.

**MR. LABGOLD:** Good morning. Thank you very much for being here. My name is Marc Labgold. I represent Enplas Display Device. They're a Japanese company that's involved in making -- you'll see in this case -- lenses that are used for TV backlights.

My client representative is here from Enplas Corporation, the parent company. He's the head of their legal department -- their patent department, Mr. Ohnuki.

And back of the room with me, I'm with the Law Firm of Shaw, Keller, my colleague Mr. Nagashima, and my colleague Patrick Hoeffner, and then also with me from another law firm John Shaw, Shaw Keller, Jeffrey Castellano, Shaw Keller, and Andrew Russell, Shaw Keller.

We too will have a lot of witnesses. Whoever is fortunate to sit on jury will get to see we have an expert who is a professor from Cornell, Dr. Clifford Pollock.

And that's generally who we are. Thank you.

**THE COURT:** Thank you very much.

Let me introduce a few of the court participants in the trial so you know who we are and make sure there's no conflict between you and the Court staff.

Again, my name is Judge Cousins. My law clerk is Casey Kirkhoff. She'll be assisting with the trial. My courtroom deputy is Lili Harrell. She'll be in charge with courtroom operations. And Rhonda Aquilina and Jo Ann Bryce will be our

court reporters.  They'll be making a transcript of what was said, including today's jury selection process.  So I'm always reminded to speak more slowly so they can make a good transcript.  And we'll also -- from time to time you might see court security poking their head in, but that will be the primary folk that you'll be dealing with during the trial.

Our schedule, we will pick the jury today and, time permitting, we'll have opening statements.  Our regular trial date will be 9:00 a.m. to 4:00 p.m. each day Monday through Friday, except this Wednesday, March 16th, we will not have court.  So there's no trial this Wednesday.  Otherwise it will go from today until approximately next Friday, March the 25th.  During that phase there will be, of course, St. Patrick's Day, I know, is Thursday.  Everyone that has other events in their lives, and some of you have put information about hardships, and we have considered that, and we'll continue to consider that information.

The trial will be timed so there are limits on how much time each party can present information to the jury, and that will help us to be done on time, and expecting the trial to be completed before the Easter holiday.

Let me now speak to the qualities we are seeking in our jurors.  We need jurors who can attend all of the trial on time each day, and who can listen and look at all the evidence presented.  We need jurors who will keep an open mind during

all the evidence.  We need jurors who will be fair and impartial to both parties to the case, and can follow the instructions of the law as I will give it to you.  We need jurors who will use their common sense and be able to communicate with the other jurors during the deliberations phase to reach a unanimous verdict.

So that is what we're hoping to find in our questioning from you.

What I would like to do now is to give you a chance each to speak with the attorneys, and with the Court.  We have considered the information in your questionnaires, and thank you for filling that out.

What I would like you to do, starting with Mr. Portillo in the back there, is to stand up and give an introduction to the attorneys and their clients, and I see you've got kind of the cheat sheet there with you.  You don't have to answer everything on there.  If you could just cover the basics of who you are, kind of introduce yourself to the group.  You will also be introducing yourselves to the other jurors you will be serving with, so this will give you a chance for them to get to know you.  And I will ask some follow-up questions about what you say, but this is just a brief introduction, and later the attorneys will also get some chance for some follow-up questions.  So don't feel like you have to cover everything on your initial questionnaire, but just a brief opportunity for us

to interact with you.

Mr. Portillo, take it away.

**PROSPECTIVE JUROR PORTILLO:**  Robert Portillo, and I -- education, I was a -- I have a Ph.D. in Musicology, and I was a music major in college, Composition, and this is the life that led me now to be a language instructor.

I have a Ph.D. from a German university, and so I lived abroad for many years.

I am not married.

Currently, I'm a freelance language instructor.  I mostly help students prepare for college as an editor.

I have no jury experience whatsoever, and -- yes.

**THE COURT:**  Mr. Portillo, you mentioned you like learning foreign languages.

**PROSPECTIVE JUROR PORTILLO:**  Yes.

**THE COURT:**  How many foreign languages do you speak?

**PROSPECTIVE JUROR PORTILLO:**  Fluently, four.  But I, as it is my hobby, I'm learning a couple more now.

**THE COURT:**  And which ones are you working on?

**PROSPECTIVE JUROR PORTILLO:**  Romanian, and a little bit of Russian, but the background is mostly Spanish/English. I grew up bilingual, and German, of course, French, and Italian.

**THE COURT:**  Have you ever served as an interpreter and translator in a courtroom?

**PROSPECTIVE JUROR PORTILLO:**  No, I haven't, but I did make some inroads into that activity, yes, but I didn't end up doing that.

**THE COURT:**  Well, we don't have many cases involving Romania, but if you keep working at it, we will call you.  There's always a shortage of skills in translators.

**PROSPECTIVE JUROR PORTILLO:**  Great.  Thank you.

**THE COURT:**  Thank you very much for being here.

All right, Mr. Martin.

**PROSPECTIVE JUROR MARTIN:**  My name is Jim Martin, and I live in Fairfax.  I went to UCLA, have a BA in Photography, but I worked in banks in college, and I ended up working in banks ever since.  I work at BofA right now, Treasurer Management Service.

I'm married, have a daughter who has just turned 13.  She's been 13 for a while, but she just officially turned 13.

Hobbies are basically -- I have a wine cellar, and gardening.

Haven't had any jury experience being on one.  I've been called several times.  In Marin County you get called every two years.  I've been close a couple times, but never really got on one.

**THE COURT:**  Mr. Martin, you mentioned favorite books and movies, Sopranos and Godfather, which have a similar theme to them.  Do you have a favorite character from those books and

shows?

**PROSPECTIVE JUROR MARTIN:**  Marlon Brando, and the movie.

**THE COURT:**  Mine as well.  Thank you so much for being here.

I'm not going to try to pronounce your name, because I will probably make a mistake.  I apologize for that.

**PROSPECTIVE JUROR KOBASHIKAWAZAGO:**  My name is Junko Kobashikawazago.

I have a Master's in Science of Nursing.

I live in San Mateo.

I'm married with two kids, seven years old boy, and three years old daughter.

So I'm working as a critical care nurse at Stanford.

And I don't have any experience with jury.

**THE COURT:**  And what are your responsibilities at Stanford?  I just couldn't quite hear what you said.

**PROSPECTIVE JUROR KOBASHIKAWAZAGO:**  Critical care nurse.

**THE COURT:**  What does that do?

**PROSPECTIVE JUROR KOBASHIKAWAZAGO:**  Work in cardiothoracic ICU.

**THE COURT:**  How long have you been working there?

**PROSPECTIVE JUROR KOBASHIKAWAZAGO:**  Since 2006.

**THE COURT:**  Thank you so much for being here.

Mr. MacDonald.

**PROSPECTIVE JUROR MACDONALD:**  My name is Stephen Barany.  I live in San Leandro.  I have a --

**THE COURT:**  I apologize.  I called you the wrong name, but you know your name, so you keep on going.

**PROSPECTIVE JUROR BARANY:**  I was worried I was someone else.

(Laughter)

**PROSPECTIVE JUROR BARANY:**  I have a Bachelor of Science Degree from University of California in Business Administration, and an MBA from the University of Michigan.

I'm currently at Wells Fargo Bank.  I've been there 28 years.  My current position is I'm the Accounting Manager in Foreign Exchange Operations.

Not married.  I have no children.

And the only other time I was on a jury was probably 25 years ago on a DUI case.

**THE COURT:**  And was that jury able to reach a verdict?

**PROSPECTIVE JUROR BARANY:**  Yes, it was.

**THE COURT:**  You mentioned the need to move around during the proceedings.  Many jurors have made a mention like that, and both for you and anyone else who needs to stand up and move about and use the restroom, please raise your hand, and do so if you need to take a break, and we will take regular breaks also to accommodate that.  Thank you very much for being

here.

Mr. Flores, correct?

**PROSPECTIVE JUROR FLORES:**  Yes.  Good morning.  My name is Armin Flores.  I live in Hayward with my partner of 22 years.  We don't have any children.  We have two dogs.  We used to have a cat, but he left us.

(Laughter)

**MR. FLORES:**  So I got my GED back in 1993.  I really don't have any hobbies except joining wine clubs we can't afford and then dropping them.

So that's pretty much my extent of excitement to my little world.

**THE COURT:**  You mentioned an appreciation for Judge Judy.

(Laughter)

**PROSPECTIVE JUROR FLORES:**  I do.

**THE COURT:**  What can I do to be more like Judge Judy?

(Laughter)

**PROSPECTIVE JUROR FLORES:**  I think it would be inappropriate for me to tell you.

(Laughter)

**THE COURT:**  Very good judgment.

All right.  Thank you, Mr. Flores, for being here.

All right, Mr. Roberts.

**PROSPECTIVE JUROR ROBERTS:**  My name is James Roberts.

I have a Bachelor's of Science in Management Information Systems from the University of San Francisco.

I live in Walnut Creek, California.

I'm single, no children.

I'm a manager at a financial investment company. My skills mostly in securities and trading.

My hobbies, I like chess, play soccer, ice hockey.

Let's see. I don't have any jury experience in terms of being on a jury, but almost got called on one several years ago.

**THE COURT:** You mentioned in your questionnaire some familiarity with the patent process. Can you tell the attorneys more about what that experience was?

**PROSPECTIVE JUROR ROBERTS:** I was hired as a chief financial officer a few years back where I was involved in filing patents and working with attorneys and filing patents on our technology. I filed for a trademark myself and was granted one a few years ago.

**THE COURT:** And what types of products or processes were covered by the patents you worked with, just roughly speaking?

**PROSPECTIVE JUROR ROBERTS:** Yeah. Mostly, I mean, I was mostly managing the process making sure that things got filed on time, understanding our technology, and that we had the properly designed patent filed.

So I don't really know, does that answer your question?

THE COURT:  It does.  The attorneys may want to follow-up with some additional questions, but it does.  Thank you very much for being here.

All right.  Now, Mr. Lowe.

PROSPECTIVE JUROR LOWE:  My name is David Lowe.  I have a Bachelor's in Anthropology and Biology in Berkeley, just practical courses at UC.

(Reporter asks juror to speak louder.)

THE COURT:  If you could speak up, please.

PROSPECTIVE JUROR LOWE:  I live in San Francisco.  Single.  No children.

I do clinical research at UCSF.  I don't think I have any special skills or training.

Hobbies are running and hiking.

And jury experience does not exist.

THE COURT:  Would you like to be on a jury?

PROSPECTIVE JUROR LOWE:  Sure.

(Laughter)

THE COURT:  Thank you for being here.

PROSPECTIVE JUROR LOWE:  Thank you.

THE COURT:  All right.  Ms. McCormick.

PROSPECTIVE JUROR McCORMICK:  My name is Captain McCormick.  I'm a high school social studies teacher.

I live in Fairfax, California.

I have a bachelor's degree in Political Science and Communication from Davis, as well as my teaching credentials.

I am married. I have a three and-a-half year old daughter.

And I guess my hobbies include parenting and hiking, cycling, traveling.

And I have been on a jury in Marin County. It was a civil case, and we did reach a verdict.

THE COURT: And what type of a case was it? I know it was a civil case, but --

PROSPECTIVE JUROR McCORMICK: It was a lawsuit resulting from a car accident.

THE COURT: The social studies that you teach, do any of them involve the courts, and might you be able to use this as learning experience to teach your students?

PROSPECTIVE JUROR McCORMICK: I teach an elective course called Street Laws.

THE COURT: Is patent covered in that course?

PROSPECTIVE JUROR McCORMICK: Not yet.

THE COURT: All right. Well, thank you very much for being here.

Mr. Fong?

PROSPECTIVE JUROR FONG: My name is Jimmy Fong. I'm an optometrist.

Married. Three kids from age 20 to 27.

I have a practice in the city, in the Richmond district, for the past 30 years.

No jury experience.

And I thought of something since filling out that questionnaire.  The LED case, it made me think about my brother.  He bought a large Sony TV, and it had a defect which wasn't reported, and he said he found out later Sony knew about it but still sold the TVs, and he was pretty mad about that. And it just made me think about that.  I don't know whether that has any bearing on patents, but...

**THE COURT:**  All right.  And how long ago was that?

**PROSPECTIVE JUROR FONG:**  Probably over five years, less than ten.

**THE COURT:**  You mentioned some of your hobbies and sports, Warriors, Giants and 49'ers.  Which one of those franchises is doing best these days in your estimation?

**PROSPECTIVE JUROR FONG:**  The Warriors.

**THE COURT:**  They sure are.

All right.  You also mentioned some concern about following the law if it conflicts with the Bible.  And I want to tell you that from my point of view there is no instruction of the Bible that bears directly on patent issues.

**PROSPECTIVE JUROR FONG:**  I don't think it will apply.

**THE COURT:**  And there might be some types of cases that might be more of a challenge, and there might be some

types of cases that might be more of a challenge.  And I don't mean to make fun of what you said, but at the same time I want to make sure that I instruct you on the law that you'll be able to follow it, even if you interpret it as somehow not coming from God.  Will you be able to follow my instructions?

**PROSPECTIVE JUROR FONG:**  Yes.

**THE COURT:**  Thank you very much for being here.

Mr. Seifried?

**PROSPECTIVE JUROR SEIFRIED:**  Good afternoon.  My name is Jeff Seifried.  I am shy of a bachelor's.  I have 30 years active duty with the United States Coast Guard, currently working for them as a civilian employee, so I don't get the $40 a day.

I am married.  I had two adult children.

No relevant special skills I think that would be of interest here.

My hobby -- I guess you could say I row.  I row in the morning.

And jury experience, this is about as far as I've gotten is into -- I've never sat on a jury, but I've been excused for one reason or another.

**THE COURT:**  Which station do you work out of?

**PROSPECTIVE JUROR SEIFRIED:**  I am at the Pacific headquarters in Alameda.

**THE COURT:**  And are you able to row at the same

location, or do you have to go different places?

PROSPECTIVE JUROR SEIFRIED:  Yes.  We row around the estuary.

THE COURT:  Thank you very much for being here.

PROSPECTIVE JUROR NAKI:  My name is Eric Naki.  I'm currently single.  I have a bachelor's degree from California East Bay in graphic design.

I think my hobbies that I put down was mostly fitness, sports, basketball, football, flag football.  I don't want to get hurt.  I'm getting old.  And I like to draw a lot, because that's part of the career.  And actually right now I'm a server, or more of a manager, at an independent business.  Then I act as a freelance graphic designer as well, and kind of have a little knowledge on the whole patent thing.  Just the bear minimum, though.

THE COURT:  When you're doing your graphic design, are you doing it free hand on the computer?  What kind of stuff do you do?

PROSPECTIVE JUROR NAKI:  Both.  So mostly comics right now, and trying to work on storyboards, because we have a big island and all that stuff in the Bay Area.

THE COURT:  Very interesting.  Thank you for being here.

Mr. Kushner.

PROSPECTIVE JUROR KUSHNER:  My name is James Kushner,

and I have a degree in Business Administration and major in Finance at the University of Miami and a JD from the University of Maryland.

I live in San Francisco.  I am married.  We have four children ranging from 31 to 44.

My occupation, I'm an author, is my full-time occupation. And I am, in the fall, I adjunct teach at Golden Gate University in Environmental Law.  And for 37 years I was a professor at Southwestern Law School in Los Angeles, emeritus status now.

Special skills?  I don't know.  I have graduate work in Urban Planning.

My hobbies are stamp collecting and also physical exercise.  I do quite a bit of that.

And I was on one jury, and we did reach a verdict.  It was a criminal case.

**THE COURT:**  You've had an extensive career as an attorney and law professor.  Have you done any work in the patent or intellectual property field?

**PROSPECTIVE JUROR KUSHNER:**  No.

**THE COURT:**  Would you agree to follow my instruction on the law even if you thought the law should be something different or thought I was saying it wrong?

**PROSPECTIVE JUROR KUSHNER:**  Of course.

**THE COURT:**  Thank you so much for being here.

Mr. Gil.

**PROSPECTIVE JUROR GIL:**  Hello.  My name is Mat Gil.  I went to San Jose State University, just got really close to graduating and moved up here.  I've lived here since the mid '70s.

I'm married.  I have a 27-year-old daughter who is a designer at restoration hardware.  I'm a full-time sculptor.  I have work in the Museum of Modern Art and LA, a museum down there, and various collections around the world.  I'm really good with metal.  I've welded since I was 13.

And my hobbies are restoring vintage motorcycles.  And I also have played the base, since I was a young kid, and recently I inherited a tuba, which is a lot of fun to learn how to translate string base to the tuba.  Really neat.  Really cool instrument.

And I have no jury experience.

**THE COURT:**  What type of sculpture are you working on now?  I'm not trying to invade any trade secrets, but what are your current projects?

**PROSPECTIVE JUROR GIL:**  I have a couple commissions, one is a hospital down in mid state, and I have a show coming up in April that we're kind of needing to get some work done for, and I have two assistants who are sitting around wondering what I want them to do, and --

**THE COURT:**  Would they like to serve on the jury too?

**PROSPECTIVE JUROR GIL:**  I know.  I'm going to be working at night, I think.  My work is done representational, maybe abstract, if anything, though I think it relates to something, and can range from pieces four to six inches to 14 footers.

**THE COURT:**  Thank you very much.

Mr. Ber.

**PROSPECTIVE JUROR BER:**  Good afternoon.  My name is Alan Ber.  I grew up in San Francisco.  I live in El Sobrante.

I am married, separated.  I live with my girlfriend and 18-year-old son at Monterey State.

I work full-time at UCSF as an assistant manager in the operating room there.  I manage support staff for three facilities there.

I don't really have any special skills, as much as I'd like to have some.

I have too many hobbies to list, but mostly cooking seems to be what I have most free time for.  Hiking.  I have a couple of dogs, and time flies, so --

**THE COURT:**  Thank you very much for being here.

Ms. Casebeer.

**PROSPECTIVE JUROR CASEBEER:**  My name is Sharon Casebeer.  My education is just GED.

I live in Livermore.  I'm married.  We have four kids, six grandchildren.

I'm retired from Alameda County Fairgrounds.  And no special skills.  My hobbies are watching the grandkids do their sporting events.

And my jury experience is two:  One criminal and one civil, and there was no verdict in either one.

**THE COURT:**  The civil case you had, what type of a civil case was it?

**PROSPECTIVE JUROR CASEBEER:**  It was a lawsuit against a house being refurbished.

**THE COURT:**  Your children's grandchildren's sporting events, which ones are your favorite?  Which is your favorite sport to watch?

**PROSPECTIVE JUROR CASEBEER:**  Soccer.

**THE COURT:**  Very good.  Thank you very much for being here.

Mr. Chan.

**PROSPECTIVE JUROR CHAN:**  Good morning.  My name is Po Sing.  I have no graduated.  I am immigrant from Hong Kong, China back to 13 years ago, and I currently live in Oakland.

I'm married.  I have two children, eight years old daughters, and then five years old son.

I'm a store manager of a Home Depot Company located in Oakland.

And then my hobbies is following the basketball games.

And then no jury experience.

**THE COURT:**   Thank you very much for being here.

All right.  Ladies and gentlemen, it's 12:55 now, and what I'm going to do is I'm going to excuse some of the jurors in the audience from further questioning based on the information that's in your questionnaires, and then the rest of you I'm going to give you a lunch break, and then we're going to come back and continue the examination process.

So what I'm going to do right now is read some names, and these are the names of jurors being excused.  So if I read your name right now, you're being excused.  And you're being asked to go back to the jury assembly room to complete your paperwork there, and then your service will be complete.

I apologize if you didn't get to speak here in public. I'm sure the other jurors would like to meet you, but they'll have to meet you at another time or later today if you'd want to come back and watch the trial, and you're welcome to as a member of the public.  But I also don't want to waste your time going through the picking stage if you're not going to be picked.

So these jurors are excused:  Gary Fralick, F-R-A-L-I-C-K, Jessica Dilley, D-I-L-L-E-Y, David MacDonald, Sarah Elizabeth Lynn, Wei He, H-E, Christin Pienkny, P-I-E-N-K-Y, Wilber Omar Castro, C-A-S-T-R-O, Robyn Lee, L-E-E, Imtiyaz Haque, H-A-Q-U-E, Lutz Wenzel, W-E-N-Z-E-L. and Harpham, H-A-R-P-H-A-M, Mercedes Campos, Charles Hardke, and Sherry Jean

Cooper.  So if I just read your name, you are excused.  And then return to the jury a assembly room.

The rest of you could stay here for just one minute before I excuse you for lunch.

All right.  So for those remaining, I'm going to ask you to take a lunch break and ask you to return at 1:40 p.m. During the break, please do not do any investigation about this case.  Don't Google it.  Don't go onto any blogs to find out what the case is about.  Don't purchase products over the Internet to do a test on the LED materials.  Don't talk to the attorneys.  Don't talk to their clients.  Please do nothing to explore the case.  You'll be hearing more about it this afternoon, I promise you.  But don't do any investigation of your own.

For those who have been seated, the first 16, we're going to come back to those same seats.  So if you could look to see who is next to you, and we'll return at 1:40.

I do recommend the cafeteria on the second floor for two reasons:  One, the food is fine, but secondly, you won't have to go out and come back through security to get into the building.  There could be a long line to get into the building, there probably was this morning, and I don't want you to be standing in line if you could avoid it.

So see you at 1:30.  Thank you.

(Proceedings were heard out of presence of the jury:)

THE COURT: All right. Everyone may be seated. Our prospective jurors have exited the courtroom. And for the record, I did excuse the last seven jurors not for cause, but out of a realization that we were unlikely to reach -- they're the final seven jurors in our randomized set of jurors, and so I concluded that we were unlikely to reach the last seven members on our list, and that's why I excused them. I think that with the information we have so far from the first 16, we're going to be able to pick a jury either from that 16 or maybe just a few more jurors out of that.

Any other questions before we take a break and return at 1:40?

MR. GOTTS: No, your Honor.

(Luncheon recess was taken at 1:13 p.m.)

**AFTERNOON SESSION**                                    **1:42 p.m**.

THE COURT: All right. Good afternoon, ladies and gentlemen. Everyone may be seated. I see that our first 16 jurors are back in their original seats. Thank you for that.

And I have some additional questions for the first 16 potential jurors. So for these questions, if you'll please raise your hand if the answer is yes, or yes to my information to convey that which has not previously been conveyed.

The first question is whether any of the first 16 jurors know any of the attorneys that you've been introduced to. So

you have the list of them this morning, you saw them here in person.  Just to make sure, if you haven't already said something about it, do you know any of the attorneys in the case?

No hands.

All right.  Do you know any of the Court staff?  Do you know me from prior experience, my law clerk, courtroom deputy, court reporter, any prior experience?

No hands.  That's always a perspective building experience, knowing how infamous we are.

Do any of the potential jurors have any firsthand experience with the companies, Enplas or with Seoul Semiconductor, that you have not already put on your jury questionnaires?

All right.  No hands.

Have any of the first 16 jurors read anything about this dispute for today?

No hands.

Have any of the first 16 jurors reached a conclusion about which side should win this case?

No hands.

That was a trick question to make sure you had not already reached a conclusion, because so far you've heard none of the evidence and none of the arguments about which side will win.  So far you're doing great keeping an open mind until you've

heard all the evidence in the case.

Please raise your hand if you will follow the law as I instruct you during the case.

(Show of hands.)

**THE COURT:** All right. With some hesitation, all jurors raised their hands. And that's good.

I will instruct you on the law -- and so far I have not instructed you on the law -- that you will follow, but that will come once the jurors are selected.

All right. I now want to give the attorneys for each side a chance to ask some of their own questions, starting with Seoul Semiconductor. The floor is yours.

**MR. GOTTS:** Thank you, Your Honor.

Good afternoon, everybody. I introduced myself before, but my name is Larry Gotts. I represent Seoul Semiconductor, or SSC, as we're oftentimes referred to as well.

As Your Honor indicated, we're here to sort of go through the process just to select a fair and impartial jury, and part of that process is asking these questions to you. And they're not meant to be impositions, and please understand there are no right and wrong answers. This is all about the only right answer is the honest answer, and that's all we're interested in. And it's not meant to pry, but it's really meant to get to know you all better, and, frankly, a chance to get to know us better too.

So with that, I want to start with some general questions, and I'll be asking some more specific questions after that. And just as Judge Cousins did, I'll direct the general questions to everybody, and we'll see where we go from there.

So let me ask first, do any of you feel like there's too many lawsuits filed in this country?  Just raise your hand.

(Show of hands.)

**MR. GOTTS:**  All right.  I'm not going to remember all the hands.  So sir, number 2 in the back, what's your thoughts on that?

**PROSPECTIVE JUROR MARTIN:**  I'm sorry.

**THE COURT:**  What's your thoughts in terms of too many lawsuits.

**PROSPECTIVE JUROR MARTIN:**  Just a simple thought to the question.  I hear about them all the time, some of them --

**MR. GOTTS:**  You feel like parties should try to work things out rather than try to file a lawsuit.  Anybody else feel that way about trying to work things out?

(no response)

**MR. GOTTS:**  Okay.  Do you have any beliefs in terms of small versus big, smaller versus bigger?  Do you think that the justice system is in any way, you know, set up to favor larger companies?  Does anyone have that concern.

Number 15, I guess; right?

**PROSPECTIVE JUROR CASEBEER:**  Yes.

**MR. GOTTS:**  And what's your concern in that respect?

**PROSPECTIVE JUROR CASEBEER:**  It just seems the more money you have, the more advantage you have sometimes to have a verdict go your way.

**MR. GOTTS:**  And do you think of that more in terms of like the little guy versus the company, or just one company is large and the other one is larger?  I mean, is that --

**PROSPECTIVE JUROR CASEBEER:**  Probably more the small person versus the company.

**THE COURT:**  Got it.  Okay.  Thank you.

And do any of you participate in any sort of law forum or tort reform kind of -- law or tort reform organizations or anything like that?

(no response)

**MR. GOTTS:**  No?  Sort of on the invention side, have any of you had a family member or close personal friend been involved in anything, whether or not it was patented?  Any inventors here?

Okay.  Sir, number 5.

**PROSPECTIVE JUROR FLORES:**  My former employer over at Clarity, Dave Brody, was a tinkerer and created his own version of CCTV for the visually impaired and put it to market, did quite well, and then we had overseas companies come in, and of course they could outbid, so he ended up closing the business back in '08, or, sorry, 2010.

**MR. GOTTS:**  Were there any concerns about the overseas companies, whether they had properly or improperly done anything?

**PROSPECTIVE JUROR FLORES:**  No, we kind of knew it was coming.  There's a company out there called AllMed.  They're based overseas.  Just the cost of the U.S. product chips, lenses for the cameras, you know, they're just expensive to get here, so we went abroad.

**MR. GOTTS:**  Were you involved at all in the lens work for that company?

**PROSPECTIVE JUROR FLORES:**  No, not at all, just the sales guy.

**MR. GOTTS:**  Do you have any expertise with lenses?

**PROSPECTIVE JUROR FLORES:**  I do not.

**MR. GOTTS:**  Sir, number 6.

**PROSPECTIVE JUROR ROBERTS:**  I was a CFO for a software company, that the founder basically invented technology that allowed us to streamline construction information in the field to engineers.

**THE COURT:**  So is that a software product?

**PROSPECTIVE JUROR ROBERTS:**  Software product and hardware.  We didn't design the hardware, it was through Northrop Grumman, we used the hardware.  But the patents that we filed, two patents I believe that we filed were based on the information that we were sharing on disconnected databases

between the users in the field.

**MR. GOTTS:** Was that, overall, would you say a positive experience for you in the company?

**PROSPECTIVE JUROR ROBERTS:** Yeah, it was -- I mean, to be a part of the process and to be a part of inventing something, I guess was, yeah.

**MR. GOTTS:** Did you or your colleague interface with the patent office at all?

**PROSPECTIVE JUROR ROBERTS:** I think I mentioned before I was involved in managing some of our associates, employees, mostly the engineers. I was in finance, but --

**MR. GOTTS:** So that was more of the approval process, I guess; right?

**PROSPECTIVE JUROR ROBERTS:** Right. I had to show the investors what we were doing, and what we own.

**MR. GOTTS:** Great. Okay. Very good.

Do we have any other hands on that one? I don't think so.

So have any of you had close personal friends sort of feel like somebody has taken advantage of you in any sort of business relationship? Anybody?

Yes, sir number 10.

**PROSPECTIVE JUROR NAKI:** I mean, I wouldn't say it was really -- it's not big, but then just in the design field, we always deal with copyright issues. And then especially in school, students are competitive, so they kind of get a

little -- try to do research on other students and take ideas from each other, and that was pretty much the issue that we had in this little video game thing that we were trying to put together where one guy was kind of taking ideas from the masters program and trying to input it into the game that they were developing, and then it kind of just got a little harry. Never went anywhere, but we kind of just settled it as -- I mean, both sides are just like we can't use that character, and we just threw it out.

But other than that, that's about it.

MR. GOTTS: So was it your information that was being used, or were you trying to use somebody else's?

PROSPECTIVE JUROR NAKI: We were just part of the team.

MR. GOTTS: Okay. How did that make you feel? Were you concerned about the process there?

PROSPECTIVE JUROR NAKI: I mean, it just always, as a designer, kind of sucks to have your work questioned, especially if you did work hard on it, which he did work hard on it, but I feel -- I mean, credit needs to go to the guy who actually did it or actually came up with the idea first. That's how I feel my staff went in on the whole thing.

MR. GOTTS: Sort of a fairness thing?

PROSPECTIVE JUROR NAKI: Well, I mean, yeah, it always traces back to the original guy.

**THE COURT:** Just for the record, that was juror number 11, Mr. Naki.

**MR. GOTTS:** Thank you, Your Honor. I guess my math isn't so good.

So our client, Seoul Semiconductor, is a South Korean company. Does anybody have any views one way or another that might impact how they would perceive this case with regard to South Korean businesses and South Korean companies? Any preconceived notions or concerns or reactions to South Korean companies?

(no response.)

And how about Japanese companies, any preconceived notions with regard to Japanese companies one way or the other?

(no response)

No? Okay.

Do any of you have any sort of specialized knowledge with regard to taking things apart? I think we had a few tinkerers in here, there was a motorcycle restorer and so forth. But anybody who kind of likes to tinker, kind of likes to know how things work?

There we go. Yes, sir, number 15? Do I have that wrong? 13. And what's your interest in tinkering?

**PROSPECTIVE JUROR GIL:** Kind of my living.

**MR. GOTTS:** Okay. Very good.

Any of you work for a company that you would say is a

highly competitive industry, business industry?

Yes, sir number 2.

**PROSPECTIVE JUROR MARTIN:**  Bank of America.  Banking is very competitive.

**MR. GOTTS:**  Are you involved in head-to-head competition yourself in your sort of aspect of the business?

**PROSPECTIVE JUROR MARTIN:**  Um-hm.

**MR. GOTTS:**  And how do you feel about that?  Do you feel -- what's your reaction to sort of competitors in the marketplace in terms of information and ideas?

**PROSPECTIVE JUROR MARTIN:**  Well, it just makes it more challenging.  You've got banks that are the size of BofA, you've got maybe four or five of those, depending on where you cut off the asset side, and then you've got regional banks, and everybody is kind of competing for the same kind of business, depending on what kind of business you're selling and what your market segment is.

So, you know, the challenge is to how you distinguish yourself versus bank X, Y, Z.  You know, some of your services are pretty much the same, so how do you make yourself look better and look different, and sometimes it's pricing, but it's not always pricing.  But, yeah, it's very, very competitive.

**MR. GOTTS:**  Okay.  Anybody else feel like they're highly competitive?

**PROSPECTIVE JUROR BARANY:**  Yes.  I'm also in the

banking industry with one of his competitors, Wells Fargo, and I agree with a lot of what he said.  But it's also very difficult to try and differentiate yourself when you do that either by pricing or by providing better customer service or just trying to do anything to differentiate your product from the other products available.

**PROSPECTIVE JUROR FONG:**  What was your question specifically?

**MR. GOTTS:**  Whether you're involved in a highly competitive business?

**PROSPECTIVE JUROR FONG:**  Being an independent optometrist, we feel like we're up against the larger Lens Crafter chains and Pearl, and large optical, so that's kind of competitive in that sense.

**MR. GOTTS:**  Do you find it difficult to compete with the larger companies sometimes?

**PROSPECTIVE JUROR FONG:**  In certain ways, yeah.  Yeah, people choosing their eyeglass options, they're swayed heavily by the advertising by the large chains.

**MR. GOTTS:**  Okay.  Thank you.

Have any of you ever sort of worked in your business in sort of a collaborative effort with say another organization or another company and had to figure out how to work together in sort of a collaborative or joint venture, if you will?

(no response)

No.  Okay.

A few specific questions directed to some of you with respect to the questionnaires that you put together.

Juror number 4, we've talked about this.  You said you had a close family friend or family member who was involved in that experience with patents, trademarks, copyrights, and the like.  Could you tell us more about that?

**PROSPECTIVE JUROR BARANY:**  My sister is an attorney, and she's worked for a couple of companies that do licensing for debit and pre-paid cards, so she's had some experience with those types of licensing agreements.

**MR. GOTTS:**  And has that been a good experience, bad experience, indifferent?

**PROSPECTIVE JUROR BARANY:**  Mixed.

**MR. GOTTS:**  Okay.  Is there any carryover on that experience as to how you would view sort of patent or intellectual property issues in this case, would you say?

**PROSPECTIVE JUROR BARANY:**  No, I don't think so.

**MR. GOTTS:**  And juror number 5, you said you had a close friend or family member that's had experience as an inventor.  Could you tell us about that one?

**PROSPECTIVE JUROR FLORES:**  Yeah, that goes back to Dave Brody for Clarity.  One of the things we used to do to protect the product is we knew that competitors were buying the cameras and taking them apart.  So we'd actually get a Dremel

and scrape off the manufacturer name, the I.D. number of the chip, anything that had any kind of identifying factors to it so that if somebody took it apart, all they saw was a chip and really didn't know where the chip originated, to help protect us.  It only lasted, you know, a few years in doing that, but, you know, it's one of the steps we did, because we knew competitors were copying our ideas.  Not just the actual camera itself, but the mechanics of the camera, because it was also you had a button control and you also had a remote control that would operate the in-and-out focus, the clarity of it, as well as the color, be it black and white, yellow and blue, blue and yellow kind of thing, so --

    **MR. GOTTS:**  Okay.  Thank you very much.

    Number 6, I think you said you've had some experience with intellectual property, inventing things, and intellectual property as well.  Is this what we already spoke about?

    **PROSPECTIVE JUROR ROBERTS:**  Yes.

    **MR. GOTTS:**  Okay.  Thank you.  And I don't believe you ever filed for a patent yourself; is that right?

    **PROSPECTIVE JUROR ROBERTS:**  I filed and received a trademark personally, but --

    **MR. GOTTS:**  A trademark.  Got you.  And how was that experience for you?

    **PROSPECTIVE JUROR ROBERTS:**  It was a learning experience, long process, but in the end it worked out.  I

actually received information about renewing it between the fifth and sixth year, I think.

MR. GOTTS: So you were interacting yourself with the Patent and Trademark Office?

PROSPECTIVE JUROR ROBERTS: Yes.

MR. GOTTS: And how did you find that experience?

PROSPECTIVE JUROR ROBERTS: Well, I felt like I got pretty close to one of the attorneys that I had a pretty good dialogue with, and the USPTO. And it didn't -- I don't know. I felt that the process was pretty easy. But then again I had been a part of that process through my former employer, so --

MR. GOTTS: Right. Have you ever been involved in any sort of litigation relating to patents or trademarks?

PROSPECTIVE JUROR ROBERTS: Not litigation personally.

MR. GOTTS: Great. Next is juror number 9. You mentioned the possibility of a conflict, and I think this may relate to the issue -- in terms of applying the law. This may relate to the issue that Judge Cousins already mentioned. Do you have continuing concerns about that?

PROSPECTIVE JUROR FONG: I'm number 9; right?

MR. GOTTS: Yeah.

PROSPECTIVE JUROR FONG: Okay. Yes.

MR. GOTTS: Okay. And you're an optometrist. Do you consider yourself knowledgeable about lenses and lens structure?

**PROSPECTIVE JUROR FONG:** Spectacle lenses, but not the technology.

**MR. GOTTS:** Do you understand optics or have an understanding of optics, would you say?

**PROSPECTIVE JUROR FONG:** Uh-huh.

**MR. GOTTS:** Do you have any design experience with lenses?

**PROSPECTIVE JUROR FONG:** No.

**MR. GOTTS:** No. Okay. Have you ever sort of tinkered with lenses, other than your work, obviously, making glasses and the like, but --

**PROSPECTIVE JUROR FONG:** Other than work and school, no.

**MR. GOTTS:** Okay. Juror number 13, you indicated I think you might have some reason to lean one way or the other in this case in your questionnaire. Can you tell us more about that?

**PROSPECTIVE JUROR GIL:** Oh, my brother-in-law is an optical engineer, has been his whole career. And he's a cool guy to talk with, and works in Silicon valley. Most of his stuff is biomed stuff, but he's designed lenses that will look at blood and do blood tests without ever touching the blood. And he's constantly telling me about the arguments that he has with the designers and the scientists. And he flies around the country, you know, learning what the scientists need versus

what he could provide.  And it's an interesting conversation that we have.  I don't know.

MR. GOTTS:  And do you feel like that in some way might bear upon your views of this case?

PROSPECTIVE JUROR GIL:  I don't know where this will take me.  I mean, it's just interesting getting the information and sifting through it, I guess.

MR. GOTTS:  So the optics issue, optics technology is something that interests you, though?

PROSPECTIVE JUROR GIL:  Yeah, it's kind of interesting.  I've taken apart everything since I was a kid, taking apart lenses back in the day.

MR. GOTTS:  And you also noted that you have an opinion about patents as well.  Could you tell us more about that?

PROSPECTIVE JUROR GIL:  I don't remember.

MR. GOTTS:  You also mentioned you had an opinion about patents to be a fair and impartial juror, I guess, was the question about that.

PROSPECTIVE JUROR GIL:  Oh, I might have marked yes or no to one of those.

I don't know how to, you know, judge things sometimes. I'm very dyslexic.  I'm an artist.  I can see the flipside of something so fast you wouldn't believe it.  I mean, I could draw this room right now with everybody in it.  And my mind can

get a little confused as to -- like I'm not a good test taker. It takes me like three hours to take the DMV test.  It's really a drag.

MR. GOTTS:  Are you good at visualizing things in three dimensions?  I'm sure you are as a sculptor.

PROSPECTIVE JUROR GIL:  That's my gift.  But it's like, yes or no, and I could see the other thing the other way so fast it's confusing.

THE COURT:  Mr. Gotts, you have two minutes remaining.

MR. GOTTS:  Yes.  Thank you, Your Honor.

I think you also indicated that this case sort of sounds like big business.

PROSPECTIVE JUROR GIL:  Yeah.

MR. GOTTS:  What did you mean by that?

PROSPECTIVE JUROR GIL:  Well, first off, I don't -- I'm hearing Japan, and I'm hearing Korea, and I'm wondering what that has to do with federal court in California.  I mean, you know, it's like let me go home, you know.  I feel like I'm being drugged by some big tide, and it's more than I can fathom.

MR. GOTTS:  And do you have -- and you have views, I believe, about the U.S. Patent and Trademark Office.

PROSPECTIVE JUROR GIL:  No, not -- no, no, I don't, I really don't.

MR. GOTTS:  Well, listen, thank you all very much.  I

really appreciate your time.  My client very much appreciates your time.

This is a real civic service, and I certainly would be honored to be presenting to any one of you.  Thank you very much.

THE COURT:  Thank you, Mr. Gotts.

And now it's Enplas' opportunity to ask some questions.

MR. LABGOLD:  Thank you, Your Honor.

Hi.  My name is Marc Labgold, and I represent Enplas Display Device.  They're a Japanese, located and Japanese founded company, and they -- their parent company is called Enplas Corporation.  Has anybody here heard of them?  Am I going to be disappointed?

(no response)

MR. LABGOLD:  Okay.  Thank you.  Not surprisingly, because their business is entirely in Japan.

The name stands for Engineering Plastics.  Does anybody have any experience working in the area of molding, plastic making, part making, those types of technologies?

(no response)

I think other than Mr. Fong, does anybody have any experience in lenses or optics?  Come on.  All together now?  I'm just kidding.

(no response)

There's a couple of you that have expressed some concerns

about the possibility of whether you could find someone

credible if they spoke through an interpreter.  Is there

anybody who is very concerned about that?

(no response)

Excellent.  Now, with regard to the -- we've heard a

couple people have answered with regard to the patent office.

Is there anybody who believes that the -- that the government

agency is infallible?

(no response)

Is there anybody who believes that government agencies can

make mistakes?

(Show of hands.)

With regard to people who develop things, design things,

is there anybody who feels strongly that they should be

entitled to their creation, that it should belong to them?

(Show of hands.)

**PROSPECTIVE JUROR FLORES:**  Repeat the question.

Sorry.

**MR. LABGOLD:**  For people who design things, create

things, whether you have a feeling that they should be entitled

to their creation, their invention, their design.

(Show of hands.)

**MR. LABGOLD:**  And with regards to everybody who has

already been asked about obviously being fair, we do have two

foreign companies here, so we don't have a situation where it's

the situation of one versus the other.  But some people have expressed concerns as to whether, you know, a foreign company should be afforded the same type of rights as a U.S. company and U.S. courts.  Is there anybody who feels very strongly about that?

**PROSPECTIVE JUROR NAKI:**  More of a misunderstanding, I would say, to that question on the questionnaire, just understanding why it's in a U.S. court with two foreign-based companies.

**PROSPECTIVE JUROR SIEFRIED:**  I second that question.

**PROSPECTIVE JUROR KUSHNER:**  Yeah, that would be my clarification on that question.

My only comment the way you asked the question is I feel strongly that they should have equal access.  They're doing business in this country, why would you treat one differently than the other.

**MR. LABGOLD:**  Fair point.

Now, I think it was Mr. Flores who talked about copying, and in particular your concern was based on personal experience where the business had been -- your company's products were being copied.

**PROSPECTIVE JUROR FLORES:**  Correct.

**MR. LABGOLD:**  And was your company, you know, an innovator in the field or --

**PROSPECTIVE JUROR FLORES:**  We started out as -- Dave

started out as the innovator in the field.  He came from -- he had an engineering degree, and then spent some time at HP, Hewlett Packard, then began his own company, Clarity.  He knew going in that eventually the technology would be stolen, so to speak.  And we knew that when I began with the company that eventually we would get outbid or the product would be copied and then manufactured, you know, overseas at a third of the cost and sold at a third of the price, and eventually that's what happened.

**MR. LABGOLD:**  Now, with regard to the fairness questions, is there anybody who doesn't agree with the concept that if your rights have been violated, you have a right to a fair hearing on them?  Does everybody agree with that concept?

(no response)

So does anybody here have strong feelings on the much too common experience that we hear about in the news with bullying?  Is there anybody who believes that bullying is a problem in our society?

(Show of hands.)

Is there anybody who doesn't believe that, that bullying is okay?

**PROSPECTIVE JUROR FLORES:**  That wasn't the question.

**MR. LABGOLD:**  Okay.  Rephrasing the question.

**PROSPECTIVE JUROR FLORES:**  I just think it has a lot of overkill.  I think when I was a kid, you know, throwing a

rock at a house wasn't, you know, bullying.  Or, you know, getting into a little brawl in the schoolyard wasn't bullying.

You know, I just think it's the way that, you know, the world is right now.  It's just one thing just to, you know, run with it.  It grows and grows and grows, and the Internet has a big part of that.  It's instant.

MR. LABGOLD:  And are there people who feel strongly that my colleague, Mr. Gotts, asked the question that there's too many lawsuits, I think that was pretty universally held.  But is there anybody who feels that if your rights have been violated, if you believe your rights have been violated that you should, you know, feel any hesitation to go have your rights, your legal rights enforced?

Does everybody -- who believes that if your rights -- you believe your rights have been in some way violated, you should have the right to go have a court hearing?

(Show of hands.)

MR. LABGOLD:  You should have the right?

(Show of hands.)

MR. LABGOLD:  And just with number 3 Ms. Kobashikawazago, what were your concerns with regards to, if you have any, with regard to the language skills of witnesses?

PROSPECTIVE JUROR KOBASHIKAWAZAGO:  I'm just concerned about my language skills, and I'm not familiar with -- if I

will be able to understand all the technical terms.

MR. LABGOLD:  Oh, I see.  But with regard to somebody who has to speak through an interpreter, do you believe that you could, you know, treat them fairly, or does the fact that they have to speak through the interpreter, that might affect your ability to find them credible?

PROSPECTIVE JUROR KOBASHIKAWAZAGO:  The fact that there is a person in the middle, you know, it might affect the interpretation of what has been said.

MR. LABGOLD:  And there will be witnesses on both sides that will be speaking through an interpreter.  And, you know, I will say just to kind of flesh out a little bit, that it does have a disconnect, because you will hear a question that's asked in English, and it will then be translated, and you will wait and hear the answer recited, and then be hanging on the edge of your seat, I'm sure, for every single answer.

But with that understanding, is there anybody else who finds that that process might be troubling to their ability to either focus on the issues or find the witness credible?

PROSPECTIVE JUROR NAKI:  I may have misunderstood that when I was going through it, because I may have felt that it was more sign interpretation rather than more language.

I've had that trouble before with a foreign exchange student in our class during a discussion one time, and it was just hard to gather every detail that he wanted to project to

us, and then it just kind of -- because, I mean, from any particular foreign language to English, there's always a different, how do I put it, communication, or there's different words.  I mean, words don't match up word for word.  There's just different ideals that kind of go with it, and I felt like he was not being able to express his complete idea, just what the interpreter is trying to take from him.  And then it kind of -- just the lingering effect of that transition between the middleman, is what kind of slowed down the progress of our discussions.  And kind of a lot of classes -- I mean, the class is only an hour and 45 minutes long, and then students have low attention span, like myself now, so, I mean, we're kind of dozing off because we're kind of not engaged anymore.

**MR. LABGOLD:**  You're not sitting on the edge of your seat with every one of my questions?  Sorry.  You don't have to answer that.

Was there anybody else?

**PROSPECTIVE JUROR CASEBEER:**  I just feel the same way, when you interpret something from one language to another, words have different meanings in different languages, you know, and even the way that they're said in certain languages have a different meaning.  So it would be hard for me, not that I wouldn't trust the person that was the witness, but am I getting the full translation of what they actually really mean?

**MR. LABGOLD:**  And would it help you to know for

everybody's benefits, both sides, as I say, will have interpreters for their own witnesses, and the other side will have what we call check interpreters to ensure that what's being translated is fairly translated.  Does that give you any extra comfort?

**PROSPECTIVE JUROR CASEBEER:**  No, because it's still the same thing.  A lot of times it's the word and everything else that kind of implies something else in different languages.

**MR. LABGOLD:**  Fair enough.  I have no further questions.

**THE COURT:**  Thank you.

We've had you answer questions in writing and here in court.  I want to make sure that there's no additional information that any juror thinks the parties should know in evaluating whether you think you could be a fair and impartial juror.  In other words, is there anything else that you want to share that you have not shared already that you think these attorneys would like to know about your background?

Yes?

**PROSPECTIVE JUROR SIEFRIED:**  Judge, I am a little concerned about paying attention -- not paying attention, but an interest level.  It seems very technical, and with interpreters, the pause, the delay and all that.  I want to stay -- if I'm in this seat, I want to be able to stay engaged.

I'm just human.  Could that be a problem?  I don't know.

THE COURT:  I appreciate you bringing that up, and that's one of the challenges of the attorneys in presenting the technical topic, is to keep you engaged.

One of the things that will help you stay engaged, and I will instruct you on the law further, but the jurors get to ask questions, and the reason that you ask questions is, one, if you're not following what's going on, is you get to say so along the way, and to ask questions of your own.  That helps the attorneys to know whether you are following along with their presentations, and to have you more actively participate in the proceedings.  So that's one -- and not all jury trials are conducted in that way, but that's one of the reasons we do it, is to keep the jurors not just engaged, because you're the ones actually determining this case, so you need to be engaged, but also be able to process the information presented in a way that will help you to make a unanimous verdict.

The other thing we will do is we will take breaks and have coffee on supply to keep everyone alert and engaged in what's going on.

Any other jurors have any additional information that you think the parties would like to know?

Yes, sir.

PROSPECTIVE JUROR CHAN:  I'm a little concerned my English level might be not fully understand judge and then

attorney and the questions.  So I will try my best, but it might take me a little bit long time to understand the question.  That's my concern.

THE COURT:  Thank you.  Any other jurors have any other information you have not previously shared?

(no response)

All right.  We're going to take a break.  It is 2:18 now.  I'll ask you to come back in 15 minutes, so that will be a little after 2:30.

During that time period, my previous admonition is in effect.  Don't research the case.  Don't discuss the case with anyone.  And return to the seat where you're now seated at 2:33.  We're near the end of the process.  Thank you.

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  Everyone else may be seated, and counsel will remain to talk about any for-cause strikes of the 16 jurors in the box.

First from -- well, let me raise a few issues that came up for possible discussion.

Mr. Chan, Juror Number 16, expressed some concern about his ability to follow the proceedings due to language.  Also, Juror Number 3, Ms. Kobashikawazago, did express in her questionnaire an illness of her daughter.  She didn't say more about that, but that was the one juror who did express some hardship in her written questionnaire.  I'm sort of noting

those two.

Seoul Semiconductor can do some for-cause strikes amongst the 16 jurors.

**MR. GOTTS:**  Your Honor, we would agree on number 3 for that reason, as well as the concern about the use of interpreters.

And, Your Honor, I thought that likewise number 16 was a bit of a concern.  There's already enough challenges in this case to understand it, but the language barrier, I think that would be a further challenge.

**THE COURT:**  All right.  And do you have any additional for-cause proposals?

**MR. GOTTS:**  Hold on, please, Your Honor.

(Pause in the proceedings.)

**MR. GOTTS:**  No, your Honor.

**THE COURT:**  And does Enplas have any for-cause commentary?

**MR. LABGOLD:**  We agree with 3 and 16.  I am a little concerned about number 15.  She seemed to express pretty clearly that she's worried about the translational issues as well, and whether she could truly find them credible, because she's not sure what they're saying, and I think that could be an effect.

And with regard to number 13, a couple of things that he said I think kind of raised concern that, you know, he didn't

put it completely in a negative situation, but it was clear he didn't want to be here, but that's not grounds enough.  But the concern is that why are these foreign companies coming here and doing this here, I just think that raises cause for concern.

THE COURT:  All right.  Here's my rulings.  I will excuse for cause jurors number 3 and 16, because of what they stated.

As to Juror number 3, illness in the family.

And as to Juror 16, concern about his ability to follow the law and the evidence presented.

As to Juror 15, Ms. Casebeer, I'm not going to excuse her for cause.  She expressed some skepticism about use of interpreters, but I didn't interpret that as being favoring one party or the other or that she would not be able to follow the instructions of the court.

Same as to Mr. Gil.  He expressed some concern about the proceedings, but, again, not one that would lead to bias for one or the other party.  If there was a situation where there was one U.S. company and one non-U.S. company, then that would be a good cause to excuse them, or at least to explain to them the basis of the law and why we're here.  But I think his skepticism does not rise to the level of bias, nor did he raise evidence of extreme hardship.  So mere disinterest is not enough to have an excuse for cause.

So I will excuse 3 and 16, which means that we will have

14 jurors remaining in the first set, and with three strikes if you wish to exercise them, that will give us a jury.

So I'm going to pass you the form now to make your peremptory strikes.  And, again, if you, in sequence, both pass, then that concludes the process.  So if, for example, on your first rotation you both decide you don't want to strike anyone, then the striking process is complete, and we will go with the first eight jurors in the box.

MR. GOTTS:  And, Your Honor, if we have more than eight left, is it just the first eight or --

THE COURT:  First eight.

MR. LABGOLD:  So I -- just so I understand the process, if I strike one, then he gets to strike until there's no --

THE COURT:  And he may pass.  They may pass.  A pass is a strike.  You don't have to exercise a strike, but if you both in sequence pass, then the process is complete.  So if you both like the first eight jurors and don't want to strike anyone, then the first eight jurors are the jury.

And I will not play the jeopardy music.  I will sit here quietly.  And the jurors will stay out of the room while you make the selection process.

MR. LABGOLD:  Thank you.

(pause in proceedings.)

(Proceedings were heard in the presence of the jury:)

THE COURT:  Everybody be seated as you come in.

All right.  Ladies and gentlemen, thank you for your participation in this process.  We have now selected our eight jurors.

For those of you who did not get to speak, thank you for being here and for listening patiently and participating in the process.  It was important for you to be here so we could be assured so we could have a fair and impartial jury.  And for those who were not selected, thank you for being here today.

Those excused jurors do need to go back to the jury assembly office to check out, and then your service will be complete.

I'm going to read the names of the eight jurors who are selected.  So the first eight names I read are staying here, and we will swear you in in a moment.  Those names I do not read are excused.  These are our eight jurors:  Mr. Portillo, Mr. Martin, Mr. Flores, Mr. Lowe, Ms. McCormick, Mr. Seifried, Mr. Ber, and Ms. Casebeer.  Those are our eight jurors.  And if you can stay in the jury box, and the others are now excused.

And for those eight who are selected, you could sit in any seat you like there.  Let's make sure we have eight.

(off the record discussion.)

I'm going to have my deputy now swear you in.

JUROR SEIFRIED:  Judge, I think you said my last name.  I want to be positive.

THE COURT:  You're in, yes.

(Jury sworn.)

THE CLERK:  Please be seated.

THE COURT:  I'm now going to have my deputy give you some trial logistics in your jury room.  She'll show you the jury room, and that will be your home when you're not in court during the trial.  She will give you your badges and some further instructions about how to get in the building tomorrow. We will resume trial tomorrow at 9:00.

Now, you're going to come back in the courtroom after that.  The first introduction, I'm going to read you the law of the case, so we're going to have a little more law, and a 17-minute video to show you before today is done.  We will be done before 4:00 o'clock today returning tomorrow at 9:00.

But I'm going to have her give you those materials now so you can know what to expect coming tomorrow.  So we'll take a five-minute recess so you can go talk logistics.

(Proceedings were heard out of presence of the jury:)

THE COURT:  Everyone else may be seated.

Given the time, I don't think we're going to have time for opening statements today, and I don't want to start with one party and cut you off and have it be disjointed.  So I'll give the opening instructions, then we'll start tomorrow morning with your opening statements with Seoul Semiconductor going first and then Enplas going second.

We have stipulations of fact, which I know the stipulations of fact are agreed to.  What we didn't discuss fully was when you want to provide them to the jurors.  I think providing them in writing as well as from the bench is a good idea, given the number of stipulations.  My instinct would be to do it after the opening statements and before the first witness.  Any objection to that?  We could also do it later if you think later is better.

MR. LABGOLD:  I have no objection to that.

MR. GOTTS:  No objection, Your Honor.

MR. LABGOLD:  Our concern, we had talked it over, just, I think after -- they have to have a little bit of foundation, otherwise it's completely -- not that it won't at this point --

THE COURT:  I think your opening statements will give some foundation.  It may not be, you know, complete, but it will be enough for them to start to understand.  And if it comes up later in the case that there's a stipulation that you want to bring attention to, I'd entertain a further reading at the end or -- and of course you can comment on it during your opening statements if there's something that needs some explanation.

MR. GOTTS:  So will we be having the jury bring those back in writing to.  Will they be part of your final jury instructions, for example?

THE COURT: The stipulations of fact will be part of the exhibits that they --

MR. GOTTS: They will.

THE COURT: They will be considered during their deliberations, so that will be part of the record.

All right. Well, let's take a few minute break, and when the jurors return, we'll do the opening instructions on the law.

ALL COUNSEL: Thank you, Your Honor.

(Recess taken at 2:39 p.m.)

(Proceedings resumed at 2:44 p.m.)

(Proceedings were heard in the presence of the jury:)

**PRELIMINARY JURY INSTRUCTIONS**

THE COURT: All right. Everyone may be seated.

Our jurors have returned.

And, ladies and gentlemen, you are now the jury in the case, and so it's my duty to instruct you on the law.

These instructions are preliminary instructions to help you understand the principles that apply in civil trials and to help you understand the evidence as you listen to it.

You'll be allowed to keep this set of instructions, and you should have each received a written copy of the preliminary jury instructions. This set of instructions may be referred to throughout the trial and during your closing deliberations as well. The instructions are not to be taken home with you, and

should remain in the jury room when you leave in the evenings.

At the end of the trial, I will give you a final set of instructions.  It is the final set of instructions that will govern your deliberations.

You must not infer from these instructions or from anything that I say or do that indicates that I have an opinion about what the evidence shows or what your verdict should be. It is your duty to find the facts from all the evidence in the case.  To those facts, you will apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with the law or not.

You must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  That means you must decide the case solely on the evidence presented to you. You will recall that you took an oath to do so.

In following my instructions, follow all of them and don't single out some and ignore others.  Each instruction is important.

Summary of the Claims in this Case.  To help you follow the evidence, I will now give you a brief summary of the positions of the parties.

The plaintiff -- and the plaintiff is the person who files a lawsuit -- the plaintiff in this case is Enplas Display Device Corporation.  It may be referred to during the trial as EDD.  EDD is a Japanese company that makes a number of devices,

including plastic lenses that are used with light-emitting diodes, or LEDs, for backlighting LCD televisions and signs.

EDD sells its lenses to other companies for use in what you will hear referred to as light bars.  Light bars are used for backlighting LCD televisions and signs.

The defendant in this case is Seoul Semiconductor Corporation Limited, who might be referred to as SSC.  SSC is a Korean company that manufactures and sells both individual LEDs and packaged LEDs, some of which are used in light bars for LCD television backlighting units.

SSC is the current owner of two United States patents. Those are U.S. Patent Numbers -- and there's a long string of numbers here -- 6,473,554 and U.S. Patent Number 6,007,209. These patents, so that we don't have to keep repeating the long number, will be referred to as the '554 patent and the '209 patent.  So that's the shorthand for the two patents that will be discussed during this case.

In 2013, SSC sent a letter to EDD stating its belief that EDD was inducing infringement of both the '554 and '209 patents.  In response, EDD filed a lawsuit to seek a judgment that these SSC patents are invalid and not infringed.

SSC then filed its counterclaim in this lawsuit seeking a judgment that these SSC patents are infringed and damages for this infringement.

I will now tell you more about the details of the law that

you must apply both before and after the parties present their evidence in support of their claims and defenses.  Again, I thank you and the attorneys thank you for your time and attention during these proceedings.

The Burden of Proof.  There are two standards of proof that you will apply to the evidence in this case depending on the issues you are deciding.  On some issues, you must decide whether something is more likely true than not.  On other issues, you must use a higher standard and decide whether it is highly probable -- excuse me -- and decide whether it is highly probably that something is true.  You should base your decision on all of the evidence regardless of which party presented it.

Evidence - Evidence You May Consider.  The evidence you are to consider in deciding what the facts are consists of, first, the sworn testimony of any witness; second, the exhibits which are received into evidence; and, third, any facts to which the lawyers have agreed.  Those are sometimes called stipulated facts or agreed facts.

Things You May Not Consider.  In reaching your verdict, you may consider only the testimony and exhibits and stipulations received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts of the case are.  I will now list for you things that are not evidence.

First, arguments and statements by the lawyers are not

evidence.  The lawyers are not witnesses.  They're not under penalty of perjury.  So what they say in their opening statements and their closing arguments and at other times is intended to help you interpret the evidence, but the lawyers' words are not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of the evidence controls.

Number two, the questions and the objections by the lawyers are not evidence.  The attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by my ruling on an objection.

Number three, testimony that has been excluded or stricken by me or that I've instructed you to disregard is not evidence and should not be considered.

In addition, sometimes testimony and exhibits are received only for a limited purpose.  When I give an instruction to consider evidence only for a limited purpose, you must follow that instruction.

Fourth, anything you may have seen or heard when court is not in session is not evidence.  You must decide this case solely on the evidence presented during the trial.

Charts and Summaries Not Received in Evidence.  Certain charts and summaries not received in evidence may be shown to you in order to help explain the contents of books, records,

documents, or other evidence in the case.  You may hear these charts referred to as demonstratives or demonstrative evidence.  They're not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard those charts and summaries and determine the facts from the underlying evidence.

Charts and Summaries in Evidence.  Certain charts and summaries may be received into evidence to illustrate information brought out during the trial.  Charts and summaries are only as good as the underlying evidence that supports them.  You should, therefore, give them only such weight as you think the underlying evidence deserves.

Types of Evidence.  Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  For example, direct evidence that it was raining would be a photo showing it raining on a given day.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  For example, circumstantial evidence that it was raining would be testimony of a witness who said they believed it was raining not because they saw the rain but because they saw a person entering a building with a wet umbrella.  You should consider both types of evidence, direct and circumstantial.  The law makes no distinction between the weight to be given to direct and

circumstantial evidence.  It is up to you to decide how much weight to give, if any, to any evidence in the case.

Use of Interrogatories of a Party.  Evidence may be presented to you in the form of answers of one of the parties to written interrogatories, which are just questions that have been submitted by the other side.  These answers to the questions were given in writing and under oath before trial. You should consider the answers, insofar as possible, in the same way as if they were made from the witness stand under oath.

Use of Request for Admission of a Party.  Also before trial, each party has the right to ask the other party to admit in writing that certain facts are true.  If the other party admits those facts, then you must accept them as true and conclusively proved in this case.

Evidence for a Limited Purpose.  Some evidence may be admitted for a limited purpose only.  When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other purpose.

The Court's Rulings on Objections.  There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks it's not permitted by the rules, that lawyer may object.  If I overrule the objection,

then the question may be answered or the exhibit received.  If I sustain the objection, then the question cannot be answered and the exhibit cannot be received.  If I sustain an objection to a question, then you must ignore the question and don't guess at what the answer might have been or what the document might have said.

My rulings are not intended to influence your eventual decision in the case.  Your decisions must be based entirely on the testimony and documents and stipulations of fact received into evidence.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence.  That means that when you decide the case, you must not consider evidence that I tell you to disregard.

Witnesses and Evaluation of Witness Testimony.  In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.  In considering the testimony of a witness, you may take into account, one, the opportunity and ability of the witness to see or hear or know the things he or she testifies to; two, the witness' memory; three, the witness' manner while testifying; four, the witness' interest in the outcome of the case and any bias or prejudice; five, whether other evidence contradicted the witness' testimony; six, the reasonableness of

the witness' testimony in light of all the evidence; and,

seven, any other factors that bear on believability.  The

weight of the evidence as to a fact does not necessarily depend

on the number of witnesses who testify about it.

Impeachment Evidence.  The evidence that a witness lied

under oath or gave different or inconsistent testimony on a

prior occasion may be considered, along with all the other

evidence, in deciding whether or not to believe the witness and

how much, if any, weight to give to that witness' testimony.

English Translation.  Languages other than English will be

used during this trial.  Each witness has the right to testify

in his or her native language.  In this case some witnesses

will testify in Japanese and some will testify in Korean both

using an official court interpreter.  When a witness testifies

in a language other than English, the evidence to be considered

is only that provided through the official court interpreters.

Although some of you might know Japanese or Korean or other

languages used in the case, it is important that all jurors

consider the same evidence.  Therefore, you must accept the

English interpretation provided by the official court

interpreter.  You must disregard any different meaning.

Do not make any assumptions about a witness or a party

based upon their use of an interpreter to assist that witness

or party.  Again, each witness is entitled to testify in his or

her native language even if they have some understanding of

English.

Expert Witnesses.  Some witnesses, because of their education or experience, are permitted to state opinions and the reasons for those opinions.  Opinion testimony should be judged just like any other testimony.  You may accept it or reject it and give it as much weight as you think it deserves considering the witness' education and experience, the reasons given for the opinion, and all the other evidence in the case.

Deposition Testimony.  A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath to tell the truth, and lawyers for each party may ask questions.  The questions and answers are recorded by a written transcript and sometimes they are video recorded.  When a person is unavailable to testify at trial, the deposition of that person may be used during the trial.  If so, you should consider the deposition testimony presented to you in court instead of live testimony in the same way as if the witness had been present to testify.

If testimony is read rather than played back from a recording, do not place any significance on the behavior or tone or voice -- excuse me.  Back up.

If testimony is read rather than played back from a recording, do not place any significance on the behavior or tone of voice of any person reading the questions or answers.

You'll be hearing or viewing only a portion or a series of

portions of the depositions taken by the parties in this case. Do not make any inferences about the fact that you are not hearing or seeing the deposition in its entirety or that what you are hearing or viewing has been edited.

I already read the part about impeachment evidence.  The next section is Conduct of the Jury - Prohibitions on Your Activities.

I'll now say a few words about your conduct as jurors. First, keep an open mind throughout the trial and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide the case solely on the evidence received in court and on my instructions as to the law that applies, you must not be exposed to any other information about the case or the issues it involves during the course of your jury duty.  Thus, until the end of the case, or unless I tell you otherwise, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This includes do not discuss the case in person, in writing, by phone or electronic means, e-mail, text message, Internet chat room, blog, website.  This applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with everyone else.  So don't communicate with your family members, your employer, the media,

people involved in the trial.  Don't communicate about the case with anyone at all.

You may notify your family and your employer that you've been seated as a juror.  That's okay.  But don't talk about the case and the evidence that's being presented.

If you are asked or approached about your jury service or about this case, respond you've been ordered not to discuss the case and report the contact to the Court.

Because you will receive all the evidence and instruction on the law here in court, do not read, watch, or listen to any news or media accounts or commentary about this case or anything to do with it.  Don't do your own research, like consulting the Internet or using other reference materials.  Do not make your own investigation in any way to try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence and so that each party has an opportunity to address the evidence here in court.

A juror who violates these restrictions jeopardizes the fairness of the court proceedings.  That could cause a mistrial and would force us to start the entire process all over again.  So if you're exposed to any outside information about the case, please notify the Court immediately.

Taking Notes.  During the deliberations in the case, you will have to make your decisions based on what you recall of

the evidence.  You will not have a transcript of the trial, so I urge you to pay close attention to the testimony during the case as it is given.

If at any time you can't hear or see the testimony, evidence, or arguments, let me know so I can correct the problem.  Much of the information will be presented on your screens, so it will be helpful to sit near one of your screens.  Some of it will be on the far screen here, so it will be up to you to decide what's easier for you to see, whether it's the small screen or the big screen or both.  There will also be witnesses seated up here.

During the case, you can sit in any of the jury seats that will help you to hear and see the evidence; and if you need to move, that's fine.  If you need to stand up to hear or see, that's fine.  Our interest is in making sure that you, the jurors, can hear and see the evidence.

If you wish, you may also take notes to help you remember what's being said.  If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case.  Do not let note taking distract you.  When you leave for the day, your notes should be left in the jury room.  No one will read your notes.  At the end of the case, they will be destroyed.

Whether you take notes or not, you should rely on your own memory of the evidence.  Notes are only to assist you with your

memory.  You should not be overly influenced by your notes or those of your fellow jurors.

Questions to Witnesses.  You will be allowed to propose written questions to witnesses after the lawyers have completed their questioning of each witness.  You may propose questions in order to clarify the testimony, but you are not to express any opinion about the testimony or to argue with the witness. If you propose any questions, remember that your role is that of a neutral fact finder, not an advocate.

Before I excuse each witness, I will offer you the opportunity to write out a question or questions on a form provided by the Court.  Do not sign a question.  I will then review the question with the attorneys to determine if it is a legally proper question.

There are some proposed questions that I will not permit or will not ask in the exact wording submitted by a juror. This might happen either because of the rules of evidence or other legal reasons or because the question is expected to be answered later in the case.  If I do not ask a proposed question or if I rephrase it, please do not speculate as to the reasons why.  Do not give undue weight to questions you or other jurors propose.  You should evaluate the answers to your questions in the same manner you evaluate all the other evidence in the case.

By giving you the opportunity to propose questions, I'm

not requesting or suggesting that you must do so.  It will often be the case that a lawyer has not asked the question because it is legally objectionable or because a later witness may be addressing that same subject.

Bench Conferences and Recesses.  From time to time during the trial, it may become necessary for me to talk with the attorneys out of the hearing of the jury either by having a conference at the bench when the jury is present in the courtroom or by calling a recess, which is just a timeout. Please understand that while you are waiting, we are working. The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence.  Our goal is to avoid any confusion and error.

We will do what we can to keep the number and length of these conferences to a minimum.  I, therefore, may not grant an attorney's request for a conference.  Do not consider my granting or denying a request for a conference as an indication of my opinion of the case or what your verdict should be.

Patent Background.  We will now show you a video about what a patent is and how one obtains a patent, and then you will also receive an exhibit of a model patent to assist you with this presentation.

This will be our first test of the technology in the courtroom to see if that can be played successfully for the

jury.

(Video was played but not reported.)

**THE COURT:**  Thank you, Judge Fogel.

All right.  We have just a few more instructions to give before we conclude this phase of the case.

So to help you follow the evidence you'll be hearing in the case, I will now give you some additional information on the position of the parties.

We have mentioned the two patents in the case are the '554 patent and the '209 patent.  The '554 patent lists David Pelka and John Popovich as the inventors, and the U.S. patent '209 lists David Pelka as the inventor.  These two patents may be referred to collectively as the patents-in-suit.

EDD filed this suit seeking a declaration from the court that it did not infringe the '554 and/or '209 patents, and, additionally, that certain claims are invalid.

Invalidity is a Defense to Infringement.  SSC in return alleged that EDD induced infringement of Claims 1, 6, and 33 through 35 of the '554 patent, and Claim 20 of the '209 patent, and SSC maintains that the claims are valid.

SSC has sought money damages from EDD for actively inducing infringement of these claims of the '554 and '209 patent by others.

The products that are alleged to infringe the '554 patent are Enplas' light enhancer cap lenses with model numbers Number

9854D, Number 9854E, and Number 9879.  The products that are alleged to infringe the '209 patent are Enplas light enhancer cap lenses with model numbers Number 9853A, 9854D, 9854E, 9879, and Number 4922.

Your job will be to decide whether Claims 1, 6, 33 through 35 of the '554 patent and Claim 20 of the '209 patent have been infringed and whether those claims are invalid.

If you decide that any valid claim of the '554 or '209 patents has been infringed, you will then need to decide any money damages to be awarded to SSC to compensate it for the infringement.  You will also need to make a finding as to whether the infringement was willful.  If you decide that any infringement was willful, that decision should not affect any damage award you give.  I will take willfulness into account later in the case.

You'll also be asked to decide whether Claims 30 through 31, 36 through 39, 41 through 43, and 45 through 48 of the '554 patent are invalid.  Although the parties may refer to other claims or lenses, you will only be asked to decide on infringement and/or invalidity of the claims and lenses listed above.

You may hear evidence that EDD's parent, Enplas Corporation, has its own patents or that EDD improved on the '554 and/or '209 patents.  A party can still infringe even if it has its own patents in the same area.

You will be instructed after trial as to what, if any, relevance these facts have to the particular issues in this case.  Meanwhile, you should keep an open mind.

Before you decide whether EDD has infringed the claims of the patents or whether the claims are invalid, you'll need to understand the patent claims.  As the video described, the patent claims are numbered sentences at the end of the patent that describe the boundaries of the patent's protection.  It is my job as judge to explain to you the meaning of any language in the claims that needs interpretation.

I have already determined the meaning of certain terms of the claims of the '554 and '209 patents.  You've been given a document reflecting those meanings, and they are attached to the back on page 15 entitled "The Claim Construction."

You are to apply my definitions of these terms throughout the case.  However, my interpretation of the language of the claims should not be taken as an indication that I have a view regarding issues, such as infringement and invalidity.  Those issues are yours to decide.

I will provide you with more detailed instructions on the meaning of the claims before you retire to deliberate your verdict.  And I'll talk more tomorrow about the claim construction, and we'll review that and make sure that there's some more context for what you're hearing.

Now let me talk about the phases of the trial.  In a

moment we're going to recess for today and reconvene tomorrow at 9:00 o'clock.  At that time each side may make an opening statement.  An opening statement is not evidence.  It is simply an outline by the attorneys to help you understand what that party expects the evidence will show.

After the opening statements, the presentation of evidence will begin.  Witnesses will take the witness stand and documents will be offered and admitted into evidence.  There are two standards of proof that you will apply to the evidence depending on the issues you are deciding, and Judge Fogel mentioned these in the video.

On some issues you must decide whether something is more likely true than not.  That's the preponderance of the evidence standard.  On other issues, you must use a higher standard and decide whether it is highly probable that something is true.  That's the clear and convincing evidence standard.

SSC will present its evidence on its contention that EDD actively induced infringement on some of the claims of the '554 and '209 patents, and that EDD's inducement has been and continues to be willful.  These witnesses will then be questioned by SSC's counsel in what is called direct examination.

After the direct examination of a witness is complete, the opposing side has an opportunity to cross-examine the witnesses.

To prove infringement on any claim, SSC must persuade you that it is more likely than not that EDD has actively induced infringement of that claim.

To persuade you that any infringement was willful, SSC must prove that it is highly probable that the infringement was willful.

SSC will also present evidence of the damages it seeks as compensation for the alleged infringement.  This does not mean that I have already determined that SSC is entitled to damages. That is for you, the jury, to decide if you find any of the asserted claims infringed and not invalid.

After SSC has presented its witnesses, EDD will then call its witnesses who will also be examined and cross-examined.

EDD will present its evidence to respond to SSC's contentions concerning infringement, willfulness, and damages.

EDD will also present evidence in support of its contentions that the claims of the '554 and '209 patents are invalid.  To prove invalidity of any claim, EDD must persuade you that it is highly probable that the claim is invalid.

SSC will then return and put on evidence responding to EDD's contention that the claims of the '554 and '209 patents are invalid.  SSC will also have the option to put on what is referred to as rebuttal evidence to any evidence offered by EDD of noninfringement or lack of willfulness.

Finally, EDD will have the option to put on rebuttal

evidence to any evidence offered by SSC on the validity of the asserted claims of the '554 and '209 patents.

Because the evidence will be presented to you piecemeal, it's important for you to keep an open mind as to the evidence as it comes in, and then wait for all the evidence to come in before you make your final decision; in other words, keep an open mind throughout the entire trial.

After all the evidence has been presented, then the attorneys will have an opportunity to make closing arguments, and I will also give you final instructions on the law that applies to the case.  Again, the closing arguments are not evidence.

After the closing arguments and instructions, the jury will deliberate and reach a verdict.

That concludes the preliminary jury instructions, and that concludes our first day of trial.

So thank you for your attention today.  You've had a lot to take in.  I will see you at 9:00 o'clock tomorrow.  As my deputy has instructed you, please allow some extra time to get into the building, and we'll start promptly at 9:00 a.m. with the opening statements.

See you in the morning.

(Proceedings were heard out of the presence of the jury:)

        **THE COURT:**  Everyone may be seated.

All right.  Any issues we need to resolve before tomorrow

morning?

MR. LABGOLD:   There's one thing that's a procedural matter, if I may.

Now that we've done such a great job of proposing our instructions and since the parties afterwards entered into a stipulation, we may have to advise the jury with respect to certain witnesses, such as Dr. Pelka, that he won't just be talking about infringement because we've agreed to the stipulation of only single call.  So --

THE COURT:   I think it would be helpful before any witness is called to have a -- if there's an agreed-upon statement that can be given as to the scope of what they're talking about, whether it's infringement, invalidity, willfulness, damages, all of the above, that we tell them; and I'm happy to be the one that tells them if you agree to what will be told to the jury.

MR. LABGOLD:   I think that would be helpful.

THE COURT:   I think it will be helpful, too. Oftentimes there might be an opportunity for one or more statements along the way from counsel to give the jury an update as to what they're going to be hearing next, and that can be done at the beginning of each day which is helpful, not to add more time to the trial, but just to give -- and not to present argument, but just a reminder going back to your opening statements as to what's happening next and why because

I think it can be very confusing to the jury as to which part of the -- which claim is being discussed, what purpose this witness is coming for.

So I'm happy to give additional instruction as we go along to help the jury understand what's happening.

**MR. LABGOLD:**  Thank you, Your Honor.

**MR. GOTTS:**  Your Honor, we dealt with objections on the demonstratives for opening this morning, but we also were served with a motion to strike today, and I guess --

**THE COURT:**  Would you like to respond to it?

**MR. GOTTS:**  Well, that's what I'm wondering.  I'm wondering if we should -- when we would do that.  The witness probably won't take the stand until Thursday as it stands now, so I would think that we'd like to respond.  We'd rather not have to do that by tomorrow, Your Honor, given we have witness prep and the like tonight, so --

**MR. LABGOLD:**  We do have Wednesday of time, but we would just request -- we received this first-type notice at 7:00 p.m. last night, and several of my colleagues here, not lacking attention because of lack of interest but because they stayed up all night to do this -- so if we could just ensure that we be allowed a short period of time to reply as well, that would be appreciated.

**THE COURT:**  I will have a response due tomorrow evening at 6:00 o'clock because we don't want to burn any

midnight oil that's needed for later in the trial, and that should be no longer than five pages I think will give you enough time for response.  And if you need a reply, that will be due the next day by noon --

MR. LABGOLD:  Thank you, Your Honor.

THE COURT:  -- of no more than two pages.

MR. LABGOLD:  Thank you, Your Honor.

THE COURT:  All right.  We'll see you in the morning. Thank you.

MR. LABGOLD:  One other thing.

THE COURT:  Oh, one quick one.  Yes.

MR. LABGOLD:  We have Dr. Pelka.  There was the issue of the one video.  With Dr. Pelka himself, there are several demonstrative exhibits, and we believe that these demonstrative exhibits by their very nature fall into the category of -- let me approach for the record -- fall into the category of expert testimony as opposed to a fact witness.

THE COURT:  I'm sorry.  These are demonstratives that SSC is going to be proposing?

MR. LABGOLD:  Yes.  And so we believe that Dr. Pelka being a fact witness should be asked about factual documents and documents that he has produced, seen, and as opposed to animations or other demonstratives, which should be reserved more for the experts or a summary of a voluminous document.

THE COURT:  And are these demonstratives that you have

reviewed now?

MR. LABGOLD:  Yes.

THE COURT:  And if there are ones that would be helpful for me to rule on before shown live, can I get a copy of them?

MR. LABGOLD:  Yes.

(Pause in proceedings.)

MR. LABGOLD:  This is -- and we'll provide a copy.

THE COURT:  This, what I'm looking at, is it --

MR. LABGOLD:  What you're looking at --

MR. SANDERS:  This is the first slide.  There are, I believe, eight of them so we can scroll through them on the screens here.

The slides, the first one, is "No TIR."  The second one shows "TIR."  Dr. Pelka will be here to testify to the background of how he came up with these inventions.  TIR figures -- total internal reflection -- prominently in these patents.  The company where he came up with inventions was named TIR.  He founded the company.

He's going to need to explain to the jury what TIR is when he's using that term and talking about what the founding of the company is and why he chose TIR.  So this is simply so that the jury can understand his testimony to illustrate the concept that he's explaining.

That explains the first two slides.  I'm happy to go

through the rest.

THE COURT:  Why don't you show me the other ones just for -- if you're able to.

MR. SANDERS:  Sure.

Can we go to the next slide, please.

So this is Number 3.  The problem that Dr. Pelka solved that he'll mention -- and a laptop is shown on the front of the patent -- is getting rid of bright spots.  So this is showing the bright spots, and the next slide shows no bright spots.  So just illustrating what the bright spots are that he'll be mentioning in his testimony that he came up with an invention to solve.

If we can go to the next slide, please.

So the other issue that Dr. Pelka addressed was dark spots.  Those are mentioned in the '554 patent.  There was a specific project where he came up with this lens design, a project for Timex, and it had dark spots.  He then developed a way to get rid of the dark spots.  He will explain -- if we go to the next slide -- that he had a project for an ARCO sign for a gas station where he was backlighting the red part, and he used the lens that had the dark spots and he was getting dark spots in the red part that he was trying to illuminate uniformly.  And so, therefore, he developed a lens to solve that problem, very much the background of the invention.  He will show that on the next -- next slide, please.

We will get rid of the animation.  It would just show this final design that Dr. Pelka created for the ARCO sign. That's 7.

And then the last one Dr. Pelka will mention that there was a problem with what he was showing on these prior slides of having the LED embedded inside the material, inside this area (indicating), that was a problem so he developed this idea of an illumination coupler, and simply explain what he's referring to when he says "illumination coupler," he would refer to this last slide.

So that's how the demonstratives relate to Dr. Pelka's testimony and his development of the work -- his development work that led to the inventions that are reflected in the patents.

**MR. LABGOLD:**  And, Your Honor, we respectfully submit that the -- as we -- as the jury just learned, that's what the specification and the figures of the patent are for, and this is purely adding to what the specification actually says.

There's no design documents.  There's no research records, those kind of documents, which often exist in a patent case and an inventor will bring forward as proof of their conception, proof of their reduction to practice and what they were doing. But this has all been clearly tailored specifically for this case, and there's nothing, there's no picture that has -- if we could go back one slide -- there's no picture of this which

looks like what they're trying to prove our lens does. That testimony should come from Dr. Moore to the extent he's allowed to provide that testimony.

If there's anything in the specification they want to rely upon, there's a portion of the specification that they refer to that we will refer to with regard to leakiness, that's what the patent should be limited to. It shouldn't be what the inventor now says he was thinking when he was inventing this because he had an obligation to tell that to the public and the Patent Office by making a full and fair disclosure in his specification.

THE COURT: All right. I'm going to take a five-minute recess to give everybody a break, and I'll come back and give you a ruling on this.

MR. LABGOLD: Thank you, Your Honor.

MR. SANDERS: Thank you.

THE COURT: Thank you.

(Recess taken at 3:44 p.m.)

(Proceedings resumed at 3:50 p.m.)

(Proceedings were heard out of the presence of the jury:)

THE COURT: All right. Back on the record with the jurors not present.

The issue is the use of demonstratives proposed by SSC for use with the testimony of Dr. Pelka, and this was covered in part, but not the details of having these particular

demonstratives in front of the Court, in ECF Docket 389 issued by the Court on March 7th.

In that ruling I said that courts in this district have found that an inventor can explain how he developed the claimed invention, the process of obtaining the patent, research of which the person was personally aware and authenticity, if disputed, of documents related to the patent application.

However, a fact witness may not opine on what a hypothetical person skilled in the art would know or what is disclosed by the claims of the patent.  And in the *Innogenetics* case, the Federal Circuit approved a decision to confine an inventor's testimony to actual words and content of the patent and patent application.

It's following the *Innogenetics* case and it's once following that reasoning that I'm going to sustain the objection to these proposed demonstratives because they go outside the words and content of the patent and could confuse the jury into thinking that these demonstratives are actually specifications of the patent.

And particularly this phase of the case where there's been no evidence put in, and we're going to hear from Dr. Pelka early, I think there will be a great danger of confusion even from a demonstrative that's not in evidence that what he's saying, even if intended to be background or describing his process of obtaining the patent, might be interpreted by the

jury as actually being the patent and the specifications of the patent.

And if Dr. Pelka wants to and if SSC wants to put up a specification of the patent, and there are examples in the patent which are similar to these demonstratives of images of things and lights that are different than the ARCO light, you can do that and that will avoid any confusion of something different than what's in the patent.

So for those reasons, based on Federal Circuit law and the relevance and danger of juror confusion, I'm going to exclude those demonstratives; but, again, Dr. Pelka may testify about the process of developing the invention so he can say that process but not use those demonstratives in doing so. That's my ruling.

See you in the morning. Thank you.

MR. LABGOLD: Thank you, Your Honor.

(Proceedings adjourned at 3:53 p.m.)

---oOo---

**CERTIFICATE OF REPORTERS**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Monday, March 14, 2016

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter

---oOo---

_____

Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
U.S. Court Reporter