**Volume 2**

**Pages 133 - 328**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

| | |
|---|---|
| ENPLAS DISPLAY DEVICE CORPORATION; ENPLAS TECH SOLUTIONS, INC.; and ENPLAS (U.S.A.), INC., <br><br> Plaintiffs, <br><br> VS. <br><br> SEOUL SEMICONDUCTOR CO., LTD., <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**NO. C 13-5038 NC**

San Francisco, California
Tuesday, March 15, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

NAGASHIMA & HASHIMOTO
12005 Sunrise Valley Drive - Suite 203
Reston, Virginia  20191
BY:  **MARC R. LABGOLD, ATTORNEY AT LAW**
**PATRICK J. HOEFFNER, ATTORNEY AT LAW**

SHAW KELLER LLP
300 Delaware Avenue - Suite 1120
Wilmington, Delaware  19801
BY:  **JOHN W. SHAW, ATTORNEY AT LAW**
**JEFFREY T. CASTELLANO, ATTORNEY AT LAW**
**ANDREW E. RUSSELL, ATTORNEY AT LAW**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported by:      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
Rhonda Aquilina, CSR No. 9956, RMR, CRR
Official Reporters

**APPEARANCES**:   (CONTINUED)

For Defendant:

                        LATHAM & WATKINS
                        555 Eleventh Street, N.W. - Suite 1000
                        Washington, D.C.  20004
              BY:  **LAWRENCE J. GOTTS, ATTORNEY AT LAW**

                        LATHAM & WATKINS LLP
                        650 Town Center Drive - 20th Floor
                        Costa Mesa, California  92626
              BY:  **RYAN R. OWENS, ATTORNEY AT LAW**

                        LATHAM & WATKINS LLP
                        140 Scott Drive
                        Menlo Park, California 94025
               BY:  **MICHELLE P. WOODHOUSE, ATTORNEY AT LAW**

                        LATHAM & WATKINS LLP
                        John Hancock Tower - 27th Floor
                        200 Clarendon Street
                        Boston, Massachusetts  02116
              BY:  **CHARLES H. SANDERS, ATTORNEY AT LAW**


Also Present:                  **Takaaki Nagashima**
                        **Yukihiko Ohnuki**
                        **Jennifer Jonak**
                        **Kibum Nam**
                        **Yudae Han**
                        **Soomi Ko, Korean Interpreter**
                        **Jacki Noh, Korean Interpreter**

**I N D E X**

Tuesday, March 15, 2016 - Volume 2

|                                                        | PAGE | VOL. |
|--------------------------------------------------------|------|------|
| Opening Statement by Mr. Gotts                         | 139  | 2    |
| Opening Statement by Mr. Labgold                       | 172  | 2    |

| **DEFENDANT'S WITNESSES**                              | PAGE | VOL. |
|--------------------------------------------------------|------|------|
| **PELKA, DAVID**                                       |      |      |
| (SWORN)                                                | 205  | 2    |
| Direct Examination by Mr. Sanders                      | 206  | 2    |
| Cross-Examination by Mr. Labgold                       | 233  | 2    |
| Redirect Examination by Mr. Sanders                    | 279  | 2    |
| Recross-Examination by Mr. Labgold                     | 285  | 2    |
| Jury Question Follow-up by by Mr. Sanders              | 290  | 2    |
|                                                        |      |      |
| Direct Examination by Mr. Owens                        | 292  | 2    |
| Cross-Examination by Mr. Labgold                       | 306  | 2    |
| Redirect Examination by Mr. Owens                      | 322  | 2    |
| Jury Question Follow-up by by Mr. Labgold              | 324  | 2    |
| Jury Question Follow-up by by Mr. Sanders              | 325  | 2    |
| Jury Question Follow-up by by Mr. Labgold              | 326  | 2    |

**E X H I B I T S**

| **PLAINTIFFS' EXHIBITS**      | IDEN | EVID | VOL. |
|-------------------------------|------|------|------|
| 14                            |      | 271  | 2    |
| 20                            |      | 237  | 2    |
| 32                            |      | 275  | 2    |
| 34                            |      | 267  | 2    |
| 35                            |      | 277  | 2    |

**E X H I B I T S**

| **DEFENDANT'S EXHIBITS**      | IDEN | EVID | VOL. |
|-------------------------------|------|------|------|
| 1001                          |      | 212  | 2    |
| 1004                          |      | 220  | 2    |

<u>Tuesday - March 15, 2016</u>                                    9:07 a.m.

**P R O C E E D I N G S**

**---000---**

(Proceedings were heard out of the presence of the jury:)

**THE COURT:**  Our jurors are ready to join us.

Any issues before we bring them in and have our opening statements?

**MR. GOTTS:**  Your Honor, we do have exhibit issues for the upcoming witnesses, and I don't know if Your Honor would like to take those up now, or --

**THE COURT:**  Let's take them up in the break after the opening statements.

**MR. GOTTS:**  Okay.  Sure.

**THE COURT:**  We will take a break after the opening statements.

I have one issue with SSC's opening slides presented to me yesterday.  I don't know if it's still in your planned presentation, but Slide 18 has information about sponsoring U.S. universities and money to the University of California. And my question is:  What is the probative value of that, and who is it coming -- is that evidence that's coming into the case?

**MR. GOTTS:**  Dr. Nam will testify to that.  It relates to overall SSC's research and development efforts, and I think that is highly relevant to not only, sort of, the damages

issues but also, frankly, the fact that they have a keen interest in protecting their intellectual property.

THE COURT:  Their donations to the University of California has to do with --

MR. GOTTS:  Oh.  Well, it isn't donations.  These are -- this is research done in LED technology.  Maybe it's not worded properly.

MR. SANDERS:  LED research.

MR. GOTTS:  It's LED research and they deal with UCSB. And they have a whole program at UCSB.  Dr. Shuji Nakamura, and the like, is a famous LED scientist, and --

THE COURT:  How does that tie into their damages?

MR. GOTTS:  Well, it ties into overall that we've invested a lot in our technology, IP and the like, and it also ties into, you know, the interest we have in protecting our intellectual property.

MR. LABGOLD:  It's not in their damages.  Their expert doesn't rely upon it or reference it or otherwise.

THE COURT:  And do you object?

MR. LABGOLD:  Yes, we do, Your Honor.

THE COURT:  All right.  The objection is sustained.  I will entertain discussion of it during a direct examination to see how it might play; but as far as the slide in the opening statements, I'm going to exclude it.

MR. GOTTS:  So, Your Honor, shall we just remove that

one segment?

THE COURT:  If you remove the last two -- if they are separate parts of the slide, if you remove the last two paragraphs.  I don't have any problem with saying that they invest heavily in patents as being a general statement, but the last two, I'm not sure of the probative value.

MR. GOTTS:  All right.  Thank you.

THE COURT:  All right.  Let's bring in our jurors.

(Proceedings were heard in the presence of the jury:)

THE COURT:  Good morning to our jurors.  And as you come in, you're welcome to sit anywhere --

A JUROR:  Can we sit?

THE COURT:  We're standing for you.

You can sit anywhere you like in the box that best aids you to see and hear the things to be presented; if you need to move around during the presentation, you're welcome to move around to do that.

Everyone may be seated.

Good morning to our jurors and welcome back.

A JUROR:  Thank you.

THE COURT:  I think there's one more coming.

THE CLERK:  Oh.

(Pause in proceedings.)

THE COURT:  Good morning.  Ladies and gentlemen, today we'll be hearing the opening statements from each party.  This,

again, is the attorneys' opportunity to tell you about the case and the evidence that they anticipate will be presented.  Each side will have that opportunity.

We'll then take a break, and then we'll begin with the evidence immediately after that.

Seoul Semiconductor will go first.  Mr. Gotts.

### OPENING STATEMENT

**MR. GOTTS:**  Good morning, ladies and gentlemen.

We are going to be using the screen, so if any of you feel like it would be easier to move around to see the screen, feel free to do so.

And, as you know, my name is Larry Gotts, counsel for Seoul Semiconductor.

So what this case is about, it's a patent case but it's also fundamentally a case about fairness.  The evidence is going to show that SSC partnered with EDD and helped it to develop critical technology only then to find itself cut out of the loop and its patent rights infringed.

So SSC is an innovative South Korean company that's invested heavily in its patents and R&D and technology, and it's a world leader in light-emitting diodes for backlighting screens of televisions and all sorts of other applications.

We're going to see a lot about backlighting, a lot about televisions.  So why don't we go ahead and take a look at one and sort of give you sort of the lay of the land.

And what we have here, and this is a schematic of a flat screen television. If you were to take one apart -- and I wouldn't commend you to do that because they don't go back together again so easily -- but if you were to take one apart, you'd find that you'd have an LCD panel on the front; a number of other sort of layers, which we'll talk about a lot more in the case; and then this cavity; and behind that are these things called light bars which project the light forward through the panel to give you the image on the picture.

So if you were to take a closer look at one of these light bars, what you see is it's a bar. It's got this PCB material. That's what electrifies it. It's got LEDs mounted on it. The LEDs are very bright light sources. You'll hear a lot about them. You have them in your flashlights, your headlights, and behind your televisions, and they're everywhere these days. And finally you've got the lenses on top.

And when you put them all together -- if we go back for a second -- you'll see they get assembled into what's called a light bar. And a light bar is a product that's sold by SSC, and Enplas makes lenses. So SSC assembles light bars, they use their LEDs, and Enplas makes lenses.

In 2010, that's when SSC got in -- developed greater into its light bar business, and it selected Enplas Corporation -- which, by the way, is the parent. EDD later spins off. So you might hear "Enplas," you might here "EDD," and we might lapse

back and forth.  So -- but realize in the early days, it was Enplas Corporation, later became EDD.  So I'll try not to confuse you on that.

But, in any event, SSC selected Enplas to help it or to work with them, I should say, in a collaborative effort to develop light bars using the Enplas lenses.

So once they did that, what became clear -- and, by the way, at that point in time, Enplas already was making lenses for light bars for Sharp televisions in Japan.  So they'd been in the business.  They had a product called the LE-Cap, or the light enhancer cap, and we'll hear about that product line.

What became clear to SSC at the outset when they got in there -- because they're the LED experts -- Enplas is the lens experts and SSC is the LED experts -- what became clear to SSC right away was that the lenses were only half the puzzle and that, in fact, they were -- Enplas was using not the right kind of lens to really maximize the benefit of their light bars.

So the collaboration began to perfect this LED lens combination.  Those are the two parts of the puzzle.  They worked closely together on a project for over eight months. SSC invested thousands of hours with sharing its LED know-how, working with Enplas to put together these collaborative light bars, and the end result was really nothing short of remarkable.

What happened was, as a result of SSC's contributions --

and I plan -- this is a thumbnail.  I'll tell you a little more in a bit -- as a result of these combinations, SSC was able to demonstrate to Enplas that it could get the exact same performance or the same performance it was getting out of the Sharp TVs using one half of the number of LEDs -- and that's the big cost of the light bar -- and even using less expensive LEDs, and they did this with only minimal changes to the Enplas lens.

So they took the existing lens, just tweaked it a little bit together, and then the LED technology that Enplas -- that SSC brought to the table allowed it to essentially double their performance -- or half of the price, however you look at it -- and the response to the marketplace was significant.

Throughout this process, SSC made it entirely clear to Enplas and later to EDD that it had patents on its technology that it believed covered these collaborative products, and at no point in time then, prior to this lawsuit, did Enplas or EDD ever dispute that notion.

And the relationship was a good one.  They worked closely together over this time period.  They developed a product.  SSC was quite proud of the product.  I suspect Enplas was quite proud of the product we'll hear.  But then after that, it came time to go into production; and when they went into production, that's when the trouble started to arise.

Enplas continually failed to meet SSC's needs for the

supply of lenses -- otherwise they would have developed a product -- the sole source is Enplas, and they can't get the lenses they need from Enplas.  This is a big problem for SSC because SSC, they were their only source.

SSC later finds out not only are they not supplying lenses to them, but they're actually supplying lenses to SSC's competitors in the marketplace using the same configurations that were -- that were used with the lenses and the light bars; namely, this type of LED that I'll talk to you about in a minute.

SSC understandably felt betrayed.  It found its competitors taking advantage of the very collaborative effort it worked on with Enplas, the technology they worked so hard to jointly develop with them, and then to find themselves competing in the marketplace with technology that's actually infringing their patents, which they also had jointly developed with Enplas.

So SSC tried to reach out to Enplas' direct and indirect competitors in the marketplace.  They tried to reach out to EDD directly.  You know, it believed if others were using its patented technology, particularly the technology they helped to perfect, that, in fairness, in fairness, they should be compensated for that.

EDD's response wasn't for a proposal for fair compensation.  It wasn't a business discussion.  It wasn't an

explanation.  Instead, on several occasions after SSC sent them a letter, they cut off SSC's supply.  Remember, they're the sole source.  SSC has contracts out there.  They're the sole source.  They cut off their supply.  They filed a lawsuit within weeks; and only then, after that, did they recommence supply at over twice the price.  They doubled the price on them.  So SSC was over a barrel.  SSC's sole source of supply was Enplas.  So here we are.

So let's step back and talk a little about the inventions.

Excuse me.

So this case relates to two patents as Judge Cousins mentioned in the preliminary instructions.  The two patents, one is the '209.  That's on the left, and that's based on the last three numbers.  And the other is the '554, and that's based on the last three numbers.  And you'll see a lot more of these patents as the case goes on.

And Dr. Pelka, Dr. David Pelka, is listed as the sole inventor on the '209 and one of the two inventors on the '554, and he'll be our first witness.

Dr. Pelka is a prolific inventor with over 29 patents mostly in the field of optics.  He is -- was a college professor.  He spent 40 plus years designing lenses and lens technology and in 1992, he filed -- he formed a company called TIR technologies.  TIR.  You're going to hear a lot about TIR.  "TIR" stands for total internal reflection.  It's an important

concept in this case as we'll get to later.  It was also a concept that was near and dear to his heart throughout his optics career, and you'll see that it became a foundation for the '554 patent.  And TIR Technologies filed the '209 and '554 patents.

So let's take a look first at the '209 patent and see what it's about.  Well, actually, both of the patents together, first, collectively address problems.  You can imagine, if you have a backlight and you put this very bright LED behind it, one of the problems that inherently occurs is you get these bright spots behind the lens, behind the screen.  But you can imagine, you don't want bright spots.  You want a nice, uniform display; right?  So the '209 patent is directed to resolving this bright spot problem.

And we'll talk in a minute afterwards about the '554 patent.  Some of the inventions in the '554 patent are directed to resolving a dark spot problem, which I'll explain in a moment.

So -- but the goal is to get a uniform display.  So let's talk about the '209 first.

The 209 is, as it says, it's directed to getting substantially uniform intensity and color to get rid of these bright spots -- this is text from the patent -- and it does that by the way it directs the light rays behind the screen.

So if you look at -- if you go to the -- if you actually

were to look behind -- if you look at the drawings that are the '209 patent -- I think it's the next slide -- what we have here is -- what we have here is a cavity.  This is the back of a panel; right?  This is the side view if you were to slice it from the side (indicating), and this is the back (indicating).  You have this panel.  There's a cavity in there; and there's LEDs mounted in a pattern, a matrix kind of pattern behind there in this particular embodiment; and then you've got these baffles, which are here (indicating), which have the effect of directing the light sideways instead of straight out, which has the effect of giving you the uniform lighting.

Dr. Pelka explains how he came upon the '209 patent invention.  He will explain I should say.  He was at a conference in 1996 or '97 relating to LED technology and lighting technology, and he came across a gentleman named Dr. Crawford.  Dr. Crawford was the chief scientist for Hewlett Packard at the time, and he explained to him that LED technology was about to take off in terms of brightness to a whole new level.  I think hundreds of times.

And Dr. Pelka at that point in time at the moment said, "You know, these LEDs, now they're going to be bright enough.  Before they weren't very bright.  We can use them for backlighting displays."  But that's when he envisioned he was going to have this bright spot problem that he had to take care of, and that's how he came across the '209 patented invention.

So Dr. Pelka soon envisioned, after the '209 patent came about, that there may be other ways to redirect this light that's in the cavity other than these baffles that are shown in the '209 patent.  The '209 generally is talking about redirecting light in a cavity, an open cavity, but now he's going to get down to something more specific, another way to do it.  And he realized, going back to that concept near and dear to his heart, TIR, "Maybe I can use a lens, a TIR lens, to make that happen."

So in a normal LED -- this is just a schematic, if you will -- but if you had an LED with no baffle, nothing, and it projects forward on a screen without any TIR, you're going to get bright spots exactly as we spoke about before.  So Dr. Pelka's concept was, "Let's use TIR to eliminate the dark spots."

So what he did -- I mean, to eliminate the bright spots. So what he did was he creates a special shape of the lens to create what's called a TIR lens.  And what that does is, and it's a matter of physics, if a light hits this angle right here (indicating) at a certain angle -- critical angle it's called -- the light goes sideways instead of forward.  That's called total internal reflection, and it's total when all of the light goes sideways.  Okay?

But as often happens, he solved one problem, the bright spot problem, and he created a new problem.  Because you can

imagine, if all the light is going sideways, all of a sudden there's no light in the middle and, lo and behold, now you've got a dark spot problem.

So he solved the light -- he went too far.  He did too good a job.  He got rid of all of the light in the middle, and that created a dark spot problem.

So now comes the invention to solve that problem.  This is the way inventors work.  When things go that way, you know, you solve problems from problems.

So he came up with a concept of leaky TIR.  And what Dr. Pelka invented was the concept -- remember, this is the '554 patent now.  And there's many inventions of the '554 patent, by the way.  There's some pure TIR lenses.  There's other things we'll talk about.  This is the -- what we'll call the leaky TIR aspect of the '554 patent.

And the idea was you could take that tip I showed you before -- this now shows a picture of it in the patent -- and you can round it; and by rounding it, some of the light goes through the center and other light goes to the side, and you get what's called leaky TIR because some of the light leaks through the center and other light goes to the side.

So as the specification of the patent -- that's the description in more detail -- says when dark spots are objectionable, as they would be in a display, you contour to make it less than a perfect internal reflector, less than that

Sharp thing we talked about, so that a significant amount of light leaks through the middle.

Lo and behold, when you do that -- and this is just a schematic, of course -- you do that, and the light -- some of the light reflects by internal reflection and some of it goes through; and by fine-tuning it and balancing it, you can come up with a nice even display that has no dark spots.  And, of course, we've already eliminated the bright spot problem.

So by way of summary, if you have no TIR, bright spots.  If you have full TIR, dark spots.  If you have leaky TIR, perfectly tuned uniform display.  So that's the '554 and '209 patents, at least as to that aspect, in a nutshell.  Of course, there's claims in the patents, and we'll talk about those later, but this is the concept.

So another important aspect -- as I mentioned, there's more than one sort of inventive aspect of the '554 patent.  Another important aspect relates to a more mechanical aspect; that is, how you connect or introduce this LED into the lens.

And if you look, what we find is that in much of the prior art -- remember, in the video the prior art is the sort of prior way of doing things in patents and the like.  In much of the prior art, what you'll find is that the LED is buried, encapsulated, or physically fixed, whether it's there or somewhere else, into the lens itself.  Okay?  That's called a -- we call it fully encapsulated or surrounded.

Dr. Pelka came up with the concept of something called an illumination coupler. Illumination coupler. That's talked about in the invention -- in the patent, and the illumination coupler is described as being -- having the LED be separate from the lens, and it's introduced -- it's coupled to the lens by either a convex or concave surface that's described in the patent. It's convex or concave. This is concave (indicating) and convex would be the angle goes the other way.

But the idea is to couple the LED to the lens, and this has got a number of advantages, which you'll hear the witnesses talk about in the trial, some mechanical manufacturing advantages, as well as other advantages.

So we have another set of claims in the case that are directed to this illumination coupler aspect, and actually they tie in with TIR. You'll see the claims combine these elements and these features. Okay?

So that's the invention. Now let's talk back. I gave the sort of high-level story of what -- how SSC and EDD came to be working together. Now I want to drill down a little bit deeper on that.

So SSC, let's talk about them first. They were founded in 1992 by a gentleman named Chung H. Lee who has -- had a physics degree and an MBA and a concept for a new business; namely, using LEDs to someday provide much more affordable lighting at -- to use much more level power, much more efficient

technology.

So SSC is -- you'll hear testimony from Dr. Kibum Nam, who is the chief technology at SSC, that they have thousands of patents worldwide and they've invested very heavily in their research and development and technology over the years.

So today SSC has grown to be one of the world's leading LED makers and certainly one of the leading light bar manufacturers.

You'll also hear the testimony from Mr. Seung-Ryeol Ryu who is an IT director, sort of a research director for SSC, and he'll tell us about SSC's story relating to display technology, and he'll explain how he got involved in display technology back in 2004 and to get into the sort of backlighting field.

And one of his early designs that he'll explain was actually a TIR LED lens for backlighting that used RGB -- red green blue -- LEDs.  And when he got into that project, his team found the '554 patent; and after determining that patent was an important patent, they decided they should take a license, which is what responsible companies do.  They take a license if they think the patent might be important.

They also licensed the '209 patent at that time.  They licensed them both from a company called Teledyne, which is actually the successor to Dr. Pelka's company.  Dr. Pelka's company was purchased by Teledyne.

So Dr. Ryu became even more interested in the concept of

direct-type backlighting in 2009.  He thought that the concept of using LEDs, and the like, in 2009-2010 time frame was going to become or could become, if properly executed, a good substitute for prior approaches, the more popular approaches at the time.

The more popular approach at the time was something called edge-light backlighting where instead of lighting from the back, you put the LEDs or fluorescent lights on the side and you light the display from the side.  So this is direct-type backlighting, which was the -- which is -- which hadn't fully caught on, but it was something that SSC was interested in pursuing.

So what Dr. Ryu came up with was a concept he called the second optic approach, which means take an LED and take a separate lens, marry those two together -- sort of like the illumination coupler we talked about there, or like the illumination coupler -- and create a second optic approach rather than a fully encapsulated approach, and he believed that would be a good way to proceed.

But he knew that they were the LED experts but not the lens experts, so they went out looking for a partner in the lens area.  They spoke to three companies, and they ultimately partnered with Enplas.  Okay?  And that's in 2010.

As I mentioned, as of 2010, SSC met with them, and they knew -- they learned they were already making lenses for Sharp,

the LE-Cap, the light enhancer cap, and they began their collaboration immediately. But as I mentioned, SSC soon realized that although Enplas had a very good foundation for lenses, it was utilizing the wrong type of lens technology. I mentioned that before. Let me explain that in more detail.

Enplas was using with Sharp something they call a dome-type lens, and it's sort of just as you expect. It's an LED with a dome over it; right? And SSC looked at that and using its LED expertise and said, "You know, we see your lens, but we think you're using the wrong kind of LED." And they recommended using something called a high-powered flattop LED.

Interestingly, the engineers at Enplas resisted the change. They wanted to stick with the dome-type that they were using with Sharp. So SSC prevailed on them to say, "Let's do some comparative testing. Let's just see how it works. Let's take what we want to use and what you want to use, and let's see what works better."

And, lo and behold, SSC demonstrated to Enplas that they were able to use half the number of LEDs with only minimal changes to the lens. And the LEDs themselves cost significantly less than the dome-type LEDs, so the cost savings were tremendous. And the end result was not only a cheaper device, but something that really took off in the marketplace.

So SSC and Enplas both stood to benefit from this

collaborative effort.  That was the whole purpose from the outset, we're both supposed to benefit here.

And as I said, SSC engineers, as Dr. Ryu will testify, spent thousands of hours on this project over eight months, and the end result was strong interest among customers.

And after they finished that project, they looked forward to a long and strong relationship working together, and they looked forward to a relationship where both would benefit from SSC's patents because, obviously, you don't want -- you want -- if you're in the business, you'd like to be able to have the exclusive rights that the patents give to you.

And that's what the patents do, and that means that allows you to keep out competitors who would otherwise be infringing your patents.  So they both were hoping -- SSC was hoping both would benefit from a long-term exclusive relationship.

And as I mentioned, SSC brought its patents to Enplas' attention on numerous occasions, and Enplas never at that point in time disputed that the patents covered the product of their collaborative effort.

But then they get out of this development phase and they get into the production phase, and this is now in 2010 and this is when things start to break down.

SSC is having continuous problems getting the full supply it needs of lenses from Enplas.  And, of course, as we say, they were collaborating.  The whole goal was to work together.

Enplas was their sole source of supply; but SSC's got customers out there that need product, and they weren't being able to get the lenses they need.

Then in 2012 -- I'm sorry -- 2011, SSC begins disassembling televisions in the United States to see what's going on; and when it does that, it finds Enplas lenses using the same flattop LED configuration that they had sort of worked on their joint collaboration in televisions in the United States.

So at the very same time that Enplas is unable or failing to meet SSC's delivery needs, it's supplying these lenses to SSC's competitors in the United States, including a company called Lumens who was then selling light bars to companies like Samsung and others.

So although the relationship started out very strong, what SSC now found itself was in an unfair position of being able to get the supply it needs of lenses; and, even worse, competing with the very sort of improved technology it jointly developed with Enplas. And, most importantly, found itself having to compete against products that it believed infringes its patents, or that infringe its patents.

So that's where we are in the timeline, and SSC was then left with no choice. It starts to send out letters. It sent a letter to Best Buy, it sent a letter to Lumens, and it wrote to EDD in October of 2013, in each instance seeking a business

solution.  Of course, just saying, "If we can't work it out, we may have to litigate."  But they sought an amicable resolution.  It's right in the letters.

So what did EDD do?  They responded first by cutting off SSC's supply entirely, and then they brought the lawsuit, and then they reinstated supply, then they cut it off again, and I will -- sort of over this period of time, and finally they reinstate supply at over double the price.

So there's SSC now facing, because it -- facing this after having filed -- after having -- because it raised its patent rights.

So let's turn now to the issue of infringement.  Let's get away from the story and into the patents.  We know there's two patents involved.  There's this '209 and the '554 patent.  I'll turn to the '209 first, but SSC will show that the accused products in this case were sold by retailers in the United States, and it knows this based upon products that it purchased in the United States.

And you'll hear a lot more about the infringement evidence in the case, and so forth, but the infringement here is based on a theory of induced infringement; namely, that although the direct acts of infringement occurred in the United States, but that Enplas -- and the judge -- Your Honor -- the Court will instruct all of you as to what this induced-in-theory means, but Enplas will -- you'll see evidence of Enplas' involvement

with light bar manufacturers to do what ultimately caused the infringement.  And we say that's inducing infringement, and you'll be instructed on that later as to what the elements of that are.

So as you heard in the patent video, patents have these things at the end called claims.  And this is -- now we get into the sort of arcane patent world, but we'll try to make it as, you know, understandable as -- and understandable for all of us, and I think by the end we'll be -- you'll see what they mean.  You have to sort of see claims to get it.

But claims are word sentences.  They're paragraphs that define in words what's within the scope of the patent because you have to figure out what is and what's not within the patent.  So if you read the words, you read the claim, that's how you determine if something is covered or infringes the patent claim.

And there are two -- the two patents have their own sets of claims.  The first patent you'll hear a lot more about is the '209 patent, but let's go back here -- I'm sorry -- to Slide 35.

Dr. Moore will be our technical expert, and you'll meet him.  He will present SSC's evidence of infringement in the case.  He's got over 40 years of experience designing lenses.  He's a Ph.D. professor in optics.  He worked with NASA to fix the big problems with the Hubble space telescope.  He was an

adviser to the White House, a scientific adviser to the White House. And he'll address the infringement issues, and the first one he'll address is the '209 patent.

So we talked about the claims a moment ago. This is the claim. It's been broken up into chunks or pieces. The first claim we're going to talk about is the one for the '209 patent. That's the bright spot patent. And we'll go through this in detail in Dr. Moore's testimony, but some of the high points are is the claim requires this cavity that's got -- and we'll go through the cavity, and then it requires that redirecting of light.

So if you look -- and Dr. Moore will walk through this all in much more detail, but if you look at a flat screen television, you'll see that it has a cavity in the back -- all of the ones that are at issue in this case have a cavity in the back -- and they have this -- internal sidewalls, which are required by the claim in that cavity; and they have an internal bottom wall, which is required by the claim; and they have -- this is a side view -- they have the aperture. The aperture is the opening across the top.

And what we find is that there are also these LEDs, which they call plural light sources, and those LEDs are mounted both along the internal bottom wall and around the perimeter of the aperture. And those are key elements of the claims.

Dr. Moore will walk through those in much more detail and

will explain why and how he believes the Claim 20 is infringed by the accused products in the case.  That will be the infringement issue in the case.

The next patent, of course, is the '554 patent, and Dr. Moore will walk through the infringement issues in the '554 patent.  And Dr. Moore will explain that he, working with a company called Breault Research Organization, who did an independent analysis, the two of them worked together, and along with another company, Advanced Coordinate Technologies, to measure and analyze the lenses and the light bars that are involved in the case.  These are the ones that are pulled from the actual products purchased in the U.S.

And if we go back for one second, Chris.

The important thing is, what you're saying here is Breault Research Organization is called out in the '554 patent itself as the independent organization that you can use to analyze these products, and they use a software called ASAP, that software product.  So these are exact -- these are called out in the patent as the products to use.

So what Dr. Moore and BRO -- what BRO did and Dr. Moore was involved with, of course, was they analyzed these lenses. They're very small pieces, and you'll see them.  You'll get to hold them, and you'll see a light bar.

So this is a lens (indicating).  And what they did is they did an analysis of the lens through a bunch of steps, which

I'll explain in a moment, and -- there we go -- and by that they were able to sort of characterize or come up with a model of the shape of the lenses.

And there's a number of dimensions here, and I'm not going to belabor them all, but there's a number there, and they're sort of important and some of them will come up in a moment.

One thing that is very important is measuring this gap here (indicating) between the LED and the bottom of the lens. This is the LED (indicating) that the light is in.  This is the lens (indicating) that goes over top of it.  This is an example of one of the lenses at issue in the case, the 9854E, and this lens, there's a gap here (indicating), which is an important dimension.

Another important dimension is the shape of this curve on the top.  Another important dimension is the diameter of these lenses here (indicating).  Okay?  All that geometry affects how the lights travel through here (indicating) because ultimately you're going to use that ASAP software -- and you're going to see something in a moment -- but it's called -- to come up with what we call ray traces.

And what those ray traces are are essentially models or simulations that say, "Well, if a light ray comes out of this LED in some direction, what happens to it?  Where does it go? How does it develop?"  And those are important because we're going to have to talk about later on whether there's TIR and

how the light rays develop in the case, and this ASAP is often used for that.

So what did Dr. Moore do in working with BRO and Advanced Coordinate Technologies?  They went through this process, this essentially a nine-step process which Dr. Moore will explain. They measured that gap that I talked to you about on actual products.  They actually measured that LED diameter on actual products.  They measured the shape of that curve on actual products.  All of this with highly sophisticated equipment from ACT and also just by analyzing the products -- sorry -- analyzing the products themselves.

They measured all these dimensions, and then after that, they entered the results into this ASAP software.  They run these ray trace analyses, and then Dr. Moore analyzes the results.  So working with the independent BRO and ACT folks, that was Dr. Moore's analysis.

So based upon that, then Dr. Moore proceeded to apply what he learned to the claims of the patent, the '544 patent.  And there's two sets of claims that are involved for infringement purposes here.  The first set of claims we call -- we'll call the illumination coupler claims.  Remember we talked about the illumination coupler?  That's that the LED is on the bottom and that's that curve that sets and that's how the light gets introduced into the lens.

So key elements of the illumination coupler claim -- and,

of course, Dr. Moore will go through all of them -- the key elements are this thing called a waveguide, the illumination coupler, and the concept of total internal reflection.  And we'll go through all these, but let's talk about these a bit first.

A waveguide is -- remember, Judge Cousins indicated at the end of the case he will instruct you what certain claim terms mean.  He, Judge Cousins, has interpreted what a waveguide is, and Dr. Moore will use that interpretation to explain how the lens -- remember this is the lens (indicating), this is the LED (indicating) -- how the lens in the Enplas products that are the accused products act as a waveguide.

The next step is the illumination coupler.  Remember the patent had that concave surface and the upper surface where the LED is introduced below?  Dr. Moore will explain how there is an illumination coupler in the accused products when they're mounted on the light bar as intended.

And now we're going to see one of these ray traces that we talked about.  We'll see some more.  What the ray traces do is they simulate -- now that you know precisely all these dimensions and all these -- how things are set up, the ray traces simulate how light is going to behave when it enters this lens.

So, for example, here (indicating), if you took a light ray -- this shows two different ones at two different

locations, but if you took a light ray here (indicating) and it reflects out, the software, based on these dimensions, tells you what's going to happen.

And in this case, you notice that instead of the light going out and spreading all different directions, these particular light rays stay within the lens and bounce straight -- go out the other way not going out or up or anywhere.  That's total internal reflection, and that will be explained to you by Dr. Moore.  He'll explain that these lenses have total internal reflection.

Now, we're going to come back to this in a moment, because that's not all they have, but they have total internal reflection.

So based upon that, Dr. Moore will provide you with his opinion that the '554 patent, Claim 1, is infringed by the three accused products.  It's three lenses that are at issue for the '554 patent.

So there's also another set of claims in the '554 patent.  These are -- and we're going to refer to these as -- I'll refer to these as the leaky TIR surface claims.  Remember we -- and these claims, these are dependent claims -- and I'll explain in a moment -- these claims get read with the next -- with their independent claim, Claim 30, and you look at the whole thing together.  And this is Claim 30.  That's just -- we'll explain that as we go, but these claims have two elements that I'm

going to talk about now, and Dr. Moore will run through them in great detail.

First they require, much like the illumination coupler, that the LED is mounted beneath the central portion of the optical element, beneath the lens, and from -- and that the light enters the optical element.  So, again, Dr. Moore will note that that requires a sort of separateness, if you will, between the lens and the LED.

The second thing is it requires a TIR surface -- we talked about TIR -- but this one has to be a leaky TIR surface.  That's that whole elimination-of-dark-spots thing we talked about.

So if we walk through the product itself, you'll see, again, we've got this LED (indicating), which is beneath the lens, beneath the central portion of the lens, and the light from there enters the lens just like mentioned in the claim.

Next you've got this TIR surface, which we've already seen that; right?  We've seen where we get the TIR; right?  But we've also got what we call -- remember we talked about leakage before?  That's this where you round the surface so that the light comes through the center.  It's not pure TIR.  The light comes through the center.  There's some TIR, some leakage; right?

So what we have here is there is a surface, the TIR surface in the accused products; and when you do the light ray

analysis for that, what you find -- see, now you're looking at a lot more rays, not just the coupled ones before.  The coupled ones were the ones you've got to find here.  They're the ones going to TIR; but some of them now, depending on where you are in this LED, if you're towards the center, they go straight through and they refract out this way (indicating).  That's leakage.  That evens things up.

More than that, what you'll see is, those very same light rays -- some of the same light rays also reflect out this way (indicating) and go out.  That's other form of refraction.  This lens is doing all sorts of things.  Okay?  But what we do know -- so it's got refraction out here (indicating), that's right, and it's got leakage and it's got TIR.  But what's important is, it's doing what the claim requires, as Dr. Moore will explain.  It's got TIR and it's got leakage.

The fact that it's got other things, like refraction out the sides, is not the issue.  The issue is:  Does it have what the claim calls, as Dr. Moore will explain it to you, TIR surface and TIR leakage?

Now, SSC [sic] is going to present evidence from Dr. Pollock, their expert.  Dr. Pollock is going to likely address a number of issues and explain his opinions.

Now, one of the things that's noteworthy is you'll hear that he never at the time he renders opinions had even looked at a light bar, let alone measured and analyzed one.  He never

even asked to see one.  And at the time he renders an opinion, he was unfamiliar with the manufacturing processes for light bars.

But Dr. Pollock will spend, we believe, a lot of time nit-picking Dr. Moore's analysis.  Dr. Pollock will point out a fact, which is a fact, that when BRO first entered the data that it had measured in the first six, seven steps, whatever it is, it made a data input entry for two of the lenses -- well, for two of the accused lenses.  The first one was right, but he didn't change a single -- one parameter, so they made a mistake.

But as soon as that mistake was brought to their attention, it was promptly fixed.  And just to be clear, the data that is being presented in this case, is the corrected data.  So let's not be confused.  The corrected data, Dr. Moore when he found the mistake, he fixed the mistake; and as to the accused lenses, it did not materially change his results, but --

            THE COURT:  Mr. Gotts, sorry to interrupt.

            MR. GOTTS:  Yeah.

            THE COURT:  I think you just said that Dr. Pollock is SSC's expert.

            MR. GOTTS:  Oh, I'm sorry.

            THE COURT:  And if that was a mistake, I want to make sure the jury doesn't get confused.

**MR. GOTTS:**  I appreciate that.

So he is Enplas' expert.  I'm sorry.

So he revised his conclusions as I note; and, yes, he made a mistake, and you'll hear all about that and sobeit.

Dr. Pollock will also suggest that Dr. Moore should have used Enplas' data rather than the data he measured from actual accused products that were purchased in the U.S., the actual products, the horse's mouth, if you will.

But what you'll hear is that that data was data prepared not by an independent organization, such as BRO, but by Enplas' in-house personnel.  The lawyers and the engineers assembled the data and they handed it to Dr. Pollock, and Dr. Pollock had a two-hour Skype call to talk about the data.

What's more is, what that data is and the source of that data was entirely unclear even to the point where Dr. Pollock, as you'll hear, I believe, seems not to have fully understood what that data was.

What we do know is that the data that was used by Professor Duncan, Dr. Duncan Moore, who is SSC's expert, was the actual data from the actual products.

We'll also see quite a bit of evidence regarding this important parameter of the gap.  As I mentioned, that Dr. Moore working with BRO, they actually measured the gap on the actual products.

What we're going to hear is that, again, Dr. Pollock never

looked at a light bar, never measured a gap. He used data from SSC, and I think the evidence will show that data was flawed.

But, lo and behold, although Dr. Pollock's data is not based on the actual light bars, it's based on data provided by Enplas, it's based on what Dr. Moore -- what will come out to be not the actual gap data, what we believe is incorrect gap data, but still on two of the three lenses, it still showed TIR. Even his data.

So I'm going to touch now very -- that's the end of the infringement discussion for now. We'll come back to that quite a bit more. I'll touch very quickly on a few other issues, and then move on.

So as I indicated, the issue -- another issue in the case is induced infringement. Enplas is charged in this case with induced infringement. And what the evidence will show is that Enplas works closely with its customers to generate specifications and to work with them to develop the light bars that are ultimately used with the Enplas lenses.

So, for example, we talked about the '209 before, '209 patent. This is an actual specification to a customer for the 9879 lens, one of the lenses involved in this case, and it talks about trying to suppress luminescent spots, bright spots. And it talks about these various layers that are in the claim we'll talk about later, the brightness enhancing film, BEF, and diffusion. Those are all things that are in the claim. And it

talks about the layout of the LEDs.  Remember how those LEDs get laid out in the cavity in a pattern.  This is all work that it does with its customers to develop the light bars.

It also generates specifications that it provides to the customers and works with the customers on fine-tunes with the customers to -- of the lens itself, which is, of course, highly relevant to the '554 patent.

And we'll see that Enplas certainly after SSC wrote a letter to them was aware that its products were being sold in the United States.  For this reason, based upon the Court's instructions and other evidence you'll hear, SSC believes that Enplas was inducing the infringement by the direct infringers in the United States.

SSC -- if you find liability in the case, you'll also be asked to seek damages -- to determine damages.  SSC will present the evidence from its technical expert, damages expert witness, Ms.  Julie Davis.  She's a renowned expert in patent damages, and she will testify regarding what she believes the parties would have agreed to prior to the active infringement as the damages in this case, and she'll testify as to a lump sum that she believes would be appropriate as the damages in this case.  EDD does not have a damages expert in this case, so you'll hear from Ms. Davis.

You'll also be asked if there's liability to find on the question of willfulness, and the Court will instruct you again

as to the question of willfulness; but the evidence will show that EDD was aware of the '554 patent and the '209 patent and of the concerns regarding infringement.

And although EDD routinely tests products and conducts simulations, the evidence will show it will come forward with no evidence of any such presuit tests or simulations done in this case to determine whether or not there was, for example, TIR in the products.

Lastly, the issue of invalidity will come up as a defense that is being raised by Enplas. In other words, whether or not SSC was rightfully entitled to its patent.

EDD will offer the evidence of Dr. Pollock, their technical expert, again on the issue of invalidity. You'll hear that Dr. Pollock himself never designed a custom-made lens for use with LEDs or otherwise, and then SSC will have its opportunity to respond on the invalidity issues through Dr. Moore, who's been designing lenses for over 40 years.

The first issue they'll raise is that the '209 patent is obvious over the prior art and, in particular, first a reference -- a prior art reference to a gentleman named Gleckman, who actually worked with Dr. Pelka at TIR.

And the Gleckman patent, as you'll hear from Dr. Moore, is relating to a small display that was used in a virtual eye -- virtual reality kind of thing in a goggle, and it had that edge lighting we talked about, that conventional edge lighting. Not

backlighting, not LEDs in the back, but edge lighting. So it wasn't directed to the bright spot problem because the LEDs are not in the back.

Then they'll say that if they would have changed that or modified that, it would have been obvious to come up with the invention of two other inventions of prior art, which have LEDs in the back but a whole different configuration, not into an open cavity. Dr. Moore will provide his opinions that the '209 patent is not invalid over the prior art.

Now, turning to the '554 patent, the first set of claims is these illumination coupler claims. You'll see a whole list of prior art that Enplas claims shows the illumination coupler claims. Dr. Moore will walk through in great detail his views as to why that prior art does not disclose the invention of the '554 patent claims.

Likewise, with the second set of claims, the so-called leaky claims -- you can go on -- Dr. Moore will show -- this is another set of prior art -- he'll explain why he believes those leaky claims likewise are not taught by the prior art.

So, ladies and gentlemen, at the end of the case, I'll have to stand up and address you with regard to what we believe we've proven; and after that time, you'll be instructed by Judge Cousins as to the law of the case. And after you've heard all of the evidence, we will ask you to return a verdict for SSC.

And as you can no doubt see by all the people in the room and all the equipment and all the attention, this is a very, very important matter for both clients.  So we deeply appreciate your service, your participation into what is a very, very important process, and thank you very much for your time.

THE COURT:  Thank you, Mr. Gotts.

It will next be Enplas' opportunity to make an opening statement.

I want to give the jurors a chance to at least stretch your legs, if you need to use the restroom, get a drink of water, use the jury room, I'll give you five minutes to do that, if you'd like want to take advantage of that.

Looks like a yes.  We'll come back in five minutes for the Enplas opening statement.

(Recess taken at 10:03 a.m.)

(Proceedings resumed at 10:08 a.m.)

(Proceedings were heard in the presence of the jury:)

THE COURT:  Everyone may be seated.

And, Mr. Labgold, the floor is yours.

MR. LABGOLD:  Thank you, Your Honor.

**OPENING STATEMENT**

MR. LABGOLD:  Members of the jury, my name is Marc Labgold.  We met briefly yesterday.  I represent the plaintiff, Enplas Display Device.  During the trial for

shorthand we'll refer to us as EDD, and you've already heard we'll refer to the other side as SSC.  So it makes it a lot easier for everyone.

There are several Enplas entities that are relevant here. So first I'd like to give you an overview and introduction to who my client is.

Enplas Corporation, the parent company of EDD, was founded in 1962.  Enplas' claim to fame, if you will, is the ability to make precision plastics, engineered plastics.  That's where the name comes from.  And they're able to do this in very high precision, very high quantities, and reproducible in those high quantities.  That's what their focus has been since the beginning.

Now, in the beginning it was what they referred to as mechatronic.  Mechanical are more things, gears.  If you think back when most of us were kids and toys were coming out of Japan, those little electric motor-type that would have like the little gear on it that would drive a car, those kind of things would be the simplest of these mechatronic-type devices.

In 1983 they branched into another area.  Now, they weren't only making things such as toys, because they're going to start doing a lot of things in the engineering area, they're going to start doing things in the automotive industries, internal engine parts for carburetors and things like that, but they start diversifying and they move into the area of

electronics.

Now, this is not on the electronic side, but in semiconductors some of you may know that this is a process where they're made on wafers and they make a lot of them, and they have to be tested. And so this part of the business was developing test sockets for the testing of semiconductors, and that continues still to today where there's a division that works on that.

Then in 1988 Enplas started to get into backlight optics. Now, there's a lot of -- well, you're going to hear "backlight." You're going to hear "backlight unit." It's going to be called a BLU for backlight unit somewhere in some of the documents. And in all of that we're referring to -- guess? -- lighting from behind, and it's truly like a wide and diverse aspect of not just signs. It's televisions. It's computers. It's these screens.

And there's a lot of different ways to do it, and in this point in time where you see these sheets, this got referred to in one context is that this is what edge light is referring to.

On things like the iPad, you don't have enough room here to backlight, or on our laptops; and so what ends up happening is, you'll hear that there's these -- think of it as plastic or a glass sheet that light is injected through the end, and the light is then dispersed through it and allowed to come out in a pattern that everybody tries to make even.

And so the edge lighting was a very popular way of doing it, and still is popular today depending on the size of the screens.  And we're going to see that size issue is going to be important with regard to some of the changes that come along the way.

Now, in 1989, Enplas starts going into precision optics, and this is going to be a precursor in this part to what's going to be the area in which we're talking because they start making optics for CD and DVD pickups -- that's actually the little lens that reads the CDD as it's spinning -- and making those in high quantity, and high reproducibility is necessary for you to be able to read the data that's on a CD or a DVD.

They also go into areas of, like, data communications, fiberoptic connectors, and things like that, which, again, have the need for high precision, reducible, and tight tolerances on manufacturing.

In 2001, they started moving into another diverse area, which is in the biological field for medical and diagnostic research.

And in 2003, you're going to hear Mr. Yamaguchi, who's an engineer at EDD, at that point in time he was at Enplas, he starts working in the area of trying to develop a lens and specifically a lens to spread light from LEDs.  That's the product that we're going to be talking about.

And I'll show you what they look like because it seems

like in the abstract and when you see them on the screen.  It's these little dime-sized pieces of plastic (indicating).  This is what we're going to be talking about.

And when you hear referred to there's the number 9879, the number 9845, the -- you know, my kids wouldn't call it even a number sign; it would be a hashtag before four numbers -- those are different models of these lenses, and you're going to get to see evidence.  You know, it will come into evidence, the physical examples of what they are so you can see, touch, feel what's at issue.

And there's five different lenses that are going to be in the case, and that's going to be something that's an interesting point because I'm not here to argue and tell you all the reasons why I disagree with my opponent's position because I'm here to just tell you what the evidence is going to be.

Because the greatest thing about this process is, no matter what I truly think and no matter what they truly think, you're the ones who are going to get to make the decision; and in doing that, you need to look at the logic or the lack of logic, the evidence or the lack of evidence, and the things that have been said.  Not just what evidence comes in, but keep track of every single one of the representations that my opposing counsel has said and every one, to the extent you want to, that I say.  But look at what evidence actually comes in.

That's what you're going to base this case on.

Now, we talk about the products at issue. In 2003, we're going to hear from Dr. Yamaguchi that he starts on these devices. By 2004, he's filed his first patent applications. Now, at this point you've already heard in the story, and we'll come back to it, they haven't met SSC.

And in 2005, they now start -- they have this. They filed the patent applications. They're on their way to doing what they intended to do, was to use these for backlights.

And you're going to see that in 2008 and 2009 they are working with Sharp, and they'll actually enter into a contract where they start selling these products to Sharp for Sharp TVs, and they've got an existing business. And like people who have existing businesses, they're going to go out and look to expand that business, and they're going to do it with several different companies, one of which is going to be SSC. And we'll come back to that whole relationship in just a moment.

But in 2012, what's going to happen is that EDD is going to be spun off. And so there's no mystery here, but just so you understand, the business that was -- essentially, think of it as a division of Enplas Corporation -- is going to become its own entity, and that's the party that's here today, Enplas Display Device.

The corporate parent, Enplas Corporation, is not a party to the suit. It's just EDD, and there is some logic to that

because the business as currently exists focuses on these lenses, which are accused.

Now, what you can't see by looking at that little thing, this is what it looks like (indicating).  It's much more impressive when you can see it right there on the screen because they are small and they look pretty simple.

And we look at it from the side, but there's some of these features.  This is -- when you saw the ray trace diagram and the profile, you know, just the outline of what you're seeing, this is what they actually are.  And you're going to hear evidence, and you're going to have to make certain decisions based upon that evidence that relates to the structure and function of these little plastic lenses.

This top surface is going to be very important, and you're going to hear a lot about this top surface.  Never something so small and looking so inconsequential are you going to hear so much about.  But this top surface, the thing that's important is the way you'll feel this slight dimple, and you can feel it when you touch the lens.  It's a very slight and subtle depression; and that design, this curve design, is essential to Mr. Yamaguchi's invention and the functioning of these lenses.

Now, for something so small, you'll see that there is a lot of detail.  Now, I've isolated one of the figures.  My colleague, Mr. Gotts, he's showed you a full design drawing.  You're going to see a lot of those.  You're going to see these

design drawings.  You're going to see those specifications

that's done for our customers -- the one he showed you was

LG -- and you'll see that they go into tremendous detail.

When you look at something as seemingly inconsequential,

you have so many different measurements.  This top line right

here (indicating), that's from what you call -- we call it a

tangent plane.  That's going to be if you turned it upside down

and you let it rest, that's that top surface.  And down to the

bottom as you'll see, it's got these little things that they

refer to as feet or legs, and that's what it stands on when

it's applied to a light bar.

You'll hear that the LED is going to be mounted below it.

And this area between where the top of the surface of the LED,

as you've heard, that gap, you will hear a lot about that.

You'll also see that the dimension of how deep that

depression is is important.  It's such a small number, it's

actually measured indirectly here because it's the difference

between this line (indicating), which is the bottom of the

dimple, and this line (indicating), which is the top of the

surface.  It's the difference between those two.  It's

400 microns.  It's .4 millimeters.

This whole thing is 14.7 millimeters across, plus or minus

.05 millimeters.  This top surface between -- there's a

little -- underneath it, what you saw has a little -- sometimes

it will be referred to as the cavity, a concavity, bullet

shape.  I think those are the ways it's been referred to in all the evidence, but it's a -- actually it serves, as you will see, as a bottom lens.  It's a hole, it's a depression, and you can see it on the real one as well, and that's what the light is actually we say injected into.  It's going to hit the one surface, it's going to go off the next.

So this whole device, when we look at this, what's truly impressive is that we have right here this one measurement: 1.745, plus or minus .05 millimeters.  And, again, this is one of the things that made Enplas' business in the first place.

You're going to hear that a mold for these has 32 holes in it, and they're going to make millions of them reproducibly out of molds that have 32 holes.

Now, for some of them, because it's a big producer, they may have 10 molds; and that, seemingly, is supposed to sound like a lot, but it's not.  You're talking about an amazing concept that they can put out millions of these and by reproducibly with these types of tolerances.  That's what helped them build their business, and that's what's ultimately going to bring SSC to want to talk to them about purchasing a lens.

Now, what these lenses do in concept, what this is, just a simple idea showing you these are LEDs -- oop, no they're not -- these are LEDs on the bottom.  They're projecting up and, as you can see, you've got space in between and this is

this hotspot concept.  It's a really simple concept.  If you put the lights far enough apart, you're going to end up with space in between and the one spot is going to be brighter than the other.

Now, you have a couple options here.  You can move them closer together, because if you move them closer together, you can make it so that they actually start to overlap.  But the concept that Mr. Yamaguchi and his colleagues were working on was by putting on these lenses, they wanted to spread the light as far as possible and as evenly as possible so that you'd end up with this uniform surface.

The other thing that you end up happening is that -- see happening is that where over here (indicating) you can imagine, but it's so far up over here where they'd actually come together, you can start to see all the way down here (indicating) you could draw a line and you could see they'd be at that theoretical even point.

At that point what you've not only done has been able to use less LEDs to illuminate the same area, but you've also now made it possible to reduce the distance.  And screens on TVs, as we know, got thinner and thinner, and now edge lighting made it possible for them to be thin but they're going to be a problem when they start getting too big because there's only so much light you can put in from the edges.  And we're going to come up and talk about that because people came up with a lot

of different ways to do this.

Now, very briefly, this is a ray trace of one of the Enplas lenses, and you're going to hear from their expert; and as you've already heard, he did all his analysis and then he made a discovery. The evidence will show that he didn't make a discovery. When he was confronted with the evidence, he had to change his entire opinion, and we'll go into that in detail and we'll see how it affected his opinion.

But the bottom line is, what you'll never see from any of the evidence that SSC is going to present, and you'll never see from any of the evidence that their expert is going to talk about, is any light that's actually coming off of the center of the LED.

Now, the way these LEDs are structured, you'll find out that there's a little depression, and inside this is the actual light emitting diode. It sits down at the bottom and it's in a resined kind of a plastic filler. You apply electricity to it and they glow. That's the basis of how an LED works. It's fantastic.

And not surprisingly, from every other thing you've ever seen from a lightbulb or any kind of illumination source, if you look right at the part where it's illuminated, you already know from experience that's the bright part, and it gets dropped -- it drops off as you get towards the edges.

The evidence is going to show that when you -- when this

lens is used the way it's intended, all that light coming off the center as the starting point, it's going to hit the first inner surface and it's going to do something called refraction, and I'll go over that briefly in a moment.

And then when it hits the next surface, the way this is contoured, Mr. Yamaguchi is going to explain that with the design of this, that has to be custom tailored depending on the LED, the way it works.

And what you're going to hear is that every customer that comes to work with Enplas, they want to purchase a lens for their application.  They, most of the time -- it's not every single one of them -- most of them are going to come in with an LED in mind, and a lot of that's because a lot of them are bar makers.  They make these things called light bars; and they, like SSC, have an LED.  They're in the LED business, and they want to make light bars and so they need lenses.

But in all these instances, they come in with the LED that they want, and what Enplas does is provides custom service.  They tune it.  They adjust the surface with the whole idea being that the light that's right at the center is going to be spread out so that in the center portion, it's very broad, and then it becomes more narrow as it's sent out to the edges.

But in these ray traces, keep in mind as you're looking at the evidence, where the light is coming from because this is the central focus point.  And what you'll see in the evidence

is, is that in addition to a story, a background story, that's been superimposed on the facts, you'll see that the evidence has been very selectively created by SSC for the purpose of their presentation.

Now, you already saw -- I'm not going to waste a lot of time -- this is what the concept is. You've got the hotspots. It makes the hotspots better. It's still not perfect, but there's still room.

Now, the '554 patent you've already been introduced to, and hearing where this whole story was going, apparently this is somehow going to have to do with the shape of the LED. Because the story that I just heard was that Enplas was already making lenses and selling them to Sharp, which it was, and then it was using a different shape LED; and then SSC comes in and the evidence is going to somehow show that their change in the LED shape is what this patent's all about.

If you see any evidence, you'll be able to weigh that and give it due consideration because there's nothing in this patent or any evidence that will be presented that has to do with the LED shape in here. What this patent has to do with is this concept of TIR.

Now, this patent was not invented by SSC. This did not come out of some joint development of technology that Enplas is going to somehow run away with. This patent was invented by Dr. Pelka and his company, which was called TIR Technologies.

You'll hear that they then sold it to Teledyne.  You'll hear that SSC licensed it first along with the '209, and you'll end up hearing that at certain points in time they're going to purchase them.  The '554 they'll purchase first and then the '209 they'll purchase later.

But what's really interesting is that you'll see in the evidence that, despite the fact that supposedly all the things that Enplas has been doing and continues to do is somehow covered by these patents, when they were not the owner of the patent but a licensee and had a royalty obligation to Teledyne, the patent owner, you'll see they paid no royalties.  The royalty obligation did not exist until after they purchased the patent.

Now, when they are saying -- when they were doing it and they would have had to pay royalties, it wasn't covered by the patent; but, conveniently, as soon as they owned the patents, it was.  You'll see the evidence.  You'll make a decision as to whether that's logical or what it looks like on its face.

Now, the '554 patent, you'll see again TIR.  There's a lot of science involved in every one of these patent cases, but we will do our best to make sure that you get the information so that you can clearly understand.

And those of you who are afraid of the math, don't be afraid of the math because there will be no calculations.  There will be no pop quizzes, and you guys get to make the

answers.  Nobody gets to tell you you're wrong, so it's a great position to be in.

The concepts you need to understand is that you're going to hear about when -- this is air (indicating), for example, and this is something that has a higher refractive index.  And what all that means is that light travels through it at a different speed typically in reference to air.  Light is traveling through air with little or no resistance; and then when it hits something that has a different refractive index, you can see that the light slows down.

You've actually observed this many times, and you don't pay attention to it.  It's when you put something like a spoon or a straw into a glass of water, and it has that optical illusion that it looks like it's bent; or when you're in the pool or you're looking into the pool at something on the bottom, it's actually not -- when you see something at the bottom of the pool, it's not right where you think it is.  It's actually over just a little bit, and that's because the light is just traveling at a different speed.

This we refer to as refraction.  This optical idea is governed by a law that was discovered about 400 years ago. You're going to hear about Snell's law.  Nothing changes.  It always works this way.

At a certain point you get what's called the critical angle.  At the critical angle, the light stops refracting and

right at the critical angle would actually run along the surface.

Now, with regard to total internal reflection, when the critical angle -- you're going to hear with respect to a thing called the normal. This isn't like abnormal. You know, there's nothing politically correct about calling this one the normal. It's up and down. It's literally my finger is in the normal to this plane. It's perpendicular to the plane which you're defining.

And when this angle gets over the critical angle, that light gets trapped; and you'll see from this, this is how fiberoptic cables work, for example. The light bounces around and continues through. And that's what the '554 patent, you'll see, was all about.

The Court has interpreted and you'll hear each one of the interpretations in the context, but the claims are going to require a TIR surface, and it's a surface that's been angled with respect to light source to produce total internal reflection within a device.

And just as you heard light coming off here (indicating), because of the way this is contoured, hits that (indicating), and then starts bouncing. And it's going to follow this rule, is that it's going to hit and depending on where it hits in here and what its angle is, it can be reflected in this general direction; but depending on where it hits and what its angle

is, some is going to naturally come through, some is not going to go through.

The idea here is to capture as much as possible, and you're going to hear propagate, which just is going to be sending it in another direction.  And that's what this concept is, take it and divert the light.  It has useful applications.

But you'll find out that the lenses at issue from Enplas, the evidence will show, were actually designed not to have total internal reflection because total internal reflections, ironically, would actually create a dark spot which Enplas is trying to avoid.

This shows you in cartoon form, it's another figure from the patent, just what the concept is:  The light bouncing off the surface, and assuming it were at the proper angles, would get trapped, captured, propagated until it can find something that it hits in an angle which is no longer critical, and it can escape.

Now, let me tell you just briefly about the relationship between the parties because hearing the opening statement, it's kind of hard to tell whether or not this is a patent case or this is just a bad divorce.

This is a situation where you're going to hear evidence that Enplas and its customers -- the first document is going to be a document called a specification, which counsel showed you one.  Again it says "Product Specification."  It's going to say

the company name at the top, who the customer is.  And then Enplas is going to work with that customer with their LED, with their needs in an iterative process and change the lens to custom design it.  It's a custom business, and that's well paid for if you want it.

Now, there's commodity aspects of this.  If you wanted to just get a new lens, there's some people where it's not that important.  If you're making a cheaper TV and you're not worrying about whether or not it's a little uneven, it might not be as important.  But when you're talking about the people that are making the high-end TVs, this is something that was important and it is important.

And so you're going to see evidence where Enplas goes through and does this design process, all the things you'd expect in a company that does engineering and is developing something.  There should be, you know, these product specifications.  There should be design drawings.  There should be all these detail.  If this is really based on something that's being developed, there should be evidence of it.

You will see evidence of that from EDD.  You'll see no evidence of this alleged joint development from SSC.  Joint development is something where you both do it together and each party submits something, and there should be some record of that.

The evidence will not show any evidence of that.  The

evidence will show that Enplas was making these lenses, continues to make these lenses, and there was never an issue. The evidence will show that these were never accused of infringement.

The way the story gets told at the moment is that it's almost out of the goodness of their hearts that, you know, bless them, that they, you know, didn't go after them.  I mean, they knew they were infringing in 2012.  It was out here on the line.  You know, they entered into this agreement.  Then over here, and then they see that -- they find it in another person's product.  And then, you know, what are they supposed to do?

What the evidence is going to show is that after that time where they allegedly found it in another product, they're going to enter into -- try to enter into a new agreement with Enplas; and under that agreement, they want Enplas' expertise in lenses bad enough that they're going to say that any patents that come out of this that relate to lenses, Enplas is going to own.  If it's related to LED, they own it.  And if it's a joint product, they jointly own it.

The problem is that they get greedy, and they basically say, "We want this deal, but it's going to have to include everything, including these that you've been making and selling to other people."  And my client did not want to give up its existing business, and it's not going to abandon its existing

customers.

Now, there's nothing about this intrinsic design you'll hear that actually makes it this TIR lens. When you hear what Dr. Pelka's testimony is going to be about what he invented and why he invented it, you'll hear why this TIR lens was important.

But one of the things you're going to be able to consider is that you're going to see five lenses in this case. You're going to get to hold five lenses in the case; and if you look really closely for those of you who either have a really good prescription or really good vision, you can actually see the number, and we'll make sure you can tell them apart.

But without looking closely, try and figure out why it is possibly that, oh, God, they look alike, they work alike, and all the evidence is going to show that there's just minor subtle differences for an individual customer, but only some of them are accused of infringement.

Again, I ask you if you use common sense, if you use reason and you look at all the evidence, you're going to see that there's one side of the story that's going to make a lot more sense, and there's a lot of parts to the other side that just can't make sense.

Now, briefly -- oh, I forgot the best part. The bad divorce.

So what ends up happening is, you know, they came in, and

I admit it, they wrote this letter and they said, "We don't want you to -- you know, we don't want to be any trouble.  We want to do this in an amicable way."  The only people who can ever think that these letters are amicable are lawyers, because the part that they highlighted was that "SSC would prefer to reach an amicable full resolution of this matter with Enplas, if possible."

But what they didn't show you, but you'll get to see the actual evidence, is that it goes on that:  (reading)

> "If you don't agree, SSC will have no recourse but to pursue enforcement of its patents in actions brought in Federal District Court or the International Trade Commission, and we demand Enplas promptly cease and desist."

That's the way lawyers send lovingly letters that, "We want to do this in a nice fashion.  You either agree with what we want, or we're going to sue you."

Now, in the United States we have the benefit of a thing called a declaratory judgment statute, and that's how it came to be with this unusual thing, which I think caused a little bit of confusion at the beginning.  How is it that the party accused of infringement is actually the plaintiff in this case?

And fortunately in the United States we have a law that allows you, if you're wrongfully accused, you believe you have a basis for that, to not have to live with this hanging over

your business.  You don't have to worry about:  What are they going to do next?  When is it going to happen?  You can go to court and you can seek to clear your name, and that's what they did.

And, in part, the reason that really motivates this is they attached this letter, and they indicate that they're contacting other people.  And what you'll hear is that this letter, which shows what's supposed to be an Enplas lens and how it supposedly falls within the scope of the patents, you'll hear -- there will not be a single person, including their expert -- I will guarantee you Dr. Moore will not say anything other than, this line over here (indicating) is impossible.  That can't exist; and this line (indicating), there is no evidence that any Enplas lens has light coming off the front, coming upwards and performing anything like this.

This was pure fabrication, and the one thing that was clear is whatever they were saying, either SSC has totally got something wrong, or they're making false representations because this is not what an Enplas lens does.  And even their expert will say this isn't what it does.

And at that point they filed suit.  Now, as part of filing suit, there's two things that people accused of infringement get to do.  One, you can say you don't infringe, and we do, and we'll provide evidence of why we think we don't infringe; and I think you'll agree, but you get to decide that.

The other thing that we have is invalidity, and invalidity is nothing, you know, fancy.  It's got a lot of fancy terms.  It's got a lot of, like, awkward terms.  For some reason, my predecessor patent attorneys decided to come up with an entire language of their own that doesn't seem to make sense to anybody else but those of us who do it all the time with things like "prior art."  You get another term like "anticipation."  All the rest of us are sitting there going with anticipation, we're waiting for something to happen.  Right now you're probably anticipating going to lunch, "Please, when will they stop talking and let us go to lunch?"

That is not what "anticipation" is.  In the context of invalidity, "anticipation" is when somebody else in the prior art has done it before you.  It's not new.

And you heard that, during our little video, that the patent is a bargain.  We're a country that hates antitrust.  We hate monopolies.  I mean, growing up you heard about it like all the oil barons and all the rail barons and all those people, and then they made a lot of money; and then by the time we got a chance to, they made it all illegal.

So patents still exist, and so it's a limited monopoly, and you're allowed to do that, exclude others from making, using, selling, and offering for sale, but you have to commit to this bargain; and that is, you have to make something new or -- another word you heard, that was anticipation -- or

nonobvious.

Now, nonobviousness, this is another one that's really confusing because most of the time in these cases, the first thing that's going through a layperson like yourself, the jurors, you're sitting there going, "I don't know how this can be obvious because I can't even say it."

But we're looking at it from this person-of-ordinary-skill-in-the-art concept, and you'll hear about this and you'll see.

And with regard to invalidity, I'm not going to go through all the details, but I'm going to leave you with one little indication of how this obviousness concept works and you'll see the evidence in the case.

This is the '209 patent. At this point in time it was assigned to Teledyne, and you saw this is the picture. And what you see here is these are lighting around the perimeter. This was represented as edge lighting. This is not what you see the evidence of edge lighting. Edge lighting is actually it's injected in and it travels along the panel.

But these perimeter lights are very similar to these lights (indicating) because what you see in the courtroom, it's actually an embodiment in, like, model -- it's like a big model of what's going to be going on in this patent because there's perimeter lights that you'll see are under like an eve. We're just looking at it from the other way instead of looking down.

But if you kind of like tilt it up, and then what you have is, you have these lights in the middle.  Because if you only had these lights along the edges over here (indicating), it's going to be uneven.  You start to see it already.  And by the time you get over here (indicating), it's going to be kind of dark.

And so since the patent -- I mean, this is what the invention is, you're going to see.  Because Gleckman, this is somebody who Dr. Pelka supervises.  And while we heard that he went to a conference and he's sitting there like at Denny's and he comes up with this great idea of a Eureka moment of the '354 patent, before him you're going to see -- let me back up over here -- this is what the prior art disclosed (indicating), and this is what the '209 patent is (indicating).

And in making that determination, you're going to have to come to a decision, based on the law as it's instructed to you, as to whether it would be obvious to take something that only has perimeter lights; and if you wanted to make it a little brighter, putting some lights in the center.  That's what the invention of the '209 patent is.  It doesn't have anything to do with TIR.  It doesn't have anything to do with these lenses.  That's literally you'll see all it's going to be.  So the concept of validity is not something that's going to be deep and mysterious.

The prior art on the '554 patent, I'm not going to bore

you with the details, but you'll see each and every concept. Just like you've heard about their expert, Dr. Moore, and you already heard about my expert, Dr. Pollock. Dr. Pollock is a professor at Cornell. He's the director of engineering at the Computer Science Department at Cornell University. He'll be explaining how the prior art anticipates and/or renders obvious the various claims.

And after that, as I said, you'll get your chance. You get to take the test where you're the only ones who know the answer. Just all I ask is, to the best of your ability, please pay attention, listen to all the evidence, and give it due consideration, and then follow the law, and I'm confident you'll come to the right result.

Thank you very much.

**THE COURT:** Thank you, Mr. Labgold.

That concludes our opening statements. We'll take a five-minute recess now for a line shift and for some discussion with the attorneys, and we'll be back in five minutes.

(Proceedings were heard out of the presence of the jury:)

**THE COURT:** We'll just talk for a few minutes here with counsel about the schedule, and any evidentiary issues that go along with the first witnesses.

So it will be Dr. Pelka first; correct?

**MR. GOTTS:** Yes, Your Honor.

**THE COURT:** And then what will be the -- how long do

you think that will go, just rough, and then -- and what's to come after that?

MR. GOTTS:  Probably with cross and any redirect, about an hour of our time, Your Honor.

THE COURT:  All right.  And then second up will be?

MR. GOTTS:  Second is Mr. Ryu.  Well, we don't know what the redirect will be.  It depends on this evidentiary issue, but I think his direct is probably under 45 minutes, maybe 40 minutes.

THE COURT:  All right.  And then next up after that?

MR. GOTTS:  Dr. Nam.  45 minutes of direct I would say.

THE COURT:  And then?

MR. GOTTS:  Then we will do our discovery read-ins and depo read-ins, and we don't -- and then I would expect we'll get to Dr. Moore on Thursday.

THE COURT:  All right.  We've got the -- thank you for that updated information.

We have the statement of undisputed and stipulated facts, which I intend to read to the jury before the first witness as we discussed yesterday.

Also, the claim construction, they've been given a written copy of it and they'll get a written copy for their deliberations, I think along with the stipulations of fact, I'll read that to them also at the same time.  It falls in the

same category of underlying information for them.  So that will be my plan.

Tell me about the evidentiary issue.

MR. GOTTS:  Okay.  Your Honor, this issue actually won't come up with Dr. Pelka.  It's a Mr. Ryu and Dr. Nam issue.

MR. LABGOLD:  I think because of the nature of it, the witnesses, to the extent there are any fact witnesses, they should not be in the courtroom to hear.

MR. GOTTS:  Are they?

MR. SANDERS:  We just got Dr. Pelka.

MR. GOTTS:  Oh, I'm sorry.

THE COURT:  If it's just about Ryu and Nam, let's talk about it --

MR. GOTTS:  Well, Dr. Nam is in here.  He's the corporate rep.

THE COURT:  Let's talk about it after Dr. Pelka just so we can move ahead with the evidence.

MR. GOTTS:  Sure.  Okay.  Great.

THE COURT:  Thank you very much.  All right.  Back in a few minutes.

(Recess taken at 10:52 a.m.)

(Proceedings resumed at 11:00 a.m.)

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  We will get our jurors

momentarily.

MR. OWENS:  Your Honor, I apologize.

THE COURT:  We'll take a minute.

(pause in proceedings.)

MR. GOTTS:  Your Honor, would it be appropriate for us to give the jury, each member, a copy of the patents?  We have a set, once they're in evidence that is.

THE COURT:  Yes.

MR. GOTTS:  Okay.  Any -- okay.

THE COURT:  Is there an objection to that?

MR. LABGOLD:  It seems to me that they're going to see them, so why not.

MR. GOTTS:  Thanks.

THE COURT:  Yes.

(Proceedings were heard in the presence of the jury:)

THE COURT:  Our jurors are returning.  Everyone may be seated.  All right.  Ladies and gentlemen, we've concluded the opening statements, and now we're moving into the evidentiary phase of the case.

First, I'm going to tell you some undisputed and stipulated facts.  These are facts that the parties have agreed to, and you should therefore treat these facts as having been proved in the case.

A copy has been provided to you, and you may retain during the entire case and during your deliberation phase.

These are the 14 undisputed stipulated facts.

First:  EDD is a corporation organized and existing under the laws of Japan, having its principal place of business at 2-30-1, Namiki, Kawaguchi City in Saitama 332-0034 Japan.

Second:  SSC is a company organized and existing under the laws of the Republic of Korea, having its principal place of business at 1B-25, 727, Wonsi-dong, Danwon-gu, Ansan-city, Gyeongi-do Korea -- and I apologize for my mispronunciations on both nations -- 425-851.

Third:  SSC is the assignee of the entire right, title and interest in the '554 patent, entitled "Lighting apparatus having low profile," which issued on October 29, 2002, and was assigned to SSC on August 27, 2009.

Fourth:  The named inventors of the '554 patent are David Pelka and John Popovich.

Five:  SSC is the assignee of the entire right, title and interest in the '209 patent, entitled "Light source for backlighting," which issued on December 28, 1999, and was assigned to SSC on September 26, 2013.

Six:  The named inventor of the '209 patent is David Pelka.

Seven:  SSC is asserting Claims 1, 6, 33, 34 and 35 of the '554 patent.

Eight:  SSC is asserting Claim 20 of the '209 patent.

Nine:  EDD has been aware of the '554 patent since it was

formed on April 2, 2012.

Ten:  EDD has been aware of the '209 patent since October 16, 2013.

Eleven:  SSC accuses EDD of inducing infringement of the '554 patent.

Twelve:  SSC accuses EDD of inducing infringement of the '209 patent.

Thirteen:  The critical date for the '554 patent is September 24, 1996.

And fourteen:  The critical date for the '209 patent is March 19, 1996.

That concludes the stipulated undisputed facts.

Next, I'm going to talk about claim construction.  Both parties referred in their opening statements to the fact that the Court had construed certain of the claims of the '554 patent before trial, and I'm now going to tell you what those constructions are.

This may not make much sense until you've heard more from the parties about the accused products and the patents, and you'll be getting a copy of the actual patents, so you might want to refer back to these claim constructions later in the case.

A copy of what I'm going to say to you is attached as the back page of the preliminary jury instructions, and you'll also have that during the entire case and during the closing phase

of the case, so you don't need to write down every word of this and memorize it. It's just, again, to get you familiar with some of these terminologies which you'll be hearing about more from the witnesses.

You should apply the following constructions to the claims of the '554 patent: First, the term "total internal reflection" means the total reflection that occurs when light strikes an interface at an angle of incidence with respect to the normal greater than the critical angle.

Second, the term "the critical angle of total internal reflection" means the angle of incidence with respect to the normal above which total internal reflection occurs.

Third, the term "cusp" means an area where two curves meet.

Fourth, the term "totally internally reflecting" means reflecting by total internal reflection.

Fifth, the term "illumination coupler embedded in an interior region of said waveguide" does not require a construction.

Next, the term "TIR surface" means a surface angled with respect to a light source to produce total internal reflection within a device.

Next, the term "waveguide" means an optical device that redirects light propagating between its surfaces.

For claim language where I have not provided you with any

meaning, the claim language's plain and ordinary meaning to a person of ordinary skill in the art at the time of the invention applies.

Finally, for all claim language of the '209 patent, you should apply the claim language's plain and ordinary meaning to a person of ordinary skill in the art at the time of the invention.

That concludes my instruction on claim construction. There will be more about that during the evidentiary and closing phases of the case.

It is now SSC's opportunity to call its first witness.

MR. GOTTS:  Your Honor, SSC calls Dr. David Pelka, and Mr. Sanders will be handling that.

THE COURT:  Very well, Mr. Sanders, good morning.

And Dr. Pelka can come forward and take the witness stand, please.

MS. WOODHOUSE:  Your Honor, I have binders.

THE COURT:  Please do whatever you can to make an orderly presentation of the evidence.

MR. SANDERS:  Thank you, Your Honor.

And while Dr. Pelka is taking the stand, may I provide a brief introduction?

THE COURT:  You may.

MR. SANDERS:  Dr. Pelka is the sole inventor of the '209 patent at issue in this case, and is one of the two

**PROCEEDINGS**

inventors of the other patent at issue in this case, the '554 patent.  He's going to testify about his research, how he developed the inventions in those patents, and the contents of the patents.

THE COURT:  Thank you.  And good morning, Dr. Pelka.  We're going to have you sworn in.  If you could stand and raise your right hand, please.

THE WITNESS:  Sure.

**DAVID PELKA, Ph.D.**

called as a witness for the **DEFENDANT**, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Please be seated.  Please state your full name for the record.

THE WITNESS:  My name is David Pelka.

THE COURT:  Dr. Pelka, I think that our loud speaker system is not working very well, if my hearing is correct, so if you can speak up really loudly.  It's very important that the jury hears you, most important.

THE WITNESS:  I can speak up.  I used to be an old university professor.

THE COURT:  All right.  Use that speaking voice if you can.  And if the jury can't hear for some reason, if you can just raise your hand.  We want to make sure that you hear everything.

Go ahead, Mr. Sanders.

### DIRECT EXAMINATION

**MR. SANDERS:**  Thank you, Your Honor.

Q.  Good morning.  Could you please introduce yourself to the jury?

A.  Yes.  My name is David Pelka.

Q.  Where do you live, Dr. Pelka?

A.  In Los Angeles a couple miles north of LAX Airport.

Q.  Do you have a family?

A.  I do.  I'm the oldest boy of four brothers.  I have a wife, Betty, I've been married to for 46 years, daughter, Suzanne, who is 41, a son, Eric, who is 36, and four grandchildren.

Q.  You look a little stiff today, Dr. Pelka.  Are you all right?

A.  Well, that comes from an accident I had about a year ago. I had low blood pressure, got up too quickly from laying in a horizontal position, and blacked out.  The result of that was I crashed to the floor and broke my C-1 and C-2 vertebrae in my neck.

Well, the neurosurgeons, when they fix you up, they put a big plate in the back of your head and two wires that run down the length of your spine -- well, not entirely -- the C-1 through C-6 vertebrae and, as a result, when I try to turn my head in an east-west direction, you're turning against the

spring, and similarly in the north-south direction.  Not so much downward, that's easy.  But it's hard to lift too much in the upper direction, because I'm fighting that spring.

So yes, I have sort of have a permanent slight stiff neck.

Q.   Thank you, Dr. Pelka.

Do you have an understanding of why you're here to testify today?

A.   Yes, I do.

Q.   And what is that?

A.   I'm the inventor of a couple of the patents that I think are at issue in this case.

Q.   We're going to come back to those patents in more detail.

Can you tell me are you working now?

A.   I work about 50 percent of the time.  I have my own consulting company.

Q.   What do you do with the other half of your time?

A.   Oh, I'm an avid golfer and a tournament bridge player.

Q.   Let's turn back to the consulting work.

Can you describe to the jury the type of consulting work you're doing?

A.   I can give an example.

Right now I'm designing the lens array that goes on the big Boeing and big air buses as they convert from incandescent lights to LED lamps.

Q.   Let's talk a bit about your education.

Did you go to college, Dr. Pelka?

A.    I certainly did.

Q.    Where did you go to college?

A.    Cal State University at Los Angeles for my Bachelor's Degree in Physics, and then the University of California Riverside for my Master's Degree and Ph.D. Degree in 1968 and 1971 respectively.

Q.    What were those degrees in, Dr. Pelka?

A.    They were all in Physics.  My Ph.D. dissertation was in superconductivity and superfluidity.

Q.    After earning your Ph.D., did you get a job?

A.    I did.  I was a university professor for approximately 15 years at a small engineering college in Inglewood, California called Northrop University.

Q.    What classes did you teach, if any?

A.    Oh, freshman and sophomore physics, upper division thermal dynamics, electricity and magnetism, and a graduate course in quantum mechanics.

Q.    Are you familiar with a company called TIR Technologies?

A.    Yes, I am.  It's a company I started in 1992 with my business associate Bill Parkyn.

Q.    Does TIR stand for anything?

A.    It stands for total internal reflection.

Q.    We'll be talking a good bit about that today.  But could you just give the jury a brief explanation about what you mean

by total internal reflection?

A.   Well, if you have light and it's going from, say, down here (indicating) is plastic or glass and up here (indicating) is air, it turns out that in almost every case light that hits an interface, some of it is transmitted and some of it is reflected.  And total internal reflection occurs when the angle of incidence with respect to the normal here exceeds about 41.7 degrees.  When that happens, nothing is emitted above here (indicating), it's all totally reflected downward.

Q.   What did TIR Technologies as a company do?

A.   It solved problems for people, basically in the area of optical technologies.

Q.   What happened to TIR Technologies?

A.   In 1997, it was acquired by a company called Teledyne Industries.

Q.   Did you join Teledyne?

A.   I did.  As part of the acquisition, I signed a five-year employment contract.

Q.   What was your role there?

A.   I was Vice-President of Research & Development.

Q.   Did you leave Teledyne at some point?

A.   Yes.  In 2002 I left Teledyne to start my own consulting company, again, Pelka & Associates.

Q.   What type of work has Pelka & Associates done?

A.   Again, mostly in the field of developing optical

technology solutions for problems that companies will bring to us, and in some cases developing intellectual property, filing patents on their behalf.

Q.   Have you done any consulting work for either of the parties in this case, EDD or Seoul Semiconductor?

A.   Yes, I've done consulting work for Seoul Semiconductor.

Q.   What work have you done for Seoul Semiconductor?

A.   Again, it had to do mostly with optical technology, creating certain types of lenses that would be useful in direct view backlighting of liquid crystal display screens.

Q.   And have you been an employee of Seoul Semiconductor?

A.   I've never been an employee of Seoul.

Q.   Do you have any agreement with Seoul Semiconductor?

A.   I have a consulting agreement with Seoul Semiconductor.

Q.   Do you have an hourly rate under that agreement?

A.   Yes, it's $250 an hour.

Q.   And have you been paid by Seoul Semiconductor for your work?

A.   Yes, I have.

Q.   And can you give us a rough estimate of how much you've been paid?

A.   Over the past two and-a-half years that I've been working with them, it would be 150 to 200,000, that range.

Q.   Dr. Pelka, have you won any awards?

A.   Oh, a number of awards, but the one I guess I'm most proud

of occurred back in the late 1998, 1999 time frame.  I was working with Hewlett-Packard extensively on lenses for the rear taillight assemblies of automobiles.  And at that time the Smithsonian had asked various large corporations to nominate technologies they thought should be stored permanently at the Smithsonian institution, and they nominated our company, and specifically TIR lenses has such a technology.

Q.   Dr. Pelka, can you tell the jury whether you're the inventor of any patents outside the optics field?

A.   Oh, I certainly am.  And one that I'm most proud of, sort of brings a smile to my face, is something I called the acoustic light switch.

When my son Eric was about four years old, I had made a set of cutoff golf clubs for him, and he would get up in the middle of the night, 3:00 or 4:00 o'clock in the morning, and have to go to the bathroom, so he'd take his golf club and do it up and down the wall to turn the switch on and off.  And my wife would hear this stuff, and she said, you know, *can't you do something to correct that?*  And I said *you know I can.*

So what I did is I invented an idea of putting a microphone on a light switch.  I called it an acoustic light switch, so it listened for the presence or absence of human activity.  If it heard something that, you know, rustling around like a four-year-old would do, it would turn on the lights automatically.  Subsequently, if it didn't hear anything

for a predetermined set of time, it would turn off the lights.

Q.   Was that ever made into a product?

A.   It was made into a product.  It was sold at Home Depot, and a number of different hardware stores thereafter.

Q.   All right.  Well, I'm sure my three-year old daughter would love to hear more about that, but we'll have to turn to the patents in this case.

I'd like to ask you to turn in your binder to DTX-1001.

A.   Yes, I'm there.

Q.   Do you recognize this?

A.   Yes, I do.

Q.   What is it?

A.   It's my '209 patent.

Q.   Who is the inventor?

A.   I'm the sole inventor on the patent.

MR. SANDERS:  Your Honor, we would offer DTX-1001 into evidence.

THE COURT:  It is admitted.  You may proceed.

(Defendant's Exhibit 1001 received in evidence)

MR. SANDERS:  Your Honor, at this time we'd like to provide the jury a copy of the patent.

THE COURT:  Yes, please.

MR. SANDERS:  Thank you.

Q.   Dr. Pelka, if I refer to this as the '209 patent, will you understand what I'm referring to?

**A.**   Yes, I will.

**Q.**   Do you remember what inspired you to come up with the inventions that are discussed in the '209 patent?

**A.**   It was an optical conference I was at, I think it was 1996, with a fellow named George Crawford, who was the chief scientist at Hewlett-Packard at the time.  And George had studied under the guy who invented LEDs at the University of Illinois.

And anyway, over lunch, George and I were talking about LEDs.  At that time they were so weak they were just used to tell you whether your stereo system was on or off.  And I said to George, *George, what do you see for LEDs in the future*.  And he said, *well, they'll increase in output anywhere from a hundred times to a thousand times*.  And that sparked something in me.

I thought -- at the time backlights for like the notebook computer you see here in Figure 1 was being done with fluorescent lamps, little thin fluorescent lamps.  And I thought, well, if LEDs are going to become powerful, it seems to me like they're going to be used for direct view backlights for notebook computers and things like that.

LCD TVs didn't even exist at that time.

**Q.**   Do you recall what the time frame was, roughly, when you had this conversation with Mr. Crawford?

**A.**   I'm pretty sure it was 1995, 1996.  It was a conference in

San Diego.

Q.   And did that discussion -- I'll give you a second to have some water there.

A.   Got a bit of frog in my throat.  My wife and I have been throwing back and forth a cold back for the last couple weeks.

Q.   No worries, Dr. Pelka.  Just let me know if you need a minute.

Did the conversation that you had with Dr. Crawford relate -- give you any ideas with relation to backlighting?

A.   Yes.  As I say, at the time the backlighting was being done with fluorescent lamps, and I believed that LEDs were going to become so powerful and so cost-effective that one would want to use them as the light source.

Q.   And can you tell the jury whether there are any issues that you anticipated would need to be addressed?

A.   Yeah.  Well, if you can imagine a screen, and you're putting some very bright sources immediately behind the screen, imagine a flashlight, and you could imagine that that's going to show through very bright spots on the screen.  Well, the question is if you're going to use this as a backlight, somehow you've got to redirect the light so that it mixes and provides a uniform sort of light source for the LCD panel.  And so what I anticipated was you're going to have to use some sort of redirecting elements, which are shown here in the figure.  And that's basically what the patent was based upon.

**Q.**   Well, let's take a look at the patent then.

I'd like to direct your attention to the very first sentence of the patent.  It's under the heading of "light source for backlighting" and the background of the invention at column 1, lines 3 to 5.

And please take a moment to read the sentence.  And then my question is can you explain that to the jury, please?

**A.**   Yes.  This is my anticipation that basically LEDs were going to be used as a good backlighting apparatus in the future for various types of flat panel monitors, notebook computers, and now, as we know, ultimately LCD TVs.

**Q.**   Let's take a look further down that column.  There's a paragraph that begins "lastly and importantly" in column 1 at lines 23 through 38.

**THE COURT:**  Mr. Sanders, can you make sure that the jury is following along with the page in the exhibit that you're referring, just to make sure.

**MR. SANDERS:**  Oh, certainly.  Thank you, Your Honor.

For the ladies and gentlemen, column one is on page DTX-1001-09.  That's in the middle of the page at the bottom. And column one is on the left of the page, and the paragraph that we're looking at now starts around line 23.

Unfortunately, the line numbers that they give at the patent office don't always line up with the lines, but it's the paragraph that begins on line 23.

THE COURT: Thank you.

BY MR. SANDERS:

Q. Please take a minute to read the paragraph, Dr. Pelka. And then could you please explain what was being discussed in your patent here to the jury?

A. (witness examines document) Yes. Well, as you know, you're viewing different types of images on your notebook computer, sometimes it's written images, sometimes it's an image of a landscape or something like this. So it's very important that whatever backlight you develop for, in this particular case a notebook computer, be very uniform in output, and basically be featureless with things like I say here in this paragraph. So it's important to somehow create this uniform light source, and how you redirect the rays to do that was the subject of this patent.

Q. Now, let's take a look at the first figure in the patent, Figure 1.

Figure 1 appears on a page that's numbered DTX-1001-03. And can you explain to the jury the problem that you were trying to solve using this figure as an example?

A. Well, that's sort of a clunky old-looking computer by today's standard, but in 1994 that was sort of state-of-the-art.

So you see the little rectangle in the center where the screen is, and, again, what you're trying to achieve is taking

the light source, whatever it is, and making it extremely uniform as it's presented to the back of the liquid crystal display screen.

**Q.**   Now let's talk about the solution that you came up with for redirecting the light.

I'd like to direct your attention back to the text.  Go back to column one, which is on page 9, and the paragraph -- the first paragraph right under the summary of the invention, which starts at line 45 and ends around line 55.  And I'd ask you to take a moment and read the paragraph.  And then could you please explain what was being discussed here in the first paragraph with the summary of the invention?

**A.**   (witness examines document)  Yeah.  Here, again, is the idea is you have a multiplicity of light sources, and you want to create a uniform output for the liquid crystal display screen.  And basically what you're doing is you're feeding this light into some cavity where it bounces around like crazy, and as it bounces around like crazy it becomes, I'll call it, uniform, and that's then what's presented to the screen, and that's what this paragraph relates to.

**Q.**   And focusing specifically now on the last sentence of the paragraph, could you explain what this sentence is stating?

**A.**   Well, what I believed, and what seems pretty clear, is that you need some sort of elements over -- directly over the LED to send the light sort of sideways, otherwise it's just

going vertically upwards.  And as you know, the distance between an LCD screen and where your light source is put is a few millimeters.  Well, so if you have unshielded LEDs, it becomes impossible to create a uniform light source for the screen.

So what this section is talking about is some sort of redirecting elements that redirect the light and get in the way of it going vertically to the screen.  So now what those are specifically, you can use your imagination.  It could be mirrors, it could be lenses, it could be many different things. But somehow you've got to deflect the light.  That's what was being said here.

Q.   Thank you, Dr. Pelka.

Now let's take a look at that in the context of a figure. I'd like to direct you to Figure 3 of the '209 patent, which is at page 5, and it's printed across the page, so you have to turn the patent to line it up for this figure to make sense.

There are a lot of components shown in this figure, Dr. Pelka.  Could you first explain to us what the item at the top labeled 28 is supposed to show?

A.   28 is supposed to represent a human eye looking down through the display.

Q.   And what are the little rectangles that are labeled 13?

A.   Oh, those are supposed to be representative of the LEDs that were placed under the screen and that were emitting light.

**Q.**   And where are those LEDs mounted in this diagram?

**A.**   They're mounted directly underneath the LCD screen.

**Q.**   What are the elements 58 that are right above the LEDs?

**A.**   Those are the shielding elements or the redirecting elements, as I like to call them, that would take the light and prevent it from going directly vertically up to the screen and creating hot spots and pushing the light sideways, so it could mix up in the cavity.

**Q.**   And how do those relate to your inventions in the '209 patent?

**A.**   Oh, I think that was basically the invention, the '209 patent.

**Q.**   Now I'd like to direct your attention to the end of the patent, and that's the paragraph at column 7, lines 59 to 67.

**A.**   I'm sorry.  What column did you say?

**Q.**   It's column 7, it's on page 12, and it's the paragraph right at the end of column 7 that begins around line 59.

Let's take a moment to read it.  And then after you've done that, Dr. Pelka, could you please explain to the jury what you're saying here in your patent?

**A.**   (witness examines document)  At the time the screens that were being backlit by fluorescent lamps were just little screens on notebook computers about this size, but I anticipated that somehow that would be able to grow, and it ultimately would have monitors, maybe LCD screens -- and LCD

TVs I mean, and so that's what this paragraph was relating to. It was saying that this method of direct view backlighting would have many different applications as the screen grew larger and larger.

Q.   Thank you, Dr. Pelka.

Now let's take a look at the other patent in the case.

I'd ask you to turn to DTX-1004, please.

Do you recognize this?

A.   Yes, I do.

Q.   What is it?

A.   It's my '554 patent.

Q.   All right.  Are you an inventor?

A.   Yes, I am the coinventor on this patent.

MR. SANDERS:  Your Honor, at this time we move for admission of DTX-1004.

THE COURT:  1004 is admitted, and you may show it to the jury.

(Defendant's Exhibit 1004 received in evidence)

MR. SANDERS:  Thank you, Your Honor.  We'll pass it out as well.

Q.   Dr. Pelka, you mentioned you were a coinventor of this patent.

Is anyone else an inventor?

A.   Yes, my long time friend John Popovich.

Q.   Who is he?

**A.**   Oh, he's a fellow with an eighth grade education, but one of the most brilliant guys I've ever known.

**Q.**   Now, if I refer to this as the '554 patent, would you know what I'm talking about?

**A.**   Yes, I will.

**Q.**   Was there any particular project that led you to come up with the -- I'm sorry.  Let me restate.

Could you explain to the jury what was your inspiration for coming up with the inventions that are discussed in the '554 patent?

**A.**   Now, this is a little funny.  About the time that my company was acquired by Teledyne, this was 1996, 1997, a company called Timex, who was famous for making watches at the time, they're not so famous now, had came to us and said *could we use some of your technology that you're developing for backlighting the crystal on a watch*, so the people, if they're in a dark environment, can touch their watch and see what time it is?

So we sat around and scratched our head for a while and came up with a structure that we thought would do that, and that's related here in the '554 patent.

**Q.**   Can you explain how you went about solving that problem that Timex had proposed to you?

**A.**   Well, I was aware, again, of total internal reflection, and I had an idea that it would be possible to launch the light

into a thin crystal by using a particularly shaped curve above, directly above the LED, and I think that's shown in one of the figures here in the patent.

Q.   And what figure are you referring to?

A.   Oh, let's see.  I think figure 16.  There's a blowup 16A, I think really shows it pretty well.

Q.   Great.  And this is on page 11 of the patent.

So let's understand what we're looking at here on Figure 16A.

What's the item that's labeled 44 at the bottom?

A.   44, that little white block represents the LED, that would be emitting light.

Q.   And what's the item 80 that's toward the top?

A.   That's a curve, a hollowed-out curve that comes to a very sharp cusp.

Q.   What's that item 82 right in the middle there?

A.   82 is the sharp point of the two curves intersecting.

Q.   How does this shape of the top surface with 80 and 82 affect the light that comes out of the LED 44?

A.   Well, it turns out, if you shape that curve correctly mathematically, it will take virtually all the rays coming from the LED and launch them sideways into the crystal of the watch, and so that's what we were trying to do, and were successful in doing.

Q.   Dr. Pelka, by sideways --

A.    Yeah, the cross-hatched area represents the light going out sideways, and imagine the thickness there is the thickness of the watch crystal.

Q.    What would the eye directly above see?

A.    Okay.  Well, this goes back to the '209 patent.  Remember I was trying to hide bright spots?  And this thing actually was too effective, it created what I called a black hole.  No light could get up there.  So now I had gone to extremes.  I went from having bright spots to creating something for a watch that was effective for a watch -- because you can imagine in the center of the watch there was a stem, so if there was a black hole in the middle of the watch, that was okay, but not for some other applications.

Q.    Is there a figure here that shows what you designed for the watch?

A.    Yeah, I think Figure 15 I was attempting to show a watch crystal, and the general curvature of the cusp that would be directly over the LED in the center of the watch crystal.

Q.    Can you describe with Figure 15 how a viewer would see the light?

A.    Well, the light would be launched horizontally into the light crystal, and there might be some mechanism, some scratchings on the surface to kick the light out so that it would illuminate the numbers in the watch crystal itself.

Q.    And how about at the -- where it's shown at 76, the arrow

in the middle, what would be seen there?

**A.**   That would be a black hole.  You would see nothing.

**Q.**   Was this black hole an issue for any applications?

**A.**   It was.  At the time I remember we received a big contract from Arco to light their, what's called the Arco spark.  It's like four red globes with a blue cross in the middle of it. And so we were going to be the first guys at Teledyne to actually use LEDs to backlight this display panel.

And so the first idea we had was we were going to use the TIR lenses, the black hole lenses that we developed under the Timex effort.  But as you can imagine, if you've got something with a black hole and you're projecting onto let's say this white piece of paper, you create a series of black spots, and the customer didn't like that very much.

**Q.**   Did you come up with any way to address that problem?

**A.**   Yes, I did.  I found that if I took the sharp cusp that we show, as I guess number 82 in that drawing 16A, and if we round that cusp off, we can let some light escape through the center of the quote-unquote black hole and fill in the black hole.

**Q.**   So let's focus now, if we could, please, on the graphic 16A.

You mentioned the item 82.  Can you explain what you did to that area of the lens?

**A.**   Basically -- well, I can remember what we did experimentally.  We took I think it was an eighth-inch drill

and we just drilled a hole down through the center, and then polished up the acrylic, and that would let light escape through the center of what was formerly a black hole that now had a method to let some of the light through the center.  And by carefully designing the -- I'll call it rounded cusp -- you could let light in that would fill in the black hole almost perfectly.

Q.   So would that item 82, was it pointed in this -- on this new design?

A.   I'm sorry.  Repeat your question.

Q.   Was the item 82 still pointed in this new design?

A.   No, it was a rounded curve.  And, again, the more rounded you make it, the less deep you make it, the more light you'll let through.

Q.   Did you have any terms that you used to describe this type of lens?

A.   I called it a leaky black hole.  So instead of a perfect black hole, this was the leaky black hole.

Q.   Now, let's take a look at the text of the '554 patent.

I'd like to direct your attention to column 14, which is on page 23 of the '554 patent, and specifically to the sentences at lines 44 to 48.

I'll give you a moment to read those couple sentences there.

A.   Which lines did you want me to focus on?

Q.    44 to 48, please, Dr. Pelka.

A.    (witness examines document).

Q.    And then after you've had a chance to read them, could you explain to the jury what's being discussed there?

A.    Yeah.  Well, when I filed this patent, I wanted to cover both the perfect black hole as well as the leaky black hole, and so in the specification here I talked about how you could round the sharp cusp into a rounded cusp and let light purposely leak through to fill in the black hole.

Q.    Now I would like to direct your attention a little later in paragraph -- column 14, same page, to the paragraph that begins at line 58, and it actually carries over to the first three lines of column 15 on the next page.  So we'll pull up the entire paragraph, and then that will make it easier to read it, put it all on one-page.

      Dr. Pelka, I'd ask you to take a moment to read this paragraph, and then could you please explain what's being discussed here?

A.    (witness examines document)  Well, I think this reflects what I just said a few seconds ago.  This perfect black hole lens created a dark spot directly above the sharp cusp, and in some applications this was very undesirable, and so we could get away from the undesirableness, if I could use that English term, by simply making a round curve.  That's what's described here, the leaky black hole.

Q.   Okay.  And how did that affect the dark spots that are mentioned in the patent?

A.   It fills in the dark spots almost perfectly, so now you had a uniform display between the reflections in the cavity plus the light going onto the LCD screen.  You had very uniform light output.

Q.   Dr. Pelka, now let's focus on another issue.

Could we turn back to Figure 16A, please, and that's on page 11 of the patent.

And you mentioned previously that 44 was the LED.  Did you identify any issues with the placement of the LED in this design shown in Figure 16A?

A.   Oh, yes, there's one critical element in an LED, and that is you've got to have some sort of electrical contact coming to it.  And to give you an idea, it's less than the width of a human hair.  So you have this little gold wire bond that brings electricity into this -- well, it's a little cube of solid state semiconductor material, and sometimes there's a cathode and anode on top of the LED with these little wire bonds coming to it; sometimes the anode is on the bottom of the LED, and you just have a cathode on the top of the LED.  But basically you're putting electricity through this little chunk of material, and when you do that it lights up.

Q.   And did that wire that you mentioned, that's less than the width of a human hair, pose any issues?

**A.**  Oh, yeah.  You could imagine if you tried to injection-mold this lens or somehow put the LED up into the material, you would destroy the wire bonds, and it won't light up.

**Q.**  Did you come up with any way to address that problem?

**A.**  Yes, yes, I did.

**Q.**  And can you describe what your solution was?

**A.**  It was something that I called an illumination coupler. It had a couple of different surfaces, a top surface and a bottom surface, and I think it's shown in one of the figures more distinctly.

**Q.**  Could we take a look at figure 24, please, and that's on page 14 at the bottom.

Dr. Pelka, does this figure assist you in describing what the illumination coupler is?

**A.**  Yeah, that's what I called the illumination coupler.

**Q.**  And let's just orient ourselves to what we're looking at in this figure.

What is the item 140?

**A.**  That's a packaged LED as you get it from the LED manufacturer with a protective lens around the wire bonds so that you can actually use this thing without destroying the wire bonds yourself.

**Q.**  And what is the item that's labeled 90?

**A.**  90 is just the cavity at which the LED is inserted into.

In other words, you've got to have a hole.  Imagine you had an array of these things, and you had some piece of plastic that was going to come down and sit over the top of this.  You've got a series of holes, a series of LEDs placed on a printed circuit board and now you're going to bring something down to fit over the LEDs, so you've got to have a hole for that, and that's what's represented by that.

Q.    Okay.  I'll trace what I think you're describing as the hole, Dr. Pelka, and you tell me if I've got it right.

A.    Yeah, that cavity right there (indicating).

Q.    Thank you, Dr. Pelka.

Now let's take a look at item 150.

What is that?

A.    Item 150 I think points to the sharp facing curve on top of the LED.

Q.    And how, if at all, do the items 150 and 90 relate to what you were describing as illumination coupler?

A.    Well, again, if you look at the rays represented, these little dotted lines that come off the LED, it would represent how the light would actually be reflected in this waveguide. And here, we actually created some, oh, I'll call it deformations in the waveguide itself, so we could allow some of the light to leak out.

Again, imagine you're trying to backlight a liquid crystal display screen.  If you're too effective, if you didn't have

any regions where the light could bounce out, it would be ineffective.  The light would just travel from one end to the other end.  You lose.  That's no good.  So you've got to scratch it or somehow create these little bumps that allow the light to get out, otherwise it just under goes total internal reflection forever.

Q.   Let's keep figure 24 on the screen, but also look at the text that describes figure 24.

I'd like to direct you to the text that's on column 16, which is on page 24, and the sentence that starts the paragraph around line 14, and that's talking about figure 24.  So this is great, we have both on the screen here.

And Dr. Pelka, can you explain to the jury what's being discussed in that first sentence of column 16 around line 14?

A.   Yeah, it says to make an effective illumination coupler, you've got to have the upper surface and basically the bottom surface, which is the hole for the LED to be fitted into, and those two surfaces working in concert with each other allows the light to be then interjected into the waveguide.

Q.   And there's a reference to TIR region 150; do you see that in the diagram?

A.   150 looks to me like it's showing the upper curve, yeah.

Q.   Great.  And then let's take a look at the -- another sentence in column 16 with Figure 24 up there.  It's the sentence that begins around line 27.

And can you explain what this is stating about the illumination coupling element?

A.   Well, it just says that the hole in which you place the LED is working together with the top surface, so there are coordinated surfaces.

Q.   And by hole, what numeral are you referring to?

A.   The cavity 140 that the LED is inserted into has a certain shape associated with it, and that shape coordinates with the upper surface 150, the V shape, the sharp V-shape surface on top.

Q.   Thank you, Dr. Pelka.

Do you recall now whether anyone expressed interest in the technology of the '554 patent?

A.   Well, I think I mentioned earlier we were working with Hewlett Packard at the time, and they were particularly interested in the technology for rear taillight assemblies for a lot of the American automobiles.

Q.   Great.  And there's one more passage in the '554 that I'd like to discuss.

If we go to column 13, which is on page DTX-1004 at page 23, specifically to line 61 to 63 of column 13, there's a reference there to a company Breault Research.  Do you know what they are?

A.   Yeah, that was a spinoff of three professors from the University of Arizona at the time.  They had created some

optical modeling software that they wanted to peddle commercially, and they called their company Breault Research. And where the name came from I'm not sure.

Q.   And there's a reference there to a software package such as ASAP.

Do you have an understanding of what that is?

A.   That was the commercial name they attached to their software package.  And Teledyne, after we were purchased by Teledyne in 1997, they purchased this optical design software for us, and we used it in creating these patents.

Q.   Can you explain why the ASAP software from Breault Research is referenced is your '554 patent?

A.   Well, because we used it in doing all the figures and all the ray tracing that goes into the background of this patent.

Q.   And do you know if Breault Research is still in business for this ASAP software today?

A.   I believe they are.

Q.   Now, to conclude, Dr. Pelka, can you sum up for the jury what it is you believe you invented that led to the '209 and '554 patents?

A.   Well, my anticipation was that we were going to have larger LCD screens, and we were going to use LED for the light source for backlighting those things.

So the first problem you have is there's a very short distance between where you're going to place the LEDs and where

you're going to have the LCD screen.  So the first instance you've got bright spots.  So how in the heck do you get rid of the bright spots?  Okay.  You've got to have some deflector over the LED redirecting whatever you want to call it that pushes the light basically sideways where it can reflect in this cavity, be homogenized and be presented to the LED screen.

Well, then we created the so-called redirecting elements, which I call the black hole.  But they were too good, so now I created just the inverse problem for myself.  Instead of having bright spots, I have black spots, and now I had to figure out a way for filling in the black spots.

Q.   And what was that solution of filling in the black spots?

A.   The two patents.

Q.   And specifically did you have a term -- I think you used the term for filling in the black spots?

A.   Well, leaky black hole.

          MR. SANDERS:  Great.  Thanks, Dr. Pelka.

          THE COURT:  Thank you.  Examination by EDD.

          MR. GOTTS:  Thank you, Your Honor.

          MR. LABGOLD:  Thank you, Your Honor.

                    CROSS-EXAMINATION

          MR. LABGOLD:  Would the Court like to advise that we're doing direct and cross, adverse direct?

          THE COURT:  Well, we've mentioned this I think yesterday, ladies and gentlemen.  The parties are doing both

direct and cross at the same time on different topics, so as to have witnesses like Dr. Pelka testify a single time.

So you will hear, as you've just heard, some inquiry in different parts of the case all happening at the same time. Another way to do it might be to have some questions on one topic now and some questions later. We've opted to try to have all the topics for each witness at one point in time.

And as the case goes along, I'll give the attorneys a chance to give some update as to what their plans are for the day, and to give some interpretation, not argument, but some interpretation. So we may do that at the end of the day or the beginning of the day Thursday.

**BY MR. LABGOLD:**

**Q.** Still morning. Good morning.

**A.** Good morning.

**Q.** Good to see you again.

**A.** Good to be seen.

**Q.** Now, I'm going to talk to you about a couple of things that you've already spoken about, and a couple of other issues that relate to issues of invalidity.

First, with regard to your '209 patent, if you can refer to that, that's DTX-1001. And with regard to column one under the summary of the invention at line 45, that paragraph that runs to 55, do you recall just testifying about these shielding elements?

A.    Yes.

Q.    And do you recall that you testified as saying that they were redirecting elements, as you like to call them?

A.    Yes.

Q.    And how long have you liked to call them that?

A.    I don't know, as long as I can remember.

Q.    Is there a reason why your patent doesn't call them redirecting elements?

A.    No.  I thought the term baffle was sort of more all-inclusive.

Q.    So you are aware of the fact that the term "redirecting element" is not in your patent; correct?

A.    Yes.

Q.    And by "baffles," which is what you called them, those are actually physically blocking elements; correct?

A.    In some cases blocking, at least ameliorating elements that slow down, redirect, et cetera; for example, baffles in a telescope.

Q.    Well, I'm not talking about baffles in a telescope, I'm talking about the baffles in your '209 patent.

      And aren't they all like they're blocking agents, they block and reflect the light; correct?

A.    Not entirely.

Q.    Is there a place where you have a baffle that actually is -- lets light through?

**A.**    Yeah, I think in the specification I call out a material, and I talk about the material being 95 percent reflective, which means it's 5 percent transmissive, implying that the baffle is not opaque.

**Q.**    Do you ever describe it as a "lens"?

**A.**    I do not.

**Q.**    Now, with regard to this baffling, that was not something that you invented yourself; correct?

**A.**    Well, I think I invented the redirecting elements or baffling elements, whatever you're going to call them here, for this particular application.

Now, were baffles known in general before that? Certainly.

**Q.**    And if you look at Figure 5, the element 58, which we see -- it's that little black -- it's actually a line there?

**A.**    Yes.

**Q.**    Correct?

**A.**    I see that.

**Q.**    Do you see that?  In this case it's actually covering -- it would be a little piece of metal that's up and over (indicating); correct?

**A.**    Yeah, something like an umbrella, yeah.

**Q.**    And was that the first time you had worked with any configuration like that or seen anybody else in your company working with that type of configuration?

A.   For this application, yes.

Q.   What about in general?

A.   In general, I would still answer the same way.

Q.   Would you refer in your binder to Plaintiff's Exhibit 20.

A.   I'm sorry.  Which Exhibit?

Q.   20.

A.   20.

Q.   Plaintiff's Exhibit 20.

A.   Yes, I'm there.

Q.   And do you recognize that as the patent to Gleckman 5684354?

A.   Yes, I do.

Q.   And that's a patent that you're familiar with?

A.   Yes, I am.

        MR. LABGOLD:  I'd like to move it into evidence, Plaintiff's Exhibit 20.

        THE COURT:  Any objection?

        MR. SANDERS:  No objection, Your Honor.

        THE COURT:  Plaintiff's Exhibit 20 is admitted.

     (Plaintiff's Exhibit 20 received in evidence)

BY MR. LABGOLD:

Q.   Now, we see that this is -- if we focus on the top portion of the page, we see that this is a patent that was issued in November of 1997; correct?

A.   Yes.

Q.   And so we look at its filing date, this was filed, right at the bottom left-hand corner of this square, do you see, October 3rd, 1994?

A.   Yes, I see that.

Q.   And your '209 patent was filed March 19, 1997; do you recall that?

A.   Yes, I do.

Q.   Now, the person, Philip Gleckman, still focusing on the top of the page, that was somebody who worked for you; correct?

A.   Yes, he was a Ph.D. scientist.

Q.   And you supervised his work; correct?

A.   I did.

Q.   And the assignee of this patent is TIR Technologies, your company; correct?

A.   Yes.

Q.   And if we look at the Figure 8, do you see where this depicts -- let's pull up 8 and 9 together, so you could see the two views -- that this depicts using a baffle for shielding the light so it's not directly viewable?

A.   Yes, I see that.

Q.   And if we look at Figures 12 and 13, you're familiar with these figures; correct?

A.   Yes, I am.

Q.   And in the top figure what we see here is the -- a cavity for the backlight; correct?

A.    Yes.

Q.    And on the bottom of that cavity, just by its very nature there's a bottom wall; correct?

A.    Yes.

Q.    And the bottom wall would run along this cross-hatched area, right?

A.    Yes.

Q.    And so if we were looking down at it, if it's like a box, that's the bottom of the box; correct?

A.    That would be the bottom of the box, yes.

Q.    And then it has side walls, correct, that's like the side of the box; correct?

A.    Yes.

Q.    And then it has this area over here (indicating) that kind of folds over, and it's kind of like the eve of a house; right?

A.    Yes, it is.

Q.    And then what you're depicting here is mounting LEDs out of view as another way of like shielding that light; correct?

A.    Yes, that's, I believe, what the drawing is trying to show.

Q.    And the area that's between them, the 72, that would be the opening, the aperture of the opening; right?

A.    Yes, that would be the area that would be exposed to the LCD panel.

Q.    And so we see that the lights are mounted outside of the

aperture in this depiction; correct?

A.   Yes, we do.

Q.   And so when we look down at Figure 13, that square in the middle where it says 16 prime?

A.   Uh-huh.

Q.   That whole square area in the center there, that's looking down now at that aperture, but you can't see the lights directly; correct?

A.   Correct.

Q.   Now, if we look at Figure 4 of your '209 patent, and that was admitted as 1001, so look at Figure 3 first, what we see -- so what we see here --

      THE COURT:   Mr. Labgold, just for the jury to follow along, when you specify when you say Figure 3 which patent you're looking at.

      MR. LABGOLD:   Thank you, Your Honor.

Q.   Looking at Figure 3 of the '209 patent.

      THE COURT:   Thank you.

BY MR. LABGOLD:

Q.   And when we look at Figure 3, so what you're depicting here in the cross-hatch is the cavity; correct?

A.   Correct.

Q.   And just like we saw, it's got a bottom wall, just like in Gleckman; correct?

A.   Yes.

Q.   And it has side walls, correct?

A.   Yes, it does.

Q.   And they curve over and create that aperture; correct?

A.   Yes.

Q.   And it has LED lights that are mounted outside of view; correct?

A.   Yes, it does.

Q.   And the -- going to Figure 4 of the '209 patent, here we're looking now again just like we did with Gleckman looking down at it; correct?

A.   Yes.

Q.   And so the difference between your patent and the Gleckman patent is the mounting of these lights labeled 13 in that open aperture area; correct?

A.   No, that's not the only difference.  In my '209 patent the shielding elements would have to direct the light sideways.  If you look at the Gleckman patent, he was just covering up an incandescent bulb forcing all the radiation downward, and so the baffles in both cases would be dramatically different.  So I disagree with your conclusion.

Q.   Okay.  So the difference -- your patent requires redirecting in a lateral direction?

A.   Certainly in a different direction than the Gleckman patent.

Q.   Okay.  And can you take a look at Claim 20?

A.   Claim 20.

     MR. SANDERS:  Objection, Your Honor.

     THE COURT:  Overruled.

     Of which patent?

     MR. LABGOLD:  Of the '209.

Q.   So in column 9, so the jury -- you're familiar with patents; correct?

A.   Yes.

Q.   And when I say column 9, you understand that in patents, the text is going to be arranged always by these two-column format?

A.   I understand that.

Q.   Okay.  And so looking at column 9, we see Claim 20; do you see that?

A.   Yes.

Q.   And it actually carries over onto the next column; do you see that?

A.   Yes, I see that.

Q.   Now, can you tell me where in this claim it talks about directing light in any lateral direction?

     MR. SANDERS:  Objection, Your Honor.

     THE COURT:  One moment.  What is the objection?

     MR. SANDERS:  The objection is that the inventor here is being asked about interpretation of claims, and Your Honor issued an order with respect to this.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our lunch break now so we can resolve this legal issue while you're at lunch, so I'd ask you to return at 1:00 p.m.  It's 12:05 now.  Enjoy your lunch.  And remember don't do any investigation about this case or discuss it or begin your deliberations, because there's no deliberation until you've heard all the evidence.

Thank you very much.  We'll see you at 1:00 o'clock.

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  On the record.

Dr. Pelka is not present, and the jurors are not present.

So Mr. Labgold, without the jury being here, what is your intention -- what are you expecting to get out of Dr. Pelka as to Claim 20?

MR. LABGOLD:  Well, we now have, for the first time, a new explanation of what his invention is, and he says it's redirecting light in a lateral direction.  And I'm just asking him -- I'm not asking him to interpret the claims, I'd just like to know --

THE COURT:  It sounds like you're asking him to interpret the claim.

MR. LABGOLD:  Um --

THE COURT:  And that is the objection, correct, that he's being asked to interpret the claim?

MR. SANDERS:  That's precisely the objection, Your

Honor.

MR. LABGOLD:  I'm just asking if there was anything in the claim that he saw that was making reference to light in a lateral direction.

MR. SANDERS:  That's asking him to interpret the claim.

THE COURT:  So then I should allow -- we've covered this before -- that would allow SSC to ask for interpretation of the claim as well from your --

MR. LABGOLD:  Well, with the inventor of the case law on this one is -- and I'd be happy to -- I don't have them at my fingertips, but I can get them to you close to immediately -- the federal circuit says that you can listen to the inventor's testimony with regard to even construction of the claim as long as it's not the inventor being asked by the patent holder.

The self-serving statements by an inventor as to what his invention is are generally considered inadmissible, and in particular with regard to claim construction, that area has been excluded.  In the case where an adverse witness is talking about what the scope of their claims are, that evidence can be admissible, and the federal circuit does allow that.

THE COURT:  And the best authority for that is?

MR. LABGOLD:  We need to get a case for you.  That may take me a minute, Your Honor.

THE COURT:  What is SSC's view on the assertion that the adverse party may solicit interpretation of a claim even where the side -- the patent holder may not.

MR. SANDERS:  Your Honor, that relates to the extent that that is supported, that relates to the claim construction process, which is a matter for the Court.  This is not a matter to be presented to the jury.  So I am sure that when you see this case, to the extent it supports this proposition, we will see that it is in the claim construction context hat Your Honor can consider.

We've already fully briefed the issue and gotten a ruling. I think this is respectively within the scope of Your Honor's ruling.

THE COURT:  Yes.

MR. LABGOLD:  And, again, that -- so I will ask the witness -- I can ask him in other ways to get at the same information without going to the claims, so --

THE COURT:  Well, unless you have a case right now, I think this is going within the scope of what I ruled before trial, and I excluded expert testimony and testimony interpreting Claim 20, including striking some demonstratives where there's going to be some elaboration by Dr. Pelka about what Claim 20 means.

And so my ruling is I'll sustain the objection unless I'm persuaded otherwise by additional authority, and that includes

asking in a different way.

How much more time do you have with Dr. Pelka?

MR. LABGOLD:  I have probably half hour.

THE COURT:  All right.  Then let's turn to the issue of the evidentiary objections dealing with the next witnesses.

MR. GOTTS:  Thank you, Your Honor.

THE COURT:  And as an aside, thank you to both parties for having the binders ready is very helpful, the presentations by both parties so far, as far as your use of the electronic evidence on the screen and for the jury, has been exceptional, and will greatly aid the jury's understanding of the evidence presented, so keep that up.

MR. GOTTS:  Thank you, Your Honor.

MR. LABGOLD:  Thank you.

MR. GOTTS:  I'm prepared to knock on wood.

THE COURT:  I wasn't trying to jinx anything, but I did want to give accolades where they were due.

MR. GOTTS:  Okay.  Your Honor, the issue before the Court presently is with regard to Mr. Ryu and Dr. Nam would receive the identification of exhibits to be used with this is witnesses by Enplas in their adverse direct.  And Enplas was unable to meet and confer until 10:00 o'clock last night, and so that's why the issue is ripe now.

The issue falls into two categories, I would say. There's -- I'll focus on Mr. -- oh, perhaps Dr. Nam should

leave the room.

THE COURT:  If Dr. Nam is present, yes, I think that would be sensible.

Thank you, Ms. Woodhouse.

MR. GOTTS:  Okay.  The issue falls under two categories, the first being -- I should say that there's, for these purposes all -- there may be slight differences, but these two same lists of exhibits are listed for both witnesses, so I'm going to talk in terms of Mr. Ryu, but I think it applies both ways.

In about fifteen exhibits, the first issue I'll just note, then I'll go to the second one, in each instance for all fifteen exhibits in the exhibit lists that were exchanged, the sponsoring witnesses who were listed for these -- all of these documents included neither Dr. Ryu, Mr. Ryu or Dr. Nam, so in that regard there's of course surprise, but -- and they were not listed.  And there was no -- they fully knew who was coming at that point in time, because the sponsoring witness list came at the same time as everything else, so it was all in there.  This was no changed circumstances.  So that alone is an issue of concern, Your Honor.

There's all sorts of foundation issue with these witnesses which is going to have us on our feet as well, because many of these they don't know anything about.  But in any event, I'm not going to address the specific foundation issues.  We would

take those on a exhibit by exhibit basis.

THE COURT:  I'm going to pause for a moment just on the foundation issue.

MR. GOTTS:  Yes.

THE COURT:  Are these exhibits you're seeking to introduce into evidence, or simply going to be asking the witnesses about and not moving into evidence?

MR. LABGOLD:  Well, we have an issue here that's created by the agreement between the parties.  I'm actually a little bit confused that this is the issue.

For the witness's convenience, we're doing adverse direct at the same time we would be doing the direct.  So otherwise I would -- the normal structure, if you will, they would close their case, I would put in the 30(b)(6) deposition, wherein these documents are admitted, and so therefore they're fully usable.  There's no objections to these documents, it's just a question of the formality due to the form.

THE COURT:  So the answer to my question is yes, you're intending to move them into evidence?

MR. LABGOLD:  I definitely want to be able to publish them.  I mean, whether I admit them, we can provisionally admit them, to the extent we want to do that as a matter of course, and then we'll put them into the deposition.  But, again, there's no objection to any of the documents.

THE COURT:  If there were no objection to them, then I

would not be provisionally admitting them, because that would just be doing two things when one can do.  If there's an objection to them, then we need to figure out if there's --

MR. LABGOLD:  And I mean, we all had to file our objections.  These were not objected to, because there actually is foundation, because it just comes into under 30(b)(6).

MR. GOTTS:  Well, that's not true.

MR. LABGOLD:  That is true.

THE COURT:  You answered my question whether you intend to move them into evidence, and the answer is yes.

MR. LABGOLD:  Yes.

THE COURT:  All right.  So you've got surprise, you've got foundation.

MR. GOTTS:  Right.

THE COURT:  What are the other categories?

MR. GOTTS:  And just to quickly address that point.

The foundation point was known from the beginning, because we all knew the sequence of evidence.  If they were the sponsoring witnesses, they should have been identified as the sponsoring witnesses, I would argue.  So that's the sequencing issue was known to all of us at the time we filed these papers, so we are surprised.

Second, Your Honor, is the large number of these exhibits, and frankly, perhaps all of them, but certainly a large number of them, go to other lenses that are not accused in this case.

Some of them go to a lens which was the replacement lens, which SSC acquired after their supply was cut off, in the case of two lenses made by a company called Boehm, B-O-E-H-M; others relate to a lens called 9845, which was the lens that SSC was purchasing from Enplas, and they're going to not only just the --

THE COURT:  Please give me an example.

MR. GOTTS:  Yes.

THE COURT:  So which of the exhibits demonstrate that?

MR. GOTTS:  Do we have a booklet of exhibits, guys?

One of the exhibits is Exhibit --

MR. LABGOLD:  Number PX-115, Your Honor, PX-115.

MR. GOTTS:  Well, no, we'll go to PX-44 is a good example, Your Honor.  We have the book here.  If not, I'll hand it up to Your Honor.

THE COURT:  I've got it, PX-44.  All right.

MR. GOTTS:  And here it is.  Here is my copy, Your Honor, and this is the specs and drawings from the Boehm lens, which was the replacement lens.  It's not at issue in this case.  It's not the subject of infringement.  It's our product.

And PX-51 is, our argument on 51, Your Honor, this is the actual photographs of the Boehm lens, for example, and it's got nothing to do with this case, Your Honor.

We've been put under a very tight leash with regard to other lenses as a result of the way the case has played out.

And the same problem occurs with the 9845 lens, which is another lens of ours that was made during the time period we acquired from Enplas.  But we're in this odd situation that really came out also in the openings, because their counsel is now making comments like, *oh, look, we only have three lenses in the case; what about all the other ones that aren't in the case?*  I mean, I heard that in the opening too, and now we're seeing this theme of, you know, where we have our hands strung, all of a sudden other lenses are coming into the case when it helps them and suits them, but not when it doesn't suit them.

**MR. LABGOLD:**  Your Honor --

**MR. GOTTS:**  So all of these lenses relate one way or another to the 9845 or this Boehm lens, all these exhibits --

**THE COURT:**  So your objection is?

**MR. GOTTS:**  My objection is relevance, prejudice, and, frankly, under the circumstances of the Court's prior orders on other lenses, I think it's a fair application that both parties should be subject to the same constraints.

**THE COURT:**  All right, Mr. Labgold?

**MR. LABGOLD:**  With regard to the reference to the lenses, there are five lenses which they have continued to assert against the '209 patent against.  So the jury is going to get to see those five lenses, that's all I was talking about with regard to that comment.

With regard to the story which they're telling is that

there was a co-development.  Mr. Ryu is the engineer on the ground, so I should be able to ask him about the specification for the lens, the 9845 lens, about the design drawing for the 9845 lens.  That was the one I referred you to, which was PX-115.  Because if they were actually doing this joint development, then these are documents that he should have seen.  If it turns out he says he's never seen this, that's important to me as well.

THE COURT:  What is the probative value of documents 44 and 51?

MR. LABGOLD:  Because they've now raised this story that they just turned around and reintroduced after it was taken out at the opening slides, that we short-saled them and left them without having their single source.  And so now they've made this completely relevant because of the fact that these are lenses that they went out and were able to get lenses from somebody else after we stopped selling them, and so there they are.

THE COURT:  All right.  Here's my ruling.

The case has not turned from a patent infringement case into a co-development divorce case.  This is not a family law proceeding.  Information has not become relevant just because there was some coercive dealing between the parties here.  The claims and defenses are focused on particular claims in two patents, and it's not going to be enlarged into be any patent

between the parties and a co-development.

There's been a small amount of context from both parties about companies and their development of other patents, that's for context.  It's not because those other patents and what happened in earlier years is going to be relevant, and it's not going to be something that the jury is going to be determining at the end.

So I'm excluding 44 and 51 and other documents of other lenses consistent with my pretrial rulings about other lenses. I am not excluding them because there's a lack of foundation. If they are in evidence from before, and if there's not a basis to object to their foundation, I'm not excluding them.  But I am excluding them under Rule 401 and 403.  That's my ruling.

MR. LABGOLD:  Well, in this regard is the witness going to be able to testify about the co-development of these lenses?

THE COURT:  I will expect, if anything, a very small amount of any history.  And of course if the proverbial barn door is kicked open on direct, then that would infringe on the amount of information I will permit within the confines of something broader.  So I think SSC would be well informed to not have testimony about things which are not in dispute in the case.

MR. LABGOLD:  And Your Honor, this brings us to one issue that's the corollary to Mr. Nam.

If I could hand you up two copies.  This is the second supplemental initial disclosure.  It was served on the last day of discovery in the case.  And with regard to Mr. -- if you go to page 4.

THE COURT:  I'm sorry.  This is two copies of the same document?

MR. LABGOLD:  Yes, it is.

THE COURT:  All right.  Go ahead.  Page 4.

MR. LABGOLD:  Yes, page 4, at line 5, you see Mr. Ryu, and below that Mr. Nam, and in both of these the only subject matter that they were identified during discovery was in SSC's involvement in codeveloping Enplas' accused products.  And this goes to our objection that's going to come up with Mr. Nam, is that he should not be allowed to be the witness who testifies about purchasing or inspecting accused and infringing devices, because he was not identified in any way, shape, or form in that category during the discovery period.

THE COURT:  All right.  So this answers the question of surprise.  And the response is?

MR. GOTTS:  Yes, Your Honor, and I'll pull it out momentarily.  Of course our initial disclosures incorporate by reference their initial disclosures, and I don't have the exact language.  I'll have it momentarily.  But their initial disclosures expressly identified Dr. Nam with regard to the alleged infringement.  So there's no surprise, in fact, they

identified him for that purpose.

MR. LABGOLD:  It clearly is not in the take-down of --

THE COURT:  One moment.  Proffer for me what Dr. Nam will be saying today, the topic.

MR. GOTTS:  Mr. Sanders.

MR. SANDERS:  Dr. Nam will be discussing basically three areas:  One is the background of Seoul Semiconductor, the second is the analyses that Seoul Semiconductor does specifically with respect to purchases of televisions that contain Enplas lenses.  He's the head of the analysis group at SSC; and the third area is the background that led to this dispute.  Dr. Nam was involved towards the end in the letters that we've already seen.

THE COURT:  All right.  And Dr. -- excuse me.  Witness Ryu --

MR. SANDERS:  Oh, witness Ryu, I'll defer to my colleague.

MR. GOTTS:  Mr. Ryu will testify to the background period in which Enplas -- SSC got into the business back in 2004, then he approached Enplas to joint develop.  And, again, in no greater detail than the opening, frankly, not to put -- we're not intending to put any documents in front of them in terms of the substance of any of those lenses.  He would then testify to the fact that they -- that they notified -- we notified Enplas of the patents, and then the at that point in

time, you know, really that sort of takes it up to the point of notice, and that's it.  He will also talk briefly about the problems that happened in the relationship, but, again, nothing that I -- frankly, it's no greater detail than was in my opening, Your Honor.

THE COURT:  All right.  With the expectation that it will not be greater than the opening statement, and given the other disclosures made in the case, I'm not going to exclude the two witnesses within the parameters of what has been set forth as to their expected testimony.

MR. GOTTS:  Thank you, Your Honor.

THE COURT:  We're taking a lunch break until 1:00 o'clock.  See you then.

(Luncheon recess was taken at 12:22 p.m.)

Afternoon Session                                    1:03 p.m.

(Proceedings were heard out of the presence of the jury:)

THE COURT:  Good afternoon.

We are ready for our jurors to return, and then for the continued examination of Dr. Pelka.

Dr. Pelka can come up.

MR. SANDERS:  Come on up, Dr. Pelka.

(Proceedings were heard in the presence of the jury:)

THE COURT:  All right.  Good afternoon, ladies and gentlemen.  Everyone may be seated.

Dr. Pelka remains at the stand with continued examination

by EDD.

MR. LABGOLD:  Thank you, Your Honor.

Q.   Welcome back.  Good afternoon.

Return to DTX-1001, the '209 patent.

A.   (Witness examines document.)  I'm sorry.  PTX what?

Q.   It's Defendant's Exhibit DTX-1001.

A.   Oh, 1001.  I've got two binders up here.  It's getting confusing.

Q.   And if you'd look in Column 5.

A.   (Witness examines document.)

Q.   Do you see where -- are you there?

A.   Yes.

Q.   Okay.  And then on line around 30, 30 and a half, "The baffles 56 have outer surfaces that face away from the LEDs 13..."  Do you see where I read?

A.   Yes.

Q.   And you understand that that's the baffles that are referred to in the other diagram we were looking at?

A.   Yes.

Q.   Now, the outer surfaces, by saying those face away, that's facing towards the aperture; correct?

A.   Facing away, I would mean that they were tilted.

Q.   The baffles have outer 56 -- let's look at a figure, Figure 5.

A.   (Witness examines document.)

Q.   Okay.  Now, the language that we've read is that "The baffles 56 have outer surfaces that face away from the LEDs 13."  Do you see that?

A.   Yes.

Q.   Now, just above that in Column 5 referring to "each baffle consists" -- let's get the language back up there.

Do you see around -- yep.  Right there.  Just go across the line.  (reading)

"Each baffle 56 consists of two portions, a support portion 57 and a shield portion 58."

Do you see that?

A.   Yes.

Q.   So we're looking at that figure, and that's what we're referring to.  Then it says that it has:  (reading)

"The baffles 56 have an outer surface that face away from the LEDs."

So that's talking about the top of them looking down; correct?

A.   Yes, I think so.

Q.   And then if you look down on line 33:  (reading)

"The inner surfaces of the baffles, which face the LEDs, are also comprised of or coated with one of the diffusely reflecting materials described above."

Do you see that?

A.   Yes, I do.

Q. And it says: (reading)

"Alternatively, the inner surfaces may have mirrored surfaces."

Correct?

A. Yes.

Q. And then if you look at the next sentence: (reading)

"In either case, the reflecting surfaces reflect light from the LEDs toward the bottom wall 15."

That means it's reflecting them down, correct, not out? Is that correct?

A. Yes, that's the way I read it.

Q. Now, where it's talking about reflecting there, that's not talking about total internal reflection; correct?

A. No, I do not believe so.

Q. Now, if you turn to DTX-1001 -- oh, excuse me, 1004.

A. (Witness examines document.)

Q. That's the '554 patent.

A. Yes.

Q. And there's several topics that you talked about on direct. First I'd like to go to Column 13 at line 61 down to the bottom of that paragraph.

A. (Witness examines document.)

Q. Do you see where it refers to "mathematical modeling of these shapes can be performed with an optical analysis software package such as ASAP"?

**A.**   Yes, I see that.

**Q.**   And in the context, what this is referring to is how to contour that surface 80; correct?

**A.**   Which figure are you referring to now?

**Q.**   Well, you're looking at Column 13, and it says -- go up a little bit higher -- line 52:   (reading)

        "The surface 80 may be either a planar curved surface or a nonplanar surface comprising a plurality of flat surfaces approximating a curve."

        Do you see that?

**A.**   Yes, I see that.

**Q.**   And if you look back at Figures 15 or 16 -- we can stay here -- that's referring to the cusp?

**A.**   (Witness examines document.)  You're on Figure 15?

**Q.**   Well, that's actually on 16.

**A.**   Item 80 appears to -- yes, refers to that cusp.

**Q.**   And this is talking about using that software to model the shape; correct?

**A.**   Yes.

**Q.**   Now, with regard to the LED here, this has an LED -- you talked about it having wires and --

**A.**   A wire bond, yes, all LEDs have wire bonds.

**Q.**   And that's a specific problem that you were addressing resolving here?

**A.**   Yes.

Q.   Is there a reason why that's not described anywhere in the patent?

A.   Could you elaborate on your question?  I guess I don't understand exactly what you're asking.

Q.   Well, you said that there was a -- motivation for having an illumination coupler was because there's a wire bond problem, and you want to correct that.

A.   Yes.  From a manufacturing standpoint, you would like to use prepackaged LEDs; and if you didn't use prepackaged LEDs, it's hard to imagine how you could fit the lens or injection mold the lens over an LED without destroying the wire bonds.

Q.   Is there anyplace in your patent where you describe that?

A.   I don't remember.

Q.   There is no place that it's described, is it?

A.   I'll take your word for it.

Q.   With regard to the paragraph right above on Column 13 where it's going to talk about Figures 15 and 16, and they talk about:  (reading)

         "The light source 44" -- that's on line number 38 --
      "preferably an LED that's mounted immediately below the
      cusp 82."
      Do you see that?

A.   Just a minute.  I'm trying to get back to Figures 15 and 16.

Q.   Take your time.

A.   I need a second.

     (Witness examines document.)  Okay.  I'm back to 15 and 16.  And what is your question?

Q.   (reading)

          "A light source 44, preferably an LED, is mounted immediately below the cusp 82."

A.   Yes, I see that.

Q.   So the LED is embedded in a correspondingly shaped hole, recess -- channel, or recess; correct?

A.   That's what the specification says, yes.

Q.   So this is talking about inserting an LED into a hole; correct?

A.   Yes.

Q.   And it goes on:  (reading)

          "In order to ensure good coupling into the waveguide" --

     And that's what we're talking about, illumination coupling; correct?

A.   Illumination coupling, yes, that's the topic.

Q.   (reading)

          -- "and reduce reflections at the interface between facets of the LED" --

     Do you see that?

A.   Yes.

Q.   On the next line it's going to say:  (reading)

-- "a transparent optical coupling agent, such as an adhesive gel (not shown) may be used to fill any air gaps between the LED 44 and the waveguide 42."

Do you see that?

A.   Yes.

Q.   So what that's talking about is, when you take the LED and you insert it into the hole or recess, you're going to fill any gap so it's essentially completely surrounded; correct?

A.   Well, you may or may not depending on what your objective is.

Q.   Well, in order to ensure good coupling, the patent says that's what you want to do; correct?

A.   Yes, you would reduce the Fresnell reflections that would otherwise be achieved if you didn't fill in the air gap.

Q.   And that's to ensure good coupling into the waveguide; correct?

A.   Yes.

Q.   So with regard to what's used to fill, it's just -- it's something that has a refractive index, which is similar to the material of the waveguide; correct?

A.   It has the same approximate index or refraction, yes.

Q.   Now, if you take a look at Column 14 at the bottom paragraph starting on line 58, and do you remember this is where we were talking about leaky?

A.   (Witness examines document.)  Repeat your question.  I have to have time to read this.

Q.   Take your time.  Read the paragraph.

And it carries over onto the next page, so if we can get the top of the next column as well.

A.   (Witness examines document.)

Q.   So this is where we were talking about leaky.  Do you recall?

A.   A leaky black hole, yes.

Q.   Now, it talks about, as you testified, "in situations where such dark spots are objectionable."  Do you recall that?

A.   Yes, I recall that.

Q.   So you're going to contour the surface to make it a less-than-perfect reflector; correct?

A.   Yes.

Q.   And on line 65, it says:  (reading)

"The amount of leakage should be preferably no more than is necessary to substantially eliminate the dark spots."

Correct?

A.   Yes.

Q.   So when we're looking at the LED below the cusp, in the perfect TIR, that's a situation where we saw the lights coming up and because of the angling, it's all getting trapped and propagated into the waveguide; correct?

**A.**   Yes, in a perfect TIR.

**Q.**   And that's going to create the dark spot that you referred to; correct?

**A.**   Yes.

**Q.**   And so this amount of leakiness should be no more than allows it to be equal so you get uniform light, correct, across and not have a black hole?

**A.**   That's the objective.

**Q.**   So if it's more than 50 percent of the light that's being leaky, is that a situation where it's uniform?

          **MR. SANDERS:**  Objection, Your Honor.

          **MR. LABGOLD:**  I'm just trying to understand what's a substantial portion to get to just enough so that --

          **THE WITNESS:**  You're going to have to rephrase your question.  I don't exactly understand what you're asking.

**BY MR. LABGOLD:**

**Q.**   Well, let's say we have a perfect -- the perfect situation here where it says it's got to be a substantial amount -- okay? -- but no more than to eliminate the dark spots.  So it's got to be uniform.  That's the whole purpose; correct?

**A.**   The purpose is uniformity, yes.

**Q.**   And so uniformity with the light that's being sent through the waveguide; correct?

**A.**   I guess what I'm having trouble understanding is substantial with respect to what?

Q.   Well, at a perfect it's 100; correct?  I mean, if it was -- just so we can get the range so we know, if it's 100 percent of the light that's going through, that's not leaky; correct?

A.   That's correct.

Q.   And if it's 100 percent reflective, that's perfect TIR?

A.   Yes.

Q.   And there's going to be some transition region in here where the intensity is going to be equal, and it can't be more than 50 percent of the light; correct?

        MR. SANDERS:  Objection, Your Honor.  Incomplete hypothetical.

        THE COURT:  One moment.

        THE WITNESS:  I guess I'm getting confused by your question.

        THE COURT:  Overruled.  You may answer the question if you can.

        THE WITNESS:  I'm confused by exactly what he's asking.  I understand you say 100 percent of the light is going sideways, but to fill in the black hole, I don't know what you're asking me to reference.

BY MR. LABGOLD:

Q.   Can the amount that's used to fill in the black hole be greater than 50 percent of the total light so that 50 percent is going -- being spread out through the rest of the waveguide?

**A.**   I would say the answer to your question would be it depends on the specific design and the specific application, so I don't think I can answer your question in general.

**Q.**   Are there circumstances where it could be -- in your experience of your invention, where it's over 90 percent?

**MR. SANDERS:**   Objection, Your Honor.

BY MR. LABGOLD:

**Q.**   Have you had that experience?

**MR. SANDERS:**   Same objection.

**THE COURT:**   Objection overruled.

**THE WITNESS:**   No, I have not had that experience.

BY MR. LABGOLD:

**Q.**   Now I'd like you to take a look at Plaintiff's Exhibit 34, please.  It will be in the white binder.

**A.**   (Witness examines document.)  Yes, I'm there.

**Q.**   And can you identify this as a patent which you are the inventor?

**A.**   Yes, a co-inventor.

**Q.**   Okay.  And the owner of the patent is SSC?

**A.**   Yes.

**MR. LABGOLD:**   I'd like to move the admission of Plaintiff's Exhibit 34.

**MR. SANDERS:**   No objection.

**THE COURT:**   Plaintiff's 34 is admitted.  You may show it to the jury if you wish.

(Plaintiffs' Exhibit 34 received in evidence)

**MR. LABGOLD:**  Thank you.  If you can pull up just the top so the jury can see.

Q.    So this is a patent which issued in March of 2015; correct?

A.    Yes.

Q.    And it's U.S. Patent Number 8,992,053.  I'll refer to it as the '053 patent.  Okay?  Is that okay?

A.    Yes.

Q.    Okay.  Just making sure for the record.

If you can take a look at Figure 5, and this is a lens that's part of the invention claimed in the '053 patent; correct?

A.    Yes, it is.

Q.    And this is a lens that is based not upon TIR but upon refraction; correct?

A.    That's correct.

Q.    And in the patent itself you state that the intent of the design is to avoid TIR; correct?

A.    Yes, that's correct.

Q.    And if we look at Figure 6, which is actually a full page that shows a variety of rays across, we see focused -- 6A is focusing on the center region.  Do you see that?

A.    Yes.

Q.    And this top surface is contoured so that it has a slight

recess or dimple, as you refer to it; correct?

**A.**    Yes, it is.

**Q.**    And if we look at 6B here, we're looking at the progression between 6B to 6C, 6D, et cetera, a gradual progression as the light gets further and further out in a lateral direction; correct?

**A.**    That's correct.

**Q.**    And this is showing how to take an LED and to make it diffuse -- the lens diffuse that light so that it creates a uniform distribution; correct?

**A.**    As I recall, this application was for reach-in refrigeration illumination, so I don't recall if it was meant to be uniform or if it was meant to superimpose a series of lenses to create uniformity.  So each lens itself may have been nonuniform to a certain extent.

**Q.**    Well, do you recall you gave that answer at your deposition, and I showed you that the patent actually discusses it's used in LCD backlight?

**A.**    I do not recall I said that.

            **MR. SANDERS:**  Objection, Your Honor.

**BY MR. LABGOLD:**

**Q.**    Turn to Column Number 1.

**A.**    (Witness examines document.)

**Q.**    Column 1, and we look at the -- starting on line 30: (reading)

"A prime example of short-throw lighting is the optical lens for a backlight unit for a direct-view liquid crystal display."

A.   Yes.

Q.   And if you -- does that refresh your recollection that this is also directed to backlighting displays?

A.   Yes.   There were a multiplicity of applications for this lens.

Q.   Now, if you turn to Column 2 at line 24 down to 42 right before the Summary of the Invention, do you recall that your patent actually makes reference to a number of other patents?

A.   Yes, I recall that.

Q.   And if you look on line 26 all the way at the end, there's 7,798,679.  Do you see that?

A.   Yes, I see that.

Q.   And I'll refer to that as the '679 patent.

If you take a look in your binder at Plaintiff's Exhibit 14.

A.   (Witness examines document.)

Q.   Do you recognize that as a patent that you've seen before?

A.   Yes, I do.

Q.   And you've seen that in the course of your work in general; correct?

A.   Yes.

Q.   And that is the patent that you're referring to in the

'053 patent; correct?

A.    Yes, it is.

        MR. LABGOLD:  I'd like to move the admission of Plaintiff's Exhibit 14.

        MR. SANDERS:  No objection, Your Honor.

        THE COURT:  Admitted.  Exhibit 14 is admitted and may be shown.

        (Plaintiffs' Exhibit 14 received in evidence)

BY MR. LABGOLD:

Q.    Plaintiff's Exhibit 14 do you see refers to U.S. Patent Number 7,798,679, and you recognize that one of the inventors is a Masao Yamaguchi?

A.    Yes, I see that name.

Q.    And as one of the assignees, do you see it's Enplas Corporation?

A.    Yes, I see that.

Q.    And you are familiar with this Enplas patent and several other of the Enplas patents; correct?

A.    Yes.

Q.    That relate to the diffusion lenses?

A.    Yes.

Q.    Now, referring back to Plaintiff's Exhibit 34, which is the '053 patent, and Figure 5 of that patent.

A.    (Witness examines document.)  Yes, I'm there.

Q.    Now, do you recall that your lens here shares several

design features with those described in the '679 patent?

A.   What do you mean by "design features"?

Q.   Well, for example, they both have an internal cavity into which the light from a light source is emitted.

A.   Yes, they do.

Q.   And they both have an emission surface that while rounded, has a slight central recess in the center?

A.   Yes.

Q.   And do you recall that the lenses of the '679 patent are also designed to avoid total internal reflection?

A.   Yes.

Q.   And, in fact, there's a -- the language which you used with regard to your '053 patent concerning the avoidance of total internal reflection shares text with the '679 patent's corresponding text; correct?

A.   I'm unaware of that.

Q.   Can you refer to Column 15 at the top of the column?

        THE COURT:  Of which patent?

        MR. LABGOLD:  The '053.  I'm sorry.  Thank you, Your Honor.

        THE WITNESS:  (Witness examines document.)  Okay.  Top of Column 15?

BY MR. LABGOLD:

Q.   Yes.  And you may need to look at the bottom of 14, but it's right there in front of you.

At Column 15, line 5, you state:  (reading)

        "In order to avoid total internal reflection of light

    emitted from light source 201 into the short-throw lens

    200..."

    Do you see there's an equation that you use there?

A.    Yes.

Q.    And is that an equation that you typically use for defining total internal reflection?

A.    It certainly can be used for defining total internal reflection.

Q.    Let me say, is that like a standard industry-wide that everybody in the art uses that equation?

A.    I would say that's not true.  I would say you can manipulate the requirement for TIR into such a form.  I wouldn't say it's standard by any means.

Q.    Okay.  And so that the equation we're looking at is this A sub 2 is less than 1 divided by the square root of the equation N squared minus 1; correct?

A.    Yes, I see that.

Q.    And now if we refer back to PX-14, that's the '679 patent you referred to in your patent.

A.    (Witness examines document.)  Yes.

Q.    Column 9 starting around line 18.  A little higher.

    Do you see on line 10:  (reading)

        "Thus, total internal reflection is always caused

under the condition of..."

And there it's A sub 2 greater than that equation.  Do you see that?

A.   Yes.

Q.   And then it says, "as such, at least the following condition should be satisfied," which is the same equation that you use in your patent; correct?

A.   Yes.  That's a necessary condition but not sufficient.

Q.   And does that refresh your recollection that you used the same reference, the equation, some of the text?

A.   Yes.  That equation describes when you can have total internal reflection and when you cannot.  That equation must be satisfied as one of the conditions.

Q.   And in both the '679 and the '053 patent, the goal is to avoid that equation being satisfied; correct?

A.   That's the objective.

Q.   And, thus, avoid total internal reflection; correct?

A.   As I say, that's the objective.

Q.   Now, the last thing is, on the '053 patent -- well, let me back up.

The reason why you say it's the objective is because it is possible that some TIR could occur; correct?

A.   Yes.

Q.   And that just even if you try to avoid it, there might still be some TIR?

**A.**    Yes.    That's why I say that equation that you point to is a necessary condition but not sufficient.

**Q.**    And in contrast, the '554 patent is directed to actually using TIR; correct?

**A.**    Yes.

**Q.**    I mean, it's not -- the goal of the TIR patent is to have the -- excuse me.  Freudian slip.

The goal of the '554 patent is not to avoid TIR, it's to use it to your advantage; correct?

**A.**    Yes.

**Q.**    Now, the last thing is I'd like to look at Plaintiff's Exhibit 32.  And do you recognize this as a copy of your agreement?

**A.**    (Witness examines document.)  Yes, I do.

**Q.**    And this is your agreement with SSC?

**A.**    Uh-huh.

        **MR. LABGOLD:**  I'd like to move the admission of Plaintiff's Exhibit 32.

        **MR. SANDERS:**  No objection.

        **THE COURT:**  32 is admitted.  You may show it to the jury.

        (Plaintiffs' Exhibit 32 received in evidence)

**BY MR. LABGOLD:**

**Q.**    Now, this document was a renewal of an earlier agreement; correct?

A.   Yes, that's my understanding.

Q.   And do you recall there is a continued renewal after this?

A.   Yes.

Q.   Turning to page 2 of this document, Plaintiff's Exhibit 32, do you see there's a paragraph "BLU Project"?

A.   Yes, I see that.

Q.   And this is -- part of your agreement was to develop a backlighting unit; correct?

A.   Yes.

Q.   And the BLU is short for backlighting unit?

A.   That's correct.

Q.   And it talks about a company software Intel -- how do you pronounce it?  InteLED?

A.   InteLED.

Q.   And is that a company you're familiar with?

A.   Yes, it is.

Q.   And what's your familiarity?

A.   I'm one of the owners of that company.

Q.   Okay.  And what does InteLED do?

A.   Optical design typically.

Q.   And does that include lenses like the type we're talking about in these other patents?

A.   In some cases.

Q.   Okay.  And does it include using lenses for LED illumination?

A.   Specifically of refrigeration cases.

Q.   And is the work for SSC for refrigeration?

A.   No.  It turns out that the lenses that you use for illuminating reach-in refrigeration cases is very similar to the lenses you use for backlight illumination.

Q.   So the work, though, that's described here for SSC, is that for LCD backlighting?

A.   Yes, that's what it says, BLU.

Q.   And it refers to a patent 7,273,299.  Do you see that?

A.   Yes, I see that.

Q.   And is that a patent that you're familiar with?

A.   I have no recall of what that patent is at the moment.

Q.   If you take a look at Plaintiff's Exhibit 35 in your binder.

A.   (Witness examines document.)

Q.   Do you recognize that as a patent which you are named as an inventor?

A.   Yes, I do recognize that.

Q.   And the patent number is 7,273,299?

A.   Yes.

     MR. LABGOLD:  I'd like to move the admission of Plaintiff's Exhibit 35.

     MR. SANDERS:  No objection, Your Honor.

     THE COURT:  35 is admitted.  It may be shown.

     (Plaintiffs' Exhibit 35 received in evidence)

BY MR. LABGOLD:

Q.   And do you recall that this patent is directed to diffusion lenses?

A.   I'm not sure I would describe things as diffusion lenses. That's a terminology you use.  I don't know what was used in this specification.

Q.   Well, let me ask it this way:  Do you recall if this was an invention that was based on refraction or total internal reflection?

A.   Let me look at the figures and I'll give you an answer.

Q.   You might want to look -- let's look at Figure 4B.

A.   (Witness examines document.)  Yes, looking at Figure 4B, I would say it was based mostly on refraction.

Q.   If you look at Figure 4C?

A.   (Witness examines document.)

Q.   Refraction; correct?

A.   Yes.

Q.   Figure 6B?

A.   (Witness examines document.)

Q.   Refraction?

A.   Yes.

Q.   Figure 8B, refraction?

A.   Yes.

Q.   Figure 9B, a complicated refraction pattern; correct?

A.   Yes.  I think you've covered them all.

Q.   Does that refresh your recollection?

A.   Yes.

MR. LABGOLD:  Okay.  I have no further questions.

THE COURT:  Thank you.

Redirect from SSC.

**REDIRECT EXAMINATION**

BY MR. SANDERS:

Q.   Good afternoon, Dr. Pelka.

Let's stick on what you were just discussing with EDD's counsel, PX-35.  Oh, and let's take a look at Figure 4B.

A.   I'm sorry.  We're on PX-35?

Q.   That's correct.

A.   And which figure did you want me to look at?

Q.   Figure 4B.  And what I actually want to do is compare that to another figure that you were asked about.

Let's take a look at that figure side by side with -- you were asked about your '053 patent, Exhibit 34, and you were asked about Figure 6 of that patent and Figure 5.  How about we do Figure 5?  I think it will be better.

A.   (Witness examines document.)

Q.   Super.

And Figure 5 of the '053, and could we pull up as well on the other side Figure 4B of PX-35?  Great.

Dr. Pelka, can you tell me, is there a difference in the structure of the lens in Figure 4B of the '299 patent, which is

PX-35, and Figure 5 of your '053 patent, PX-34?

A.   The major difference I see is the negative curvature, the negative lens at the top of the lens.  That's the first thing that occurs to me.  And then the cavity isn't as deep as it is on Figure 5 in which the LED is placed.

Q.   Just to be --

A.   It looks like the lens is removed a little bit.

Q.   Thank you.

And just to be clear, when you said "negative lens," which figure are you --

A.   Yeah, it's the cusp.  It's the downward-shaped cusp in the center of the lens.

Q.   Great.

And I just want to be clear for the record.  When you're referring to that negative lens and downward-shaped cusp, which figure are you referring to?

A.   In what's up here, Figure 5.

Q.   Great.  So just to be clear for the record, that's Figure 5 of the PX-34, the '053 patent.

And does that negative lens or, as you called it, downward cusp have any bearing on the principle of total internal reflection?

A.   There would be some total internal reflection depending on the size of the LED and some geometric considerations as you would ray trace all the rays coming from the LED.  So there

would be some total internal reflection involved in that lens --

Q.   Now --

A.   -- although it's not explicitly shown in the figure.

Q.   Now let's take a look at PX-14.  That's the '679 patent you were asked about.

A.   (Witness examines document.)  Okay.  I'm there.

Q.   All right.  Let me just...

And let's take a look at a figure that shows Figures 1 and 2 in that patent.

And is there a difference between the lens designs of Figure 1 and Figure 2?

A.   Yeah.  Once again, the major difference I see is the negative cusp in Figure 1 and the absence of negative cusp in Figure 2.

Q.   And just to be clear, Dr. Pelka, when you're saying "negative cusp" --

A.   It's the central downward-directing curve there.

Q.   Okay.

A.   And the upper one, it looks like it's continuous with no downward-directed cusp.

Q.   And can you explain whether that feature that you just identified in Figure 1 has any relation to total internal reflection?

A.   Yes.  I would expect there would be total -- some total

internal reflection off the cusp.

**Q.** Why is that, Dr. Pelka?

**MR. LABGOLD:** Objection. Expert testimony at this point. Expert testimony. It goes beyond the statements of the documents themselves.

**THE COURT:** Overruled.

**BY MR. SANDERS:**

**Q.** So the question is: Why is that, Dr. Pelka?

**A.** Once again, it has to do with the geometry of the light rays coming from the LED, the size of the LED, and the specific dimensions involved in the design, and it's impossible to say how much TIR I'd get unless I have all those specifications.

**Q.** Thank you.

I'd like to do one more figure comparison, Dr. Pelka. You were asked about Figure 4 of the '209 patent, which is DTX-1001, and Figure 4 is at page 6 of the patent. And you were also asked about Figure 13 of the Gleckman '354 patent, which is PX-20, and that's at Sheet 6 of that patent.

Would you take a look at both of those figures, please, side by side?

**A.** Slow up. Slow up.

**Q.** I'm sorry, Dr. Pelka.

**A.** Okay.

**Q.** Great.

And we put them on the screen for you to try to make it

easier.

A.    Oh.  Okay.

Q.    Can you tell us, Dr. Pelka, is there any difference between Figure 4 of your '209 patent and Figure 13 of the Gleckman '354 patent?

A.    Yes.  It's the fundamental difference between the two patents.  In one case you've got an array of LEDs placed directly below the LCD display; and in the other case, they're all hidden under a beveled edge.

Q.    And just to be clear for the record, Dr. Pelka, when you say "an array of LEDs," are you referring to those elements 13?

A.    I don't have my reading glasses on, so let me take a closer look.

Q.    Can we blow up Figure 4 for a moment?  And then we'll come back to the comparison.

A.    Can you highlight 13?

      Oh, yes.  Red, green, and blue LEDs.  Yes, I see that.

Q.    All right.  And by red, green, and blue, are you referring to the --

A.    Well, when we filed the patent, we filed it -- you didn't have white LEDs yet, but you did have red, green, and blue; and if you mixed red, green, and blue in the appropriate percentages, you'll get white light.  That was what we were -- we were trying to make the patent as general as possible.

Q.    Does the red, green, and blue have any relationship to the

G, the B, and the R that's --

A.    That's exactly what the red, green, and blue are.

Q.    Okay.  And can you explain whether having this array of LEDs, elements 13, on the back, whether that required any design considerations?

A.    Yes.  It's the fundamental difference.  In one case, you've got to redirect the rays so that they mix in the cavity; and the other one, the mixing is done by the beveled edge before the light is introduced into the cavity.

Q.    And do --

A.    But it's fundamental, if you've got the LEDs directly under the LCD, that's a much, much more difficult problem to solve optically than if you've got them hidden under a ledge.

Q.    And, Dr. Pelka, what was your solution to that problem?

A.    It was to use a redirecting element to basically move the light so that it will reflect a multiplicity of times in the cavity and thereby be randomized, and then you would present that to the LCD screen through a diffuser and some other optical films that had a favorable impact on uniformity and output.

        MR. SANDERS:  Thank you, Dr. Pelka.

        THE COURT:  Mr. Labgold, would you like to have further examination of Dr. Pelka?

        MR. LABGOLD:  Just one question.

**RECROSS-EXAMINATION**

BY MR. LABGOLD:

Q.   Dr. Pelka, you do agree, though, that like the '679 patent, you emphasize in your '053 patent that the contour of the upper surface of the lens should be structured in a way as to avoid total internal reflection; correct?

A.   I'm sorry.  Tell me the two patents again.

Q.   So you have the '679 patent.

A.   And which one is that?

Q.   That's Exhibit 14.

A.   (Witness examines document.)  Okay.  And your question again?

Q.   And let's pull up '034 -- 34, the '053.

     So like the '679 patent, you emphasize in your '053 patent that the contour of that upper surface of the lens should be structured in a way so as to avoid total internal reflection; correct?

A.   Yes, if that's what it says in the specification.

Q.   Pardon me?

A.   I said if that's what it says in the specification, I agree with your statement.  I haven't reread the specification recently, so I'll take your word for it that it's there somewhere.

Q.   Well, let me show you what you said at your deposition.

A.   Sure.

Q.   If I can pull up -- you can pull it up on the screen; right -- page 77 --

MR. SANDERS:  Objection, Your Honor.

BY MR. LABGOLD

Q.   -- line 2 to line 7.

THE COURT:  Before we show it to the jury, let me see what you're...

(Pause in proceedings.)

THE COURT:  I can't tell from that page, Counsel, if it's referring to the same question you're asking in court or not.

MR. LABGOLD:  If you look at page 76 starting at line 11, then you'll see the comparison.

THE COURT:  All right.  You may read that.

BY MR. LABGOLD:

Q.   Now, if you look in your binder, you'll see your transcript.

And can I --

THE COURT:  Sorry.  Let me interrupt.

Ladies and gentlemen of the jury, during the preliminary instructions, I introduced the idea of depositions.  A deposition is a question and answer under penalty of perjury that's done before trial, very similar to this but without the jury present, without the judge present, and both parties' attorneys may ask questions of a witness.

Dr. Pelka, like many witnesses, had his deposition taken before trial.  The questions and answers were written down into a transcript, and that's what Mr. Labgold is referring to.

**BY MR. LABGOLD:**

Q.   Now, if you look in the front of your binder, you'll see there's a transcript.

A.   Yes, I see that.

Q.   And then on page 76, line 14, you can see, "And in Figure 5, for example..."  This is referring to the '053 patent.

A.   Okay.  Can you highlight this for me?  Yes.

Q.   Just to give you -- do you see you're talking about the '053 patent and the '679?

A.   (Witness examines document.)  Yes, I see what's being said there.

Q.   Okay.  So just so you can see --

A.   What's your question again?

Q.   -- so you can see the context.

On page 77 now, line 2:  (reading)

"And like the '679 patent, you emphasize that the contour of that upper surface," and it was referring to '053, "should be structured in a way as to avoid total internal reflection; correct?"

And your answer was:  (reading)

"I think that was the intent of the design."

Was that your testimony?

A.   Yes, it was.

Q.   And does that refresh your recollection that that is, in fact, the case?

A.   That was my testimony.

MR. LABGOLD:  No further questions.

THE COURT:  Thank you.

Ladies and gentlemen, at this point in time we're going to take a ten-minute recess and return at 2:00 o'clock.

Now, during that time period, if you have any questions for Dr. Pelka, you may write them down in the form provided. Again, you're not required to ask questions.  It may be that if you have questions, that they might be answered by a later witness; but if you have something you'd like Dr. Pelka to say that he hasn't already said, you may write it down, and we'll ask him at 2:00 o'clock.  Thank you.

(Proceedings were heard out of the presence of the jury:)

THE COURT:  Dr. Pelka, if you would stick around for 10 more minutes.  You can step down and take a break, but come back at 2:00 o'clock.  Thank you.

Everyone else is in recess.

(Recess taken at 1:51 p.m.)

(Proceedings resumed at 2:03 p.m.)

(Proceedings were heard out of the presence of the jury:)

THE COURT:  All right.  Good afternoon, everyone.  You

may be seated.

Dr. Pelka is present.

Without reading the question, there's a two-part question, which I intend to ask him.  I don't know the answer to the question, but I think there's no error in him addressing it.  And after I ask it, I'll give the parties a chance to follow-up if you wish to.

All right?

MR. LABGOLD:  No objection, Your Honor.  That's fine.

THE COURT:  Any objection from SSC?

MR. SANDERS:  No, Your Honor.

THE COURT:  All right.  Then let's bring in our jurors.

(Proceedings were heard in the presence of the jury:)

THE COURT:  All right.  Everyone may be seated.

Dr. Pelka, I have a two-part question from our jurors.  You remain under oath.  And I'll read the entire question twice because it does have the two parts.  I want you to hear the entire question before you respond to either part.

The first part is:  Did you have direct or indirect interaction with EDD during the amicable period of SSC and EDD's collaboration?

Part two is:  If so, did you work or interact with Dr. or Mr. Yamaguchi?

And I'm hoping I have the pronunciation and spelling

correct of that.

THE WITNESS: Okay. I wasn't even aware there was a collaboration. And, no, I've had no interaction with Mr. Yamaguchi.

THE COURT: All right. Any follow-up from EDD?

MR. LABGOLD: No, Your Honor.

THE COURT: Any follow-up from SSC?

MR. SANDERS: Yes. One question, Your Honor.

**JURY QUESTION FOLLOW-UP**

BY MR. SANDERS:

Q.   Dr. Pelka, have you had any interaction with EDD?

A.   I have not.

MR. SANDERS: Thank you.

THE COURT: Thank you.

Dr. Pelka, you may step down. Thank you very much for being here today.

(Witness excused.)

THE COURT: And if SSC will please call its next witness.

MR. GOTTS: Your Honor, SSC calls Mr. Seung-Ryeol Ryu. We do need to set up the interpreter's mic.

THE COURT: Yes. So everyone may just rest in place, and the witness may come forward, and we'll let the interpretation setup.

This next witness will require some in-court translation;

and as we described during the beginning phases, that is permitted and you should rely upon the translation provided.

**MR. LABGOLD:** And does the Court have a preference with regard to the check translator? Can she just sit at counsel table so that way if there's an issue, we can raise the issue?

**THE COURT:** That will be fine. Whatever is logistically easiest.

**MR. LABGOLD:** Okay. Thank you, Your Honor.

(Pause in proceedings.)

**THE COURT:** Mr. Labgold, can we just for the record get the name of your interpreter?

**MR. LABGOLD:** Yes.

**INTERPRETER KO:** Good afternoon, Your Honor. My name is Soomi Ko. That's spelled S-O-O-M-I, K-O, court certified and oath on file.

**THE COURT:** All right. And for our other interpreter, if we can get your name, please.

**INTERPRETER NOH:** Yes, Your Honor. Jacki Noh -- J-A-C-K-I, N-O-H -- Korean language court interpreter. Certification number is 300150 with an oath on file. Interpreting for Mr. Seung-Ryeol Ryu.

**THE COURT:** Thank you for being here. And if we need to rearrange the chairs to make you each comfortable, you're welcome to do so.

**PROCEEDINGS**

INTERPRETER NOH:  If I can sit up here.

THE COURT:  And, Counsel, if you can aid them in getting set up in the best way possible.

(Pause in proceedings.)

THE COURT:  All right.  Mr. Ryu, may we swear you in, please.  Raise your right hand.

**SEUNG-RYEOL RYU**,

called as a witness for the Defendant, having been duly sworn, testified as follows through the interpreter:

THE WITNESS:  (Through interpreter)  Yes, I do.

THE CLERK:  Please be seated.

Please state your full name for the record.

THE WITNESS:  (Through interpreter)  My name is Seung-Ryeol Ryu.

RYU - DIRECT / OWENS

**DIRECT EXAMINATION**

BY MR. OWENS:

Q.   Good morning.  Could you please introduce yourself to the jury?

A.   (Through interpreter)  Good afternoon.  My name is Seung-Ryeol Ryu.

Q.   And, Mr. Ryu, where do you live?

A.   I live in the city of Seoul, South Korea.

Q.   And do you understand English?

A.   I can read a little bit, but I cannot speak it as well.

**Q.**  And who do you work for?

**A.**  I'm employed by Seoul Semiconductor.

**Q.**  And are they also called SSC?

**A.**  Yes, it is.

**Q.**  And what is your current position at SSC?

**A.**  I'm managing director of IT development at SSC.

**Q.**  And what sort of products do you work on in the IT Department?

**A.**  IT Department develops LED and light bars using display backlighting.

**Q.**  And do you have a college degree?

**A.**  Yes, I do.

**Q.**  And what is your degree?

**A.**  I have a BS in engineering.

**Q.**  And when did you join SSC?

**A.**  I started working for SSC in December 2000.

**Q.**  And when did you begin work on display backlighting?

**A.**  Let's see, April of 2000 -- no, 2004.

**Q.**  All right.

         **MR. OWENS:**  Your Honor, may I hand -- actually, they probably already have these.

**Q.**  Mr. Ryu, if you could look in the binder in front of you. And can you please turn to DTX-1004?

         Do you recognize this document?

**A.**  (Through interpreter)  Yes, I do.

Q.   And what is this document?

A.   This is the '554 patent.

Q.   And when did you first become aware of the '554 patent?

A.   Around fall of 2004.

Q.   And how did you become aware of the '554 patent?

A.   At that time I was working on a lens for an LED that had a curved top with a total internal reflection, and it was a direct-type LED, and I asked our patent team to look for prior arts, and they identified this patent, and I felt that it was relevant to my research.

Q.   And what was the relevance of the '554 patent to your research?

A.   This patent described the curved top with a cap top lens, and it described the internal -- TIR, total internal reflection, along with a leaky TIR.  So it was related to what I was working on.

Q.   And what was your impression of the '554 patent at that time?

A.   Based off of my high-level review and discussions with the patent team, I thought it was very important or one of the most important patents for direct-type backlighting, and we all agreed on that.

Q.   And what is direct-type backlighting?

A.   Direct-type backlighting means that the LEDs were light source right behind the screen.

**Q.**    And what did you do after learning of the '554 patent?

**A.**    I discussed it with the staff at SSC, and rewrite --
licensed the patent.

**Q.**    And when was that?

**A.**    We licensed the patent in December of 2004.

**Q.**    And who did SSC license the '554 patent from?

**A.**    From Teledyne we licensed.

**Q.**    Were any other patents included in that license?

**A.**    We licensed 12 patents, including '554.  Also included
'209 patent.

**Q.**    So in the binder in front of you, if you could turn to
DTX-1001.

**A.**    (Witness examines document.)

**Q.**    It's the next tab there.

**A.**    (Witness examines document.)

**Q.**    And do you recognize this document?

**A.**    Yes, I do.

**Q.**    And when did you first become -- and what is it?

**A.**    As I stated -- no, this is the '209 patent.

**Q.**    And when did you first become aware of the '209 patent?

**A.**    Around the same time, fall of 2004.

**Q.**    And what was your impression of the '209 patent?

**A.**    It was -- I felt that it was also very important for
direct-type backlighting just like '554 patent.

**Q.**    Did SSC eventually purchase the '554 patent?

**A.** Yes, we did.

**Q.** And when was that?

**A.** We purchased it in 2009.

**Q.** And who recommended that SSC purchase the '554 patent?

**A.** I along with my team members, engineers, and also the patent team members recommended.

**Q.** And what prompted that recommendation to purchase the '554 patent?

**A.** We recommended that although direct-type lens are not -- direct-type backlighting is not very prevalent at the moment, but we felt that direct-type backlighting technology is very important down the road, so this is a very critical patent we should have.

**Q.** And in 2009, how widely used was direct-type backlighting?

**A.** Let's see, I believe only one to two percent in the entire LCD TV market.

**Q.** And what type of backlighting was used with the rest of the market for LCD televisions?

**A.** Approximately 30 percent of them was edge-type using LED, and the rest was CCFL.

**Q.** And what is CCFL?

**A.** CCFL is not LED.  It's not used as a light source.  It uses a conventional fluorescent as a light source.

**Q.** And what is edge-type backlighting?

**A.** Edge-type backlighting -- edge-type backlighting has --

well, the LED is mounted on edges, mounted on edges since they're behind the screen, and that's the LED light source.

Q.    Did industry adoption of direct-type backlighting change after 2009?

A.    In 2012, after we launched our SSC's direct-type backlighting that was new, brand new in the market, which was different than what was available at that time, the adoption rate increased dramatically.  So currently the entire LCD TV market, direct-light backlighting, is about 60 to 70 percent.

Q.    And when did SSC's direct-type backlighting development begin?

A.    Somewhere around 2010.

Q.    And what was your involvement in that?

A.    At that time I was in charge.  I was the development team leader.

Q.    And what sort of light bar were you considering for your backlight approach in 2010?

A.    At that time we were considering giving a separate LED and lens, separate lens with an air gap in between.

Q.    And did you have a name for this approach?

A.    Normally we called that the second optic approach.

Q.    And why did you call it the second optic approach?

A.    Well, the reason that we called this second optic is that unlike the first optic, which had a built-in -- lens built in the LED package, the second optic had a separate lens, an LED

with an air gap.  That's why we called that second optic.

Q.   And what was the function of the air gap?

A.   The purpose of air gap, it would improve the overall light diffusion performance when it fused the LED through the first refraction.  So the overall light diffusion performance improves.

Q.   And what, if any, relation to the '554 patent have to the second optic approach?

A.   '554 patent described using the separate lens with an air gap.

Q.   And in 2010, did SSC have the ability to manufacture its own lens for a second optic approach?

A.   At that time, no, we did not.  We are an LED expert -- experts, LED-producing company, and we did not design or manufacture lens or other related lens products.  We did not have the manpower nor the manufacturing facility.

Q.   And once you decided you wanted a lens for the second optic approach, what did SSC do?

A.   We started meeting with lens suppliers who can develop and manufacture.

Q.   And which lens manufacturer did you decide to work with?

A.   We decided to work with Enplas.

Q.   And when did your work with Enplas begin?

A.   We started working together in October of 2010.

Q.   And why did you decide to work with Enplas Corporation?

A.    We decide to select Enplas because Enplas is a very large company with offices all around the world, and they had a very large manufacturing capacity, and they also had experience with backlighting, and they also had technical ability with respect to a prism mold.

Q.    Did they already have any lenses for backlighting available?

A.    Yes, they did.

Q.    And what did they call that lens?

A.    At that time they called it the LE-Cap, the lens for backlighting.

Q.    And who were they selling the LE-Cap lens to at the time?

A.    Sharp in Japan.

Q.    And what was your understanding regarding the types of LEDs they had designed the Sharp lens to be used with?

A.    They supplied Sharp with a dome-shaped LED.  It had a dome-shaped configuration.

Q.    And what do you mean by "dome-shaped LED"?

A.    The dome-shaped LED package is -- the top of the package had a dome shape, and the light is diffused throughout this dome-shaped lens.

Q.    And when you first met with Enplas, what was your impression of their LED expertise and knowledge?

A.    Although Enplas had some LED experience to develop lens, but my understanding is that their knowledge of LED was quite

limited, rather rudimentary level.

Q.    And what type of LED did Enplas initially want to use for the light bars that they were developing with you?

A.    Enplas suggested that we use the dome-shaped LED that they had done for Sharp.

Q.    And what was SSC's reaction to Enplas' suggestion?

A.    I determined that they did not fully utilize the type that they had.  It seems like they had a very limited understanding of the lens.

Q.    What did SSC recommend be used with their lenses?

A.    We did not agree with the dome-shaped LED.  We suggested the flattop LED.

Q.    And did you have a name for that flattop LED?

A.    We called the 3528 package, 3528 LED package.

Q.    And what was Enplas' reaction to your initial recommendation to use this LED?

A.    In the beginning, they resisted to our suggestion, which was not using dome-type.

Q.    And what did you do next in order to reach agreement on what type of LED to use?

A.    At the time we sent Enplas our 3528 package, and also what they suggested, which is the dome-type or similar to dome-type, so that they could conduct a comparative analysis.

Q.    And what was the result of the comparative analysis?

A.    We received the feedback that the one that we suggested,

which was 3528 package, performed much better.

Q.   And what was their reaction?

A.   They seemed to be surprised, because they learned something that they were not aware of before.

Q.   And specifically what are the advantages of the flattop LED approach you suggested?

A.   The biggest benefit is that in order to realize BLU, you could save substantially compared to what you spend before.

Q.   And what do you mean by BLU?

A.   BLU stands for backlight unit.

Q.   And why specifically was it cheaper to use flattop LEDs to make a backlighting unit?

A.   Compared to dome-type, the flattop LEDs themselves were much cheaper than the dome-shaped LEDs.  Secondly, using the flat-type LEDs, you could spread light much better so you could use much less LEDs to do the BLU.  So overall you can reduce the 50 percent of LEDs while maintaining the same performance.

Q.   What, if any, changes were necessary to the Enplas lens to make it work with the flattop LED?

A.   Enplas did not make any oval shapes -- I mean, the oval shape did not change much, the external changes.  But they had to make some minor adjustments to optimize the lens for the flattop, because the LED light source was changed to flattop.

Q.   And how long did the overall joint development project between SSC and Enplas last?

**A.**    The most active research period was development period, was from November of 2000 through June of 2011, but there continued to be minor tunings after that per customers' needs.

**Q.**    Maybe I heard that wrong.  Was that November 2000 or November 2010?

**A.**    November, 2010.

**Q.**    How involved was SSC in that development process?

**A.**    SSC discussed with Enplas concerning what type of lens to be developed, and we evaluated the certain type of BLU properties or characteristics and also the areas for improvement.

**Q.**    And what was the level of involvement of SSC in that process?

**A.**    We closely met with Enplas and we talked about assessment of what we saw, and we developed together, and we discussed any relevant contents.

**Q.**    And how many engineers were involved in the joint development project from SSC?

**A.**    Including myself, the five engineers actively involved in this project.

**Q.**    And do you have a rough estimate of how many hours SSC invested in this project?

**A.**    Let's see, during that time period, if I can combine all the hours that these engineers put into this project, I would estimate about 10,000 hours.

Q.   And how frequently did you interact with Enplas during this period?

A.   During the period, we had meetings once, twice a month, and I met with -- during that period, I probably met with Enplas staff about 10 times, more than 10 times I had meetings with them.

Q.   And who at Enplas Corporation did you usually meet with?

A.   The one that I had most frequent interaction was Mr. Murano, who was with sales, and I also met with Mr. Kutsuzawa who was in charge of sales, and I also met with other engineers.

Q.   And how would you describe SSC's relationship with Enplas during that joint development period?

A.   Our relationship was quite good.  I say we had an amicable relationship during this joint developmental phase.  We treated them as a development partner.  I can say that they were our development partners.  So during this period, our relationship was quite amicable, quite good.

Q.   And how successful was the combination of the flattop LED and Enplas' lenses for backlighting?

A.   If you look at the end result, it was very successful. The configuration was extremely successful.  After 2012, after we launched this product in question, well, the LCD market had about 50 percent direct-type backlighting, the product that we developed, and this direct-type backlighting became the

industry standard after that.

Q.   So let's turn back to the '554 patent for a minute. That's DTX-1004.

     Did you at any time bring the '554 patent to Enplas' attention during that joint development period?

A.   Yes, I did.

Q.   And who did you bring it up with?

A.   Mr. Murano, with whom I had most frequent interactions, and I told him about the patent.

Q.   About how many times did you bring it up with --

A.   At least three to five times.  Perhaps more than five times I mentioned about that patent.

Q.   And why did you raise the '554 patent with Enplas?

A.   Well, I wanted to be sure that they would respect our patents.

Q.   And what was Enplas' response?

A.   Concerning the patent, they did not respond.  I did not receive any replies from them.

Q.   And what specifically did you tell Mr. Murano about the '554 patent?

A.   When this joint development project was almost completed, I mentioned that this end product, which combines our flattop and LED and their lens, is covered by this patent.

Q.   And when was that specifically?

A.   I mentioned that around May of 2010, May of 2010 I

mentioned the patent, but I disclosed the patent number in June 2011.

**Q.** And what were the circumstances of you telling Enplas about the patent in June 2011?

**A.** For starters, at that time the purpose of disclosing the patent number was to have an exclusive relationship with Enplas. We noted that the competitors would be influencing our patent we made, and we made it very clear that Enplas would not have an issue under our patent if working with us, exclusively with SSC.

**Q.** So what happened after that intensive phase of development ended in June 2011?

**A.** After that, the production phase began, production for mold.

**Q.** And once you entered the production phase with Enplas, how did that go?

**A.** Unlike during the joint development phase, the production phase of our relationship did not go very smoothly. We constantly had serious deadline issues, and they could not -- I mean, we could not obtain lenses from Enplas. We continuously had these problems.

**Q.** And how did those delays and problems affect SSC?

**A.** We had a very big problem. It was very critical issue. As I explained earlier, after we launched this product in 2012, the production rate for direct-type backlighting went through

the roof, increased dramatically, but Enplas was our only source for lenses, but they did not supply our lenses, so we could not meet our customers' needs, and we could not meet our customers' commitments.  We had very serious problems.

Q.   Who else was Enplas selling lenses to at this time?

A.   Well, at the time we were not -- to find out exactly what other customers they sold their lenses to; but when we analyzed or conducted the reverse engineering of the TVs in the market after 2012, we purchased some TVs and we analyzed it, and we noticed that there was an Enplas lens on top of a flattop that we developed, and Enplas was selling these lenses to other LED manufacturers.

Q.   And when was this dismantling done?

A.   Starting somewhere of 2012.

Q.   And who made the light bars in the televisions SSC dismantled?

A.   The one that we dismantled, the most common one was the Lumens, which is our competitor in Korea, that is another LED manufacturer in Korea.

             MR. OWENS:   Thank you, Mr. Ryu.  No further questions.

             THE COURT:   Examination by EDD.

**CROSS-EXAMINATION**

BY MR. LABGOLD:

Q.   Good afternoon, Mr. Ryu.

A.   (Through interpreter)  Good afternoon.

Q.   So in reverse order, are you aware that there are no products accused that are sold by Lumens?

A.   I'm not sure if I completely understood your question.

Q.   Are you aware of the fact that there's not a single product that is sold by Lumens that is accused of infringement in this case?

A.   I cannot say one way or another if they infringed the patent or --

Q.   I'm just asking if you know that fact.

A.   Well, I'm an engineer.  I'm not in the position of determining whether a company infringed another company's patent or not.  That is determined by the patent team.

Q.   When you learned of the '554, you could tell that this was a very important patent; correct?

        MR. OWENS:  Objection, Your Honor.  Foundation. Assumes facts.

        THE COURT:  Overruled.

        THE WITNESS:  (Through interpreter)  Yes, I'm aware -- I was aware that the contents of the patent was quite important when it talked about the configuration.

BY MR. LABGOLD:

Q.   And you said that the '209 patent was very important, correct?  You recognized that?

A.   (Through interpreter)  Yes, I stated that I felt it was also an important patent.

Q.   And were there any of the patents that you licensed from Teledyne that you didn't think -- that you thought were not important?

A.   Among the patents that they were considering licensing it, I -- if I put a priority order, I said that the priority number one was '554, followed by '209.  That, I did say that.

Q.   Who did you say that to?

A.   I said that to the patent team.

Q.   Did you say this orally or in writing?

A.   I cannot recall how I relayed that message.

Q.   But -- so then you just went over to the patent department, told them that there were these important patents, and then they just went out and licensed them?

        MR. OWENS:  Objection, Your Honor.  It misstates his testimony.

        THE COURT:  Overruled.  You may answer.

        THE WITNESS:  (Through interpreter)  Well, it was not the decision that's solely made by me.  I just stated earlier I -- we had a discussion among engineers and the patent team, and we reached a consensus that this is -- these are the important patents to license or purchase.

BY MR. LABGOLD:

Q.   And this was all done without any documentation; correct?

A.    (Through interpreter)  Since I was not the person in charge with the discussion, I'm not sure if there were any

documentation concerning those discussions.

Q.   No internal e-mails; correct?

A.   Correct.  I did not personally exchange any e-mails concerning that.

Q.   No memos?

A.   I cannot recall.

Q.   No technical analysis?

A.   I do not know whether such documents exist or not.  Other engineers might have it or the staff at the patent department might have, but I do not personally know.

Q.   You haven't seen any such documentation; correct?

A.   I did not personally verify those.

Q.   Is that -- have you seen any or not?  Yes or no, please.

A.   Well, since we are talking about 2009, it's been quite some time, so I don't remember whether I saw any documents around that time or not.

Q.   Now, with regard to the '554 patent, is it your understanding that that was relating to flattop LEDs?

A.   I deemed that it wasn't the flattop LED that was important.  It was -- what's more important, what's more crucial was that the separate lens and the air gap.

Q.   So everything that you said about the flattop LED, that's completely irrelevant to the '554 patent; correct?

A.   If a certain patent is relevant or irrelevant, well, I'm not in a position of stating that.  I'm an engineer.

Q.   Well, I think you said that you had a collaborative relationship with EDD, correct, or Enplas?

A.   Yes, that is correct.

Q.   And when you met them, they were already making backlight lenses for Sharp; correct?

A.   Yes, that is correct.

Q.   And you said that they were supplying Sharp with the dome-type LED; correct?

A.   Enplas was supplying the not dome-shaped lens but the dome-shaped -- the dome-type -- they were supplying lens to Sharp for dome-type LED, not dome-type lens.

Q.   You know that Enplas doesn't sell LEDs; correct?

A.   Correct.  They are a lens manufacturer.

Q.   And it's to your understanding that when Sharp came to them for a lens, they used the LED that Sharp wanted to use; correct?

A.   Are you asking me why Sharp asked EDD to make lens or what?

Q.   No.  I'm saying that you understand that Sharp supplied the dome-type LED and Enplas made a lens to work with it.

A.   Yes, I understand that Sharp had dome-shaped LED with Enplas lens.

Q.   And then when SSC came for a lens, you had a flattop LED; correct?

A.   That is correct.

Q. And then EDD, the overall shape of the lens, did not change, but they made minor adjustments so it would be working with the flattop LED; correct?

A. That is correct.

Q. Now, you talk about this collaboration starting in November 2010; correct?

A. Yes, that's when we actively developed together.

Q. And it was pretty much completed by June 2011?

A. Yes. That's when the initial customer specifications was completed.

Q. And that was a document that was prepared by SSC and given to Enplas?

A. What do you mean by documents that was prepared by SSC?

Q. The specification.

A. I don't know what you mean by that.

Yes. So we collaborated on the specifications.

Q. And have you seen the specification?

A. I was not the person who was involved in that personally, so I did not personally see the specification or confirmations.

Q. But you were the lead engineer; correct?

A. That is correct.

Q. And you didn't see the lens specification?

A. One of my subordinates, another engineer who was in charge of the lens specification, so I was not directly involved with it.

Q.   Did you ever see any of the lens design drawings?

A.   Yes.  In the beginning of the stage, I saw lens design drawings.

Q.   And what was -- did you just look at them?  Did you comment on them?

A.   Well, concerning the drawing, I just had the oval shape, and I did not have to make any comments with respect to design, and I had another engineer who was in charge of that.

Q.   So what part of this were you involved in?

A.   As I stated earlier, I planned the concept of oval BLU configuration, and I was also the supervisor for engineers who was in charge of lens or LED package, et cetera, respectively.

Q.   Did you ever prepare any documents concerning that subject matter?

A.   No, I did not prepare specific documents concerning that.

Q.   No engineering records?

A.   What do you mean by "engineering records"?  Could you be more specific?

Q.   Anything that would possibly evidence SSC having any engineering activity relating to an Enplas lens.

A.   Although I do not currently have any, but we probably have some internal reports that are kept in the office.

Q.   You haven't seen any, though?

A.   Yes, I have seen some reports.

Q.   Do you know why none were produced in this case?

MR. OWENS:  Objection, Your Honor.

THE COURT:  Sustained.  Lack of foundation.
Argumentative.

BY MR. LABGOLD:

Q.   Now, you said that there were five engineers that were involved in the project?

A.   (Through interpreter)  Yes, that is correct.

Q.   And you spent 10,000 hours on this?

A.   Yes, that is correct.

Q.   So beginning in November of 2010 until June, that's eight months?

A.   Correct.

Q.   And so those people were working on this project more than full time during this period?

A.   Correct.  These five engineers' main work was this project, so they worked approximately 40 hours per week on this project.

Q.   Okay.  Now, what were they doing?

A.   We have engineers who worked on LED package and module and bar design, and we worked in the development, designing, and also evaluation.  All of those.

Q.   And what about the PCB, was that something you also designed?

A.   Yes, we did.

Q.   Was Enplas involved in that?

**A.** With respect to PCB, I don't think Enplas was involved in the production phase, in the final production phase.

**Q.** So that was outside of the collaboration or inside the collaboration?

**A.** Well, in the beginning they did collaborate with us when we designed -- when we developed the PCB in the beginning.

**Q.** Now, focusing still on the '554 patent, I believe you said that you brought it to Enplas' attention at least five times; correct?

**A.** Yes, that's correct.

**Q.** And did you send them an e-mail concerning that?

**A.** No, I did not.

**Q.** Did you send them a letter, as in like a stamp and an envelope?

**A.** No, I did not.

**Q.** Did you send them a facsimile?

**A.** No, I did not.

**Q.** Did you hand them any documentation conveying your message to them in writing?

**A.** No, I did not.

**Q.** Now, if I understand correctly, you licensed both '554 and '209 in 2004; correct?

**A.** Yes, that's correct.

**Q.** And then you bought the -- in 2009, SSC bought the '554 patent; correct?

A.   Yes, that's correct.

Q.   And was there a reason you didn't buy the '209 patent at that time?

A.   I don't know specifically about the purchase with respect to '209 patent, but I was asked about my opinion on the purchasing of the '554 patent, and I gave them my opinion.  I agreed the purchase of it.

Q.   Those were oral communications as well?

A.   Yes, at the meeting, like I said earlier.

Q.   Now, with the 2000 -- with the '209 patent, you continued to be -- SSC continued to be licensed under it; correct?

A.   I do not know until what period SSC licensed.

Q.   Do you know -- but you know you purchased it; correct, it being the '209 patent?

A.   Yes, we purchased it.

Q.   And you do understand that SSC was licensed until the time that it purchased it; correct?

A.   I do not have specific knowledge on that.

Q.   When did SSC start making a product that used the '209 technology?

A.   The '209 patent describes the BLU configuration, and we started making related products -- well, when we started applying on the second optic.

Q.   And so that's when you started using the Enplas lens; correct?

**A.**    That is my understanding.

**Q.**    Now, with regard to the '554 patent, was it your understanding that it was important, and one of the teachings of the '544 patent was to avoid an air gap?

        **MR. OWENS:**  Objection, Your Honor.  Calls for expert testimony.

        **THE COURT:**  I'm going to -- one moment.  I'm going to sustain the form of the question, because it was a little bit confusing.  Can you ask it again?

**BY MR. LABGOLD:**

**Q.**    You mentioned several times about the air gap.  Do you have any understanding as to how -- if the air gap relates to the '554 patent?

**A.**    (Through interpreter)  Well, concerning that, I do not have a complete understanding.  I do not understand 100 percent.  I heard about that from our patent team, so I know that it talks about air gap, but I do not have a complete understanding of it.

**Q.**    Well, let's go back to when you found out about the '554 patent and you said that this was an important patent to the patent team.  At that time did you understand it had anything to do with an air gap?

**A.**    Well, the patent team explained about the claims of that patent and explained about the air gap separate lens TIR.  So my understanding was limited to what I was told by the patent

team.

Q.    Well, maybe I misunderstood.  Didn't you review the '554 patent before you took a -- SSC took a license?

A.    Although I did look at the patent, I just skimmed through; but since I could not -- I cannot understand English 100 percent, anything details or -- I received advice from the patent team.

Q.    So how did you recommend that this was important if you couldn't understand what it said?

A.    Because the patent team explained what was in the claims and the detailed information in the patent.  So based on that explanation, I felt that it was an important patent.

Q.    Has there ever been a time that you've actually read a translation of the specification of the '554 patent?

A.    Are you talking about the translated version of the patent?

Q.    Yes.

A.    Yes.  I read it once a long time ago.

Q.    You don't have any recollection of it now?

A.    Well, I did not review it recently, and I don't remember the details of the patent.

Q.    Do you know the model number of the lens that Enplas made for SSC?

A.    My understanding is that the most common one was 9845.

Q.    And that was used with SSC's 3528 package; correct?

**A.**   Yes, that is correct.

**Q.**   Was it ever used with any other LED?

**A.**   I don't recall that was ever used with any other LED.  Not to my recollection.

**Q.**   Has -- how many different 3820 -- excuse me -- I think 3825 -- how many different 3825 packages?  Is that one product?

**A.**   It has several part numbers.

**Q.**   And are they different configurations, each one?

**A.**   The configuration is the same.  The oval shape is the same except that what goes in there, some of the materials goes in there are different.

**Q.**   Now, I believe you said that after starting working with EDD, that you realized they were selling lenses to other companies; is that correct?

**A.**   That is correct.  I learned that they were selling lenses to other companies so -- when we disassembled products.

**Q.**   And I believe you said that the thing that caught your attention was because those products, unlike the Sharp products, were using flattop LEDs; correct?

**A.**   That is correct.

**Q.**   Now, at the time you started what you referred to as a joint development.  Is there a joint development agreement?

**A.**   No.

**Q.**   Was there any contract, any contractual arrangement between the parties for this joint development?

**A.**   No.   At the time we did not have such a contract.

**Q.**   Because all the business was done by purchase order and invoice; correct?

**A.**   Correct.   We had our POs.

**Q.**   And those were purchase orders you issued to Enplas to make lenses, which they responded by producing lenses and then sending you an invoice; correct?

**A.**   Well, we placed an order, and based on our order, I mean, we purchased the lenses from them.

**Q.**   And when you realized that what you described as finding out that they were selling this jointly developed technology to other companies, was there any complaint letter sent?

**A.**   Well, by the time we disassembled the TVs, well, I was already transferred to another department.   I was no longer with the BLU.

**Q.**   So how do you know that there were TVs found then?

**A.**   The development engineer reported that to me.   That's how I learned.

**Q.**   So you have no personal knowledge of that?

**A.**   I received a report concerning that from a development engineer, and also the analysis report, and I actually saw the actual product itself.

**Q.**   Okay.   So, then, was a letter sent?

**A.**   No, the letter was not sent.

**Q.**   No letter, no e-mail, no fax, no communication in writing

whatsoever complaining about this activity to Enplas; correct?

A.    Well, at that time, as I said earlier, I was transferred to another department so I was not in the position of sending such an e-mail, and Enplas was the sole source for lens for Seoul Semiconductor SSC, and I was that -- something like that would not be decided solely by me.

Q.    Are you -- is Enplas still the sole source?

A.    No.

Q.    Are you still selling product, backlight units configured the way they were with the 9845 and the 3825 package?

        MR. OWENS:    Objection, Your Honor.  I think we're moving into the area that we discussed during the -- before lunch.

        MR. LABGOLD:    I think they moved well into that on their direct, Your Honor.

        THE COURT:    Overruled.

        MR. OWENS:    I don't believe so.

        THE COURT:    How much more examination do you have, Mr. Labgold?

        MR. LABGOLD:    Maybe ten minutes.

        THE COURT:    Let's get to it.  Go ahead.  You may please rephrase the question so that the witness can be refreshed.

BY MR. LABGOLD:

Q.    Is SSC continuing to sell light bars that have a lens and

a 3825-type package?

A.   (Through interpreter)  My understanding is that some 3528 package is still being sold.

Q.   And for the lenses that Enplas was selling you, were you able to get them sourced from somebody else when Enplas stopped selling them -- or EDD stopped selling them?

A.   Well, as I stated earlier, after 2012, since I moved to another department, I don't have all the specific information as to that.

Q.   Are you aware of the fact that during the time when this development was going on, Dr. Pelka was a consultant for SSC?

A.   Well, after that -- well, I don't know exactly when. Well, I met Dr. Pelka after that.

Q.   Was he ever brought into the joint collaboration with EDD before EDD stopped selling?

A.   As I stated earlier, are you talking about after 2012 when I was no longer in charge of this project?  So I cannot give you an answer to that.  I don't know.

Q.   What about in 2011?

A.   No, he was not directly working on the project.

Q.   Is there a reason why, if this project related to the '554 patent, you wouldn't consult Dr. Pelka?

A.   At that time, at the time of development, we felt that it was not necessary to obtain advice or consultation from Dr. Pelka, and maybe that is why he was not consulted.

MR. LABGOLD:  I have no further questions.

THE COURT:  Thank you.

Any further examination from SSC?

MR. OWENS:  One second, Your Honor.

(Pause in proceedings.)

MR. OWENS:  Just one question, Your Honor.

**REDIRECT EXAMINATION**

BY MR. OWENS:

Q.   Mr. Ryu, did you expect Enplas would respect the '554 patent?

A.   (Through interpreter)  Yes, I did.

MR. OWENS:  No further questions.

THE COURT:  Thank you.

Ladies and gentlemen, we'll take a five-minute recess now. During that period, if you have questions for the witness, you may pose them in writing.  If you do not, we'll continue on.

Thank you.  Five-minute recess.

(Recess taken at 3:38 p.m.)

(Proceedings resumed at 3:52 p.m.)

(Proceedings were heard out of presence of the jury:)

THE COURT:  And proposed question number 2 for the jury:  Any objection from SSC in asking the question?

MR. OWENS:  No, your Honor.

THE COURT:  Any objection from Enplas?

MR. LABGOLD:  None, Your Honor.

**THE COURT:**  All right.  Let's bring in the jury.

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  All right.  Everyone may be seated, please.

Mr. Ryu, I have a question for you from the jurors.

During the collaborative period, did SSC establish or design specifically the lens shape for the flat tip lens number 3528?

**MR. LABGOLD:**  Objection.  I'm not sure what to do in this circumstance.  I'm not sure you misread it.  Not the flattop lens, but the flattop LED.

**THE COURT:**  I will correct it as misinterpretation of the writing.  I apologize.  I'll rephrase the question.

During the collaborative period, did SSC establish or design specifically the lens shape for the flat tip LED number 3528?

**MR. OWENS:**  Your Honor, I think it's flat *top*.  Sorry.

**THE COURT:**  Two strikes you're out.  We'll make it three.

(Laughter)

**THE COURT:**  Sorry for rushing.  Flattop LED number 3528.

**THE WITNESS:**  Are you referring to the design for the package or the lens?

**THE COURT:**  The lens shape.

**THE WITNESS:** For starters, for 3528 package, the oval shape did not change much. As I stated earlier, there was a specific mold, but the oval shape did not change, but they had to do the optimization work for the specific 3528 design.

**THE COURT:** And the question is did SSC establish or design specifically the lens shape?

**THE WITNESS:** So we did not design the lens ratio, but we collaborated with the leg that attached to lens.

**THE COURT:** Mr. Labgold, would you like to follow-up on that question?

**MR. LABGOLD:** It's just going to be a question or two.

### JURY QUESTION FOLLOW-UP

**BY MR. LABGOLD**

**Q.** Isn't it correct that when it came to the design of the lens, the shape, the contours, the surface, that was all done by EDD, or Enplas?

**A.** With respect to oval shape, EDD designed, but we collaborated whether that design is -- can be aligned with SSC package, but the oval shape was not changed much, and they did the overall design.

**Q.** And by the collaboration, they being Enplas provided you with prototypes, which you then tested on your light bars; correct?

**A.** That is correct.

**MR. LABGOLD:** No further questions.

THE COURT:  Any further examination from SSC?

MR. OWENS:  Just a few questions.

**JURY QUESTION FOLLOW-UP**

**BY MR. OWENS**

**Q.**   Mr. Ryu, did SSC provide feedback to Enplas during that collaborative process on how well the various lens designs were performing?

**A.**   Yes, they did.

**Q.**   And did Enplas make changes to the lens shape in response to your feedback?

**A.**   Yes, they did.

**Q.**   And why were you analyzing the performance on the light bars?

**A.**    In order to determine the final specifications for the lens.

**Q.**   And how many iterations of back and forth between SSC and Enplas on various prototypes did you go through before you reached a final design?

**A.**    Before we had the final production version, production phase version, more than ten times.

MR. OWENS:  No further questions.

THE COURT:  Thank you.

MR. LABGOLD:  May I ask, Your Honor?

THE COURT:  One more.

///

**JURY QUESTION FOLLOW-UP**

**BY MR. LABGOLD:**

Q.   With regard to the feedback, was it performance-related or was it suggestions on how to change the design?

A.   Well, we did not provide direct suggestions on design, but in order to improve the overall performance, we gave them feedback such as *please raise the top of the lens or lower the top of the lens,* and also what kind of modifications that they need to make in order to improve the performance and properties of the lens.

Q.   Well, did you change the optics?  Did you tell them to change contours?

A.   In order to meet the performance that we required, they need to change the design, so of course we tell them to change the design of it.

Q.   And you provided specific requests for how to change the design?

A.   The request was not specifically for design change, but rather in order to improve the performance or in order to meet our performance requirement what changes need to be made.

Q.   And was this done in writing or was this orally?

A.   Both.  Orally as well as in writing we exchanged the evaluation results.

        **MR. LABGOLD:**  No further questions.

        **THE COURT:**  Thank you.

Mr. Ryu, you may step down.  Thank you.

And ladies and gentlemen of the jury, that concludes our trial for today.

A reminder, you have tomorrow off from your jury service. A reminder, during your day off, do not take apart your flat screen TV at home.

(Laughter)

**THE COURT:**  Do not do any investigation of your own into the facts of the case.  Don't discuss the case with anyone, including your fellow jurors.  That will wait until the end of the case.

We will resume with the next witness at 9:00 a.m. on Thursday.  Thank you very much for your time and attention today.

(Proceedings were heard out of presence of the jury:)

**THE COURT:**  We have a plan for 4:00 p.m. tomorrow for a telephonic conversation.  Further briefs may have already been filed or coming.  Dr. Nam, who is coming, is the next witness.  And what's the plan for after Dr. Nam?

**MR. GOTTS:**  I'm sorry, Your Honor?

**THE COURT:**  Who would be the next witness after Dr. Nam.

**MR. GOTTS:**  Dr. Nam is -- then our expert witness Dr. Moore, and Ms. Davis after that.

**THE COURT:**  Very well.  All right.

MR. GOTTS:  He said after that.

THE COURT:  Yeah, after that.  Very good.

MR. GOTTS:  Your Honor, could I -- might I raise a couple issues?

THE COURT:  You've got about thirty seconds.  I'm due at a meeting and one interview.

MR. GOTTS:  All right.  Then I guess I would like to put on the table an issue that for the '679 patent we didn't object because of Your Honor's rulings, but I am concerned about sort of what they do next in terms of the use of that information for infringement purposes, which I do think would violate the roll order, and I think that's the whole reason they're setting up this testimony, saying that there are these differences -- so I just want to cue that up.

THE COURT:  All right.  Thirty seconds is up.  That was maybe a better objection to make before the patent came in.

MR. GOTTS:  No.  No --

THE COURT:  But I hear you, and we'll -- I'll keep listening to that.

MR. GOTTS:  It sort of relates to the next issue, the next question we have.

THE COURT:  Great.  We'll talk about it more tomorrow.  Thank you.  Have a good night.

(Proceedings adjourned at 4:01 p.m.)

---oOo---

**CERTIFICATE OF REPORTERS**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Tuesday, March 15, 2016


_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter



_____

Rhonda Aquilina, CSR No. 9956, RMR, CRR
U.S. Court Reporter