**Volume 3**

**Pages 329 - 354**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

ENPLAS DISPLAY DEVICE          )
CORPORATION; ENPLAS TECH       )
SOLUTIONS, INC.; and ENPLAS    )
(U.S.A.), INC.,                )
                               )
          Plaintiffs,          )
                               )
  VS.                          )     **NO. C 13-5038 NC**
                               )
SEOUL SEMICONDUCTOR CO., LTD., )
                               )
          Defendant.           )
                               )

San Francisco, California
Wednesday, March 16, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

NAGASHIMA & HASHIMOTO
12005 Sunrise Valley Drive - Suite 203
Reston, Virginia  20191
**BY:  MARC R. LABGOLD, ATTORNEY AT LAW**
**PATRICK J. HOEFFNER, ATTORNEY AT LAW**

SHAW KELLER LLP
300 Delaware Avenue - Suite 1120
Wilmington, Delaware  19801
**BY:  JOHN W. SHAW, ATTORNEY AT LAW**
**JEFFREY T. CASTELLANO, ATTORNEY AT LAW**
**ANDREW E. RUSSELL, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    Rhonda Aquilina, CSR No. 9956, RMR, CRR
                    Official Reporters

**APPEARANCES**:   (CONTINUED)

For Defendant:

LATHAM & WATKINS
555 Eleventh Street, N.W. - Suite 1000
Washington, D.C.   20004
BY:   **LAWRENCE J. GOTTS, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
650 Town Center Drive - 20th Floor
Costa Mesa, California   92626
BY:   **RYAN R. OWENS, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, California 94025
BY:   **MICHELLE P. WOODHOUSE, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
John Hancock Tower - 27th Floor
200 Clarendon Street
Boston, Massachusetts   02116
BY:   **CHARLES H. SANDERS, ATTORNEY AT LAW**

Also Present:           **Takaaki Nagashima**
**Yukihiko Ohnuki**
**Jennifer Jonak**
**Kibum Nam**
**Yudae Han**
**Soomi Ko, Korean Interpreter**
**Jacki Noh, Korean Interpreter**



Wednesday - March 16, 2016                    4:15 p.m.

**P R O C E E D I N G S**

**---000---**

(Proceedings were heard out of the presence of the jury:)

THE CLERK:  Calling civil 13-5038, Enplas Display Device, et al versus Seoul Semiconductor Company.

Counsel, please state your appearances for the record.

MR. LABGOLD:  It's Marc Labgold for Enplas Display Device.  Also present with me is John Shaw and Andrew Russell.

THE COURT:  Good afternoon.

MR. GOTTS:  Good afternoon, Your Honor.  Larry Gotts for Seoul Semiconductor.  With me are Charles Sanders, Ryan Owens, Bradley Hyde, and Michelle Woodhouse.

THE COURT:  Good afternoon.  I hope you all spent your day out in the sun relaxing, escaping trial.

(Laughter)

MR. GOTTS:  Exactly what we did, Your Honor.

MR. LABGOLD:  Thank you, Your Honor.  Happy thoughts are helpful.

THE COURT:  I wish.  I also did not spend the day outside in the sun, so we're all in the same boat.

I see you have filed some more things.  Give me one moment here, and I will get the pile going in front of me.

And I think we, for the record, have a court reporter, and my deputy also participating in the conference today, so

there's a transcript being made as part of the trial proceedings.

Mr. Gotts, we're in your part of the case, so why don't I start with you with your suggestion as to our agenda for today.

**MR. GOTTS:** Okay. Well, Your Honor, we have some small housekeeping items. We did file this motion today, this afternoon regarding Yamaguchi and the scope of his testimony, which we filed around 2:00 o'clock today. We expect the other side would want to respond to that. And it turns out, unless something has changed, that we don't see that it's likely that Dr. Yamaguchi will take the stand tomorrow.

So, you know, we're happy -- I'd be happy to argue it now. I suspect Enplas would like to respond to this.

**THE COURT:** What is the best estimate as to when -- I agree that it seems unlikely to me that Yamaguchi will be taking the stand tomorrow. What is your best estimate as to when that testimony will occur?

**MR. GOTTS:** I think, from my time calculations, assuming that Enplas hasn't significantly deviated from its time calculations, we would think sometime probably, if he's our first witness, late morning on Friday.

**MR. LABGOLD:** I would think so as well, Your Honor.

And I would also note that we didn't have a chance to even meet and confer on this, and some of these issues I think we can resolve, so this could clearly be something that could be

left till tomorrow.

And to the extent we need to respond, we just need to know what time we need to respond by.

**THE COURT:**  I have yet to read the motion, as I've been in court all day today, and so I don't know.  If you do need to respond, first assess whether you need to respond, and if you are going to file a response, file it by 4:00 o'clock tomorrow.

**MR. LABGOLD:**  Okay.  Fair enough.

**THE COURT:**  And -- if for some reason we had to resolve the motion, you know, if Mr. Yamaguchi's testimony comes up sooner than Friday, then we will take it up before the witness takes the stand.

**MR. LABGOLD:**  Thank you, Your Honor.

**THE COURT:**  All right.  Mr. Gotts, what next is on your itinerary?

**MR. GOTTS:**  The next -- all the other issues I think are, frankly, defense.  Although there's one on deposition designations that Ms. Woodhouse will address.  I think it's a relatively discrete -- oh, sorry, Charles Sanders is going to address that -- and that's a relatively discrete issue, so maybe I'll pass the floor to him.

**THE COURT:**  All right, Mr. Sanders.

**MR. SANDERS:**  Good afternoon.  Thank you, Your Honor.

The issue is that in the 30(b)(6) depositions, there was

an assertion of privilege on behalf of EDD in response to questions about what EDD had done with respect to actions or investigation regarding the patents, and we've designated those instructions not to answer so that the jury will know that Enplas has claimed the privilege, and the witnesses were instructed not to answer.

EDD has objected to our reading of those instructions.

We see one or two possible ways to resolve this, one of which is to have those read in, the instructions read in; the other would be for the Court to give the instruction that EDD claimed the privilege.  But either way we think the jury is entitled to know that there's been -- EDD has claimed the privilege here.

**MR. LABGOLD:**  Well, Your Honor, if I may respond.

**THE COURT:**  You may.

**MR. LABGOLD:**  With regard to the assertion of privilege, in this regard it's specifically going to whether or not there's opinion of counsel or what they did in response to the letter.  The claim of the privilege leaves us with the absence of being able to rely on opinion of counsel, by putting in that we, you know, properly instructed the witness not to waive privilege when there was no opinion of counsel, but just going into the inner workings of the legal department and how they're responding to a threat to infringement, we believe that's properly a claim of privilege which should not be

waived, does not need to be waived, and the jury would clearly not understand, or if there's a risk of confusion and prejudice by our assertion of a right to privilege.

THE COURT:  And to be clear here, going back to Mr. Sanders, you're not asserting that there's been a waiver of privilege by asserting the privilege or by not asserting the privilege.  That's not the reason that you are seeking to include this in the depo excerpts?

MR. SANDERS:  That's correct, Your Honor.  But just to be clear, this is not limited to opinions of counsel.  For example, there was a claim of privilege to the question "Did you take any actions after learning of the '554 patent?"  So this goes to the relevant standards for inducement, and whether they had sufficient content to infringe.  They refused to answer the questions, and the jury can draw their own inferences.

THE COURT:  All right.  And why do you need to have -- there is no evidence that comes from a properly-made objection to a privilege, a question that seeks privilege.  So if there's not an evidentiary inference that the jury can make from a properly asserted objection, what purpose will there be in hearing an objection and resolution of that objection?

MR. SANDERS:  Your Honor, the jury can draw inferences in this case from the assertion of privilege in response to the question "Did you take any actions in response to learning

about the '554 patent?"  So the jury can make its own conclusions with respect to that; otherwise we have the position where Enplas is -- you know, there's no evidence in the record of what they did, and there's no -- there's a suggestion that, you know, the jury doesn't know that Enplas is claiming privilege with respect to this, which is highly probative, I think, of their state of mind.

**MR. GOTTS:**  If I might add, Your Honor -- this is Larry Gotts.

For example, one of the emerging defenses in the case is that they designed these devices to avoid TIR, and, you know, so there's clearly a defense brewing here about whether or not based on advice of counsel that they had a good faith belief that they didn't infringe the patents, and we were never permitted to explore that.

This question that they -- from their 30(b)(6) witness, from the company where we asked, you know, what was your reasons for believing you don't infringe, or what did you do after you learned of the patent, that was a very broad question.  They just cut it off.  So they should (inaudible) to suggest they did anything on a good faith basis to avoid infringement.

**MR. LABGOLD:**  That actually is not correct, Your Honor.  There's actually other designations that they've put in that goes to some of the issues that were not privileged.  I

mean, from a logical standpoint, when you're asking somebody who is involved in, you know, coming from the patent department:  "Did you do anything," they obviously retained counsel, they spoke with their counsel, and they filed a complaint.

To the extent -- just to affirm what Your Honor said, is that there's nothing evidentiary here, there's no evidence that will be able to be put up; and if they want to, you know, make the argument of the absence, that's where they get to draw the inference if there's no evidence there.  But protecting a proper right of privilege, just because my client is accused of infringement does not waive their right to counsel.

THE COURT:  Okay.  Here's my ruling on this issue, without seeing the particular excerpts in front of me to see how it might apply.  I'm ruling more generally, and my ruling is that I don't see the probative need for a jury to read or hear excerpts of objections properly made, and certainly colloquy between counsel about the objections also would be unnecessary for the jury, and improper for the jury to consider, because they are not themselves evidence.  And under 401 and 403, I think there's a danger to the jury confusing a properly made privilege objection with being something improper, and it might require instruction to the jury on what the privileges are, how privileges work, what the burdens are, and an explanation to them as to what they should make of all

that.  I think that would be time-consuming and distracting to the jury from their task at hand.  So on that basis I will exclude from any deposition excerpts properly made objections of privilege, both the question and the privilege assertion.

What's the next topic from the SSC side?

MR. GOTTS:  Okay, Your Honor, the next topic relates to the Davis report.  We have an objection to --

THE COURT:  And Mr. Gotts, you're scratching up a little bit.  If you could speak right into your phone.

MR. GOTTS:  Okay.  Sorry.  The next -- is that better, Your Honor?

THE COURT:  Yes, it is.  Thank you.

MR. GOTTS:  The next relates to Ms. Davis' report.

We have an objection to her demonstratives and presumably to the scope of her testimony.  This ties back into Your Honor's order on the *in limines* where Your Honor will recall you ruled that Ms. Davis cannot assume that there's an infringement for products not in the case, products not in the case, and then you indicated that she may present evidence that under a lump sum royalty, EDD would seek to treble all the potential infringing products, but that her ultimate damages determination should be adequately adjusted to reflect that the lens -- that only recovery -- we could only recover for those lenses in the case.

What Ms. Davis will be testifying to is precisely that.

She did not assume, for purposes of her testimony, and she never has, that all of the products infringe.  She's assuming that it's a lump-sum negotiation.  And in that negotiation she will testify that, as she said, that there's a pragmatic view that EDD would have sought to cover all potential infringing products, and that the pricing of the royalty for the accused products would -- you know, would be premiumed appropriately to take into account that scope of license.  And she had indeed adjusted already, in her initial calculations, the royalty amount to take account of the fact that this is not an infringement damages for all products, that the royalty is deeply discounted, it only goes up through the time of the report.  The lower number only takes into account 50 percent or less of the actual accused -- what were estimated the products would be since she had in fact already discounted that.

So the reasoning -- you know, she previously followed Your Honor's order, as we certainly understood it, and think the testimony ought to be permitted.

THE COURT:  And this is the topic of EDDs filing 424 in support of its objections to the expected testimony of witness Davis; correct?

MR. GOTTS:  Correct, Your Honor.

MR. SHAW:  Your Honor, this is John Shaw.  I'll respond.

THE COURT:  Yes.  Go ahead, Mr. Shaw.  I'm looking at

what you've submitted in writing, and you can elaborate on it, please.

**MR. SHAW:** Sure. So I want to start with the first two things or the last two things Mr. Gotts mentioned, that Ms. Davis had already premiumed her numbers and already adjusted or already discounted the numbers.

There's no sign of that anywhere in her expert report. And while I appreciate Mr. Gotts saying that, I think it would be useful for Your Honor to see a citation to the expert report where she actually does that, because in our view that never happened.

In fact, if you go to the conclusion of the report, she says -- and I'm going to read from it, because I think that's the clearest way to do it:

"if one assumes that the hypothetical negotiations would result in a license only for the disclosed products, I believe that the hypothetical negotiators would have agreed to a one-time upfront lump sum payment of $500,000 for license to the accused patent."

So that's her number for just the accused products.

Her 2-to 4 million number she very clearly says is a license for all of Enplas' Life Enhancer Cap products. There's no indication anywhere in the report that she's adjusted that to account for the fact some may have infringed or some may have not, or that she's discounted in any way. That was her

original report before there were any issues about whether all Light Enhancer Caps were part of the case or not.

**MR. GOTTS:** So Your Honor, if I could just briefly respond.

The supplemental report, which Mr. Shaw hasn't read to you, reads as follows:

> Dr. Moore's corrected report reflects the fact that he is not aware of a single Enplas lens that does not infringe the '554 patent.
>
> They had already factored into -- this into the possibility into my analysis by setting the lower end of the royalty range at a point that would mean the parties expect that Enplas would need a license for only about half of this Light Enhancer Cap product.

In other words, she's already discounted it and taken into account that this is essentially an insurance policy and not a royalty damages. So that just as Your Honor suggest, the parties in the room would -- she would be permitted to say, as I'm sure they would, the parties would have negotiated to seek to cover all infringing products. They would have never gone in and said, Your Honor, look, we found three products that infringe, and when you find three more, come back and we'll license those three more and you're fine with three more. That's just not the way in a pragmatic world this would have gotten licensed.

And in the case of a lump sum, that's already the way it's done.  For example, if you have a lump-sum payment, they are always sort of backing out toward the, you know, the life of the patent, for example.  So they're always covering products that were not the subject of the case.  That's inherent in what a lump sum license is.  So anything that was already factored into her report, I should clarify in her supplemental report, which is permitted, which has not been --

THE COURT:  And just, Mr. Gotts, that's the November 12th, 2015 Supplemental Report, is what you're referring to?

MR. GOTTS:  Yes, Your Honor.

THE COURT:  All right.

MR. SHAW:  Your Honor, John Shaw.

THE COURT:  You may respond.

MR. SHAW:  Yes.  So two things:  First, I think the sentence Mr. Gotts read from that report proves exactly our point, because he ended it with the license would be for about half of the Light Enhancer Cap products.  Half of them are not accused of infringement of the '554 patent, only three of them are.

And he also admitted the preceding sentence which states very similarly to what I've just read:

"I have not changed my conclusion that the lump-sum payment of between 2 and $4 million that the parties have

agreed to were licensed to the '554 patent covering all of Enplas' Light Enhancer Cap products."

**MR. GOTTS:**  Yeah, and that's exactly right, because -- and as the Court has noted, the parties would have sought to cover all potentially infringing products, if Ms. Davis is permitted to say that.  And what you've read is entirely true, so you would then value that, and after you come up with valuations, just like you would if you're buying car insurance, you know, if I have likely a 1 out of 10 chances of making a claim or 1 out of 5, or whatever it is, and that's exactly how parties would negotiate this.

And I think they're perfectly entitled to examine that in cross-examination, Your Honor; otherwise we're having a licensed negotiation here that would never comport with any reality regardless of how they got here with regard to the limitings of the evidence.

**THE COURT:**  This is Judge Cousins speaking.

On this issue, which is again set forth in document 424, I'm going to overrule the objection to the expected testimony of Ms. Davis, finding that it goes to the weight of her testimony rather than to the admissibility of the testimony, and that through cross-examination, EDD will be able to effectively challenge the anticipated testimony of 2 million to $4 million being the proper license for a patent covering all of the Light Enhancer Cap products, and that there will be a

challenge to using that in this case, and an instruction on the law, the back end of the case about how the jury might determine damages, but that there's not a basis to exclude entirely the report of witness Julie Davis.  And of course there will be the benefit of the Supplemental Report dated November 12th, 2015 in examining her on her opinion.

So that's my ruling on the challenge to witness Davis.

**MR. GOTTS:**  Okay.  Thank you, Your Honor.

The last item I think relates to Dr. Moore's testimony, and Mr. Owens is going to handle this.  This was an issue that was really previously done on a *Daubert*, but it's sort of surfacing in view of some current demonstratives which we believe we should have -- our exchange to those should have addressed it, but Mr. Owens will address it, Your Honor.

**THE COURT:**  And this is in regard to EDD's motion to strike Dr. Moore's opinions about the 9879 and 9854 E-lenses?

**MR. OWENS:**  Yes, Your Honor.

**MR. LABGOLD:**  It's our motion, Your Honor.

**THE COURT:**  Let me hear from EDD first in support of its motion.

**MR. LABGOLD:**  Thank you, Your Honor.

This is Marc Labgold for EDD.

As you know, Dr. Moore submitted an original report which, after his deposition, he submitted a replacement report, the corrected report, I think for supplemental, that's what it's

called, a supplemental report.  During his deposition there were several issues that came up, one of which was the one that resulted in the retraction and replacement with the supplemental report; another one that came up was the fact that there was LED measurements.  The measurements were done based on an LED having a size of at least 2.5 millimeters in diameter, and there were some of these where he said they measured them, but he doesn't know, some of them may be smaller, but they still take the measurements.

Now, in the corrected report they didn't correct that, despite our objection.  We raised it in *Daubert*.  We raised it in the motion to strike.  They defended the position, and so we prepared our case based on the fact that it's based upon what's in his supplemental report, and obviously any criticism we have from the original report.

But that being the case, now on literally the eve of trial, they put forth other slides.  First it was composites that have never been produced before in any form, and they were certainly not in his expert report.  After complaining about it, now they've taken those back and just gone with selective and a cherrypicking of data, and, again, with ray traces that may have been considered but did not make it into his expert report.

And so we're in a situation where literally I, at this point, I have very little understanding of what it is they're

going to say.  Our position should be that he should be presenting the evidence that's in his supplemental report and not be going back and changing it now and saying, *well, I'm only relying on this part* or *I'm only relying on that part*, because it's -- and it's prejudicial for us to have to readjust our entire case, to the extent we can, and I'd like to actually know what he was doing beforehand.

And I think that's our position.  They're basically changing his expert opinions yet again.

**MR. OWENS:**  Your Honor, this is Mr. Owens, if I could respond to that.

**THE COURT:**  You may.

**MR. OWENS:**  Your Honor, I think they're revisiting an issue that has been before the Court several times.  We submitted a declaration with our *Daubert* report that explained that why the various ray traces were done at 2.2 and 2.5 millimeters diameter LEDs, and that the composites were included in his reports to support his opinion that there was TIR over the whole range of 2.0 millimeters to 2.5 millimeters. This was in a declaration that they sought to strike.  It was discussed during a hearing with Your Honor.  Mr. Gotts spoke about this for quite some time with, Your Honor, and you denied that motion to strike that declaration.

Subsequently, Pollock's supplemental report in January devoted four paragraphs to specifically this issue in the

declaration, in addition to responding to other things in that declaration; and even in preparation for this case, Your Honor, they've stipulated to Professor Moore being able to talk about this declaration and the subject matter of this declaration.

Now, the BRO reports themselves that he relied on, they systematically go through and have the -- separately the 2.0, the 2.2 and the 2.5 ray traces on separate pages, and then after that is a composite of all three.  Those are in reports that they've agreed will go into evidence.  We have no objection to them coming into evidence, and the expert reports themselves include the composite where it combined all three of those showing the ray traces at 2.0, 2.2, 2.5, so you have only one page showing that over that range there is TIR.  So that supports his opinion.  He has relied on this.  He has given his opinion on this.  And I don't think there's any rule that requires that when he's shown all three of these, that he cannot support his opinion by showing what does it look like when you're looking at those 2.0 millimeters or just a 2.2 millimeters.

So, again, we think this is just an attempt to reargue that, the same issue that they've had ample opportunity to respond to, and which they got to strike before.

THE COURT:  Mr. Labgold, final word.

MR. LABGOLD:  Thank you, Your Honor.

First of all, we didn't raise this issue to revisit

anything.  Had they not changed what is actually in his expert report -- in the supplemental report, if they are held to what's in his supplemental report, we don't have an issue.

As Mr. Ryan said, you know, at the beginning of his statement, they confirmed, and it's been confirmed, and it's undeniable.  The only thing that's in his expert report is a composite of all three points, taking it at 1.0, 1.1, and 1.25 millimeters off center, and that's for a 2.0, a 2.2, and a 2.5-millimeter diameter.  He's defended repeatedly the purpose for doing that, and the reasons for doing so, and he felt that it was only necessary, even in his supplemental report, to put in that his opinions were based upon -- and this is also reiterated in the declaration -- on the composite of all three data points.  Now to sit there and say that it's only based upon a selected piece of data outside of his actual claim charts and his report is unfair.

**MR. GOTTS:**  Your Honor, I know you said last word.  This is Larry Gotts.

**THE COURT:**  I'm going to get the last word.

The motion to strike is denied.  And it's consistent -- it's denied consistent with prior rulings.  We have had pretrial hearings on Dr. Moore's testimony.

In conclusion, I think that the concerns go to the weight, not to the admissibility of the opinions, and that EDD will be able to impeach Dr. Moore with his deposition testimony and his

expert report and other materials in the case, and that at this point of the proceedings, that is the just result rather than a further exclusion of his expected testimony.

So that's my ruling on that motion. Along with it -- along with it there's also a motion to seal filed at docket 423 filed by EDD. Is there any opposition to that motion by SSC?

MR. GOTTS: No, your Honor.

THE COURT: All right. So docket 423 will be granted, that's the motion to seal docket 415. The motion to strike is denied for the reasons stated.

From EDD, then, any other matters to be presented before we resume the case tomorrow?

MR. LABGOLD: The first thing we have coming up tomorrow, and I think it may be the only thing that needs to be raised at the moment, but that I'll need a confirmation on that from the other side, we have objections to some of the documents for Kibum Nam, the next witness. If you'd like to address those now, Your Honor.

THE COURT: Have the parties conferred about those objections?

MR. LABGOLD: Yes, we have.

MR. GOTTS: We've conferred about the objections, Your Honor. But I think we believe that this is -- we ought to -- we just going to put them in with a witness with foundation. We're happy to discuss the issue if Your Honor would like,

but --

MR. LABGOLD: Some of them -- there are several of them that are truly foundational, and if they could lay the foundation, then I don't know that we can resolve the issue until they raise the foundation, so --

THE COURT: All right. What are the foundational objections to the exhibits?

MR. LABGOLD: Well, on that, if I may -- I'm sorry, Your Honor.

The one thing with regard to Mr. Nam is that there's the foundational issues, but there's also the notice issue, and this is with the initial disclosures, that if the witness was not identified -- it's when we broke yesterday.

THE COURT: Actually, you raised it, and I ruled on the issue. So are you asking for a motion of reconsideration?

MR. LABGOLD: Okay. No. We'll address everything in a foundational sense.

Now, with regard to there's two exhibits, DTX-1024 and 1029. These are both letters that did not come to EDD but went to -- one went to Best Buy, one went to a company called Lumen's. And unlike the letter that came to EDD, which relates to one of the lenses in the case and one that's not in the case, those are both related to the 9849 lens, which was specifically excluded by its name or number. So we don't believe that they should be included, because it's only likely

to confuse the jury, and they don't have any probative value.

MR. GOTTS:  Your Honor, I think I can cut that short. Those are two exhibits we are not planning to offer.

THE COURT:  All right.

MR. GOTTS:  So that takes care of that.

And there is a third letter, which, by the way, for the very same reason, relates to the 9849 lens, and we also did not plan to offer that letter, and we would object to it for the very same reasons that counsel has just objected to it.

MR. SANDERS:  And that's PX-142.

THE COURT:  I'm sorry, Mr. Sanders.  Say that number again.

MR. SANDERS:  Yes.  PX-142, we will not be offering that letter as well, for the same logic that --

THE COURT:  All right.

MR. LABGOLD:  We will actually be offering that one. That one is a no objection by both parties, because it's actually the threat letter that started the case.  Neither party has an objection to it.  It's like if we wanted to, we could agree to, you know, possibly redact that word, but I don't think that that's the issue.

They raised that they sent this, you know, the friendly notice letter, and they made a, you know, a big issue about the fact that my client just rushed in without any notice.  So we intend to introduce the notice letter, and we have no

objection, neither party has, until this point.

**MR. GOTTS:**  Well, we do object now in light of the rulings on the 9849, and then we see how they're using it, that if it's only for the issue of notice, Your Honor, it would be fine, but it's now clear from how they've opened that they plan on using the claim chart in attacking the claim chart, which is a 9849 claim chart as to Claim 38, which has been dropped from the case.  So in light of that, we do have an objection.

And in light of the Court's rulings that 9849, other lenses should be out, we would object.  We would not object if they -- if the claims are withdrawn, because after that I don't think there's any really reason for confusion, that the claim chart attached to the letter we believe does now create a problem under the other lenses' rulings, and particularly in light of now how we've seen the intended use of the letter.

**THE COURT:**  Well, here's the deal.  If you're going to -- each side is going to start changing your stipulations and making objections, you're going to have to confer with each other first and give each other a chance to think about if you're changing your approach to the case.

If there was a joint agreement to have the Plaintiff's Exhibit 142 admitted, then I'm going to admit it.  It might be appropriate to have a limiting instruction if it might be confusing to the jury to -- if it's going to be used for a damages assessment or something else.  But it sounds like the

purpose of it and the way it's being used so far is to reference notice, and the background of the filing of the case, and I would entertain, when it comes in, that an instruction be given about the use of the document.

**MR. GOTTS:**  Your Honor, I think that would address our concerns, because we don't care about the letter, but it is how it might be used.  So we'll take that up at the time, Your Honor.

**THE COURT:**  Very good.

**MR. LABGOLD:**  Thank you, Your Honor.

**THE COURT:**  Again, back to EDD side, any other issues you would like to discuss for tomorrow's witnesses?

**MR. LABGOLD:**  Not that I know of.

**THE COURT:**  All right.  And from SSC side?

**MR. GOTTS:**  No, your Honor.  Thank you very much for --

**THE COURT:**  Very good.

**MR. GOTTS:**  Thank you.

**THE COURT:**  Thank you for working through those issues.  We'll see you at 9:00 a.m. tomorrow.  Have a good night.

(Proceedings adjourned at 4:50 p.m.)

---oOo---

**CERTIFICATE OF REPORTERS**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Wednesday, March 16, 2016

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter

_____

Rhonda Aquilina, CSR No. 9956, RMR, CRR
U.S. Court Reporter