**Volume 4**

**Pages 355 - 606**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

| | |
|---|---|
| ENPLAS DISPLAY DEVICE CORPORATION; ENPLAS TECH SOLUTIONS, INC.; and ENPLAS (U.S.A.), INC.,<br><br>　　　　　Plaintiffs,<br><br>　VS.<br><br>SEOUL SEMICONDUCTOR CO., LTD.,<br><br>　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　**NO. C 13-5038 NC**<br>)<br>)<br>)<br>)<br>)<br>) |

San Francisco, California
Thursday, March 17, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

　　　　　　　　NAGASHIMA & HASHIMOTO
　　　　　　　　12005 Sunrise Valley Drive - Suite 203
　　　　　　　　Reston, Virginia  20191
　　　　　　BY: **MARC R. LABGOLD, ATTORNEY AT LAW**
　　　　　　　　**PATRICK J. HOEFFNER, ATTORNEY AT LAW**

　　　　　　　　SHAW KELLER LLP
　　　　　　　　300 Delaware Avenue - Suite 1120
　　　　　　　　Wilmington, Delaware  19801
　　　　　　BY: **JOHN W. SHAW, ATTORNEY AT LAW**
　　　　　　　　**JEFFREY T. CASTELLANO, ATTORNEY AT LAW**
　　　　　　　　**ANDREW E. RUSSELL, ATTORNEY AT LAW**

　　　　(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported by:　　　Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
　　　　　　　　Rhonda Aquilina, CSR No. 9956, RMR, CRR
　　　　　　　　Official Reporters

**APPEARANCES**:   (CONTINUED)

For Defendant:

LATHAM & WATKINS
555 Eleventh Street, N.W. - Suite 1000
Washington, D.C.  20004
BY:  **LAWRENCE J. GOTTS, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
650 Town Center Drive - 20th Floor
Costa Mesa, California  92626
BY:  **RYAN R. OWENS, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, California 94025
BY:  **MICHELLE P. WOODHOUSE, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
John Hancock Tower - 27th Floor
200 Clarendon Street
Boston, Massachusetts  02116
BY:  **CHARLES H. SANDERS, ATTORNEY AT LAW**

Also Present:           **Takaaki Nagashima**
                        **Yukihiko Ohnuki**
                        **Jennifer Jonak**
                        **Kibum Nam**
                        **Yudae Han**
                        **Soomi Ko, Korean Interpreter**
                        **Jacki Noh, Korean Interpreter**

# I N D E X

Thursday, March 17, 2016 - Volume 4

**DEFENDANT'S WITNESSES**                                    **PAGE**   **VOL.**

**NAM, KIBUM**
(SWORN)                                                       362      4
Direct Examination by Mr. Sanders                             362      4
Cross-Examination by Mr. Labgold                              394      4
Redirect Examination by Mr. Sanders                          416      4
Recross-Examination by Mr. Labgold                           418      4

**WATAI, KAYOKO**
By Deposition                                                 427      4

**SETO, YOSHIHIRO**
By Deposition                                                 443      4

**YOSHIDA, MAMORU**
By Deposition                                                 458      4

**MOORE, DUNCAN**
(SWORN)                                                       499      4
Direct Examination by Mr. Owens                               499      4
Cross-Examination by Mr. Labgold                             579      4

# E X H I B I T S

**PLAINTIFFS' EXHIBITS**                            **IDEN**   **EVID**   **VOL.**

54                                                            587      4

55                                                            587      4

60                                                            587      4

60A                                                           587      4

61                                                            589      4

62                                                            597      4

135                                                           425      4

142                                                           398      4

286                                                           425      4

**I N D E X**

**E X H I B I T S**

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1023 | | 425 | 4 |
| 1028 | | 404 | 4 |
| 1034 | | 375 | 4 |
| 1034-1 | | 375 | 4 |
| 1035-4 | | 375 | 4 |
| 1035-5 | | 380 | 4 |
| 1035-3 | | 385 | 4 |
| 1036 | | 425 | 4 |
| 1037 | | 425 | 4 |
| 1040 | | 371 | 4 |
| 1041 | | 371 | 4 |
| 1042 | | 533 | 4 |
| 1043 | | 371 | 4 |
| 1044 | | 533 | 4 |
| 1045 | | 533 | 4 |
| 1046 | | 533 | 4 |
| 1050 | | 382 | 4 |
| 1051 | | 382 | 4 |
| 1052 | | 382 | 4 |
| 1053 | | 534 | 4 |
| 1054 | | 382 | 4 |

**I N D E X**

**E X H I B I T S**

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1055 | | 534 | 4 |
| 1056 | | 534 | 4 |
| 1057 | | 534 | 4 |
| 1070 | | 425 | 4 |
| 1073 | | 384 | 4 |
| 1074 | | 384 | 4 |
| 1075 | | 384 | 4 |
| 1076 | | 534 | 4 |
| 1077 | | 384 | 4 |
| 1078 | | 534 | 4 |
| 1079 | | 534 | 4 |
| 1080 | | 425 | 4 |
| 1083 | | 387 | 4 |
| 1085 | | 387 | 4 |
| 1092 | | 379 | 4 |
| 1101 | | 389 | 4 |
| 1102 | | 389 | 4 |
| 1103 | | 379 | 4 |
| 1104 | | 379 | 4 |
| 1105 | | 379 | 4 |
| 1106 | | 425 | 4 |

**I N D E X**

**E X H I B I T S**

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1107 | | 389 | 4 |
| 1108 | | 532 | 4 |
| 1109 | | 532 | 4 |
| 1110 | | 532 | 4 |
| 1111 | | 425 | 4 |
| 1123 | | 500 | 4 |
| 1133A | | 387 | 4 |
| 1135A | | 371 | 4 |
| 1135B | | 371 | 4 |
| 1135C | | 371 | 4 |
| 1135D | | 371 | 4 |
| 1136A | | 379 | 4 |
| 1136B | | 379 | 4 |
| 1136C | | 379 | 4 |
| 1136D | | 379 | 4 |
| 1234 | | 532 | 4 |

<u>Thursday - March 17, 2016</u>                      <u>9:11 a.m.</u>

**P R O C E E D I N G S**

**---oOo---**

(Proceedings were heard out of the presence of the jury:)

THE COURT:  Let's go on the record, and we'll bring in our jurors.

(Proceedings were heard in the presence of the jury:)

THE COURT:  All right.  Good morning to our jurors. Welcome back.  Happy St. Patrick's Day.  I hope you enjoyed your day away, and thank you for coming back.

And if SSC will call its next witness, please.

MR. GOTTS:  Your Honor, SSC calls Dr. Kibum Nam.

THE COURT:  Dr. Nam may come forward.

MR. SANDERS:  Your Honor, with your permission, may I provide a short introduction of Dr. Nam?

THE COURT:  Please.

MR. SANDERS:  Good morning, ladies and gentlemen. Dr. Kibum Nam is Seoul Semiconductor's vice president and chief technology officer.  He will testify about the background of Seoul Semiconductor, SSC's relationship with EDD, and about the background of the dispute that led us here.

THE COURT:  Thank you.

Dr. Nam, we will swear you in.

///

**KIBUM NAM**,

called as a witness for the Defendant, having been duly sworn,

testified as follows through the interpreter:

      **THE WITNESS:**  (In English)  Yes, I do.

      **THE CLERK:**  Please be seated.

    Please state your full name for the record.

      **THE WITNESS:**  (In English)  My name is Kibum Nam.

      **MR. SANDERS:**  With your permission, Your Honor, we'd

like to just hand out the binders.

      **THE COURT:**  Yes.  Please.

      **THE WITNESS:**  (In English)  Thank you.

            (Pause in proceedings.)

**DIRECT EXAMINATION**

**BY MR. SANDERS:**

**Q.**   Good morning.  Could you please introduce yourself to the jury?

**A.**   (In English)  My name is Kibum Nam.  I'm an executive vice president and chief technology officer in Seoul Semiconductor.

**Q.**   Are you comfortable testifying in English today?

**A.**   Yes, I am; but if I have something I don't understand clearly, I can use the translator.

**Q.**   Yes.  Absolutely.

    Dr. Nam, where do you work?

**A.**   I'm working in Seoul Semiconductor in Korea.

Q.   How long have you been working there?

A.   Eleven years.  Since 2005.

Q.   Do you have a family, Dr. Nam?

A.   Yes, I do have one wife and two children, one son and one daughter.

Q.   Did you go to college?

A.   Yes, I went to college.

Q.   Where did you go to college?

A.   In Korea.

Q.   What did you study?

A.   I studied physics.

Q.   Where did you go after college?

A.   After receiving Bachelor's degree in Korea, I went to Kansas State University, and I received a Ph.D. from Kansas State University in U.S.

Q.   What was your Ph.D. in?

A.   Semiconductor.

Q.   What did you do after receiving your Ph.D., Dr. Nam?

A.   I did some post-doc work in Kansas State University, and also I went to U.C. Santa Barbara to work with Shuji Nakamura.

Q.   When you say U.C. Santa Barbara, do you mean the University of California Santa Barbara?

A.   Yes, it is.

Q.   Who is Shuji Nakamura that you mentioned?

A.   Shuji Nakamura is our -- one of our consultants for Seoul

Semi, and he's a Nobel Prize winner in LED last year.

Q.   What is Seoul Semiconductor's business?

A.   Seoul Semi is making LED for television and also automotive and smartphone and also lighting.

Q.   When was SSC founded?

A.   1992.

Q.   Who founded SSC?

A.   Chung-Hoon Lee, C.H. Lee.

Q.   Does Chairman Lee have a scientific background?

A.   Yes.  He has a Bachelor's degree in physics and also he received a MBA.

Q.   Where is Seoul Semiconductor located?

A.   In Ansan-city in Korea one hour apart from Seoul.

Q.   Does Seoul Semiconductor have any presence in the United States?

A.   Yes.  We do have an office in Los Angeles and also in Toronto and Detroit.

Q.   How much of Seoul Semiconductor's resources are devoted to research and development?

A.   We are -- we continue invest about 10 percent of our revenue and 100 U.S. million dollar in last year, hundred million U.S.

Q.   And does SSC have patents?

A.   Yes, we do have a patent.

Q.   How many?

**A.**   About 4,000 patent in our own patent, and -- but we also have license from outside.

**Q.**   Does SSC file for its own patents?

**A.**   Yes, we do.

**Q.**   Does SSC acquire patents from others?

**A.**   Yes.  We purchase some patent from outside.

**Q.**   Why does SSC purchase patents?

**A.**   In the beginning we cannot do everything.  We cannot develop every technology.  And when we develop some technology or product, patent is very important.  Patent is really the technology.  You can -- you can -- maybe you can do some research in-house without patent, but you cannot sell or commercialize in the market without permission of some owners.

**Q.**   What is the benefit to Seoul Semiconductor of acquiring patents?

**A.**   Since -- actually at Seoul Semi we respect IP, but without considering this kind of IP, if we don't purchase, there is some original IP of some certain product or technology, like direct-type TV -- I think '554 or '209 is the original patent -- but we cannot make -- we cannot design around from this kind of original patent.  That's why we purchase original patent.

**Q.**   And you mentioned the '209 patent.  Are you familiar with the '209 patent, Dr. Nam?

**A.**   Yes, I am.

Q.   How did you learn about it?

A.   We had some -- we had a license since 2004, but we purchased this '209 in 2000, I think, '13.

Q.   And who did you learn about the '209 patent from?

A.   Dr. Pelka.  Dr. Pelka was -- he was also -- he's also our consultant, and I was talking to Dr. Pelka at the time.  He suggest to me to purchase this one because this is one of original patent for to make backlighting.

Q.   And who did Seoul Semiconductor purchase the '209 patent from?

A.   Teledyne, Los Angeles.

Q.   Now, switching to a new topic, Dr. Nam, does Seoul Semiconductor do any analyses of products in the marketplace?

A.   Yes, we do.

Q.   Why does Seoul Semiconductor do those analyses?

A.   We analyze some product in the market because we are monitoring our IP position and also some technology trend.

Q.   Is this a standard practice of Seoul Semiconductor?

A.   This is a totally standard process.

Q.   What is your role in those standard analyses?

A.   I started an analysis group from 2005, and I guided sometimes what to analyze and how to analyze the product.

Q.   Does the analysis group that you started analyze televisions with LED backlighting?

A.   Yes.

**Q.** Have any of the televisions that Seoul Semiconductor analyzed contained Enplas lenses?

**A.** Yes, we did.

**Q.** What was your involvement in the analyses of those televisions?

**A.** I ordered some of our engineer and salesmen to purchase product in U.S. market and to analyze those kind of a product.

**Q.** Where were those televisions purchased?

**A.** Los Angeles area.

**Q.** And who did you direct to purchase those televisions?

**A.** Mr. Woo and Mr. Ye.

**Q.** Who is Mr. Woo?

**A.** Mr. Woo is one of our salespersons in Los Angeles, and Mr. Ye is our patent manager in Korea.

**Q.** Where was Mr. Ye at the time these televisions with Enplas lenses were being purchased?

**A.** He was visiting Los Angeles area, and he purchased a television from Costco or Fry's Electronics.

        **THE COURT:** Mr. Sanders, can we get a spelling of the names of those two witnesses, Woo, and Ye?

        **MR. SANDERS:** Certainly. Mr. Woo is W-O-O, and Mr. Ye is Y-E.

        **THE COURT:** Thank you. Please continue.

**BY MR. SANDERS:**

**Q.** Dr. Nam, why did you direct Mr. Woo and Mr. Ye to purchase

those televisions in the United States?

A.   We purchased product from outside of U.S., but U.S. is -- U.S. market is leading market for televisions, so that's why we purchased a television from U.S. market.

Q.   Did you ask Mr. Woo and Mr. Ye to do anything with the receipts for those televisions?

A.   Yes.  I asked them to keep the receipt.

Q.   What did the analysis group at Seoul Semiconductor do with the televisions that were purchased containing Enplas lenses?

A.   We took photograph of the receipt and also television, and we analyzed the product.

Q.   Does the standard process for analysis at SSC include taking photographs?

A.   Yes, it is standard process.

Q.   Why is taking photographs part of the standard analysis?

A.   We can analyze the LED and the light bar inside of television, but without taking these kind of a model number or a receipt, we don't know what television we are looking in later.  So after a certain time, we have to remember.

Q.   Who took the photographs of the televisions with Enplas lenses that were purchased in the United States?

A.   Mr. Ye and one of our operator in the analysis group.

Q.   Have you seen the receipts and photographs?

A.   Yes, I saw them.

Q.   Have you seen the actual televisions that were

photographed?

A.   Yes, I do.

Q.   Now, bear with me, Dr. Nam.  We have some documents to go through.

     You have a binder in front of you.  Could you please turn to Tab A1 in your binder?

A.   Tab A1?

Q.   Yes, please.  And that is DTX-1043.

A.   (Witness examines document.)

Q.   All right.  Dr. Nam, do you recognize this?

A.   Yes, I do.

Q.   What is it?

A.   This is a receipt of the JVC television purchased from Costco.

Q.   Is this a fair and accurate copy of the receipt for the JVC television?

A.   Yes, it is.

Q.   Could you please take a look at Exhibits A2 through A8, which are DTX-1040, 1041, 1135A, 1135B, 1135C, 1135D, and 1034?

A.   (Witness examines documents.)

Q.   And my question after you've had a chance to take a look through those is whether you recognize them.

A.   Yes, I do.

Q.   What are they?

A.   These are photograph of a JVC television and also light

bar inside of a television.

Q.   Do those photographs fairly and accurately represent the JVC television and its components that were analyzed by Seoul Semiconductor?

A.   Yes, they are.

Q.   Can you tell me how, if at all, those photographs relate to the receipt in Tab A1 that is DTX-1043?

A.   There's a photograph of the model number, DTX-1040-09, and also there is a model number on the receipt starting from EN32.

Q.   Are those model numbers the same or different, Dr. Nam?

A.   Same.

MR. SANDERS:   Your Honor, at this time we move for admission of DTX-1043, 1040, 1041, 1135A, 1135B, 1135C, 1135D, and 1034.

THE COURT:   And these are represented by A1 through A8; is that accurate?

MR. SANDERS:   That is correct, Your Honor.  And, in fact -- well, let's move those in, then we can do one more.

THE COURT:   But am I correct that it's A1 through A8?

MR. SANDERS:   It is A1 through A8, Your Honor, yes.

THE COURT:   And are those designated in your exhibit list by those designations A1 through A8, or are they designated by different numbers?

MR. SANDERS:   They are designated by the exhibit numbers, which I can read again.

THE COURT:  Please do just so I'm making sure I'm following it.

MR. SANDERS:  Certainly, Your Honor.  They're DTX-1043, 1040, 1041, 1135A, 1135B, 1135C, and 1135D.

THE COURT:  Any objection?

MR. LABGOLD:  No objection, Your Honor.

THE COURT:  All right.  Those exhibits are admitted, and you may show them to the witness and jury.

(Defense Exhibits 1135A, 1135B, 1135C, 1135D, 1040, 1041, and 1043 received in evidence)

MR. SANDERS:  Thank you, Your Honor.

Now, if we could publish the documents on the screen, please.

Q.  And if you could please explain again how the receipt and the photographs match up now that the jury can see them.

A.  Okay.  Usually we take a photograph of the television, so you can see there -- on the right-hand side you can see the model number, and also there is a model number on the receipt, EM32TXTS.

Q.  Thank you, Dr. Nam.

Now, I'd like to direct your attention back to DTX-1041, which is under your Tab A3?

A.  (Witness examines document.)  Yes, I'm there.

Q.  And I'd like to direct your attention to page 2 of that exhibit.

**A.** Yes.

**Q.** Can you tell me what's shown there, Dr. Nam?

**A.** This is a marking of an Enplas lens indicating EN.

**Q.** And I'd like to direct your attention forward to page 4 of the Exhibit DTX-1041. Can you tell me what is shown there?

**A.** Also, this is a photograph of the model number of Enplas lenses showing 9854E.

          **MR. SANDERS:** Your Honor, may I approach the witness?

          **THE COURT:** You may.

                    (Pause in proceedings.)

**BY MR. SANDERS:**

**Q.** Dr. Nam, I've handed you what's been marked as DTX-1034-1. Do you recognize this?

**A.** Yes, I do.

**Q.** Can you tell us what it is, Dr. Nam?

**A.** This is a light bar of the JVC television.

          **MR. SANDERS:** Your Honor, may I approach?

          **THE COURT:** Yes.

**BY MR. SANDERS:**

**Q.** Dr. Nam, I've given you what's been marked as DTX-1035-4, as well as a magnifying glass to assist you. Do you recognize this --

**A.** DTX-1035?

**Q.** Yes, 1035-4, the item in the bag I just gave to you. The item in the bag.

**A.**   Yeah.  Just a second.

(Witness examines document.)  A4.  Did you say 1035?

**Q.**   Oh, Dr. Nam, to be clear, it's the item I just handed you.

**A.**   Ah, this is DT -- this is it.

**Q.**   It's DTX-1035-4 that you're holding there.

**A.**   Okay.

**Q.**   And my question is whether you recognize that.

**A.**   Yes, I do.

**Q.**   What is it?

**A.**   This is Enplas lens so showing the marking of EN.

**Q.**   Are you able to see the model number on the lens?

**A.**   Actually, I cannot see the model number clearly.

**Q.**   You can take it out of the bag, Dr. Nam.

**A.**   Okay.

(Witness complying.)  Okay.  Model number is 9854E.

**Q.**   Thank you.

And just because you weren't able to speak at the microphone in that moment, did you say 9854E?

**A.**   Right.

**MR. SANDERS:**  Your Honor, at this time we move to admit DTX-1034-1 and DTX-1041, the light bar and the lens.  I can confirm the exhibit numbers if you'd like.

**THE COURT:**  Did you say 1041?

**MR. SANDERS:**  May I, Your Honor?

**THE COURT:**  Yes.

(Pause in proceedings.)

**MR. SANDERS:**  Thank you, Your Honor.  I misspoke. DTX-1034-1 and 1035-4.

**THE COURT:**  That's what I thought.

All right.  And just for the record, the photographs of the light bar, which are at A8, those are identified as DTX-1034, and I wasn't sure if you --

**MR. SANDERS:**  Yes, Your Honor.  I realize that I mentioned them in the first time of listing the exhibits but not the second.  So if I may deal with that issue.

**THE COURT:**  You want to deal with it now?

**MR. SANDERS:**  Yeah.

**THE COURT:**  Yes.

**BY MR. SANDERS:**

**Q.**  Dr. Nam, could you please turn to Tab A8, DTX-1034?

**A.**  (Witness examines document.)  Yes, sir.

**Q.**  And do you recognize this?

**A.**  Yes, I do.

**Q.**  What are they?

**A.**  This is a light bar.

**Q.**  And by "light bar," which light bar?

**A.**  Taken from JVC TV.

**MR. SANDERS:**  Your Honor, at this time I'd also move for admission of DTX-1034.

**THE COURT:**  All right.  So is 1034 -- maybe some

additional foundation.  You have a physical exhibit before you, the light bar and photographs of a light bar, which are marked as 1034, are they the same?

MR. SANDERS:  Your Honor has asked a very good question.  Let me present to you the light bar again.

Q.   Dr. Nam, can you tell me whether the light bar that is DTX-1034-1 and the photographs and DTX-1034 bear relationship to one another?  Are they the same?

A.   Both are the same.

MR. SANDERS:  So, Your Honor, we move to admit DTX-1035-4, which is the lens; DTX-1034-1, which is the physical light bar; and DTX-1034, the photographs.

THE COURT:  Any objection?

MR. LABGOLD:  No objection.

THE COURT:  All right.  So 1034, which is the photographs; 1034-1, which is a physical exhibit of the light bar; and 1035, the physical --

MR. SANDERS:  1035 --

THE COURT:  1035-4 is what you're calling it?

MR. SANDERS:  Yes.

THE COURT:  -- the physical exhibit of the cap lenses are admitted in evidence.

(Defense Exhibits 1034, 1034-1, and 1035-4 received in evidence)

MR. SANDERS:  Thank you, Your Honor.

May I publish?

THE COURT:  You may.

MR. SANDERS:  Thank you.

Q.   Thanks for bearing with me, Dr. Nam.  We have a few more of these to do.

I'd like to direct your attention now to tab B1 through B7 in your binder which are DTX-1103, 1104, 1105, 1136A, 1136B 1136C, and 1136D.

A.   (Witness examines document.)

Q.   And my question, after you've had a chance to take a look through those, is whether you recognize them.

A.   Yes, I do.

Q.   What are they?

A.   These are photograph of an LG television.

Q.   And just to make clear for the record, are you saying the letters L and G?

A.   Right.

Q.   Do those photographs fairly and accurately represent the LG television and its components that were analyzed by Seoul Semiconductor?

A.   Yes, they are.

Q.   I'd like to ask you to turn now, Dr. Nam, to Tab B8, which is DTX-1092.

A.   (Witness examines document.)

Q.   Do you recognize that?

**A.** Yes, I do.

**Q.** And can you tell me, is there any document in that compilation, any page that corresponds to the photographs?

**A.** Yes. If you go to the DTX-1092 at 18, page 18, you can see the receipt from Amazon.com.

**Q.** And you're referring, just to be clear for the record, DTX-1092 at page 18?

**A.** Right.

**Q.** How did these -- how do the photographs relate to that Amazon receipt at DTX-1092 at 18?

**A.** Again, we took a photograph of the television, and DTX-1103, page 6, you can see the photograph of the model number and there is a model number on the receipt.

**Q.** Are the model numbers on DTX-1103 at 6 and DTX-1092 at 18 the same or different?

**A.** They are same.

**THE COURT:** Mr. Sanders, can you clarify? At 1092, page 18, there are two different televisions described. Can you be specific as to which one you're referring to if you're not referring to both of them?

**MR. SANDERS:** Certainly, Your Honor.

**Q.** Dr. Nam, for which television do the model numbers match?

**A.** Just a second. Let me see. (Witness examines document.)

**Q.** Perhaps I can make it easier, Dr. Nam.

**A.** I can do that. Just a second.

**Q.**   All right.  Sorry.

**A.**   (Witness examines document.)  Yeah.  This is -- I got it.
The first one, 42-inch.

**Q.**   And by "first one, 42-inch," can you identify the brand
name of that?

**A.**   Yes.  The model number is 42LN5400.

**Q.**   And is that the LG or the Sharp TV?

**A.**   LG.

**Q.**   Thank you, Dr. Nam.

          **MR. SANDERS:**  At this time, Your Honor, move for
admission of the photographs that are DTX-1103, 1104, 1105,
1136A, 1136B, 1136C, and 1136D, along with the receipt in
DTX-1092.

          **THE COURT:**  And are you seeking the admission of all
of what's been marked for identification as 1092 or only the
page reference 1092, page 18?

          **MR. SANDERS:**  Your Honor, we're satisfied with
DTX-1092-18.

          **MR. GOTTS:**  Your Honor, we think it should be the
entire document.

          **MR. SANDERS:**  We do not have an objection to that,
Your Honor.

          **THE COURT:**  All right.  Then let me ask.  Is there any
objection to the other exhibits offered into evidence?

          **MR. LABGOLD:**  No objection, Your Honor.

THE COURT: So all of 1092 will be admitted with a request for completeness, as well as Exhibits 1103, 1104, 1105, and 1136, parts A, B, C, and D.

MR. SANDERS: Thank you, Your Honor.

(Defense Exhibits 1103, 1104, 1105, 1136A, 1136B, 1136C, 1136D, and 1092 received in evidence)

BY MR. SANDERS:

Q. Dr. Nam, now that the jury is able to see the documents, could you explain again how the photographs match to the receipt at DTX-1092-18 for Amazon?

A. Okay. The left-hand side is the receipt showing model number, and right-hand side is a photograph taken by Seoul Semi.

Q. I'd like to direct your attention to Tab E4, which is DTX-1136-A.

A. (Witness examines document.) Yes, I'm there.

Q. Do you recognize this?

A. Yes, I do.

Q. What does it show?

A. This is a photograph of the Enplas lenses showing marking of EN and a model number 9879.

Q. Thank you, Dr. Nam.

MR. SANDERS: Your Honor, may I approach?

THE COURT: Yes.

///

BY MR. SANDERS:

Q.   Dr. Nam, I've handed you what's been marked as DTX-1035-5. Do you recognize this?

A.   (Witness examines exhibit.)  Yes, I do.

Q.   What is it?

A.   This is the Enplas lenses showing model number of 9879.

Q.   And just to be clear, did you say 9879?

A.   Yes.

         MR. SANDERS:  Your Honor, we'd move for the admission of DTX-1035-5, which is the lens.

         THE COURT:  Which is the physical exhibit; correct?

         MR. SANDERS:  Yes, correct.

         THE COURT:  Any objection?

         MR. LABGOLD:  No objection.

         THE COURT:  1035-5 is admitted.

      (Defense Exhibit 1035-5 received in evidence)

         MR. SANDERS:  Your Honor, may I publish it to the jury?

         THE COURT:  Yes.

BY MR. SANDERS:

Q.   I'd like to direct your attention now to the Tab C exhibits, specifically Tabs C1 through C3, which are DTX-1050, 1051, and 1052.

A.   (Witness examines documents.)

Q.   And can you tell me whether you recognize those?

A.   These are photograph of the -- of Sanyo TV.

Q.   Do those photographs fairly and accurately represent the Sanyo TV that was analyzed by Seoul Semiconductor?

A.   Yes, they are.

Q.   And could you turn to Tab 4, please, Dr. Nam, Tab C4, which is DTX-1054?

A.   (Witness examines document.)

Q.   Do you recognize that?

A.   Yes, I do.

Q.   What is it?

A.   This is a receipt of Sanyo TV --

Q.   Is that --

A.   -- purchased from Walmart.

Q.   Is that a fair and accurate copy of the receipt for the Sanyo TV purchased from Walmart?

A.   Yes, it is.

Q.   Can you tell me, do the photographs in Tabs C1 through C3 relate to the receipt in DTX-1054 at Tab C4?

A.   There is also a photograph of serial number starting from B339, and also you can see the serial number on the receipt. The photograph of the serial number is DTX-1050, seventh page.

Q.   Thank you.

     And can you tell me whether the serial number on DTX-1050, page 7, and on DTX-1054 are the same or different?

A.   Same.

          MR. SANDERS:  Your Honor, we'd move the admission of

DTX-1050, 1051, 1052, and 1054.

          MR. LABGOLD:  No objection.

          THE COURT:  1050, 1051, 1052, and 1054 are admitted.

     (Defense Exhibits 1050, 1051, 1052, and 1054 received in

evidence)

          THE COURT:  You may proceed.

          MR. SANDERS:  Thank you, Your Honor.

Q.   Now that the jury can see the documents, Dr. Nam, can you

explain the match-up between the photographs and the receipt?

A.   Okay.  Left-hand side is receipt showing serial number.

Also, right-hand side is photograph of the serial number on TV.

Q.   I'd like to direct your attention back now to Tab C2,

which is DTX-1051.

A.   (Witness examines document.)

Q.   And can you tell me what's shown on the first page of

DTX-1051?

A.   This is a photograph of an Enplas lens showing marking of

EN.

Q.   And I'd like to direct your attention forward to DTX-1051

at 3, and can you tell me what's shown on that page?

A.   Another photo -- photograph of the Enplas lenses showing

model number 9879.

Q.   Thank you, Dr. Nam.  A few more to go.

     I'd like to direct your attention to Tab D1, which is

DTX-1077.

A.   Yes.

Q.   Do you recognize this?

A.   Yes, I do.

Q.   What is it?

A.   This is a receipt of the Seiki television.

Q.   Is it an accurate receipt for the Seiki television?

A.   Yes, it is.

Q.   Can you please now take a look at Tabs D2 through D3, which are DTX-1073, 1074, and 1075?

A.   (Witness examines document.)

Q.   And after you've had an opportunity to take a look at those, my question is whether you recognize them.

A.   (Witness examines document.)  Yes, I do.

Q.   What are they?

A.   This is a -- these are a photograph of the Seiki television and also a light bar inside of the TV.

Q.   Do those photographs fairly and accurately represent the Seiki television and light bar that were analyzed by SSC?

A.   Yes, they are.

Q.   And do those photographs relate to the receipt that's in Tab D1, DTX-1077?

A.   Yes, they are.

Q.   Can you explain how they relate?

A.   If you go to DTX-1073, page 3, and you can see the model

number SC40, and you can also see the model number on the receipt.

Q.   Are the model numbers on the receipt DTX-1077 and DTX-1073 at 3, the photograph, the same or different?

A.   The same.

        MR. SANDERS:  Your Honor, at this time we move the admission of DTX-1077, 1073, 1074, and 1075.

        MR. LABGOLD:  No objection.

        THE COURT:  Those are admitted.

        (Defense Exhibits 1073, 1074, 1075, and 1077 received in evidence)

        THE COURT:  Proceed.

BY MR. SANDERS:

Q.   Dr. Nam, now that the jury can see the documents, could you explain again how the photographs match the receipt?

A.   Okay.  On the receipt you can see the model number starting from SC40FHO3, and also right-hand side you can see the photograph of model number of Seiki TV.

Q.   I'd like to direct your attention to Tab 3, D3, again, which is DTX-1074, and specifically the first page.  Can you tell me what's shown there?

A.   This is a marking of Enplas lenses indicating EN.

Q.   Could you turn to page 3 of that exhibit, DTX-1074?

A.   This is another photograph of model number of Enplas lens showing 9854D.

MR. SANDERS:  Your Honor, may I approach?

THE COURT:  Yes.

BY MR. SANDERS:

Q.   Dr. Nam, I've handed you what's been marked as DTX-1035-3. Do you know what that is?

A.   (Witness examines exhibit.)  Yes, I do.

Q.   What is it?

A.   This is an Enplas lens showing model number 9854D.

Q.   And just to be clear for the record, did you say 9854D, as in dog?

A.   Right.

MR. SANDERS:  Your Honor, may I publish it to the jury?

THE COURT:  Do you want to admit?

MR. SANDERS:  Good idea.  Thank you, Your Honor. Move for admission of DTX-1035-3.

THE COURT:  All right.  1035-3, any objection?

MR. LABGOLD:  No objection.

THE COURT:  All right.  That's been identified as a physical exhibit of a model 9854D delta.  It's admitted and may be shown.

(Defense Exhibit 1035-3 received in evidence)

MR. SANDERS:  Thank you.

Q.   Just a couple more to go, Dr. Nam.

I'd like to direct your attention now to Tab E1, which is

DTX-1085.

**A.**   (Witness examines document.)

**Q.**   Do you recognize that?

**A.**   Yes, I do.

**Q.**   What is it?

**A.**   This is a receipt of a Sharp TV purchased from Best Buy.

**Q.**   I'd like to direct your attention now to Tabs E2 and E3, which are DTX-1083 and 1133A.  Do you recognize those?

**A.**   Yes, I do.

**Q.**   What are they?

**A.**   These are photograph of the Sharp television and also light bar.

**Q.**   Does DTX-1085 and 1083 and 1133A fairly and accurately represent the receipt and photographs for the Sharp television?

**A.**   Yes, they are.

**Q.**   Can you explain how the photographs relate to the receipt?

**A.**   There's a photograph of the model number DTX-1083, page 2.

**Q.**   And how does that -- go ahead.

**A.**   Yeah, please.

**Q.**   Sorry, Dr. Nam.

How does that model number on DTX-1083 at 2 relate to the receipt DTX-1085?

**A.**   You can see the model number on the receipt, and those are same.

        **MR. SANDERS:**  Your Honor, we'd move for the admission

of DTX-1085, 1083, and 1133A.

MR. LABGOLD:  No objection.

THE COURT:  They're admitted.

(Defense Exhibits 1083, 1085, and 1133A received in evidence)

THE COURT:  Proceed.

BY MR. SANDERS:

Q.   Dr. Nam, now that the jury can see them, can you explain the match up between the photos and the receipt?

A.   Okay.  There is a model number showing on the receipt 32LE450U, photograph and model number on the receipt.

Q.   Now, I'd like to direct your attention, Dr. Nam, to Tab E3, which is DTX-1133A.  Can you explain what is shown on DTX-1133A?

A.   Okay.  This is also Enplas -- a photograph of Enplas lenses showing marking of EN and model number of 9853A.

Q.   Thank you, Dr. Nam.  On to the last one.

Would you please take a look at Tab F1, which is DTX-1107?

A.   Okay.

Q.   Do you recognize that?

A.   Yes, I do.

Q.   What is it?

A.   This is a receipt of RCA television purchased from Fry's Electronics.

Q.   Is that a true and accurate copy of the receipt for the

RCA television purchased from Fry's?

A.    Yes, it is.

Q.    Would you please take a look now at Tab F2, which is DTX-1101, and F3, which is DTX-1102, and tell me whether you recognize those?

A.    (Witness examines documents.)  This is a photograph of a RCA television and the light bar inside of the TV.

Q.    Do those photographs fairly and accurately represent the RCA television and light bar that were analyzed by SSC?

A.    Right.

Q.    Can you explain any relationship between the receipt DTX-1107 and the photographs?

A.    If you go to the DTX-1101, page 5, you can see the model number starting from LED.

Q.    Are the model numbers on DTX-1107 and DTX-1101 at 5 the same or different?

A.    The same.

        MR. SANDERS:  Your Honor, we move for the admission of DTX-1107, 1101, and 1102.

        MR. LABGOLD:  I'm trying to find them in the book.  I don't think I have them.  Can I just --

                    (Pause in proceedings.)

        MR. LABGOLD:  No objection.

        THE WITNESS:  You can see the model number under photograph LED32B.

THE COURT:  Exhibits 1101, 1102, and 1107 are admitted.  You may show them.

(Defense Exhibits 1101, 1102, and 1107 received in evidence)

MR. SANDERS:  Thank you, Your Honor.

Q.   Now that we can show them to the jury, can you explain the match-up between the photographs and the receipt?

A.   You can see the model number on the receipt and the photograph of the model number of the LED32B30RQ.

Q.   Thank you.

I'd like to direct your attention now to Tab F3, which is DTX-1102, and can you explain what's shown on the first page there?

A.   This is a photograph of Enplas lenses showing marking of EN.

Q.   And I'd like to direct your attention to DTX-1102 at 3, and can you explain what is shown there?

A.   This is another photograph of the model number of Enplas lens showing 4922.

Q.   Thank you, Dr. Nam, for your assistance with the exhibits. We're thankfully done and can move on to a new topic.

In what brand of television did Seoul Semiconductor first find Enplas lenses in a television purchased in the United States?

A.   We found Enplas lenses from the Samsung television

purchased from Best Buy.

Q.    What did Seoul Semiconductor do when it found out about that?

A.    We sent a letter to light bar manufacturer, actually the Lumens in Korea, and also we sent another letter to Best Buy.

Q.    Can you explain, what is the relationship between Lumens and Samsung, if any?

A.    Lumens is one of the light bar supplier to Samsung.

Q.    And do you have any understanding of a relationship between Lumens and Enplas?

A.    Enplas is a lens supplier to Lumens.

Q.    What was the time frame when Seoul Semiconductor sent this letter?

A.    We sent the letter to Lumens in 2012, and we sent another letter to Best Buy in 2013.

Q.    Why didn't Seoul Semiconductor write directly to EDD?

A.    Actually, we sent another one to EDD, directly to EDD, in October after we sent the letter to Best Buy.

Q.    Why did Seoul Semiconductor first write to Lumens rather than writing to EDD directly?

A.    EDD is the lens supplier and Lumens is a light bar supplier, so -- and Lumens is our competitor, and Enplas is not our competitor so we wanted to send the first letter to Lumens instead of EDD.

Q.    Did Seoul Semiconductor receive any response from Lumens?

A.   No, we did not receive any.

Q.   And why did Seoul Semiconductor have these letters sent?

A.   SSC, we respect IP and also since we respect the IP, we want Lumens and Best Buy, Enplas, respect IP.  So we want them notify our IP position.  As I said, our, I think '554 and '209 are original patent to make direct-type TV.

Q.   Just to be clear, because there are a few Enplas entities, did Seoul Semiconductor send any letter directly to EDD?

A.   Yes, we did.

Q.   When was that?

A.   October 2013.

Q.   Were there any patents identified in that letter?

A.   Yeah.  We mentioned the '209 and '554.

Q.   Did you have any conversations with anyone at EDD relating to the subject matter of the letter?

A.   After we sent the letter to EDD, I talked to one of the sales manager, Murano-san, about this situation.  As I told you, the Enplas is not our competitor.  There is another -- Lumens is -- Lumens are light bar manufacturer, our competitor. EDD is not our competition -- competitor.  So I told Murano-san, this is just a letter so we want EDD know our IP position.  So we don't want them to be upset.

Q.   How did Mr. Murano respond?

A.   He didn't say anything at the time; but when he went back to Japan and after we sent the letter to EDD, then they stopped

the whole supply of lenses in one week after we sent the letter.

Q.   How did EDD's stopping supply of lenses within a week affect Seoul Semiconductor?

A.   This is a shooting pick because EDD was only one supplier, and we couldn't do anything without lens.  The light bar business is 30 percent of our revenue.  It's about 300 million U.S. dollars per year.  So we were so worried about the loss of this kind of revenue.

So I was actually surprised about this EDD direction because it's too short time frame.  They can -- I think they can stop supply, but they have to give us some time frame, like a six months' time frame, something like that, to back up. This is six-month time frame is usual in -- maybe in business, but they cannot stop whole supply in one week.

Q.   At that time did Seoul Semiconductor have any other suppliers for the lenses?

A.   No, we didn't have any.

Q.   How did EDD's stopping supply within a week affect Seoul Semiconductor's relationships with customers?

A.   We had a lot of complaint from our supplier.  Since EDD stop supplying all lenses to Seoul Semi, we stopped our production line.  And then we visited EDD over and over again, and then they actually restarted the supply but a small amount of lenses.

And we -- then they stopped again, and then they asked Seoul Semi for some advanced payment and doubled price, 2.3 times higher price than normal.

And we had this kind of a situation, and we could not support our customer like Samsung and LG and also Toshiba and also HiSense.  We have worldwide customer in TV, and we couldn't supply enough to our customer.  Even -- even though they raised the price by 2.3 times higher, we couldn't get enough lenses from them.  So we had a very serious time in 2013.

Q.   All right.  Did EDD take any other action against SSC?

A.   Yes, they did.  After stopping this whole supplier -- whole supply of the lenses, they raised the litigation in the U.S., this case.

And this case, we didn't -- Seoul Semi did not start litigation in U.S. because litigation costly -- cost a lot, and we don't like litigation.  So we -- I don't know how EDD did this one like this.  Anyway, they raised the litigation so we needed a counterclaim.

Q.   So was this the reaction that you expected, Dr. Nam?

A.   No.  This is totally unexpected because this is not personal matter.  This is company-to-company matter.

Q.   All right.  And was Seoul Semiconductor's business harmed?

A.   Yes, it is.  As I said, this light bar business in TV is about 30 percent of our revenue, 300 U.S. -- 300 million U.S.

dollar per year. So we almost lost this revenue, and we had a very hard time to recover the business. And we -- in 2013, we lost some of our business.

MR. SANDERS: Thanks very much, Dr. Nam.

THE WITNESS: Thank you.

THE COURT: Examination by EDD.

MR. LABGOLD: Thank you, Your Honor.

### CROSS-EXAMINATION

BY MR. LABGOLD:

Q. Good morning, Dr. Nam.

A. Good morning.

Q. Let's start and go backwards. So didn't EDD ask SSC to withdraw its warning letter?

A. Yes, they did ask to withdraw -- withdraw this letter.

Q. And didn't SSC refuse to do so?

A. Yes, we did.

Q. Now, with regard to the supply situation, did you have a supply agreement with EDD?

A. As long as I remember, we do have some supply agreement.

Q. You could?

A. We have.

Q. So --

A. I don't remember. Actually, I'm not purchasing guy. But I don't know why you are asking, but this is the supply -- the supplier and customer, so we could have a supply agreement. I

don't -- I don't know.

Q.   It was purchase order to purchase order; correct?  You'd issue a purchase order?

A.   Okay.

Q.   Enplas would -- EDD would manufacture?

A.   Uh-huh.

Q.   They would ship and then they would invoice; correct?

A.   Right.

Q.   There was no formal supply agreement; correct?

A.   I think so.  I think so.

Q.   But you didn't sue for breach of contract; correct?

A.   No, I did not walk away from this contract.

Q.   With regard to the damage which occurred, the damage you're saying is the business was harmed because you couldn't supply your customers; correct?

A.   Right.

Q.   Now, you said that you didn't want EDD to be upset?

A.   Right.

Q.   So when you found out, as you say, in 2012 that there was an EDD lens in a Lumens product --

A.   Right.

Q.   -- so why didn't you just call up your friends at EDD and say, "What's going on?"

A.   We -- actually, our member noticed our IP to EDD several times, as long as I remember, and they noticed IP status to

EDD.

And I don't know your question, why we have to send a letter to EDD.  Lumens is our competitor so we want them know -- we want to talk to Lumens first.

Q.   So you'd rather talk with your competitor first rather than the party which you are supposedly having a cooperative relationship with?

A.   We already talked to them, so...

Q.   Well, no.  Isn't it a -- didn't you testify that you contacted Lumens in 2012?

A.   You mean letter?

Q.   Yes.

A.   So we sent a letter to Lumens.  So I don't know.  I don't see any problem.

Q.   In 2012, you sent a letter to Lumens; correct?

A.   Right.

Q.   Then first in 2013 you sent a letter to Best Buy; correct?

A.   Right.

Q.   And that's because supposedly you found a television that had an EDD lens in it; correct?

A.   Right.

Q.   And I'm asking, why would you contact Lumens and Best Buy first and not simply ask EDD?

A.   That's not my decision.  The IP Department is independent from me.

Q.   Well, you seem to be pretty well aware of all of the details.  So you don't know, is that your answer?

A.   I -- I don't see why we have to contact with EDD first.

Q.   Now, when you did finally contact EDD, it was by a letter; correct?

A.   So the timing of contact to EDD, you are saying is a letter to EDD?

Q.   Yes.

A.   No.  We had some work -- some work from July, not October. So we -- I talked to -- we had some cooperation from July in 2013, and we were willing to work with EDD from July.  So we had some work with EDD.

Q.   Let me hand you up a binder.

        MR. LABGOLD:  If I may, Your Honor.

        THE COURT:  You may.

BY MR. LABGOLD:

Q.   This is the first one here.  If you could turn to PX-142.

A.   (Witness examines document.)

Q.   Dr. Nam, do you recognize PX-142?

A.   Yes, I do.

Q.   And is that something that you are familiar with prior to this today?

A.   Yes, I am.

        MR. LABGOLD:  I'd like to move the admission of Plaintiff's Exhibit 142.

MR. SANDERS:  Your Honor, we have an objection to the attachment.  This pertains to Your Honor's order.

MR. LABGOLD:  There's no objection pretrial to any of this exhibit, Your Honor, even after the supplemental.

THE COURT:  The objection is overruled, and I'll consider later instructing the jury about what to do with the exhibit.

(Plaintiffs' Exhibit 142 received in evidence)

MR. LABGOLD:  Thank you, Your Honor.

Q.   If we could bring up 142.

Do you recognize this as a letter sent in October of 2013 to EDD?

A.   Right.

Q.   And this is after you had already contacted Lumens and Best Buy; correct?

A.   Right.

Q.   And in this letter, this is the first time you provided notice to EDD about Lumens and Best Buy; correct?

A.   Right.

Q.   And in the letter, if you go to the second page, did you understand that your attorneys were writing -- your U.S. Attorneys; correct?  These are your attorneys in the United States?

A.   Right.

Q.   They were sending a letter --

A.    Right.

Q.    -- to EDD and saying that if SS -- if EDD does not stop selling its products to other companies, SSC is going to sue them for infringement in the United States; correct?

A.    (Witness examines document.)  Yes.  This is a formal letter of the -- from our attorney.

Q.    And you said that you would -- if they did not cease and desist, SSC was going to sue them in Federal District Court. Do you understand what that is?

A.    Yes.

Q.    That's where we're standing; correct?

A.    This is -- okay.  This is a formal letter.  So in letter if you don't say anything, then why you send letter to EDD?

Q.    You understand that we're standing in a Federal District Court?

A.    Yes.

Q.    That's where we are; correct?

A.    Right.

Q.    And also you threatened to bring action in the International Trade Commission.  Do you see that?

A.    Yes.

Q.    And you understand what the ITC is; correct?

A.    Yes, I do.

Q.    And you bring actions in the ITC to stop companies from importing any products that are covered by your patents?

A.   For this case, no.

Q.   But that's what the ITC --

A.   Right.  Right.

Q.   You have familiarity?

A.   Yeah, I'm familiar.

Q.   So your attorneys didn't send this without SSC's authorization; correct?

A.   I think we discussed, but I'm not -- again, I'm not legal person.  So I -- our attorney talked to our IP Department.

Q.   But you were dealing directly with EDD; correct?

A.   In which sense?

Q.   You had direct meetings with EDD in the summer of --

A.   Uh-huh.

Q.   -- 2013; correct?

A.   R&D meeting.

Q.   Right.  And you never brought up this Lumens issue; correct?

A.   Lumens issue... I think, no.

Q.   Do you recall at that time you were meeting concerning a new project you were interested in joining into with EDD?

A.   Right.

Q.   That being the summertime?

A.   Uh-huh.

Q.   Now, so this is after you found out that EDD is, in your view, selling products to Lumens --

A.    Uh-huh.

Q.    -- and other companies --

A.    Uh-huh.

Q.    -- to your competitors?

A.    Uh-huh.

Q.    And now you want to enter into a new project; correct?

A.    Right.

Q.    And that new project is a development about an entirely new type of lens; right?

A.    Right.

Q.    It was a TIR-based lens; correct?

A.    I don't say TIR.

Q.    Is that just on principle?

A.    At the time the contour lenses is for the -- you can have 25-millimeter of particular, which means the thickness of TV. So we wanted to decrease the thickness of TV down to 15-millimeter from 25-millimeter, slim type.

Q.    But isn't it correct that as part of that discussion, one of the things that you wanted to do was to use SSC's IP?

A.    Yes, it is.

Q.    And in your discussions with EDD, you wanted to be able to use Enplas' IP and SSC's IP, and have a new product line that would be jointly developed; correct?

A.    No.  We don't have to use the Enplas IP.

Q.    I'm sorry?

**A.**   We don't have to use Enplas/EDD's IP.  We didn't have to.

**Q.**   But isn't it correct that you entered into an agreement -- you tried to enter into an agreement where you would jointly develop this product?

**A.**   Right.

**Q.**   And if any patents issued from that project, that --

**A.**   No, we didn't have any -- we didn't -- what's your question?

**Q.**   If any patents issued from the project that related to lenses, Enplas would get to own them or EDD; correct?

**A.**   Yes.

**Q.**   And if any patents issued relating to the LED, then SSC would own them; correct?

**A.**   Right.

**Q.**   And if any related to a new joint product, then that would be -- the patents would be jointly owned; correct?

**A.**   Right.

**Q.**   So despite the fact that EDD is out selling to your competitors, you're still willing to enter into a new development project with them but not address what you think is a prior issue with these Lumens sales?

**A.**   We -- we -- I talked to one of our board member R&D director, Yokoyama-san, and he's a director -- one director of R&D, and I told him our IP covers the Enplas lenses.

So -- but Enplas is -- I think is almost -- is very good

at manufacturing of lenses.  So we wanted to utilize the manufacturing skill from EDD.  So, honestly, we don't want to use to cooperate for the R&D, but we wanted to use manufacturing.

Manufacturing is useful.  Manufacturing is also very important in business.  Without manufacturing, you cannot produce any product.  So manufacturing, I admit, Enplas is good at manufacturing.  So that's why we wanted to enter to the new agreement.

Q.   Now --

THE COURT:  One moment.  Dr. Nam, you said the name of a director and I didn't catch the name, and if you could say it again and spell it so we get can get a record of it.

THE WITNESS:  I think I remember Yokoyama.  Yokoyama.

THE COURT:  How do you spell that?

THE WITNESS:  Y-O-K-O-Y-A-M-A.

THE COURT:  Thank you.

THE WITNESS:  But not for sure, but Yokoyama.

BY MR. LABGOLD:

Q.   Now, I'd like you to take a look at DTX-1028 in your binder.

A.   10 -- DTX -- which binder?

Q.   It's in the white binder.

A.   This one?

Q.   Yes.  DTX-1028.  It should be towards the back.

**A.**   DTX-1028.

         (Witness examines document.)  Okay.

**Q.**   And can you tell me if you recognize this document?

**A.**   (Witness examines document.)  Yeah, MOU.

**Q.**   And this was an MOU that EDD sent in response to yours; correct?  It's a revised version?

**A.**   Yes.

         **MR. LABGOLD:**  And I'd like to move the admission of DTX-1028.

         **MR. SANDERS:**  No objection.

         **THE COURT:**  1028 is admitted.

         (Defense Exhibit 1028 received in evidence)

         **THE COURT:**  Proceed.

**BY MR. LABGOLD:**

**Q.**   Now, turning to the second page, this is in September of 2013; correct?

**A.**   Right.

**Q.**   Now, this is EDD's response to your initial proposal; correct?

**A.**   (Witness examines document.)  This is not final version of MOU.  We have just one page, so --

**Q.**   This is EDD's response to your initial proposal; correct?

**A.**   I don't remember, but I saw final version of MOU.  I did not check the -- we exchanged several versions with our Strategy Planning Team, but I don't know this is response from

EDD or not.

Q.   If you look at the first page, you see that it's sent from Enplas to Skyview?

A.   Yeah.

Q.   And then Skyview would end up providing it to you?

A.   Right.

Q.   Okay.  So do you recall that one of the changes that EDD made to the initial draft was to clarify that the agreement was related to a new lens based on total internal reflection?

A.   But after this -- we received this one, we replaced the revised draft.  So we did not admit this draft.  So we did not say "total reflection."

Q.   Can you turn to page 2 and in the "whereas" clause and the "therefore," and pull it all up together, please?  A little bit more there.  Thank you.

     So you see where it starts off that "EDD is engaged in the business of design, development, manufacturing, marketing, and selling lenses and other optical devices"?

A.   So I did not see this document.  I saw final version of MOU, but I don't know why you put this draft revised by EDD.

Q.   So you have no recollection of the fact that EDD sent a revision clarifying that the MOU, that the project --

A.   I do not recall this total device version.

Q.   Now, you stated that SSC respects IP and you wanted others to respect your IP; correct?

A.   Right.

Q.   And so that's why you contacted Lumens and Best Buy; correct?

A.   Right.

Q.   And so you didn't sue Lumens or Best Buy; correct?

A.   Right.

Q.   If they were disrespecting your IP, why not?

A.   Did we sue EDD?

Q.   What?

A.   Did we sue EDD?

Q.   Did you?

A.   Did we sue EDD?  We didn't sue EDD because EDD is our supplier.

Q.   No.  Why didn't you sue Lumens?

A.   Why we have to sue Lumens and Best Buy?

Q.   Because they're your competitor and they're using what you thought was your intellectual property?

A.   We sent -- we sent -- the reason we want to send a letter to the customer or supplier, we want to talk.  We want to talk about licensing first.  Without talking licensing first, how can you sue directly?

Q.   Did Lumens take a license?

A.   We are -- we are still talking, but -- so --

Q.   Three years later you're still talking, yes?

A.   This business is very complex, so if we sue Best Buy -- we

don't -- anyway, we didn't sue EDD.

Q.   Now, with regard to the product that you isolated, it was a Samsung TV I believe you testified?

A.   Uh-huh.  Uh-huh.

Q.   And there's no Samsung TV accused in this case; correct?

A.   I think so.

Q.   Now, we went through the receipts, and it sounds like you had a very meticulous way of selecting them, purchasing them, and analyzing them; correct?

A.   Right.  Right.

Q.   So what criteria did you use to tell others to go purchase the TVs?

A.   What's your question again?  Can you --

Q.   Did you randomly purchase TVs, or was there some criteria they were supposed to follow?

A.   We don't -- we don't have a criteria for -- we purchased the product regarding our IP or technology.  So if there is a direct-type TV, we purchased randomly.

Q.   Okay.  And before you purchased them, then, you had no idea what lens was in them; correct?

A.   No, no idea.

Q.   Okay.  And that included finding out that one of the TVs included the 9845 lens that you sell; correct?

A.   Right.

Q.   So beforehand, SSC didn't even know that it was buying a

TV that included a product that it actually sold; correct?

A.    We don't know what's inside.

Q.    Now, once you purchased those TVs, they were analyzed here in the United States?

A.    We -- no.  In Korea.

Q.    So they were shipped to Korea?

A.    Right.

Q.    And then you opened the TV?

A.    Right.

Q.    And you saw what was inside?

A.    Right.

Q.    And then all of the TVs that you purchased, did they all have Enplas lenses?

A.    In 2013.  There is some, I think, on other manufacturers.

Q.    Do you know how many different manufacturers?

A.    I don't remember, but the majority is Enplas.  Because as I told you, Enplas is the only supplier, but there is some -- some portion of, I think, Chinese lenses.

Q.    You said it was your only supplier; correct?

A.    Enplas was only one supplier to SSC.

Q.    Now, does Epistar make LEDs for TVs?

A.    For TV means direct-type or --

Q.    Direct-type.

A.    In TV there is direct-type and edge-type.

Q.    Direct-type.

**A.**   Epistar, I don't think so.  I don't know exactly, but I don't think so.

**Q.**   But you're not sure?  You can't confirm or deny?

**A.**   I have not seen Epistar's product.  I cannot confirm because some of the -- like AU -- I don't know.  I can't say that.  The AUT or Everite -- Everite is making direct-type TV. They purchased chip from Epistar.

**Q.**   Now, when you received them, you took -- isolated the light bars, and then we saw you looked at the lenses; correct?

**A.**   Right.

**Q.**   And you carefully made sure that each one of them, as you showed us, had an Enplas logo; correct?

**A.**   Right.

**Q.**   And then what did you do with them?

**A.**   What do you mean?

**Q.**   What was next?

**A.**   What's next?  We talked to -- this is -- we randomly purchased the product, and we transferred those kind of document to IP Team.

**Q.**   Okay.  And then what did they do with them?

**A.**   I don't know the next because IP Team is, again, independent organization from R&D.

**Q.**   So were there any of the Enplas -- were any of the lenses that you saw that didn't have an Enplas logo?

**A.**   For the Enplas -- among Enplas lenses?

**Q.** Yeah.

**A.** I don't think so. I have not seen anything.

**Q.** So who else other than you was making -- was doing tear-downs of TVs?

**A.** Except for SSC, or what do you mean?

**Q.** Who else other than you, unless I misunderstood, I believe --

**A.** I did not do it. The Analysis Team did the analysis.

**Q.** But I thought you supervised it?

**A.** Yes, I supervised.

**Q.** Okay. So who -- is there any other team other than the team that you supervise that's doing tear-downs?

**A.** Only the Analysis Team and I think IP Team.

**Q.** And were there any of the TVs that were torn down that you didn't supervise?

**A.** I don't supervise everything, so I don't supervise a hundred percent, but it's regular process purchase product and we do the analysis. It's a regular process. But once we find out some infringement of our IP, then we talk with the IP Team.

**Q.** Okay. So other than you and the analysis group, does anybody else do tear-downs?

**A.** No. I -- no. I don't think so.

**Q.** But isn't it correct that you isolated some lenses that did not have an Enplas logo?

**A.** Actually, I don't know.

Q.   But I thought you went through the meticulous process of making sure that they had an Enplas logo.

A.   Yes, it is.

Q.   So then do you know for a fact that there were some that didn't have an Enplas logo?

A.   I don't know.  I don't know inside of Enplas.  I don't know why you are asking.

Q.   I'm asking you about the lenses that you actually analyzed.

A.   Uh-huh.

Q.   Some of them did not have an Enplas logo; correct?

A.   I -- so your question is Enplas lenses doesn't have some kind of a marking, or --

Q.   The ones that you isolated, weren't some of the lenses that you took out of a TV off the light bars, there was some of them that did not have an Enplas logo; correct?

A.   Right, but we thought it was like tiny lenses, as I said.

Q.   But you accused one of those of infringing; right?

        MR. SANDERS:  Objection, Your Honor.

        THE COURT:  Overruled.  But if you can -- I couldn't hear your question exactly.  Can you rephrase it?

        MR. LABGOLD:  I'm sorry.

Q.   But one of those -- after you isolated a lens that you thought was infringing, you sent it to the IP group; correct?

A.   Yes.

Q.   What did they do with it?

A.   I don't know.  IP Team is independent, so --

Q.   So one of the lenses that you sent as identified as an EDD lens, in fact, had no Enplas logo; correct?

A.   That's not I think Enplas lenses, and we had -- I think -- I don't know.  You know some history.  We -- we accused one of TV product in U.S., which is Kurtis, K-U-R-T-I-S.  In those kind of TV, they didn't have an Enplas logo.

Q.   Now, if you could please turn to DTX-1092?  That will be in the black binder.

A.   DTX-10 -- ah, black.  (Witness examines document.)

Q.   And this is the collection of receipts.

A.   (Witness examines document.)  You mean the B8?

Q.   Oh.  I'm sorry.  B8, that's correct.

A.   Yeah.

Q.   Now, on the first page of this, DTX-1092, if we can pull that up, this is a receipt for the Sharp TV; correct?

A.   Right.

Q.   And you can just confirm for yourself that is -- that's one of the TVs that you analyzed; correct?

A.   (Witness examines document.)  Just a second.  Let me check.

Q.   It's the Es.

A.   E.  (Witness examines documents.)

Q.   Do you see that?

**A.**   Yep.

**Q.**   So the first page of DTX-1092, that we've got pulled up here, is actually the receipt which you identified.  DTX-1085, it's a copy of it?  That's for the Sharp TV; correct?

**A.**   Right.

**Q.**   And you identified that this was the receipt because it had the model number of the Sharp TV; correct?

**A.**   Uh-huh.

**Q.**   Now, if we can refer to in DTX-1092, page 18, that we'll pull up side by side.

And this was the LG receipt.  Do you see that?

**A.**   Yes.

**Q.**   Now, below the LG receipt, you'll see that there's another reference there to a Sharp TV; correct?

**A.**   Right.

**Q.**   And you'll see that that's the exact same model number in the other receipt, LC32E450U; correct?

**A.**   Right.

**Q.**   So are you sure that the one that you analyzed was the one in the receipt that is DTX-1085?

**A.**   I'm pretty sure.  When we received the receipt together with the product, we keep the product with the receipt so we can -- I think we have -- we keep the product in our storage area.  We can provide the real product to you.

**Q.**   So where's the -- what did -- what did you do with the

other Sharp TV, the one that's reflected on the receipt 1092-18 that you bought online from Amazon with the LG?  Are you sure that's not the one?

A.    (Witness examines documents.)  No.  We keep the receipt with the product, so I'm pretty sure this receipt is the real product in our storage unit.  We can provide a visit and we'll produce to you.

Q.    You're pretty sure.  What did you do with the other TV, the one that came from Amazon?

A.    I think we have -- we keep that product also in storage unit.

Q.    But that didn't have Enplas lenses?

A.    I don't -- I'm not sure.

         MR. LABGOLD:  I have no further questions, Your Honor.

         THE COURT:  Thank you.

    Ladies and gentlemen, we're going to take a ten-minute break now.  If during that period, you have any questions for the witness, you may pose them, but you're not required to.

    I will give SSC a further opportunity for examination after the break.

    Back in ten minutes.

                    (Recess taken at 10:40 a.m.)

                 (Proceedings resumed at 10:48 a.m.)

         (Proceedings were heard out of presence of the jury:)

         THE COURT:  You may be seated.

There are no questions from the jury for Dr. Nam, so we will resume in a moment with the further examination by SSC if SSC further wishes to further examine Dr. Nam.

MR. SANDERS: Yes, Your Honor, we have a brief --

THE COURT: All right. Before the jury comes back, SSC did file docket 429 while we were in examination of their witness, a motion in limine to preclude EDD from commenting on SSC's expert invoking privilege, and there have been other motions, objections filed during the trial.

The motion is denied for lack of good cause, and because both parties have by now exceeded the page limitations on motions in limine set by the Court at pretrial, and to deter further motions from being filed at the same time because there's only one judge and one trial, there will be no more motions in limine filed without leave of Court before they're.

Filed by any party.

Let's call in the jury.

(Proceedings were heard in the presence of the jury:)

THE COURT: All right. Our jurors have returned. You may be seated.

Mr. Sanders, you may have a second go at examination of Dr. Nam.

MR. SANDERS: Thank you, Your Honor.

///

### REDIRECT EXAMINATION

**BY MR. SANDERS:**

**Q.**   Dr. Nam, when SSC was sending the initial letters to Lumens and Best Buy, did SSC have any concerns about sending a letter directly to EDD?

**A.**   Yes, we did have some concerns about sending letter directly to EDD, because EDD is only one supplier of lenses, and they -- we think -- we thought they could stop supplying of lenses, so we are afraid of sending letter to EDD.  But we expected like some of grace period, like six months or maybe one year to pick up.

**Q.**   And what happened when SSC did in fact send a letter to EDD?

**A.**   When we -- one week later, after we sent the letter to EDD, they stopped supplying all lenses to SSC in just one week, so one week is too short time frame.

**Q.**   Had SSC raised the patent issues to EDD prior to sending the letter to EDD?

**A.**   So what do you mean by your -- can you repeat your question?

**Q.**   Sure.  Had SSC told EDD about the patent issues before sending the letter to EDD?

**A.**   Yeah, I explained our '554 patent to Yokoyama-san one time in Japan.

**Q.**   Now, on cross-examination, counsel brought up that EDD

asked for withdrawal of the warning letters.

Did EDD offer to pay for the withdrawal of the warning letters, a license for the patents?

A.   No, just with the withdrawal letter, and then they didn't talk about licensing and royalty.

Q.   And I'd like to direct you back to an exhibit that you were asked about on cross-examination.  That's PX-142, that's in your white binder, and specifically to the page you were asked about, which is page 2 of the exhibit.

A.   Just a second.  Could you tell me PX --

Q.   PX-142.  Certainly.  And we have it on the screen for you, sir.

A.   Okay.  Okay.  I can see.

Q.   And do you see there -- I'd like to focus you on the first two sentences of the paragraph.

A.   Yes.

Q.   And do you see there it states:

       "SSC would prefer to reach an amicable resolution of
       this matter with Enplas if possible."

A.   Yes, I do see.

Q.   Do you have an understanding of that?

A.   Yeah, the -- as I said, EDD was only one supplier.  We wanted to talk about licensing of our IP.  So IP is very important, so we have -- since SSC has original patent, so we were willing to talk about licensing.

Q.   And the sentence continues to talk about SSC's licensing program; do you see that?

A.   Yes.

Q.   Do you have an understanding of what that is?

A.   Yes, I do.

Q.   Can you explain, please?

A.   Licensing program, let's say you have an ordinary IP, then you can actually litigation by -- actually, you can't sue anyone without talking about licensing.  So litigation cost is much more higher than talking about licensing.

Licensing program is -- we have a -- some licensing program of our IP.  We own the 4,000 patents in our product.

Q.   Did EDD ever talk with you about reaching an amicable resolution for taking a licensing to the '554 or '209 patents?

A.   No, they never.

MR. SANDERS:  Thank you, Dr. Nam.

THE COURT:  Any further examination by EDD?

MR. LABGOLD:  Thank you, Your Honor.

**RECROSS-EXAMINATION**

BY MR. LABGOLD:

Q.   Now, with regard to the sole source of lenses, that was SSC's choice; correct?

A.   Yes.

Q.   You could have gone and got another source of lenses --

A.   Right.

Q.   -- if you wanted to; correct?

A.   Um-hm.

Q.   And it was a $230-million business that you were talking about?

A.   300.

Q.   300.  And SSC consciously just made the decision to go with one source?

A.   Um-hm.

Q.   Now.  With no supply agreement?

A.   We -- I think one time we supply agreement to EDD.

Q.   There is no supply agreement; right?

A.   They denied.  They denied.

Q.   Is there a supply agreement or not?

A.   I guess no.

Q.   Now, you say that just one week EDD cut you off?

A.   Right.

Q.   They continued to sell until June 2014; correct?

A.   Right.

Q.   So October, November, December, January, February, March, April, May, June, I believe you said that you expected six months to a year before you'd get cut off; correct?

A.   Um-hm.

Q.   And so that's what actually happened; correct?

A.   No.  We sent a letter to EDD on I think October 16th, and they cut off the supply on 21, and they restarted supply in I

think, I don't know how long.  But they started in -- after 13 they started suppling lenses, and then they start okay, and we pay the 25 times higher price, and also authorized the payment before receiving lenses from EDD.  Then this kind of things happened over and over again, so just one week notice --

Q.   Now, when EDD stopped selling lenses to SSC, you closed down this business entirely; correct?

A.   Right.

Q.   You did?

A.   The -- we, I think we did not have -- we did not receive the lens product from EDD, I think from in my memory, maybe March of 2014.

Q.   And so --

A.   Because we developed the new lens solution based on '554 and '209 patent.

Q.   So you didn't get out of the business, you just got a different source; correct?

A.   Yes.  And yeah, you are correct.

Q.   And you said that you explained the '554 patent; correct?

A.   Right.

Q.   To EDD?

A.   Right.

Q.   Prior to sending the letter?

A.   Right.

Q.   And did you actually say EDD's diffusion lenses, such as

9845, are included within the scope of this patent?

A.   Yes.

Q.   You did?  You accused them that -- you really said this?

A.   I explained one of our claim for the '554 to Yokoyama-san, and I made some drawing.

Q.   And did you --

A.   I told -- I told him this kind of our idea '554, and lenses.

Q.   And did you provide that drawing in writing?

A.   I, I made that drawing on the blackboard in Japan.

Q.   Did you save a copy of this?  Did you --

A.   I guess we -- I think we -- they took a picture, Yokoyama-san maybe.  I don't remember, but I explained it.

Q.   Did SSC ever directly send any written notification to EDD of the patents?

A.   Yeah, we sent a letter to EDD in --

Q.   Not from your attorneys, I'm saying SSC directly.

A.   This is the IP letter, so why do you think we have to send a letter to EDD?  This is IP, IP letter, so it's supposed to be done by attorney; right?

Q.   Were you doing business with EDD in the United States?

A.   We are -- we have a supply from EDD in Korea.

Q.   And EDD is located in Japan; correct?

A.   Right.

Q.   And so you didn't see them in Japan?

MR. SANDERS:  Objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  So what do you mean?

BY MR. LABGOLD:

Q.   You didn't -- you didn't sue them or threaten to sue them in Japan; correct?

A.   In Japan?

Q.   Yeah.

A.   We have our -- some patent -- not litigation, so invalidation -- some litigation in Korea and Japan.

Q.   Is there any infringement action in any other country other than in America?

A.   No, this is a U.S. IP, okay.

Q.   But all of your business is taking place between Japan and Korea; correct?

A.   But this is -- you can buy TV from U.S. market, so why you are -- I don't understand why you are asking about.  EDD --

Q.   Can you not answer my question?

All of your business has been between Japan and Korea; correct?

A.   Our business is in U.S. too, because the -- you see, everybody can understand our product is going from Korea to U.S., so customer -- customers knows and also supplier knows that the product is going to U.S.  You see --

Q.   Did you, your business -- do you not understand the

question?  All of your business with EDD took place between Japan and Korea; correct?

A.    But we send the product -- yes.

Q.    Yes or no?  Did you do any business with EDD in the United States?

A.    Not directly, but indirectly we sell the product TV to U.S. market.

Q.    Is there a reason why you can't say that all of your business was between EDD in Japan and SSC in Korea?  That's where it happened; correct?

A.    Right.

        MR. LABGOLD:  No further questions.

        THE COURT:  Any further examination from SSC?

        MR. SANDERS:  No, your Honor.

        THE COURT:  Dr. Nam, you may step down.  Thank you very much.

    And if SSC will call its next witness.

        MR. GOTTS:  Your Honor, at this point we have discovery readings, depositions, and the like.

        THE COURT:  All right.

        MR. GOTTS:  We do have an issue with one of the exhibits, or two exhibits, where they include these other products we talked about.  We don't object to the exhibits, but for the same comment before with regard to how they might be used, we might request, Your Honor, that we could deal with

that at the appropriate time.

THE COURT:  Let's deal with that at a break.

MR. LABGOLD:  Thank you, Your Honor.

THE COURT:  And are you prepared with the -- to deal with the information in the format that you want to?  And maybe if you could give an introduction to the jury as to an overview of what you're going to be telling them.

MR. GOTTS:  Your Honor, Ms. Woodhouse and Mr. Hyde will do the readings of the depositions and various discovery responses, and I'll ask Ms. Woodhouse to do the introduction of the witnesses as they are read.

THE COURT:  Very well.  And ladies and gentlemen, as a reminder at the beginning of the preliminary instructions, I introduced the idea of depositions, and those are out-of-court questions and answers under oath which you can consider along with all the other evidence in the case when you render your verdict.  But there's other types of discovery responses, interrogatories, which are questions under oath which are answered by the other party, also Requests for Admissions, which you ask the other party to admit if a fact is true or not - those are all types of evidence that you can consider, along with all other evidence you've heard in court when you render your verdict.

MS. WOODHOUSE:  Your Honor, as a housekeeping matter there are certain exhibits that are going to come in with the

read-ins.  In order for them to be published to the jury, I'd like to preadmit them now.

THE COURT:  Why don't you identify them for me, please.

MS. WOODHOUSE:  DTX-1001, which has already been admitted, DTX-1004, which has also already been admitted. DTX-1106, DTX-1023, which is one of the exhibits that Mr. Gotts just mentioned, DTX-1036, DTX-1037, DTX-1070, DTX-1080, DTX-1111, PX-135, and PX-286, which is the other exhibit that Mr. Gotts just mentioned.  And with the Court's permission, if we could have those entered?

THE COURT:  Any objection?

MR. LABGOLD:  Subject to the other issue, I don't think we have any objection.

THE COURT:  All right.  Subject to further discussion and conversation, 1001 and 1004 are already in evidence, 1106, 1023, 1036, 1037, 1070, 1080, 1111, and PX-135 and 286 are admitted and may be shown to the jury.

MS. WOODHOUSE:  Thank you, Your Honor.

(Defendants' Exhibits 1106, 1023, 1036, 1037, 1070, 1080, 1111 received in evidence)

(Plaintiff's Exhibits 135, 286 received in evidence)

MS. WOODHOUSE:  For the read-ins, do you want me to take the witness --

THE COURT:  You may.

**MS. WOODHOUSE:** Okay.

**THE COURT:** And both, if you'll speak into the microphone, that will assist the jury's understanding, and the creation of a good record.

And a reminder for the jury, this is a reread, so the emphasis that the question and answer are given are not part of your understanding of what's being said.

**MS. WOODHOUSE:** Thank you, Your Honor.

With that being said, the first read-in is the deposition of Kayoko Watai. Ms. Watai was EDD's 30(b)(6) witness, a corporate representative, and she is -- she handles intellectual property at the Intellectual Property Department at Enplas Display Device.

**THE COURT:** And if you don't mind telling the jury what a 30(b)(6) witness is, because that might not be terminology that they're familiar with.

**MS. WOODHOUSE:** I apologize for that.

A 30(b)(6) witness is a corporate representative. Because the corporation itself cannot provide testimony, the corporation designates one of its employees to provide testimony on behalf of the corporation.

I will be reading on behalf of Ms. Watai, and Mr. Hyde will be doing the questions.

**KAYOKO WATAI,**

called as a witness for the Defendant, having been duly sworn,

was examined and testified through **DEPOSITION TESTIMONY** as

follows:

(As read by Mr. Hyde:)

**BY MR. OWENS:**

Q.   Good morning.  Could you please state your full name for
the record?

(As read by Ms. Woodhouse:)

A.   Yes.  My name is Kayoko Watai.

Q.   And who are you employed by?

A.   Enplas Corporation.

Q.   And what is your position at Enplas Corporation?

A.   I handle intellectual property at Intellectual Property
Department.

Q.   Do you handle intellectual property for Enplas Display
Device?

A.   I also handle intellectual property of EDD.

Q.   What is your job title?

A.   I am a specialist.

Q.   Do you have a legal background?

A.   I simply have been handling intellectual property matters
through my work about ten years.

Q.   Did you graduate from university?

A.   Yes.

**Q.** What was your degree?

**A.** Science.  Chemistry.

**Q.** Chemistry?

**A.** Science was the wrong interpretation.  Chemistry.

**Q.** And when did you graduate from university?

**A.** 1992.

**Q.** And when did you start at Enplas Corporation?

**A.** The same year, 1992.

**Q.** Before you were a specialist, did you have another position at Enplas?

**A.** You're talking about the title?

**Q.** Sure, title.

**A.** Before I became a specialist, I was simply staff handling intellectual property matters.  I'm sorry.  Let me restate.

I have been a specialist within the IP department for last several years.  Before that, I was working at the engineering department as a manager, and my level of position was kept the same.  In other words, I slid as a manager level when I was transferred to intellectual property department.  I'm sorry. It's a little complicated to explain.

**Q.** Uh-huh.  When you were a manager in the engineering department, what products were you responsible for?

**A.** At that time I was responsible for light-guiding plate for backlighting -- light -- light-guiding plate used for notebook personal computer.

MR. LABGOLD:  Your Honor, if I could, just one point of clarification.  It might help that the jury understand that this was a deposition through interpretation.  And so to the extent that the transcript is a little rough, that's part of what the issue is.

THE COURT:  I think there's no dispute about that.  It was through, as you've seen here in court, through a translator.

MR. LABGOLD:  Thank you, Your Honor.

THE COURT:  Proceed.

(As read by Mr. Hyde:)

BY MR. OWENS:

Q.   And when did you move from the engineering department to the IP Department?

A.   That was 2004.

Q.   You're aware of the '554 patent at issue in this litigation; is that correct?

A.   Yes.

Q.   When did you first become aware of the '554 patent?

A.   That was September 30th of 2010.

Q.   Is that when you personally became aware of the '554 patent?

A.   Yes.

Q.   How did you personally become aware of the '554 patent?

A.   I learned about it via telephone conversation.

Q.    With who?

A.    Mr. Murano.

Q.    Okay.  And how did Mr. Murano learn about the '554 patent?

A.    He heard about it during the discussion with SSC during his business trip.

Q.    And who at SSC told Mr. Murano about the '554 patent?

A.    That was Mr. Lee of SSC who -- who is -- who was the vice-president.

Q.    And what did Mr. Lee say about the '554 patent?

A.    The fact that SSC owns the patent '554.

Q.    So the only thing that Mr. Murano told you that Mr. Lee said was that SSC owns the '554 patent; is that correct?

A.    Yes.

Q.    So I'm going to mark as Defendant's Exhibit 23 a document with the title U.S. -- United States Patent, Patent Number U.S. 6,473,554 B1.

      And I'm going to mark as Exhibit 24 a document entitled United States Patent, Patent Number 6,007,209.

      Ms. Watai, do you recognize Exhibit 23?

A.    Yes.

Q.    And what is Exhibit 23?

A.    This is U.S. Patent Number 6,473,554.

Q.    Is this the patent we were discussing earlier when we referred to the '554 patent?

A.    Yes.

Q.   Ms. Watai, do you recognize Exhibit 24?

A.   Yes.

Q.   And when did EDD first learn of the -- well, let's back up.

     What is Exhibit 24?

A.   That is the U.S. Patent Number 6,007,209.

Q.   And for convenience, if I refer to this patent as the '209 Patent, would you understand that?

A.   Yes.

Q.   And when did EDD first become aware of the '209 Patent?

A.   Since your question asked about EDD's knowledge and establishment of the company was April 2nd of 2014.

Q.   12?

A.   2012.  So the time or timing would be -- would be after that establishment.

Q.   When did Enplas Corporation first become aware of the '209 patent?

A.   That was October of 2013.

Q.   And when did EDD first learn of or first become aware of the '209 patent?

A.   The same time, I think.

Q.   Who at EDD first learned of the existence of the '209 patent?

A.   Mr. Kutsuzawa.  Correction.  Mr. Murano.

Q.   How did Mr. Murano first learn of the existence of the

'209 Patent?

A.   When the notice of SSC's attorney was received.

Q.   Who first received that notice at EDD?

A.   That would be Mr. Kutsuzawa who received that first within EDD.

Q.   And then he told Mr. Murano about the patent?

A.   Earlier I mentioned Mr. Murano's name.  Mr. Kutsuzawa was the first one who received it, and in turn Mr. Kutsuzawa conveyed that to IP, Intellectual Property Department.

Q.   So when did Mr. Murano become involved?

A.   About the same time when Intellectual Property received that communication.

Q.   So Mr. Kutsuzawa provided the notice letter to you and Mr. Ohnuki?

A.   He provided that to Mr. Ohnuki.

Q.   And what did Mr. Ohnuki do after receiving the notice letter?

A.   He showed me that notice as well.

Q.   Did you do anything to investigate the '209 Patent after receiving the notice letter?

A.   I don't recall.

Q.   Did you spend any time analyzing the '209 Patent after receiving the notice letter?

A.   Yes.

Q.   Did EDD ever obtain an opinion of counsel on validity of

the 555 -- excuse me, the '554 patent separate and apart from this litigation?

A.   No.

Q.   Did EDD ever obtain an opinion of counsel on infringement of '554 patent separate and apart from this litigation?

A.   I don't know.

Q.   Did Enplas Corporation ever obtain an opinion of counsel on infringement of the '554 patent separate and apart from this litigation?

A.   No.

Q.   Did you have an understanding of what an opinion of counsel is?

A.   Yes.

Q.   And what is your understanding of what an opinion of counsel?

A.   This deals with whether or not certain product infringes or not, and also determination regarding patents encompassing all.

Q.   Maybe this would help.

If you gave an opinion on infringement or validity of a patent, would you consider that an opinion of counsel?

A.   Yes.

Q.   Before this litigation, did EDD ever discuss the '554 patent with any of its customers other than SSC?

A.   You're talking about with customers or customer?

Q.    That's what I said.  We'll start with that.

A.    And prior to this litigation?

Q.    Yes.

A.    Then no.

Q.    Is -- if you can turn to Exhibit 25 -- or could you please describe what Exhibit 25 is?

A.    This is material for the purpose of responding for this deposition testimony.

Q.    And as we discussed with Mr. Seto yesterday, does this document contain information that you gathered in preparation for your deposition today?

A.    Yes.

Q.    Sitting here today, are you aware of any other information that you would add to this document?  And to be clear, sitting here today, are you aware of any other information that you would add to Exhibit 25?

A.    Then that would be these materials which you previously numbered.

Q.    And in preparation for your deposition today, did you review the spreadsheets that are not printed in 34 that have placeholders?

A.    Yes.

Q.    And what, generally, did these spreadsheets show?

A.    That shows the data of the light pass, in other words, light angle -- the instant -- instant light surface

configuration, as well as exiting light surface -- surface configuration for each of seven model lenses.

Those showed the surface formation of the incidence of light or the surface formation of the exiting of light -- of light for each of the seven model lenses.

Q.    Do these spreadsheets that you reviewed show the shape of portions of the accused lenses?

A.    Yes.

Q.    And what is the exhibit in front of you?

A.    Are you referring to the Exhibit Number 34?

Q.    Right.  Why did you review those spreadsheets?

A.    Because that equivalent, that -- those are true and true design drawings of seven model lenses.

Because they are the design drawings which correspond to the seven models.

Q.    So just to be clear, are the spreadsheets design drawings that correspond to the model seven models?

A.    Yes, the drawings -- I mean, the design drawings of seven lenses.  To put it another way, that would be the data necessary in manufacturing those lenses.

Q.    And where did you get those spreadsheets?

A.    From the computer used for conducting simulations at EDD.

Let me add something.

Q.    Okay.

A.    The data located within the computer for simulation, one

could not see in the form of spreadsheet.  So that I had someone put that data into the Excel spreadsheet format.

Q.   So does Exhibit 34, in addition to the spreadsheet, does it contain engineering drawings for the seven accused lenses?

A.   Yes.

Q.   And are those the engineering drawings we discussed this morning that you gathered in preparation for this deposition?

A.   Yes.

Q.   And the specification that we discussed this morning that you gathered in preparation for this deposition, are those in front of you in any one of those exhibits?

A.   Yes.

Q.   And which exhibit are they in?

A.   Exhibit 29, Exhibit 36, Exhibit 35.  That's it.

Q.   If we could just note for the record there appears Exhibit 29 marked today is potentially identical to Exhibit 14 from yesterday.

Are the specifications ever provided to customers?

A.   Among them, the one model, the 9827 is a standard lens not for a specific customer.  So that -- that was provided to multiple customers.

As for the other six models, those are for specific customers, so those were provided only to those customers.

Q.   If you look at Exhibit 29, on the very first page that's Bates number EDD-023362.

A.   Yes.

Q.   Was this product specification provided to Sharp Corporation?

A.   Yes.

Q.   So in these specifications, other than the 9827, is the identity of the company that specification was provided to identified at the top of the first page?

A.   Yes, those were identified.

Q.   And if you go to the -- the page of the product specification provided in Sharp in Exhibit 29, and you go to page 16 of that document?

A.   Yes.

Q.   And this page has a Bates number EDD-023377?

A.   Yes.

Q.   Do you see where it says "attached data"?

A.   Yes.

Q.   Are the various documents identified under "attached data" also provided to customers along with the specifications?

A.   Yes.

Q.   I'm going to hand you a document that's been previously marked Defendant's Exhibit 15.

     Ms. Watai, could you take a look at the document and let me know if you've ever seen this before?

A.   Yes.

Q.   And when did you first see this document?

**A.**   This set of document includes two materials.  And either one of them, I believe it was about one year ago.

**Q.**   You said this document includes two materials.  What are those two materials?

**A.**   I mean, there is material regarding the Enplas Corporation and material regarding products of Enplas Display Device.

**Q.**   Okay.  But this is just one document that includes information on both Enplas Corporation and Enplas Display Device products; correct?

**A.**   Here, in this form, it is one document.

**Q.**   Does EDD provide this document to customers?

**A.**   Although I didn't confirm whether or not these were handed to our customers, these are used in presentations through showing slides.

**Q.**   Now, are these presentations to customers?

**A.**   Yes.

**Q.**   Is "LE-Cap" the trademark name for a group of lenses?

**A.**   It is not given to any specific lenses, but, rather, it will include newly designed lenses, as well.  And all those would be trademark -- trademarked as "LE-Cap."

**Q.**   Have the seven accused lenses in this case been designated as LE-Cap lenses?

**A.**   Did you say "ever," in the past?

**Q.**   I said "have."

**A.**   Yes.  Even now.

Q.   So I guess so the record is clear, are the seven accused lenses in this case designated as LE-Cap lenses?

A.   Yes.

Q.   What about the material on EDD-005900?  Did you help prepare any of that?

A.   The things written on the left half of the page, '554 Patent front page, I offered that to EDD.

Q.   Who prepared the rest of this document; do you know?

A.   I don't know.

Q.   Who asked you to prepare the materials on the '554 Patent?

A.   Are you talking about the table on the last page?

Q.   We can start with that.  Sure.

A.   I wasn't asked.

Q.   Did you prepare that table after learning about the '554 Patent?

A.   Yes.

Q.   And was that back in 2010?

A.   Although I cannot say exactly when this table was prepared, the investigation of corresponding patents search, that was done in 2010.

Q.   Did you provide -- did you provide the table on the last page to someone for use in this presentation?

A.   No.  Not so.

Q.   Did you review this document in preparation for your deposition today?

**A.**    No.

**Q.**    Do you have any idea what this document relates to? Actually, that's too broad of a question.

If you look at the first page, is the -- at the very top of the first page, does that mention SSC?

**A.**    Yes.

**Q.**    And what does it say about SSC?

**A.**    It says collaboration proposal for -- with SSC.

**Q.**    Do you know what collaboration proposal this document is referring to?

**A.**    Yes.

**Q.**    And what collaboration proposal that?

**A.**    Around the time this collaboration proposal was discussed, EDD and SSC were starting to consider the joint development plan to develop new type of total reflection lens, which is to make backlighting thinner for LCD TV use.

**Q.**    Did EDD and SSC end up entering into a joint development agreement?

**A.**    No.

**Q.**    Why not?

**A.**    In the process of creating the agreement for this, the joint development agreement, SSC was trying to make that agreement convenient or advantageous for SSC.  And for this, the total reflection lens, they were not limiting to diffusion lenses like EDD's previous seven models.

And EE -- SSC was trying to obtain exclusive purchasing right for entire -- entire lenses of EDD.

Such proposal of exclusive purchasing right was not the condition acceptable to EDD.  So that EDD on its own went to Uchida Samejima Law Firm and asked the help of Mr. Samejima and Mizota attorney in preparing the draft for the agreement.

And that draft was limiting in the scope of '554 Patent claim for the total reflection lens, whereas the point that SSC was insisting on was to include EDD's past products, including the seven models.

EDD's prepared draft was limiting all -- the total reflection lenses within the scope of '554 -- '554 Patent claim.

Because of these disagreements or different views, we ultimately did not reach the point of entering into the contract.

Q.   You attended internal company meetings that discussed the negotiations with SSC over the potential collaboration proposal?

A.   Yes.

Q.   Do you know if SSC told EDD during those meetings that EDD's lenses infringe the '554 patent?

A.   I do note here that they stated that it is infringed.  However, I did hear that their understanding was that their patent claim scope is broad such that EDD's products would be

included there.

Q.   And when did you hear that?

A.   Around September of 2013.

Q.   Ms. Watai, can you turn to what's been marked as Exhibit 29?

A.   Yes.

Q.   And can you turn to the page with Bates number EDD-023447?

A.   Yes.

Q.   And did you review this part of Exhibit 29 in preparation for your deposition today?

A.   Yes.

Q.   And is this the products specification for a lens with model number 9879?

A.   Yes.

Q.   And is this lens number 9879 a custom lens for LG Innotek?

A.   Yes.

        MS. WOODHOUSE:   That concludes the reading for Ms. Watai.

        THE COURT:   Thank you.   And you have a next reading?

        MS. WOODHOUSE:   We do.   Your Honor, can I step down and get a pair of glasses?

        THE COURT:   You sure may.

    And when Ms. Woodhouse returns to the stand, for this category of witnesses there will, of course, not be questions from the jury permitted, because it's not the actual witness

who could answer those questions, and we don't want to speculate as to how the witness might have answered your questions.

MS. WOODHOUSE:  Thank you, Your Honor.  Our next reading is Mr. Yoshihiro Seto.

Like Ms. Watai, Mr. Seto was also designated by EDD to answer certain questions, certain topics on behalf of EDD.

THE COURT:  And why don't you say the date of the deposition too.

MS. WOODHOUSE:  Sure.  This deposition was taken June 8th, 2015 in San Francisco, California.

THE COURT:  Proceed.

**YOSHIHIRO SETO,**

called as a witness for the Defendant, having been duly sworn, was examined and testified through **DEPOSITION TESTIMONY** as follows:

(As read by Mr. Hyde:)

**BY MR. OWENS:**

Q.   Good morning, Mr. Seto.

(As read by Ms. Woodhouse:)

A.   Good morning.

Q.   Could you please state your full name for the record?

A.   My name is Yoshihiro Seto.

Q.   Who is your current employer?

A.   Enplas Corporation.

Q.   What position do you hold at Enplas Corporation?

A.   My title is Legal Senior Specialist.

Q.   And what are your responsibilities in that role?

A.   I handle entire legal matters within Enplas Group.

Q.   Are you an attorney?

A.   No.

Q.   Do you have legal training?

A.   I have experience of legal matters over 20 years.

Q.   Do you have any interaction with Enplas Display Device?

A.   Yes.

Q.   What type of interactions do you have with Enplas Display Device?

A.   Let me explain.  The Enplas Display Device does not have a legal department within the organization.  Therefore, Enplas Display Device would consult any legal matter with my department, which is a legal department within the parent company Enplas -- Enplas Corporation.

     Would that be suffice?

Q.   Are you in any way responsible for marketing at Enplas Display Device?

A.   No, I am not.

Q.   Were you asked by Enplas Display Device to provide legal assistance in regard to the dispute with Seoul Semiconductor?

A.   Yes.

Q.   And when were you first asked to provide legal assistance?

A.   I believe it was around two years ago.

Q.   So that would be in 2013?

A.   That's the way I recall.

Q.   Do you recall when in 2013?

A.   If my recollection is correct, I believe it was in fall, maybe September or October.

Q.   Mr. Seto, do you understand that you're here today as a witness on behalf of Enplas Display Device?

A.   Yes.

Q.   What is Display Search?

A.   My understanding is that that is a name of the company, as well as a name of the report or reports.

Q.   You mentioned Display Search before the break.

     Is Display Search a company that does market reports on the television industry?

A.   Yes, I believe so.

Q.   And you reviewed some Display Search market reports in preparation for your deposition today?

A.   Yes, that's right.

Q.   How many reports did you review?

A.   Three, three pages.

Q.   Three pages of one report?

A.   Among two reports.

Q.   Do you recall what they said?

A.   I reviewed them in order to confirm the TVs' market share

by region.

Q.   So all three pages related to the market share by region for LCD televisions?

A.   Yes.

Q.   You said the three pages that you reviewed discussed the market share by region for LCD televisions; is that correct?

A.   Yes, that's right.

Q.   What regions were included in the market share data?

A.   North America market was included there.

Q.   Do you recall whether the market share data that you looked at in these pages discussed direct back-lighting LCD televisions?

A.   Does your question inquire if that report dealt with backlighting market share?

Q.   Do you understand the distinction between direct back-lighting LCD and edge-lighting LCD televisions?

A.   Yes, I believe I have understanding.

Q.   And what is your understanding of that distinction?

A.   As to a direct method, it is a method of EDD.  And here the lenses are combined with the LED.  That's how it is used.

     As to the edge method, it uses a light-guiding plate of L, for LED.

Q.   Do you recall whether the market share data you reviewed in those three pages from the Display Search reports made a distinction between direct backlighting and edge lighting for

LCD televisions?

A.    My recollection is that such distinction was included there.

Q.    Mr. Seto, do you recall whether the market share data that you reviewed showed that direct back-lighting LCD televisions were sold in North America?

A.    My recollection is that the data regarding North market was there -- North America market.

Q.    Do you recall for the 2010 data what -- the percentage of direct back-lighting LCD televisions were sold into North America?

A.    No, I don't.

Q.    But you saw at least some direct back-lighting LCD televisions were sold into North America in 2010; correct?

A.    Yes, I did.

Q.    And you understand the United States is part of the North America market?

A.    Yes, I understand.

Q.    So, does Enplas Display Device understand that direct back-lighting LCD televisions are sold into the United States?

A.    I don't think it does.

Q.    Why?

A.    The locations where Enplas Display Device makes sales are either Japan, Korea, China or Taiwan.  Those are the places that they have customers.  But not in America.

**Q.**   So my question is, does Enplas Display Device understand that direct back-lighting LCD televisions are sold in the United States?

**A.**   My belief is that they don't have that understanding.

**Q.**   So Enplas Corp -- Enplas Display Device today does not believe that direct back-lighting LCD televisions are sold into the United States?

**A.**   By that I mean I don't think they have any understanding or they don't have no way of knowing.  The reason is that, as I have said earlier, Enplas Display Device's customers are located either in Japan, Korea, China or Taiwan.  And after that, how those lenses may be used by those customers are sold, that's something that they have no way of knowing.

**Q.**   Do the pages of the Display Search market report show that direct back-lighting LCD televisions were sold into the North America market?

**A.**   Yes.

**Q.**   Does North America market include the United States, though?

**A.**   Yes, I believe so.

**Q.**   Do you recall whether the 2013 market share data show that direct back-lighting LCD televisions were sold into the North America market?

**A.**   Yes, I -- my recollection is that such thing was shown for the year 2013.

Q.   Do you have any reason to believe that the information shown in the Display Search pages that you looked at was incorrect?

A.   The Enplas Display Device would have no way of understanding whether or not any information provided by Display Search is accurate or not.

Q.   Does Enplas Display Search do its own market analysis of the LCD television industry?

A.   I don't believe they conduct such search on its own.

Q.   Are you sure?

A.   Yes.  My belief is they don't do that.

Q.   So it is your understanding that Mr. Murano obtains information on the LCD television market from television manufacturers?

A.   That's right.

Q.   Do you know which LCD television manufacturers Mr. Murano has obtained information from?

A.   Samsung.

Q.   Any other ones?

A.   Other than that, Sharp.

Q.   Anyone else?

A.   Maybe LG as well.

Q.   Do you know what type of information was provided to Mr. Murano on the LCD television market for any of these television manufacturers?

A.   No, I don't know.

Q.   Do you recall if the Display Search market share data that you reviewed in those three pages made a distinction between CCFL direct backlighting and LED backlighting?

A.   I don't have clear recollection.

Q.   Does Enplas Display Device make lenses for LED direct backlighting of LCD televisions?

A.   Yes, it does.

Q.   Does Enplas Display Device know if Samsung sells LED back-lighting LCD televisions into the United States?

A.   Yes, I believe it does.

Q.   Does Enplas Display Device know if LG sells LED back-lighting LCD televisions into the United States?

A.   Yes, I believe it does.

Q.   Does Enplas Display Device know if Sharp sells LED back-lighting LCD televisions into the United States?

A.   I believe it does.

Q.   Does Enplas Display Device supply Samsung with lenses that are used in LED back-lighting LCD televisions?

A.   Yes, it does.

Q.   Does Enplas Display Device understand that LG incorporates Enplas Display Device lenses into LED backlighting in LCD televisions?

A.   Yes, I believe it does.

Q.   Does Enplas Display Device understand that Panasonic

incorporates Enplas Display Device lenses LED back-lighting LCD televisions?

A.   I believe it does.

Q.   Does Enplas Display Device understand that LCA incorporates Enplas Display Device lenses into LED backlighting in LCD televisions?

A.   Did you say RCA?

Q.   Uh-huh.

A.   What is RCA?

Q.   You don't know who RCA is?

A.   Right.  I don't know.

Q.   Do you know who AmTRAN is?

A.   I know of that company name.

Q.   Do you know if Enplas Display Device lenses are incorporated into AmTRAN products?

A.   I don't know.

Q.   Could you explain the business flow of Samsung that you discussed with Mr. Murano?

A.   The discussion was about EDD selling lenses to Samsung LED, which is Samsung subsidiary, and Lumens.

Q.   And what does Lumens do?

A.   My understanding is that this is a company which manufactures LED bars.

Q.   Do you know who Lumens' customers are?

A.   Yes, I do.

Q.   Who are Lumens' customers?

A.   I think it is Samsung.

Q.   Anyone else?

A.   As to others, I don't know.

Q.   Other than the companies we've discussed, do you recall discussing any other companies with Mr. Murano?

A.   LG Innotek.

Q.   I-N-N-O-T-E-K.  Who is LG Innotek?

A.   LG Innotek is a manufacturer of LED bars, and they supply their bars with an LED display -- they supply their bars to LG Display.  Oh, LG, Display.

Q.   Do you know whether LG Innotek provides light bars to any other customers other than LG Display?

A.   No, I don't.

Q.   Do you know what LG Display manufactures?

A.   My understanding is that they manufacture TV display.

Q.   Did you discuss a company called Tohko Jushi with Mr. Murano.

A.   Yes.

Q.   Who is Tohko Jushi?

A.   Tohko Jushi is a trading company.

Q.   And what does it do?

A.   That's a company to whom EDD sells lenses.

Q.   Do you know what companies Tohko Jushi sells EDD lenses to?

A.    Although I don't know all of them, I know some.

Q.    What are the ones you're aware of?

A.    Samsung.

Q.    Anyone else?

A.    Probably LG, as well.

Q.    Anyone else you're aware of?

A.    As to others I don't know.

Q.    Does EDD sell lenses to Innolux Corporation?

A.    I don't believe it sells directly, but indirectly.

Q.    How does it sell indirectly?

A.    I don't recall whether that was with Tohko Jushi or Inabata Industries.  But I believe such sales is conducted through a trading company.

Q.    What is the business flow for LG Display?

A.    I confirmed the business flow in which EDD sells those lenses to Tohko Jushi, and then from there they are sold to LG Innotek, and from there those are sold to LG Display as for LED bars.

Q.    Does EDD have a share of the global market for lenses used to directly back light LCD televisions?

A.    Yes, it does.

Q.    Do you know what the current share of the global market for lenses used to directly back light LCD televisions that EDD has?

A.    As to that question, I don't know.

**Q.**    Do you know what the share of the global market for lenses used to directly light -- directly back light LCD televisions EDD had in 2014?

**A.**    No, I don't know.

**Q.**    Could you answer that question for 2013?

**A.**    This again I cannot.

**Q.**    Could you answer that question for 2012?

**A.**    This again I don't know.

**Q.**    Could you answer that question for any year?

**A.**    No, I don't know.

**Q.**    Who are EDD's competitors in the market for providing lenses for use in back lighting LCD televisions?

**A.**    I don't believe there is any competitor of EDD for lenses used for back lighting in TVs.

**Q.**    So you believe EDD sells all of the lenses that are used for direct backlighting with LEDs of LCD televisions?

**A.**    I don't believe all of them are sold by EDD.

**Q.**    So other than your preparation for today, you have no general knowledge of EDD's competitors for its lens products used in back-light televisions; is that correct?

**A.**    I don't believe there's any competitor.  But if I were to be forced to say someone, then the edge method would be one.

**Q.**    Do you see down below in the dark box the first sentence says, "The LE-Cap share of LG Electronics is five percent"?

**A.**    Yes, I see it.

Q.    Do you know what that means?

A.    Yes.

Q.    And what does that mean?

A.    If I were to understand exactly what it says here, I believe this says that the LE-Cap shares is five percent.

Q.    And does the LE-Cap share include the 9879 LE-Cap?

A.    The way I understand from looking at this is that when you combine the share for the number 9900 and 9879, five percent.

Q.    So the September 30, 2010 meeting related to a cooperation or alliance proposal between SSC and EDD?

A.    Excuse me.  But let me correct something.

      Since EDD -- EDD did not exist in 2010, so I'm talking about between Enplas and SSC.  Back then -- back then there was a negotiation of an NDA, non-disclosure agreement between Enplas and Mr. Lee of SSC.

Q.    Who asked to have that meeting, Enplas Corporation or SSC?

A.    That was Enplas.

Q.    Why did Enplas Corporation ask to have that meeting?

A.    Back then, the -- its customers was -- customer was only Sharp, and we wanted to expand our sales.

Q.    Your sales of what?

A.    Back then there were lenses developed by Enplas which was incorporated in Sharp's TV.  We wanted to expand those lens -- those lenses sales throughout the world.

Q.    Was there one -- was there more than one lens developed by

Enplas for incorporation in Sharp TVs?

A.   4922.   4922.

Q.   Just one lens?

A.   As far as I know, that was only one.

Q.   And was this a lens used for direct backlighting of LCD televisions?

A.   Yes.

Q.   And was Sharp your only customer for those types of lenses at the time?

A.   Yes, that's right.

Q.   And at that meeting did you offer to sell SSC the 4922 lens?

A.   Since 4922 was lens specific for Sharp, so that we were to develop new lens for SSC.

Q.   Did Enplas work with SSC to develop the lens for direct backlighting of LCD televisions?

A.   My understanding was that SSC had a great deal of -- excuse me.

My understanding was that SSC had a great deal of interest in selling Samsung the LED bar combining LE-Cap lens made by Enplas and SSC's own LED.  However, SSC had never used LE-Cap lens made by Enplas -- Enplas, so that SSC did not have technology to incorporate lens or lenses into its SSC's LED bar.

Q.   Do you mean SSC did not have technology to incorporate

lens or lenses into SSC's LED bar, or did not have technology to mount lenses or lenses into SSC's LED bar?

A.   I think the answer is both.  They did not have the technology to build LED bar, nor did they have technology to combine LE-Cap and LED.

Q.   And how do you know that information?

A.   I heard that from Mr. Murano.  And may I continue my answer?

Q.   Which answer?

A.   Since SSC could not build LED bar, Enplas had I-Chiun build that for them, because I-Chiun had already experienced building such thing for Sharp.

Q.   Are you sure it was the 4922 lens that was -- that Enplas made for Sharp?

A.   My understanding is that the lens for Sharp is 4922.

Q.   And what was the lens that Enplas made for SSC, the first made for SSC?

A.   That was 9845.

Q.   Do you know whether any patents were discussed during the September 30, 2010 meeting?  Do you know?

A.   Yes, I do.

Q.   What patents were discussed during the September 30, 2010 meeting?

A.   Patent '554.

Q.   You're referring -- you're referring to the one of the

patents at issue in this litigation; correct?

A.    Yes, that's right.

Q.    Were any Enplas patents discussed during the September 30th, 2010 meeting?

A.    There were some discussion about patent or patents.

Q.    In your answer were you -- when you referenced there was some discussion about patents, patent or patents, do you mean only the '554 or do you also mean there was some discussion of Enplas patents?

A.    I was talking about the discussion about the patent '554.

        MS. WOODHOUSE:    That concludes the read-ins of Mr. Seto.

        THE COURT:    Thank you.

        MS. WOODHOUSE:    And Your Honor, our last reading is -- our last read-in is Mamoru Yoshida.  His deposition was taken on June 12th, 2015, also in San Francisco.

    Mr. Yoshida is a sales specialist for Enplas Display Device.

        THE COURT:    Was this deposition also taken with the aid of a translation?

        MS. WOODHOUSE:    Yes, Your Honor, it was.

        THE COURT:    You may proceed.

                MAMORU YOSHIDA,

called as a witness for the Defendant, having been duly sworn, was examined and testified through DEPOSITION TESTIMONY as

follows:

(As read by Mr. Hyde:)

**BY MS. WOODHOUSE:**

Q.   Good morning, Mr. Yoshida.

(As read by Ms. Woodhouse:)

A.   Good morning.

Q.   And if you don't understand the questions interpreted,
please ask, and I'll try to do my best to rephrase it.

A.   Yes.

Q.   Where do you currently work?

A.   I work at Enplas Display Device.

Q.   And throughout the day, if -- to make it easier on us and
our interpreter, if I refer to Enplas Display Device as EDD,
will you understand what I mean?

A.   Yes.

Q.   How long have you worked at EDD?

A.   This is my 22nd year.

Q.   Is it your 22nd year at Enplas Display Device or did you
previously work for another Enplas subsidiary or parent
company?

A.   Correct.  Throughout the career at the Enplas family, this
is my 22nd year.

Q.   And how long have you worked for EDD specifically?

A.   This is my fourth year.

Q.   And what is your position at EDD?

**A.**   I am a specialist.

**Q.**   Have you been a specialist for your entire four years at EDD?

**A.**   Yes.

**Q.**   Are you a specialist of any particular technology or field?

**A.**   Yes.

**Q.**   And what is that particular technology or field?

**A.**   Sales.

**Q.**   Have you been a sales specialist for your entire four years at EDD?

**A.**   No, I haven't been for the entire time.

**Q.**   Prior to being a specialist in sales at EDD, what -- were you a specialist in another field or technology?

**A.**   Yes.

**Q.**   And what was that field or technology?

**A.**   Engineering.

**Q.**   What was the general category that included products you were responsible for?

**A.**   Lenses -- lens.

**Q.**   In your current position as a specialist in sales, what are you selling?

**A.**   I am selling lenses -- lens.  I think it would be lenses.

**Q.**   Let me try a different question.

Have you heard of the term "LE-Cap"?

A.    Yes.

Q.    Do you sell LE-Cap lenses at EDD?

A.    Yes.

Q.    Do you sell any other lenses besides LE-Cap lenses at EDD?

A.    No.

Q.    Does anyone else at EDD sell lenses?

A.    Yes.

Q.    How many others -- other people at EDD sell lenses?

A.    Besides me, there are two others.

Q.    And who are those two other people?

A.    Would you accept by last names only?

Q.    Sure.

A.    They are Kimura and Yuzawa.

Q.    Are you responsible for selling LE-Cap lenses to a particular customer?

A.    Yes.

Q.    And are you responsible for selling LE-Cap lenses to more than one customer?

A.    Yes.

Q.    And what customer are you responsible for selling LE-Cap lenses to?

A.    Although I can't remember them all, and therefore my list is may be incomplete, my customers are Sharp, Nichiya Kagaku, and LG Innotek, and others.

Q.    Do you know what companies Mr. Kimura sells lenses to?

A.   Yes.

Q.   And what companies does Mr. Kimura sell lenses to?

A.   Sansei LED.

          (Interpreter speaking) "Sansei" is Samsung in English, but witness didn't use the word "Samsung," so I just spelled it out as it was said.

Q.   Have you heard of a company named Advanced Optoelectronic Technology?

A.   Yes.

Q.   Is that company also referred to as AOT?

A.   Yes.

Q.   What does AOT sell, if you know?

A.   They are selling LEDs.

Q.   Have you ever sold LE-Cap lenses to AOT?

A.   Yes.

Q.   Have you ever heard of a company called I-Chiun?

A.   Yes.

Q.   Do you know what I-Chiun sells?

A.   They sell LED bars.

Q.   Have you ever sold an LE-Cap lens to I-Chiun?

A.   Yes.

Q.   Do you remember any of the models of LE-Cap lenses you sold to I-Chiun?

A.   No, I don't.

Q.   Do you know what the LED bars that I-Chiun makes go into?

A.   No, I don't.

Q.   Do you know who I-Chiun sells LED bars to?

A.   No, I don't.

Q.   Have you heard of a company called Shanghai Inabata Trading Company or Corporation?

A.   Yes.

Q.   Do they sell lenses for televisions?

A.   Yes.

Q.   Have you ever sold LE-Cap lenses to Shanghai Inabata Trading Company?

A.   Yes.

Q.   Do you remember what lens model numbers you sold to Shanghai Inabata Trading Company?

A.   No, I don't.

Q.   Do you know what Shanghai Inabata Trading Company does with EDD lenses when it buys?

A.   Yes.

Q.   What does it do with EDD lenses when it buys?

A.   They sell them to LED manufacturers.

Q.   Do you know which LED manufacturers they sell to?

A.   To several companies, but I don't know all of them.

Q.   Do you know any of them?

A.   Yes.

Q.   Could you tell me the ones you do know?

A.   AOT and I-Chiun.

**Q.**    Mr. Yoshida, have you heard of a company called Tohko Jushi Company?

**A.**    Yes.

**Q.**    Do you know what Tohko Jushi sells?

**A.**    Yes.

**Q.**    And what does Tohko Jushi sell?

**A.**    Lenses.

**Q.**    Have you ever sold lenses to Tohko Jushi?

**A.**    Yes.

**Q.**    Do you remember any other lens models that you sold to Tohko Jushi?

**A.**    9879.

**Q.**    Do you remember the last time you sold lenses to Tohko Jushi?

**A.**    Yes.

**Q.**    And when was that?

**A.**    Last month.

**Q.**    Do you remember what lenses you sold to Tokyo Jushi last month?

**A.**    Yes.

**Q.**    And what lens did you sell to Tohko Jushi last month?

**A.**    9879.

**Q.**    Do you know what Tohko Jushi was using the 9879 lens you sold to it for?

**A.**    Yes.

Q.   And what was it using the lens for?

A.   For televisions.

Q.   Do you know what television it was being used for?

A.   No, I don't.

Q.   Do you know what companies Tohko Jushi sells to?

A.   Yes.

Q.   What companies does Tohko Jushi sell to that you're aware of?

A.   LG Innotek.

Q.   Do you know of any others?

A.   Yes.

Q.   What other ones do you know?

A.   Samsung LED.

Q.   How do you know that Tohko Jushi sells to LG Innotek?

A.   I came to know it when I had a meeting at LG Innotek.

Q.   Have you had more than one meeting with LG Innotek?

A.   Yes.

Q.   Do you meet with LG Innotek regularly?

A.   Yes.

Q.   How often do you meet with LG Innotek?

A.   Once or two times a month.

Q.   How long have you been meeting with LG Innotek once or two times a month?

A.   I would say the recent one year.

Q.   Where did these meetings take place?

A.    In Korea.

Q.    Do you attend in person?

A.    Yes.

Q.    How long do these meetings last?

A.    For one hour to two hours.

Q.    When you go to a meeting with LG Innotek, does anyone else from EDD go with you?

A.    Sometimes, yes, that is true.

Q.    Who goes with you?

A.    Mr. Murano, M-U-R-A-N-O.

Q.    Why do you go to meet with LG Innotek?

A.    We go when we receive inquiry from our customer.

Q.    And what is the inquiry that you receive?

A.    Questions regarding lenses.

Q.    What type of questions regarding lenses?

A.    Questions regarding diffusing lenses.

Q.    Are these questions about LG Innotek wanting to purchase diffusion lenses?

A.    Yes.

Q.    Do you know what LG Innotek purchases the lenses for?

A.    Yes, I do.

Q.    What does LG Innotek purchase the lenses for?

A.    To purchase bars for TV sets.

Q.    Does -- when you say "bars for TV sets," are you talking about LED bars?

A.   Yes.

Q.   Does LG Innotek sell LED bars?

A.   Yes.

Q.   Do you know who LG Innotek sells LED bars to?

A.   No, I don't.

Q.   How do you get the questions that you provide answers to?

A.   We receive customer requests through a trading company or trading companies.

Q.   What is a trading company?

A.   Skyview.

Q.   Are there any other trading companies?

A.   Tohko Jushi.

Q.   Does LG Innotek provide you with desired specifications?

A.   Yes.

Q.   Does LG Innotek tell you that they're looking for a lens to ultimately go in televisions?

A.   Yes.

Q.   Does LG Innotek tell you what television models the lens will go into?

A.   No.

Q.   Does LG Innotek tell you what company will make the televisions?

A.   Yes.  Yes.  Sometimes it does.

Q.   What companies has LG Innotek told you will make televisions using EDD lenses?

**A.**   LG Display.

**Q.**   Any others?

**A.**   LD Denshi.

**Q.**   Do you know how -- do you know how if Tohko Jushi sells lenses to Samsung LED frequently?

**A.**   Currently they sell it monthly every month.

**Q.**   Do you know what Samsung LED uses the lenses it buys monthly for?

**A.**   Yes.

**Q.**   And what do -- does Samsung LED use the lenses for?

**A.**   To make LED bars.

**Q.**   Does Samsung LED sell LED bars?

**A.**   Yes.

**Q.**   Do you know who Samsung LED sells LED bars to?

**A.**   No.

**Q.**   Have you ever met with anyone at Samsung LED?

**A.**   Yes.

**Q.**   When did you meet with someone at Samsung LED?

**A.**   I don't remember.

**Q.**   Have you met with anyone who works for Samsung LED more than once?

**A.**   No.

**Q.**   Do you remember why you met with this person who works for Samsung LED?

**A.**   Because Kimura was unable to attend.  To replace his

position, I attended -- I attended in Japan.  That's why.  That's why I remember.

Q.   Have you ever heard of a company called Guangzhou Enplas Mechatronics?  I'll spell that first word.  G-U-A-N-G-Z-H-O-U.

MR. HYDE:  Sorry.  For the record, I believe we read a portion that was not on the right page.

The person who works at Samsung LED -- I think there was a copy of the page.  That's what's causing confusion, Your Honor.  We're starting at page 65 to restart.

(As read by Mr. Hyde:)

Q.   What does Innolux sell?

A.   Displays.

Q.   Does Innolux buy lenses from EDD?

A.   Yes.

Q.   Do you know which lenses?

A.   That I don't know.

Q.   Are you responsible for selling lenses to Innolux?

A.   No.

Q.   What does Taiwan Inabata Sangyo sell?

A.   Lenses.

Q.   Does Taiwan Inabata Sangyo buy lenses from EDD?

A.   Yes.

Q.   Do you know what lenses it buys from EDD?

A.   I don't remember.

Q.   Do you know who Taiwan Inabata Sangyo sells lenses to?

A.    Yes.

Q.    What companies?

A.    AOT and I-Chiun.

Q.    And how do you know that?

A.    I heard it from Yuzawa-san.

Q.    Other than meeting with LG Innotek, what other customers have you met with?

A.    I met with Sharp.

Q.    Have you met with any other customers?

A.    I met with Nichiya Kagaku.

Q.    Have you met with any other customers?

A.    No.  These three companies are it.

Q.    How often do you meet with Sharp?

A.    Roughly once a month.

Q.    How long have you been meeting with Sharp for roughly once a month?

A.    I would say about three years.

Q.    Where do these meetings that you have with Sharp take place?

A.    I meet them -- I meet with them in Hiroshima-ken.

Q.    About how long does each meeting last?

A.    For one to two hours.

Q.    Does Sharp make any goods that it sells?

A.    It makes LEDs.

Q.    Does Sharp make televisions?

A.   Yes.

Q.   Does it make LED televisions?

A.   Yes.

Q.   Does Sharp buy EDD lenses?

A.   Yes.

Q.   Do you know what Sharp does with EDD lenses it buys?

A.   Yes.

Q.   What does it do with EDD lenses?

A.   It makes LED bars with them.

Q.   Does Sharp sell LED bars?

A.   Yes.

Q.   Do you know who it sells LED bars to?

A.   No.

Q.   Do you know if Sharp uses the LED bars it makes in televisions it manufactures?

A.   I don't know.

Q.   When you have meetings at Sharp, what do you discuss?

A.   I receive an explanation or explanations on specifications which customer wants.

Q.   When you say "customer," do you mean Sharp?

A.   No.

Q.   What customer do you receive specifications from?

A.   That is something I wasn't told.

Q.   Did you ever ask?

A.   There were sometimes I did.

Q.   So to make sure I understand, Sharp will give you specification for a product that Sharp wishes to make?

A.   What I am saying is there are times when that falls into that situation.  What I'm saying is there are times when that happens.

Q.   Does something else ever happen in that situation?

A.   Yes.

Q.   What else happens?

A.   There were times when only the specification for the product that they -- product which they desired to develop without ever revealing customer name or names.

Q.   In those situations where the customer's name was not revealed, do you ask who the customer was?

A.   No, I didn't.

Q.   When Sharp had provided EDD with specifications, did EDD design a custom lens for Sharp?

A.   Yes.

Q.   Does the specification provided by your customer say it's going to be used in an LED television?

A.   Sometimes yes, that is true.

Q.   How often do you meet with Sharp?

A.   Once a month or once per two months.

Q.   You mentioned that you also had in-person meetings with Nichiya Kagaku.

     How often do you meet with Nichiya Kagaku?

A.   Once a month or every other month.

Q.   Do you know what the model number was for the Samsung television that had an EDD lens in it?  And when I say "model number," I mean the model number of the television.

A.   No, I don't.

Q.   Do you know what the model number of the EDD lens was that was used in the Samsung television?

A.   I don't remember.

Q.   Do you know where the Samsung television that had an EDD lens in it was sold?

A.   No, I don't know.

Q.   Have you ever heard that an EDD lens was used in a Sony television?

A.   No.

Q.   Would you be surprised to learn that an EDD lens was used in a Sony television?

A.   No.

Q.   Would you be surprised to learn that an EDD lens was used in an LG television?

A.   No.

Q.   Have you ever heard that EDD lens was used in a Panasonic television?

A.   No.

Q.   Would you be surprised to learn that an EDD lens was used in a Panasonic television?

**A.**   No.

**Q.**   Have you ever heard that an EDD lens was used in a Sanyo television?

**A.**   No.

**Q.**   Would you be surprised to learn that an EDD lens was used in a Sanyo television?

**A.**   No.

**Q.**   Have you ever heard of a TV manufacturer named Seiki?

**A.**   No.

**Q.**   Do you know if televisions containing EDD lenses are sold in the United States?

**A.**   I don't know.

**Q.**   Can you think of any reason why a television containing an EDD lens could not be sold in the United States?

**A.**   No.

**Q.**   When you sell EDD lenses, do you ever tell a customer they can't be sold in the United States?

**A.**   No.

**Q.**   When you sell EDD lenses, do you ever tell a customer the televisions using those lenses cannot be sold in the United States?

**A.**   No.

**Q.**   Would you be surprised to learn that televisions -- that the television containing EDD lenses are sold in the United States?

**A.**    No.

**Q.**    Have you ever heard that an AmTRAN television has an EDD lens?

**A.**    No.

**Q.**    Would you be surprised to learn that an AmTRAN television uses an EDD lens?

**A.**    No.

**Q.**    Is there anyone in EDD who tries to figure out what lenses are used in different televisions?

**A.**    Yes.

**Q.**    How do you know that there's a person at EDD who tries to figure out what lenses are used in different televisions?

**A.**    Because I have heard of disassembling a TV or TVs.

**Q.**    I'm going to hand you what was marked the other day as Exhibit 15.  And for the record, this is document bearing production numbers EDD-020096 through EDD-020109.

**A.**    Yes.

**Q.**    Have you seen this document before?

**A.**    I don't remember.

**Q.**    Can you turn to page 9 of this document.

And for the record, this is page bearing production number EDD-020104.

**A.**    Yes.

**Q.**    Do you see in the second box on the top row it says "Design in for Panasonic TV"?

**A.**    Yes.

**Q.**    Do you know what the phrase "design in" means?

**A.**    No, I don't.

**Q.**    You see on the right-hand side of the document it says "global share (2012)," and under that it says "30 percent"?

**A.**    Yes.

**Q.**    Do you know what that refers to?

**A.**    It means that Enplas occupies 30 percent shares of the entire TV.

**Q.**    When you say "Enplas," do you mean any particular Enplas subsidiary?

**A.**    EDD lenses.

**Q.**    Do you -- in your job as specialist in sales, do you track EDDs market share?

**A.**    Yes.

**Q.**    How do you track EDD's market share?

**A.**    I verify it by reviewing information magazines.

**Q.**    What type of information magazines do you review?

**A.**    Materials by Display Search company.

**Q.**    Does EDD subscribe to Display Search materials?

**A.**    Yes.

**Q.**    How often do you look at Display Search materials?

**A.**    Once every six months.

**Q.**    When was the last time you looked at Display Search materials?

A.    January 2015.

Q.    As of January 2015, what was EDD's market share, according to Display Search, if you remember?

A.    It wasn't or isn't stated there.

Q.    When was the last time you looked at Display Search materials that provided Display Search's reporting of EDD's market share?

A.    I didn't see it.

Q.    What is the highest percent of global market share that you ever remember seeing EDD -- or calculating EDD to have?

A.    It was 50 percent.

Q.    Do you remember what that was?

A.    No, I don't.

Q.    Do you recall you were asked questions about whether you would be surprised about certain things?

A.    Yes.

Q.    And specifically you were asked whether you would be surprised if certain televisions containing EDD lenses were sold in the United States?

A.    Yes.

Q.    What did you mean when you answered you would not be surprised?

A.    Whether I would be surprised or not surprised, because I wasn't quite sure what kind of information the questions were referring to, I couldn't understand that part at all.

**Q.**   What was your understanding of the question, the portion of the questions about being surprised?

**A.**   I couldn't understand, therefore I didn't understand.  I'm sorry.  Let me do this again.

I couldn't understand, therefore, I didn't know this was with regards to what.

MS. WOODHOUSE:  That concludes the read-ins of Mr. Yoshida.

THE COURT:  Okay.  Thank you very much.

Now, are there any further discovery excerpts to present to the jury at this time?

MS. WOODHOUSE:  Yes, Your Honor.  At this point we'd like to read in a set of Requests for Admission.

THE COURT:  All right.  Again, for the Jury, a request for admissions are requests that one party serves on the other asking them to admit or deny certain facts.  And in this circumstance there are some requests in response to those requests that will be presented to you.

MS. WOODHOUSE:  And again, these are requests that SSC served on Enplas Display Device.

THE COURT:  And if you could pull the microphone real close to you.  Thank you.

MS. WOODHOUSE:  (reading) Admit that by February 25th, 2014, EDD understood that it had a share of the backlight LED lens in global TV market.

Response: Admitted.

Request: Admit that by February 25th, 2014, EDD understood that it had a 50 percent share of the backlight LED lens in global TV market.

Response: EDD admits that as of February 25th, 2014, it estimated it had a 50 percent share of the backlight LED lens in global TV market.

Request: Admit that by February 25th, 2014, EDD understood that it was, quote, a leading company in LED optics especially in the LED TV backlight market, end quote.

Response: Admitted.

Request: Admit that EDD has been aware of the '554 Patent since it was formed on April 2nd, 2012.

Response: Admitted.

Request: Admit that EDD provided a copy of the product specification for Light Enhancer Cap model number 4922 (e.g., EDD-023362 through 77) to Sharp Corporation.

Response: Admitted.

Request: Admit that EDD provided a copy of Part Drawing 77-208-065-01 (e.g., EDD-000966) to Sharp Corporation as an attachment to the Product Specification for Light Enhancer Cap model number 4922 (e.g., EDD 023362 through 77.)

Response: Admitted.

Request: Admit that EDD was aware that Light Enhancer Cap model number 4922 would be used for backlighting a television

screen.

Response:  Admitted.

Request:  Admit that EDD provided a copy of the Product Specification for Light Enhancer Cap model number 9853A (e.g., EDD-023405 through 17) to Advanced Optoelectronic Technology, Inc.

Response:  Admitted.

Request:  Admit that EDD provided a copy of Part Drawing 77-208-059-A1 (e.g., EDD-001018 to Advanced Optoelectronic Technology, Inc. as an attachment to the Product Specification for Light Enhancer Cap model number 9853A (e.g., EDD-023405 through 17.)

Response:  Admitted.

Request:  Admit that EDD was aware that Light Enhancer Cap model number 9853A would be used for backlighting a television screen.

Response:  Admitted.

Request:  Admit that EDD provided a copy of the Product Specification for Light Enhancer Cap model number 9854D (e.g., EDD-023418 through 31) to I-Chiun Precision Industry Company, Limited.

Response:  Admitted.

Request.  Admit that EDD provided a copy of Part Drawing 77-208-060-D1 (e.g., EDD-01018) to I-Chiun Precision Industry Company, Limited as an attachment to the Product Specification

for Light Enhancer Cap model number 9854 (e.g., EDD-D023418 through 31.)

Response:  Admitted.

Request:  Admit that EDD was aware that Light Enhancer Cap model number 9854D would be used for backlighting a television screen.

Response:  Admitted.

Request:  Admit that EDD provided a copy of the Product Specification for Light Enhancer Cap model number 9854E (e.g., EDD-023432 through 46) to I-Chiun Precision Industry Co, Limited.

Response:  Admitted.

Request:  Admit that EDD provided a copy of Part Drawing 77-208-049-01 (e.g.,EDD-002095) to I-Chiun Precision Industry Co, Limited as an attachment to specification for Light Enhancer Cap model number 9854E (e.g., EDD-02343246.

Response:  Admitted.

Request:  Admit that EDD was aware that Light Enhancer Cap model number 9854E would be used for backlighting a television screen.

Response:  Admitted.

Request:  Admit that EDD provided a copy of the Product Specification for Light Enhancer Cap model number 9879 (e.g., EDD-023447 through 60) to LG Innotek Company, Limited.

Response:  Admitted.

Request:  Admit that EDD provided a copy of Part Drawing 77-208-09801 (e.g., EDD-001054) to LG Innotek Company, Limited as an attachment to the Product Specification for Light Enhancer Cap model number 9879 (e.g., EDD-0023447 through 60).

Response:  Admitted.

Request:  Admit that EDD was aware that Light Enhancer Cap model number 9879 would be used for backlighting a television screen.

Response:  Admitted.

Request:  Admit that EDD has reviewed information on the worldwide market for LCD televisions.

Response:  Admitted.

Request:  Admit that EDD has understood since April 2012 that it is part of the world market for LCD televisions.

Response:  Admitted.

Request:  Admit that EDD has been aware since April 2012 that LCD televisions are sold in the United States.

Response:  Admitted.

Request:  Admit that EDD is currently aware that LCD televisions are sold in the United States.

Response:  Admitted.

Request:  Admit that EDD does not sell the accused Enplas lens products with a prohibition that they may not be incorporated into products that will be imported into the United States.

Response:  EDD admits that it does not sell the accused Enplas lens products with a prohibition that they not be incorporated into products that will be imported into the United States, since it does not sell the accused Enplas lens products in the United States, nor is it aware of any prohibition against the resale of its products incorporating the accused Enplas lens products in the United States.

That concludes the Request for Admission.

THE COURT:  Thank you.  Are there any further discovery?

MS. WOODHOUSE:  Your Honor, there are a set of interrogatory responses, but if I could just have a minute to confer.

THE COURT:  You may.  And whether it's one question or two, or we could take a lunch break now, or if you want to conclude those depending on the duration.

MS. WOODHOUSE:  If I could just confer quickly.

THE COURT:  You may.

(pause in proceedings.)

MR. GOTTS:  Your Honor, would it make sense to do the lunch break now so we could just confer on something?

THE COURT:  You may.

Ladies and gentlemen, let's take a lunch break now.  It's 12:10.  Let's return at 1:00 o'clock for further evidence.

A reminder not to do any investigation or discussion of

the case while you're at lunch.

Enjoy your lunch.  See you at 1:00.

(Proceedings were heard out of presence of the jury:)

**THE COURT:**  Let's stay on the record.

The jurors are not present.

Just checking in on what's to come.  How much more of this category do we have?  And I also want to inquire from EDD if you have counter-designations for those three witnesses and any discovery you want to present to the jury now.  You don't have to.

**MR. LABGOLD:**  They were read in together.

**THE COURT:**  That's what I interpreted.  We didn't tell the jury that, that included an opportunity for you to contribute to what was being said.  I don't know that it's necessary to say more about it.  They've heard the information and they've been instructed that it doesn't matter whose mouth the information comes.  So unless you have a suggestion --

**MR. LABGOLD:**  I think we'll just leave it.

**THE COURT:**  All right.  Very good.  Then what do we have after lunch?

**MR. GOTTS:**  Your Honor, after we finish one more -- the rog read-ins, we'll have Dr. Moore.  And I suspect that will carry us through the afternoon.  So I think that's probably it for today.

**THE COURT:**  Very good.  I had one suggestion in

contemplation and thinking about the jury's understanding of what's happening so far, and that's on the statement of stipulated facts, 13 and 14 refer to the critical dates for the '554 and '209 Patent.  The terminology "critical date" I think came up in Judge Fogel's introductory video, if I'm not mistaken.  It came up somewhere.  But of course it's a different date than -- in the face of the patents, they may be confused as to why that's one year off of what they see in the patents.  And it may be that you're going to have a witness describe that in some way.  But if we don't have something to describe it, I don't want the jury to be confused by why we're telling them that date.

MR. GOTTS:  Understood.  I think that's probably more relevant to the validity portion of the date.  Obviously, the date is relevant, because we're not disputing the prior art as prior art.

MR. LABGOLD:  None of the prior art is contested, so --

THE COURT:  So the question is what do we want to tell the jury, sort of explain that.  And you could come up with some explanation for how it matters.  But I thought I'd kind of present it to you first to see if you were going to tie it in in some way, if you get to that part of the case, or if you think it doesn't matter, and we don't need to explain it.

MR. LABGOLD:  I think we could probably come up with

proposed language for -- you know, we'll run something by counsel.

THE COURT:  Think about that.

MR. LABGOLD:  It won't come up until, I mean, for the first time, I guess, maybe tomorrow.

THE COURT:  Maybe tomorrow or Monday.

MR. LABGOLD:  More likely Monday.

THE COURT:  It's nothing, but I just wanted to give you something else to think about.

See you at 1:00 o'clock.  Thank you.

(Luncheon recess was taken at 12:13 p.m.)

**Afternoon Session**                                **1:05 p.m.**.

(Proceedings were heard out of the presence of the jury:)

THE COURT:  Good afternoon.

ALL:  Good afternoon, Your Honor.

THE COURT:  Let's bring in our jury.

(Proceedings were heard in the presence of the jury:)

THE COURT:  All right.  Good afternoon, everyone. Please be seated.

Does SSC have any further discovery read-ins which you would like to present to the jury?

MR. GOTTS:  We do, Your Honor.  Mr. Hyde will read in some interrogatory responses.

THE COURT:  Very well.

And, again, ladies and gentlemen, interrogatories are a

**PROCEEDINGS**

type of discovery where one party asks the other party questions, and they respond with information under penalty of perjury; and it, like the other evidence you've heard today, is part of the evidence that you may consider in rendering your verdict.

Mr. Hyde.

**MR. HYDE:**  Thank you, Your Honor.

Interrogatory Number 1:  For each Enplas lens --

**THE COURT:**  I'm sorry.  Can you specify who is asking the interrogatory to which party?

**MR. HYDE:**  Understood, Your Honor.  Thank you.

This Interrogatory Number 1 is from SSC to EDD.

For each Enplas lens, provide all internal and external product names and model numbers that Enplas or its employees use to refer to each lens; and identify all engineering drawings relating to the lens, all design and performance specifications pertaining to the lens, all intermediate and end products in which the lens has been incorporated, all intermediate and end products for which Enplas has designated or tested the lens, and all customers and/or purchasers of the lens, including the full business name and address.

EDD's response:  EDD is not engaged in any activity within the United States or which is intentionally or knowingly directed to customers within the United States concerning the Enplas lenses or accused products.  Nonetheless, in response to

this set of interrogatories, subject to and without waiving specific and general objections, EDD incorporates Exhibit A and B hereto.

Exhibit A:  Accused Enplas Lens 4922.  Internal and external product name and model names:  Light Enhancer Cap 4922, CPN PLNS-0015 PASA.  The engineering drawings relating to the lens are EDD 000966 through EDD 000984.  Design and performance specifications pertaining to the lenses relate to EDD 000966 through EDD 000984.

For the accused product lens 9853A, the internal and external product names and model names are the Light Enhancer Cap 9853A.  The engineering drawings relating to the lens are EDD 001018 through EDD 001030.  The design and performance specifications pertaining to the lens are the same.

Accused Enplas lens 9854D.  The internal and external product name and model numbers:  The Light Enhancer Cap 9854D. The engineering drawings relating to the lens is EDD 001031 through EDD 001037.  The design and performance specifications pertaining to the lens are the same.

Accused Enplas lens 9854E.  Internal and external product names and model numbers:  9854E lens.  Engineering drawings relating to the lens:  EDD 001038 through EDD 001053.  The design and performance specifications pertaining to the lens are the same.

The accused Enplas lens 9879.  Internal and external

product names and model numbers:  9879 lens.  Engineering drawings relating to the lens:  EDD 001054 through EDD 001071. The design and performance specifications pertaining to the lens are the same.

MR. LABGOLD:  Your Honor, we'd like to address an omission.

THE COURT:  In which?

MR. LABGOLD:  There was an agreed-to omission, and then there's one that we did not agree to be omitted.  It's the number 9845 lens, the subject matter of the parties' initial...

THE COURT:  And are you wanting to read additional information in the interrogatory, or are you wanting to --

MR. LABGOLD:  It was agreed that there would only be one read-in, so I'm just asking that that portion be read in as well.

MR. GOTTS:  Your Honor, this relates to the topic of yesterday, and we had informed them we were not going to read that in.

THE COURT:  All right.  We're going to have to resolve this outside the presence of the jury, so we'll take that up later.

MR. GOTTS:  Thank you, Your Honor.

THE COURT:  Mr. Hyde, were you finished with the parts that you were reading?

MR. HYDE:  I'm moving on to Exhibit B, Your Honor.

THE COURT:  Proceed.

MR. HYDE:  Exhibit B to EDD's response to SSC's Interrogatory Number 1.

Accused Enplas lens 4922.  All intermediate and end products in which the lens has been incorporated:  Unknown.

All intermediate and end products for which EDD has designed or tested the lens, and there's a footnote here.  The lens is designed or tested using LED provided from customer.  When the LED is provided without a substrate, the LED is mounted on a standard substrate to prepare and test the LED model.  EDD does not keep records indicating which instances the LED and/or substrate is provided.

All customers and/or purchasers of the accused lens, the 4922 lens:  Enplas Electronics (Shanghai) Company Limited.

9853A lens.  All intermediate and end products for which the lens has been incorporated:  Unknown.

All intermediate and end products for which EDD has designed or tested the lens:  LED module with a lens.

All customers and/or purchasers of the accused lens: Advanced Optoelectronics, Tech & Company Taiwan, Innolux Corporation, Taiwan Trading Company, Shanghai Inabata Trading Company, and Taiwan Inabata Sangyo Company Limited.

9854D lens.  All intermediate and end products in which the lens has been incorporated:  Unknown.

All intermediate and end products for which EDD has

designed or tested the lens:  LED module with a lens.

All customers and/or purchasers of the accused lens: I-Chiun Precision Industry Trading Company, Shanghai Inabata Trading Company and Taiwan Inabata Sangyo.

The 9854E lens.  All intermediate and end products: Unknown.

All intermediate and end products for which EDD has designed or tested the lens:  The LED module with lens.

All customers and purchasers of the 9854 lens:  I-Chiun Precision Industry Company, Shanghai Inabata Trading Company, and Taiwan Inabata Sangyo.

For the 9879 lens, all intermediate and end products for which the lens has been incorporated:  Unknown.

All intermediate and end products for which EDD has designed or tested the lens:  The LED module and the lens itself.

And for the customers:  LG Innotek Limited and Tohko Jushi Limited.

Interrogatory Number 2 to EDD:  Separately for each Enplas lens identified in response to Interrogatory Number 1, explain in detail how Enplas assists its customers, potential customers, purchasers, original equipment manufacturers, and/or original design manufacturers in using or incorporating the Enplas lens into intermediate or end products; including identifying any Enplas officers and employees involved in this

activity and describing all guidance, support, or instruction provided by EDD to its actual or potential customers and purchasers relating to the Enplas lenses or to intermediate or end products incorporating the Enplas lens, including, but not limited to, written, recorded, whether audio, video, or by other means, and pictorial guidance, as well as in person, telephonic, live, and Internet-based communication.

EDD's response to Interrogatory Number 2:  In general, EDD receives an LED, LED bar, or backlight module including LED bars from a customer seeking manufacture of an LED lens.  EDD produces trial products for use with the LED, bar, or module based on initial specification for the lens.  After the final specification for the lens has been established, EDD produces a new mold for that particular product in question.  A product manufactured using the new mold is provided to the customer for approval.  Following customer approval, the lens is mass produced by EDD.  For each and every step in this process, it occurs outside of the United States.

Interrogatory Number 3 to EDD:  Separately for each of the patents-in-suit identify the date when Enplas first became aware of the patent, describe the circumstances under which EDD first became aware of the patent, and identify all persons and documents to which Enplas first became aware of the patent.

EDD's response to Interrogatory Number 3:  EDD has been aware of the '554 patent since April 2, 2012; and has been

aware of the '209 patent since it received the October 16, 2013, letter from SSC's counsel.

Supplemental responses to defendant's First set of interrogatories.  I will reread the Interrogatory Response Number 1.

Interrogatory Question Number 1 to EDD:  For each Enplas lens provide all internal and external product names and model numbers that Enplas or its employees refer to each lens and identify engineering drawings relating to the lens, all design and performance specifications pertaining to the lens, all intermediate and end products in which the lens has been incorporated, all intermediate and end products for which EDD has designed or tested the lens, and all customers and/or purchasers of the lens, including the full business name and address.

EDD's first supplemental response to Interrogatory Number 1:  EDD is not engaged in any activity within the United States or which is intentionally or knowingly directed to customers in the United States concerning the Enplas lenses or accused products.  Nonetheless, EDD provides the below information in response to this interrogatory.

EDD identifies the following documents from which responsive information may be ascertained regarding EDD's customers pursuant to Federal Rules of Civil Procedure 33(d); that is, EDD 023461 through EDD 023462.  That's information

regarding sales of the accused lenses; EDD 020159 through EDD 023345, purchase orders and invoices; EDD 001793 through EDD 020071, that's e-mails including communications with customers; and EDD 023463 through EDD 046022, that's e-mails including communications with customers.

EDD identifies the following documents from which responsive information may be ascertained regarding specifications for the accused lenses pursuant to Federal Rules of Civil Procedure 33(d):  EDD 023362 through EDD 023460.

Interrogatory Question Number 2 to EDD:  Separately for each Enplas lens identified in response to Interrogatory Number 1, explain in detail how Enplas assists its customers, potential customers, purchasers, original equipment manufacturers, and/or original design manufacturers in using or incorporating Enplas lenses into intermediate or end products, including identifying any Enplas officers or employees involved in this activity and describing all guidance, support, or instruction provided by Enplas to its actual and potential customers and/or purchasers relating to Enplas lens or to intermediate or end products incorporating the Enplas, including, but not limited to, written, recorded, whether by audio, video, or other means, and pictorial guidance, as well as in person, telephonic, live, or Internet-based communications.

EDD's response to Interrogatory Number 2:  In general, EDD

receives an LED, LED bar, or backlight module, including LED bars from a customer, seeking manufacture of an from LED.  EDD produces trial products for use with the LED bar, bar, module based on the initial specification for the lens.  After the final specification for the lens product has been established, EDD produces a new mold for the particular product in question.  A product manufacturing the new mold is provided to the customer for approval.  Following customer approval, a lens is mass produced by EDD.  Each and every step of this process occurs outside the United States.

EDD's first supplemental response to Interrogatory Number 2:  As part of this process described in the original response in Interrogatory Number 2, prior to the development of the initial specification, EDD provides a form document for the lens type, which the customer uses to describe its requirements for the lens.  Through subsequent communications between EDD and the customer, the customer's agent during the design process, a specification is developed and eventually used to mass produce the lens.

Pursuant to Federal Rules of Civil Procedure 33(d), form documents for the lenses at issue in this case may be found at EDD 023362 through EDD 023460, and communications between EDD and its customers may be found at EDD 001793 through EDD 020071 and EDD 023463 through EDD 046022.

Interrogatory Question Number 2 to EDD -- or Number 3 to

EDD:   Separately for each of the patents-in-suit, identify the date which Enplas first became aware of the patent.  Describe the circumstances under which EDD first became aware of the patent and identify all persons and documents through which Enplas first became aware of the patents.

EDD's first supplemental response to Interrogatory Number 3:  EDD came into existence in April 2, 2012, when Enplas Corporation Japan (ECJ) established EDD as a separate company.  As such, EDD did not and could not have had actual knowledge of any information, including *inter alia*, the requested information before it was created on the date.  Business records in the possession of EDD, however, indicate that before EDD was formed, SSC and ECJ employees had discussed the '554 patent.

As such, EDD provides the information on information and belief and reserves its right to supplement, amend, or correct should additional information become available.

On information and belief, on or about September 30th, 2010, Mr. Murano, sales representative for ECJ, and Mr. Takashio, engineer for ECJ, met with Mr. Lee, vice president of SSC.  During this meeting, Mr. Lee informed Messrs. Murano and Takashio that SSC owned the '554 patent.

Subsequently, on or about May 25th to 26th of 2011, Mr. Murano met with Mr. Ryu, manager of SSC; Mr. Kim, manager of SSC; as many as three other representatives of SSC whose

identity is unknown; Mr. Chen, vice president of I-Chiun; Mr. Hong, manager of I-Chiun; as many as two other representatives from I-Chiun whose identity is unknown. During that meeting, SSC proposed that Enplas and SSC form a collaborative business relationship excluding other companies from entering entry to the LCD market. In this regard, SSC indicated that it had sent notice of patent infringement to Sharp and indicated it was contemplating it was filing lawsuits against LCD manufacturers in addition to Sharp. While SSC did not identify any specific LCD products of Sharp or others nor the basis for the alleged infringement, it affirmatively represented it had no intention to bring a lawsuit against SSC. See EDD 046023.

**MR. LABGOLD:** That last answer was misread. "SSC had no intention to bring a lawsuit against Enplas." You read it as SSC.

**MR. HYDE:** Correct. Sorry. Thank you.

**THE COURT:** Read the last two sentences, Mr. Hyde, if you will, just for clarity.

**MR. HYDE:** Absolutely.

While SSC did not identify any specific LCD products of Sharp or others nor the basis for the alleged infringement, it affirmatively represented it had no intention to bring a lawsuit against Enplas. See EDD 046023.

One more set and we're almost done, Your Honor.

Case 3:13-cv-05038-NC  Document 451  Filed 03/25/16  Page 144 of 252   498
PROCEEDINGS

This is Interrogatory Number 7 to Enplas -- to EDD. Excuse me.  Identify and describe in detail each license, agreement, contract, or covenant, whether written or oral, to which you are a part that covers or otherwise relates to any accused product or feature, technology, component, or part thereof.  For each such license agreement, contract, or covenant, your response should include an identification and description of its terms and parties and the effective time period; the patent numbers, patent application numbers, and accused products to which it pertains; all compensation, i.e., running royalties, lump sum payments, stock, or equity received and paid; all communications relating to its negotiation and drafting; the persons most knowledgeable about the foregoing information and subject matters known to them; and any documents set forth or otherwise reflecting the foregoing information.

EDD's response to Interrogatory Number 7:  EDD has not entered into any licensing arrangements concerning the relevant technology regardless of how the document is characterized: Licenses, contracts, agreements, et cetera.

That concludes our discovery read-in.

**THE COURT:**  Thank you, Mr. Hyde.

**MR. HYDE:**  Thank you.

**THE COURT:**  And if SSC will call its next witness, please.

MR. GOTTS:  Your Honor, our next witness is Dr. Duncan Moore, and Mr. Owens will handle the examination.

THE COURT:  Dr. Moore, come on forward.

And, ladies and gentlemen, Dr. Moore is one of the type of witnesses described during the opening instructions as an expert witness who, because of his skills, experience, and education is permitted to state his opinions on topics in the case.  There will be other experts called in the case, but Dr. Moore is the first in that category.

Dr. Moore, if you'll be sworn in.

**DUNCAN MOORE**,

called as a witness for the Defendant, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name for the record.

THE WITNESS:  Duncan Moore.

THE COURT:  You may.

**DIRECT EXAMINATION**

BY MR. OWENS:

Q.   Professor Moore, I'm going to bring you this binder here that's going to help you out a bit.

Good afternoon.

A.   Good afternoon.

Q.   Could you please introduce yourself to the jury?

**A.**   Yes.   I'm Duncan Moore.

**Q.**   And what are you here to testify about today?

**A.**   I'm here to testify regarding the infringement of patents '209 and '554.

**Q.**   So let's discuss your background a little bit.   If you please turn to the first tab in your binder there, there's a Tab DTX-1123.   Do you see that?

**A.**   Yes, I do.

**Q.**   And what is that?

**A.**   It's a copy of my curriculum vitae.

**Q.**   Is it current?

**A.**   It's about a year old.

**Q.**   Okay.

         **MR. OWENS:**   Your Honor, we offer DTX-1123 into evidence.

         **MR. LABGOLD:**   No objection.

         **THE COURT:**   1123 is admitted.

      (Defense Exhibit 1123 received in evidence)

         **THE COURT:**   Proceed.

**BY MR. OWENS:**

**Q.**   So let's please turn to the top of page 5 of this exhibit. Could you please describe your education?

**A.**   Yes.   I received a baccalaureate degree from the University of Maine at Orono in physics.   I received a Master's degree in optics from the University of Rochester.   I received

a Ph.D. in optics from the University of Rochester.

Q.    Could you describe what optics is?

A.    Yeah.  Optics is -- lots of people think of optics being eyeglasses, but it's not.  I mean, it includes eyeglasses.  It includes things like lasers and fiberoptics and lenses, like for your camera or your cell phone.  And so I actually specialize in lenses for camera lenses and concentrating photovoltaics and things of that sort.

Q.    Let's please turn to page 3 of DXT-1123.

Could you please describe generally what you've done since you graduated with your Ph.D.?

A.    Yeah.  Immediately upon graduating from my Ph.D., I joined the faculty of the University of Rochester as an assistant professor; and then gradually over the years I became an associate professor, then a full professor, and then I now have an endowed chair in optics.

Q.    And it says here you're a professor at the Institute of Optics.  Can you describe what that is?

A.    Yeah.  The Institute of Optics, if it were started today, it would be called the Department of Optics; but for historical reasons, it was called the institute.  It's the oldest department in the United States for teaching of optics, and we like to think it's the premiere department for teaching optics in the United States.

Q.    So if we go up a little bit, it says you were the

Associate Director for Technology at the White House.  Could you please describe what that is?

A.   Yes.  This is a semi-confirmed position.  The United States Senate must confirm you for these positions.  And I reported to the science adviser to the President, in this case President Clinton, and we did work for both Vice President Gore and President Clinton.

Among the things we worked on was the so-called Nanotechnology Initiative that was begun during that period and has been carried on since then.  Other issues were what was called a Clean Car Initiative to make cars more efficient and create less pollution.  And a final one was we worked on something called Elder Tech, which would allow people to live independently longer in their own homes.

Q.   Great.

So if we could also turn to page 56 of DTX-1123, and it says you've done some work for NASA.  Could you please describe that work?

A.   Yeah.  Some of you may remember in 1990 when the Hubble Space Telescope launched, there was a problem.  About four or five weeks after the launch, they started realizing, uh-oh, a mistake was made.  So I was called down to Goddard Space Flight Center outside of Washington, D. C., for what was supposed to be a one-day meeting to see how to fix it.

It took us about a year to figure out what was wrong with

it, and we ultimately did fix it with incredible results; and many of you have probably seen the photographs that have been taken through the Hubble Space Telescope.  They're really fantastic.

Q.    Do you still do work for NASA?

A.    I do.  I'm chairing the committee for the next telescope. The Hubble Telescope you may remember is about 6 feet across. So it's a pretty big telescope.  The new one is going to be 18 feet across, and one of the things at NASA does no one have is a Hubble problem.  And so they put together a committee, which I chair, to look at what happens -- make sure it doesn't happen because, unlike the Hubble, this telescope it's going to be very, very difficult to repair; and so if a mistake is made, we're in big trouble.

Q.    So you mentioned lenses.  What has been your involvement with lenses in your career?

A.    I've been -- I've been teaching aspects of lenses for my whole professional career since I joined the faculty.  So I've taken -- taught a number of courses around lenses.

Q.    And maybe we can go to pages 39 and 40 of your CV.

      Actually, let's jump to 62.  I think this is what you're talking about.  And does this describe some of the classes that you were just mentioning?

A.    Yes.  These are the classes I've taught since I joined the faculty.  A number of them have to do with lenses, including

the course numbered 241, which is Geometrical Optics; 441, Instrumental Optics; 442, a course actually in the design of lenses; 444; and one in Optics 591.

**Q.** So do you have any patents related to lenses?

**A.** I do.

**Q.** Maybe we can turn to 39 and 40. What does this show?

**A.** This shows the list of patents that I have been either the sole author or co-author on since the beginning, since I joined the faculty in -- well, actually, it goes back before I joined the faculty.

**Q.** And do any of these relate to lenses?

**A.** Many of them do. You can see one on a rifle scope. You can see the ones -- the last three all involve lenses for the collection of light. There's one on optical disc pickup that's near the top. And so the top two, telecentric lenses, are all in that category.

**Q.** And do any of these categories relate to total internal reflection?

**A.** Yes. As a matter of fact, there are two more patents that are not on this CV that have been issued. One issued in late January of this year, about six weeks ago. And the last five patents, the three that are listed plus the two that are not listed, all have to do with total internal reflection.

**MR. OWENS:** Your Honor, just for the record, the parties have stipulated to Dr. Moore being an expert regarding

the infringement of the '554 and '209 patents, the level of ordinary skill in the art, the validity of the '554 and '209 patents, testimony relevant to damages, and other subjects as set forth in Professor Moore's expert reports, declaration, and deposition.

Q.   So, Professor Moore --

THE COURT:  And just to pause there, and EDD does not wish to examine the witness at this time on his expertise but to defer until cross-examination?

MR. LABGOLD:  Yes, Your Honor.

THE COURT:  Very well.  Pursuant to the pretrial work in the case and the stipulation of the parties, I will permit Dr. Moore to testify within the confines of what's been proffered as an expert.

MR. OWENS:  Thank you, Your Honor.

Q.   Professor Moore, now I'd like to ask you about your opinions in this case.  And have you prepared any materials to help explain your testimony today?

A.   Yes, I have.

MR. OWENS:  Your Honor, we've marked slides as a demonstrative for identification as a demonstrative exhibit numbered DDX.  We'll be referring to the internal page numbers as we proceed, just for the record.

MR. GOTTS:  What's the number?

MR. OWENS:  DDX-4.

THE COURT:  Are these also in the binder?

MR. OWENS:  They're not in the binder, Your Honor, but we'd be happy to pass those forward.

THE COURT:  Thank you.

(Pause in proceedings.)

THE COURT:  You may proceed.

MR. OWENS:  Okay.  So maybe we can go to the first side, Chris.

Q.   Okay.  So let's first discuss the patents in the case.  I think in your binder you have DTX-101 and DTX-100 -- actually, let me repeat that -- DTX-1001 and DTX-1004.  And what are those?

A.   1001 is a copy of the patent '209, and 1004 is the patent '554.

Q.   And are you familiar with those patents?

A.   Yes, I am.

Q.   And it looks like you prepared a graphic for these patents.

A.   Yes.

Q.   Can you please talk about the patents?

A.   Yes.  So the patent '209 was filed in 1997 as you can see, and it was issued in 1999, December of 1999.  It has to do with the light sources for backlighting, particularly backlighting of televisions.

The patent '554 was also filed about that same time, in

September of 1997.  It was issued in October of 2002, and it has to do with light apparatus having low profile, usually associated with back-panel illumination.

Q.    And can you describe more about what these patents generally relate to?

A.    Yes.  So the patents relate to the issues associated with what happens when you see the raw LEDs.  A LED is a very bright source, and what -- if you just look at it, you're going to get a bright spot.  So what you like to do is figure out a way -- excuse me -- a way to make sure that spot is eliminated because what you ultimately want on the screen, such as the ones you're looking at, is you want uniformity.  You don't want to have a whole series of bright dots in front of you.  So that's the main part of that.

The '554 is one in which it shows, if you -- there's a possibility that you can actually turn it away and remove all the light out of the center, in which case you have a dark spot left over.  And that's not desirable either, because you don't want dark spots in the middle of your screen.  And so it addresses that particular issue.

Q.    And in your opinion what did this technology enable?

A.    Well, it's enables the whole issue -- the whole idea of fairly large direct backlighting of televisions.  You may have noticed as you go into the stores, the size of the TVs are getting really, really big.  Well, this is all enabled by this

kind of technology.

Q.   And what are the advantages of direct-type backlighting?

A.   Well, the first advantage is cost.  You probably have noticed the cost of TVs has plummeted over the last few years. They're much more efficient than they were before; that is, and the performance is much better than they were.  The quality of the pictures we're seeing today is just remarkable compared to what it was just a few years ago.

Q.   Thank you.

Let's first turn to the '209 patent.  How did the '209 solve the bright spot problem you were talking about?

A.   Well, the first thing it did is it directed the light from a multiplicity of sources.  So we had a lot of sources, and we need to direct that light away from those sources.  And the idea is to eliminate the dark spots -- or the white spots, rather; and the light is distributed through this whole cavity because you've got a cavity that's as big as your TV.  And so you want to have the light coming out of that be nice and uniform so no matter where you view it, everybody's seeing the same image.

Q.   And this is DDX-4, page 4?

A.   Yes, it is.

Q.   Okay.  And you talked about how light is distributed in the cavity.  How is that done in the '209 patent?

A.   In the case you have -- excuse me.

Referring to this particular figure, you're actually using a baffle to do that, and you can see a series of LEDs associated with that.  But the claims do not require there to be a baffle.

Q.   And what did you shade in green here?

A.   That is the -- that is the cavity.  You can see that in the top view, which is where you see the eyeball at the top looking through four layers, and you're looking down into this cavity.  That is an opening.  So that becomes the thickness of your overall TV or the display part of it.  And so on the back plane of that cavity is -- are these LEDs.

Q.   And what is the purpose of the cavity in the '209 patent?

A.   The purpose of the cavity is to make the light, as it comes out of the LEDs, bounce around.  You want it to bounce around, come off the back surface of that, so that when everything is intermixed, you don't see the LEDs anymore at all.

Q.   And we're on page 6 of DDX-4.  Does this describe something related to the patent cavity?

A.   Yeah.  So the cavity as a whole acts as what's called a Lambertian source, and all you need to know is that means it looks the same in all directions.  It's like a mat finish when you paint a wall.  It looks the same in all directions.

Q.   So let's turn to your infringement analysis for the '209 patent.  What were the accused products?

**A.**   The accused products as shown here, there were six of the products and they're listed here.  They were all bought in the Los Angeles area except for one, which was delivered to the Los Angeles area.  So they're done in the United States.

**Q.**   And how did you analyze these televisions?

**A.**   Well, the way you'd analyze a TV system like this, you take it apart.  You actually -- when you take it apart, you actually destroy it, which is a very unfortunate thing to be doing, but that's, in fact, what happens.

**Q.**   And did you see this dismantling?

**A.**   No, I did not.  The TVs were dismantled in Korea.

**Q.**   And so how did you observe the dismantling?

**A.**   So what I was provided was documentation that showed the documentation of the purchase of the TVs, the photographs of the TVs when they were in the box, and then as -- step by step as they were taken apart.

**Q.**   Did you talk with anybody about the dismantling?

**A.**   Yes.  I talked to Mr. Ye.

**Q.**   And who is he?

**A.**   He is an engineer at SSC in Korea, and one of his responsibilities is to take and look to see if they're infringing products.

**Q.**   Okay.  Let's look at Tabs 4 through 32 of your binder there.  We'll step through these, but I just want to read them into the record.  I understand that these all have been

admitted already into evidence, but just so you have them there for your reference.

They go DTX-1040, 1041, 1135A, B, C, and D.  I believe those are associated with the JVC 9854E television.

There's DTX-1073, 1074, 1075, associated with the Seiki 9854D television.

A.   I see that.  Correct.

Q.   DTX-1103, 1104, 1105, 1136A, B, C, and D, associated with the LG television.

There's DTX-1050, 1051, 1052, associated with the Sanyo television?

A.   Yes.

Q.   DTX-1083, 113A, associated with the Sharp television.

And DTX-1101 and DTX-1102, associated with an RCA television.

Do you see all those in there?

A.   I do.

Q.   And what are these exhibits?

A.   These are exhibits that were provided to me to show the dismantling of the televisions.

Q.   Okay.  And those are the ones on page 8 of DDX-4?

A.   Yes.

Q.   And how did you use these photographs?

A.   Well, I used them to confirm that the TVs were bought in the United States and what was inside of the televisions as

they were dismantled.

Q.   And what did you find based on the photographs?

A.   Well, based on the photographs, all of these TVs are essentially the same design, and they have similar parts to them; and so from that, I was able to analyze each one of them and to find out how the system actually worked.

Q.   And can you go through an example of that?

A.   Yeah.  So beginning with the Seiki one, we take -- so you see the box for the Seiki TV, and that's a 40-inch TV.  The first thing you have of a part that's closest to you as the observer is what's called a liquid crystal display, an LCD display.  And so that's the -- that's where the actual images are formed that you watch on the television.  But there's no light that comes out of an LCD by itself, so you need something to illuminate it.

So the next thing that happens is -- so you see -- in the lower right-hand corner, you see a series of films that have been taken out and laid there; and the shiny layer that's there, that's what's called the brightness-enhancing film.  And you can tell it's that because it's reflective.  You can see it's shiny, and so that's that film.

There is another film that's on top of that one, which is not necessary as part of the claims.  There can be more films than just this one and one more we're going to describe, but it must have at least two, the brightness-enhancing film and one

we call the diffuser.

Q.   So on page 10 of the demonstrative, how can you tell that that particular film is the brightness-enhancing film?

A.   As I said, you see it because it's shiny.  And so because it's shiny, it does that.  I think we've got it so when we colorize it, so it's a lot easier to see.  You can see, to make it observable in the display, it's shown in green.  Of course, it's not green at all.

Q.   And this is from DTX-1075?

A.   Yes, it is.

Q.   And what's next?

A.   Okay.  Behind that has to be a diffuser.  Where you see the diffuser there, the function of a diffuser is it actually spreads the light around.  Now, it's the same phenomena as you have, for example, if you go and buy a lightbulb at Home Depot or anyplace like that, you can buy a lightbulb that's clear, has a clear bulb on it, but it's really bright when you look in that bulb.  So what you do -- what do you do?  You coat it on the inside so it's -- it has a diffuser, which then diffuses the light in all directions and softens it so it's not as intense as the other lights.  That's what this layer does, it actually softens the LED so the light is spread out more than would be normally apart.

Q.   Let's go to Slide 12 here.  What is this showing?

A.   So behind that is a tray, a white tray, and you can see

the white trays on the lower right-hand side.  It's got some holes in it.  And so that tray, you'll notice it's pretty much of a mat finish.  It's not shiny.  It's a mat finish.  And so that helps make the system a Lambertian surface.  That is, remember, that's the one I want to make it uniform and so the light isn't bouncing around inside that cavity; and when it finally exits from it, it then comes out as this what I call Lambertian source -- surface.

Q.   And going to Slide 13, what does this show?

A.   Then behind that mounted on the back wall are the light bars.  These are the bars which are shown here, and you can see there are four light bars in this particular one with LEDs and with lenses on them.

Q.   Maybe if I can hand you --

A.   Yes, please.

Q.   -- a light bar that's been previously admitted into evidence DTX-1034.

A.   Yes.  I believe you may have all seen this already. You'll notice in this case there are three lenses left on here, and three lenses have been popped off.  Okay.  So that you can -- the ones that are popped off, you can see the -- oh, sorry -- you can see the LED right in the middle here (indicating), and the emission surface is that kind of yellowish color that's associated with that.

    And so the one here (indicating), here (indicating), and

here (indicating) have been popped off, and the lenses are left here (indicating).  So you get an idea of what the sizes of these lenses are relative to the display.  So it's rather small compared to the display.

Q.    And which television is that light bar from?

A.    This is from a JVC, I believe.

Q.    Okay.  And Slide 14, what are you showing here?

A.    All right.  So now what we're going to do is we're going to take apart the light bar.  So just as I mentioned before, we're going to pop off the lenses.  Behind there is the LED, and then this part here is the printed circuit board.  So that's where the electricity gets in here.  It also acts as a heat sink to take the heat away from the LED.

Then in the upper left-hand corner is a photograph of one of the lenses where you're actually looking straight down on it.  You're photographing it from this angle (indicating), and you're seeing the top view of it.  And if you look real carefully in the image, but you can see it -- when you look at this particular one, you can actually see the LED through the center.  And so we've got dashed lines indicating it's below that -- below the lens.

Q.    And that's in DTX-1073, page 44?

A.    Yes.

Q.    Okay.  Let's go from Slide 14 to 15.  What's shown here?

A.    This is an image, a photograph of the lens numbered 9854D,

and it's taken from the bottom of the lens.  So it's taken if I pop this lens off and look at the bottom of it.  It shows the Enplas logo, company logo, at the top, and it shows the part number as being 9854D.

Q.   All right.  Okay.  Let's go to your infringement analysis. Which claim did you analyze for this patent?

A.   I analyzed Claim 20 for this.

Q.   And what information did you use to understand this claim?

A.   I used three things.  I used the specifications, that is that part of the patent where the author outlines some of the information; I used the -- any claim construction if there was one, in the case there wasn't any; but -- and then finally I used the information what somebody of ordinary skill in the art would know in 1997.

Q.   And what is your opinion as to the knowledge of one of ordinary skill in the art for the '209 patent in 1997?

A.   In 1997, it would be a person who has an undergraduate degree in optical engineering, physics, electrical engineering, with three or more years of experience designing LED systems, optical systems.

Q.   And were you a person of at least ordinary skill in 1997?

A.   Yes, I was.

Q.   And have you formed an opinion as to whether the six televisions you analyzed infringe Claim 20?

A.   I have, and I believe they do.

Q.   Okay.  And let's start with the Seiki television here, and let's start with the first limitation of Claim 20, and that reads "a method of backlighting a display panel."

Have you formed an opinion as to whether the Seiki television meets that limitation?

A.   Yes, it does.  It's clearly a display because it's a television display and so, therefore, it does contain that element.

Q.   And it says "a method of backlighting a display panel." What does that mean?

A.   What that means is whenever you turn on your TV, you're doing it.  Assume whoever has the remote and turns it on, that would enable this.

Q.   So who's performing this method?

A.   The customer.

Q.   Okay.  And it's Slide 18?

A.   Yes.

Q.   So going to Slide 19, what is your opinion?

A.   So I believe that element is there.

Q.   Okay.  Let's go to the next limitation of Claim 20.  This is Slide 20, and it says "producing illumination from a substantially Lambertian light source comprising a cavity with internal sidewalls, an internal bottom wall, and an aperture."

Have you formed an opinion as to whether this limitation is met by the Seiki television?

A.    Yes, I have, and it does.

Q.    Okay.  Let's look first at the cavity here.  Can you tell us more about that?

A.    Sure.  So the cavity is an opening.  It's air.  So that would define the cavity, and you can see that's exactly what we have here.

      We have the internal sidewalls.  We have walls on the side that are actually slanted about 45 degrees.  We have an internal bottom wall as shown here in blue, and we have an aperture.  We see that the aperture is that area in which the light comes out of the television.  So that defines that active area.

Q.    So what's your opinion?

A.    This meets all the criteria for this element.

Q.    All right.  Let's go to the next limitation.  This says "said step of producing illumination comprising the step of directing light rays emitted by plural light sources mounted on said internal bottom wall and around the perimeter of the aperture into the cavity such that the light exiting the aperture is substantially uniform in intensity and color."

      Have you formed an opinion as to whether that limitation is met with the Seiki television?

A.    Yes, I have, and it does.

Q.    Okay.  So this is Slide 24?

A.    Yes, and we'll step through this because it's such a long

sentence.

So the first thing we need to do is we need -- we have to have a plurality or multiple light sources.  That's one of the key elements.  And so we're going to take that light, and we're going to redirect -- I'm sorry -- direct the light from these light sources around this cavity.

Q.   And what are the light sources?

A.   The light sources are LEDs.

Q.   And how are they directed in this case?

A.   They're directed by lenses.

Q.   And what else?

A.   Okay.  So then "such said the light exiting the aperture," remember that was the pink section, "is substantially uniform in intensity and color."  You want to have the same color in every direction and you want to have the same intensity in every direction.

Q.   So going to Slide 25, what's your opinion?

A.   Okay.  And then we need some of the LEDs mounted on the internal bottom wall.  We see that.  And we see some of them are mounted around the perimeter of the aperture in the cavity.  So we have them in the center and we have them around the perimeter of this cavity.  So that element is also met.

Q.   All right.  Let's go to the next element.  "Using a diffuser to diffuse light from said substantially Lambertian light source."  Is this limitation met by the Seiki television?

**A.** Yes, it is. And as we've set out before, when we were taking the lenses -- the systems apart, the element that's closest to the LED bar is the diffuser, and that diffuser is shown for schematic purposes as shown in yellow.

**Q.** This is Slide 28 and DTX-1075?

**A.** Yes, it is.

And so the diffuser is used to diffuse light, and so it becomes a substantially Lambertian light source.

**Q.** Becomes a substantially --

**A.** Diffused light from said -- well, from -- it diffuses light from the substantially Lambertian light source.

**Q.** So let's turn to the next -- oh, okay. What did that show?

**A.** This shows the diffuser being put back onto the television with the cavity; and so you see when you did that, the LED lights diffused out, the light became more uniform.

**Q.** So what is your opinion?

**A.** That that element is also met.

**Q.** All right. Let's go to the next opinion. "Using a brightness-enhancing film to concentrate the diffused light into a predetermined angular range without significantly reducing the uniformity of the diffused light."

Have you formed an opinion as to this limitation?

**A.** Yes, I did, and it does.

So a brightness-enhancing film does the following: We

said that the Lambertian source is uniform in all directions. That's great when you're going left to right in the room, but it also means a lot of light is going towards the ceiling and it's going into the floor. Well, that's wasted. So what you want to do is you use a bright -- brightness-enhancing film to concentrate the light into the direction where people are actually going to be.

And so it means that you're being more efficient because no -- unless you're, you know, working on the ceiling or something, there's no reason to have light up there.

Q. And this is Slide 31, DTX-1075?

A. Yes, it is.

And so as I described, it concentrates the light in predetermined angles, that is angles where people would be observing it, but without reducing the uniformity. You still want to have it nice and uniform going, if you will, left to right. And, therefore, this element is also -- meets the criteria.

Q. So let's look at the final limitation here of Claim 20, and this is "directing the concentrated diffused light onto said display panel."

Did you form an opinion as to this limitation?

A. Yes, it does. And this is actually the actual display. This is the display of the mountain in the background. That is your actual LCD display that's being illuminated. So the

combination of those allows you to actually see the images on the television.

Q.   And going from Slide 34 to 35 -- here we are -- what's your final opinion on the Seiki television?

A.   So all of the elements are met and, therefore, this claim is infringed.

Q.   All right.  Let's turn to the JVC television.  Did you form an opinion as to whether the JVC television met Claim 20?

A.   I did, and it does.  So in this case what we're going to do is we're going to make -- we're not going to go through all the steps as we did before, but we're going to see that they're all the same design.  There's slight variations in the theme, but they're pretty consistent with all the elements.

So the first thing we need to have is we need to have multiplicity of sources.  We see multiplicity of sources in this case because the previous TV I think was 42 inches, and this is only 32 inches.  You don't need as many lightbulbs -- or LEDs, rather.  And so we see around the perimeter and we see them all -- we see the center ones on the back plane.

We have a diffuser shown in yellow, and we have the brightness-enhancing film shown in green.  And we'll use these colors consistently as we go through each of the TV sets.

Q.   And for the record, this is Slide 37 of DDX-4, and DTX-1135D and 1135B; is that correct?

A.   Yes.

Q.   So what was your final opinion on the JVC television?

A.   That this TV also infringes Claim Number 20.

Q.   Okay.  So let's go to the next set of televisions. There's an LG and a Sanyo television.  Why did you group those together?

A.   Because they have exactly the same systems of images -- I mean, sorry -- light bars.

Q.   Okay.  And why don't we start with the LG television.  Why don't you tell us about that?

A.   Okay.  This is another 42-inch one, so you expect to see more LEDs.  You see the diffuser in yellow, the brightness-enhancing film in green, and there are two other films in there which are not relevant to this Claim 20.

Again, we have a plurality of or multiple light sources, and we have them in the center and we have them around the perimeter.

Q.   So going from Slide 40 to Slide 41, you have a Sanyo television here.  What was your opinion on this television?

A.   The same.  So you can see the configuration here.  You see the brightness-enhancing film, the diffuser, and you see the multiple light sources.

Q.   Okay.  And this is DTX-1050 and DTX-1052, for the record, that you're looking at here?

A.   Yes.

Q.   So what was your final opinion on the LG and Sanyo

televisions?

**A.**   That they also infringe Claim Number 20.

**Q.**   Okay.  Going from Slide 42 to 43, let's talk about the RCA television.  Did you form an opinion as to whether this television infringed?

**A.**   Yes, and it does.

And, again, we see this is a 32-inch TV, so it's back to the smaller TVs.  It has a diffuser, it has a brightness-enhancing film, and it has multiple sources on the bottom and around the perimeter.

**Q.**   And this is Slide 44, and we're looking at DTX-1101 for these images?

**A.**   Yes, we are.

**Q.**   Okay.  So what was your final opinion on the RCA television?

**A.**   That the RCA television also infringes Claim Number 20 of the '209 patent.

**Q.**   All right.  Going from 45 to 46, our final television, the Sharp television, did you form an opinion as to this television?

**A.**   Yes, I did, and it does.

And, again, we see the diffuser, the brightness-enhancing film.  We see the multiple LEDs on the back plane and around the perimeter.

**Q.**   This is Slide 47 with DTX-1083 is where these photos are

coming from?

A. Yes, it is.

Q. Okay. And so your final opinion on the Sharp television?

A. The Sharp television also infringes Claim Number 20 of the '209 patent.

Q. All right. So overall -- of the six televisions that you analyzed, what was your overall opinion?

A. That all six of them infringe Claim Number 20 of the '209 patent.

Q. All right, great.

Why don't we go to the '554 patent. And could you explain to us in a bit more detail what the '554 patent -- the problem it solved?

A. Yeah. So in the case of the '554 patent, we are going now having dark spots that we want to eliminate, and that's also objectionable, and we'll show how to do that in the next slide or two.

All right. So the technology that's being used here is we're going to use a technique called total internal reflection. And so the idea here is in this case we have no total internal reflection, and so the light from the LED that's in the center is now going to come out of this surface, out in every part of it. So that's -- that's the bright-light problem.

Okay. So now what we're going to do is we're going to

curve that surface so that we redirect -- excuse me -- redirect the light.  So instead of coming out directly towards you, it goes to the sides.

Well, what happens?  When you do that, then there's no light coming out right directly out of the top.  So you've solved one problem and you've created another problem, and so now what you'd like to do is solve that problem.

Q.   And this is Slide 52 you're looking at?

A.   Yes, it is.

Q.   So how did the '554 patent suggest solving that problem?

A.   So the way it did it was to create what they called a leaky surface.  So rather than having this cusp that comes straight to the center that's a point, imagine you rounded that a little bit and you recontoured that surface.  If you did it correctly, then some of the light would leak out.  It wouldn't be totally internally reflected.  So you have part of it would be TIR'd, and part would leak out and come out towards you with the idea that if you did it correctly and did the design correctly, you would now have a uniform illumination, which is your ultimate goal.

Q.   So we went from Slide 53 to Slide 54.  What does this show?

A.   Okay.  So in the case of where the dark spots are objectionable, we're going to recontour the surface and going to take a significant amount of light that's impinged on this

particular part of it.  Okay.  It's not all the LED light.
It's the light that's actually on that center section.  And now
we're going to redistribute that light to eliminate the dark
spots.

And so now the three as shown in cross-section in which
you have -- the first one you have the bright spots, on the
right-hand side you have the dark spots, and the final one in
the middle you have a uniform distribution.  So you've taken
partially TIR and partially leaky to create this correction.

Q.  So going from slide -- did the '554 patent address any
other problems?

A.  Yes, it did.  There was another problem involving the lens
being encapsulated.  So in many of the systems the LED was
encapsulated in some sort of material.  Well, that's a real
problem as these LEDs get brighter and brighter and brighter.
Because when they get brighter and brighter and brighter, they
get hotter and hotter and hotter, and that's a problem.

You want to separate those two from one another.  And so
the best way to do that is have an interface; that is, have
some air between the two because that way the transfer of heat
is a lot lower, and you're not going to melt the plastic
elements.

Q.  And this is Slide 57.  Does this relate to your testimony?

A.  Yeah.  So the way to do this is Dr. Pelka talked about it
on Tuesday, he talked about an illumination coupler or

illumination coupling of the light from the LED into the optical element.

So in that system you could make -- so you can see the illumination coupler is kind of that purple slash pink area. So it extends from a refractive surface down at the bottom, which is drawn here as being convex -- that is, it's curved downwards in this particular case -- and goes up to an upper surface there, which we'll describe later.

Q.   Is that the surface you're talking about?

A.   Yeah.  So that's the convex surface in the way we talk about optics; and if we -- but he says in his -- in the description, it says that the surface can be either convex as drawn here or it can be concave.

And so -- and now you notice the surface is now concave; that is, it's now curved inward as the same way you would do as if you drilled into it.  You'd create a concaved surface at the end of your drill bit.

And the advantage of the concave surface is it acts like a negative lens; that is, it takes the light instead of going straightforward or focusing it down, it takes it and diverges it.  So that means when you do that -- I mean, when it diverts the light, then the light is more likely to hit that top surface at beyond the critical angle and, therefore, be TIR'd; that is, totally internally reflected.

Q.   Thank you, Dr. Moore.

Let's turn to your infringement analysis.  And which televisions did you analyze for the '554 patent?

A.   There were three of them that are shown here.  Again, they were -- two of them were purchased in the greater Los Angeles area, and one was shipped from Amazon to the Los Angeles facility.

Q.   And what specifically did you look at for the '554 patent in these televisions?

A.   Well, here what we were looking for is looking at the light bars, and then looking at the LEDs and the lenses associated with them so that we could actually tell, you know, what -- whether the lenses exhibited these unencapsulated -- that is, not encapsulated -- materials and that they show leaky surfaces.

Q.   So going from Slide 60 to 61, are these the ones you looked at?

A.   Yes.  These are photographs of the three lenses that are in question here:  The 9854D, the 9854E, and the 9879.

Q.   So going from 61 to 62, let's talk about the methodology you used to examine the light bars for purposes of the '554 patent.

How did you begin?  What did you have to do in order to do this analysis?

A.   Well, a standard practice in doing this would be to take the television apart, to actually measure the real television

to see if all the elements are there. Because before when you're buying a television at Best Buy or wherever you buy it, you don't know what's inside of there. All you care as a customer is what you're seeing on the television, that you get a good image.

But if you're building a product, what you like to know is: What's really in there and how is it working? So it's very sad to see all these TVs taken apart, but it's a really fun exercise.

Q. Next slide.

So for the '554 patent, what did you specifically do?

A. Okay. So what we did, we need to find somebody to model the characteristics of this because this is not a simple problem. I mean, you have all these LEDs. You've got white surfaces. You've got diffusers. You've got all these other things. So you need to find an organization or a company that can actually do this modeling, and a company that can do that is a company called Breault Research that's based in Tucson, Arizona.

Q. And do you know why Breault Research was selected?

A. Yes. In the '554 patent, the one that we're describing now, they're actually called out as a company that can do the modeling. And so the program is called ASAP, and it's a product of Breault Research. Breault Research sells the ASAP program as a customer if you want one; but they also provide

engineering services so that if you want to just take some products there, they will actually do the analysis for you.

Q.   And what kind of program is this ASAP program?

A.   It's a computer simulation program.  So what it does is, and we'll talk about ray tracing a little bit later, but essentially what it does, it determines where all the light goes.  And so you can figure out, ah ha, the light goes -- this part of the light goes over here (indicating), and this part of the light goes over there (indicating), and you figure out what the composite of all these is.

Q.   And who did you work with at Breault?

A.   A person named Kevin Garcia, who's the chief technical officer for Breault Research.

Q.   And if you turn to Tab 27 in your binder there, there is a document DTX-1234.

A.   (Witness examines document.)

Q.   Could you look at that and let me know what that is?

A.   Yes, it is.  It's an analysis done by Breault Research entitled "Measurement and Analysis of an Illumination Optic."

Q.   And did you rely on this document?

A.   I did.

MR. OWENS:  Your Honor, we offer into evidence DTX-1234.

(Pause in proceedings.)

MR. LABGOLD:  Okay.

THE COURT:  1234 is admitted.

(Defense Exhibit 1234 received in evidence)

BY MR. OWENS:

Q.   And, Professor Moore, if you could please turn to Tabs 28, 29, and 30.

A.   (Witness examines document.)

Q.   And these are DTX-1110, DTX-1108, and DTX-1109.  What are these documents?

A.   The last one is 1110.

Q.   Oh, yeah, it is.  1109.  Today and numbers.

A.   Okay, yes.

So those are the documents that are used as backup for the previous admitted one.

Q.   And did you rely on those?

A.   I did.

MR. OWENS:  Your Honor, may we offer into evidence DTX-1110, DTX-1108, and DTX-1109?

MR. LABGOLD:  No objection.

THE COURT:  They're admitted.

(Defense Exhibits 1108, 1109, and 1110 received in evidence)

THE COURT:  Proceed.

BY MR. OWENS:

Q.   All right.  Let's go to the next set here.  There's Tabs 31 through 34 there, and they should have the Exhibit Numbers

DTX-1042, 1044, 1045, and 1046.  What do those relate to?

A.   These related to the optics numbered 9854E.

Q.   And who prepared those?

A.   Breault Research.

Q.   And did you rely on them?

A.   I did.

          MR. OWENS:  Your Honor, we offer into evidence DTX-1042, 1044, 1045, and 1046.

          MR. LABGOLD:  No objection.

          THE COURT:  Those are 1042 you said and up?  Not 11 -- I just didn't hear.

          MR. OWENS:  I apologize, Your Honor.  1046.

          THE COURT:  Great.  So 1042, '44 --

          MR. OWENS:  '44, '45, and '46, right.

          THE COURT:  They're admitted.

     (Defense Exhibits 1042, 1044, 1045, and 1046 received in evidence)

          THE COURT:  You may proceed.

BY MR. OWENS:

Q.   DTX -- and these are Tabs 35, 36, and 37 -- we're getting near the end there -- DTX-1076, 1078, and 1079.

A.   Yes.  Those are associated with the optic part number 9854D.

Q.   And did you rely on those?

A.   Yes, I did.

MR. OWENS:  Your Honor, we offer into evidence DTX-1076, 1078, and 1079.

MR. LABGOLD:  No objection.

THE COURT:  1076, 1078, and 1079 are admitted.

(Defense Exhibits 1076, 1078, and 1079 received in evidence)

BY MR. OWENS:

Q.   Final set, and these are Tabs 38, 39, 40, and 41, and it's DTX-1053, 1055, 1056, and 1057.  What do those relate to?

A.   They relate to the optic part number 98 -- I'm sorry -- yeah, 9879.

Q.   And who prepared them?

A.   Breault Research.

Q.   Did you rely on them?

A.   Yes, I did.

MR. OWENS:  Your Honor, we offer into evidence DTX-1053, 1055, 1056, and 1057.

MR. LABGOLD:  No objection.

THE COURT:  They are admitted.

(Defense Exhibits 1053, 1055, 1056, and 1057 received in evidence)

BY MR. OWENS:

Q.   All right.  Let's look at some photos from these exhibits. This is Slide 64 of the demonstrative, and I'm looking at DTX-1042.  Can you tell us what this is showing?

A.   Yes.   This is a photo -- the upper left-hand corner one is a photograph taken from the bottom of the optic.  So it's we pop it off and we look at the bottom and photograph that.

The one in the lower right-hand corner is one when you look at it from the side.  So if I've taken this (indicating) and I'm taking this light bar (indicating) and I'm looking at it in this direction (indicating).

Q.   And let's look a bit closer at looking from the side there.  How did you model this lens specifically?

A.   So what we need to do is we need to find all the parameters of the lens eventually, and then put this into a computer code, the ASAP program that I mentioned earlier on, and determine where all the light goes.

Q.   Going over to Slide 65, what does this show?

A.   So what this is is what's called a cross-section.  So imagine I took this lens and cut it right in half, right through the middle, and I looked at the side of that, and I would see this cross-sectional drawing of it.  This lens is what's called rotationally symmetric; that is, no matter how I slice the planes, the optic part of it is the same in all planes -- okay -- so where the actual optics action occurs.

Q.   Is doing a cross-section typical?

A.   Yes.  It's fairly typical when you do optical design because it simplifies it.  It requires less time in order to do the analysis.  Eventually you have to do the whole

three-dimensional one; and so when you do the final analysis, that's what you do.  But for this -- for this particular part of it, all we need to do is a cross-section.

Q.   This looks -- this is from page 2 of DTX-1045.

A.   Yes, it is.

Q.   And I see the ASAP software blown up there?

A.   Yes, that's correct.

Q.   And how was this model created that we see here?

A.   So what we wanted to do is we went through the whole process of taking things apart and measuring all the parameters.  So this is essentially a nine-step process we had to go through in order to get all the data.  So we'll go through each one of them in turn and describe what happened on those.

Q.   And who performed these steps?

A.   The tests were performed either by Breault or a company who had special abilities to make certain types of measurements.  So Breault would then subconract with other people to make some of the measurements because it did require fairly specialized equipment.

Q.   Okay.  Let's turn to the first step.  Can you tell us about that?

A.   Yeah.  So the first step is to measure the gap between the LED and the bottom of the lens, and that's shown here.  You can see there's a gap between those two.  And the way the -- the

standard way of measuring this -- because if you pop the lens off, you've lost where it was -- so what you do is there are what are called shims.  Okay.  So you slide very calibrated pieces of material -- think of them being pieces of paper and they're flexible like that -- you slide them between in this case the LED and the bottom of the lens.  In doing that, you keep doing thicker and thicker ones until finally you don't get anything through there.

And so for those of us who are old enough to remember tuning our cars back when we had carburetors and sparkplugs, this is the same type of thing you use to gap the sparkplugs and set the points.  And so we had -- you know, we all bought from Sears some of these devices -- which I still have, which I've never used in 30 years -- but, anyway, the point of the matter is you use this to actually determine the spacing between the two of those.  And this is a fairly standard practice for determining the gap of something.

Q.   Have you ever used shims before?

A.   I have.  We use that fairly regularly in some of the work we do in solar cells where we have to place the cell at a very specific location, so we'll put that in and fill it with adhesive.

Q.   And when this measurement was done -- and who did this measurement?

A.   Breault and Kevin Garcia.

Q.   And what gaps did Breault find?

A.   He found the gaps ran from about 25 microns to 125 microns, so a range of about 100 microns.  Just so most of -- most people don't think in microns, but it turns out it's the diameter of a human hair.  A human hair depending upon how fine your hair is or how thick it is is in the range of 75 to 100 microns.  So you think about that's what you're sliding in there.

Q.   And what gap did you decide to use for your analysis?

A.   So we decided to use -- because the range was 25 to 125, we decided to use the range -- we decided to use 75 between the two.  So we used the average of those two.

But to actually do the analysis to assure that no matter what the gap really was, we actually went through each of the lens -- the three lens systems and measured the parameters as a function of that gap.

And so -- I'm sorry -- recalculated the function of that gap.  So we did it all the way from 0 to 125, and we found there was very little difference between those.

Q.   All right.  Let's turn to the next step.

A.   All right.  So the next thing we need to do now that we know the gap, we can pop off the lens.  So that's what we're going to do.  We're going to pop off the lens, and now what's exposed is the LED.

Okay.  So now it's just like it is here (indicating), up

here (indicating).  We've popped off this lens (indicating).

There's an LED here (indicating).  And now this yellow area in

the center (indicating), which you can't see but you can see

over on the image there, you can then now measure the diameter

of that emitting area.  So the light is actually coming out of

that entire yellow area.  So you can think of that being the

source.  So we need to know that diameter because we need to

put that diameter into the computer simulation code.

So Kevin Garcia again measured them, and for the products

we had, they were in the range of 2.3 to 2.5 millimeters.  So

that's about order of magnitude an eighth of an inch.

Q.   And what diameters did you end up modeling?

A.   What we did was we actually had Breault model multiple

sources with each of these lenses because we didn't know going

forward what other products would show up with the same -- say

the same lens but a different LED.

So what we could then do is it was a lot more efficient,

once we had the code all set up, to just model all of them at

one time, and then we would decide which ones of the models we

would actually use depending upon what the size of the LED was.

Q.   And what range of diameters did you use?

A.   2.3 to 2.5.

Q.   In your analysis?

A.   Sorry.  In the analysis?  We did -- oh, we did 2 -- in the

analysis we did 2 -- 2.0, 2.2, and 2.5.

Q.   Okay.  Let's turn to the third step.  What did this involve?

A.   All right.  So the third step is now we need to figure out what the shape of these surfaces are.  So when you felt the -- if you put your finger through -- around this, you could feel there was a little bit of a dip in the center when you put your nail down in there, and so we needed to actually measure that shape very precisely.

And so we have two surfaces we need to measure.  We need to measure the top surface, which is the one with the dimple on it, and we need to measure the bottom one, which is like a dimple.

And so the way you do that is it's called a coordinate measuring machine.  That's a pretty fancy word, but it is a method by which you take something and trace across it.

Now, again, people that can remember record players back when we had record players and vinyl, there was a stylus on the end of that -- the needle that moved up and down as it rotated to create -- take that pattern that was embossed into the record and it would convert it to sound.

This is exactly the same principle.  In this case what happens is that the needle, if you will, goes -- it's on the end of that white stock, if you will, so it's right there in the other middle, and you'll see that there's a line drawn in the horizontal direction labeled X.  So that will be the X

dimension. And so what we're going to do is we're going to take that stylus and we're going to move it right through the center of that optic from one side to the other.

Then we're going to do the same thing in the Y direction. All right. So that we'll do -- you see X is left to right and Y is up and down, and we'll go right through the center of that.

You can see in the background in a fairly poor photograph, this is actually a Nikon coordinate measuring machine.

Q.   And who did this measurement?

A.   This was done by a company called ACT, which stands for Advanced Contouring -- I can't remember the name of it. ACT is like -- I'd like to say it's like AARP. Nobody really remembers what it stands for anymore, and I've forgotten what it stands for.

Q.   And what type of business is ACT?

A.   They're -- they sell both instrumentation and they sell services. So if you want to buy a coordinate measuring machine, if you went at home tonight, you can probably go to them and buy one, but you probably don't need one in general practice. What we would do is we would use them in a fee-for-service-type application.

Q.   And what does this show?

A.   So this shows the departure -- or it shows from a flat surface. So you use a flat surface as a reference, and what

you see is what the departure from that flat surface is.

So you see this is what we call a gull-wing shape.  So it's got the shape of a gull wing like that (indicating).  And so it's a little distorted because the coordinates in the horizontal direction you see go to about plus or minus 7, in this case millimeters; but the vertical scale, it goes from about plus .5 to about minus 2.

So it's like we took this data and we compressed it horizontally, and you do that because there's no sense having this big (indicating) in one dimension.  It's just a standard practice just to show what's going on here.

Q.   And there seems to be two curves on for each of these plots.  Can you explain that?

A.   Yes.  So in this case what happened was, you may remember I said that we were going to measuring both in the X dimension and in the Y dimension.  And so we've taken those two, and we've put them on the same -- on the same graph.

Q.   And why do you do that?

A.   You do that to see if the system is rotationally symmetric, because we want to know whether it's the same in the X coordinate as the Y coordinate.

Q.   And how close are these?

A.   It's very close.

Q.   And do you know which set of data was used?

A.   Yes.  The X data was used.

Q.   Let's go to the next step.  Can you explain that?

A.   Yes.  So now a thing we don't know is what the separation is between the two surfaces because we have to know, in order to put this in the code, we have to know where the two surfaces are located, and so this is shown here.

So this is a separation, and the standard in the industry is to use the separation at the center of the lens.  And so what you do is you measure that distance, and that's the input data to a program like ASAP, and that was measured on the coordinate measuring machine also.  So that was done at ACT.

Q.   So let's go to the next step.  Can you please explain that?

A.   Yes.  So now what we want to do is just measure some other parameters that you can do with digital calipers that don't need the precision of a coordinate measuring machine.  So you measure the -- using digital calipers you measure the flange height, you measure the diameter of the lens.  These are not critical in this particular situation.

Q.   And let's go to step six.

A.   Okay.  So the next part you need is you need to know what the material is.  What is this lens made out of?  Because if you don't know that, you can't do the ray tracing.  So what you do -- these were then sent to a company called Woollam Company, which is in Nebraska, and they were in the business of selling not only instruments for measuring this, but also for doing

services, fee for services for measuring the index refraction.

**Q.** And step seven, what is that?

**A.** Now, step seven is now we have all the information, and now we need to put it all together and put it in the ASAP software package so that we'll be able to do the simulations.

**Q.** And so what's shown on Slide 82 here?

**A.** Right. So these are the parameters that are entered into ASAP as shown here. You see the profile of the top surface, the bottom surface, the distance between the surfaces, the gap between the lenses, and the diameter of the emitting surface. So those are all the steps we did for the first six steps. Now we're really ready to consolidate them all together.

**Q.** Did that step go smoothly?

**A.** No, it didn't. What happened was in the transfer, there were -- you'll remember there were three lenses in question. I'll call it the D, the E, and the '98, the one that's not in either of them.

And so what happened was, when they were entered, the curvatures -- the shapes were all changed properly for both the top and the bottom surfaces. The index remained the same because they were all PMMA-type material. But when we went from the first lens, which was the D lens, that was the first one that was analyzed, a clerical error was made, an error was made in which the thickness or the separation, that distance between the surfaces, was not changed when they went to the

other two lenses.

Q.   And how did you find out about that?

A.   I found that out in my deposition, that there was a problem with regard to these.

Q.   And what did you do after that?

A.   Essentially what we did is I went back to Kevin and said, "What's the problem here?"  And so we determined what the problem was, and then we reanalyzed the lenses to see if there was any changes in the performance.

Q.   And, Chris, if we can put DTX-1044 up for a second.

So what -- do you know whether or not this involves the new data you're talking about?

A.   Yes, it does.  My deposition was in late October, and this is a couple of weeks later.  It was pretty straightforward, once we discovered it, to actually reanalyze it.

Q.   And is this the corrected thickness?

A.   That's correct.  And this is for the E lens, the '54E.

Q.   And that's what you're relying on today?

A.   Yes, I am.

Q.   For all your analysis?

A.   Yes.

Q.   And if we go back to the slides, 83, and let's go -- so how did this change in the thickness affect your results?

A.   It had -- it did have a slight change, and we'll see that here.  So on the left-hand side, we see the original ray trace

with the incorrect thickness.  When we corrected the thickness,
we see that we actually got more total internal reflection than
we had in the uncorrected one.  So it actually increased the
TIR from what it had been before.  So it was actually better.

Q.    And what about the '79?

A.    And here's the '79.  Here's the situation where the same
thing happened, the original is on the left-hand side; and now
doing the same thing, we have it on the right-hand side, and we
see more TIR.

Q.    And going from Slide 85 to Slide 86, what about the '98?

A.    Well, the 9854D was not wrong.  So we did not rerun that.
So this is the one as reported.

Q.    And how did it make you feel to find out about the error?

A.    I was not a happy camper, but that's the way stuff is
sometimes, and at least it wasn't a billion-dollar error made
by NASA.

Q.    Are you confident in your corrected analysis?

A.    Yes, I am.

Q.    Okay.  So what does this show?

A.    So this shows the final corrected lenses in cross-section
of the three of them.  So we've done them in color because it's
a lot easier to see what goes on in color than it is black and
white.  And so what we have is the three of them look -- to the
eye, it looks like they're all the same.  And so you say, "Oh,
they look all the same."

Now, let's actually bring them all together and, voila. You see that the blue one actually has a smaller thickness than does the red one or the green one. And so remember the green one is the one which was the one that was done correctly. So the other two actually were thinner than the D lens.

You also notice that the curvatures, that is the shape of the surfaces, is also slightly different. You see that the red curve is clearly above the blue and the green curve; and if we zoomed in, we could actually see -- in some of the places that we could actually see the green and blue separated from one another.

Q. So going to -- from Slide 88 to 89, step eight, run ray trace analysis using ASAP software, can you tell us about that step?

A. Yes. So now what we've got -- we've got all the data in. We've got it in correctly. Now what we're going to do is we're going to run ray traces on it.

Now, the easiest way to think about a ray trace is think about a laser pointer. A laser pointer you have a point of -- a point of light that is the same diameter for a very long distance. Now, in the case of a ray trace, it's actually a very thin laser pointer; that is, a very small diameter.

And so what you do is the ray of light is emitted or comes off of the simulation off the LED, it will refract at that first surface of the so-called bottom surface, and then it will

propagate or travel up to the top surface; and depending upon what angle it strikes that top surface, it will either refract out or be reflected back down into the surface.  If it's beyond the critical angle, then it will be reflected.

Q.   So going from Slide 90, which is showing page 3 of DTX-1045, to Slide 91, what is this showing?

A.   Well, this shows a lot of light rays.  We had only one in the other one so you could see that pretty clearly; but now when you put a lot of light rays in there, you can see that some of the light is -- a group of it -- maybe you can point it out -- is reflected back down there.  Whatever leaks out, that is, it goes out the top like that, and then part of it is refracted out at the periphery so that the light is then being spread out horizontally and going then bouncing off the walls, et cetera.

Q.   And what area of the lens are you concerned about with the '554 patent?

A.   For the '554 patent we're concerned about the center part of this.  Yeah, it's a little bit smaller than what you've drawn it.  It's about -- it's where the LED -- sorry, LED -- it's where the TIR area ends is the extent to where we want to work on it.

Q.   All right.  And what is this slide showing?  This is Slide 92.

A.   Okay.  As I mentioned earlier, what we wanted to do is we

wanted to do is a series of source sizes. And "inner source" really means smaller source. So this would be a source that's 2 millimeters in aperture.

I'm sorry?

Q. Sorry. Go ahead.

A. So this is 2 millimeter source, and so that's shown with the rays reflect out -- sorry -- are transmitted. And you can see in the case of the '54E, even at 2 millimeters we get total internal reflection, we get it in the 9879, but we do not get it in the '54D. There is no total internal reflection at an LED of 2 millimeters.

Q. And that's LED diameter of 2 millimeters?

A. That's the LED diameter.

Q. So going from DDX-92 -- I'm sorry.

Going from Slide 92 to Slide --

A. So now this shows a little bit -- this is kind of zooming in, and this shows that the size of the -- the area in which we're actually doing the analysis for this is 2 point millimeter diameter.

Q. So when we see "inner source," that's going to refer to 2?

A. That's correct.

Q. So going from 92 to 93, what is this showing?

A. All right. So now we're doing the same thing with the source being 2.2 millimeters. Now, remember why we're doing this. We're doing this because, you know, we've got different

lenses, we might have different LEDs, and so we're getting all the information at one time.

So if we had an LED with a diameter of 2.2 millimeters, we see we're getting total internal reflection as the configured '54E and the '79, but we're still not getting it on the '54D.

Q.   So with the 9854E we saw total internal reflection with 2 millimeters.  What do we know about between 2 millimeters and 2.2 millimeters?

A.   All the distance -- all the light coming out between 2.0 and 2.2 and all these angles will also be total internal reflection.

Q.   And what about the 9879?

A.   The same for the 9879.

Q.   And going from Slide 93 to 94, now we're at the outer source.  Can you tell us about that?

A.   So now the diameter of the source is 2.5 millimeters, and now what we see is for the 9854E and the 9879, the ones on the left hand and the ones in the bottom, we see that we're getting total internal reflection, or some portion of it light is going that way; and now we're getting some light from the 9854D, which is now total internally reflected.

Q.   So based on this and the previous ones, what do we know about the distance between what's happening between 2.2 millimeters and 2.5 millimeters?

A.   It will show the same result.

**Q.** And what result is that?

**A.** That is that light will be total -- some part of the light will be totally internally reflected.

**Q.** And is that the same for the 9879?

**A.** Yes, it is.

**Q.** So going from 94 to 95, the final step, step nine, what happened at that step?

**A.** Well, now we want to analyze the results of this to see -- determine whether the '554 patent is infringed.

**Q.** And who performed that study?

**A.** That was done by Breault also.

**Q.** The analyzed results?

**A.** Oh, I analyzed the results, but they performed the ray traces.

**Q.** Okay. So let's go to the patent infringement for the '554 patent.

             **THE COURT:** I think that's probably a good place to pause for a ten-minute break for our jurors.

        Return at 2:45. We're in recess until 2:45. Thank you.

                    (Recess taken at 2:36 p.m.)

                 (Proceedings resumed at 2:48 p.m.)

        (Proceedings were heard out of presence of the jury:)

             **THE COURT:** We will bring back our jurors and continue the examination of Dr. Moore.

        (Proceedings were heard in the presence of the jury:)

THE COURT: All right. We're in our homestretch.

You may be seated, and we'll continue the examination of Dr. Moore.

BY MR. OWENS:

Q.   Welcome back, Dr. Moore.

A.   Thank you.

Q.   So we're going to look at the '554 patent infringement.

So we did methodology. Now we're going to look at the actual comparison of the claims.

Which claims did you look at?

A.   I looked to the Claims 1, 6, 33, 34, 35.

Q.   And what information did you use to understand what these claims mean?

A.   I used the specifications, the Court's constructions, and what would be known by an ordinary person skilled in the art in 1997.

Q.   And is that the same level or ordinary skill that you mentioned for the '209 Patent?

A.   Yes, it is.

Q.   And what is your opinion as to whether EDD lenses when combined with LED light bars infringe these claims?

A.   That they infringe all five of the claims.

Q.   Were there five of the claims? There are five of the claims. I just saw six. Sorry. That's my fault.

Okay. Let's turn to Claims 1 and 6.

And what can you tell us about these claims?

A.   Well, one of the key elements of the Claims 1 and 6 is the illumination coupler.  This was something that Dr. Pelka talked a lot about on Tuesday, and the whole issue of separating the LED from the material itself.

Q.   So from 99 to 100, could you tell us more about that illumination coupler?

A.   Yes.  As you remember, this is the device that we showed earlier that's in the purple area shown here that has a bottom surface, in this case it's concave, and an interesting surface at the top which allows light to totally internally reflect off the top of the surface.

Q.   And here is Claim 1 of the '554 Patent, and it's -- it has on the right the lens numbers for the Enplas lenses that you looked at; is that correct?

A.   Yes.

Q.   Okay.  So why don't we walk through this patent limitation by limitation and look at comparison claims.

A.   Okay.

Q.   So the first limitation is an illumination device.

Did you form an opinion as to whether the light bars you looked at had this limitation?

A.   Yes, it definitely is a limitation device.  After all, it's an LED with a lens associated with it, so it's an illumination device.  So we see it cross-sectioned there.

Sorry.  It's pulled apart there, the LED and the lenses, so that would be -- constitute illumination device.

Q.   So that light bar as a whole?

A.   Correct.

Q.   So we went from 103 to 104, that limitation was met.

Let's go to the next limitation:

"A waveguide having an illumination coupler embedded in interior region of said waveguide."

Have you formed opinions with this limitation?

A.   Yes, I have.  And it does.

So first of all, we have to understand that a waveguide is defined by in the Court's construction is an optical device that redirects light propagating between its surfaces.  So this is the Court's construction that I will be using to -- in this particular section.

So we have a waveguide -- sorry.  A light guide.  It's a waveguide --

Q.   And why is this a waveguide?

A.   Because it satisfies the Court's construction of an optical device that redirects light propagating between its surfaces.

Q.   And can you provide an example of that?

A.   Yeah.  So we see from this case the inner source. Remember that's the 2-millimeter source?  Light is refracting up into the waveguide reflecting off the surface and is

propagating between the two surfaces.

Q.   And what's happening right here (indicating)?

A.   In that case it's totally internal reflection occurring in that area.

Q.   And how does that relate to the Court's construction?

A.   The Court construction, the two surfaces are defined at the edge, I believe.

Q.   Okay.  Let's go to the middle source here.

And what is this showing?

A.   It's showing exactly the same thing for the 94E.

Q.   Okay.  So the next part of this limitation, waveguide having illumination coupler, what can you tell us about that?

A.   Okay.  So the overall device in the gray and the pink is the waveguide, and the illumination coupler is the device in the center part of it, which is designated in the pink area, so that -- the top portion of the illumination coupler, which is at the top of this diagram, and the bottom portion which is at the bottom.

Q.   So moving from 109 to 110, we have the last part of this.

Can you please explain this part of the limitation?

A.   Yeah.  So the illumination coupler now is embedded into interior region of said waveguide.  And so what we see is you can think of this being like an apple core, and we see the core down through the center, and that's the center part of it, and we see the interior region of that.  So in the left-hand side

we see the cross-section, and in the right-hand side we see the top view of that same thing as viewed from the top of the lens.

Q.   And these are taken from DTX-1045 and the picture from 1041, just for the record.

So going from 110 to 111, what are you showing here?

A.   So we're repeating what you just showed in the previous diagram of the 9854E.  And then we superimpose the other two, and so we now have the 9879 that shows the same phenomenon, and the 9854D shows the same result.  This is so that we don't go through all the details, and it saves all of us some time.

Q.   So what's your final conclusion?

A.   My final conclusion is all three of these lenses meet this element.

Q.   All right.  Let's go to the next limitation.

This says said:

"Illumination coupler adapted to receive light from a point source within said region, interior region, and to direct light between generally parallel top and bottom surfaces outside said interior region."

Have you formed an opinion on whether this is met by the light bars?

A.   Yes, I have.  And it does.  So in this specification, it says the point sources such as LEDs not shown.  So clearly, the point sources were met to be, at least one example would be LEDs.  And we see the point sources within the interior region,

so it's within the dashed lines.

Q.   (indicating).

A.   And so illumination coupler has two functions; it's first going to receive the light from the point source, and then the illumination coupler is going to direct light between generally parallel top and bottom surfaces outside said interior region. So they -- generally parallel top and bottom surfaces are shown in light blue, and so the light is directed between those two surfaces, and that -- those surfaces are outside the interior region, interior region again being the dashed area.

Q.   So moving from flag 116 to 117, it looks like we're looking at the middle source.  Is that similar?

A.   Yes, it is.  And this is the 2.2-millimeter source.

Q.   And what are we showing on slide one?

A.   So we're doing the same thing again.  We did the detail of the upper left-hand corner one, and now we're just doing the schematics of the other two showing the same result.

Q.   And all this information is found in the exhibits on the bottom of this slide, DTX-1045, 1055 and 1078?

A.   That's correct.

Q.   So what's your conclusion on that limitation?

A.   So that element is also met.

Q.   Let's go to the next limitation of Claim 1.  It says:

        "Said illumination coupler comprising a refractive

        index interface which is inclined relative to at least one

of said top and bottom surfaces."

What is your opinion on that limitation?

A.   That that limitation is infringed also.

So first we need to define what the refractive index interface is, and that is a surface between one material and another.  So in this case it's the material -- we're going from PMMA or plastic element to air, and so that becomes, in our parlance, is referred to as "refractive index interface."  So it's the same thing is for glasses.  It's from the air to -- you know, the material of your glasses which causes the refraction, which gives you the power and the correction to be able to see.

Q.   And how does that relate to the top and bottom surfaces?

A.   So you notice that if we look at that surface, it's not parallel to either one of them, it's inclined.  It's tipped downward in this particular case, so it's inclined relative to the top and bottom surfaces.

Q.   So what is your conclusion?

A.   And so again, we look at the other two lenses, the 9879 and the 9854D, and we see exactly the same result.

Q.   And you can see the refractive index interface in these?

A.   Yes.  So this is important as we go forward, because that's where the refractive index interface is at the top of the element.

Q.   So going from slide 122 to 123, what's your opinion on

this limitation?

**A.**   So that element is also met.

**Q.**   Okay.  Let's go to this last element.  This looks like a long one:

"Said interface being configured to reflect light rays emitted by the point source which propagate along a line that forms less than the critical angle of total internal reflection with respect to a line lying in one of said top and bottom surfaces, such that light rays which would otherwise pass out of said waveguide are captured for propagation between said top and bottom surfaces."

Can you help explain your opinion on that one?

**A.**   Yes.  This is rather complicated, but we have a good graphic here.

All right.  So first of all, we have the surface, and we see in this case we're going to start with flat, that is it's not inclined.  It's exactly parallel to this.  So we're going to go from this, and then we're going to incline it to see what the result of that is.

And so what you see in this case is some of the light is coming up from the LED is actually going out into the air, and you could see it refracting out into the air.  And so we're going to incline this surface, graphic, okay, first just to show this in a little more detail, and we make the diagram a little clearer, we've made the rays that are outside, that are

refracted outside showing in yellow at this particular point. And now we're going to begin the inclining of the surface.

And so what happens is as I incline the surface, we could see those rays that exited are now being reflected down by total internal reflection.  So that's a key part of this whole thing, and so that they are now captured for propagation between said top and bottom surfaces.

Q.   Is that what's described up here (indicating)?

A.   Yes, it is.

Q.   So this is slide 128, and this is from DTX-1045.  You see that that matches up there.  Is that being tension?

A.   Yes, it is.

Q.   And this is the middle source.

What source is that?

A.   Yes, so this is the 2.2-millimeter source, and we're showing the same thing again.

Q.   And what are you showing here?

A.   We're showing -- for each of them we're showing the surface before it's inclined, and then you can see the rays came out.  Now we're going to show them after they're inclined.

Q.   So going from slide 130 to slide 131, what is your final conclusion on Claim 1?

A.   My final conclusion in Claim 1 is that that is infringed by all three products.

Q.   So let's go to Claim 6, and Claim 6 reads:

"The illumination device of Claim 1 wherein the waveguide and illumination coupler are integrally formed from a single piece of material."

Have you formed an opinion as to that claim?

A.   Yes, I have.  And it is infringed.  And you could see from the diagram it's all one unit.  But more importantly, when you hold it up and you look at it, you can see that it's all one unit, and that would make sense, because you don't want to have to put two materials together if you can do it all in one.

Q.   And what is that material?

A.   It's a PMMA.

Q.   And what is that?

A.   It's a plastic material.  It's a common plastic used in optical devices.

Q.   So let's go from 133 to 134.

What are you showing here?

A.   Let's see.  I have Claim 6 here.  Okay.  Oh, yeah, sorry.

So again, we're doing the same thing.  We're showing all three devices, all three lenses showing the same exact characteristic of them, and so --

Q.   Go ahead.

A.   So Claim 6 is also infringed on all three of the products.

Q.   Great.  So that's Claims 1 and 6.

Let's turn now to Claims 33, 34 and 35.

What can you tell us about those claims?

A.    So the key part of this set of claims is going to the leakage part.  The earlier part had to do with the illumination coupler, the 1 and 6.  Now we're going to talk about the leaky part of the system, so that's -- sorry -- in Claims 33, 34 and 35.

Now, so remember what we're doing is we're trying to eliminate the dark spots, that's the whole function of this, and we're going to do that by contouring that surface so that a significant portion of the light is on that particular part of the surface, not of the whole LED, but that small area is -- leaks through the surface, okay.  So think about just the light that's in that center cone.

Q.    And going from DTX-138 to 139, what are you showing here?

A.    All right.  So it's important that we have -- these are what are called dependent claims.  They depend on another claim.  So in order for 34 to be infringed, 33 must be infringed, and if for 33 to be infringed -- sorry.  For 34 to 35 --

Q.    Well --

A.    I'm sorry.

Q.    Start over.

A.    Let me start over.

Starting at the bottom, so 35 requires 34 to be infringed. 34 requires 33 to be infringed, and 33 requires Claim 30 to be infringed.  So we work upward.

Q.   So let's take a look at Claim 30.

A.   Yes, so we must start now with Claim 30, because we've got to make sure that each of those elements infringe before we can even get to 33, 34 and 35.

Q.   All right.  So here's one of our charts again to simplify this process.

A.   Right.

Q.   And this is slide 140.  Let's start with the first limitation of Claim 30, which is an optical apparatus.

Have you formed an opinion as to that limitation?

A.   Yes.  This is an optical apparatus.  And the optical apparatus in this case is a lens and an LED, so that constitutes an optical apparatus.

Q.   So going from 141 -- so your final opinion on that is?

A.   That that is -- that element infringes.

Q.   That looks like an easy one.  Let's go to the next one, 143.

A.   They all have LEDs, so I believe it infringes also.

And so we see a cross-section, we see the three lenses with an LED placed below it, so that part is contained in it, so therefore it infringes also.

Q.   So what's your final opinion on that?

A.   Final conclusion is that all three of these lenses infringe this element.

Q.   Okay.  Slide 146, let me read this limitation of Claim 30;

it says:

"An optical element having top and bottom opposing sides and an edge extending between the top and bottom opposing sides, said LED mounted at a predetermined location beneath a central portion of said optical element such that light from the LED enters the optical element."

Professor Moore, have you formed an opinion as to this limitation?

A.   Yes, I have.  And it does.  So we see here a top opposing side, as shown in kind of a reddish color, we have a bottom opposing side, and we have an edge connecting the two together.

Q.   (indicating)  All right.  So that's the first part.

And what are you showing in this slide?

A.   This shows the same thing for the other two lens elements. They're the same prescription.

Q.   So going from slide 148 to 149, addressing the second half of that limitation.

A.   Yes.  So the LED is mounted.  As you can see, it's not at a predetermined location; it's beneath the central portion of the optical element, and the light from the LED is entering the optical element, and you can see the light coming -- going upward and entering the optical element through the bottom surface.

Q.   And that's shown in DTX-1045 exhibit?

A.   Yes, it is.

Q.   And going from slide 149 to 150, what are you showing here?

A.   We're showing the same thing as we've shown before, but now for the 9879 and the 9854D.

Q.   Okay.  So we can check that one off.

Let's go to slide 152, and let me read the next limitation here:

"Said optical element including a TIR surface spaced from said bottom side and extending from a point above the LED outwardly towards said edges, said TIR surface positioned to receive light emitted by the LED."

Can you tell us about this limitation?

A.   Yes.  And it does.  So we see the TIR surface.  We see the optical elements.  We got the TIR surface in it.  It's clearly spaced from the bottom surface, and extending from the point source above the LED so -- from a point, rather, from a point above the LED outwards towards the edges.

Q.   So let's go back to slide 153.

And what is the Court's construction of TIR surface?

A.   Yeah.  The Court's construction of TIR was a surface angle with respect to the light source to produce total internal reflection within the device.

Q.   And where is the TIR surface?

A.   The TIR surface is on the top as shown where the red arrows are.

Q.   (indicating)  And what's happening where the red arrows are?

A.   Where the red arrows are, the light as shown is totally internally reflected as shown by the light going upward and then going back downward.

Q.   And the Court's construction says a surface angled?

A.   Yes.

Q.   What is your opinion on that part of the Court's construction?

A.   Well, it would be tilted or rotated or tilted in some way to reshape it.

Q.   And is that the TIR surface?

A.   Yes, it is.

Q.   Let's go to slide 154.  It says "the TIR spaced from said bottom side."

A.   Yes, it is.  As you can see, the bottom side is down at the bottom, and so it's spaced from that bottom side.

Q.   And the next --

        THE COURT:  Mr. Owens, to the extent you're speaking to the screen, if you could speak up loud enough so the jury can hear you.  I know we're getting to the end of the day.  If you could speak up so we can hear you.

        MR. OWENS:  Sure.  Absolutely.

        THE COURT:  Thank you.

BY MR. OWENS:

Q.   Let's go to the next part of that limitation:

"Extending from a point above the LED outwardly towards said edges."

A.   Yes.  So a point above the LED would be in the center, and --

Q.   (indicating).

A.   It's extending outwards toward the edges.

Q.   (indicating).

A.   And finally in this one, the TIR surface is positioned to receive light emitted from the LED.  So the LED is emitting light, and it's being received, and then it is reflecting off that surface.

Q.   So going from slide 156 to 157, what does this show?

A.   This shows the same thing from the other two lenses in question.  So, again, this element is also met.

Q.   Okay.  Let's go to the next limitation, which is the final limitation of Claim 30.  So we're going from slide 158 to 159, and let me just read that:

"Said TIR surface curving towards the LED so as to form a cusp above the LED, the curving TIR surface totally internally reflecting light rays such that reflected light rays propagate from the TIR surface towards the edge of the optical element."

Have you formed an opinion as to whether the light bars

meet that element?

**A.**   Yes, I have.  And it does.  So we see that the TIR surface -- first of all, we see a dip in the cusp, okay.  The Court has construed the cusp as an area where two curves meet, so it's an area where two curves come together.  So what we're going to do first is we're going to say the TIR surface curving towards the LED, and you can see it's curving downwards towards it, and it's forming a cusp right over the LED, of the LED right in the center area there.

A curving TIR surface is totally reflect -- totally internally reflecting light rays as shown there by those black rays.

**Q.**   And we go from 161 to 162, what is this showing?

**A.**   And now -- and so light then propagates from the TIR surface, as shown there, towards the edge of the optical element.

**Q.**   Great.  And this slide?

**A.**   And we see the same thing again for the other two lens elements, 9854D and 9879.  So we're using the same hand work.

**Q.**   Great.  So that is all limitations of Claim 30.

What's your final opinion on Claim 30 for these three light bars?

**A.**   That the -- all three of these infringe Claim Number 30 of '554.

**Q.**   Okay.  Let's go to the first of the asserted claims, which

incorporates everything we just talked about in Claim 30.  And this reads:

> "The optical apparatus of Claim 30, wherein said TIR surface is leaky such that some light emitted by the LED is transmitted therethrough."

Have you formed an opinion as to whether this claim is met by the light bars?

A.   I have.  And it does.

So in this case -- remember what we were trying to do here?  We're trying to eliminate the dark spots.  This is the whole reason we're doing this.  And what we're going to do is we want to get a significant portion of the light that's incident on that part of the surface, which is only some of the light from the LED.  There's a lot of light from the LED, and so the TIR surface is leaky, so, again, we want the light to come out through it and to make the pattern uniform.

Q.   And going from slide 166 to 167, what is this showing here?

A.   Yes.  So this is showing -- in the yellow area we're showing the TIR portion of the surface, and the center part is the part where it's leaky, and that's shown in pink, so that light is coming out uniformly from that surface.

Q.   Okay.  And is that what's this up here (indicating), this shaded pink?

A.   I'm -- the ray traces?

**Q.** Yeah.

**A.** Those are the -- that's the ray tracing, the black. It's just colored to show where the rays go, the full fan of rays.

**Q.** All right. And is this in DTX-1045, page 11?

**A.** Yes.

**Q.** Okay. And going from slide 167 to 168, what is shown on this slide?

**A.** We're again repeating the same approach where we're showing the 54D and the 9879 showing the same result.

**Q.** And what result is that?

**A.** The result is that this element is met and therefore infringes.

**Q.** So that's Claim 33. Let's go to claim 34. This is slide 170.

And with this one we take the optical apparatus of claim 33. So that was the previous one that was dependent on Claim 30, and to this one we add:

"Wherein said cusp is contoured to permit leakage of light through said TIR surface."

Have you formed an opinion as to this claim?

**A.** Yes. And I do believe it infringes also.

**Q.** And can you explain that?

**A.** Yes. So what you want to do is you want to begin the changing of the shape in various ways to actually do a contour or a change of shape such that the light leaks out, and so it's

just a shape change.

Q.   And what are you showing on slide 172?

A.   We're showing the same thing for the other two lens elements 9879 and 9854D.

Q.   And can you describe what you mean by contouring?

A.   Contouring is if you think about the shape starting with an apex, and you begin to rotate it up or do some sort of a reshaping of the surface, that would be contouring.

Q.   Okay.  So in conclusion, what's your opinion on Claim 34 for these light bars?

A.   That Claim 34 also infringes -- all three of the light bars infringe Claim 34.

Q.   So slide 173, going to 174, this is claim 35.  And Claim 35 takes claim 34, so it has all the other claims built in. And it says:

          "Wherein said cusp is rounded to permit leakage of
     light through said TIR surface."

     Have you formed an opinion as to this claim?

A.   Yes.  And so it simply means we rounded it and made more of a spherical shape to do that.

Q.   And what does this slide 175 show?

A.   This shows a composite of all that.  So it shows the LED, the illumination coupler, the leaky TIR surface, and we see the rays of light, of light coming out of that top surface.

Q.   So what's happening up here (indicating)?

**A.**    So part of the light is totally internally reflected.  You see that at the edges of that curve, and you see the center part of it is leaky.

**Q.**    And Claim 35 mentions rounded.

Could you explain how this shows rounded?

**A.**    Well, it's clearly -- the shape is clearly rounded.

**Q.**    (indicating).

**A.**    Right there.

**Q.**    And slide 176, this is taken from page 11 of DTX-1045 again, and this is the 9854E lens.

Can you explain what's shown in this?

**A.**    So this is the same thing now with the -- let's see.

Oh, this shows a multiplicity of sources down at the bottom, and it shows the TIR surface being in yellow, and the leaky part being in the pink.

**Q.**    Okay.  And what is shown on slide 177?

**A.**    This shows the same thing as we've done before for the other two asserted lenses.

**Q.**    So what is your final opinion as to --

**A.**    My final opinion is that all three of these lenses infringe Claim Number 35.

**Q.**    Okay.  And what about the light bars?

**A.**    Those are the light bars.  That's part of that.

**Q.**    Okay.  Great.  So going from slide 178 to -- these list all the claims for asserted claims from the '554 Patent.

What is your overall opinion of these claims?

A.   That all five of the claims are infringed by these three products.

Q.   Great.  So Dr. Moore, just to wrap up here.  Aside from the '554 Patent and '209 Patent, did you review any other SSC patents in connection with this litigation?

A.   Yes, I was asked to review Patent Number 6,647,199.

Q.   And is that related to any patent in this litigation?

A.   Yes, it's related to the '554 Patent.

Q.   And what was your reason for reviewing this patent?

A.   To see what the differences were between the two patents between the '199 and the '554.

Q.   And did you make any conclusions?

A.   Yes, the major difference between 0 --

     MR. LABGOLD:  Objection, Your Honor.  This was subject to a motion going into the claims scope issue.

     THE COURT:  Ladies and gentlemen, we're going to take a five-minute break and come back at 3:25.

     (Proceedings were heard out of presence of the jury:)

     THE COURT:  All right.  Jurors are not present.

     All right.  Mr. Owens, could you proffer where you're going?

     MR. OWENS:  Yes.  This is directly from his report. This is paragraph 87 of Dr. Moore's corrected expert report. And all we're getting to is just him providing the testimony

that he provided in here that Ms. Davis then relied on to determine the relative value of the '199 Patent to the '554 Patent.

It is a part of Ms. Davis' testimony.  She relied on it. It's in his report, and I don't believe that it is subject to any order of the Court.

MR. LABGOLD:  Your Honor, we had moved in context of the *Daubert* motion.  It was framed in the context of excluding the legal opinions, because basically all he does here is that these two patents share a specification, and so the only difference between them is the scope of the claims.  And so he's offering a legal opinion as to the difference in the scope of what the two patents cover.

The Court entered a ruling as to the -- kind of in the terms that Enplas argues that Moore gives legal opinions on claim construction.  The Court was addressing it there and saying that he would not be able to give his legal conclusions. The issue as we phrased it was more like legal opinions.  And here, though, he would necessarily have to construe the scope of the claims to be able to differentiate them.

MR. OWENS:  Your Honor, he's going no further than providing a very general assessment of the value of the '199 Patent versus the '554 Patent in scope.  We're not getting into anything other than just his final opinion.  We're not going to provide anymore details beyond that in our direct.

If Mr. Labgold would like to cross and bring more of that in, that's fine.  But we are not going into anymore detail than his ultimate opinion here.

MR. LABGOLD:  Well, Your Honor, the only differentiation between these two patents, because they share a scope, share a specification, is in fact the claims.  So unless he's qualified to opine on the legal opinion on the scope of the claims, he should not be allowed to testify.

MR. OWENS:  And Your Honor, one final point.  He's just interpreting these as one of ordinary skill in the art. They're in the same time frame.  He is just providing that opinion from that perspective.  He's not reaching any conclusions he's going to provide to anyone.  He's just providing his overall opinion to one of ordinary skill in the art, and is not reaching any type of legal opinion.  He is one of ordinary skill in the art.  He's already acting as one of ordinary skill in the art in this context, and he's just providing that opinion as one of those people, and not as a legal conclusion.

MR. LABGOLD:  Your Honor, the issue of what one of ordinary skill in the relevant art would be is what the patent discloses to those.  It's the disclosure which is what is teaching.  Now, the claims are actually defined in the legal meets and bounds.  So the only distinction he can make here between these two patents that share a common specification in

all of its figures, because they're a continuation of each other, is what was claimed in one versus what was claimed in the other.  That's a purely legal conclusion.

THE COURT:  Well, the conclusion might come from an opinion.

Are there any demonstratives of exhibits you're intending to --

MR. OWENS:  No, there's not going to be anything. There's one more question, and then we would be ending this.

THE COURT:  All right.  The objection is overruled with that expectation.

Bring back the jury, please.

(Proceedings were heard in the presence of the jury:)

THE COURT:  All right.  Our jurors are returned, and we may be seated and continue with the examination of Dr. Moore.

BY MR. OWENS:

Q.   So Professor Moore, just to put us back in context.  We were talking about your comparison of the '199 Patent and the '554 Patent, and the differences between those.

Just my question is did you make any conclusions based on that?

A.   Yes.

Q.   And what were those conclusions?

A.   Conclusion is the '199 does not include direct type

backlighting.

Q.   And without going into any detail, can you give us your overall view of the '199 claims versus the '554 claims?

A.   Well, they're narrower --

MR. LABGOLD:  Objection, Your Honor.

THE COURT:  Sustained.

BY MR. OWENS:

Q.   Professor Moore, do you know whether EDD sells other lenses -- and just let's back up.

If we could go to slide 87.

MR. LABGOLD:  Objection, Your Honor.  This is again subject to multiple motions before the Court regarding, quote, other lenses, close quote.

MR. OWENS:  Your Honor, I believe this is all testimony that Your Honor allowed in to support Ms. Davis' testimony regarding her damages number, and --

THE COURT:  How many minutes of this examination do you have left, Mr. Owens?

MR. OWENS:  I have a couple minutes, Your Honor, two or three minutes.

THE COURT:  All right.  Is this your last exhibit?

MR. OWENS:  Yes.

THE COURT:  Or demonstrative, I should say?

MR. OWENS:  Yes.

THE COURT:  All right.  Proceed.

BY MR. OWENS:

Q.   Professor Moore, do you know whether EDD sells other lenses that are similar in shape to these lenses?

A.   Yes, I do.

Q.   And does -- do you know whether EDD sells those lenses for use in direct type backlighting?

A.   Yes, I do.

Q.   And how do you know that?

A.   From Mr. Ye.

Q.   And who is Mr. Ye?

A.   Oh, sorry.  He works for SSC in Korea.

Q.   And how do you determine if any of those lenses that you just mentioned infringe the patents?

A.   Well, we would have to go through the whole extensive analysis we just did for the other three lenses in order to be sure that they infringe.

Q.   And what is the chance that those lenses would infringe the patents?

        MR. LABGOLD:  Objection, Your Honor.  Calling for what are the chances?

        THE COURT:  Sustained.  Speculation.

BY MR. OWENS:

Q.   Do you have any view as to whether those lenses could infringe the patents?

        MR. LABGOLD:  Same objection.

THE COURT:  Sustained.

MR. OWENS:  No further questions.

THE COURT:  Thank you.  Examination by EDD.

MR. LABGOLD:  Thank you, Your Honor.

### CROSS-EXAMINATION

BY MR. LABGOLD:

Q.   Good afternoon, Dr. Moore.

A.   Good afternoon.

Q.   Let me give you a more concrete example.

Are you familiar with a lens called 9853A?

A.   Yes.

MR. OWENS:  Objection, Your Honor.

BY MR. LABGOLD:

Q.   Is that one --

THE COURT:  One moment.

MR. LABGOLD:  Is that a lens?

THE COURT:  One moment, Mr. Labgold.  The objection is --

MR. OWENS:  This is also one of the lenses that is subject to the motions in limine and the stipulations between the parties as to lenses that are not in the case.

MR. LABGOLD:  That is not the case.  This is not a dropped claim.  This is something which I will be examining him on, because it's part of the issues which the Court has said I could test his credibility, because it's only because of his

corrected report that that no longer is there.

THE COURT: Overruled with that confine.

BY MR. LABGOLD:

Q. Are you familiar with the 9853A lens?

A. Yes, I am.

Q. And that's a lens which you originally said was infringing?

A. That's correct.

Q. And with regard to the 9853A lens, it's similar in shape and structure to the other lenses?

A. Yes, it is.

Q. And after your analysis, you concluded it does not infringe; correct?

A. That's correct.

Q. Now, lets talk about the testing that was done.

You testified that you understand that the lenses were removed from TVs bought in the United States; correct?

A. Yes.

Q. And I believe you said that that was -- doing that was a fun exercise, taking apart all those TVs; correct?

A. It is a fun exercise.

Q. But you didn't participate in that fun exercise; correct?

A. I did not take those TVs apart.

Q. It is your understanding that SSC disassembled the TVs; is that correct?

A.   That's correct.

Q.   And you were not involved in that activity at all; correct?

A.   That's correct.

Q.   And that SSC transferred the lenses to BRO; correct?

A.   That's my understanding.

Q.   And it's your understanding, because you didn't participate; correct?

A.   Yes.

Q.   Now, the lenses themselves, you've seen all of the accused lenses; correct?

A.   Yes.

Q.   But you did not rely upon the lenses in forming your opinions; correct?

A.   I relied on the measurements of the lenses to form my opinion.

Q.   But you actually didn't look at the lenses for any part of forming your opinion; correct?

A.   In order -- the lenses are very precise lenses.  Looking at them you would not be able to tell what the shapes were no more than I would be able to determine the shape of your eyeglasses by simply looking at them.  I would have to go through an extensive metrology of measurement of the properties of your lenses in order to determine how they actually performed optically.  So looking at them would not be

sufficient.

Q.   So it just wasn't -- so it's true you didn't look at --
you don't rely on any review that you did of the lenses?

A.   I reviewed the results of the analysis of the lenses.

Q.   Now, the ray traces are supposed to be analytical data;
correct?

A.   I'm sorry?

Q.   The ray traces, they're intended to be analytical data;
correct?

A.   Well, analytic -- the word "analytic" I don't understand
how you're using it.  But they are -- that tells you how the
light propagates through it.  An analytical solution usually
has a different mathematical understanding.

Q.   Can I blow up page 27 of your deposition at line 12?

          MR. GOTTS:  Counsel, you're going to supply the
witness with a copy of the deposition?

          MR. LABGOLD:  It's in his binder there, page 27,
line 12 to line 15.

          THE COURT:  One moment.

          MR. GOTTS:  Could you direct the witness to where it
is in the binder, please, Counsel?

          MR. LABGOLD:  Okay.  May I assist?

          THE COURT:  Yes.

          THE WITNESS:  I'm sorry.  What page and what line?

BY MR. LABGOLD:

Q.   Page 27, starting on line 12:

"Q.   The ray traces are not intended to be simply

cartoons.   They're supposed to be analytical data;

correct?

"A.   Correct."

A.   That's correct.   That's what I said.

Q.   And that is your --

A.   Well, the word "analytic" when you used it, I was using

the interpretation of analytic solution for which is a closed

form solution of equation.   And this is -- this case is just --

the word is being used as analyze, and so it's analyzing the

performance of the lens.

Q.   And so they're not intended to be cartoons.   You're

supposed to be able to look at them, rely upon them as an

accurate representation of some methodology that's credible and

reliable; correct?

A.   Yes.

Q.   And so necessarily your opinions are dependent upon the

ray trace diagrams being performed correctly?

A.   Yes.

Q.   And you would agree that to the extent they're not

performed properly, they would not be reliable?

A.   If they were not done correctly, there might be an error,

yes.

Q.   Now, the president of BRO, he's a friend of yours?

A.   I've known him for many years, yes.

Q.   But prior to this case you've never worked with him or had any professional relationship; correct?

A.   That's correct.  My professional relationship has been within professional societies like the Alpha Society of America.

Q.   So despite having never worked with them before, you were confident that the tests were done properly; correct?

A.   Yes, they're an ISO-certified organization.

Q.   I mean, you were so confident that to the extent that hypothetically it wasn't even possible that they could make a mistake; correct?

A.   Well, we unfortunately all make mistakes.

Q.   Well --

A.   And I was surprised when a mistake was made, yes.

Q.   But at your deposition it wasn't even a hypothetical possibility; isn't that correct?

A.   I don't remember what I said exactly.

Q.   Well, can I play the clip?

        THE COURT:  Where are you playing from?

        MR. LABGOLD:  We're playing from page 14, line 19 to 24.

                (video as played:)

    "Q.  But hypothetically, if the ray traces were not

performed properly, they would not be suitable for the purpose you put them to?

"A.   This company is ISO-certified.  I'm sure they're right."

        THE WITNESS:  And that turned out to be wrong.

BY MR. LABGOLD:

Q.   Because you hadn't analyzed the data yourself; correct?

A.   I had looked at the data.  I did not see that mistake.

Q.   Now, if you turn to PX-60 in your binder.  That's a ray trace diagram that was performed by BRO; correct?

A.   60 is just a cross-sectional diagram.  There's no rays on it.

Q.   Exactly.  It's a lens profile; correct?

A.   It's a lens profile.

Q.   And that one is specifically a lens profile of the 9879 lens; is that correct?

A.   That's correct.

Q.   And I'd like to hand you a document that's Moore Exhibit 10A at your deposition.  It's 60A in the record.

        If I may, Your Honor.

        THE COURT:  You may.

BY MR. LABGOLD:

Q.   Do you recall that at your deposition you were shown the transparency of the document, the ray trace, and you confirmed that it overlapped exactly?

**A.**   This one does not.

**Q.**   Okay.  I'm saying do you remember at your deposition --

**A.**   Yes.

**Q.**   -- you confirmed that?

And then you confirmed the same thing was true with regard to the lens profile of the 9845 lens; correct?

**A.**   That's what I said at the deposition.  And that was incorrect.

**Q.**   Now -- but you actually did the alignment sitting there at your deposition.  Do you remember that?

**A.**   I did it at my deposition.

**Q.**   Now, if you take a look at the document that's been marked as PX-55.

**A.**   You say 55 or 65?

**Q.**   55.  And that was another document.  Do you recall seeing that's a lens profile for the 9845 lens; correct?

**A.**   Yes, it is.

**Q.**   And at your deposition you confirmed that if you took the overlay, which was the transparency for the 9879 lens, it overlaid perfectly with the lens profile for the 9845 lens; correct?

**A.**   That's what I said at the deposition was incorrect.

**Q.**   You -- that isn't something that you had determined before, correct, not something you had noticed?

**A.**   I had not noticed that before.

Q.   Now, if you take a look at the document we've marked as PX-54 --

And I'd like to move the admission of 55, 60, 60A.

THE COURT:  And also 54 or just --

MR. LABGOLD:  And 54, yes.

THE COURT:  Any objection?

MR. GOTTS:  One minute, Your Honor.

BY MR. LABGOLD:

Q.   Now, pulling up the --

THE COURT:  One moment.

MR. OWENS:  No objection, Your Honor, as limited relevance.

THE COURT:  Overruled.  We'll discuss it later.  54, 55, 60 and 60A are admitted.

(Plaintiff's Exhibits 54, 55, 60, 60A received in evidence)

BY MR. LABGOLD:

Q.   Thank you, Your Honor.

Pull up PX-54.  And do you recognize this as the Enplas lens design drawing for the 9845 lens that you saw at your deposition?

A.   Help me with the identification.  There's a lot of Japanese here.

Q.   Absolutely, if I could --

A.   Oh, here it is.

Q.   At the bottom right-hand corner.

A.   I see it now.  This is the 9845; right?

Q.   Now, in the course of your professional work, you've seen documents like this design drawing; correct?

A.   In English, yes.

Q.   And with regard to this type of data for a manufacturer's product like this, especially one that, you know, is a high precision tolerance, you know, high tolerance device, you would expect it to have some kind of detailed design drawings; correct?

A.   This should be a set of design drawings for each manufacturer, yes.

Q.   Now, if you could please take a look at Plaintiff's Exhibit 141 -- or 138.

     Do you recognize -- do you recognize this as a design drawing for the 9879 lens?

A.   Yes.

Q.   And do you recall you reviewed that during your deposition?

A.   I don't see a witness stamp on here.

Q.   If you look at -- could I use Exhibit 61?  If you go back a couple.

A.   Okay.

Q.   And you recall that --

A.   Okay.  That's Exhibit 11 from my deposition, yes.

MR. LABGOLD:  I'd like to move the admission of Plaintiff's Exhibit 61.

MR. OWENS:  No objection, Your Honor.

MR. LABGOLD:  If we could pull that up.

THE COURT:  One moment.  Plaintiff's Exhibit 61 is admitted.

MR. LABGOLD:  Thank you, Your Honor.

(Plaintiff's Exhibit 61 received in evidence)

THE COURT:  Proceed.

BY MR. LABGOLD:

Q.   So again, this is the 9879 lens; correct?

A.   Yes.

Q.   Now, prior to -- at the time you were forming your opinions, you did not have access to the design drawings for these lenses; correct?

A.   The ones that we submitted before there error was found, that's correct.

Q.   Right.  And at the time you were forming your opinions, you didn't review any design drawings of any Enplas lenses; is that correct?

A.   That's correct.

Q.   And you had asked for that information from SSC's attorney and from BRO, however; correct?

A.   I asked for the manufacturing data.

Q.   And you were provided no information; correct?

**A.** At that time I was not provided any information.

**Q.** Well, you weren't provided that information until EDD put it in front of you; right? Mainly me at your deposition.

**A.** That's correct.

**Q.** So despite having asked for manufacturing data, again, none of that was provided?

**A.** Yeah. In thinking about this, you know, I think I did see it before I talked to you.

**Q.** You saw --

**A.** I just don't remember when I first saw it.

**Q.** Turning to your transcript of your deposition, if you look -- go to page 22, please.

**A.** Refer to my --

**Q.** And at line 7:

    **"Q.** But at the time you were forming your opinions, you had not seen any of these documents?

    **"A.** I don't believe so."

**BY MR. LABGOLD:**

**Q.** Is that your testimony?

**A.** That's what it says, yes. I just don't remember at what point in history I first saw these.

**Q.** But you do recall that you testified that you had asked for copies, and you asked for -- from SSC's attorneys and from BRO, but you were not provided them; is that correct?

**A.** Yes.

Q.   Now, in reviewing those design drawings, if we pull up 61, was it, do you recall at the deposition we highlighted this number right here (indicating)?

A.   Yes, yes, I do.

Q.   And that number specifically is the distance between the top surface of the lens, if we took the lens and just laid it on its topside.  So a tangent line; correct?

A.   Tangent plane.

Q.   And it's a plane.  And the distance between that tangent plane and the top of the concavity; correct?

A.   Yes.

Q.   And in this lens it's 1.45 plus or minus .02 millimeters; correct?

A.   Yes.

Q.   Now, in the other lens for the '554 -- the 9845 lens, it is 1.745.

     Do you recall that?  And that would be on PX-54.  That would be this number (indicating)?

A.   (witness examines document)  Yes.

Q.   And you confirmed that on these lens profiles blown up to the size that they are on a sheet of paper, eight and-a-half by 11, you would be able to discern .2 millimeters difference in that measurement; correct?

A.   Yes, I did.

Q.   Now, the explanation that you've come back with when you

replaced your report was that you went back and talked to Mr. Garcia; correct?

A.   Yes.

Q.   I think it's Dr. Garcia; correct?

A.   Yes, it is.

Q.   Now, Dr. Garcia is the person who did the analysis in the first place; correct?

A.   Yes.

Q.   And Dr. Garcia collected the data that was put into the BRO ASAP software; correct?

A.   Yes.

Q.   And he ran the ray trace analysis; correct?

A.   Yes.

Q.   And he provided them to you?

A.   Yes.

Q.   Then you went back to him afterwards and you said there seems to be a problem, or something to that effect; correct?

A.   Yes.

Q.   And in that regard you asked him to try and determine what problem had occurred, and he came back and he said that he had found the answer; correct?

A.   Yes.

Q.   And the answer that he had found was that he had put in the same thickness for all the lenses; correct?

A.   Yes.  Of the three -- the three lenses that are in

question here.  9845 was not reanalyzed.

Q.   I think it was 9854D that was not --

A.   Okay.  I'm sorry.

Q.   Isn't that correct?

A.   I'll have to look at my notes.  Which one are you saying? We dropped A; right?

Q.   It's your opinion.

A.   I guess I'm going to have to go back and look at my report.

Q.   Okay.  Well, that's --

A.   There's so many numbers in play here.

Q.   Well, let's leave it at Dr. Garcia finds the mistake, and he tells you what the mistake is, and then he goes back and corrects the mistake; correct?

A.   Yes.

Q.   And he runs new ray traces for you; correct?

A.   Yes.

Q.   And you relied upon them?

A.   Yes.

Q.   So the same person who made the mistake in the first place was put in charge of figuring out how to fix it, and then supposedly fixed it, and you just relied upon that again?

A.   Yes, I did.

Q.   You didn't think it was necessary to do any backup, any confirmation?

**A.**   No, I didn't.

**Q.**   Because they're ISO-certified, and they're flawless after they just made you replace your entire analysis?

**A.**   Well, that's what I relied on, yes.

**Q.**   Now, with regard to the thickness, did you ask him specifically what this thickness was, what measurement it was, where in this lens shape -- what that actually --

**A.**   Yes.

**Q.**   And where was that?

**A.**   It's the thickness along the centerline of the optic.

**Q.**   So the thickness along the centerline -- if I gave you a pointer, maybe you could -- do you think you could show me where that is?

**A.**   Long distance.  Right along that line (indicating).

**Q.**   So it's the bottom of the top curve to the top of the bottom curve; is that a way to put it?

**A.**   Yes.  So it's not this line here (indicating).  That line is the tangent plane, because it's tangent of this surface here (indicating).  You could see there's are dip or dimple in here (indicating).  So it's from the bottom of that point here (indicating), as close as I could hold it this far away, and to there (indicating).

**Q.**   Okay.  So I think that if you would agree, that's the 5.145 number -- it's from that line down to the bottom of the feet; whereas the 5.545 number is the tangent plane to the

bottom of the feet.

Do you see that?

A.   I'm trying to -- so it's -- the arrow -- it looks to me that the bottom of the feet is -- maybe you could put some letters on the line so that I could describe them by letters, because I think this is little confusing.

Q.   Well, just so we can confirm.  It's this distance here, right (indicating), from the bottom of the dip to the top of that curve (indicating)?

A.   Yes, that's correct.  I thought you said something about the feet.

Q.   So that's the thickness; correct?

A.   Yes.

Q.   Now, did you sit down afterwards and look at the numbers comparing Plaintiff's Exhibit 54 with Plaintiff's Exhibit 62 to see if that actually made sense?

A.   I did not check 50 -- because it was 45, so the three lenses in question were the 9879, the 9854D, and the 9854E.

Q.   So you --

A.   I did not go back and check this.

Q.   So you didn't consider the fact that this number (indicating) is going to have to get bigger, and this number (indicating) is going to have to get smaller for them to have lined up together.  Whereas this number (indicating) gets -- they're moving in the opposite direction.

For these two things to be superimposable, this smaller number (indicating) has to meet this larger number (indicating), and this smaller number (indicating) has to meet this larger number (indicating).  This smaller number (indicating) has to meet this larger number (indicating).  This larger number (indicating) has to meet this smaller number (indicating).

So with one single measurement, you're going to move things up and down.  Did you consider that?

A.    The only relevant number, when you enter the program in ASAP, is that axial thickness.  That's the only thing that counts.

Q.    But I'm asking when you were considering whether the explanation made sense, did you go back and see if there was actually one number you could change that would actually make these two different set of measurements superimposable?

A.    I did not look at the 9845.

Q.    Did you consider the data that had been generated the first time?

A.    What does that mean?  Yes, I considered the data.

Q.    Well, did you consider whether the explanation made sense in light of the data that was obtained in the first set of measurements?

A.    Well, yes, because it was from the coordinate measuring machine.

Q.   Okay.  Well, we had a 9845, and we had a 9879, which were superimposable.

Do you remember that?

A.   Yes, I do.

Q.   And if we could, just for the benefit of the jury, if you look at PX-62, do you recall at your deposition that was the confirmation of what the transparency of 9879 looked like perfectly overlaid on the 9845?

A.   I can't tell.  The legend is all messed up here.

Q.   You recognize that's one of the deposition exhibits?

A.   I do.  It's deposition number 12.

MR. LABGOLD:  I'd like to move the admission of Plaintiff's Exhibit 62.

MR. OWENS:  No objection, Your Honor.

THE COURT:  62 is admitted.

(Plaintiff's Exhibit 62 received in evidence)

THE COURT:  Proceed.

BY MR. LABGOLD:

Q.   Can we pull that up?  And then you can see this is -- you recall at your deposition we did the analysis, and all the corners perfectly lined up.  These sets of numbers here (indicating) are so closely aligned that it looks like a single set of numbers.  The only way you can tell it's an overlay is because the words are overlaid here (indicating)?

A.   Right.  And I can't read those letters.

Q.   And the -- I'll represent, without going back to your deposition, that it was 9845 and 9879.  Those were the only ones we did.

A.   Okay.  I accept that.

Q.   And you could see that at every point everything was lined up (indicating)?

A.   It appears to be that case, but it's actually not.

Q.   The -- at your deposition you confirmed that they lined up exactly, didn't you?

A.   I was incorrect.

THE COURT:  I couldn't hear that discussion.  Could you give an answer again.

BY MR. LABGOLD:

Q.   I asked him if he confirmed at his deposition that they lined up exactly.

And you did; correct?

A.   I said that at the deposition, but that is incorrect. When we looked at it in more detail, we found out that in fact they were different, and that the differences were measured in such that if you take two black lines together, you can't see the difference.

Q.   So the -- remember on your direct you showed a picture that had colored lines that showed how the lenses were very small little differences, but you could still see them?

A.   Yes.

Q.   So the difference you're talking about is even subtler than that; correct?

A.   That's correct.  When you do -- when you actually look at the 9879 and you look at the real surface, it turns out that there's enough of a difference between the shape of the 45 from the 79 that the TIR goes away.

Q.   It's enough of a difference that the 9845 shows a completely different TIR pattern?

A.   That's correct.  That's -- the differences between those two surfaces are exactly where that TIR is.  If you look very carefully at them, you could see that there's a slight difference between the two, and the TIR goes completely away, because it's a very precision part.

Q.   And so these really slight differences, these tiny little differences can make that much of an impact?

A.   In this particular case it did.

Q.   Now, you talked about the analysis that was performed by BRO, and you went through a kind of a flowchart in your direct.

Do you recall that?

A.   Yes, I do.

Q.   And the first step of that, just picking one, is going to be -- you're going to measure the gap between the lens and LED on the light bar; correct?

A.   Yes.

Q.   Now, did BRO actually measure the gap on the light bars?

A.    Yes.

Q.    And you were not participating?

A.    I measured -- I measured some when I was down in Tucson in July.

Q.    Which one did you measure?

A.    I can't remember.  I measured several of them.

Q.    Okay.  Now, there's two TVs that have the 9879 lens; correct?

A.    Yes.

Q.    You've grouped them together just as 9879 lens, though; correct?

A.    Yes.

Q.    Which TV did it come out of, the one you measured?

A.    I don't remember.

Q.    Well, you understand that in order for there to be infringement, there actually has to be a product?

A.    Well, I think --

Q.    That is practicing the invention.

A.    I think they did both of them.  I'll have to confirm that.

Q.    Well, again, if you know the answer, please provide it.

A.    I'll have to look at it.

Q.    Okay.  So now they measured the gap -- how many -- how many TVs?

A.    There were six TVs involved.

Q.    All right.  Now, on the LG TV, there's 50 lenses.

Do you recall that?

A.    It's approximately 50.  I didn't actually count them.

Q.    Do you know how many lenses for each TV where actually the gap was measured?

A.    I believe it was about 20.

Q.    So what was the error range for like a 9879?

A.    I don't know what that number was sitting here, but I know that they were all within the range of 25 to 125 microns.

Q.    Okay.  Well, 125 microns to 25 microns, that difference, it may sound like a small amount, but a hundred microns, that's a lot bigger difference in distance than you're talking about with that simple little overlay, aren't you?

A.    That's absolutely true.  But the surfaces are very, very sensitive, and the Hubble Space Telescope, with a 6-foot diameter optic over the entire 6 feet, was only off by 8 microns, one -- one-tenth of a human hair, and it totally messed it up.

Q.    Oh, I believe it.

A.    But here, the separation, what we did, we did the analysis of various gaps from zero gap to 125 microns and found no appreciable change between the two, so therefore it's -- you can't compare surface topology with thickness separations, or separations of components.

And in most optical systems, for example, in a camera lens, the curvatures -- the surfaces have to be made to better

than one one-hundredth of a human hair.  Okay.  In fact, it needs to be more like two-hundredths of a human hair, where is -- so that's the surfaces.  But the separation, you can be off by several human hairs.

THE COURT:  Let's pause there.

Mr. Labgold, how much further examination do you have for Dr. Moore?

MR. LABGOLD:  A considerable amount, Your Honor.

THE COURT:  All right.  Then let's do that tomorrow.

Ladies and gentlemen, we have reached the end of the day.  Thank you for your attention with the subject matter.  We'll resume at 9:00 a.m. tomorrow.

I wish you a good evening.  Remember not to do any investigation on your own or discuss the case.  We'll see you tomorrow.  Thank you very much.

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  Dr. Moore, you may step down.  Thank you.  With a promise to return tomorrow as well.

How are we doing at the macro level?  What do we got -- I know we got Dr. Pollock coming.

MR. LABGOLD:  After.

MR. GOTTS:  We have one more witness, Your Honor, Ms. Davis, the damages expert.

THE COURT:  And what are we going to do immediately after Dr. Moore?  Will it be --

MR. GOTTS:  That's Ms. Davis.

THE COURT:  That will be Ms. Davis, and that's going to be your last witness?

MR. GOTTS:  Yes, Your Honor, subject to our adverse directs.

THE COURT:  The rebuttal.

MR. GOTTS:  So we won't be resting, but it's our last witness.

THE COURT:  Your last witness in this phase?

MR. GOTTS:  Yes.

THE COURT:  Fair statement.

MR. LABGOLD:  And then Mr. Yamaguchi will be the first witness followed by Mr. Akiyama and Mr. Murano.

THE COURT:  That will probably take us to tomorrow and maybe more than that.

MR. LABGOLD:  I'd like to think they get done, but just cautiously optimistic.

THE COURT:  And they all will have -- I can't remember the list.  They all will have interpreters; correct?

MR. LABGOLD:  Yes.

THE COURT:  Very well.  Part of the reason I'm asking is I just want to make sure we're on schedule, and I think we are, is my interpretation.

Think about when we should have the charging conference to discuss the closing instructions and verdict form.  It sounds

like we don't need to do that tomorrow, but maybe Monday would be the appropriate time to have that conversation.

Do you agree with that assessment?

MR. GOTTS:  That sounds right, Your Honor.

MR. LABGOLD:  I would say probably Tuesday.

THE COURT:  But not needed sooner than -- not needed sooner than Monday.

MR. LABGOLD:  No, because what will happen on Monday, whatever -- we've got a little bit of deposition coming in. They're getting shorter by the minute.  And then we've got Dr. Pollock, and then after that that should be it for our case.

THE COURT:  Yeah, so --

MR. LABGOLD:  And then Dr. Moore will be up again on the validity issues.

THE COURT:  I would plan to be ready for it on Monday. All right.  See you in the morning.  Thank you.

MR. GOTTS:  Your Honor, one question.  Were we going to address our motion -- not tonight, but did we want to schedule a time?

THE COURT:  As to Mr. Yamaguchi?

MR. GOTTS:  Yes.

THE COURT:  There was a response filed a little while ago.

MR. GOTTS:  I haven't seen it.

THE COURT:  Which I have not read yet.  So I have to read it before telling you when we're going to talk about it.  But it won't be now.

Good night.  Thank you.

ALL COUNSEL:  Thank you, Your Honor.

(Proceedings adjourned at 4:05 p.m.)

---oOo---

**CERTIFICATE OF REPORTERS**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Thursday, March 17, 2016


_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter



_____

Rhonda Aquilina, CSR No. 9956, RMR, CRR
U.S. Court Reporter