**Volume 5**

**Pages 607 - 845**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

| | | |
|---|---|---|
| ENPLAS DISPLAY DEVICE CORPORATION; ENPLAS TECH SOLUTIONS, INC.; and ENPLAS (U.S.A.), INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| VS. | ) ) | **NO. C 13-5038 NC** |
| SEOUL SEMICONDUCTOR CO., LTD., | ) ) | |
| Defendant. | ) ) | |

San Francisco, California
Friday, March 18, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

NAGASHIMA & HASHIMOTO
12005 Sunrise Valley Drive - Suite 203
Reston, Virginia  20191
BY:  **MARC R. LABGOLD, ATTORNEY AT LAW**
**PATRICK J. HOEFFNER, ATTORNEY AT LAW**

SHAW KELLER LLP
300 Delaware Avenue - Suite 1120
Wilmington, Delaware  19801
BY:  **JOHN W. SHAW, ATTORNEY AT LAW**
**JEFFREY T. CASTELLANO, ATTORNEY AT LAW**
**ANDREW E. RUSSELL, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
Rhonda Aquilina, CSR No. 9956, RMR, CRR
Official Reporters

**APPEARANCES**:   (CONTINUED)

For Defendant:

LATHAM & WATKINS
555 Eleventh Street, N.W. - Suite 1000
Washington, D.C.  20004
BY:  **LAWRENCE J. GOTTS, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
650 Town Center Drive - 20th Floor
Costa Mesa, California  92626
BY:  **RYAN R. OWENS, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, California 94025
BY:  **MICHELLE P. WOODHOUSE, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
John Hancock Tower - 27th Floor
200 Clarendon Street
Boston, Massachusetts  02116
BY:  **CHARLES H. SANDERS, ATTORNEY AT LAW**

Also Present:          **Takaaki Nagashima**
                       **Yukihiko Ohnuki**
                       **Jennifer Jonak**
                       **Kibum Nam**
                       **Yudae Han**
                       **Toyu Yazaki and Teresa Sumiyoshi**

**I N D E X**

Friday, March 18, 2016 - Volume 5

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|

**YAMAGUCHI, MASAO**

| | | |
|---|---|---|
| (SWORN) | 795 | 5 |
| Direct Examination by Mr. Labgold | 795 | 5 |
| Cross-Examination by Mr. Gotts | 819 | 5 |
| Redirect Examination by Mr. Labgold | 837 | 5 |
| Jury Questions | 839 | 5 |

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|

**MOORE, DUNCAN  (RECALLED)**

| | | |
|---|---|---|
| (PREVIOUSLY SWORN) | 619 | 5 |
| Cross-Examination resumed by Mr. Labgold | 619 | 5 |
| Redirect Examination by Mr. Owens | 664 | 5 |
| Recross-Examination by Mr. Labgold | 683 | 5 |

**DAVIS, JULIE**

| | | |
|---|---|---|
| (SWORN) | 689 | 5 |
| Direct Examination by Ms. Woodhouse | 689 | 5 |
| Cross-Examination by Mr. Shaw | 722 | 5 |
| Redirect Examination by Ms. Woodhouse | 782 | 5 |

**E X H I B I T S**

| **PLAINTIFF'S EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 102 | | 812 | 5 |
| 103 | | 813 | 5 |
| 104 | | 810 | 5 |
| 105 | | 807 | 5 |
| 106 | | 806 | 5 |
| 112 | | 815 | 5 |
| 113 | | 815 | 5 |

**I N D E X**

**E X H I B I T S**

| PLAINTIFF'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 118 | | 816 | 5 |
| 119 | | 816 | 5 |
| 124 | | 816 | 5 |
| 125 | | 816 | 5 |
| 126 | | 827 | 5 |
| 130 | | 818 | 5 |
| 131 | | 818 | 5 |
| 136 | | 818 | 5 |
| 137 | | 818 | 5 |
| 180 (screen shots only) | | 735 | 5 |
| 321 | 688 | 689 | 5 |
| 500 | 791 | | 5 |

**E X H I B I T S**

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1006 | | 714 | 5 |
| 1114 | | 751 | 5 |
| 1140 | | 714 | 5 |
| 1141 | | 714 | 5 |
| 1150 | | 714 | 5 |
| 1159 | | 787 | 5 |
| 1160 | | 763 | 5 |

**I N D E X**

**E X H I B I T S**

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1161 | | 755 | 5 |
| 1166 | | 761 | 5 |
| 1172 | | 759 | 5 |
| 1177 | | 732 | 5 |
| 1185 | | 719 | 5 |
| 1187 | | 707 | 5 |
| 1188 | | 705 | 5 |
| 1199 | | 714 | 5 |

Friday - March 18, 2016                                    9:01 a.m.

**P R O C E E D I N G S**

**---000---**

(Proceedings were heard out of the presence of the jury:)

        **THE COURT:**  Good morning, everybody.

        **ALL:**  Good morning, Your Honor.

        **THE COURT:**  Happy Friday.  You may be seated.

Our jurors are assembled and will be joining us in a moment.

A few procedural updates.  I read the further briefing on Witness Yamaguchi.  Thank you for working out most of the issues as to Witness Yamaguchi.  There are still remaining disputes as to Documents 92 and 141.  My thoughts are that we can maybe take that up right before lunch at the conclusion of testimony, unless you think that it has to be sooner than that.

        **MR. GOTTS:**  Your Honor, I think even better, I think it's resolved.  They're withdrawing those exhibits for Mr. Yamaguchi.

        **THE COURT:**  All right.  That is great progress.  So we'll mark that off as resolved.

        **MR. GOTTS:**  Okay.

        **THE COURT:**  Second, some kind of just hanging issues from yesterday -- not that we have to resolve them all now, but just a reminder -- there was some discussion during the discovery read-ins as to whether there was one part omitted and

whether that should be read later.  At that moment I deferred it until later conversation, and we didn't touch back on it. Has that been resolved?

MR. LABGOLD:  I think, if we may, we'll pick it up on -- let me see over the weekend whether we actually need to --

THE COURT:  Okay.  I just wanted to remind you that was --

MR. LABGOLD:  -- because we've gotten past the point that was the problem.

THE COURT:  Very good.  Sorry to interrupt.

I just -- that was one of the issues that didn't get resolved fully --

MR. LABGOLD:  Thank you, Your Honor.

THE COURT:  -- and I wanted to remind you of that.

There was also a conversation about whether a limiting instruction was going to be appropriate after some of the things were read in and some of the evidence came in, which we sort of deferred until a later conversation.  And I don't think it needed to be resolved at that moment, but that's something that's part of our continuing conversation.

MR. GOTTS:  I thought about a variety of these limiting instructions, Your Honor, and I tend to think if we're having a charging conference probably on Monday, unless something develops in the next day or two that causes me to

think we've got to do it right away, maybe we can work -- we can address that in the context of the charge.

**THE COURT:**  I think that makes sense.

**MR. GOTTS:**  Thank you, Your Honor.

**THE COURT:**  Next on my list, verdict form.  And the case has developed.  We've had rulings on.  Now we have substantial but not all the evidence in the case.

In preparation of the charging conference I'd like you to work together to see if we can come up with an updated and preferably joint, but if not joint, to have each side do your updated view as to what the verdict form might look like.

You have the benefit of my annotated closing instructions, which, of course, are going to take further feedback from you as to whether those are okay or not; but even if you don't agree to them, at least getting an updated view from you as to what a verdict form would look like consistent with the evidence that has actually come in in the case.  And we don't have all that evidence now, but at least at this point you probably have a projection between now and what's coming in on Monday of what will come in.

So my request is for you to confer during the day today and over the weekend, and by Monday at 9:00 a.m. to file either a joint -- and you can do it sooner -- but file a joint proposed verdict form or your disagreed verdict forms, and that can highlight what still needs to be resolved at a charging

conference, and we can resolve that at the same time as the jury instructions.  Does that make sense to you?

**MR. LABGOLD:**  It makes sense to us, Your Honor.

**MR. GOTTS:**  Yes, Your Honor.

**THE COURT:**  All right.  And on the charging -- the closing instructions, there have been some written orders, there have been some things addressed here in court, you've put some things in writing about the closing instructions before.

Do you wish to have more submitted in writing from you?  Are you comfortable just moving ahead with the charging conference without something in writing?  What's your preference?

**MR. GOTTS:**  I don't think we need anything further from the Court, Your Honor, from our perspective.  I suspect that we may want to bring to the charging conference any of these particular instructions we have in mind, and we can talk about them then, if that's okay with Your Honor.

**THE COURT:**  It's okay with me.  It's partly just for you to have a plan for what you're going to do between now and then, and to make sure your plan -- you know each other's plans.

**MR. LABGOLD:**  Yeah.  No.  I'm hoping, we haven't actually -- there's a variety of things, and I've been a little focused on other things this morning; but the plan is hopefully to work over the weekend to see, you know, if they have any

additional instructions, if they have any proposed changes.

As you say, it always happens as the evidence starts coming in, things logically move along.  So -- but I don't know that -- we'll work it out, but I don't think there needs to be any formal submission.  I think it's probably just easier to work it out in the conference.

THE COURT:  Let's leave that to the side.  I do want you to confer, and you've been conferring on a lot of things.  Let's put that on the list of things that you're going to continue to confer about before the final conference, so that potentially we can work out any differences in advance.  And if we don't, that you're not -- either side is not surprised by what the other side is saying about some closing instruction because we don't want that to delay the conclusion of the case.

All right.  Well, that was everything I wanted to just touch in on that we had kind of left over from yesterday.

MR. GOTTS:  It might be premature to ask this, Your Honor, but does -- what's the Court's thinking on closing?  Would we do it the day after the close of the evidence typically?  Is that the way you do it?

THE COURT:  It's going -- let's check in on that at the end of the day to sort of see where we're at.  Yes is the short answer, but that may depend on what your projection is as to when those events are going to occur.

MR. GOTTS:  Right.

**THE COURT:**  I would ideally like to have a little gap for you to, you know, be prepared and not have the jury waiting around here while we're getting prepared; but, conversely, if we finish the case at 9:30, if the jury comes in for an hour, I don't want them to be here only for an hour and have to come back the next day.

So, hopefully, that answers your question.

**MR. GOTTS:**  It does.  Thank you, Your Honor.

**THE COURT:**  Very well.

**MR. LABGOLD:**  One of the things just as a reminder, we have disagreement because they won't be able to close their case until they get to adverse direct on our witnesses.  So we won't be filing any Rule 50 motions.

**THE COURT:**  Understandably, because you can't until there's been -- all the evidence has come in.

I thought of one other thing.  When we finish with -- this is because of the issue of closing and if the case is closed or not -- when we finish with Witness Davis' testimony, my thought is that each party might give a two-minute supplemental opening statement to the jury, not argument but just an update as to what's coming next in the case, kind of a reminder of the sequencing and still what is to come in the case.

Again, not intended to be your closing argument.  You're going to have a closing argument, but just an update as to what evidence has come in, what the next phases of the case are, so

that they'll have from each of you an updated outline of what's to come from there.

MR. LABGOLD: And so, I mean, my intention would be just to say that, you know, we've heard evidence with regard to infringement. The next phase is that, you know, you'll be hearing witnesses that will come from EDD and then the experts.

THE COURT: And you can say, "And here who's those witnesses are. Here's why we're calling them, is to give you information about" --

MR. LABGOLD: Just a road map.

THE COURT: A road map of A, B, C, and D, so they know what's to come and they can start to put it in their brains as to how that fits in with what they've heard so far and what's to come.

And I would have EDD go first on that; and have SSC then also say, "And here's what we're going to be asking them about," and just give them an introduction. Make sense?

MR. LABGOLD: Makes sense.

MR. GOTTS: Yes, Your Honor.

THE COURT: Very good. Let's call in our jury.

MR. LABGOLD: Thank you, Your Honor.

(Proceedings were heard in the presence of the jury:)

THE COURT: All right. Good morning to our jurors. Happy Friday. Please be seated.

Thank you for persevering to get here. I know BART in

particular has been extra problematic this week, and everyone's been prompt.  We are on time in our case, and with your great assistance, the case is on the schedule that we set forth at the beginning of the week.

As a reminder, Dr. Moore is on the stand and being examined by EDD, and that examination will continue.

Dr. Moore, you remain under oath.

**DUNCAN MOORE**,

called as a witness for the Defendant, having been previously duly sworn, testified further as follows:

**CROSS-EXAMINATION**   (resumed)

**BY MR. LABGOLD:**

**Q.**   Good morning, Dr. Moore.

**A.**   Good morning.

**Q.**   When our viewers last tuned in, we were just about to talk about the gap.

Now, with reference to the gap, do you understand when I use that term I'm talking about the distance between the LED top surface and the bottom of the lens?

**A.**   Yes.

**Q.**   And that's the way you've used it in your analysis; correct?

**A.**   Yes.

**Q.**   Now, it's your testimony that BRO actually measured the gap for each of the products; correct?

A.   Yes.

Q.   And they measured that out to be, depending on the product, between 25 and 125 microns; correct?

A.   That's correct.

Q.   Now, for the products at issue, we have -- let's start off with 9854D.  What is the measured value of the gap?

A.   Oh, I don't remember that.

Q.   Okay.  Do you know what the design value --

A.   I don't remember that either.

Q.   Okay.  Let's go to 9854E.  Do you know what the gap is there?

A.   I don't remember.

Q.   Do you know what gap was used?

A.   The gap that was used is 75 microns.

Q.   Now, for any of the products -- 9854D, 9854E -- well, let me ask.  9879, do you know what the gap was?

A.   I do not.

Q.   So the number that's been chosen to be used for all of them is not the number that's in the actual product; correct?

A.   The number that was used is 75 microns.

Q.   And that's not a number that's the actual gap for any of the products; correct?

A.   I don't know that.  Sitting here, I just don't remember.

Q.   Now, isn't it fair to say that changing the gap would necessarily change the angle of incidence for each light ray?

**A.**   It would change it slightly, yes.

**Q.**   It will change it; correct?

**A.**   It will change it.

**Q.**   Now, in your first set of data, the one that was replaced, you used this same measurement of 75; right?

**A.**   We modeled it with 75-micron, yeah, BS.

**Q.**   And even though you were able to redo the ray traces in -- I think you said it was a couple of weeks?

**A.**   It took about two weeks.

**Q.**   The corrected ray traces, as I think you refer to them, still use this fictional 75-millimeter value; correct?

          **MR. OWENS:**   Objection, Your Honor.   He's calling it "fictional" for some reason.

          **THE COURT:**   Overruled.   You may answer.

          **THE WITNESS:**   I'm sorry.   Repeat the question.

**BY MR. LABGOLD:**

**Q.**   So your corrected ray traces continue to use the fictional 75-micron gap; correct?

**A.**   We continue to use 75 microns as the gap.

**Q.**   So even though BRO -- well, let's pull up, just so we can follow along -- this is one of the slides that you prepared; correct?

**A.**   Yes, it is.

**Q.**   And this is your overview of the analysis that was performed; correct?

A.   Yes.

Q.   And the first step is to measure the gap between the lens bar, LED, and the light -- the LED, and the light bar; correct?

A.   Yes.

Q.   And then down here in seven, you say "Enter results from Step 1 to 6 into ASAP software to create model of LED and lens"; correct?

A.   Yes.

Q.   But that part down there, step number seven, does not accurately reflect what happened, correct, because you didn't enter the actual measured value?

A.   We used 75 microns.

Q.   Is there a reason why you couldn't use the actual measured value if they actually went to the trouble of measuring it?

A.   I don't remember.

Q.   Again, just to make sure, you do know that to do an infringement analysis, it has to be based on the actual product as sold, the configuration; correct?

A.   That's correct.

Q.   And with regard to the LED gap, you didn't use the actual value; correct?

A.   We had modeled it from 0 to 125.  So 75 was within that -- it was within that range.

Q.   But, again, it's not the actual measured value; correct?

A.   That's correct.

Q.    Now let's refer back to the LED shown in PX-55.  We'll pull that up on the screen.  We're just going to use it for reference value.

Now, in your original expert report, you used an LED that had a space -- well, let me ask just so we can orient.

This whole rectangle (indicating) is the outside package of the LED; correct?

A.    Yes.

Q.    And the little trapezoid on the top, that portion is actually where the light emission is coming from; correct?

A.    Yes, the light is coming out from that entire area.

Q.    And at the bottom center of that trapezoid, that's where the LED, the actual light-emitting diode, the semiconductor, would actually be; right?

A.    That's where the blue laser diode -- LED is.

Q.    Okay.

A.    That's where the blue one is.

Q.    Now, in looking at this LED, when it's a real LED in real life and we have that diode here in the center, the intensity of the light is greatest in the center; right?

A.    I would assume that to be the case.

Q.    Just like you said with a lightbulb, if it wasn't frosted, as we've all experienced, when you see the light-emitting element inside the bulb, it's brightest at the element; correct?

A.   Yes, it is.

Q.   And it's going to fall off towards the edges?

A.   Not necessarily.  There's more area on the outside, and so -- and the light is bouncing around inside of there and changing.  It's taking the blue light and converting it to red light and green light to make the whole thing look like it's white light.

Q.   So is it your testimony that the light emission at the center point is equal to the light emission at the very, very edge?

A.   I don't know what the variation is.  It's really bright everywhere.

Q.   Okay.  Now, when you performed your measurements for your analysis, you performed three measurements that you've reported; correct?

A.   You mean three sides of the LEDs?

Q.   Three light-emission points; correct?

A.   Right, three apertures.

Q.   And so that light-emission face in one of them takes a measurement at 1.25 millimeters off center; correct?

A.   1.25 millimeters off center, right.

Q.   So what we're talking about is starting at the center point and you move over 1.25 millimeters, by definition this light-emission face has to be 2.5 millimeters across; correct?

A.   That's correct.

Q.   Now, in the actual products -- let's pick the 9879.  The actual product that was isolated from a TV, that LED did not have a light-emission face that was 2.5 millimeters in diameter; correct?

A.   That's right.  It was -- I think it was 2.3.

Q.   So assuming it's 2.3 for the moment, the measurement that you took at 2.5 -- at 1.25 millimeters doesn't actually exist; correct?

A.   The reason we did that, as I said on direct, was that we wanted to model each one of them as if -- you know, for each one of the lenses, we wanted to know what it was for many different laser diodes.

You are correct, for that particular one, the one that would be relevant would be the 2.3 one; but another LED, such as the one that was used in '54D, which was 2.5, then we would be able to actually do the analysis without having to rerun the whole code again.

So it was a handy way of getting a lot of data out of Breault so that we wouldn't have to keep rerunning the data; but for the other ones, the LEDs were smaller, but we did the simulation on all of those.

Q.   Well, remember, you do have to prove infringement with regard to what the actual product is; correct?

A.   And we did.

Q.   And the actual product, a 2.5 measurement, is nonexistent;

correct?

**A.** But it still had total internal reflection at 2.3. That's what was relevant.

**Q.** Well, the 2.5 -- the 1.25 outer measurements, those are phantom data; correct?

**A.** For that particular product, that's correct, but that's not relevant. It still has total internal reflection at 2.3.

**Q.** I believe it's not relevant, but we're going to get there if we can stick to my questions.

Now, with regard to one of your ray traces here, every one of them shows three measurements, but for at least two of them, assuming those are the actual measurements, there's not any possibility of that data; correct?

**A.** I don't understand the question.

**Q.** Well, let's look over here at 9879.

**A.** Yes.

**Q.** You have three data points: 2.0, 2.2, 2.5. 2.5 is the heavy one on the outside; correct?

**A.** It is. I'm sorry. Yes, it is.

**Q.** So that is nonexistent data in that device as it exists?

**A.** Right. The other two are existing, and they have TIR.

**Q.** Okay. We're going to get there.

Now, when we look at -- let's pull up on the screen DTX-1056.

And do you see this? I'm not sure it's in the binder. Do

you see it on the screen?  This is one of the corrected thickness.

A.    Okay.

Q.    Now, if we look at 1056 at Slide 11 --

A.    Can I look at the original document?

        MR. LABGOLD:  Can I get a copy of 1056?

                (Pause in proceedings.)

BY MR. LABGOLD:

Q.    1056.

A.    (Witness examines document.)

Q.    Now, we're going to look at Slide Number 11.

A.    (Witness examines document.)

Q.    This is one of the slides which you were using to show leakiness; correct?

A.    Yes.

Q.    Now, this includes all three measurements; correct?

A.    Yes, it does.

Q.    So this is overexaggerating the amount of TIR which you've said is present; correct?

A.    The -- for this particular product, it should only include the inner two.

Q.    Now, if we refer to Slide Number 12.

A.    (Witness examines document.)

Q.    This is a composite of the three points of what you're showing as TIR; correct?

A.   Yes, it is.

Q.   And if we go to Slide Number 15, this is the amount that's at the outer point; correct?

A.   Yes, it is.

Q.   Now, let's go to Slide Number 13.

A.   (Witness examines document.)

Q.   This is the amount that you're saying is at the inner point; correct?

A.   It's at 2 millimeters.

Q.   So that's the 1.0-millimeter off-center measurement; correct?

A.   Yes, it is.

Q.   Now, looking at this slide and all of the slides -- all of the ray traces that you've used, you haven't shown any of the light emission for any position other than the 1.0, 1.1, and 1.25 measurement; correct?

A.   That's right.  Those are the three that were used to -- as examples.

Q.   Now, yesterday during your direct, I believe you explained that when -- all the area in between 2.2 and 2.5, that would -- all of that area would exhibit TIR as well.  Do you remember that?

A.   Yes, and that's true.

Q.   And in those products -- 9879, 9854E -- where you admit there is no 2.5, that's not true; correct?

**A.** Well, in that case it would be between 2.0 or 2.2 or 2.3 depending upon the size of the LED.

**Q.** But, obviously, nothing up at the upper end where the LED doesn't exist; correct?

**A.** There would be nothing beyond the diameter of the LED, that's correct.

**Q.** Now, is there a reason why you haven't shown any rays coming off the center?

I'll pick another color.

**A.** The reason we chose that, as you can see, the beginning of the TIR occurs at about 1.0.

**Q.** Well, that's --

**A.** Below that value, the TIR does not exist for those object points.

**Q.** So if we take light right off the center of the LED and we go straight up, that's going right through; correct?

**A.** That ray will go straight through that surface and not bend at all.

**Q.** And because this is a Lambertian emission at that individual point, it actually has a uniform distribution over a range; correct?

**A.** Yes, an overextended -- over the angles, that's correct.

**Q.** So if we just say over this angle range, everything from that one point in the center is going straight through at every portion of the upper surface?

**A.** That's not true. It's got to be refracted at both surfaces.

**Q.** Thank you for the clarification. I agree.

It's going to first hit the surface here (indicating), then it's going to bend a little bit. Then it's going -- depending on where it hits this surface (indicating), it's either going to bend a little bit, or depending on where it is, it may be depending a lot; correct?

**A.** It depends on angle of incidence of each of the rays at the surfaces.

**Q.** But there certainly will be no total internal reflection; correct?

**A.** That's correct.

**Q.** So if we move this spot incrementally by photon widths --

**A.** By photon widths? What's that mean? Photon doesn't have a width.

**Q.** It's actually infinite, isn't it, across that surface, how many points you can define?

**A.** I guess you could go down and define an infinite number of points if you wish to.

**Q.** So each one is a point source. So over that entire face until you get to that point where you're actually able to see TIR, all of that light is actually going through. It's being refracted.

**A.** It's being refracted at those two surfaces, yes.

Q.   And so if we chose the center point as our point source, there is no TIR surface with respect to that point; correct?

A.   There is no TIR refraction at that point.

Q.   Because -- but there's no surface that's inclined from which the light emitting from that point could be totally internally reflected; correct?

A.   But it is when we get to the object -- when the point source is located at 1 millimeter.

Q.   Now, as you went along -- and did you actually take the measurement at the center point?

A.   I did not.

Q.   It wasn't necessary; right?  Your level of experience, you know very well by looking at that there's no way there's going to be any TIR at any angle coming off the center of this; correct?

A.   I wouldn't have known that until I did the ray trace to be sure.

Q.   Well, then, you did do a ray trace?

A.   I said if we had done that, I wouldn't have known for sure whether it did or did not; but sitting here now, I know that the TIR begins at about 1 millimeter.

Q.   How do you know that?

A.   Because you can see that at that particular one it's actually slightly less than 1 millimeter because you can see the number of rays, if you will, the angle that's suptended by

the rays for that particular point is fairly small.

So as I -- if I were to move the object or move the point closer to the center from the 1 millimeter, say .9 -- and I don't know where that actually begins -- at some point I will get the first ray to TIR. And then from then on out, from extending from the .1 -- I'm sorry, whatever the number is, let's say it's .9 -- from .9 to the furthest extent of the LED, I'll have TIR.

Q. You will admit if this lens was designed to be a TIR lens, they failed miserably?

A. I'm not going to comment on that.

Q. You have no opinion on that?

A. They succeeded in getting TI -- there was TIR on that surface.

Q. Would you be comfortable standing up at a scientific conference and saying -- putting up this lens and saying, "I've just created a new TIR lens"?

A. I think that the fact of the matter is, it is a TIR surface, and that's all that counts.

Q. Now, with regard to what's coming off at all these points, each one of those with all the necessary refractions, if we went through, as you did in the one example, and showed something like this (indicating) -- do you remember?

A. Is that from the same one?

Q. Yes.

A.   Yes.

Q.   So if we actually showed the emission points across the entire face, wouldn't it look something like this (indicating)?

A.   I assume that to be the case.

Q.   It would be completely solid because there would be all of these infinite number of rays so that all of that light is just going through, refracting but going through; correct?

A.   That's correct.

Q.   Now, I believe it's your testimony that the reason why it's going through is because it's intending to be a leaky lens; correct?

A.   That's correct.

Q.   So, now, you understand that the reason for leakiness in the context of the '554 patent was that Dr. Pelka had created a new patent that was based on TIR; correct?

A.   That's correct.

Q.   And so his TIR lens was so effective, he actually ended up with these black spots; correct?

A.   Yes.

Q.   And so in order to compensate for that, he then had to go backwards, if you will, and correct how efficient he had been with creating TIR; correct?

A.   He had to recontour the surface, that's correct.

Q.   So, again, he started -- the concept of leakiness is to take a TIR surface and compensate for this problem you may have

created a black spot?

A.    That's correct.

Q.    Now, in this instance -- again, I just want to make clear -- are you saying that this lens was designed as a TIR lens and then backed off so that the leakiness was obviated?

A.    I don't know how the lens was designed.  I wasn't part of the design of the lens at all.  However --

Q.    And you were -- you didn't see and you weren't shown any of the documents we saw, including the manufacturing records; correct?

A.    I saw them eventually, yes.

Q.    But not when you were forming your opinions?

A.    Correct.

Q.    Looking at the '554 patent, that's going to be DTX-1004.

A.    (Witness examines document.)

Q.    Do you have it there?  You may not.  Actually --

A.    1004 is not in this document.

                    (Pause in proceedings.)

BY MR. LABGOLD:

Q.    Do you recognize that as the '554 patent?

A.    Yes, it is.

Q.    And on direct you discussed about the concept of leakiness; correct?

A.    Yes.

Q.    Now, I first want to take a look at Figure 16 and 16A.  We

can get the whole thing.

**A.**   (Witness examines document.)

**Q.**   Here we have a representation of a TIR waveguide as Dr. Pelka envisioned it; correct?

**A.**   Yes.   This is a TIR surface, yes.

**Q.**   Well, the TIR surface is actually the curve coming down 80; correct?

**A.**   Yes.

**Q.**   And then the rest of this is a waveguide; correct?

**A.**   Yes.

**Q.**   Now, in concept what's supposed to happen is the light's supposed to be emitted from this LED, hit this surface (indicating); if it's greater than the critical angle, it will then be reflected, and then it's going to bounce?

**A.**   Yes.

**Q.**   And that's, again, this concept, that's how fiberoptics work.   And if the fiberoptics are efficient and not having absorbing surfaces, that signal can travel for great distances at high efficiency; correct?

**A.**   If it's a low-loss fiber, that's correct.

**Q.**   Now, with regard to the leakiness, if you will refer to Column 14 starting on line 58, and then we're going to also capture what's going to carry over to the next page.

So the concept of leakiness you explained and in your slides you've spoken about the first part; and by that I mean:

(reading)

"Because the TIR cusp region 76 of Figures 15 to 18 reflect substantially all light incident thereon, these regions 76," that's referring to 15, "appear dark relative to portions of the waveguide outside the TIR regions 76. In situations where dark spots are objectionable, the surface 80 should be contoured to be less than perfect" -- "less than a perfect" -- "be a less than perfect internal reflector so that a significant portion of the incident light leaks through the surface."

Correct?

A.    Yes.

Q.    And you're focusing on a significant amount of light or significant portion leaking through the surface; correct?

A.    That's only that center section, that's correct.

Q.    And the next sentence, however, says that the amount of leakage should preferably be no more than is necessary to substantially eliminate the dark spot; correct?

A.    That's correct.  That's -- the whole function is to make it uniform.

Q.    Now, in your slides, looking at DTX -- just a minute here. I lost the tab.

                    (Pause in proceedings.)

BY MR. LABGOLD:

Q.    Let's look at your Slide 138.  So it's Defendant's

Demonstrative Exhibit 138.

A.   (Witness examines document.)

Q.   Now, first of all, is there any structure in the '554 patent that has this kind of a gentle recess the way you've drawn it in this diagram?  Is there any other figure that's anything remotely similar to that?

A.   I'm not aware of one.

Q.   The concept that's described with regard to -- as we saw Figures 15 through 18, is to take that sharp cusp and round -- contour the point so as to allow some of the light through; correct?

A.   It's to recontour the surface, that's correct.

Q.   And it's to be equal to only enough to eliminate the dark spot; correct?

A.   That's -- in the ideal situation, that would be correct.

Q.   So, now, what is the dark spot in the accused lenses that's being corrected?

A.   Well, that surface is being recontoured.  It's not a -- it's a smooth curve.  And so the result of all of this is that the illuminations coming out of it is uniform.

Q.   But it's uniform in spite of the TIR that you say is present; correct?

A.   In spite of?

Q.   Yeah.  When we --

A.   I mean, you're trying make the whole thing be Lambertian

at the end of the day, so you take and you integrate all of the phenomena occurring:  The refraction, the reflection, the -- okay.

Q.   Is it your testimony that even in the one that has data that does not exist in the actual device, that this amount of TIR is actually going to be visible; it's going to have a visible effect on the uniformity of all that other light that's already going through?

A.   The only thing that's relevant is that there is a TIR surface.  That's all the claim requires.  It doesn't say anything about a fraction of it or anything.  It's says -- the claim says there must be TIR, and there's TIR.

Q.   So you're basing it on the fact it has -- you will admit it has no practical effect; right?

A.   I'm not saying that.

Q.   So can you think of a way, other than running a ray trace, in the real world that you could actually -- let's assume every -- even if you take the LED out as far as you want in that 2.5 where it doesn't even exist, if I give you that in a hypothetical, can you think of a real-world way that you could measure that TIR, how much light is actually there?

A.   Yes, I can think of a way to do it.

Q.   Why didn't you do it?

A.   Because I was only required to show that the surface was a TIR surface.  I was not required to show that X percent was

TIR.  All I was required to do was simply show that that was the fact.

Q.   Do you have an estimate of how much of the light is actually reflected?

A.   I do not.

Q.   Do you think it's more or less than 50 percent of the light?

A.   I'm not going to speculate.

Q.   You're telling me that with all your years of experience and able to fix the Hubble Telescope from here, you can't tell whether or not 50 percent of the light is being reflected or not?

A.   I would suspect it's less than 50 percent.

Q.   Wouldn't you suspect it's less than 10 percent?

A.   I don't know that because you've got to integrate all the way around the outside.  You've got a lot of area out there.  Even though it's only -- you know, you say I can go up to 2.5 millimeters.  You said that if I go to 2.5 all the way around that outside, so I've got a lot of area out there, I have no idea what the number is.

Q.   And that's giving you from 2.0 to .5.  Now, what about that whole 2.0 in the center?  You don't really think, even if you do it by surface area, that it's greater than 10 percent, do you?

A.   I don't know that.

**Q.**   So these measurements were used, a fictional gap, include phantom data, and they give you an optimized output with what you say is TIR; correct?

**A.**   They're not phantom.  We all understand what the ranges are, where there's a difference between them.  They're in no way phantom.

**Q.**   Other than the fact that they don't exist in the actual product; correct?

**A.**   They do exist in the actual product.

**Q.**   Dr. Moore, I don't think the jury needs to hear it again, but if you're going to insist, the actual product in 9879 --

        **THE COURT:**  Sustained.  The jury doesn't need to hear it again, because they've been listening very attentively.  So let's move on.

**BY MR. LABGOLD:**

**Q.**   Now, when you -- looking at your opinions on infringement, when you did your infringement opinions, did you use the same definitions for both infringement -- and I mean by "definitions" the same claim construction -- for both infringement and invalidity?

**A.**   Yes, I did.

        **MR. OWENS:**  Objection, Your Honor.  Beyond the scope of direct.

        **THE COURT:**  Overruled.

///

BY MR. LABGOLD:

Q.   So -- and to the best of your ability, you followed the Court's construction; correct?

A.   Yes.

Q.   Now, referring to Claim 1 of the '554 patent.

A.   (Witness examines document.)

Q.   Are you there?

A.   I am.

Q.   Now, with regard to Claim 1, you understand that the claim requires it's a waveguide; correct?

A.   Yes, it does, it requires a waveguide.

Q.   And the waveguide is going to have an illumination coupler that's embedded in an interior region; correct?

A.   Yes.

Q.   And the rest of the claim is going to go on and describe how that waveguide and the illumination coupler interact with each other with regard to the light; correct?

A.   Yes.

Q.   Now, the light that's totally internally reflected needs to be captured for propagation; correct?  It's the last sentence -- the last part of the claim, rather, the last clause:  (reading)

     "Such that light rays, which would otherwise pass out
   of said waveguide, are captured for propagation between
   said top and bottom surfaces."

A.    Yes.

Q.    And so "captured for propagation" means that it's going to be -- not going to be able to escape the waveguide; correct?

A.    Not at the point of the TIR surface.

Q.    And is it fair to say that in your view of propagation, as it's used in Claim 1, the light rays must be reflected more than once?

A.    No.  It just says it must be propagated.  It doesn't say it has to be reflected more than once, I don't believe.

Q.    Well, if you'll refer to Defendant's Trial Exhibit 1220 in your binder.

A.    (Witness examines document.)

Q.    You recognize that document; correct?

A.    Yes.  This is -- sorry.

Q.    It's one of the reports that you prepared; correct?

A.    Yes.

Q.    And if you turn to page 23, you see that you're going to have a discussion of the Koito reference?

A.    Yes.  This is on Claim 30, though.

Q.    Page 23.

A.    Yes.  It says Claim 30.

Q.    You say here:  (reading)

         "Furthermore" --

A.    Where?

Q.    At the top of the page.

**A.**    Okay.

**Q.**    (reading)

"Furthermore, as the optical element disclosed in Koito cuts off immediately after the angled surface, Koito fails to disclose a waveguide at all as the light is not captured inside for propagation but is instead allowed to exit the lens after the initial reflection."

Do you see that?

**A.**    Yes.

**Q.**    Does that refresh your recollection that with regard to your interpretation of the claims as applied in that context, the light rays have to be reflected more than once for propagation?

**A.**    (Witness examines document.)

**Q.**    I did read it correctly.

**A.**    I'm trying to understand the context.  It's been a very long time since I've reread this report since I was not going to prepare for this until this weekend for the invalidity report.  So I'm having to refresh my memory.

(Witness examines document.)  My -- okay.  Now, looking at the figure -- can we get the figure -- can we put the figure up?

**Q.**    No.  I can't do that.  I can't admit this one because it's your report.  Sorry.

**A.**    So in this particular case, there is no waveguide at all.

It's just reflecting off a surface.

Q.   The language you said:  (reading)

        "It fails to disclose a waveguide at all as light is

    not captured inside for propagation but is instead allowed

    to exit the lens after the initial reflection."

    Correct?

A.   That's correct.  It immediately goes out of the lens.  It
reflects off this TIR surface and then, boom, it's out of the
material altogether.

Q.   So propagation requires more than just an initial
reflection; correct?

A.   (Witness examines document.)  Hmm.  I think the Court
ruled it had to go between -- I need to get the --

Q.   Well, let me refresh your recollection a little further.
You can turn to page 32.

A.   Of?

Q.   Of that same report.

A.   (Witness examines document.)

Q.   There you were talking about the Sharp prior art, and you
say --

A.   No, I'd like to see the Court construction.

Q.   Of?

A.   For the wave -- the one where it talks about a waveguide.

Q.   A waveguide.  Yeah.  I'm talking about the last portion of
the claim, "captured for propagation between said top and

bottom surfaces."

A.    Yes.  So here's the waveguide.  There's top and bottom surfaces.  So I don't understand the problem.  In the case of Quakay (phonetic) -- not Quakay -- Kotell (phonetic) -- whatever it was -- there is no top and bottom surfaces.

Q.    But that's not what you said.  You said that it doesn't disclose a waveguide at all because the light is not captured for propagation and leaves after the first reflection; correct?

A.    That's correct.

Q.    And on page 32 with regard to the Sharp reference, you say:  (reading)

        "Sharp fails to disclose a waveguide at all as the
        light is not captured inside for propagation but is
        instead allowed to exit the lens after the initial
        reflection."

        Correct?

A.    That's correct.

Q.    Does that refresh your recollection that your definition of "propagation" requires more than one reflection as it's used in Claim 1?

A.    (Witness examines document.)  Well, I mean, the differences between these two is such that in the case of the Claim 1, it's reflecting down, it strikes the bottom surface, and so there's a bouncing thing.  It's propagating between two surfaces.  So I don't --

Q.   But there has to be more than one reflection; correct? That's what I'm saying.  You can't just have one reflection and leave.  You have to be able to have multiple reflections.

A.   That's correct.

Q.   Now, if you want to take a look on page 41.

A.   (Witness examines document.)

Q.   We're going to do this with the Althaus prior art: (reading)

"Althaus fails to disclose a waveguide at all as the light is not captured inside for propagation but is instead allowed to exit the lens after initial reflection."

It's consistent throughout your report.

A.   Correct.

Q.   Now, is it -- you have not shown any ray trace that goes more than one reflection anywhere in your report; isn't that correct?

A.   The ray in -- can we bring that slide up?

Q.   I'm asking.  You have not shown any --

A.   But one --

Q.   -- ray traces that have more than one reflection; correct?

A.   One of ordinary skill in the art would have known that the ray that bounced -- went down to the bottom -- to the bottom surface would have reflected off that surface.

Q.   You have no ray traces that show more than one reflection;

correct?

A.    One of ordinary skill in the art would have known what happens after that.  It wasn't necessary.

Q.    Have you provided any ray traces with more than one reflection?  Yes or no.

A.    As I said, I have not.

Q.    Now, your opinion with regard to what forms a TIR surface is that the accused lenses have a TIR surface; correct?

A.    Yes, they do.

Q.    And if we look at, just for reference, page 56, here it's shown with the encapsulated LED.  But for the purposes, it's the same upper surface that you're saying is the TIR surface; correct?

A.    It's in cartoon form, that's correct.

Q.    Now, you would agree that in the accused products, that upper surface -- I believe you called it a dimple, that you can feel it, the slight dimple.  It's a slight recess; correct?

A.    Yes, it is.

Q.    And in your invalidity opinions, you believe that a slight recess -- it takes more than a slight recess; is that fair?

A.    I'm not sure what the word "slight" means in your case.

Q.    Well, the Court's definition is what you applied; right?

A.    I don't believe the Court gave a definition of "slight."

Q.    I'm sorry.  With regard to TIR surface.

A.    Yes.

Q.   And the Court's definition of TIR surface is:  (reading)

"A surface angled with respect to light source" -- a

"light source to produce total internal reflection."

Correct?

A.   Yes.

THE COURT:  And, Mr. Labgold, it actually has the words "within a device" at the end of it, if you're going to be reading the definition.

MR. LABGOLD:  Oh.  Thank you, Your Honor.

Q.   And with regard to that structure, it's your opinion that there has to be a sufficient angle; correct?

A.   It has to be angled such that you get TIR, that's correct.

Q.   So it's not a structural angle, it's simply a -- it just has to be inclined?

A.   It has to be -- the surface has to be such that light striking it is subjected to total internal reflection.

Q.   So if it was a spherical depression, would that be angled with respect to the light?

A.   What does that mean "spherical?"  Do you mean like a --

Q.   Well, if it was actually a spherical cut out, would that be an angled surface?

A.   It probably wouldn't have T -- well, I don't know whether it would have TIR, though.

Q.   Now, isn't it correct with regard to the Rohm reference, you believe that Rohm fails to even disclose an angled TIR

surface merely presenting a standard dome encapsulant with a slight central recess?  And you can find that on page 36 of that report.

**A.**   (Witness examines document.)

**Q.**   It's the language right above the figure.

**MR. LABGOLD:**  Does SSC have any objection to pulling up the figure?

**MR. GOTTS:**  We have an objection this is beyond the scope of direct.

**THE COURT:**  The objection must come from Mr. Owens under the Court's order.

**MR. OWENS:**  Sorry, Your Honor.

**THE COURT:**  And, Mr. Labgold, if you want the jury to understand what you're doing, there's not been any foundation explained to them as to what report you're referring to or to why it matters.

So if you want to confuse the jury, you're accomplishing that objective.  If you want to explain what your purpose is, they might benefit from that.

I am concerned about the amount of time that you're going into a report that they don't know what you're talking about.

So I'll sustain the objection in that respect; but if it's probative of what he's testified to about infringement or you can tie the topics together -- and I'm giving you some leeway to connect them.  That's why I'm permitting it.  But I am not

going to permit much more without some explanation to the jury so they're not confused further.

MR. LABGOLD:  Thank you, Your Honor.

Q.   Again, now with regard to the TIR surface, when you applied the definition in terms of infringement, did you apply it the same way with both infringement and invalidity?

A.   Yes.

Q.   And so with regard to the report that's before you, this is your invalidity report; correct?

A.   (Witness examines document.)  Yes.  It's my rebuttal to Pollock's report, which is the invalidity report.

Q.   And with regard to the Rohm reference that's referred to here, you said that that did not include a TIR surface; correct?

A.   (Witness examines document.)  So it's -- I wrote: (reading)

        "Discloses an LED resin molding around an LED; however, Rohm fails to disclose an angled TIR surface."

So I'm not sure what you're asking me.  There's a -- there appears to be two rays of light.

Q.   You're saying that it has a slight central recess and not an angled TIR surface; correct?

A.   (Witness examines document.)

MR. LABGOLD:  Your Honor, I'd like to publish the image, if possible.

**MR. OWENS:**  Objection, Your Honor.  We spent quite a bit of time on this.  I don't think Mr. Labgold did go back and establish the foundation or solve the confusion.

**THE COURT:**  That's sustained.  Not that you can't ever go into this, but I'm going to defer further examination into this area until the jury has some context for it.

**MR. LABGOLD:**  We'll come back in the other context.

**Q.**   Now, with regard to the encapsulation, you stated that encapsulation is a problem; correct?

**A.**   Yes.

**Q.**   Does the '554 patent say that encapsulation is a problem?

**A.**   It says that -- I don't remember whether they actually said that that is a problem --

**Q.**   Well --

**A.**   -- but it is a problem.

**Q.**   With regard to Figure 16 -- let's pull that back up again.

With regard to Figure 16, does this show encapsulation?

**A.**   I don't believe it does.  I believe 44 is an opening.

**Q.**   Okay.  And in that regard, 44 is an LED; correct?

**A.**   (Witness examines document.)

**Q.**   It's Column 13.

**A.**   (Witness examines document.)

**Q.**   We'll stay on the figure for the moment.

**A.**   (Witness examines document.)

**Q.**   Column 13, it's at line 28, "Figures 15 and 16 illustrate

a light source 44, preferably an LED."  You pointed it out on your direct.  Line 39.

A.   I guess that is -- that would look like that's encapsulated.

Q.   And, in fact, if we pull up the language at Column 13 starting on line 39 to the end of the paragraph, you see where it says that it's inserted into a hole, channel, or recess that extends to the bottom surface of the waveguide; correct?

A.   For this example, that's correct.

Q.   And in order to ensure good coupling into the waveguide -- and that's what the illumination coupler does; right?  It couples the light into the waveguide?

A.   That's what it does.

Q.   And reduce reflections at the interface between facets of the LED and the corresponding sides of the recess?

A.   That eliminates what's called the Fresnell reflections.

Q.   A transparent coupling agent, such as an adhesive or gel, may be used to fill air gaps between the LED and the waveguide; correct?

A.   That's what it says.

Q.   So in that regard you're actually filling the space with this gel so that there's no air that's actually encapsulated; correct?

A.   In that example, that's correct.

Q.   And just so we know, this transparent optical coupling

agent, that's a commonly well-known substance; right?

A.   Yes.

Q.   These type class of substances?

A.   They're listed there:  Epoxies, silicones.  Those are all common gels.

Q.   And it says that they should have the refractive index, which is not different from the LED and the waveguide; correct?  So you're trying to avoid a refractive index interface?

A.   Excuse me.  In order to reduce the Fresnell losses, that's correct.

Q.   Now, it's like index matching; correct?

A.   That's correct.

Q.   I mean, that's a common thing as well; correct?

A.   Yes.

Q.   And at the time this patent was filed, that was something one of ordinary skill in the art would have understood?  This wasn't a novel invention using a coupling agent like this?

A.   I don't believe so.

Q.   And if you refer to Figure 24, this is one of the figures that you relied upon --

A.   Yes.

Q.   -- for the concept that you can have this not be integrated; correct?

A.   That's right.

Q.   But this embodiment as well teaches using a transparent

coupling agent; isn't that correct?

A.    (Witness examines document.)

Q.    If you go to Column 16, lines 15 through 38.  Do you see what we're referring to as shown in Figure 24; correct?

A.    Uh-huh.  Yes.

Q.    And then it goes forward and discusses the LED, and in the second paragraph that starts on line 27:  (reading)

      "The illumination coupling element desirably includes a lens element 90 that is integrally formed with the surface."

      Do you see that?

A.    Yes.

Q.    And then on line 31-'2:  (reading)

      "The transparent optical coupling agent is inserted between the LED 140 and the waveguide 132."

      Correct?

A.    Yes.

Q.    So this also teaches now sealing this; correct?

A.    It doesn't say anything about sealing it.

Q.    Well, the coupling agent is going to hold the LED in place; correct?

A.    I don't know what a coupling agent is in this case.

Q.    Well, it's the transparent optical coupling agent.  If you look back at the previous paragraph, you don't recall it being called that?

A.    (Witness examines document.)

Q.    Column 13.  Let's go back to Column 13 at the bottom of --
it's line 47, "The transparent optical coupling agent..."

A.    I see what it says there, but I don't see it being said in
the place you referenced it.

Q.    But that was something you didn't consider in forming your
opinions; is that correct?

A.    I believed that there was an air gap between them, that
there was no epoxy in that case.

Q.    Is it -- now, in addition to not discussing encapsulation
being a problem, does this '554 patent anywhere talk about heat
being a problem?

A.    Not as far as I know.  At that time heat was not a problem
because LED's were not very bright.

Q.    Now let's turn over to the '209 patent, which you will
find as DTX-101 -- 1001.

A.    (Witness examines document.)

Q.    And let's look at Figure --

A.    Just a minute.  I'm not there yet.

      (Witness examines document.)  Okay.

Q.    Let's first look at Figure 4.

A.    (Witness examines document.)  I see it.

Q.    Now, this is showing the embodiment that you spoke of in
your direct; correct?

A.    Yes.

Q.   And these lights over here (indicating) are what are referred to as perimeter lights; correct?

A.   In this patent, that's correct.  In that figure, they are.

Q.   And this portion here (indicating) is what's referred to as the aperture; correct?

A.   That's correct.  The aperture is that center part.

Q.   Because these lights (indicating) are actually shielded, if you will, because they're under an overhang; correct?

A.   That's correct.

Q.   Now, these lights (indicating) are referred to as bottom lights; correct?

A.   Yes.

Q.   And they, too, are shielded but they're shielded in a different way; correct?

A.   That's right.

Q.   Now, Claim 20 doesn't require any shielding elements; correct?

A.   Claim 20 uses lenses as a shielding -- let me look to see the exact claim language.

Q.   Let's look at Claim 20.

A.   (Witness examines document.)  Well, we need to direct the light somehow.

Q.   Okay.  You will agree that there's no discussion whatsoever in the '209 patent as of lenses; correct?

A.   That would be there are no discussion about lenses in that

patent.

Q.    And the only discussion of shielding elements with regard to those that are in the open space on the bottom are baffles; correct?

A.    Baffles and I believe there's a reflection -- there's a reference to reflectors also.

Q.    And the goal there is to reflect the light towards the back surface, which is going to be painted white; correct?

A.    It's to distribute the light and direct the light across the entire surface.

Q.    And specifically it talks about in either case, the reflecting surfaces reflect light from the LEDs toward the bottom wall; correct?

A.    Show me the reference, please.

Q.    Column 5, line 30 through 39.

A.    (Witness examines document.)  That's the case of the baffles.

Q.    But that's the only description that's given in the entire patent as to how to direct the light; correct?

A.    I think somewhere in the claims they talk about reflectors, though.  Let's see, where is it.

Q.    The goal of the shielding elements is to make sure that light doesn't go from the light source directly towards the aperture; correct?

A.    You want to redirect the light so you don't get a bright

spot, that's correct.

Q.   And, again, the only description is that it reflects it back towards the overall reflective surface, so what is accomplished, as you described, is that the light bounces around inside there until it gets even and then can diffuse out through the diffuser; right?

A.   You want to redirect the light.  It doesn't make any difference.  I mean, the baffles are one example of that.

Q.   Now, referring back to Claim 20, Claim 20 is a method; correct?

A.   Yes.

Q.   Now, you understand that in order for the method to be practiced -- a method claim to be infringed, somebody has to practice the method, and I believe you said it's the person at home; correct?

A.   Yes.

Q.   So is it your -- are you rendering any opinion as to whether the person is motivated to buy the TV based on the fact that it has these Enplas lenses in it?

A.   I would think the motivation for buying the TV would be because you want a TV.  I don't think anybody cares -- I don't think any of us care, the first approximation, what's inside of it as long as it's low price and high quality.

Q.   Now, one of the steps that you talked about very quickly in your direct was that the light exiting the aperture is

substantially uniform in intensity and color.  Do you remember that?

A.    Yes.

Q.    Now, how did you determine that the light exiting the aperture is substantially uniform in intensity and color if you didn't turn the TV on?

A.    If the TV were off, you wouldn't know.

Q.    No.  I'm asking you.  How did you determine?  You didn't turn on the TVs; correct?

A.    I did not.  You're talking the ones that we took apart?

Q.    Right.

A.    I did not turn those on.

Q.    And as you just said, without turning them on, you wouldn't know; correct?

A.    That's correct.

Q.    So you didn't determine whether this element was actually met in any of the accused devices; correct?

A.    Well, you would know it was met because when you're in the store to buy it and you look at the TV, and you look around -- and when I buy a TV, I look to see what everybody's going to see because I don't want -- you know, I don't want my wife not be able to see the TV, so we want to make sure it's uniform as we look at it at different angles.

Q.    So you simply assumed that somebody turned on the thing before they bought it because it was on display?

A.   That's -- I think that's why -- that's how you buy TVs.

Q.   And then you assumed without looking at it, it had to be uniform in intensity and color?

A.   You certainly want it to be uniform in intensity and color.

Q.   So you're basically saying that every TV would be uniform in intensity and color?

A.   I suppose you could -- you know, somebody making a very cheap TV would make something that's not uniform in intensity and color, but these are very high -- these are high-quality TVs.

Q.   You looked at the price of these TVs; correct?

A.   Yes.

Q.   These weren't like thousands and thousands of dollars TVs; right?

A.   No.  They were -- the 32-inch ones were, like, $300.  I mean, we bought one of these new TVs, what's called a 4K TV, which has got really high resolution, and we paid $600 for it, which is just remarkable.  So, I mean, they're high-quality TVs.

Q.   Which of the accused products is this 4K TV?

A.   Oh, this is one we bought and took apart.

Q.   Which one is it?

A.   It's not any of those.

Q.   Okay.  So it's none of the accused products?

**A.**    That's correct.

**Q.**    All right.  Let's assume that the light is uniform in intensity and color because that's what you did; correct?

**A.**    Yes.

**Q.**    It's going to go through the diffuser?

**A.**    Yes.

**Q.**    And it's going to go through the brightness-enhancing film?

**A.**    Yes.

**Q.**    And then it's going to be by just the configuration directed out of the TV; correct?

**A.**    Or it may go through some other films before it is directed on the LCD display.

**Q.**    With regard to the Seiki TV, if we can go back to pull up Figure 4 of the '209 patent.

So these perimeter lights are around the aperture; correct?

**A.**    That's correct.

**Q.**    With the aperture being the portion that's open and a light is coming through; correct?

**A.**    Yes.

**Q.**    So this part actually works like a frame on a laptop, you know, the old kind of -- well, you see right here (indicating). You can see it on the screen you actually have this frame portion that's silver, and then the part where the light's

actually coming through is the aperture; correct?

A.   That's correct.

Q.   Now, with regard to the Seiki TV that you opined on, you're saying this whole opening of the cavity, that's the aperture; correct?

A.   Yes.

Q.   So the aperture is not smaller than the total area?  It's not -- it's a different configuration than what's in the '209 patent in the figure we saw?

A.   I don't understand what you're saying.  The aperture is the full -- the full -- the full area that's outlined in what is white.

Q.   So there's no way to put lights around the aperture, correct, with the round being on the outside?

A.   There's no way to put them outside of the aperture.

Q.   So you're saying that these lights that you've made red, those are the perimeter lights?

A.   That's correct.

Q.   And they're perimeter lights simply because you've arbitrarily made them -- selected them from all the other lights?  They're no different in intensity; correct?

A.   That's correct.

Q.   They're no different in structure; correct?

A.   That's correct.

Q.   You're just saying it's their proximity?  There are --

right?

A.   They are around the perimeter of the aperture.

Q.   Now, they're on the bottom as well?

A.   Yes.

Q.   So this light over here (indicating), these two that are one back, are those -- why are those perimeter lights and not bottom lights under your interpretation?

A.   Are you asking me about the red ones?

Q.   These first two yellow ones.  The first two yellow ones on the left and the right.

A.   Those are bottom lights.

Q.   And we're referring to DDX-4 at 025, and this comes from a picture which is Defendant's Trial Exhibit 1073 at 13.

A.   So what's the number again?  Well, I can do it from here.

So you're asking me why the yellow ones are not perimeter lights?

Q.   Yeah.  Why are these first two rows on the left and the right not perimeter lights?

A.   Because they're not the ones on the perimeter.  The perimeter ones are the ones next to the edges.

Q.   Well, aren't they perimeter with respect to the ones that are actually in the center?

A.   My definition of "perimeter" would be around the outside.

Q.   Mine too.

        MR. LABGOLD:  I have no further questions.

THE COURT:  Thank you.

Any further examination by SSC?

MR. OWENS:  Yes, we will have a redirect.

THE COURT:  And, ladies and gentlemen, I anticipate that we'll have further testimony from Dr. Moore later in the case on the topic of validity and invalidity.  I say that because when we get to your questions, I want you to know that there are still more things to come from Dr. Moore.  So if there are some topics that you were tickled by but have questions about, it may be that those questions will be answered later in the proceedings.

**REDIRECT EXAMINATION**

**BY MR. OWENS:**

**Q.**  All right.  It's good to see you again, Dr. Moore.  I hope you're doing well.

Do you recall yesterday Mr. Labgold questioning you on the fact that you did not dismantle the televisions yourself?

**A.**  Yes.

**Q.**  Did you think it was necessary for you to dismantle the televisions yourself to understand the structure?

**A.**  No.

**Q.**  And why is that?

**A.**  Because there was enough detail given to us -- or given to me, rather, by SSC to understand what was going on there.

**Q.**  And --

MR. LABGOLD: Your Honor, one of the jurors had his hand up.

A JUROR: I cannot hear.

THE COURT: Thank you.

Mr. Owens, if you can speak into the microphone and speak up, please.

MR. OWENS: Sure.

THE COURT: Thank you.

BY MR. OWENS:

Q. Do you recall yesterday Mr. Labgold asked you on cross about your friendship with the president of Breault?

A. I'm sorry. Ask the question again.

Q. Okay. Do you recall yesterday Mr. Labgold asked you on cross about your friendship with the president of Breault?

A. Yes.

Q. Did you select Breault to perform the analysis of the lenses?

A. I did not.

Q. And who did?

A. They were already selected before I was involved.

Q. And do you recall testifying as to why Breault was selected?

A. Yes. It was selected because they were listed in the '554 patent as a company that could perform such analyses.

Q. And who in particular selected Breault?

A.    SSC.

Q.    And what role, if any, did your friendship with Breault's founder play in SSC's selection of Breault?

A.    I wasn't involved in the selection, so probably no role whatsoever.

Q.    Okay.  And in what role did your friendship in Breault's founder play in your evaluation of Breault's analysis?

A.    Not at all.

Q.    And do you recall stating yesterday in response to Mr. Labgold's questioning that Breault is an ISO-certified organization?

A.    Yes.

Q.    Could you please explain to the jury what that means?

A.    That's a certification that's given by the government that determines if somebody has the right proper credentials and the right documentation to provide certain sorts of consulting services.  So it's a well-established method of certifying it because oftentimes when you go out to -- like if you want to hire a contractor, you like to be sure that that contractor is good so you will ask your friends.  Well, when you're doing consulting services, you have this mechanism in place that actually certifies the quality of the work they do and have good practices.

Q.    And what is Breault's reputation in the industry for these services?

**A.**   It's very good.

**Q.**   And what interest, if any, does Breault have in the outcome of this case?

**A.**   None.

**Q.**   They're an independent testing organization; right?

**A.**   That's correct.

**Q.**   Do you recall yesterday Mr. Labgold questioning you on the overlays that you looked at during your deposition that appeared identical to the eye?

**A.**   Yes.

**Q.**   And do you recall testifying yesterday that afterwards, you determined they were not identical?

**A.**   That's correct.

**Q.**   Okay.  Are we able to put this up?

So up in the top corner is the 9879.  That's PX-155 at 12.

**A.**   Yes.

**Q.**   And down at the bottom, this is the 9845, and it's not the one you overlaid.  And we'll show you that one in a second, but it's the same configuration and it's showing some total internal reflection there.  Do you see that?

**A.**   Yes, it does.

**Q.**   Now, assuming that these were identical and all other parameters were the same, in your view would ASAP show that total internal reflection?

**A.**   Yes.

Q.   Let's back up.

Let's -- if --

A.   Which one?

Q.   If both of these are identical -- let's assume both of these are identical, the one on the top and the one on the bottom --

A.   Yes.

Q.   -- everything's identical --

A.   Yes.

Q.   -- the shape's identical, the parameters in ASAP are identical, would the one for the 9845 down on the bottom right, PX-152, would that show total internal reflection?

A.   152 shows some total internal reflection.

Q.   What if these two were identical?

A.   If they were identical and they were identical to the one in '79, they would not.

Q.   Okay.  So let's go to the next.

So this is PX-152 at 2 down at the bottom, and this is the figure that Mr. Labgold took of the 9845 and asked you to compare at your deposition to the figure up in the top right. He had the overlays that you put on --

A.   Yes.

Q.   -- to compare those.

And let's see what happens when we combine those.  So looking at that, can you tell the difference between those just

looking at them with your eye?

**A.** Not at that magnification.

**Q.** Okay. And how good is your vision even with glasses?

**A.** It can be corrected beyond 20/40.

**Q.** So why don't we actually change the color of these.

**A.** Okay.

**Q.** And the 9879 is going to be in red.

**A.** Okay.

**Q.** And the 9845 is going to be in blue.

**A.** Okay.

**Q.** And it was very difficult to see with the black. Let's focus a little bit more. Are these two actually the same?

**A.** No, they're not.

**Q.** And where are they different?

**A.** They're different in the area where the TIR surface is.

**Q.** And is that that area over here (indicating)?

**A.** Yes, it is.

**Q.** And in your opinion, is that enough difference to cause different total internal reflection between the two?

**A.** It turns out it does.

**Q.** Okay. Do you know why Mr. Labgold told you they were identical?

**A.** I do not.

**Q.** So let's address some other ray traces. So, again, this is -- if you turn them from red to black, they're pretty

difficult to --

A.   When they're both in black, it's extremely difficult to see.

Q.   There you go.  And that's what you were looking at; right?  Okay.

Let's -- oop, let's see if we can jump back here.

Okay.  Let's add some other lines to this.  So these are all the ones you originally did.  Remember, this is your uncorrected data, and you corrected this.  But this is the data that was put -- was discussed during your deposition; is that right?

A.   Yes.

Q.   And are these identical?

A.   No.

Q.   Do you recall Mr. Labgold telling you they were identical?

A.   Yes.

Q.   But they're not?

A.   No.

Q.   Why do you think he told you that?

A.   I have no idea.

Q.   Did he actually show you these drawings in your deposition, the other ray traces?

A.   I'm sorry?

Q.   Did he actually show you these other ray traces during your deposition?

A.    I don't believe so.

Q.    Let's go to PX-54.

A.    (Witness examines document.)

Q.    Do you remember discussing this with Mr. Labgold yesterday?

A.    Yes.

Q.    And do you recall from your deposition testimony that you had -- that these were attached as part of Dr. Pollock's noninfringement expert report?

A.    Yes.

Q.    So you had looked at these before your deposition?

A.    Yes.

Q.    Okay.  So with this particular document, is there anything in this document that actually shows the specific profile of these lenses?

A.    No, it doesn't.  The best I can tell, I don't know what all those numbers are, but in my understanding it does not show the profiles.

Q.    So could you actually use this to determine and create a computer model in order to do the type of simulations we've seen?

A.    No.

Q.    Okay.  And why don't we go to some testimony from today, and let's start with DTX-1001 at page 6.

A.    (Witness examines document.)

Q.   And do you recall seeing this figure we discussed today?

A.   Yes.

Q.   In your opinion, are the claims limited to this figure?

A.   No.

Q.   And we discussed what an aperture is; is that right?

A.   Yes.

Q.   And you were one of ordinary skill back in 1997; is that right?

A.   Yes.

Q.   And the term "aperture," how would you have used that term back then?

A.   It would be the same as I use it today; and that is, it's the area in which the light comes out of the TV.

Q.   And does that require the edges or overhangs in order for it to be less than the bottom of the cavity?

A.   No.

Q.   Can it be bigger than the bottom of the cavity?

A.   Can the aperture be bigger --

Q.   Can the aperture be bigger than the cavity, the bottom of the cavity?

     And maybe it will be easier.  Let's go to DTX-4-025 [sic].  I'm sorry.  DDX-4, Slide 025.  And maybe go back one step to 24, and back, and back, and back.  All right.  Let's stop here.

     So you recall this from your testimony?

A.   Yes.  Yes, I did -- or, yes, I do, rather.

Q.   And what in your opinion is the aperture here?

A.   It's that red-pinkish area.

Q.   And that can be bigger than the bottom of the cavity?

A.   It can be bigger than the bottom of the cavity.

Q.   And that's consistent with your understanding as one of ordinary skill?

A.   Yes.

Q.   And Mr. Labgold was questioning you today about the perimeter LEDs versus the inner LEDs?

A.   Yes.

Q.   Okay.  And in your opinion, the ones along the outside are around the perimeter of the aperture?

A.   Yes.  The way I like to think about this is like a hockey rink.  In a hockey rink you can be a hockey player and you're around the perimeter and you're inside the hockey rink, or you can be a fan and be around the perimeter and be outside the hockey rink.  So that it can be either way, and you're still in a perimeter situation.

Q.   Great.

     And if we could go to Claim 20.  And you recall discussing directing light rays.  So let's go to "comprising the step of directing light rays emitted by plural light sources."

A.   Yes.

Q.   Can you see that?

     Looking at that, "directing light rays," as one of

ordinary skill back in 1997, what things would you believe that would cover?

A.   Well, certainly baffles was one of those.  You could use lenses.  You could use prisms.  You could use diffractive optics.  There's lots of ways you could direct light.

Q.   Okay.  And do you remember today Mr. Labgold was talking about "substantially uniform in intensity and color"?

A.   Yes.

Q.   And he was asking you whether you actually turned the televisions on yourself --

A.   Uh-huh.

Q.   -- in order to confirm that they were substantially uniform in intensity and color?  Do you recall that?

A.   Yes.

Q.   Can you explain to the jury why you believe that all these televisions meet that limitation, that it is -- the light exiting the aperture would be substantially uniform in intensity and color?

A.   I just believe the product would have to be that way in order to --

Q.   And why is that?

A.   In order to sell it and be a viable product.

Q.   And why would that be?  I mean, what would you need about the screen or the display that would be necessary for it to be sold?

**A.**    I'm not sure what you're asking me.

**Q.**    That's a bad question.

So if you go down to "directing the concentrated diffused light onto the display panel."

**A.**    Yes.

**Q.**    Okay.  Why do you think that is met by the televisions you analyzed even if you did not turn the televisions on?

**A.**    Well, the way the optics are set up, it would do that.  I mean, the configuration of the LEDs, the diffuser, the bright-enhancing film would all come together to actually make it going onto the display.

**Q.**    So you believed these televisions would work correctly?

**A.**    Yes.

**Q.**    And they would actually backlight the display as they're supposed to?

**A.**    Yes.

**Q.**    You weren't assuming they were defective?

**A.**    That's correct.

            **MR. LABGOLD:**  Objection.  Leading.

            **THE COURT:**  Overruled.

            **MR. OWENS:**  Excuse me just a minute.

                    (Pause in proceedings.)

            **MR. OWENS:**  If we could go back to DDX-4 and bring that up.  And if you could go to about Slide 130.  And let's go back to about Slide 120.

(Pause in proceedings.)

MR. OWENS: All right. Let's go back to Slide 100 here.

(Pause in proceedings.)

MR. OWENS: Actually, let's go to Slide 67.

Q. All right. Now we're oriented.

So you remember talking with Mr. Labgold today about what he called a fictional gap?

A. Yes.

Q. And that what he was saying was the 75-micron gap?

A. That's correct.

Q. And can you remind the jury from your direct testimony what you actually explained as to what gaps you found TIR at?

A. Yes. So during the measurement phase, we concluded that the gap was between 25 and 125 microns. So we did a simulation actually from 0, as if the LED was butted right up against it, all the way out to 125, which is the maximum. And we find no difference in terms of the TIR function at this -- I mean, I shouldn't say no difference. It's a very small difference.

Q. So -- and why -- you were asked specific questions about which light bar had which gap. Do you remember those questions today?

A. Yes.

Q. Does that matter?

A. No.

Q.   And why doesn't that matter?

A.   Because they all exhibited the TIR.

Q.   And were they all within that 0 to 125 gap?

A.   Yes.

Q.   So let's go to it's probably Slide 69 and to Slide 70.

So another thing that Mr. Labgold talked a lot about was the -- was phantom data, and he was talking about how at certain LED diameters, that in the actual products the diameters would have been less than 2.5.  Do you recall that?

A.   That's correct.

Q.   And can you explain again why you analyzed from 2.0 to 2.5?

A.   Again, what we were doing was we were looking to see what would happen if other LEDs were used with the particular lenses.  So that if other products came along, we could actually -- we'd know the answer without having to do any more analysis.

Q.   So in your opinion, were there LED diameters that were actually found within that range?

A.   Yes.

Q.   Including the 9854D?

A.   Yes.  That one actually is 2.5.

Q.   So that would have been then?

A.   Yes.

Q.   Okay.  Let's turn to some figures from the patent that we

just looked at, the '554 patent, and this would be DTX-1004 and Figure 16.  Why don't we look at that one first.

A.    (Witness examines document.)

Q.    And why don't we blow up the center there.

So you recall testifying this is actually the encapsulated LED embodiment?

A.    Yes, I did.

Q.    And are you -- you're aware there's other claims that cover this embodiment?

A.    Yes.

Q.    So let's go to Figure 24 and highlight the center there.

A.    (Witness examines document.)

Q.    So we've looked at this during your direct testimony.

A.    Yes.

Q.    And is this the figure that shows an embodiment of the illumination coupler?

A.    Yes.

Q.    In the illumination coupler, the LED is not embedded?

A.    That's correct.

Q.    Okay.  There was some questioning on the coupling agent. Do you recall that?

A.    Yes.

Q.    And whether there was an air gap present.  Do you recall that?

A.    Yes.

Q.   So let's go to Column 16, 14 through 38.

A.   (Witness examines document.)   16, 14 through 38.

Q.   And this is talking, as shown at the top, about Figure 24?

A.   Yes.

Q.   And the Figure 24 has the illumination coupling element or coupler?

A.   Yes.

Q.   And you recall the testimony from Mr. Labgold -- I'm sorry -- questioning from Mr. Labgold talking about how the bottom paragraph here required an optical coupling agent?

A.   Yes.

Q.   Now, if you look at the very bottom of the -- it's around 36 --

A.   Yes.

Q.   -- do you see where it discusses an air gap?

A.   Yes.

Q.   And that air gap is around the LED?

A.   That's correct.

Q.   And is that important to the function of the illumination coupler?

A.   Yes, it is, because if you put a gel in there, it would make that, whether it be concave or convex surface, disappear and so there would be no lensing.  And so it's important that you have air on either the concave or convex surface.

Q.   And that's what this whole paragraph is talking about;

right?

A.   Yes.

Q.   So you wouldn't put an illumination -- a coupling agent in there?

A.   You wouldn't do that, otherwise it would not -- its function would be gone.

Q.   It would be pointless?

A.   Correct.

Q.   Okay.  Just a few final things.

     If you go to DTX-1056, page 13.

A.   (Witness examines document.)

Q.   And maybe we could actually go to 14.

     Okay.  So this is the middle source for the 9879 LED or --

A.   Yes.

Q.   -- lens?

     And what does that correspond to?

A.   2.2 millimeters.

Q.   Okay.  And you recall the questions from Mr. Labgold today about whether there would be light along that whole surface?

A.   Yes.

Q.   And can you explain why there's going to be light along that whole surface?

A.   Well, the LED puts out light on that entire surface.

Q.   Okay.

A.   The whole surface is lit up.

Q.   And do you recall during the opening and even here he focused on the chip in the middle?

A.   Yes.

Q.   And is that -- when you turn these on, is it only the shape of the chip that's illuminated?

A.   You can't even see the chip.

Q.   What does it look like?

A.   It's just a bright white source.

Q.   And what's the diameter from which it's coming from?

A.   It's whatever the diameter of the chip is.

Q.   Of the LED?

A.   The LED.  Sorry.

Q.   Okay.  And there was a --

        MR. OWENS:  Do you have that blacked-out exhibit?

                (Pause in proceedings.)

BY MR. OWENS:

Q.   And you saw this a couple types during Mr. Labgold's questioning?

A.   Yes.

Q.   And he's -- I guess this was a marker he kind of --

A.   I don't know how he made that.

Q.   Okay.  You notice he's having light across this whole surface, but did he actually go to the trouble to show that there would be more TIR?

A.   No.

Q.   Okay.  So in your opinion, would there be a lot more TIR shown?

A.   Yes, there would be.

Q.   If you blacked out this whole thing?

A.   Yes.

Q.   Okay.  And he didn't show that to you, though?

A.   No, he did not.

Q.   Okay.

                    (Pause in proceedings.)

          MR. OWENS:  I don't think we have any further questions.

          THE COURT:  Okay.  Ladies and gentlemen, we're going to take a break now for ten minutes.  Return at 10:55.  If during that period, you have any questions for the witness, you may write them down with a reminder that you will have further opportunity to hear from Dr. Moore later in the case, I expect.

     One other thing before you go.  Sorry.  With this type of an expert, I don't allow them to offer any new opinions.  And the reason is for an expert, the other party gets an opportunity before trial to hear the opinion and to test it themselves.  So with Dr. Moore and with later experts in the case, they can't come into court to offer new opinions.

     So even if you were interested in some new opinion from Dr. Moore on something he hasn't said, I'm not going to allow him to offer a new opinion because the other party would not

have had a chance to test that opinion before court.

So you can ask questions if you wish to about what he said in court, but I won't allow him to essentially do a new experiment and offer a new expert opinion here in court.

See you in ten minutes.  Thank you.

(Proceedings were heard out of presence of the jury:)

THE COURT:  We're in recess.  Thank you.

(Recess taken at 10:46 a.m.)

(Proceedings resumed at 10:56 a.m.)

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  We return to the record.

And Mr. Sanders, you can report that there are no questions for Dr. Moore from the jury, so we're ready to call our next witness once the jury returns.

MR. LABGOLD:  Could I have --

THE COURT:  Oh, do you have more questions?

MR. LABGOLD:  Just two or three questions.

THE COURT:  All right.  Let's bring our jury back in then.  Yes.

(Proceedings were heard in the presence of the jury:)

THE COURT:  At EDD request's, I'll permit further examination of a short duration of Dr. Moore.

### RECROSS-EXAMINATION

BY MR. LABGOLD:

Q.   Dr. Moore, on Redirect you were asked questions about the

directing step in the '209 Patent.

A.   Yes.

Q.   And you said that you could use lenses, prism, and refractive optics; do you remember that?

A.   I said defractive optics.

Q.   What was that?

A.   Defractive.

Q.   So there's no mention, however, of the use of lenses, prism, defractive optics, or any kind of optics in the '209 Patent; correct?

A.   That's correct.

        THE COURT:   I'm not hearing the amplification, so everyone needs to speak up.

        THE WITNESS:   I don't think this is on.

        THE COURT:   Wait one second.

                (Pause in the proceedings.)

BY MR. LABGOLD:

Q.   Now, you were also asked about whether or not the overlays were actually identical, and we saw that the red and blue lines were overlapping.

A.   They were not overlapping.

Q.   At some point one is above, one is below, in your view?

A.   Yes.

Q.   Within the line width?

A.   No, it's more than line width.

Q.   Okay.  But assuming for the moment they're not identical, both of them had to be replaced; correct?

A.   What do you mean "replaced"?

Q.   Well, they were both done wrong; correct?

A.   The surfaces were done correctly.

Q.   But those lens profiles had to be replaced because they included the -- they were based on the wrong data; correct?

A.   No, that was done by the surface profilometer.  The arrow was in the thickness measurement between the top and bottom surfaces.

Q.   Dr. Moore, the overall profile, the lens profile, as you corrected me when I called it a ray trace, those two lens profiles had to be replaced; correct?

A.   I don't understand the word "replaced."

Q.   The 9879 and that 9845 were both based upon the incorrect data; correct?

A.   No, they had different surface profiles.  They were measured separately.

Q.   I'm talking about the overall -- in your original report -- okay -- you had data for 9845; correct?

A.   Yes.

Q.   You had data for 9879; correct?

A.   Yes.

Q.   You had data for 9853A; correct?

A.   Yes.

Q.   You had data for 9854D?

A.   Yes.

Q.   And data for 9854E; correct?

A.   Yes.

Q.   Now, with the exception of 9854D, all of the ray traces and lens profiles had to be replaced because they were based on the wrong data; correct?

A.   The wrong data was -- the data was done correctly.  The curvatures were all measured separately, so the polynomials were fit separately, that's why they look different.

Q.   They all had to be replaced though; correct?

A.   I don't think --

Q.   Your corrected report is based on the exact same data?

A.   For the surface profiles it is.

Q.   The lens profiles, the whole lens profile, that's all I'm talking about, that image that we've seen again and again, that was wrong.  This outer surface that outlines the lens was wrong for all of them with the exception of 9854D; correct?

A.   No.  The only thing that was wrong was that axial thickness, so that centerline.  We talked about this yesterday, or sometime.

Q.   And why did you replace them?

A.   Why did I replace the thickness?

Q.   Why did you replace the ray trace diagrams, and why did you replace the lens profiles?

**A.**    I didn't replace the lens profiles.  They're the same as when -- in my original report.

        **THE COURT:**  One more minute.

**BY MR. LABGOLD:**

**Q.**    A person of ordinary skill in the art -- you were asked a question:  What's the definition of person of ordinary skill in the art.  Did you reply for your opinions?

**A.**    It's a person with an undergraduate degree in optical engineering, electrical engineering or physics with three or more years of experience in designing optical systems for LEDs.

**Q.**    And in 1997, does that describe you?

**A.**    Yes.

**Q.**    You had a lot more than that; correct?

**A.**    Correct.

**Q.**    By 1997, did you have a Ph.D.?

**A.**    Yes, I did.

**Q.**    And post-doctoral work?

**A.**    No.

**Q.**    And you had been a professor for how long?

**A.**    20 -- more than 20 years.

        **MR. LABGOLD:**  No further questions, Your Honor.

        **THE COURT:**  Thank you.  Dr. Moore, you may step down.

        **THE WITNESS:**  Aren't there questions?

        **THE COURT:**  More later.  That's not for now.  Thank you.

THE WITNESS:  Sorry.

MR. LABGOLD:  Your Honor, we'd like to move the admission of this just for illustrative purposes, illustrative testimony that we're talking about.

THE COURT:  I can only hear one person at a time.

MR. OWENS:  I apologize.

MR. LABGOLD:  Just so the record reflects what the witness was talking about both on Cross and Redirect with regard to the black --

MR. OWENS:  We were going to ask to do that as well, Your Honor.

THE COURT:  Okay.  You both wish to move it into evidence?

MR. LABGOLD:  We will refer to it as Plaintiff's Exhibit -- would you like it marked as a demonstrative?

THE COURT:  I would like it marked so we know what we're talking about.

MR. LABGOLD:  Plaintiff's Exhibit 321.

(Plaintiff's Exhibit 321 marked for identification)

THE COURT:  And there's no objection to that.

MR. LABGOLD:  And we will submit a stickered copy to the Court.

MR. OWENS:  And Your Honor, we'd also like to mark the demonstrative that we used during the Redirect just for purposes --

THE COURT:  We'll figure out some of the logistics of that during a break.

But 321 is admitted for that purpose.

(Plaintiff's Exhibit 321 received in evidence)

THE COURT:  And if SSC will call its next witness, please.

MR. GOTTS:  Your Honor, SSC calls Ms. Julie Davis. And Ms. Woodhouse will be handling examination of Ms. Davis.

THE COURT:  Thank you.  Thank you.  Good morning, Ms. Woodhouse.

And Ms. Davis is coming forward.  She is another one of the type of expert witness who by their skills, experience, and education are permitted to testify as to their expert opinions.

Good morning, Ms. Davis.  And we will swear you in.

**JULIE DAVIS**,

called as a witness for the **DEFENDANT**, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Please be seated.

Please state your full name for the record.

THE WITNESS:  My name is Julie L. Davis.

**DIRECT EXAMINATION**

BY MS. WOODHOUSE:

Q.   Good morning, Ms. Davis.

A.   Good morning.

**Q.** Can you please introduce yourself to the jury?

**A.** You heard my name. I'm Julie Davis. And I work for a firm called Davis & Hosfield Consulting.

**Q.** And can you tell the jury why you are here today?

**A.** I've been asked to address the amount of damages that EDD should pay to SSC if you decide that either or both of these patents in this case have been infringed and are also valid.

**Q.** And have you prepared slides to help illustrate your testimony?

**A.** I have.

**Q.** Can I ask you to turn to the tab labeled DDX-5 in your binder in front of you? I believe it's the last tab.

**THE COURT:** And counsel, may I also -- maybe there isn't a copy, but could I get a copy of the slide deck, too?

**MR. GOTTS:** Sorry, Your Honor.

**THE COURT:** Thank you.

**MS. WOODHOUSE:** Sorry, Your Honor. It was the last tab.

**THE COURT:** That's what I didn't understand. I have it. Thank you.

**BY MS. WOODHOUSE:**

**Q.** Ms. Davis, are you at DDX-5?

**A.** I am.

**Q.** And is this a copy of the slide deck you prepared?

**A.** It is.

Q.   And, again, for -- we've marked these demonstratives for identification as DDX-5.  Throughout the examination we'll be referring to them as the internal page numbers.

THE COURT:   Thank you.

BY MS. WOODHOUSE:

Q.   And Ms. Davis, before we get to your slides, I'd like to discuss your background a little bit and your qualifications.

Could you explain to us a little bit about your work at Davis & Hosfield Consulting?

A.   Davis & Hosfield Consulting is a group of about 20 professionals.  We all come from backgrounds in accounting and finance, and most of the work we do is economic and financial consulting that typically has something to do with situations like this where parties are engaged in some sort of dispute with one another.

Q.   And I notice that the title is Davis & Hosfield.

Are you "Davis"?

A.   I am the "Davis" of Davis & Hosfield.

Q.   And what is your position?

A.   I am one of the co-founding partners.  So Mr. Hosfield and I formed the firm together in 2003.

Q.   And specifically what type of work do you do?

A.   Nearly all the work I do is in the context of intellectual property litigation, so it has something to do with something like patent infringement or trademark copyrights and trade

secrets.

I have also over the years handled a number of projects that have something to do with managing intellectual property, and it has to do with assisting clients who are trying to use their patent portfolios in a way that makes sense for their company.

Q.   That all sounds very complicated.  I'm assuming you had to go to college to do this.

A.   Yes.  I do have a bachelor's degree in business administration and accounting from Kansas State University.

Q.   And while you were at college, did you obtain or receive any awards?

A.   I did.  I graduated summa cum laude, and I also received an award for the highest score in the state on the CPA exam that year.

Q.   So you're a Certified Public Accountant?

A.   I am.  And I'm licensed in five states, including here in California.

Q.   When did you start your career?

A.   I started my career when I graduated in 1978.  And the first nine years of my career were -- was at Touche Ross, which has since become Deloitte & Touche.  It was one of the big 8 accounting firms at the time.

Q.   And what is it that you did at Touche Ross?

A.   During those nine years I was in the audit practice, so I

was responsible for auditing the books and records of a number of different kinds of companies.

Q.   What did you do after leaving Touche Ross?

A.   When I moved from Kansas City to Chicago, I joined one of the other big eight international accounting firms known as Arthur Andersen at the time, and I was there for 15 years.

At the time I left, I had been put in charge of the international or worldwide intellectual property consulting practice.

Q.   What type of intellectual property were you dealing with?

A.   At that time most of the work we did was also in the area of patents and trademarks with some trade secret and some copyright work as well.

Q.   What was your next position after Arthur Andersen?

A.   The practice of which I was a part at Arthur Andersen was sold in 2002 to KPMG, yet another one of the big eight, now big four international accounting firms, and so we were there for about a year before we started our new firm.

And my role at KPMG was similar to that at Andersen.  I was in charge of the intellectual property consulting practice.

Q.   And have you published any papers regarding IP or IP damages?

A.   I have.  I've authored a number of articles related to patent infringement damages, and I've also coauthored a book called Edison In the Boardroom which focused on the stories of

a number of different companies that were known to be managing their patent portfolios well, and it identified the best practices of companies like Hewlett-Packard and IBM and Dow and DuPont, and others that you would recognize, because they were doing a good job of managing their portfolios.

Q.   And Ms. Davis, is this a copy of the cover of your book?

A.   It is.

Q.   Do you belong to any professional organizations?

A.   I belong to a number of such organizations.  The two that probably matter the most today are the American Institute of CPAs, the AICPA, and the Licensing Executive Society.  The latter is a group that consists of individuals who are professionals in the licensing profession.  So what we're here to talk about today will be licenses.

Q.   You mentioned earlier that you've worked on a number of cases involving patent infringement damages.

     Can you provide an approximation of how many cases?

A.   I would say in the last 30 years or so I've been involved in 350 or more patent cases.

Q.   And how many of these patent cases have you submitted an expert report?

A.   I would estimate probably 200 to 250.

Q.   And how many of these cases have you testified at trial?

A.   About 50 of them have gotten all the way to trial.

Q.   Again, how many years has it been that you've been

involved in determining damages in patent cases?

A.    I think it's been almost exactly 28 years now.

Q.    Over those 28 years, how has your time been allocated between patentee, patent holder, and the alleged infringer?

A.    My work is pretty evenly split between the party that owns the patent, and the other half of the time is the party that is the alleged infringer.

Q.    And can you give us some examples of some of the areas of technology that you've worked with?

A.    The technology areas or the products themselves have ranged widely from jet engines to golf balls, farm tractors to semiconductors, cell phones to kitty litter.

        MS. WOODHOUSE:  And I think if we could --
Mr. Schmoller, if you could turn to the next slide.

Q.    Is this a representation of the clients you've worked with?

A.    These would be some of the clients that would be most recognizable.

Q.    And is it fair to say that intellectual property damages is the main focus of your practice?

A.    Yes, that would be fair to say.

        MS. WOODHOUSE:  And Your Honor, just for the record, I'd like to the offer Ms. Davis as an expert regarding damages in the other subject matters set forth in her report.  This has been stipulated by the parties.

THE COURT:  And would EDD like to examine on this topic or defer until cross-examination?

MR. LABGOLD:  Defer until cross-examination.  We've already stipulated.

THE COURT:  Which of you is going to be doing the cross-examination?

MR. SHAW:  I will, Your Honor.

THE COURT:  All right.  Then you need to do the agreeing or disagreeing for this witness.

By stipulation, which means the parties have agreed, and I will permit the witness to testify in her area of expertise.

MS. WOODHOUSE:  Thank you, Your Honor.

Q.  Ms. Davis, what was the assignment that you undertook in order to provide testimony here today?

A.  I was asked to determine the amount of damages that EDD should pay to SSC.

Q.  And in determining this amount of damages, is there a starting point?

A.  There is.  The patent statute itself is the starting point for any kind of analysis like this.

Q.  And is this something that you -- Mr. Schmoller beat me to it.

Is this the patent statute that you're talking about?

A.  This is the language from the statute itself.  The part that we'll focus on the most is at the end where we talk about

it should be in no event less than a reasonable royalty for the use made of the invention by the infringer.  So that's our guiding principle.

Q.    And so when you start this task of analyzing patent infringement, what are your objectives?

A.    The objective is to determine in this case an appropriate amount of damages that's no less than a reasonable royalty.

Q.    And did you form an opinion as to the amount of damages appropriate in this case?

A.    I did.

Q.    Before we get to your opinion, I'd like to discuss a little bit about your methodology.

Can you explain to the jury what it is that you did?

A.    My work in this case started about a year and-a-half ago, in the summer of 2014.  I asked a couple of my colleagues to assist me, and together what we did was to review all of the documents that had been provided by EDD and SSC that have something to do with the damages issues, some of which we'll be talking about today.

I've also read the depositions of a dozen individuals or more from EDD and SSC.

I've reviewed the expert reports that were submitted by both parties.

I have performed a number of analyses.

I've interviewed SSC personnel.

And ultimately I submitted two reports to document my opinions.

And I have either been in court here today to hear the testimony, or I have reviewed the testimony prepared by the court reporter that you have heard during the week.

Q.   And are these the usual and customary sources of information?

A.   Yes.

Q.   In addition to the materials you reviewed in this case, did you rely on your experience over the course of your career?

A.   Yes.  My work, of course, is informed by my background in this type of area.

Q.   So we discussed a little bit earlier about this term "reasonable royalty," but can you explain that to the jury a little bit more?

A.   The term "reasonable royalty" is a legal term that I think of as the amount of money that one party would pay to another, in this case what EDD would pay to SSC for the right to use the patented technology.

Q.   And how is this reasonable royalty -- is it documented somehow?

A.   Yes.  That -- reasonable royalty would be part of a license that would be negotiated between the two parties, so that license agreement is the document that would contain the terms of that arrangement.

Q.    And when you say the terms of that arrangement, what would be included there?

A.    There would be a number of terms, but the ones that we're focused on mostly today would be the financial terms; in other words, how much money is going to be involved in the exchange.

Q.    And when you say "money," is this what you mean -- is this the royalty?

A.    Yes.

Q.    And how are these royalty agreements structured?

A.    Royalty agreements can be structured in different ways. The two most general ways of doing it -- one way would be a lump sum payment upfront where the parties just agree that if one party pays the other a lump sum, then you could use that patented technology until the patents expire.

The other way to do it would be on a running royalty basis, and that term is more of a pay-as-you-go concept where it's usually based upon the number of units of the product that are sold or the dollar amount of product that is sold, and so it's paid as the sales are made.

Q.    And in this case did you determine what type of royalty structure would apply?

A.    I did.  I think in this case the lump sum approach would be the most appropriate.

Q.    And why is it that the lump sum approach is the most appropriate?

**A.**    Well, as we'll see when we talk a little bit further, there are several licenses for these patents already, and most of them contain lump sum terms.  But also a lump sum is an easier way to administer a license.  You don't have to keep track of the sales.

And in a situation like this, it's particularly advantageous, because what we're here to talk about is a U.S. patent, or, actually, two U.S. patents, and so you have to focus on U.S. sales only, not worldwide sales, and it's hard to keep track of the products that end up in the U.S.  So it's much easier to negotiate a license like this in a lump sum structure.

**Q.**    So when you're trying to determine how much EDD would pay for this license, is there some factors you look to?

**A.**    There is.  There's a case from many years ago that's often referred to as the *Georgia-Pacific* case, since it involved a company called Georgia-Pacific, and in that case the judge outlined 15 different factors that should be considered in determining a reasonable royalty.  So that's the approach that experts like me would take to determine reasonable royalty.

**Q.**    And earlier we talked a little bit about your experience.

Have you performed a reasonable royalty analysis before?

**A.**    Yes.  In almost every patent case I've been involved with there's been a need for a reasonable royalty analysis.  So that's probably 250 or more.

**Q.**   And when starting with this, just looking at these *Georgia-Pacific* factors and making this reasonable royalty determination, is there any assumptions that have to be made?

**A.**   Yes.  We start with the assumption that the patents are valid and infringed.

**Q.**   And have you -- have you issued any opinion whether or not they actually are valid or infringed?

**A.**   No, I don't have an opinion on that.  That would be outside my expertise.

**Q.**   And turning back to these *Georgia-Pacific* factors, how many are there?

**A.**   There are 15.

   **MS. WOODHOUSE:**  Mr. Schmoller, if you could pull up.

**Q.**   And Ms. Davis, are these the *Georgia-Pacific* factors you're talking about?

**A.**   They are the exact *Georgia-Pacific* factors.

   Happily, we don't need to talk about each one of them separately.

**Q.**   Which one do we need to talk about first?

**A.**   In this case, as with perhaps every other case I've been involved with, I think the most important one is number 15.  So I think it would be helpful if we focused on that.

**Q.**   Sure.  And what is *Georgia-Pacific* factor 15?

**A.**   This is number 15.  It's still a lot of words, but think of it as the hypothetical negotiation that takes place between

the licensor, who is SSC in this case, and the licensee, who is EDD.  And this hypothetical negotiation takes place at the date of first infringement, or in other words when the licensee first needs a license to the patented technology.

**Q.**   And you talked a little bit about factor 15.

How do the other factors interplay with this?

**A.**   You could actually think of the other 14 factors as considerations that would be part of any one of these negotiations anyway, so they kind of get swallowed up inside the hypothetical negotiation.

I documented my comments and observations about each of those separately in my report, but we could talk about the more important ones now.

**Q.**   So earlier you said that you have to look at when the date of the hypothetical negotiation was.

**A.**   Yes.

**Q.**   Can you explain what the date of the hypothetical negotiation would be in this case?

**A.**   The date of hypothetical negotiation in this case would be April of 2012, because that's when EDD was first formed.

**Q.**   And looking at DDX-5.007 of the slide that says "hypothetical negotiation dates," and on the right it says "parties," can you explain what you're indicating there?

**A.**   Well, what we have to look at is in April of 2012, for these two patents, at the time they were owned by different

companies.  So SSC had already purchased the '554 Patent from Teledyne, so it owned the patent at that time, and therefore the negotiation EDD would have for that patent would take place with SSC.

However, in April of 2012, Teledyne still owned the '209 Patent, so that negotiation has to take place with Teledyne.

Q.   And you've been calling this a hypothetical negotiation.

Can you explain to the jury how this hypothetical negotiation compares to a real world negotiation?

A.   Well, it's a hypothetical negotiation, because of course it never happened.  But there are two major differences between a hypothetical negotiation and any real world negotiation.

First of all, we have to assume that the patents are known to be valid and infringed in the hypothetical negotiation. That is just not true in real world negotiations, because the parties are always disputing that.

The second major difference is that in a hypothetical negotiation, we are to assume that both parties, the negotiators at the table, knew everything that we now know about the parties and the products and the market and the technology, and all the events and circumstances that have happened since then.  That's referred to as the book of wisdom. Of course in a real world situation that would not be known.

Q.   So when we were looking at the hypothetical negotiation, are there factors that the hypothetical negotiation --

negotiators would consider?

A.    Yes.  In this particular case I think there are half a dozen factors that we ought to talk about specifically that would impact the outcome of that hypothetical negotiation.

MS. WOODHOUSE:  And Mr. Schmoller, if you could turn to the next slide, please.

Q.    And Ms. Davis, is this a summary of the factors that we should consider?

A.    These are the key considerations that I think would impact that negotiation.  So I think we can talk about them one at a time.

Q.    Sure.  Maybe we could start with the first one.

And so sales of infringing lenses that arrive in the U.S., can you explain what you mean by that.

A.    What I mean here is that if we're trying to figure out how much EDD should pay for the right to use these U.S. patents, we need to start by understanding, well, what exactly is the volume of sales of the product that they need the license for, and the volume of sales is only the U.S. sales that we would have to -- that EDD would have to pay a royalty for.  So we need to start by determining what that number is.

Q.    And how do you start by determining that number?

A.    Well, in this case EDD did not supply any information on the volume of their U.S. sales.  They did provide information that you can refer to on the volume of their worldwide sales.

So we need to take that worldwide number and estimate the U.S. sales from that.

Q.   And were you able to estimate the U.S. sales?

A.   Yes.

Q.   And was this part of your report?

A.   It is.

Q.   If I could have you turn in your binder to the tab labeled DTX-1188.

And are you there?

A.   I am.

Q.   Do you recognize this document?

A.   I do.  This is a page from my second report referred to as Supplemental Appendix B in that report.

Q.   And can you please describe what this document shows?

A.   What this shows is the sales, worldwide sales that Enplas recorded for its five products in this case.

MS. WOODHOUSE:  And Your Honor, at this time we'd like to enter DTX-1188 into evidence.

MR. SHAW:  No objection, Your Honor.

THE COURT:  1188 is admitted.

(Defendant's Exhibit 1188 received in evidence)

MS. WOODHOUSE:  Thank you.  Mr. Schmoller, if you could pull that up, please.  And if we could zoom it a little bit.

Q.   Ms. Davis, can you explain what's depicted here?

**A.** Well, it's a little difficult to read on the screen. And fortunately you don't need to write down any of these numbers yet, we're going to get to that part later.

But the top half of this page were the sales reported worldwide by EDD in Japanese Yen. And I said earlier mistakenly five products. There's actually six products. There will be one product that we'll talk about separately in a minute.

But the bottom half of this page converts the Japanese Yen to U.S. dollars. So what it shows is that the total sales from April of 2012 through the end of 2014 for these six products was about $53 million. But once again, that's a worldwide number.

**Q.** And so you said earlier that you can -- that you have to get to a U.S. sales number; is that correct?

**A.** That's right.

**Q.** And were you able to do that in this case?

**A.** I did.

**Q.** And can I have you turn to DTX-1187.

Do you recognize this document?

**A.** Yes. This is another page from my second report titled Supplemental appendix A.

**Q.** And what is being shown in this document?

**A.** What this does is calculate an estimation of U.S. sales of these products.

**MS. WOODHOUSE:**  And Your Honor, at this time I'd like to enter DTX-1187 into evidence.

**MR. SHAW:**  No objection, Your Honor.

**THE COURT:**  1187 is admitted.

(Defendant's Exhibit 1187 received in evidence)

**MS. WOODHOUSE:**  Thank you.  And Mr. Schmoller, if you could pull that up and also zoom in.

**Q.**  And Ms. Davis, if you can explain to the jury what they're seeing on this.

**A.**  The top half of this page are the worldwide sales numbers that were calculated on the page we just left.  What you'll notice at the top line is the 9845 product.  Those numbers have been removed.

What you may remember from testimony earlier in the week is the 9845 product was sold by EDD to SSC, and because SSC owns the patents, then they would not have to pay royalty on those products.  So I've removed those sales.  So the $53 million number now because a 36 million-dollar number for worldwide sales.  But to convert those or to estimate the amount of those sales that would become U.S. sales, I have relied upon information from a company called IHS, or Display Search.

And you may remember from the deposition readings yesterday that two of the EDD witnesses talked about Display Search as a company that provides information that even Enplas

relies upon.  So I used information that came from Display Search that estimates the volume of sales that are sold in different parts of the world, and used these estimates of sales in North America that range from 24.8 percent in 2012 down to 19.5 percent in 2014.  For the entire damages period, it's about 21 percent, so about a fifth of the sales are estimated to end up in the U.S.  So these are TVs sold in the United States that include lenses manufactured by EDD that are accused of infringement in this case.

Q.    And Ms. Davis, you've talked a little bit about your reliance on Display Search.

In your 30 years of experience, have you relied on Display Search before?

A.    I have.  That's a common source of information like this that has been used by most companies in the industry and most of us who are required to estimate U.S. sales.

Q.    And turning to DTX-1187, can you explain where you get to the amount of U.S. sales or where it's depicted here?

A.    The U.S. sales numbers that probably matter the most, if you're writing down any of these numbers, is at the bottom of the page the U.S. sales of the three products that are accused of infringing the '554 Patent and the '209 Patent total about $6 million.  And if we were to go on and add to that the sales of the products that are accused of infringing only the '209 Patent, that's another $1.3 million.  So we're talking about

total sales accused of infringement in this case of about $7.3 million.

**Q.**   And Ms. Davis, do you have any reason to believe that the actual sales could be higher than the numbers depicted in DTX-1187?

**A.**   Yes, I do.  Because as you see, the column here, 2014, is the most recent information I have.  EDD did not report any information related to 2015 sales, or of course 2016 sales.

**Q.**   And I think for the jury, it might be easy to -- or easier to see if we could turn to DDX-5.009.

And is this the summary of these sales?

**A.**   This is the exact summary we were looking at on the other page that's now a little bit easier to read because the typeface is larger.

        **MS. WOODHOUSE:**  If we could turn back to the summary of the factors of the hypothetical negotiations, the next slide, Mr. Schmoller.

**Q.**   So we spoke about the first one.  If we could move on to the second:  The impact of the hypothetical licenses on the parties.

Can you explain what is meant there?

**A.**   Well, now that we've determined what the volume of the sales is, one of the next considerations that the negotiators would address would be what's the impact on SSC if it gives a license to EDD to use the patented technology?  And what we

know is that EDD, if it has a license, will sell these products, the lenses, to other manufacturers that compete with SSC. So SSC has the risk of losing sales in the long run, because it's competing with competitors who will now be using the SSC patented technology. So that's the consequence to SSC of giving away a license.

The consequence to EDD is that EDD is now allowed to sell products to other customers rather than just SSC.

Q. And so I think earlier you mentioned that Teledyne would also have been a party to the hypothetical negotiation?

A. Yes. Teledyne would be the party to the '209 negotiation. And in this case, as far as we know, Teledyne was not manufacturing products that used the patented technology. So the benefit to Teledyne by providing the license to EDD is that it would collect royalties that it would not otherwise receive.

Q. And if we could move to the next factor, the relative importance of the patented technology.

Can you explain what is meant by that?

A. Another thing that you have to consider when you're trying to figure out how much a party would pay to another is how important is this technology.

And I think what we've learned throughout the week, based upon the testimony of a number of witnesses, is that this is very important technology. It provides benefits that relate to the cost and the efficiency and the performance of the

products, and so that's an important aspect.

We also learned from the testimony of the witnesses earlier in the week that these types of products have increased volume of sales dramatically over the years, and so they have become pretty much the standard for current sales.

Q.   And most of the testimony we've heard was from SSC.

Do you have any information about how EDD considered this technology?

A.   Yes.  We know that EDD was also impressed with the technology.  I think you heard in the deposition readings yesterday that EDD does not know of any competitor that can provide the same type of lens using this type of technology.

Q.   Did -- did you have any information about how EDD would have considered this technology to how -- the importance of the technology going forward?

A.   We know that EDD, based upon some of their own documents, expected the popularity of this type of technology to increase over time.

Q.   And if we could move to the next bullet point we have, is the patent assignment agreements for the patents-in-suit.

And can you explain what is meant about?

A.   The patent assignment agreements are the -- think of them as purchase agreements that SSC purchased these two patents from Teledyne.  So if you want to know how much somebody would be willing to pay in a hypothetical negotiation, you would of

course want to know what somebody *did* pay.  And so both of those patent assignments I think would be important to your decision.

MS. WOODHOUSE:  And Mr. Schmoller, if you could turn to DDX-11.

Q.   Ms. Davis, does this summarize the patent assignments that you looked at?

A.   It does.

Q.   And can you explain to the jury what's shown here?

A.   SSC purchased the '554 Patent along with another U.S. patent, the '199 patent, and four foreign patents from Teledyne in August of 2009.  And SSC paid Teledyne at that time $600,000.

Q.   And does the timing of the purchase have any bearing on your opinion today?

A.   It does, because what we learned in the testimony this week is that the expectation was that this technology would become more and more important as time went by.

So I think you heard earlier in the week that back in the 2009 time frame, only one or two percent of the products were made using this type of technology.  Since then, it's now up to 60 to 70 percent of the market.  So what somebody would be willing to pay in 2012 is likely going to be more than what somebody paid in 2009.

MS. WOODHOUSE:  Mr. Schmoller, if you could move to

the next slide.

Q.   And we're back to your hypothetical negotiations factors. And the last one we see is license agreements covering the patents-in-suit.

Can you explain what's meant there?

A.   Yes.  It turns out that Teledyne had licensed these patents to other parties.  There are five such licenses.

Once again, if you want to know what somebody would be willing to pay in the hypothetical negotiation, it makes sense to look at what somebody actually paid in the real world.

Q.   Okay.  Ms. Davis, did you review these licenses?

A.   I did.

Q.   And can you turn to tab DTX-1006 in your binder?

A.   I have that.

Q.   And is this one of the licenses you reviewed?

A.   It is.

Q.   Can you turn to DTX-1140 in your binder?

A.   I have that.

Q.   And is this one of the licenses you reviewed?

A.   Yes.

Q.   And can you turn to DTX-1141 in your binder?

A.   I have that.

Q.   And is this one of the licenses you reviewed?

A.   It is.

Q.   And if you could turn to DTX-1150 in your binder?

**A.**   I have that.

**Q.**   And is this one of the licenses you reviewed?

**A.**   It is.

**Q.**   And lastly, if you could turn to DTX-1199 in your binder?

**A.**   I have that, too.

**Q.**   And is this the last license you reviewed?

**A.**   It is.

          **MS. WOODHOUSE:**  Your Honor, at this time I'd like to move DTX-11 -- sorry, excuse me.  Start over.

          I'd like to move DTX-1006, DTX-1140, DTX-1141, DTX-1150, and DTX-1199 into evidence.

          **MR. SHAW:**  No objection, Your Honor.

          **THE COURT:**  All right.  1006, 1140, 1141, 1150 and 1199 are all admitted:

          (Defendant's Exhibits 1006, 1140, 1141, 1150, 1199 received in evidence)

          **THE COURT:**  Proceed.

          **MS. WOODHOUSE:**  Thank you, Your Honor.

**Q.**   Have you summarized what's in these agreements?

**A.**   I have.  I have a slide that captures the pertinent elements.

**Q.**   Is this -- referring to the record DDX-5.013 -- is this the slide?

**A.**   It is.

**Q.**   Can you explain what we're seeing here?

A.    I have summarized on this single slide what all the pages of those various documents reflect related to the licensing arrangement for these patents.

So the licensee is named in the left-hand column.  You heard a little bit earlier in the week about the license between Teledyne and SSC.  This is the same license, the third one on this list.

The first three of those were negotiated in 2004, the next one was 2006, and the last one, most recent one, was 2009.

You see that the structure of the licenses is slightly different, and the amounts are of course different, but the lump sums are part of four of the five licenses.  Those lump sum amounts range from $200,000 to $775,000.

And then three of the parties also or instead negotiated running royalties, and those running royalty amounts range from one percent of net sales to up to seven percent of net sales.

Q.    And does the fact that parties have agreed to a lump sum impact your analysis today?

A.    Yes.  I think this reflects that my conclusion that a lump sum makes sense is a fact true even in the real world.

Q.    So now that we've discussed all the factors you looked at, can you explain to us or tell us what your opinion is regarding the amount of damages that EDD would agree to pay SSC?

A.    I think what EDD would agree to pay SSC in the hypothetical negotiation for the '554 Patent would be $500,000

for the five products at issue here.

For the '209 Patent, I think what EDD and Teledyne would agree to would be a $70,000 amount.  That $70,000 relates to the Patent Assignment Agreement.  I think that slide got away from us before I got to address the bottom half of it.  But the amount paid by SSC to purchase the patent from Teledyne in 2013 was $70,000.

I think Teledyne would be equally happy with $70,000 from EDD for a license to the '209 Patent.

**Q.**   Ms. Davis, just to clarify.  With respect to the '554 Patent and what's in DDX-5.014, what products would be covered under this?

**A.**   That would be just the five lenses excluding the sixth one that was sold to SSC.  So it would be only those five products, and it would cover the sales of those products through the end of the patent term.

**MS. WOODHOUSE:**  And Mr. Schmoller, if you could just turn back to -- sorry -- DDX-5.009.

**Q.**   Do you remember how these products were separated here?

**A.**   Yes.  The top three -- and I think I should clarify what I just said.

The '554 Patent, the license would only address the top three products in that case.

The '209 license would have to cover those three plus the additional two.

**Q.** So just to clarify, your opinion of the total, the $570,000 covers these five products?

**A.** It does.

**MS. WOODHOUSE:** Thank you. And Mr. Schmoller, if you could go back to them.

**Q.** And in your opinion, is this the type of agreement that a party would have reached in the hypothetical negotiation?

**A.** I don't think this is what they would have reached in an actual negotiation in the real world.

**Q.** And why not?

**A.** Typically, parties would not limit a license to just the three products if there is a risk of infringing the patent by manufacturing other products that are similar in nature. You now know how complicated it is to test these products. So if EDD had to go to SSC every time it wanted to launch a new product, and the two parties had to test the product, and then had to agree on a royalty for that particular product, this would just be an endless stream of serial negotiations. And it's not something that's done in the real world.

**Q.** So in the real world, how would this license have been negotiated in your opinion?

**A.** The more pragmatic approach would be for the parties to decide that the royalty -- some premiums should be paid in order for the right to avoid this ongoing hassle of testing and licensing additional products. So that premium would ensure

the freedom to operate, in other words, peace of mind that you no longer have to negotiate for every future product that you might sell.

Q.    And earlier today you said that you were assuming that the products at issue infringed the Patents-in-Suit; correct?

A.    Yes.

Q.    And are you now assuming that other products infringe the Patents-in-Suit?

A.    No.

Q.    And are you seeking -- are you saying that EDD would pay for damages on products that aren't said to infringe the Patents-in-Suit?

A.    No.  I'm simply saying that they would be willing to pay a premium to avoid the complications of going through this negotiation process for every other product they might choose to sell.  So it's an insurance policy.

Q.    And did you determine this premium that EDD would pay?

A.    Yes.

Q.    And how did you go about doing that?

A.    What I did was look at the best information I had available on the volume of sales of other lenses by EDD.  And while EDD did not provide any of that information in this case, there is some publicly-available information from the Enplas web site that I relied upon to determine what that volume of sales would be.

Q.  And if you could turn in your binder to DTX-1185.

Are you there?

A.  I am.

Q.  Do you recognize this document?

A.  I do.

Q.  And what is this?

A.  This is another page from my report that reflects the revenue and gross margin for the Enplas plastic optical business.

The plastic optical business, according to the Enplas web site and the documents on it, later became EDD.

MS. WOODHOUSE:  Your Honor, at this time I'd like to move DTX-1185 into evidence.

MR. SHAW:  No objection, Your Honor.

THE COURT:  1185 is admitted.

(Defendant's Exhibit 1185 received in evidence)

THE COURT:  Proceed.

MS. WOODHOUSE:  Thank you.  Mr. Schmoller, if you could pull that up.  This is a little harder, but if we could zoom in.

Q.  So the revenue on the top line, is that what you were looking at?

A.  Yes.  The sources for this are shown at the bottom of the page.  But I obtained this information directly from the Enplas Corporation business plans that were on the Enplas web site,

because that's the only information I have.  So I captured the revenue number on top as well as the gross margin down below.

The revenue number is stated in Japanese Yen.  Once you convert that to U.S. dollars, what you learn is that the volume of sales for the entire business that sells the lenses is eight to ten times the sales of the specific products that we're here to talk about today.

Q.   And how do you use this eight to ten times to determine this insurer premium that you spoke about?

A.   That gives you some in sight as to the potential exposure of other lenses that might infringe, that they would have to go through the process of testing and then negotiating a license for each of those if indeed they needed one.

Q.   And did you determine this amount of this license that EDD would pay to cover all lenses?

A.   Yes.

MS. WOODHOUSE:  And Mr. Schmoller, if you could pull up the next slide.

Q.   And is this what's reflected here?

A.   Yes.  I think for the '554 Patent, if what they wanted was a freedom-to-operate license, and they were being pragmatic about it, they would be willing to pay 2-to $4 million in order to ensure that they'd never have to worry about testing these products and negotiating other licenses for those products in the future.

**Q.**   And why is it that your range is 2-to $4 million?

**A.**   The range depends upon what you ultimately decide is the volume of sales of potentially infringing products beyond the ones in this case.  And I don't have any better information on that.

If it were all the products, it would be the upper end of that range, the $4 million.  If it were only half of the products, it would be the lower end of the range.  Or you may determine if EDD ultimately provides you any better information, that some other factor is appropriate.

**MR. SHAW:**  Objection, Your Honor.  This is beyond the scope of the report.

**THE COURT:**  Sustained.  The jury will disregard the last part of the answer by Ms. Davis about what the jury will be determining.  Because I will be instructing you at the end of the case what you will be determining.

So wait until you hear that instruction from me before you decide your verdict in the case.

**BY MS. WOODHOUSE:**

**Q.**   And just -- the '209 Patent, you have the same $70,000 number for this?

**A.**   That number doesn't change.  That negotiation takes place with Teledyne, and it's not impacted by this situation.

**Q.**   And so, again, just in conclusion, can you again tell the jury what you opined were the reasonable royalties in this

matter for just with respect to the accused lens if the license was to only cover those?

A.   If the license is limited only to the accused lenses, I think the reasonable royalty for the '554 Patent is $500,000, and for the '209 Patent $70,000.

        **MS. WOODHOUSE:**  Thank you, Ms. Davis.  I have nothing further.

        **THE COURT:**  Thank you.  Cross-examination?

        **MR. SHAW:**  Yes, Your Honor.

                         **CROSS-EXAMINATION**

        **MR. SHAW:**  Your Honor, may I briefly introduce myself and what we're going to do here?

        **THE COURT:**  You may.  Yes.  Thank you.

        **MR. SHAW:**  Thank you, Your Honor.

    So my name is John Shaw.  I haven't had a chance to speak to you yet this week.

    We're going to take this examination in two parts.  First, some questions about the overall scope of the opinion, the royalty rates; and then we'll drill down into those five factors that Ms. Davis talked about.

Q.   Okay.  So Ms. Davis, the '209 Patent, first of all, that's the 70,000-dollar hypothetical negotiated reasonable royalty, is your opinion?

A.   That's right.

Q.   Okay.  And you read testimony, I guess, through the week

that the '209 Patent enables this direct-type LED backlighting?

**A.**   That's one of them that does, yes.

**Q.**   Yes.  And "enables" to you means that without that patent, you can't make those products?

**A.**   I don't know what the technical experts would say about that, but I think it's one of the aspects of the technology that provide the ability to have those characteristics, yes.

**Q.**   Right.  So if you don't use the '209 Patent, you can't have the characteristics we've been talking about?

**A.**   That's outside my expertise.  I can't answer that.

**Q.**   Okay.  That's fine.

So in the hypothetical negotiation, you're talking about Teledyne knew that the '209 Patent was enabling; is that right?

**A.**   Yes.

**Q.**   And they knew about the projected market expansion for this type of television?

**A.**   That's right.

**Q.**   All right.  So now let's go to 2013 when they actually sold the '209 Patent.

This market expansion you've been talking about has now happened in real life; right?

**A.**   That's right.

**Q.**   And Teledyne is not in the television field, but they do advanced technology work?

**A.**   That's my understanding.

**Q.**   Okay.  Now, the main difference between the sale of the patent in the hypothetical negotiation is what?  Concern about whether the patent is being infringed by anyone?

**A.**   Not necessarily.  The sale of the patent provides ownership rights to the buyer and so that patent can then be enforced against other parties.  And the license of the patent in a non-exclusive agreement would not provide that right.

**Q.**   Right.  And what's unknown in the sale process, though, is whether the patent is infringed; is that right?

**A.**   That's right.

**Q.**   And what's unknown in the sale process is whether the patent is invalid; is that right?

**A.**   Correct.

**Q.**   All right.  So in 2013, we have a buyer, SSC, who is only willing to pay $70,000 for this patent?

**A.**   That's what they did pay.  They might have been willing to pay more.  I don't know.

**Q.**   But they did.  They agreed on 70,000?

**A.**   That's right.

**Q.**   And Teledyne at this time was willing to take $70,000; is that right?

**A.**   That's right.

**Q.**   Right.  And they made that deal not knowing whether the patent was infringed, and they made that deal knowing there was uncertainty about patent validity; correct?

A.    That's right.

Q.    All right.  Now, you've given -- switch to the '554 Patent for a moment.

You told the jury about your opinion of the $500,000 royalty for the three products at issue here?

A.    Right.

Q.    All right.  And you had estimated just a little bit over $6 million of U.S. sales from 2012 to 2014?

A.    That's right.

Q.    Okay.  Now, you had given an earlier opinion on the '554 Patent also for a $500,000 royalty.

Do you remember that?

A.    I do.

Q.    All right.  Now, at that time there were four products accused of infringement; right?

A.    That's right.

Q.    And at that time the -- you had estimated the total sales to be 6.7, plus change, million dollars for 2012 to 2014?

A.    I remember sales of about $600,000 for the product that is no longer accused.

Q.    Okay.  So putting those together, 6.6 million?

A.    Yes, that's a good estimate.

Q.    That's fair.  So your opinion, when that product came out of the case, went from four patents, 6.6 million in U.S. sales -- sorry -- four lenses, 6.6 million U.S. sales, $500,000

royalty.  And then we now have three lenses and $6 million of U.S. sales, and you're still at a $500,000 royalty?

A.   That's right.

Q.   All right.  So if the jury decides that one of these lenses doesn't infringe, how much should that $500,000 number change?

A.   I'll leave that to the jury.

Q.   Okay.  And you have no opinion on that?

A.   I do not.

Q.   All right.  Now, you used the IHS database, you said, because the total of the products sold are hard to track?

A.   The U.S. sales of those products are hard to track.  And EDD has not provided any information that would --

        MR. SHAW:  Objection, Your Honor.  There's an agreement and a ruling on that exact subject.  And I'd like to have that answer stricken.

        THE COURT:  All right.  I will strike that response.  And it's because of some pretrial decisions of the Court, which I don't want the jury to speculate about.

    And I'll ask Mr. Shaw to be very careful in your questioning going forward.

        MR. SHAW:  Yes, Your Honor.

Q.   Now, you had said that -- well, first of all, you know that EDD doesn't sell anything in the United States; right?

A.   That's generally my understanding of the witness

testimony, yes.

Q.   Right.  And all their sales are in Japan, China, Korea, Taiwan?

A.   Those are the four countries that are identified in the EDD witness testimony.  I don't know if there are other sales or not, but those are the four that they've specifically mentioned.

Q.   Right.  But you haven't seen any indication of any direct sales into the United States by EDD?

A.   I have not.

Q.   Okay.  Now, you looked through the witness testimony in the depositions; right?

A.   Yes.

Q.   All right.  And you noticed in there, didn't you, SSC's testimony on behalf of the company that even SSC couldn't track how many companies there were between their sales of light bars and when TVs came to the United States.

     Do you remember that?

A.   I generally remember that they cannot track the volume of sales in the U.S.  Sometimes they know the string of parties along the way, but not always.

Q.   All right.  And you understood that there was no one at SSC that could tell the number of companies between SSC and the typical importer of its products?

A.   I don't know that I would agree with that.  I think in

some situations they know how many companies are between, but they may not know for all.

MR. SHAW:  All right.  Do you have Mr. Seto's testimony loaded?

Could you look at page 124, please.

And Your Honor, we'll be playing this.  There are no objections to this testimony.

THE COURT:  Do you have a copy for me?

MS. WOODHOUSE:  I believe there actually are objections to this testimony.

MR. SHAW:  To 124?  Well, take that down, please. Because we don't want to put that up.  Why don't we come back to this after lunch.

THE COURT:  All right.

BY MR. SHAW:

Q.   All right.  Now the IHS data you used, though, because it was hard to track the number of products that actually came to the U.S.?

A.   That's right.

Q.   Okay.  And the 4922 product on your slide that said "Sharp," do you remember that?

A.   I do.

Q.   All right.  Who was the company that actually -- what was the brand of the TV that the Sharp product was found in.

Do you remember?

**A.**    I do not remember.

**Q.**    I think your report has a table on that, on page 10. Could you just take a look?  It's in tab C in the notebook I gave you.

All right.  Does that remind you as to what companies or what brand of TV the 4922 lens was found in?

**A.**    Yes.  That shows an RCA TV of 32-inch screen size.

**Q.**    Okay.  And you've not seen any indication or evidence that that lens has been sold in the United States in any other television; right?

**A.**    I have not been looking for any such evidence, so I don't have a comment on that.

**Q.**    Okay.  Now, your exhibit that had the total estimated sales of the 4922 lens in the U.S. was roughly $375,000?

**A.**    I'll look for you.  (witness examines document)  I'm showing estimated U.S. sales of the 4922 lens of $511,243.

**Q.**    I'm sorry.  I asked a bad question.

In 2012, it was 376,000?

**A.**    That's right.

**Q.**    Okay.  And 2013, it was some amount -- whatever the difference of those two is; right?

**A.**    Right.

**Q.**    Okay.  So what was the price of the 4922 lens when EDD sold it?

**A.**    I can answer that --

**Q.** You have a table in your report, I think it's on page 86, or third page from the end, if that will help you.

**A.** If you have my report all in one place in here --

**Q.** It's in tab C.

**A.** Okay. And you were referring me to what page, please?

**Q.** I think the third page from the end tab, and I think it's tab C. There's a table of estimated sales price for sales price per lens.

**A.** Yes.

**Q.** All right. And what was the sales price per lens for the 4922 in 2012?

**A.** Two cents per lens.

**Q.** In 2013 it was?

**A.** Same.

**Q.** Same. So there's 37 -- let me back up now.

How many lenses are in an RCA TV that was found; do you know?

**A.** I do not know.

**MR. SHAW:** Could you pull up DTX-1101, please, on page 12. And this exhibit was already admitted, Your Honor. Let's try the next one.

**Q.** You see three rows of lenses in there.

**A.** I'll take your word that that's what those are.

**Q.** Okay. And you see eight per row?

**A.** Yes.

Q.   All right.  So why don't we estimate that at 25, to do the math.

A.   Okay.

Q.   And that would make about 50 cents of lenses per TV?

A.   Yes.

Q.   All right.  So the $376,000 you're reporting of TVs containing -- the 376,000 is lenses; right?

A.   Yes.

Q.   All right.  So that would be how many TVs, RCA TVs?

A.   I'm sorry.  You're asking me to take the $376,000 of sales?

Q.   Right.  And we estimated about 50 cents of lenses per TV.

A.   Okay.

Q.   And what's that about, 750,000?

A.   Right.  Roughly double.

Q.   All right.  Now, the 4922, I think we covered this, was only sold in RCA TVs, to your knowledge, in the U.S.?

A.   That's my understanding.

Q.   All right.  Now, the IHS database you used was the tool you used to get to the 376,000 for 2012?

A.   That's right.

Q.   Okay.  And did you check your numbers against the IHS database?

A.   I obtained my numbers from the IHS database.

         MR. SHAW:  Okay.  Could we look, please, at DTX-1177.

Don't put that up yet, because you didn't -- did you move that one into evidence?

THE COURT:  No.

MS. WOODHOUSE:  I did not.

BY MR. SHAW:

Q.   So could you look at DTX-1177, please.

A.   I have that.

Q.   And that's a printout of the database; correct?

A.   It's not a printout of all of it, but it's part of it.

Q.   Right.  And you looked at least at this part of the database; right?

A.   Yes.

MR. SHAW:  All right.  Could you -- I'd like to move 1177 into evidence, Your Honor.

MS. WOODHOUSE:  No objection.

THE COURT:  1177 is admitted.

(Defendant's Exhibit 1177 received in evidence)

THE COURT:  Proceed.

MR. SHAW:  All right.  Could you publish, please, the first page.

And why don't you blow up the first page, Mr. Harper, so everybody can see it.

Q.   All right.  Now, you've also used this in the form of a live spreadsheet; is that right?

A.   Yes.  The spreadsheet has more data; it has a number of

tabs that are not reproduced in this particular exhibit.

Q.   Okay.  Now, could you turn -- and we're going to get there, but the tab you used is the one that's TV shipment area; is that right?

A.   Yes.

MR. SHAW:  All right.  Now, if could you turn forward, please, Mr. Harper, to DTX-1177-11.  I'm sorry -10.

Q.   Now, this is a printout of IHS's database of what they believe were numbers of televisions sold in the U.S. in different years; is that right?

A.   Yes.

Q.   And the numbers are in, I guess, thousands?

A.   That's right.

Q.   Now, could you look at the RCA line, please, and tell me how many televisions in the U.S. IHS believe were sold in 2012?

A.   It shows none for 2012.

Q.   And for 2013, how much does it show?

A.   Also none.

Q.   Now, you could have tried to get information directly from RCA about the number of their TVs sold in the U.S.; is that right?

A.   No.  I don't know where that information would come from. I don't have that ability.

Q.   In other trials you've testified you haven't gathered information?

**A.**    No.

**Q.**    All right.

**A.**    If that's not provided by the parties or subpoenas, I don't have access to it.

**Q.**    That's fine.  So let's go now to the part of the IHS database you did use in your analysis.

        **MR. SHAW:**  And Your Honor, I'm going to go to the live spreadsheet.  That's that PX-180.  There's no way to show that to Ms. Davis without showing it to the jury at the same time, but I don't believe there's any objection to it.

        **THE COURT:**  Proceed.

        **MR. SHAW:**  Okay.  And I'd like to move that into evidence as well.

        **MS. WOODHOUSE:**  Sorry.  You want to move the whole spreadsheet into evidence?

        **MR. SHAW:**  Well, what we've agreed, Your Honor, is any portions of live spreadsheets the parties use, we'll take screen pictures so that the jury could have those and take those back to the jury room.

        **THE COURT:**  All right.  So you're proposing to show certain parts of 180 to the jury now, and those are the only parts that the jury will consider in their deliberations; is that correct, Mr. Shaw?

        **MR. SHAW:**  That's correct, Your Honor.

        **THE COURT:**  All right.  Any objection to that?

MS. WOODHOUSE: No objection.

THE COURT: With that limitation, it is admitted.

(Plaintiff's Exhibit 180, screen shots, received in evidence)

MR. SHAW: And I will try to ask Mr. Harper to take screen shots. But, please, if I'm missing something you want a picture of, please tell me and we'll get everything.

Q. So you said the area you used was the TV shipment area?

A. That's right.

MR. SHAW: All right. Could you go there, please, Mr. Harper.

Q. All right. And does that look like the TV shipment area that you first looked at?

A. It's hard to tell when we're only looking at a single screen.

Q. Right. So you had created a chart, though. I think it's DTX-1186 that has the numbers you found in this spreadsheet to use for sales of TVs that you were analyzing.

A. Do I have a copy of 1186 in here?

Q. The black book doesn't seem to have it. So let me see if it's in mine.

Did you find 1186?

A. I did.

Q. And does that have your estimated U.S. sales numbers?

A. It does.

**Q.**   And it has the worldwide sales numbers as well?

**A.**   Yes.

**Q.**   Let's talk about the process where you created that first.
The numbers you have on that are different than the sales numbers that are shown on this slide here.  Well, let me back up.
You used the LCD TV line?

**A.**   I did.

**Q.**   And that's this line here (indicating).  Unfortunately, we can't zoom in too much, but we'll try to do that as we go.
Now, the numbers here, 2012, it shows 81,710.
That's not the number you used; right?

**A.**   That's right.  I was focused only on the seven manufacturers that I've named here.

**Q.**   Right.  The seven brands that you named in your chart?

**A.**   Right.

**Q.**   And you got to that by taking the tab that says "brand" and selecting those seven manufacturers; is that right?

**A.**   That's right.

        **MR. SHAW:**  Now, Mr. Harper, could you select those seven.

**Q.**   And Ms. Davis, could you tell us what they are, so he can select them?

**A.**   It's JVC, LG, Panasonic, RCA, Sanyo, Seiki, TongFang, and Sharp.

MR. SHAW: All right. Now we're starting -- and please take a picture, Mr. Harper.

Q. And we're starting to see the numbers in your spreadsheet on the LCD lines; is that right?

A. Yes.

Q. And then 2014 is blown out into multiple years. But we can collapse that by hitting the minus button right there?

A. That's right.

Q. Okay. And now the numbers on the screen for the LCD line match the numbers you have in your exhibit?

A. They do.

MR. SHAW: And Mr. Harper, could you please take out the other kinds of displays and then take another screen shot?

Q. And the numbers still match up; is that right?

A. They do.

Q. Now, to estimate U.S. sales, you looked at the North America market; is that right?

A. That's right.

Q. And you do that by taking the region here and selecting "North America"?

A. Yes.

MR. SHAW: Could you do that please, Mr. Harper? And take a screen shot, please?

Q. And now this matches the North America sales you reported in DTX-1186?

**A.**    That's right.

**Q.**    Now, you know the TV -- this case involves sales in the U.S.?

**A.**    Yes.

**Q.**    And you know it involves LED-lit televisions, not just all LCD tvs?

**A.**    I have a general understanding of that.

**Q.**    Right.  And from reading the trial transcripts, you know it involves direct-lit LED TVs, not edge-lit LED TVs?

**A.**    That's right.

**Q.**    Okay.  So does the spreadsheet contain information about those subjects?

**A.**    It does not.

**Q.**    It does not?

**A.**    I don't believe it shows the distinction between direct-type backlighting and edge-type backlighting, if that's what you're asking.

**Q.**    Does it have data on U.S. sales?

**A.**    It does not have specific data on U.S. sales.  The best information was North America sales.

          **MR. SHAW:**  Okay.  Mr. Harper, could you put your cursor in one of the number boxes, please.

**Q.**    And do you see these things called Pivot Table Fields on the right?

**A.**    I do.

Q.   And you've used those before, haven't you?

A.   I don't recall these specific pivot tables, but we could look at those.

Q.   Okay.  Well, you've used pivot table fields before.  You know how to use them?

A.   Yes.

Q.   And do you see the place where it says, "country"?

A.   I do.

MR. SHAW:  And Mr. Harper, could you click that button, please.

Q.   And now Ms. Davis, you see a line for U.S. sales of LCD TVs; right?

A.   I do.

MR. SHAW:  Now, Mr. Harper, could you also please scroll down on the pivot table.

Do you see where it says "LED-type," pause there.  Could you click that one, please?

Q.   And you see direct-and edge-lit?

A.   I do.

MR. SHAW:  And could you -- and the screen shot, please.

Now, could you also hit "backlight tab" on the pivot table.  And take a screen shot of that also.

Q.   Now, the data that is really at issue in this case is in the spreadsheet; isn't it?  At least appears to be.

**A.**   What you walked through would appear to be, but I think I need to study it more closely.

     **MR. SHAW:**  Okay.  Now, Mr. Harper, could you please select just "U.S." for the sales.

**Q.**   And could you please -- do you know what a CCFL is?

**A.**   Yes.

**Q.**   It's not the type of TV at issue in this case?

**A.**   That's my understanding.

     **MR. SHAW:**  All right.  Could you please, before you do it, take that screen shot where we just were, and now deselect "CCFL."

     And why don't you -- all right.  And take a screen shot there, please.

**Q.**   Now, edge-lit is not at issue in this case?

**A.**   That's my understanding.

     **MR. SHAW:**  And before you move to hit screen shot here, deselect edge-lit, please.

**Q.**   Now, according to the IHS company, this is the actual sales of LED backlit TVs in the United States for 2012, 2013 and 2014.

     Do you see that?

**A.**   I do.

**Q.**   And those numbers are quite a bit different than what you report on DTX-1186, aren't they?

**A.**   The numbers themselves are.  The ratio may not be, because

you haven't gone through what to do to the denominator yet.

Q.   Right.  So -- and we do that by unclicking North America and going back to worldwide.

And I'm looking at the United States.

A.   Yes.

MR. SHAW:  All right.  So first could you unclick "North America" and select "all."  And also unselect "U.S." under country and then take a screen shot.

Q.   So now we have the grand total on the bottom, and that's the worldwide sales for LED-type direct-lit TVs.

Do you see that?

A.   That's right.

Q.   And there's also a line for the U.S.

Do you see that?

A.   Yes.

Q.   Okay.  So I saw you took a calculator to the stand.

A.   I have one.

Q.   All right.  Could you calculate, please, the percentage of sales for 2012?

A.   I started on 2014.  Do you want 2012 instead?

Q.   That's fine.  Either one.  Let's get them all in.

A.   2014 is about 18 percent.

Q.   Okay.  And you used something higher than that?

A.   I used 19 percent.

Q.   All Right.  2013?

A.   2013 is 16 percent.

Q.   And you used?

A.   19.

Q.   All right.  And then 2012?

A.   21 percent.

Q.   All right.  Now, the other thing you did here is you took all the brands together and you created these ratios; right?

A.   I'm not following you.

Q.   In the brand line you have -- you selected all the brands for the TVs -- for TVs that contained -- where Enplas lenses were found?

A.   Yes.

Q.   All right.  Is there a reason you didn't look at, for example, just the ratio of LG TVs sold in the United States when you were trying to calculate how many of those lenses found in the LG TVs were sold?

A.   Yes, there is.

Q.   And what's that?

A.   Because we don't know for a fact that all of the sales, for example, to Sharp for the 4922 end up in RCA products. Some of them may end up elsewhere.

    The one that was taken apart for purposes of this case happened to be an RCA product.

Q.   But you have absolutely no evidence to say that any lens, 4922 lens, ended up in the U.S., except ones that were in the

RCA brand TVs; correct?

**A.** Other than the fact that you just showed us that there were no RCA TVs that ended up in the U.S., according to this document.

**Q.** Well, we know at least one did.

**A.** Obviously.

**Q.** And probably a couple more than that.

**A.** Presumably.

**Q.** All right. And that really tells us that this document is not that accurate; correct?

**A.** It can't be precisely accurate, but it's still the best information available in the industry, so that's what all the companies in the industry use.

**Q.** And on RCA TVs in 2012, it was off by 750,000 models?

**A.** 750,000 products, if you assume that every 4922 sold to Sharp went to RCA.

**Q.** To RCA. But we have no evidence that any 4922 that went to Sharp went anywhere other than an RCA?

**A.** We only have the one that I know about.

**Q.** Right. And we don't know anywhere in the world those TVs were sold; right? We don't know where these other TVs, if there were ones that had 4922 lenses, were sold, do we?

**A.** We don't know anything about where they were sold or who they were sold to.

**Q.** Okay. Now, we could look just at LG TVs, their brand,

because there was an LG TV that had the accused lens in it; right?

A.   Right.

Q.   So to do that we would go back to the brand portion and unclick everything except "LG;" is that right?

A.   Right.

        MR. SHAW:  Could you do that, please, Mr. Harper, and take another shot?

Q.   Now, could you calculate the percentage of the LG TVs that were sold in the U.S. for each of these units, please, and tell the jury.

A.   Looks like 15 percent in 2014.

Q.   That's lower again than the percentage even that we calculated on the worldwide group; right?

A.   That's right, if it were relevant.

Q.   All right.  And what did you get for 2013?

A.   16 percent.

Q.   And 2012?

A.   11 percent.

        MR. SHAW:  Okay.  Your Honor, I have at least another half hour.  I'm happy to break now.

        THE COURT:  I think it's a good time for a break now. Thank you.

     Ladies and gentlemen, we'll take our lunch break now.

Please turn at 1:05.

And during lunch, don't do any investigation or discussion of the case.  See you at 1:05.

(Proceedings were heard out of presence of the jury:)

THE COURT:  Ms. Davis, you may step down.  Thank you.

MR. SHAW:  Your Honor, I have two short matters.

THE COURT:  Let's take them up right now.

MR. SHAW:  First, we already made our motion on the 2-to 4 million number.  I know you've denied it.  But after hearing the testimony, I just wanted to renew it, to take another shot at having to exclude it.

THE COURT:  And what new information do you think there is now that has not been presented in anticipation of the testimony.

MR. SHAW:  Well, most of what was there was not presented in anticipation of the testimony.  But the point of the motions previously was that the damages for infringement need to be based on the products sold in the U.S.  And Ms. Davis very clearly said that her estimation of that was $500,000.

The rest of the testimony was from a pragmatic view of what licensees would want to do in the real world.  And Ms. Davis candidly said that those extra amounts would not be for lenses that are at issue in this case.

THE COURT:  She did that, and explained, in my mind, what she based it on, and that was not new information that

I -- it was in a report before, so it's not a surprise.  I don't think that you're objecting based on surprise.  You're objecting to the admissibility of that testimony.  And my opinion has not changed, which it goes to the weight of the testimony, not to its admissibility, and so I will overrule your renewed objection.

MR. SHAW:  Okay.  Thank you, Your Honor.

And then the second was there were a couple times in the direct testimony, once I objected to it, and it happened on the cross where Ms. Davis blurted out that she wasn't provided information during discovery.

I would just like to have counsel for SSC caution Ms. Davis to not do so gratuitously as she did in her Direct.

THE COURT:  Well, I don't -- characterization of "blurted" and "gratuitously," I don't know -- I didn't make a finding of that.  That's your argument.  And I ruled on the objection, and I struck some testimony, so I don't think a further admonishment is necessary.

MR. SHAW:  Okay.  Thank you, Your Honor.

THE COURT:  There was -- you started to make reference to a Seto deposition, and I don't know if you were going to go back to that or not, and if you do, maybe it's in the materials you gave me.  But if you could just direct me to where it is, or if it's not --

MR. SHAW:  We'll get a printout once Your Honor -- I

had gone through -- the testimony I was going to ask her about was the deposition designation objections that were exchanged pretrial, and to those lines there had been no objections.

So we can talk about that at lunch and sort that out.

THE COURT:  All right.  And are there any other -- so yes, talk about it at lunch.

If there are other depositions excerpts that you wish to impeach the witness with, that's, of course, your decision. But I want to know what they are when we get to it, so that I have a chance to know where you're going.

MR. SHAW:  Good news is, Your Honor, that's the only one.

THE COURT:  All right.  Well, then that will obviate the need for further discussion.

Thank you very much.  We'll see you at 1:05.

(Luncheon recess was taken at 12:20 p.m.)

**Afternoon Session**                                    **1:04 p.m.**

(Proceedings were heard out of the presence of the jury:)

THE COURT:  Good afternoon, everyone.

ALL:  Good afternoon, Your Honor.

THE COURT:  I think our jurors are ready.  Let's bring them in.

MR. SHAW:  While they're coming in, Your Honor, I can report the Seto material, there was no objection.  I'll hand up copies.

THE COURT: Very good.

MR. SHAW: Maybe we won't need to use it, but I'll reask those questions.

THE COURT: All right. We'll be ready just in case. Thank you.

MR. SHAW: Those include all the designations, not just the ones that might come up here.

THE COURT: Thank you.

MS. WOODHOUSE: And just for the record, we've only said there are no objections to the ones he's indicated. I'm not sure if there are others, but --

MR. SHAW: And that may be, but the ones that are in the range 118 to 124.

(Proceedings were heard in the presence of the jury:)

THE COURT: All right. Good afternoon to our jurors. Everyone may be seated.

And we will continue with the examination of Ms. Davis.

Ms. Davis, you remain under oath.

MR. SHAW: Good afternoon again, everyone.

We're now going to move into the middle section, which we talked about, which were the discussion of Ms. Davis' five factors that were on DDX-5.012.

Q.   Well, I guess I should say before we do that, I wanted to go back to the place we had the glitch with the deposition transcript and just ask you a couple questions there, please.

So when you looked through the evidence and Mr. Seto's deposition, it's correct, isn't it, that he could not identify the number of intermediaries between SSC and the point of importation of SSC's products into the United States?

A.   I think that's true, at least not for every single customer.

Q.   Well, you understood from reading it that no one at SSC could give that number?

A.   I think that's probably true.

Q.   All right.  And you also understood that it wasn't an easy answer to give because SSC would first have to identify its customer companies located in China, Japan, and Korea, and thereafter they would need to find out whether or not those manufactured TV sets were exported to the U.S. or not?

A.   Exactly.

Q.   Okay.  So now let's move into the middle section.

When you were calculating the number of sales in the U.S. -- you read the transcript from yesterday; right?

A.   I did.

Q.   And you saw Ms. Watai's reference to 5 percent of LG's sales or lenses going to LG that they needed?

A.   I don't remember that specifically.

Q.   Okay.

MR. SHAW:  Your Honor, may we call up that portion of the transcript to reorient Ms. Davis?

THE COURT:  You may, if it's the part that was presented yesterday.

MR. SHAW:  Yes.  So I believe on the trial transcript at the bottom of page 454 and then line 8 at 455.  Starting at line 23.  Thank you.

And then go down, please, to line 8.

Q.  All right.  Do you remember seeing that testimony yesterday?

A.  Vaguely.

Q.  All right.  And she's -- Ms. Watai here is talking about a document that I'm assuming you looked at in your analysis from EDD?

A.  I may have.  I can't tell what document this is.

Q.  Okay.  Could you look at DTX-1114, please.  I think it's in the white binder.

A.  (Witness examines document.)

Q.  And before we call that up, it's not in evidence yet.

This is one of the documents you looked at when you were reviewing the deposition transcripts?

A.  If it was marked at one of the depositions that I reviewed, then, yes, I did see it.

Q.  And it was marked?

A.  I'm sorry?

Q.  On the first page there's an exhibit to the Seto deposition.  Do you see that?

A.    Yes.

       MR. SHAW:  All right.  I'd like to move DTX-1114 in evidence.

       MS. WOODHOUSE:  No objection.

       THE COURT:  1114 is admitted.

       (Defense Exhibit 1114 received in evidence)

BY MR. SHAW:

Q.    All right.  Now, can you move to, please, DTX-1114 at page 13?

A.    (Witness examines document.)

Q.    And the beginning of the document -- as you're doing that, the beginning of the document is in Japanese, and then there's a certified translation on the second half.  Do you see that?

A.    I'm certainly aware that the beginning is in Japanese, and the page you have referred me to is in English, so that's good.

Q.    And maybe you can move up to page 12, and we'll see the same first page in English just to orient the jury.

       And then could you look at the last page, please, page 23.  There's a translation certificate.

A.    (Witness examines document.)  I see that.

Q.    Okay.  So let's go back to page 13.

       Now, when you looked at the transcript, you saw that -- this is the part she's talking about in the black box where it says the LE-Cap share of LG Electronics is 5 percent?

A.    I see that.

Q.    All right.  And from your research, do you know that the -- now moving to the top of the page it says "POLA"?

A.    Yeah.

Q.    You know that's a TIR lens used for direct-type backlighting?

A.    I don't recall that.

Q.    All right.  They report here you see it's 70 percent of LG's needs?

A.    I see that.

Q.    Okay.  And then the LE-Cap total at the bottom for two lenses is 5 percent of LG's needs.  Do you see that?

A.    I see that.

Q.    And then there's some details about the 9879 usage and this other lens 9900.  Do you see that?

A.    I do.

Q.    And, just roughly, the percentage of 9879s here that are being used for LG is maybe two thirds of 5 percent?  Roughly.

A.    And where are you getting the two thirds?

Q.    Well, you see the number of units for the other two types of lenses listed there, right, 400,000 and 60,000?

A.    (Witness examines document.)  I see the 400,000 and the 60,000.

Q.    And the 1 million units for the 9879?

A.    Yes.

Q.    And you add all those up together, and 1 million of it

for -- 1.4 -- 1,460,000 is roughly two thirds, or maybe a little less.

**A.** Okay.

**Q.** Now, you didn't use this in your analysis of how many 9879 lenses came to the United States, did you?

**A.** No.  I don't think this tells us anything about that.

**Q.** Well, it doesn't tell you anything about that because this tells you just the percentage of lenses sold into LG Electronics; correct?

**A.** This appears to be telling us the number and -- or at least the type of lenses that are sold by EDD to LG during this period of time.

**Q.** Right.  And the date on this was summer of 2014?

**A.** It was.

**Q.** All right.  And you had testified in your direct that depending on the year, as much as 24 percent or 19 percent of the lenses in an LG TV would be a 9879.  Do you remember that?

**A.** No.

**MS. WOODHOUSE:**  Objection, Your Honor.  Misstates testimony.

**MR. SHAW:**  I'll rephrase the question, Your Honor.

**THE COURT:**  All right.  Sustained.  You can restate it.

**BY MR. SHAW:**

**Q.** You had the chart for the jury that had the percentages

each year that you used to estimate how many lenses came to the United States by model?

A.   That's right.

Q.   And those percentages were, and I'm not trying to be exact, but they were roughly 24 percent in 2012 and 19-some percent in 2013.  Do you remember that?

A.   Yes.

Q.   All right.  And you didn't use this information in analyzing how many 9879 lenses came to the U.S.?

A.   No.  This information isn't focused on the U.S., as near as I can tell.

Q.   Right.  Okay.  Thank you.

     Now, I want to ask you a couple questions about your overall opinion.  You did not -- it's your opinion that no running royalty is appropriate in this case; right?

A.   I think for all the reasons we've been talking about, running royalty would be very complicated, and it would not be the structure chosen by the parties.

Q.   Okay.  Now, next I want to talk about your use of the public information about the plastic optics business of Enplas. Okay?

A.   Sure.

Q.   All right.  And you put that on DTX-1184?

A.   (Witness examines document.)  I don't believe we talked about 1184 this morning, but that is a page from my report.

**Q.**   Okay.  So there you summarize the sales by year for the plastic optics business?

**A.**   That's right.

**Q.**   Okay.  And you got that -- if you could turn in your white binder, please, to DTX-1161.

**A.**   (Witness examines document.)

**Q.**   And you assembled the information on the total plastic optics business sales based on looking at reports like the one that's at DTX-1161?

**A.**   That's right.  I used separate reports for each year.

**Q.**   And these were all publicly available reports?

**A.**   Yes.  They were on the Enplas website.

        **MR. SHAW:**  Your Honor, I'd like to move the admission of DTX-1161.

        **MS. WOODHOUSE:**  No objection.

        **THE COURT:**  1161 is admitted.

     (Defense Exhibit 1161 received in evidence)

        **MR. SHAW:**  All right.  Could you move, please, to page 27 of that exhibit and publish the front page.  That's the front page of the exhibit.

**Q.**   And then there's discussions of -- this Enplas Corporation's document, right, not EDD's?

**A.**   That's right.

**Q.**   And it discusses all of Enplas Corporation's different businesses; is that your memory?

A.   As of April 27th of 2012.  So EDD had just been formed.

Q.   Right.  But it discusses more than just EDD in this report?

A.   Correct.  This is all of the parent corporation.

Q.   Right.  And it divides its reporting on page 6 into three different businesses.  Do you see that?

Would you pull that up, please, Mr. Harper.

A.   (Witness examines document.)  That's right.

Q.   All right.  So one of them was the engineering plastics business, and that's not at issue in this case as far as you know?

A.   As far as I know.

Q.   And semiconductor peripherals business, that's not at issue in the case?

A.   Correct.

Q.   And then the one you looked at was plastic optical business?

A.   Correct.

Q.   All right.  Now go to page 27, please.

You saw in the reports, didn't you, that there are other components to the plastic optical business than just LE-Cap lenses; right?

A.   I'm aware that there are, yes.

Q.   And one of those is optical pickup?

A.   That's what this would suggest.

**Q.** Another one is optical communication?

**A.** True.

**Q.** Could you please open your binder to DTX-111. I believe this one has already been admitted into evidence.

**A.** 111?

**Q.** 1111.

**A.** Okay.

**Q.** Sorry. I left a digit out.

**A.** (Witness examines document.) I have that.

**Q.** All right. And this is another Enplas Corporation document; right?

**A.** It is.

**Q.** And could you go to page 6, please.

**A.** (Witness examines document.)

**Q.** And do you see the line for precision optics in there?

**A.** I do.

**Q.** And that's optics for CD and DVD pickup?

**A.** Right.

**Q.** And that revenue is part of the plastic optics business revenue you were pulling from the public reports; right?

**A.** I don't know that we can conclude that from this page.

**Q.** Well, did you see in the -- if we go back to DTX-1161, you just indicated that the optical pickup part of Enplas Corporation is in these numbers. Do you remember that?

**A.** Let me go back to 1161.

**Q.** 1161, page 27.

**A.** (Witness examines document.)  It was before EDD split off, yes.

**Q.** Right.  And then this document, if you go to page 7 --

**A.** And when you say "this document," which one?

**Q.** I'm sorry.  DTX-1111.

**A.** Okay.

**Q.** Now, here we look at the bottom.  There's reference to three different types of products.  You see plastic lens for optical fiber communication?

**A.** I do.

**Q.** And you see that their market share in that business is 40 percent global, at least Enplas Corporation's estimation?

**A.** For the overall parent, yes, that's correct.

**Q.** And the grading for CD/DVD players, were you able to tell when you reviewed all these documents, that that was part of the -- that that's the same as the optical pickup?

**A.** No.

**Q.** Okay.  But that's 40 percent of the global -- they have 40 percent of the global market, too.  Do you see that?

**A.** That's their market share is the way I would interpret this.

**Q.** And lens for LED signage, you see that as 60 percent for market share?

**A.** Right.

**Q.** Now, let's go to DTX-1172. And this is another of the exhibits you have -- you looked at in working on your analysis; correct?

**A.** That's right.

**Q.** And this is part of that public group of information and research you did?

**A.** Correct.

**Q.** All right.

**MR. SHAW:** I'd like to move the admission of DTX-1172, Your Honor.

**MS. WOODHOUSE:** No objection.

**THE COURT:** 1172 is admitted.

(Defense Exhibit 1172 received in evidence)

**BY MR. SHAW:**

**Q.** Now, this is an annual report for the whole business of Enplas Corporation?

**A.** Yes.

**Q.** All right. Now, could you go, please, to page 7 of the report.

**A.** (Witness examines document.)

**Q.** And could we highlight, please, the bottom half there.

And here's reporting on the plastic optical business again. Do you see that?

**A.** Right.

**Q.** And in this reporting period, they're still talking about

optical-communication-related lenses being part of the plastic optics business.  Do you see it?

A.   I do.  They're talking about the core product, though, being the LED diffusing lenses for the direct backlight.

Q.   Well, first get to my question.  You see the part where they're talking about the optical fiber?

A.   I do.

Q.   And you were referencing this first sentence?

A.   Yes.

Q.   And here they're reporting that LED backlit market is an emerging market.  Do you see that?

A.   Not yet.  Where are you?

Q.   The first sentence.  Could you read the first sentence there, please, out loud.

A.   Oh, okay.  (reading)

       "In emerging nation markets, more LED backlit LCD TV
    models have employed the cost-effective direct backlight
    types, and our LED diffusing lenses, which is our core
    product, has been adopted in more models."

Q.   Now, the U.S. is not part of the emerging market as you understand that phrase in terms of parts of the world; correct?

A.   No, of course not.

Q.   All right.  Now, when is it your understanding that EDD started selling Light-Enhancer Cap licenses?

A.   My understanding is that EDD came into being in April of

2012, and the part of the business that had became EDD was already selling lenses at that time.

Q.    Right.  And there was some sales before then by Enplas Corporations?

A.    By various Enplas entities, yes.

Q.    Now, they didn't exist before 2010, did they?

A.    Those other Enplas?

Q.    The other Enplas lenses sold by Enplas Corporation, they weren't being sold in 2010, were they?

A.    I believe that's correct.

Q.    Now, could you turn, please, to DTX-1166.

A.    (Witness examines document.)

Q.    And the first question is:  This is another one of the documents you used in working on your analysis; right?

A.    It is.

        MR. SHAW:  And, Your Honor, I'd like to move the admission of DTX-1166.

        MS. WOODHOUSE:  No objection.

        THE COURT:  1166 is admitted.

    (Defense Exhibit 1166 received in evidence)

BY MR. SHAW:

Q.    Now, the Japanese fiscal year goes from April 1st to March 31st.  You know that; right?

A.    I'm aware that that's the Enplas fiscal year.  I can't comment on whether that's true for all Japanese companies.

**Q.**   Fair enough.

So the report for 2012 revenue would be from April 1st, 2011, through March 31st, 2012?

**A.**   That's right.

**Q.**   And for 2010, it would be from April 1st, 2009, through March 31st, 2010?

**A.**   Correct.

**Q.**   All right.  And could you please look at DTX-1160.

**A.**   I'm sorry.  I thought we were on 1166.  Do you want to go to 1160?

**Q.**   We were.  We're now moving to 1160.

**A.**   Okay.

**Q.**   And this is another report that you used in working on your analysis?

**A.**   (Witness examines document.)  I may have seen this one. This would not have been particularly pertinent since it predates the establishment of EDD.

**Q.**   But this was one of the documents that was in the publicly available resources you used; right?

**A.**   It was.

**Q.**   Now, could you turn to page 6 of that, please.

**A.**   (Witness examines document.)

**MR. SHAW:**  Oh, Your Honor, I'd like to move this into evidence as well.

**MS. WOODHOUSE:**  No objection.

THE COURT:  1160 is admitted.

(Defense Exhibit 1160 received in evidence)

MR. SHAW:  All right.  Could you publish the first page, please.

Q.   This is the business report for 2012.  Do you see that?

A.   Yes.

Q.   All right.  Now, move to page 6, please, Mr. Harper.  And at the bottom could you highlight the plastic optics business?  And could you highlight the sales box on the right.

And here in this publicly available information, they're reporting revenues for the plastic optic business before LE-Cap lenses were ever sold; right?

A.   Before the accused lenses were ever sold.  I don't know what was sold prior to that.

Q.   Okay.  Thank you.

Now, could you go back to DTX-1111, 1111?

A.   (Witness examines document.)

Q.   And in the middle of that document, you'll see a page that has the heading "Enplas Corporation."

A.   Do you have a page number?

Q.   I don't actually have it.  It's probably 5 or 6.  Did you find it?  I'm sorry.  "Enplas Display Devices."

A.   I have "Enplas Display Device Products."  Is that it?

Q.   Perfect.

A.   Okay.

Q.   And that's DTX-1111-08.

Now, could you go to page 13?

A.   (Witness examines document.)

Q.   And page 13 is part of the section on Enplas Display Device products; correct?

A.   Let me confirm that for you.

(Witness examines document.)  It appears to be.

Q.   And here it's reporting on different types of Enplas Display Device products, such as omnidirectional lenses. Do you see that?

A.   I do.

Q.   And ceiling light lenses?

A.   I see that.

Q.   And LED tube lens on the bottom right?  Do you see that?

A.   Oh, tube.  I thought you said "two."  Yes, I see that.

Q.   And LED flash lens for smartphone.  Do you see that?

A.   Right.

Q.   And that would be things like an iPhone or an Android phone, smartphone?

A.   I would expect it to be a smartphone like that.

Q.   Okay.  Thank you.

Now, let's move over to a couple little detail items.

You set the hypothetical negotiation for the '209 patent on April 2nd, 2012?

A.   April of 2012.

Q.   Okay.  And you've looked at the list of stipulated facts for the jury?

A.   I have.

Q.   And you understood from those facts that EDD first learned of the '209 patent in October 2013?

A.   I'm aware of that.

Q.   Now, you had a slide up at the beginning of your testimony about your book.  Do you remember that?

A.   Yes.

Q.   Your book is not about how to calculate reasonable royalty damages, is it?

A.   It is not.

Q.   Now let's go to the '554 patent and the last section of your analysis, the one that looked at the different licenses. Okay?

     First of all, in this hypothetical negotiation, EDD ends up with a license for either the accused products or all of its products under your analysis; right?

A.   That's right.

Q.   And they pay amount of money back to -- they pay for that? They either pay the $500,000 in your analysis or the 2 to 4 million?

A.   That's right.

Q.   Okay.  What else do they get?

A.   They get the right to use the patented technology.

Q.   Right.  But they don't get anything other than the right to use their patented technology for whatever products were licensed?

A.   Correct.

Q.   Okay.  Now, could you pull up DTX-1141, please.

And all the remaining exhibits I have have already been admitted.

And could you go to the second page, please, and blow up the first paragraph and the title.

This is one of the licenses you looked at in your analysis; right?

A.   Yes, it is.

Q.   You didn't show any of these to the jury in your analysis, did you?

A.   We didn't go through them one by one, but we identified all of them.

Q.   Okay.  But this is one of the licenses that licensed the '554 patent; right?

A.   It is.

Q.   And that's in Exhibit A of the license?

A.   The '554 designation you mean?

Q.   Well, that's where it lists the patents that were licensed?

A.   Yes.

Q.   That's in Exhibit A?

**A.**   That's right.

**Q.**   Could you go there, please.

**A.**   (Witness examines document.)

**Q.**   And this licensee is 3M.  That's a big company in the U.S.; right?

**A.**   It is.

**Q.**   All right.  Now, could you go, please, to Exhibit A of this, Mr. Harper.  I think it's page 17.  And could you blow up as much of the screen as you can get.

It's not the easiest to read, but all these exhibits will be in the jury room.

Now, Ms. Davis, it's correct, isn't it, that this license to 3M, 3M got a lot more than the '554 patent?

**A.**   It's also got the '199 patent and a handful of foreign patents.

**Q.**   Right.  It got -- the '199 patent is on the second line here?  Right there (indicating)?

**A.**   Correct.

**Q.**   The first line is the '554 patent.  Do you see that?

**A.**   Yes.

**Q.**   And then there's a pending Canadian application.  That matured into a patent eventually, didn't it?

**A.**   I believe it did.

**Q.**   All right.  And then there's a German patent that's already been granted that they got?

**A.**   That's right.

**Q.**   And a French patent that was granted?

**A.**   Right.

**Q.**   And a UK patent that was granted?

**A.**   Yes.

**Q.**   And then there's a Japanese pending application, and your understanding is that was not matured into a patent; right?

**A.**   I think that's correct.  I don't recall specifically.

**Q.**   All right.  So 3M got these -- it got the '554, the '199, and four foreign patents in this license.  Do you agree with that?

**A.**   Yes.

**Q.**   And they also got something at the top that's all blacked out.  Do you see that?

**A.**   That's the '199 patent, I think.

**Q.**   This blacked-out part at the top is the '199 patent?

**A.**   Yes, because that's what's referenced down below.

**Q.**   Well, doesn't down below -- you see this line here it says "U.S. Patent Number 6,473,554"?

**A.**   I do.

**Q.**   And then you see a title section that says "Title" right underneath that --

**A.**   Yes.

**Q.**   -- in both places?

      Could you highlight, please, Mr. Harper, the top where it

says "U.S. Patent Number" and then where it says "Title."

And then for '554, it lists two inventors.  Do you see that?

A.   Yes.

Q.   And at the top it lists something that might be more than two inventors, but we can't tell because it's blacked out?

A.   We don't know.

Q.   Right.  And then underneath the inventors that we can see, it says "Country Applications."  Do you see that?

A.   Yes.

Q.   And then it lists the '554 patent, the '199 patent, and some foreign applications.  Do you see those?

A.   Right.

Q.   So are you telling us that at the top they were repeating reference to the '199 patent?

A.   We can't know for sure since it's redacted.

Q.   Right.  And you can't tell -- are you saying that it would be repeated at the bottom also?  Because there's another section of patents at the bottom that are blacked out, too, aren't there?

A.   Right.

Q.   Yeah.  And you didn't factor any of that into your analysis because you didn't know what was blacked out?

A.   I don't know precisely what's blacked out.

Q.   And this patent -- or this license came from SSC; right?

It came to you from SSC?

A.    Not exactly.  My understanding is that this is what was provided by Teledyne to SSC when SSC purchased the patent.

Q.    Right.  But for your analysis, it was provided to you by SSC?

A.    I got it from SSC for -- at least from the production that SSC provided to EDD.

Q.    Right.  Now, this license covers more than just three lenses; right?

A.    It does.

Q.    And it covers more than just one product line of lenses; right?

A.    That's right.

Q.    It covers every product 3M makes?

A.    That needed this technology.

Q.    Right.  So 3M could make, I don't think they do, but they could make LCD TVs that use direct backlit technology with this license; correct?

A.    I don't think they did, but I think they could.

Q.    Right.  Now, this license -- and that's shown in Section 1.3 on page -- I don't know what page that is.  I was going to say 17, but I don't think that's correct.  It's shown in Section 1.3 of the license?

A.    I'll confirm that for you in just a second.

      (Witness examines document.)  Yes, this defines licensed

products as any product, device, or component having a configuration that's covered by one or more claims of these patents.

Q.   All right.  And then the other thing 3M gets is the right for its affiliates to use this technology; correct?

A.   Yes.

Q.   And that's not something that EDD would get if it licenses the technology?

A.   That's right.

Q.   Sorry.  I had a chart I was looking for, and I couldn't find it.

Could I have the document camera, please.

Now, I prepared a demonstrative just to help keep track of what it is we're talking about here.

Now, could you -- I guess you can't zoom in, but I can.

This upper left portion of the chart replicates what you showed to the jury this morning about these licenses.  Do you see that?

A.   I do.

Q.   All right.  Now, I want to mark off -- and you tell me if I'm getting anything wrong here -- what Enplas is getting and what 3M is getting.

Enplas gets lenses, so I'm going to use an "L" for that. Is that okay?

A.   Okay.

Q.    And 3M gets all its products.  I'll use an "A" for that.
Is that all right?

Under the license -- if they took 3M's license, they have a license to every -- they can make any product they want to, but in your hypothetical negotiation, Enplas only gets a license to make its lenses; right?

A.    Well, I guess where I'm a little confused is this is only a license to products that require a license to these patents.  So 3M Scotch tape doesn't need a license to these patents.

Q.    Sure.  I'm only trying to say that 3M could make any product it wanted to that needed these patents.

A.    Yes.

Q.    Okay.  And I don't want the "A" to mean anything more than that.

So 3M you said gets a license to the '554 patent?

A.    Yes.

Q.    The '199?

A.    Right.

Q.    Some foreign patents?

A.    Correct.

Q.    And some unknown patents?

A.    I agree.

Q.    And Enplas gets the '554 patent?

A.    Correct.

Q.    Okay.  Now, let's go, if you would, please, to the SSC --

SSC/Teledyne license.

And you can take the document camera down.

We're going now to DTX-1006.

Now, we'll walk through this, but just to shorten things, it's right, isn't it, that SSC got a right to make any product? I should check the "A" box for SSC on this line; right?

**A.** I'm still looking at something that looks like the agreement.

**Q.** Okay. Well, you looked at the SSC/Teledyne agreement; right?

**A.** Sure.

**Q.** Right. And they got a license to use the patents that were licensed for any product?

**A.** Yes.

**Q.** Okay. And they got a license to the '554 patent?

**A.** They did.

**Q.** And the '199 patent?

**A.** I believe so.

**Q.** Okay. Now, SSC got rights to something called technical assistance in this license, didn't they?

**A.** They had to pay extra for it, but they were allowed to take advantage of technical assistance.

**Q.** Okay. Could you go to the document camera, please.

I'm going to check the "A" for the products here, the '554 and the '199 patent.

Now, you said they had to pay extra for the engineering assistance?

A.   That's my recollection.

Q.   All right.  That's part -- extras are wrapped into this $200,000 and 1 percent number in some way?

A.   I think we'd have to look at that provision.  I think there may have been a requirement that they pay --

Q.   All right.  Let's go up --

A.   -- specifically.

Q.   I'm sorry.  Were you finished?

Okay.  Let's go to the top of DTX-1006.  Could you highlight first the title?

This is a Patent License and Engineering Assistance Agreement.  Do you see that?

A.   I do.

Q.   Now, could we go to Section 2.1, which is on page 4?

A.   (Witness examines document.)

Q.   While we're here -- this wasn't where I was intending to go first, but while we're here -- they got a license for their subsidiaries; right?

A.   Yes.

Q.   Okay.  I'm going to check that box.  I'm not going to go back and forth on the cameras, but I'm just going to check that for now.

And then go down a little bit further.  It's in Section 2

on the next page.  I think it's 2.4 to 2.6.

All right.  2.4, by the way, this is an obligation by SSC to promote and make products that use these technologies; correct?

A.    Right.

Q.    And did you see any evidence in this case from the materials you reviewed that SSC ever paid a penny for using the '209 patent?

A.    I don't have any information on how much was paid specifically for the '209 patent other than the purchase price of that patent.

Q.    My question was different.  Did you see any evidence that SSC paid a penny to Teledyne for use of the '209 patent?

A.    Not specifically for the '209 patent.

Q.    They paid for the patent, but they didn't pay a royalty for using the technology?

A.    Not specifically assigned to the '209 patent.

Q.    You didn't see evidence they paid a royalty for anything, did you?

A.    I have no reason to think that they did not pay the requirement of the $200,000.

Q.    Well, that's -- okay.  I didn't mean the lump sum $200,000.  The 1 percent royalty, the running royalty.  You saw no evidence that any money was ever paid to that, did you?

A.    I don't have any royalty reports, so I don't know what was

paid.

Q.   Okay.  So if you go to page 2 point -- or Section 2.5. These are the technical assistance paragraphs.  Do you see those?

A.   I do.

Q.   And there is a mention in there of paying costs to Teledyne if they send someone to Korea.  Do you see that?

A.   (Witness examines document.)  Are you looking at a specific clause?

Q.   I'm looking at 2.6.

A.   (Witness examines document.)  I agree.

Q.   All right.  And SSC could ask for help at any time to develop its technologies; right?

A.   Right.

Q.   Okay.  So if we go back to the document camera, please.

     I'm going to check off engineering assistance if that's okay.

A.   Okay.

Q.   And I didn't check off for 3M subsidiaries, but they got that right also, didn't they?

A.   They did.

Q.   Now, Epistar is the next license I wanted to talk to, and that's DTX-1199.

     Now, Epistar manufactures TVs for LCD displays; right?

A.   I believe so.

**Q.**   That would make them a competitor of Seoul Semiconductor; right?

**A.**   Yes.

**Q.**   And I thought you had testified earlier that there were no competitors to Seoul Semiconductor in this technology that have been licensed.

**A.**   There were no competitors that EDD had identified that sold this technology.

**Q.**   Right.  And the importance of that was if there was no one else that could get into this technology, the patent would be worth more to Seoul Semiconductor; correct?

**A.**   It would be worth more to EDD.

**Q.**   It would be worth more to EDD, but the converse of that is, it's worth less to Seoul Semiconductor because now they're letting someone that could sell to the entire marketplace in?

**A.**   That's true.

**Q.**   All right.  And Epistar could also compete with Seoul Semiconductor because it had a license to this '554 patent?

**A.**   They did.

**Q.**   They did.

**A.**   Although, if we're going to talk about that one, can I have that in front of me?

**Q.**   Sure.

**A.**   I think you said it was 1199.

**Q.**   DTX-1199.

**A.**   Okay.

**Q.**   Now, quickly, could you go to page 22 of that license and blow up the patents again.  All of them.

And we see, again, the '554, the '199, the foreign patents, and the blacked-out patents.  Do you see that?

**A.**   That's right.

**Q.**   In your review of this license, you saw and understood that Epistar got rights for subsidiaries to use the technology?

**A.**   I believe that's correct.

**Q.**   And a different item in this license, Epistar also got rights to sublicense someone in China.  Do you remember that in Section 2.2?

**A.**   Let me look at that.

**Q.**   Could you pull up Section 2.2, please, Mr. Harper.  It's on -- there you go.  Top of the page.

**A.**   Yes, they got rights to do that and would pay royalties accordingly.

**Q.**   And no restriction on the type of company that could get that license?

**A.**   Other than the territory.

**Q.**   Okay.  I'm going to go back to the document camera, please.

Is it okay if I write an "A" in there for products for Epistar?

**A.**   Okay.

Q.   And for the '554 patent, check that?

A.   Yes.

Q.   '199, check that?

A.   Correct.

Q.   Foreign patents, check that?

A.   Yes.

Q.   Unknown patents, check that?

A.   Yes.

Q.   Subsidiaries, check that?

A.   Yes.

Q.   Sublicense rights, check that one?

A.   Yes.

Q.   Now, Lumileds, you know from your review that they also got a right to all their patents -- or all their products; correct?

A.   Yes.

Q.   I'll write an "A" in there.

     And a right to the '554?

A.   Correct.

Q.   And to the '999 -- '199?

A.   That's right.

Q.   And to some foreign patents?

A.   That's right.

Q.   And I believe unknown patents?  You might need to check that.

**A.**   I believe so.  We may want to check that to be sure.

**Q.**   That's DTX-1140.  And I believe the last page should be the list of patents again, or the next-to-the-last page.  There we go.

We've got the unknown patents.  Do you see that?

**A.**   Yes.

**Q.**   And it got rights for its subsidiaries?

**A.**   (Witness examines document.)  Let's look for that.  I don't remember that specific clause in this license.

**Q.**   Why don't we pass over that.  I'm sure the jury can find it, but I won't check it because I haven't showed it to you.

**A.**   Okay.

**Q.**   All right.  Then the one last thing I didn't check, there's three columns on my document camera chart that say Patent Families 1, 2, and 3.  Do you see those?

**A.**   Yes.

**Q.**   Now, those were in the SSC/Teledyne agreement; correct?

**A.**   They were.

**Q.**   They were.

Could you pull that back up, please, Mr. Harper.  It's DTX-1006 on page 20.  Blow up that section.

This is what SSC licensed from Teledyne in 2004; right?

**A.**   Not exactly.  This set of product families is included in the license and the amounts to be paid varied depending upon how many of these families were ultimately launched, and that

amount -- those amounts to be paid in addition to the 200,000 were not on my chart.

Q.   You're exactly right, that they had to pay different running royalties depending on which patent families they used. That's what you're saying?

A.   Different running royalties and different lump sums in addition.

Q.   Yeah.  But my question was:  They got rights to all these five patent families?

A.   If they wished to do so, they could pay for the right to use them.

Q.   They didn't have to get any further license or negotiation?

A.   That's right.

Q.   Is it fair to check those columns off in my chart?

A.   As long as there's an understanding that what you're checking off is not part of the $200,000 price tag and the 1 percent running royalty rate.

Q.   I'll agree with that.

A.   Okay.

Q.   But it's the case if they used the '209 patent, they had to pay the 1 percent?

A.   I believe that's correct.

Q.   Or if they used the '554 family, they had to pay the 1 percent?

**A.**    Yes, I believe so.

**Q.**    Or if they used Patent Family 1, they'd have to pay the 1 percent?  And there's a cap.  They couldn't go higher than 2?

**A.**    Well, you need to look at these other patent families if you want to get into the details, but they would have to pay an additional lump sum, and we'd want to check the running royalties.

**Q.**    All right.  Well, that's in the -- those financial details are in the agreement.

**A.**    Of course.

**Q.**    And the jury is able to check them as well; right?

**A.**    Sure.

**Q.**    Okay.  Ms. Davis, what was your hourly rate for doing this work?

**A.**    The firm bills $900 an hour for my time.

        **MR. SHAW:**  Thank you.  I'll pass the witness, Your Honor.

        **THE COURT:**  Thank you.

    Any further examination from SSC?

        **MS. WOODHOUSE:**  Yes, Your Honor, just a couple.

                        **REDIRECT EXAMINATION**

**BY MS. WOODHOUSE:**

**Q.**    So, Ms. Davis, picking up where Mr. Shaw left off, he talked a lot about these license agreements.

        And if we could pull the document camera up again.

And so we'll see here the date of a license to Lumileds is in 2004.  Do you see that?

A.   Yes.

Q.   And that's six years before your hypothetical negotiation?

A.   Eight years since the hypothetical negotiation would take place in 2012.

Q.   Sorry.  Bad math.

Does the difference in the date affect the analysis of the importance of this agreement?

A.   It affects all of these, because all of these are well before the popularity of these types of products caught on.  So as we heard -- or you heard and I read in the testimony from earlier this week, the portion of the market that is now covered by this type of technology is now 60 to 70 percent. Back in those days, it was less than 1 or 2 or 3 percent.

Q.   And I think we heard testimony earlier that these technologies enabled backlighting televisions?

A.   That's my understanding.

Q.   And do you know if that type of technology was available in 2004?

A.   I do not.

Q.   I'd like to direct your attention to DTX-1160.

And, Mr. Schmoller, if you could pull that up.  Do you have it?

And do you see the date on this document?

A.    Yes.

Q.    And what is it?

A.    This is from April 1, 2011, through March 31 of 2012.  So just before EDD was formed in April of 2012.

Q.    And if I could direct your attention to the third page of this.

A.    (Witness examines document.)  Okay.

Q.    And looking at the first two paragraphs -- sorry.  It's the page labeled DTX-1160-03.

A.    I have that.

Q.    Do you see the second paragraph --

A.    Yes.

Q.    -- where it discusses a challenging situation?

A.    I do.

Q.    Do you see above that it talks about the business impact of the earthquake in March 2011?

A.    Yes.

Q.    Would this challenging situation that Enplas was in affect how much it would pay for the license?

A.    Not necessarily.

Q.    Could it affect their willingness to license?

A.    Yes.

Q.    And if I could direct your attention to the remainder of the second paragraph where it talks about the rapid-fire growth in our operation.

**A.**    Yes.

**Q.**    And it also discusses including tapping the market for light-emitting diode LED TVs?

**A.**    Yes.

**Q.**    Would that affect the willingness to license?

**A.**    They certainly would be looking for the right to sell these kinds of products because that would be a way for them to tap the market for the LED TV-related products.

**Q.**    We saw a lot of manipulations of spreadsheets, if you recall, earlier.

**A.**    I do.

**Q.**    And we did some math and some sorting of columns, and you recall that?

**A.**    I do.

**Q.**    And I think that the result was that there might have been in some situations approximately a 3 percent difference between what you relied on and what the spreadsheets might have showed?

**A.**    At most.  I think in a couple years it was only about 1 percent.

**Q.**    And does that 3 percent affect your opinion today?

**A.**    No.  My opinion is not based upon a running royalty.  If it were, then that would affect the overall calculation.  But I think what it shows is that this is not the type of business where someone wants to structure a license based upon a running royalty related to U.S. sales only.

The running royalties that you saw on the other licenses were paid on worldwide sales, and that's why they would be willing to sign up for a running royalty, because that's easy. You can't -- you can't calculate U.S. soil -- U.S. sales with complete precision.

Q.   And going back to the spreadsheets, there was some math and manipulation involved to show or imply that the estimated amount of sales into the United States or the estimated amount of worldwide television sales could have been 3 percent lower of what you calculated.  Do you recall that?

A.   Could have been, yes.

Q.   And does that affect your opinion today?

A.   No.  It's not based on a running royalty, so it doesn't affect the lump sum.

Q.   And, lastly, there was some discussion about the Enplas plastic optic business.

A.   Right.

Q.   And there were some documents shown to you regarding different types of lenses?

A.   Yes.

Q.   Did you -- you've reviewed documents regarding the LE-Cap lenses; is that correct?

A.   Yes.

Q.   Can I direct your attention to DTX-1159?

A.   (Witness examines document.)

Q.   I think that's in the black binder.

A.   (Witness examines document.)   1159?

Q.   Correct.  It's in the third set of tabs.

A.   I found it.

Q.   Is this a document you reviewed in preparing your analysis?

A.   Yes, it is.

          MS. WOODHOUSE:  At this time I'd like to move 1159 into evidence.

          MR. SHAW:  Your Honor, I'm having trouble locating that particular document.  May I approach?

          MS. WOODHOUSE:  Yes.

                    (Counsel conferring.)

          MR. SHAW:  No objection, Your Honor.

          MS. WOODHOUSE:  Thank you.

          THE COURT:  1159 is admitted.

      (Defense Exhibit 1159 received in evidence)

          MS. WOODHOUSE:  Sorry.  I seem to have lost my place in the document.

                    (Pause in proceedings.)

BY MS. WOODHOUSE:

Q.   Let me move on from this one.  Actually, my apologies.

     If you could turn to the page numbered DTX-1159-26.

A.   I'm there.

Q.   And do you see there the first bullet point?

A.    I do.

Q.    And what does that say?

A.    "Major item shifted to LE-Cap."

Q.    And does this impact your opinion regarding the appropriateness of using the plastic optics business as a proxy?

A.    Yes.  This is one of the things I considered when I was trying to identify what portion of the business we should be looking at.

Q.    And then just one last -- one last question.  If we could go back to the document camera.

You mentioned earlier that the date of some of these hypotheticals -- or these license agreements might affect or might be different from the hypothetical negotiation?

A.    Yes.

Q.    If I start at the first one, the Lumileds license from May 15th, 2004, does the fact that that was in 2004, does that impact the importance of this license?

A.    It just suggests that a license negotiated in 2012 with the same conditions would be priced higher because of the popularity of the technology by that time.

Q.    So is it fair if I circle the licenses that might be priced higher in 2012 based on this chart?

A.    I'll let you negotiate that with Mr. Shaw, but it's okay with me.

MR. SHAW:  It's fine, Your Honor.

BY MS. WOODHOUSE:

Q.   So we'll go ahead and circle the Lumileds.

And the next one we see Epistar, and for that we have a date of December 1st, 2004.  Would that same situation apply here?

A.   It would.

Q.   So I'll go ahead and circle that.

A.   Yes.

Q.   And the next one we have is SSC from December 17th, 2004?

A.   Right.

Q.   And would the same situation apply here?

A.   Yes.

Q.   So I'll go ahead and circle that.

A.   Okay.

Q.   And the last one -- sorry.

The next one we have is 3M, and this date is August 1st, 2006?

A.   Yes.

Q.   This is slightly later than the 2004 dates that we've been discussing, but does the timing of that compare to when the hypothetical negotiation is provide any insight?

A.   The 2006 date is still well before the popularity of this technology took off.

Q.   So I'll --

**A.**    It would have the same effect.

**Q.**    So I'll go ahead and circle that as well.

**A.**    Yes.

**Q.**    How about the license to InteLED from May 1st, 2009?

**A.**    That's still true, to some extent, because even by 2009, the technology had not caught on the way it has now.  I think in 2009, that's when the testimony suggested that it was still at 1 to 3 percent of the market.

**Q.**    So I can go ahead and circle that as well?

**A.**    You can.

        **MS. WOODHOUSE:**  Thank you, Ms. Davis.  I have no more questions.

        **THE COURT:**  Mr. Shaw, do you have any further examination?

        **MR. SHAW:**  No, Your Honor.

        **THE COURT:**  All right.  Ladies and gentlemen, we'll take a ten-minute break now.  Return at 2:05.

     If you have questions during that period, you may ask them to the witness.  As with prior experts, we will not allow her to give any new opinions, only to explain those she's already delivered.

     Ms. Davis, if you can stick around for 10 more minutes at least.

        **THE WITNESS:**  Of course.

        **THE COURT:**  Thank you.

We're in recess.

(Recess taken at 1:55 p.m.)

(Proceedings resumed at 2:03 p.m.)

(Proceedings were heard out of presence of the jury:)

THE COURT:  We are back on the record.

MR. SHAW:  Your Honor, I didn't give a demonstrative exhibit number to that chart.  I'm happy to do it in front of the jury.  We've agreed on a number.

THE COURT:  We can do it right now.

MR. SHAW:  We called it PDX-500, so I knew it was not used.

THE COURT:  All right.  We'll designate that as PDX-500.

(Plaintiff's Exhibit 500 marked for identification)

THE COURT:  The jury has no questions for the witness, so --

Ms. Davis, you are excused.

THE WITNESS:  Thank you.

THE COURT:  And while the jury is not here, what will be next?

MR. GOTTS:  Your Honor, Ms. Davis was our final witness subject, of course, to our leaving our case open to examine EDD's witnesses.

So we hand the floor over to Mr. Labgold.

THE COURT:  So when the jury comes back in, I'll give

you two minutes to update them on where you're going in the case.  Again, an opening statements not closing arguments dial to give them just a little procedural outline.

All right.  Let's bring in our jury.

(Proceedings were heard in the presence of the jury:)

THE COURT:  All right.  Our jurors are returning.

We may be seated.

Ms. Davis has been excused with the conclusion of her questioning.

We have reached a milestone in the case, in that we're passing the baton back to EDD to call the next witness.

I thought, given that it's Friday afternoon, and we've gone through some of the case but not all of it, that I'd give the attorneys just a two-minute opportunity just to update you on their expectations for the evidence to come during the next phases of the case.

Again, what the attorneys say is not evidence itself. It's just their statement of what they expect will be occurring.

I'll let EDD go first.

MR. LABGOLD:  Thank you, Your Honor.

Good afternoon.  So just to give you a little heads up on our roadmap, while not clearly delineated whose case we were in because we were taking adverse questioning of their witnesses so we wouldn't have to call them back at the same time, the

same thing will happen with our witnesses.

So we're kind of in a brackish water kind of phase here when we're coming to the fact witnesses.

The first fact witnesses -- the first witness we're going to call is going to be Mr. Yamaguchi.  He's an engineer.  He'll be introduced in a moment.  After that we'll have Mr. Akiyama.  He works in the Department of Development.  And then after that we'll have Mr. Murano.  He's in sales.  You've heard his name a couple times.  And then following that we'll have Dr. Pollock, who is our expert.  He'll be talking about both infringement and invalidity.  And after that we'll proceed back and we'll close our case.  There will be some more of those exciting deposition read-ins, and fortunately they're short.

THE COURT:  Thank you, Mr. Labgold.

And an update from SSC?

MR. GOTTS:  Thank you, Your Honor.

Good afternoon, ladies and gentlemen.  It's been a while.  I've let everybody else do the work all week.  But you'll hear a lot more from me in the second part of the case.

You know where we've been.  We heard from the inventor who told you about the invention.  We've heard from Dr. Nam, who told you about how the parties interacted.  And Mr. Ryu.  So we sort of talked about how the parts got to where we are.

We talked about damages.

We talked about infringement.

There are issues in the case called induced infringement, which is now talking about how the activities outside of the U.S. impact the case.  And the judge will instruct you on that later.

And we're going to have witnesses -- examination of the EDD witnesses on those sorts of issues, as well as issues related to willfulness going to the issue of infringement.

And as you recall, Dr. Moore did not address yet the questions of validity.  Dr. Pollock will get to go first on that.  Then you'll hear from Dr. Moore again on the invalidity issues of the case, and then they get to speak again too.  So it goes back and forth several times.  But we are getting there, I promise you.

And thank you for your patience and your attention.

THE COURT:  Thank you, Mr. Gotts.

All right.  So if EDD will call forward Mr. Yamaguchi.

MR. LABGOLD:  Thank you, Your Honor.  We call Mr. Masao Yamaguchi as our first witness.

It will be interpreted.

Mr. Yazaki is the official interpreter.

THE COURT:  Thank you.

MR. LABGOLD:  And he will need to be sworn in.

THE COURT:  We'll swear in our interpreter, I suppose.

MR. LABGOLD:  Actually, do we have -- please, we should have her come forward so she could be sworn at the same

time.

THE INTERPRETER:  Teresa Sumiyoshi, S-U-M-I-Y-O-S-H-I.

THE COURT:  All right.  Swear in both interpreters.

**TOYU YAZAKI**,

official court interpreter for the Plaintiff, translated from the English language into Japanese, and from Japanese into English, as follows:

**TERESA SUMIYOSHI**,

official court interpreter for the Defendant, translated from the English language into Japanese, and from Japanese into English, as follows:

THE INTERPRETER:  Yes, I do.

THE INTERPRETER:  I do.

THE COURT:  Thank you.  And now for the witness, we will swear him in.

**MASAO YAMAGUCHI**,

called as a witness for the **PLAINTIFF**, having been duly sworn, testified as follows:

THE WITNESS:  Yes, I do.

THE CLERK:  Please be seated.  Please state your full name for the record.

THE WITNESS:  I'm Masao Yamaguchi.  Good afternoon.

**DIRECT EXAMINATION**

BY MR. LABGOLD:

Q.  Could you please briefly introduce yourself by giving your

name and what your current position or company you work for?

A. I am Masao Yamaguchi. I work at Enplas Display Device Corporation as the head of the Development Department.

Q. And how long have you been in the position of the head of the Development Department?

A. I've been at that -- head of the Development Department position ever since the founding of Enplas Display Device, so that would be since 2012.

Q. And did you attend university?

A. Yes.

Q. Which university did you attend?

A. That is Oeta University in Japan.

Q. And what degree did you receive?

A. I have a master's.

Q. And what is your master's in?

A. In energy engineering.

Q. And what is energy engineering?

A. That would be the discipline that would encompass both mechanical engineering and electrical engineering.

Q. Prior to 2012, who were you employed by?

A. I was working at Enplas Corporation.

Q. And what was your position at Enplas Corporation for the founding of EDD?

A. My position was that of a group leader.

Q. And what specific group?

**A.**    That was the Development Group.

**Q.**    And what is Enplas known for?

**A.**    Enplas is well known as a company having the capability to produce high-precision plastic molded, high-performance parts in large numbers repeated.

**Q.**    And what are some of the industries that Enplas Corporation serve?

**A.**    The examples of the products that we manufacture would be high-performance precision plastic gears; for example, the gears that are used in printers.

In the past, in the world of cassette tapes, we had a greater than 50 percent global share of the plastic reels which are used in the cassette tapes.

In addition to the aforementioned, we sell, manufacture and sell test sockets for semiconductor devices.

In addition to that, we manufacture optical parts which are used in optical fibers for communication purposes.

**Q.**    Now, which businesses -- which technology areas were taken out of Enplas into EDD?

**A.**    The company Enplas Display Device was founded for the purpose of expanding the sales of the product which I had developed, namely the diffusion lenses for use in LCD tvs.

**Q.**    Now, before we get into EDD itself, what projects did you work on starting at Enplas Corporation?

**A.**    I was working on the development of plastic parts to be

used with LEDs being used as light sources.  One example would be the mobile phone application -- one example of the work which I was doing would be the development of the light guide panel to be used in the application of edge backlighting for displays used in, for example, PCs, notebook or PCs, and mobile phones.

The other example would be the development of optical parts to be used for illumination purposes.  And when I say illumination purposes, I mean for sign boards.

One other example would be the development of the optical part, namely the diffusion lenses to be used as direct-type backlighting for TVs.

**Q.**   Now, briefly, with regard to edge-lit, is that the same type of technology that's used with the lenses that are involved in this case?

**A.**   No.  The technology used would be completely different.

**Q.**   And just briefly, what is meant by edge-lit?

**A.**   Please assume that this folder is a light guide, and the illuminated LEDs would be located at the edge like where I just pointed out, and the flat surface of the folder is the display surface.

So how the light guide panel works in edge-lit application would be that assuming that this folder is the light guide panel, the LEDs would be located at the edge surface of the light guide panel, and the light that is emerging from the LED

would be bouncing through within the light guide panel and would be propagated within the light guide panel.  But there will be provided on the surface of the light guide panel places where the light can escape out.  So that would be the light guide panel for an edge-lit application.

Q.   Now, you also talked about sign boards.

A.   Yes, I did.

Q.   What is meant by sign boards?

A.   When I say "sign boards," I mean the signs which are located in Japanese train stations, and these would be boards serving as a map to show what the landmarks are located near the station.  And that is what I mean by a sign board.

Q.   And these are backlit somehow?

A.   That's right.

Q.   Now, finally we come back to televisions.

And what is your work on the direct backlighting?

A.   That work had to do with the use of the diffusion lens placed above the light source, which is the LED, the function of the diffusion lens, to make sure that the brightness and distribution on the TV display surface would be even.

In the absence of any diffusion lens, if the LED light surfaces were to be arranged in the matrix, what would happen is there would be hotspots or bright spots that would be created on the TV display surface.  That would result in a TV which would have a very uneven brightness rendering the TV

difficult to look at, not pleasant to look at.

The light coming from LED is known for its very strong directionality.  It would be emitting light in the forward direction very strongly.  So the purpose of the use of the diffusion lens is to spread out the directional light coming from an LED, so that the lighting, the brightness on the TV surface would be even.

Q.    And were you involved in the development of these diffusion lenses?

A.    Yes, I was the inventor, and I did all the work through commercialization.

Q.    When did that work start?

A.    The development occurred in 2003, and the patent filing was done in 2004.  And the first commercialization happened in 2009, in use in Sharp TVs.  Sharp being a Japanese company.

Q.    Other than Sharp, were there any other companies that started using it in that time frame?

A.    No, there wasn't.

Q.    Sharp was -- Sharp was the first?

A.    Sharp was the first.

Q.    Now, when you say "diffusion lens," what do you mean by that?

A.    Explaining what a diffusion lens is just by words is not easy.

Would it be okay for me to draw to explain?

MR. LABGOLD:  Would Your Honor -- could we use the pads so he can describe?

THE COURT:  If you brought some materials for him to draw, you can draw, yeah.

THE WITNESS:  May I stand up?

THE COURT:  Yes, you may.  Thank you.

BY MR. LABGOLD:

Q.   First, Mr. Yamaguchi, if you can describe what you're referring to with -- let me ask it this way.

Your diffusion lenses, how did you go about developing the design?

A.   In describing the diffusion lens, the lens is going to be axially symmetrical, so I'd like to explain only one-half of the lens.  The other side would be a symmetrical shape.

So there's the center of the LED, which is the light source.

Q.   I think you're going to have to stay seated.  So maybe if -- I'll move the easel back just a little bit?

A.   Yeah, I can't see.

Q.   Where would be best for the jury?

A JUROR:  In front of the chair to your left is fine.

MR. GOTTS:  Your Honor, is it okay if I relocate so I can see?

THE COURT:  You may.

MR. GOTTS:  Thank you.

THE WITNESS:  So there is the LED.  And I'm now drawing the center line.  And light coming from an LED, unless nothing is done to it, it would travel in a straight line.

THE COURT:  One second.  Where is the feedback coming from?

(Pause in proceedings.)

THE COURT:  All right.  See if that helps.

THE WITNESS:  So what we want to do is this.  We want to avoid the situation where light coming from the LED would be traveling in a straight line, only that direction.  So what we want to do is to bend the light in an outward direction.

And the manner in which the bending of the light from the LED is done is by way of the diffusion lights.

And the diffusion lens would have two surfaces, a first surface --

THE COURT:  One moment.  Time out.  We need to turn that off, because I think the jury's ability to follow with a high-pitched screech will be diminished.

(Pause in the proceedings.)

THE WITNESS:  So the diffusion lens would have two surfaces:  A first surface and a second surface.  And the light from the LED that strikes the first surface will be bent slightly in an outwardly direction, just as I drew here.

And what we want to do is to bend that light.  One is bent even further by way of the second lens surface.  And so we want

the second lens surface to have that sort of angle at that spot.  And by so doing, the light once bent will be even further bent by the second surface.

And by the very nature of light and its behavior, light that is bent refracted in this way will not be reflected.  There will be no reflection taking place at that spot.

The other way of stating this, the converse would be that light that is reflected will not be refracted.  It will not be bent.  Light reflected will not be refracted.

So what we want to do is to bend all of the light that is coming from the LED.

THE COURT:  All right.  We're going to take a recess to see if we can solve that problem.

So I apologize, ladies and gentlemen.  I'm not sure what the technical problem is, but if we come back in five minutes, we're hoping that our technical problems will be solved.

Back in five minutes.

(Discussion held off the record.)

(Recess taken at 2:30 p.m.)

(Proceedings resumed at 2:33 p.m.)

(Proceedings were heard out of presence of the jury:)

THE COURT:  We're back on the record.

The jury is not present.  Hopefully we have the technical issues solved.  It's a test, I think, of all of our age whether you hear that pitch or not.

(Laughter)

THE COURT:  If the attorneys are hearing it and I'm not, raise your hand, because I think the jury is being distracted, and that's the last thing we want as well.

MR. LABGOLD:  Thank you, Your Honor.

Yeah, I was just barely able to hear it.  But it was the barking dog that heard it.

THE COURT:  So let's bring in our jury and hope their hearing has not been damaged permanently.

(Proceedings were heard in the presence of the jury:)

THE COURT:  All right.  Our jurors are returning, hopefully with their hearing not impaired.

I think we fixed the technical problems.  I apologize for the technical problems, and hope they will not recur.

Please be seated.

BY MR. LABGOLD:

Q.  So Mr. Yamaguchi, so you've drawn one light ray.

Can you proceed to explain -- continue your explanation?

A.  So I showed by an example one light ray, how the light rays are bent.  And we want to make efficient usage of the light from the LED, such light that is coming out from the LED within a certain, certain range.

Let's say we focus on a light ray coming from the LED in a very angled direction, such as this light ray (indicating).  With respect to the light that's coming from the LED, that is

centrally, forwardly directed, we want to bend those light outwardly as much as possible, but we don't want to bend those outwardly directed light to begin with even further outward.

So what we do in the designing of the first lens is that the angle, for instance, of the light ray into that spot on that first surface would be close to perpendicular, so that refraction doesn't occur.

And a similar thing is done with the second surface of the lens, which is the upper surface of the lens.  We want the relationship between the light ray that is instant to that thus far on the second surface, and the angle of the second surface to be nearly perpendicular so that there's not much refraction that happens.  So this sort of bending of the light coming from the LED would be done on the different light rays coming from the LED.  So this process is repeated.

So eventually what happens is that we would determine what the shape of the point on the second surface of the lens, the upper surface would be for many points.  And when you connect all of those second surface points and its angles, then you arrive at a continuous contour, a profile of the upper lens surface.

So our patent is the technology that would allow the light coming from the LED to be outwardly bent in a controlled way.  That is our patent.  And this is the principle of a diffusion lens.

Q.   Okay.  So please, if you could return.

Were you involved in the development of any commercial products that used this design of yours?

A.   Yes, I was the inventor.

MR. LABGOLD:  I'd like to hand the witness, if I may Your Honor?

THE COURT:  You may.

BY MR. LABGOLD:

Q.   Plaintiff's Trial Exhibit 106.

If you could tell me if you've seen that before.

A.   Yes, I have.

Q.   And what is that?

A.   This is the diffusion lens which was used in the Sharp product.

MR. LABGOLD:  Okay.  If I could publish it -- oh, I'd like to move the admission of Plaintiff's Exhibit 106.

MR. GOTTS:  No objection, subject to our limited relevance caveat, Your Honor.

THE COURT:  All right.  Exhibit 106 is admitted.

(Plaintiff's Exhibit 106 received in evidence)

MR. LABGOLD:  If I may hand it to the jury.

THE COURT:  You may.

MR. LABGOLD:  Thank you, Your Honor.

Q.   Now I'd like you to refer to Plaintiff's Exhibit 105.

A.   Yes.

Q.   Have you seen that document before?

A.   Yes, I have.

Q.   And is that your name listed in the category under the "Designed By"?

A.   That's right, this is my name.

        MR. LABGOLD:  I'd like to move the admission of Plaintiff's Exhibit 105.

        MR. GOTTS:  No objection, again subject to conditional relevance, Your Honor.

        THE COURT:  Exhibit 105 is admitted.

     (Plaintiff's Exhibit 105 received in evidence)

        MR. LABGOLD:  I'd like to pull that up, please.

Q.   So over down here (indicating), what does it indicate where your name is listed?

A.   Among the information that is included in this section would be the name of the product, the product name, and also the name of the designer.

Q.   And who is indicated as the designer?

A.   Myself.

Q.   Is the 4922 lens the first lens that was prepared for Sharp?

A.   There was a lens that preceded this which was designed for Sharp.

Q.   Now, if we could pull out -- I'd like to focus on this view up here (indicating).

A.    Yes.

Q.    And Mr. Yamaguchi, could you explain what that view is, with respect to the lens?

A.    This would be the plan view of the lens, but looking at the lens top down.

Q.    And moving over to the right of the document, what is indicated here?

A.    This is again the plan view of the lens, but looking at the lens bottom up.

Q.    And this circle right here (indicating) in the center, what does that indicate?

A.    So that is the first surface of the lens, which would be the surface onto which light from the LED would be striking, would be incident.

Q.    And with regard to your design drawing, where would that be on the drawing?

      Oh, you don't have to draw it.  You could just point to it.

A.    So this just shows the one-half of the lens.  So the same thing as this would be over here (indicating), and we are looking at this portion here (indicating).

Q.    Now, referring back -- calling out of the document here, looking down in this portion (indicating), what is indicated down there?

A.    Shown here would be the profile of the lens looking at the

lens from the side in a cross-section with the cross-section being taken at dead center of the lens.

Q.   And first of all, why does it seem uneven?  It's not symmetrical.

A.   That would be best answered by looking at the view above this, which we looked at earlier.  Even though the lens portion itself is completely symmetrical, the portion of the lens that has the optical function is completely symmetrical.  The rest of the lens is not entirely symmetrical between the left half and the right half, and so when you look at it from the side, it is not perfectly symmetrical between the left side and the right side.

Q.   Now, going back down where we were, on the side view of the profile, what are all the numbers that are listed here (indicating)?

A.   Various dimensions.

Q.   And why are some of them crossed out on this document?

A.   That shows the revisions and the modifications which were made to the lens in the pursuit of better performance, in other words, and even more evenly distributed brightness of the TV surface.

Q.   So was -- does this document get changed during a development stage or what stage does it get changed at?

A.   The revision can happen during the development stage, but also after mass production has been done if the pursuit of

better performance requires such a revision.

Q.   Now, zooming out, the document that's represented as 105, what is this document used for?

A.   This would be a manufacturing document which is meant for EDD internal use.

Q.   Now, looking at Plaintiff's Exhibit 104 --

A.   Yes.

Q.   You'll see that -- what is this document?

A.   This is a drawing from the diffusion lens meant for Sharp.

MR. LABGOLD:  And what is -- what's done with this version -- let me -- can I move the admission of Plaintiff's Exhibit 104?

MR. GOTTS:  No objection, conditional relevance.

THE COURT:  104 is admitted.

(Plaintiff's Exhibit 104 received in evidence)

MR. LABGOLD:  If we can pull that up.

Q.   So this document is slightly different from the previous version.

What is this one used for?

A.   This would be the drawing that would be given to the customer.

Q.   Okay.  And then zooming in at the numbers down here (indicating).  For example, this number here (indicating) 1.508 plus or minus 0.05, why is there a plus or minus value?

A.   That represents the tolerance that is provided for the

number that is given ahead of it, and this would be the tolerance that would be allowed in terms of achieving the even illumination of the TV surface, the tolerance that's allowed.

Q.   And tolerance at what process?  What do you mean by "tolerance"?

A.   The tolerance would describe the range within which a particular dimension would have to fall in order for the design performance to be manifested.

Q.   And are these measurements, are they accurate?

A.   These are accurate numbers.

Q.   And just briefly turning back to PX-105 to the same place, we see here these numbers are the same numbers, but the plus or minus value is now 0.02.

    Why is -- what's the reason for the difference?

A.   The document that is meant for internal use has a tighter tolerance that is specified than the one for our customer use, and the reason is that since we are the manufacturer, we want to be manufacturing under a tighter tolerance so that what we produce would be all good items.

Q.   Now, the shape that's shown here, is this accurate to scale?

A.   These are not drawn to scale.  The dimensional values given are correct, but the graphic representation is not done to scale.

Q.   And is there additional information that's required beyond

this design drawing for the manufacturer of a lens?

**A.**   That's right.

**Q.**   And what type of information is that?

**A.**   Looking at this design drawing, this does not show detailed data concerning the profile, the contour of the lens. That information is not here.

**Q.**   Now I'd like you to turn to PX-102.

**A.**   Yes.

**Q.**   And have you seen this information before?

**A.**   Yes, I have.

**Q.**   And is this a document you're familiar with from your ordinary course of business?

**A.**   Yes.

     **MR. LABGOLD:**   I'd like to move the admission of Plaintiff's Exhibit 102.

     **MR. GOTTS:**   No objection, Your Honor, conditional relevance.

     **THE COURT:**   102 is admitted.

   (Plaintiff's Exhibit 102 received in evidence)

     **MR. LABGOLD:**   And if we could just pull up the first page here.

**Q.**   What is this string of numbers?

**A.**   You can see to the right of the row of numbers a graph, what appears to be a graph.  This would be the depiction, inside view of the contour of the upper surface of the lens.

So this shows the lens, just one half, because the other half is symmetrical.  It just shows the one-half.  And the detail values associated with the -- associated with the different points on that contour is listed in a tabular form as numbers.

Q.   And I notice up here there's an indication there's an "M." What is that in reference to?

A.   That letter designates the shape of the lens that I designed.  This happens to be the M-shaped lens, that's why "M."

Q.   And where is this -- where does this data -- what is it used for?

A.   This would be used for the purpose of shaping the lens.

Q.   And where is it maintained?

A.   This data will be stored as electronic files in a shared folder at the EDD headquarters.

Q.   Now, I'd like you to turn to Plaintiff's Exhibit 103.

And what is indicated here?

A.   Shown here would be the data for the first lens surface, which is the cavity in the lens.

MR. LABGOLD:  I'd like to move the admission of Plaintiff's Exhibit 103.

MR. GOTTS:  No objection, Your Honor, conditional relevance, please.

THE COURT:  103 is admitted.

(Plaintiff's Exhibit 103 received in evidence)

**MR. LABGOLD:**  And if we could just pull up the first page in the same fashion.

**Q.**   And so what is depicted in the graph here?

**A.**   Shown here would be the contour, the profile of the first lens surface, one side of that, and also the numerical data associated with the different points on that contour, the profile.

**Q.**   Now, with these two sets of data and the design drawing, is there anything -- any other additional information that's required to manufacture the lens?

**A.**   No.  As long as you have the dimensional information and the information having to do with the shape of the lens, actual lenses can be manufactured.

**Q.**   Other than manufacturing, is this data used for any other purpose?

**A.**   These data would be used for the purpose of simulation, which may be run during the design phase.

**Q.**   And by "simulation," what are you referring -- what type of simulation?

**A.**   The simulation I am talking about is a simulation done using a commercially-available and sold as software called Light Tools, and this would be an optical design simulation tool, and we would use it for design purposes.

**Q.**   And are there any outputs that you make from that?

**A.**   Yes, they would output things.

Q.   And what type of output would you make?

A.   That software can do ray tracing simulation.  By ray tracing I mean an analysis similar to what I just showed you manually (indicating).

Q.   And have you used that in the design process?

A.   I do that routinely.

Q.   Now, I'd like to refer you just briefly to PX-112 and 113.

A.   Yes.

Q.   And what is represented there?

A.   Shown here would be the lens profile data, the lens contour data, similar to what we just saw.

Q.   And for which lens is this?

A.   That would be the 9845.

     MR. LABGOLD:  I would like to move the admission of Plaintiff's Exhibit 112 and 113.

     MR. GOTTS:  No objection, Your Honor, conditional relevance.

     THE COURT:  112 and 113 are admitted.

     (Plaintiff's Exhibits 112, 113 received in evidence)

BY MR. LABGOLD:

Q.   If you could refer to Plaintiff's Exhibit 118 and 119?

A.   Yes.

Q.   And what's set forth in those documents?

A.   This is the lens surface contour data, similar to what we just saw.

Q.   For which lens?

A.   That would be the 9853A.

          MR. LABGOLD:  I'd like to move the admission of PX-118 and 119.

          MR. GOTTS:  No objection, Your Honor.

          THE COURT:  118 and 119 are admitted.

      (Plaintiff's Exhibits 118, 119 received in evidence)

          MR. LABGOLD:  Just briefly if you could pull up PX-118.

     There's an indication -- could we have the right spot? Thank you, Mr. Harper.

Q.   Right up at the top here there's a "K."

     What is that referring to?

A.   It means that this is the K lens, which is a lens I designed.

Q.   Now I'd like to refer to Plaintiff's Exhibit 124 and 125.

     What are these documents?

A.   Again, this is a set of point data for the lens profile.

Q.   Which lens?  Which lens?

A.   That's the 9854D.

          MR. LABGOLD:  I'd like to move the admission of Plaintiff's Exhibit 130 -- oh, sorry, 124 and 125.

          MR. GOTTS:  No objection, Your Honor.

          THE COURT:  124 and 125 are admitted.

      (Plaintiff's Exhibits 124, 125 received in evidence)

**BY MR. LABGOLD:**

Q.    Plaintiff's Exhibit 130 and 131, please.

A.    Yes.

Q.    And what do these represent?

A.    Again, this is the point data describing the lens contour, but for the 9854E lens.

Q.    And what type of lens upper surface is represented in PX-130?

A.    This is the data for the L lens, which is a lens I designed.

Q.    How many different -- well, let me ask.

      Is the L lens a standard lens surface?

A.    Yes.

Q.    And what about the M lens?

A.    Yes, the M lens would be a standard lens in our lens product lineup.

Q.    How many standard upper surfaces are there?

A.    In terms of the lenses which I designed, there are four.

Q.    And with regard to the lower surfaces, how many lower surfaces?

A.    In terms of the type of lens we're talking about here, there is one lower lens surface, one type.

            MR. LABGOLD:  And did we move the admission?

            THE COURT:  You did not.

            MR. LABGOLD:  I would move the admission of

Plaintiff's Exhibit 130 and 131.

MR. GOTTS:  No objection, Your Honor.

THE COURT:  They're admitted.

(Plaintiff's Exhibits 130, 131 received in evidence)

BY MR. LABGOLD:

Q.   And last but not least, PX-136 and 137, please.

A.   Yes.

Q.   And what lens does this data represent?

A.   Shown here would be the point data for the contour of the upper and the lower surface of the lenses for the lens 9879.

MR. LABGOLD:  I'd like to move the admission of Plaintiff's Exhibit 136 and 137.

THE COURT:  They are admitted.

(Plaintiff's Exhibits 136, 137 received in evidence)

BY MR. LABGOLD:

Q.   If you could briefly turn to what's in your binder DTX-1004.

A.   Yes.

Q.   Have you ever seen -- prior to this lawsuit, had you ever seen this patent before?

A.   No.  Only after the start of the lawsuit did I come to know of this patent.

Q.   Is your lens design based upon total internal reflection?

A.   No, that is not the case.  As I mentioned earlier, refraction is the only principle used.

          MR. LABGOLD:  I have no further questions, Your Honor.

          THE COURT:  Thank you.  Examination by SSC.

          MR. GOTTS:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. GOTTS:

Q.   Good afternoon, Mr. Yamaguchi.

A.   Good afternoon.

Q.   My name is Larry Gotts.  I am one of the attorneys for SSC?

A.   Nice to meet you.

Q.   Nice to meet you.  Can we start by taking a look at your chart.

     I want to grab a pen.  And if I may approach, Your Honor?

          THE COURT:  You may.

BY MR. GOTTS:

Q.   I'll try to keep my voice up so that you could all hear me.  And let me know if you can't, please.

     So sir, this is your drawing of the diffusion lens; right?

A.   Yes.

Q.   And what you've drawn in the bottom portion of the lens is the LED as a point source; right?

A.   Yes.

Q.   And if we were to look at the engineering drawings that you put up, the opening of the bottom of the lens typically is -- well, maybe you could look at an engineering drawing.

How wide is this opening (indicating) typically in a lens?

A.   Just a second, please.

Q.   Sure.  Take your time.

MR. LABGOLD:  105.

THE WITNESS:  Shown here in 105, is that the diameter of the opening -- is 3.53, so that would be the diameter.

BY MR. GOTTS:

Q.   So half of it would be about 1.75; right?

A.   I'm not quick to do math, so I can't do that calculation in my mind.

Q.   Okay.  Well, 3.5 divided by 2 is 1.75; right?  I can get you a calculator.

A.   For 3.5, yes, it's 1.75, if divided by two.

Q.   So 1.75 would be the radius or half of it; right? Approximately?

A.   Yes.

Q.   And what's the diameter of the emission surface of the LED that's used with, say, your 4922 lens?

A.   I'd say the diameter would be between 2 and 2.5 millimeters.

Q.   Okay.  So why don't we pick an average, 2.2, for discussion; okay?

A.   Fine with me.

Q.   So this LED isn't really a point; right?  It actually extends roughly 1.1 millimeters in this direction (indicating);

right?  Approximately?

**A.**   Are we assuming here that the LED is a single chip, that there is a single LED chip?

**Q.**   Yes.

**A.**   Now, in the case of an LED dye, a single chip, typically it's a 1.0-millimeter or a 1.1-millimeter square.  And light emission from an LED is the strongest at the dye, and the rest of the LED is where phosphorus are placed so that there could be a glow from there.  But the light intensity from the phosphorus is weak, so the LED's light is strongest where the dye is, which would be at 1.0 or 1.1-millimeter square.

So even though the LED diameter may be 2.2 millimeters, the strongest emission comes from only the dye portion, which is at 1.0 or 1.1-millimeter square.  Are you ignoring that fact?

**MR. GOTTS:**  Your Honor, move to strike as non-responsive.

**THE COURT:**  Overruled.

**BY MR. GOTTS:**

**Q.**   Now, sir, the way this works is I get to ask you questions, and you get to answer them; okay?

**A.**   I don't know exactly what the procedure or the rules of the examination process is.  But are you saying that if I were to have a question I need to have answered, I could not ask such a question to you?

**Q.** You're supposed to answer my questions.

THE COURT: Mr. Gotts, hold on a second.

It's a question-and-answer proceeding, but if your answer requires you to explain your answer, you may do so.

THE WITNESS: When it comes to a conversation with LED manufacturers, we talk in the context of the dye size. And with respect to the peripheral portion, the light coming from those peripheral portion would be weak. So that's why when we talk with LED manufacturers, we talk in terms of the dye size. So I just wanted to get that point across to you.

BY MR. GOTTS:

**Q.** Fine. Now, let's answer my question.

You would agree that the emission diameter or the radius going in this direction is approximately 1.1 millimeters? Yes or no?

**A.** Yes.

**Q.** Thank you. You haven't drawn any of the rays on your drawing that come from any part of the emission diameter other than the center, which I'm circling in purple; isn't that right? Yes or no?

**A.** It's not so much that I am ignoring the light coming from a point other than the center of the LED, but what I'm saying is that when I do the design work, this is how I do the design, with light coming from the center.

In terms of the simulation, one would be able to do, in

terms of the simulation capability to use a light source that is not dead center, it can be done if you want to do it, in terms of the simulation capability.

Q.   Great.  So you could simulate a light ray coming off from a point at the end of the emission diameter, such as the one I've shown in purple; right?

A.   Yes, you can do that capability-wise, yes.

Q.   Great.  And you have not -- it's true, is it not, that a light ray coming off the emission diameter from the remote portion could exhibit total internal reflection; right?

A.   I would believe otherwise.  I don't think -- I would not think there would be a total internal reflection coming off in terms of the light coming from the edge of the emission diameter.

I would like to ask you why you think that is possible? That's a question from me to you.  So if you could -- if you can tell me what the behavior of that light coming from the edge is, I would like to be told by you.  I don't know what the behavior of that light would be, Counsel.

Q.   You don't know.  You don't know; right?

A.   No.  What I'm saying is that I know the behavior of light coming from that edge portion.  But if you are saying that that would undergo a total internal reflection, that I cannot buy into.

In my case, if I were to do the ray tracing from the light

coming from the edge, it would not undergo a total internal reflection.

Q.   Did you prepare the ray traces for Dr. Pollock?

MR. LABGOLD:  I would just object, Your Honor.  They moved to exclude that specifically, so --

MR. GOTTS:  It's my only question.

THE COURT:  Overruled.  I didn't hear the answer.

THE WITNESS:  Yes, I did.

BY MR. GOTTS:

Q.   Okay.  We'll just look at those with Dr. Pollock then and see if they have TIR; is that okay?

A.   Okay, yes.  So you're not going to tell me why that light coming from the edge would undergo a total internal reflection?

THE COURT:  He doesn't have to.

(Laughter)

THE WITNESS:  I see.

BY MR. GOTTS:

Q.   I think you want to switch seats; right?

A.   No, I'm not saying that.  I don't know the rule, the procedure of how things are to transpire here.  But I thought you were going to tell me why that ray would undergo a total internal reflection.

Q.   Okay.  Now, you mentioned that in the design phase you conduct simulations with light tools; is that right?

A.   Yes, I did.

**Q.** And you did that for every custom-designed lens; right?

**A.** I just do the basic design.

**Q.** Does Enplas do a simulation for every custom-designed lens?

**A.** That is not work I do. That is not my work. So on the matter of whether or not the simulation is done for every custom-designed lens, I do not know. One thing I can say is that with respect to the project in which I was involved, such simulation was done.

**Q.** Were you involved in the project for the 4922 lens?

**A.** Yes.

**Q.** Were you involved in the project for the 9845 lens?

**A.** No, I was not, not in that one.

**Q.** Did you run simulations for the 4922 lens?

**A.** I did, yes.

**Q.** Where are those simulations?

**A.** That should be in the shared folder at Enplas.

**Q.** Is there any reason Enplas's simulations were not provided to SSC in this case?

**A.** I don't know anything about that.

**Q.** Are you aware there's not a single pre-lawsuit simulation produced in this case?

**MR. LABGOLD:** Objection, Your Honor. Goes to the procedural order of the Court.

**THE COURT:** Sustained. Next question.

Mr. Yamaguchi, that means you don't have to answer the question.

THE WITNESS:  Thank you.

MR. GOTTS:  Chris, could we pull up PX-102, please? Sorry, 103.

Mr. Yamaguchi, PX-103 is one of the simulation datasets that you discussed in your Direct Examination; isn't that right?

A.   Yes.  These are data, but not just for simulation, but also for manufacturing.

Q.   Right.  Now, if you could tell me first, sir, see under the "Y" there is a number 3, and then point, and then there's six zeros; do you see that?

A.   Yes.

Q.   So does 3.000000 represent the height of the inner surface?

A.   Yes.  Let me put it this way.  That represents the height of the top point of the first surface, the lower surface.

Q.   So that's the distance from the bottom of the lens to the top point of the inner surface; right?

A.   It should.

MR. GOTTS:  Okay.  Chris, why don't we go to PX-126, please.

Q.   Mr. Yamaguchi, PX-126 is the --

A.   Did you say 126?

**Q.**   I did.  That's the engineering drawing for the 9854D lens; correct?

THE INTERPRETER:  The witness is saying that he doesn't have 126.  He sees 125, but not 126.

THE WITNESS:  You did say 126?  It goes from 125 to something in the 130s.

MR. GOTTS:  Okay.  Let me go ahead, and we're going to put up -- no, pull it down until I offer it here, Chris.

**Q.**   Mr. Yamaguchi, I'm going to show you what's been marked by plaintiffs as Plaintiff's Exhibit 126, and I'd ask you to take a look at this and tell me what it is.

**A.**   This is a design drawing for the 9854D.

**Q.**   Okay.  And I believe you indicated in your Direct Examination that these design drawings are intended to be accurate; correct?

**A.**   Yes.

MR. GOTTS:  Okay.  Now, sir, could you please turn -- Your Honor, I offer Plaintiff's Exhibit 126?

THE COURT:  It's admitted.

(Plaintiff's Exhibit 126 received in evidence)

MR. LABGOLD:  No objection.

MR. GOTTS:  So now if we could pull it down for a moment.  I want to put up Plaintiff's Exhibit 125, please, is Chris.

**Q.**   So Plaintiff's Exhibit 125 is the lower surface curve for

the 9854D lens, isn't it?

A.   Yes.

Q.   And just like the previous data we looked at for the 4922, it shows the distance from the lower surface to the top of the curve is 3.0; right?

A.   Yes.

Q.   Actually, it's got six zeros, which is about the equivalent of one one-hundred-thousandth of a human hair; right?

A.   The only thing I could say is that we're talking about a small dimension.  That much I can say.

        MR. GOTTS:  Chris, could you put up 126 side-by-side with 125, please?  And can you zero in on this image right here.  This image here, Chris, the side view?

Q.   Mr. Yamaguchi, the -- in Plaintiff's Exhibit 126, we actually have the dimension of the height of the incident angle, of the inner surface, don't we?  And it's measured here at 2.93, isn't it?

A.   Yes.

Q.   And it's shown at 3 millimeters in Plaintiff's Exhibit 125; right?

A.   That's right.

Q.   So it's a 70-micron difference; right?

A.   I think in the context of the earlier explanation, I stated that what is shown in the design drawings are

dimensions, and what is shown in Exhibit 125 in this case will be data associated with the lens profile, the contour, its shape.

**Q.**   Right.

**A.**   So the 3 represents the top point of the lens surface, and the lens would be shaped as shown over here (indicating).  And what I'm saying is that 3 shows the relative height, the height of the top point and --

**THE INTERPRETER:**  I need to clarify something with the witness.  May I speak with the witness?

**THE COURT:**  Yes, you may.

**THE WITNESS:**  All right.  Shown here in this document would be dimensional data.  That shows the positional relationship between the top surface and the lower surface.

And in contrast to that, looking at the point data information in Exhibit 125, this would be the data associated with the lens shape, the contour, its profile.  And the positional -- and the lens with the surface that is described here would be manufactured having the positional relationship that is shown in the design drawing.

So in the case where it states 2.93 as the top position, the -- so the top position of the lens would be located where it will be 2.93.

The most important thing is where the upper surface of the lens is located, and the position designated here as 3 here

would be the -- may I illustrate the point I'm trying to get across?

**Q.**    No, I have another question for you.

**A.**    May I illustrate my answer?

         **THE COURT:**  I want to, in the interest of time, move ahead.  So you may have a chance to explain further in a minute, but I'm going to allow Mr. Gotts to ask his next question.

         **THE WITNESS:**  The point is this.  The lens surfaces would be positioned to be in accordance with the positional relationship.

**BY MR. GOTTS:**

**Q.**    Okay.  It's pretty confusing, isn't it?

**A.**    Indeed.  So illustrating would facilitate the understanding.

**Q.**    Okay.  Now, but I did ask you twice if this distance here (indicating) was the distance from the bottom of the lens to the top point of the inner surface.  And twice you said yes; isn't that right?

**A.**    I thought I said that.  I thought I restated by saying that that would be the dimension as seen from the top.  Didn't that get across to you?  So we're talking here relative positions.  The important thing is the relative positions.

**Q.**    So, sir, I think the record will say what it says, and that's fine.

So here's my question to you. How, looking at these two documents, was SSC ever to understand how it should reconcile the fact that this number (indicating) is 3, and this number (indicating) is 70 microns smaller at 2.93?

A. The top -- the position that is described in the point data at the top, that would coincide with the position that is shown in the right figure.

MR. GOTTS: Okay. I think we'll move on, because I think we get the point.

Let me ask you if you could pull up, Chris, the composite exhibit that's gotten 3, 113, 119, 131, and 137 and 124.

A. Yes.

Q. So Mr. Yamaguchi, the exhibit that's on your screen has all six of the lower surfaces for the lenses that you described in your Direct Examination.

Do you see that?

A. Yes.

Q. And if we compare that data for each lens, it's identical; isn't it?

A. It is the same.

Q. So we've done that here. See, we've pulled them together, and it's actually the identical data, isn't it?

A. Yes, they are identically the same.

Q. Right. So this is not actual measured data, is it?

A. These are design values.

**Q.**   Right.  Did you ever tell Dr. Pollock that this was actual measured data?

**A.**   You are asking me did I tell him that?

**Q.**   Yes.

        **MR. LABGOLD:**  I've just got an objection, beyond the scope.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I don't remember telling him that.

**BY MR. GOTTS:**

**Q.**   Did you ever tell Dr. Pollock that this was actual data that was measured using a profilometer?

**A.**   I don't remember that.  I think that means that I never told him that.

**Q.**   Let's pull up the second one.

        I've put together now on the screen a compilation that's got Plaintiff's Exhibit 112, Plaintiff's Exhibit 130, and Plaintiff's Exhibit 136.

        Do you see that?

**A.**   I see that.

**Q.**   And that's the data for the -- you testified to this in your Direct.  That's the data for the 9879, 9845E -- 9845, sorry, and 9854E; isn't that correct?

**A.**   That's right.

**Q.**   And this is the profile data for the upper surfaces of those three lenses; right?

**A.**    Yes.

**Q.**    And if we advance the slides here, you'll see that all three -- oh, we didn't do that for this one.

Are all three of these datasets, if you look at your screen, they're all identical too, aren't they?

**A.**    They are identical.

**Q.**    So that also couldn't possibly be actual measured data, could it?

**A.**    These are design values.

**Q.**    Right.  Is there any reason why in this case Enplas has never provided to SSC any actual measured data of a lens?

    **MR. LABGOLD:**  Objection to the procedural aspect.

    **THE COURT:**  Sustained.  You don't have to answer that question.

**BY MR. GOTTS:**

**Q.**    It's fair to say you've got millions of lenses; right?

**A.**    When you say I've got millions of lenses, what do you mean by that?

**Q.**    Enplas has millions of each of these lenses; right?  They have access to the lenses?

**A.**    Do you mean Enplas has manufactured millions of these lenses?

**Q.**    Correct.

**A.**    Yes, we have.

**Q.**    Now, earlier today Mr. Labgold said, quote, you do have to

prove infringement with respect to the actual product.

These drawings -- these designs are not the actual lenses, are they?

MR. LABGOLD:  Objection, Your Honor.

THE COURT:  Sustained.  And the jury will be reminded what the attorneys say is not evidence, whether it's Mr. Gotts or Mr. Labgold or any other attorney.  Their words are advocacy, and the evidence is coming from the witnesses and the exhibits in the case.

MR. GOTTS:  Chris, could we pull up the exhibit that's got PX-103, PX-113, PX-131, and PX-137.

THE WITNESS:  Yes.

Q.   So Mr. Yamaguchi, what we have on the screen here now is four of the exhibits you talked about in your Direct Examination.  The first one, PX-103, is the incident -- the lower surface profile for the 4922; the second one, PX-113, is the lower surface profile for the 9845; the third one, PX-131, is the lower surface profile for the 9854E, and the fourth one PX-137, is the surface profile, lower surface profile for the 9879.

Do you see that?

A.   That's right.

Q.   So if we could pull this up, I'd like to show the titling on each of these lenses.  Each one of them is labeled.

Do you see the first one is labeled 9879?

**A.**    Yes.

**Q.**    Second one is labeled 9879; third one is labeled 9879; fourth one is labeled 9879; and only one of these is 9879, isn't it?

**A.**    Yes.  What is your question?  I'm not quite sure I got it.

**Q.**    In your Direct Examination, you said that PX-103 was the data for the 4922; correct?

**A.**    Yes.

**Q.**    But it's labeled 9879, isn't it?

**A.**    I see what you mean.

**Q.**    Right.  So three of the four are mislabeled, aren't they?

**A.**    The labeling of the lens might have been mistaken, but these are all lenses known as the B3.  So for the B3 lenses the data is the same.

**Q.**    But they're mislabeled; right?

**A.**    I'm not the one who prepared this document, so I don't know, but I think there's a mislabel.

**Q.**    That gets me to my next point.

These documents were prepared -- all of these spreadsheets were prepared for purposes of this litigation; weren't they?

**A.**    I'm not quite sure I understand what you just said.  But you are saying that these data did not exist originally; is that what you're saying?

**Q.**    Ms. Watai -- Mr. Watai pulled the data from the simulation program and selected it and put it in these spreadsheets;

right?

**A.**   I don't know the exact procedure behind these spreadsheets.  But the design values exist from the very beginning of the design work, so these values exist from the design stage as design values.

**Q.**   And how is SSC supposed to know that?

            **MR. LABGOLD:**  Objection, Your Honor.

            **THE COURT:**  Sustained.

**BY MR. GOTTS:**

**Q.**   Mr. Yamaguchi, you mentioned your '679 patent briefly in your Direct Examination, did you not?

            **MR. LABGOLD:**  No, we did not ask any questions.  He says he had patents.  He didn't mention any specific patents.

            **THE COURT:**  What is the question going to be?

**BY MR. GOTTS:**

**Q.**   Sir, are you aware that virtually all the claims of your patent have been invalidated over the prior art?

            **MR. LABGOLD:**  Objection, Your Honor, procedural.

            **THE COURT:**  Sustained.  Sustained.

            **MR. GOTTS:**  No further questions.

            **MR. LABGOLD:**  The jury should be instructed.

            **THE COURT:**  The jury will be instructed to disregard that question, and has been previously advised that what the attorneys say is not evidence, and nothing they say should be considered, because -- as evidence, because the lawyers are not

under oath, so they are not under penalty of perjury.  They have a duty to advocate on behalf of their clients, and that's what they're doing.  The evidence is coming from the witnesses and the exhibits which are admitted into evidence.

Any further examination from EDD?

MR. LABGOLD:  Just a couple quick questions, Your Honor.

### REDIRECT EXAMINATION

BY MR. LABGOLD:

Q.   You were asked a question that you wanted to answer by showing on the drawing?

A.   Yes.

Q.   And can you explain how the three pieces of data work conceptually, so that would be a top surface, a bottom surface, and the design drawing?  How do these three pieces work together?

A.   May I?

THE COURT:  You may.

THE WITNESS:  Thank you.  There is the upper lens surface data in that fashion we saw earlier.  This is the lens shape (indicating).  There is the design drawing.  So the point that coincides with this surface (indicating), this point here (indicating) is taken as the oval point here (indicating) in this direction (indicating), the oval.

So if you were to depict this surface (indicating) as a

physical thing, an actual thing, assuming that this here (indicating) is this (indicating), then you get this shape (indicating).

And the top position which we saw in the earlier document that been 3.000000 would be this point here (indicating).

In terms of the positional relationship between this (indicating) and the physical lens, we bring this position to be here (indicating).

Next, we need to control the positional relationship between the upper lens and the lower lens. And the point that is determined by design, that point is made to be here (indicating).

So earlier I thought the figure was 2.93, was that? So earlier we saw the figure of 2.93, that number simply means that (indicating). It is from this point to a point 2.93 down, is what that value 2.93 means.

So what is important for us is the lens' positional relationship. And with respect to this shape, we can use offset and adjust.

MR. LABGOLD: Thank you very much. I have no further questions.

THE COURT: Let's take a recess for just a few minutes to evaluate if the jurors have any questions for Mr. Yamaguchi, and to advise my deputy if you do. So we'll take a few minute recess.

**MR. LABGOLD:**  Thank you, Your Honor.

(Recess taken at 3:50 p.m.)

(Proceedings resumed at 3:57 p.m.)

(Proceedings were heard out of presence of the jury:)

**THE COURT:**  We have one question from the jury.  Note number 4, which I intend to ask the witness.

Let's bring in -- any objection to that?

**MR. LABGOLD:**  No objection.

**MR. GOTTS:**  No, your Honor.

**THE COURT:**  All right.  Let's bring in the jury.

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  Everyone may be seated.

Mr. Yamaguchi, there is a question about Exhibit 106, which is the 4922 lens.

**THE WITNESS:**  Yes.

### JURY QUESTIONS

**THE COURT:**  The question is:  What is the purpose of the honeycombing pattern in the lens bottom surface?

**THE WITNESS:**  Light that leaks out of the LED at times can become instant to the bottom surface of the lens.

Now, if the bottom surface of the lens was a smooth surface, a mirror surface, then the lens -- the light that leaked out of the LED that entered into the bottom surface would form on the display a ring.  And so we don't want that ring to be a form, so the measure to avoid the formation of a

ring is to make the bottom surface rough, rough in the bottom surface to scatter the light, so that the ring will not be formed.

THE COURT:  Thank you.

Mr. Labgold, any follow-up questions to that?

MR. LABGOLD:  No follow-up questions, Your Honor.

THE COURT:  Mr. Gotts, any follow-up questions to that?

MR. GOTTS:  No, your Honor.

THE COURT:  Mr. Yamaguchi, you may step down.  Thank you very much.

And ladies and gentlemen, that will conclude our evidence for today, and we will resume on Monday at 9:00 a.m. with further evidence.

You heard the attorneys give a forecast of what they expected will come on Monday.  I anticipate that on Tuesday we will be having the closing arguments, and the case will go to you either on Tuesday or Wednesday for your deliberations.

So that's my forecast.  It's, of course, dependent on how things -- whether things go as fast or slowly as I anticipate, but that's my best guess.

We will have court on Wednesday.  So this past week we did not have court on Wednesday.  We will have court Monday, Tuesday, and Wednesday until the conclusion, and I think we will finish at or ahead of schedule.

This weekend you may watch as much TV as you like, but do not dismantle your TV to do investigation of the case or deliberate or do anything else to discuss the case or begin your deliberation.  So wait until all the evidence is done before you begin to assess it with each other.

I wish you a very pleasant weekend.  Thank you very much.

(Proceedings were heard out of presence of the jury:)

THE COURT:  You may step down.  Thank you.

And everyone may be seated.

All right.  So as I just indicated, I do anticipate that at the close of the day Monday we'll have our charging conference, whether we've concluded all the evidence or not by that point.  It may be that Dr. Pollock is still on the stand or Dr. Moore might be on the stand at that point, but I think we'll do that then in anticipation that we might have the closing arguments on Tuesday if things continue to go according to plan.

Does that work for you both?

MR. LABGOLD:  I suspect that Dr. Pollock will still be on the stand.  So given that we have Akiyama next, then Murano, I think their time estimates may actually be higher than ours with each one of the witnesses, and then Dr. Pollock, because he's both topics infringement and validity, and then Dr. Moore again for invalidity, but clearly we'll be ready on Monday for charging conference.

**THE COURT:** Be ready on Monday. And should those witnesses go longer into his examination, then you're going to leave yourself no time to examine Dr. Moore or for your closing argument, so it's something to continue to be aware of, and because I know that there might be substantial things remaining that you want to ask about.

**MR. GOTTS:** Your Honor, the only other housekeeping item is there's a number of different demonstratives that were used today. We'd like to collect ours. And should we just file them or should we mark them in court on Monday? What would Your Honor like us to do for that? And also we would like to take photos of that.

**THE COURT:** You may take photos of that and mark the demonstratives that were used. Work together to make sure we've got an agreed-upon record of, for example, the screen shots.

**MR. GOTTS:** Right.

**THE COURT:** Maybe both sides were taking screen shots, but pick one set so we don't have dueling screen shots.

Thinking about what we're going to show the jury for just a moment, there were more than a hundred pages of financial records put into evidence today. Not every page was shown on the screen or discussed with a witness. They're all in evidence. They all may go to the jury. I don't think there's more financial documents that are going to be coming in later.

My concern is that we are reaching the point where it's going to take them days to look at every page of the documents just on the documents that just came in through this witness, if they look at every page of the data. That's also hundreds of pages. And I'm just concerned about the cumulativeness of the data.

And the financial documents, for example, it might be that you can agree upon the pages shown, the first page and the last page, and the sections that are relevant, and exclude the parts of the financial records that no one has discussed, no one is planning to discuss, because the jury may spend -- just in those documents alone they may spend five hours looking through them, because you put them in evidence. They may be diligent to think that it all might have something important in there, and maybe it does have something important in there and you're going to bring it to their attention. I'm not going to prevent you from discussing it. But if you're not going to mention it, you don't think it's necessary, I'd be inclined to not give them every page in the interest of your time and presentation in the case.

So it's something to think about in that category or in the dataset that you just looked at. You do the same thing that you did with the spreadsheet data that you manipulated: Use just the parts that are shown and you care about, and take out the parts that maybe are not necessary.

One more weekend project.  I wish you a good weekend.  See you Monday morning.

**ALL COUNSEL:**  Thank you, Your Honor.

(Proceedings adjourned at 4:06 p.m.)

---oOo---

**CERTIFICATE OF REPORTERS**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Friday, March 18, 2016

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter


_____

Rhonda Aquilina, CSR No. 9956, RMR, CRR
U.S. Court Reporter