**Volume 6**

**Pages 846 - 1065**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

| | |
|---|---|
| ENPLAS DISPLAY DEVICE CORPORATION; ENPLAS TECH SOLUTIONS, INC.; and ENPLAS (U.S.A.), INC., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| VS. | ) **NO. C 13-5038 NC** ) |
| SEOUL SEMICONDUCTOR CO., LTD., | ) ) |
| Defendant. | ) ) |

San Francisco, California
Monday, March 21, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

> NAGASHIMA & HASHIMOTO
> 12005 Sunrise Valley Drive - Suite 203
> Reston, Virginia  20191
> **BY:  MARC R. LABGOLD, ATTORNEY AT LAW**
> **PATRICK J. HOEFFNER, ATTORNEY AT LAW**

> SHAW KELLER LLP
> 300 Delaware Avenue - Suite 1120
> Wilmington, Delaware  19801
> **BY:  JOHN W. SHAW, ATTORNEY AT LAW**
> **JEFFREY T. CASTELLANO, ATTORNEY AT LAW**
> **ANDREW E. RUSSELL, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:    Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                Rhonda Aquilina, CSR No. 9956, RMR, CRR
                Official Reporters

**APPEARANCES**:   (CONTINUED)

For Defendant:
                         LATHAM & WATKINS
                         555 Eleventh Street, N.W. - Suite 1000
                         Washington, D.C.  20004
                   BY:  **LAWRENCE J. GOTTS, ATTORNEY AT LAW**

                         LATHAM & WATKINS LLP
                         650 Town Center Drive - 20th Floor
                         Costa Mesa, California  92626
                   BY:  **RYAN R. OWENS, ATTORNEY AT LAW**

                         LATHAM & WATKINS LLP
                         140 Scott Drive
                         Menlo Park, California 94025
                   BY:  **MICHELLE P. WOODHOUSE, ATTORNEY AT LAW**

                         LATHAM & WATKINS LLP
                         John Hancock Tower - 27th Floor
                         200 Clarendon Street
                         Boston, Massachusetts  02116
                   BY:  **CHARLES H. SANDERS, ATTORNEY AT LAW**


Also Present:          **Takaaki Nagashima**
                       **Yukihiko Ohnuki**
                       **Jennifer Jonak**
                       **Kibum Nam**
                       **Yudae Han**
                       **Toyu Yazaki and Teresa Sumiyoshi**

I N D E X

Monday, March 21, 2016 - Volume 6

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **AKIYAMA, KOJI** | | |
| (SWORN) | 857 | 6 |
| Direct Examination by Mr. Labgold | 858 | 6 |
| Cross-Examination by Mr. Owens | 872 | 6 |
| Redirect Examination by Mr. Labgold | 885 | 6 |
| **MURANO, TAKESHI** | | |
| (SWORN) | 903 | 6 |
| Direct Examination by Mr. Shaw | 904 | 6 |
| Cross-Examination by Mr. Sanders | 920 | 6 |
| Redirect Examination by Mr. Shaw | 948 | 6 |
| **SEO, WON CHEOL** | | |
| By Deposition | 954 | 6 |
| **KIM, WON-IL** | | |
| By Deposition | 962 | 6 |
| **POLLOCK, CLIFFORD** | | |
| (SWORN) | 964 | 6 |
| Direct Examination by Mr. Labgold | 965 | 6 |

E X H I B I T S

| PLAINTIFF'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 4 | | 954 | 6 |
| 6 | | 954 | 6 |
| 16 | | 954 | 6 |
| 20 | | 1019 | 6 |
| 101 | | 867 | 6 |
| 111 | | 868 | 6 |
| 114 | | 872 | 6 |

**I N D E X**

**E X H I B I T S**

| PLAINTIFF'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 115 | | 872 | 6 |
| 116 | | 869 | 6 |
| 117 | | 872 | 6 |
| 120 | | 872 | 6 |
| 121 | | 872 | 6 |
| 122 | | 869 | 6 |
| 123 | | 866 | 6 |
| 128 | | 869 | 6 |
| 129 | | 867 | 6 |
| 132 | | 870 | 6 |
| 133 | | 872 | 6 |
| 134 | | 869 | 6 |
| 138 | | 872 | 6 |
| 139 | | 872 | 6 |
| 140 | | 869 | 6 |
| 141 | | 860 | 6 |
| 170 | | 917 | 6 |
| 200 | | 1019 | 6 |
| 201 | | 1019 | 6 |
| 204 | | 1019 | 6 |
| 205 | | 1019 | 6 |

# I N D E X

## E X H I B I T S

| PLAINTIFF'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 212 | | 1019 | 6 |
| 216 | | 1019 | 6 |

## E X H I B I T S

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1016 | | 911 | 6 |
| 1017 | | 911 | 6 |
| 1018 | | 911 | 6 |
| 1019 | | 911 | 6 |
| 1020 | | 911 | 6 |
| 1021 | | 911 | 6 |
| 1027 | | 916 | 6 |

Monday - March 21, 2016                                    9:01 a.m.

**P R O C E E D I N G S**

**---oOo---**

(Proceedings were heard out of the presence of the jury:)

**THE COURT:**  Good morning.

**ALL:**  Good morning, Your Honor.

**THE COURT:**  Everyone may be seated.

Counsel may come forward.

All right.  What have we got on tap for today?

**MR. GOTTS:**  Your Honor, there's probably a number of disputes, but I think we probably can pick the ones up that have to be picked up for the witnesses as they come.

**THE COURT:**  Prioritize, yes.

**MR. GOTTS:**  Prioritize.

So the first one relates to Mr. Akiyama.

Is he in the courtroom?  Okay.

He's the first witness this morning.  We have a situation with Mr. Akiyama both in terms of expert testimony and scope of disclosures.  It's in many ways similar to the issue we raised with Mr. Yamaguchi but worked out.

If Chris could bring up the exhibit that sort of is the heart of this.

Mr. Akiyama was identified as a witness in pretrial disclosures as testifying with regard to information regarding to the design, development, and manufacturing of Enplas lens

products.  No expert testimony.  Never gave a report.  No 26(a)(2)(C) statement, you know, identifying summaries and so forth.

He it turns out that -- this is the exhibit, Your Honor, that is the heart of this.

Mr. Akiyama did do support work for Mr. Pollock.  He measured -- characterized a bunch of LEDs and did measurements on those and the like, which was -- in documents which are -- clearly were prepared in connection with the litigation.  These aren't existing, percipient kind of documents.

And we don't have any objection to the evidence coming in. We think it should come in through Dr. Pollock, not through Mr. Akiyama.  This is just like the Breault situation. Remember we wanted to use Breault to authenticate it if we had to, but we weren't going to put in any evidence or, you know, opinion-wise.  There's no reason for him to authenticate because we agreed to it coming in through Pollock.

So we don't really think he should be talking at all about the expert work, the work he did to support the expert. Dr. Pollock can address that.

And sort of in a related issue is with regard to this light-bar-gap-measurement issue.  As Your Honor will recall, the January 19 supplemental, which we -- you know, we did -- we understand Your Honor ruled, but there was stuff there that didn't even relate to the correction on the gap measurements.

You know, we don't think that Mr. Akiyama should be testifying on expert analysis of the gaps or the analysis of the PCB boards or the solder.  You know, if he happens to have -- if he has actual knowledge of the accused products based upon what he knew as opposed to what he's analyzed for this case, I suppose that's one thing; but I don't think he should be giving expert testimony, particularly when it's way beyond the scope of his disclosures, and we never had a chance to examine him on it, and they've got Dr. Pollock anyway to testify to these things.

THE COURT:  Mr. Labgold?

MR. LABGOLD:  Thank you, Your Honor.

I'm totally mystified about this entire discussion because I've assured them multiple times.  These pictures were produced at the beginning of the case.  These pictures were not prepared for Dr. Pollock.  They were not prepared by Mr. Akiyama.

THE COURT:  What is it a picture of?

MR. LABGOLD:  What these are is when -- during the development process, as you've already heard, EDD doesn't make LEDs.  So the client comes to them -- the customer comes to them, and gives them an LED and says, "This is the LED we want to use and we want a lens, and this is the kind of TV we want."

Mr. Akiyama is in the Development Department, and so his connection to this is these are the LEDs that come from customers, and that's all he is going to say about that because

he is not -- he didn't do any work for Dr. Pollock.  He didn't -- there's no expert testimony to be given.

MR. GOTTS:  Your Honor --

THE COURT:  So your view is that Mr. Akiyama will not be giving expert testimony?

MR. LABGOLD:  Not at all.  I mean, the only thing he's going to talk about, I can assure you, I'm going to ask him to explain to the jury the development process, what happens when a customer comes and provides an LED, they develop the lens, and how that process works so that the jury can understand what the -- basically what the steps of the process are and how the documents get generated along the way, such as the specification, the design drawings, and then actually just the lenses because these are all lenses that he's worked on.

MR. GOTTS:  So, Chris, can we scroll through this?

This is document, Your Honor, if I can approach.  And you'll see at the end it's a conveniently made document that only has the lenses that are involved in this case.  There's a table at the end that was -- this isn't the translated version, but go to the end of the table.  Wait.  Here we go.  There's the translation.

This was done by Mr. Takashio.  I think this is --

MR. OWENS:  2014.

MR. GOTTS:  -- 2014 after the lawsuit.  It lists the accused products.  It just happens to have the dimensions that

are being used for determining the gap calculation.

It's not credible, Your Honor, that this is not a document that was prepared in connection with the litigation for purposes of whatever analysis they were doing, expert or otherwise, and it was then provided to their expert.  This is not an assisting document.

THE COURT:  Is this witness going to talk about this document?

MR. LABGOLD:  No.  I just -- I was literally -- I wanted them to be able to see in the context a picture of an LED.  I mean, I can just bring up one of them.

THE COURT:  This screen here is not a picture.  It's --

MR. LABGOLD:  Right.  He is not going to speak to this.

THE COURT:  All right.

MR. GOTTS:  Okay.

THE COURT:  Then with the promise --

MR. GOTTS:  Okay.  We looked at it -- we didn't -- okay.  That's fine.  We couldn't get that out of the meet and confer yesterday.  That's fine, Your Honor.

And I do have the same issue with regard to the gap analysis.  I mean, the witness shouldn't be giving expert testimony on things he's done to look at gap.  I don't know what he's going to say because this all came up after

discovery, Your Honor.

THE COURT:  All right.  Here's my ruling.

MR. GOTTS:  Yes, Your Honor.

THE COURT:  The witness is allowed to talk about the development process.  That's the principal -- not the only but the principal proffer as to the reason that he's being called. He's not been disclosed as an expert, so there will not be expert testimony.  There will not be Pollock-like testimony.

It's not been proffered he's going to be being a duplicate witness or laying a foundation to Pollock's analysis, so that will be excluded.

It's been proffered that he's not going to talk about this chart and measurement dates, but he will be allowed to talk about the process of development.

MR. LABGOLD:  And just to be clear, with regard to -- so we're not going to have objections, he's going to talk about what their interaction is with the customer, and that includes like -- things like, you know, do they take into account things like glue and solder and things like that in the lab.

THE COURT:  That's part of the process.

All right.  Our jury is waiting, so I want to get to them. Are there any other issues for --

MR. GOTTS:  Not for Akiyama, so maybe we can pick up the other ones at a break, Your Honor.

THE COURT:  Let's do that.

**MR. GOTTS:**  Okay.

**THE COURT:**  Thank you.

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  All right.  Good morning to our jurors.  I hope you had a nice weekend.  Please be seated, everyone.

And we'll return to our trial with EDD calling its next witness, please.

**MR. LABGOLD:**  Thank you, Your Honor.

Our next witness is going to be Mr. Akiyama.  He works in the Development Department at EDD, and he'll be talking about the development process with regard to the lens.

**THE COURT:**  All right.  Mr. Akiyama come on forward.  Welcome.  And we will swear you in.

**THE CLERK:**  Please raise your right hand.

**KOJI AKIYAMA**,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows through the interpreter:

**THE WITNESS:**  Yes I do.

**THE CLERK:**  Please be seated.

Please state your name for the record.

**THE WITNESS:**  (Through interpreter)  I'm glad to meet you.  My name is Koji Akiyama.

**THE COURT:**  You may be seated, Mr. Akiyama.

///

**DIRECT EXAMINATION**

**BY MR. LABGOLD:**

**Q.**   Good morning, Mr. Yokoyama.

**A.**   (Through interpreter)  Good morning.

**Q.**   Who are you currently employed by?

**A.**   I work at Enplas Display Device.

**Q.**   Is it okay if I refer to Enplas Display Device as EDD for your examination?

**A.**   Yes.  That's fine.

**Q.**   Now, where is EDD located, the facility you work at?

**A.**   In Saitama, Japan.

**Q.**   And how long have you worked for EDD?

**A.**   That would be four years.  Ever since the founding of EDD in 2012.

**Q.**   And what is your current position at EDD?

**A.**   I'm the head of the Engineering Department.

**Q.**   And as the head of the Engineering Department, can you explain to the jury briefly your general job responsibilities?

**A.**   I'm responsible for the series of work having to do with the design, development, and the mass production of the diffusion lenses, which are used with the LEDs, which are used in the backlight of LCD TVs.

**Q.**   And prior to performing that task for EDD, were you involved in the same type of activity at Enplas Corporation?

**A.**   Yes.

Q.   Now, in general terms, are you involved in the development of, let's say, custom lenses for your customers?

A.   Yes.

Q.   And so if you could explain, how does that process start?

A.   The activity will start with a request that comes from the customer as to a certain type of lens.

Q.   Okay.  And when they come to you, what type of information do they provide?

A.   The process would begin with our obtaining information from the customer on the specifications for the LED and the backlight.

Q.   And what type of information do they provide with regard to the LED?

A.   They would present to us the general properties, the characteristics of the LED, and that would include the shape of the LED, the diameter of the light-emitting portion of the LED, and also the height or the thickness of the LED.

Q.   Do they ever provide you with samples of the LEDs?

A.   Yes, that would happen.

Q.   And if you can look in your binder to Plaintiff's Exhibit 141.

A.   (Witness examines document.)  Yes, I have it.

Q.   And what is shown here in the document?

A.   This would be the drawing for the LED that would be used. This would be the drawing for the lens 9845, which would be

used for an LED.

MR. LABGOLD:  If I can move the admission of Plaintiff's Exhibit 141.

MR. OWENS:  No objection, Your Honor, subject to the Court's ruling this morning.

THE COURT:  141 is admitted.

(Plaintiffs' Exhibit 141 received in evidence)

BY MR. LABGOLD:

Q.   Just so we understand what you're talking about, is what's shown here in the picture, is this an LED that's used -- that was used in development?

A.   (Through interpreter)  That's right.

Q.   And where would this have been provided from?

A.   The customer.

Q.   Now, after you started this initial step, what's the next step in your development process?

A.   If the LED that is provided to us is similar to an LED that has been used in the past as to what has been referred to as a reference lens, then we would combine the reference lens with the LED just given to us, and then evaluate the two together.

Q.   And by "reference lens," is it fair to say that it's kind of a lens that you've used before?

A.   That's right.

Q.   Now, when does the new lens get a model number?

A.   The point in time that a lens request is made to us from the customer, that I would call it the project, and the lens number would be given at that juncture.

Q.   And in the past, how is the lens numbering?  Is there a convention for it?  How does the lens numbering occur?

A.   There is a convention.

Q.   What is the convention?

A.   There is a legend that is used to control the lens numbers, and the lens numbers would be a four-digit number that would be signed on a sequential basis.

Q.   Now, once you have the LED and you start with the reference lens and you have a model number going forward, what's the next step in your process?

A.   It would be a very rare instance that the combination of the reference lens and the LED is a perfect match, that there is no problem as is.  So in almost all cases, we would begin the modification of the lens.

Q.   And what types of modifications are made in that process?

A.   The aspects of the lens that would be modified would typically be along three dimensions.  One would be the leg height of the lens; the next one would be the lens thickness, which would be the dimension between the upper lens and the lower lens; and the third would be the general profile or the contour of the upper lens.

Q.   And do you make prototypes?

A.    Yes.   Prior to changes being made to the lens, we would produce -- create a prototype mold, and then work off the prototype mold, prototype lens.

Q.    And how many cavities or molding holes are there in a prototype mold?

A.    There will be four cavities.

Q.    And then what's the next step in your process?

A.    The process of making revisions to the lenses would be continued until the specifications -- the required specifications, including the specification for the backlight, are met.

Q.    And does this usually happen in the first try?

A.    When you say "the first try," you mean in the very first iteration?

Q.    Correct.

A.    That's what you mean?

      It would be a very rare instance that the very first try would be -- would strike exactly what we are looking for.  So the number of iterations that are done can be as many as 10 to 20 times.

Q.    Now, once you've -- do you do any simulations along the way during those iterations?

A.    Yes, we will.

Q.    Now, once you've gotten a prototype that meets what you think is satisfactory results, what happens next?

**A.**   The lens will be provided to the customer.

**Q.**   And once it's provided to the customer, do they do evaluation or any other activity?  What's the next step?

**A.**   What would happen at the customer side would be to combine the lens from us with the customer's LED and then to evaluate that combination.

**Q.**   And does that end the process?

**A.**   If the customer is satisfied with the prototype lens, then that prototype step will be completed.

**Q.**   How often does that happen?

**A.**   When you say "how often," it's hard for me to give you a frequency; but, generally speaking, there will be further several iterations that happens between us and the customer.

**Q.**   And what types of -- what's happening during those iterations?

**A.**   The revision of the lens, making changes.

**Q.**   Now, once you get to that point and that's satisfactory, what's going to be the next step?

**A.**   That would mark the beginning of the work to create the production molds.

**Q.**   And once the production molds are created, do you go directly into mass production?

**A.**   Not quite.  Not so.

**Q.**   Why not?

**A.**   It would be quite difficult to obtain from the mass

production mold produced lenses the exact same performance as from the prototype mold created prototype lenses.  So what we need to do would be --

THE INTERPRETER:  I need to ask a question to the witness.

THE WITNESS:  (Through interpreter)  So revisions would have to be made to the production mold so that the production mold is the same as the prototype mold.  In other words, molding the actual lens requires that step as well.

BY MR. LABGOLD:

Q.   And does the customer have any input at that stage?

A.   (Through interpreter)  Until the mass production can replicate the prototype, we would not be able to deliver the lenses to the customers yet, so there would not be much interaction between us and the customer at this stage.

Q.   And once you're satisfied with the mass production mold, what's your next interaction with the customer?

A.   We would provide to the customers the mass production lenses manufactured using the mass production mold, and the customer would assemble that into a backlight, which would be evaluated by them.

Q.   And is that the end of your involvement?

A.   Assuming that the customers are satisfied with the mass production lenses, then the mass production of those lenses would begin; but my involvement would continue for one month

beyond the start of the mass production to see to it that the quality of the lenses are maintained, a single quality, during the initial month of mass production.

Q.   And do you ever get customer complaints during that stage?

A.   Yes, that would happen.

Q.   And what types of complaints do you typically receive?

A.   In the case of the prototype molds, those molds would have only four cavities; but in the case of the mass production molds, there would be 32 cavities.  So the typical issue has to do with the variability cavity to cavity.  That would be the typical issue.

Q.   And is that something that Enplas is able to resolve?

A.   Most naturally we would be able to do it and we do, indeed, resolve those issues so that the mass production can be done.

Q.   And are there any problems that ever arise because of the customer not using the lens properly?

A.   Yes, that would happen.  After we are capable of reducing the variability in the different cavities of the mass production mold, they would have to be next then mounted into a backlight, the lenses would.

And in the process of the mounting of the lenses to the backlight and the LED, there can be mounting errors, mounting variabilities, that can occur at the customer site, but that sort of mounting errors that occur at the customer site is

something we can't really get to know.  It's beyond what we know.

**Q.**  Do you do anything to help them try to resolve that in the initial steps?

**A.**  Yes.

**Q.**  What do you do?

**A.**  What we do would be to confirm the nature of the problem; and if the problem is such that it can be addressed by our working on the lens, then we would do the necessary work on the lens.

**Q.**  Now, can you please refer to Plaintiff's Exhibit 123 in your binder.

**A.**  (Witness examines document.)  Yes.

**Q.**  And is this a document that you are familiar with?

**A.**  Yes.

        **MR. LABGOLD:**  I'd like to move the admission of Plaintiff's Exhibit 123.

        **MR. OWENS:**  No objection, Your Honor.

        **THE COURT:**  123 is admitted.

    (Plaintiffs' Exhibit 123 received in evidence)

        **MR. LABGOLD:**  If we can just pull up the first page.

**Q.**  What is this type of document?

**A.**  (Through interpreter)  This is the product specification for the lens which number is 9854D.

**Q.**  And is this something that's prepared for every lens that

you manufacture?

**A.**    Yes.    That's right.    This is essentially a standard form document, and this standard document would be prepared for every lens.

**Q.**    And with regard to -- can you look at Plaintiff's Exhibit 129?

**A.**    (Witness examines document.)    Yes.

        **MR. LABGOLD:**    And I'd like to move the admission of Plaintiff's Exhibit 129.

        **MR. OWENS:**    No objection, Your Honor.

        **THE COURT:**    129 is admitted.

    (Plaintiffs' Exhibit 129 received in evidence)

**BY MR. LABGOLD:**

**Q.**    Can you also refer to Plaintiff's Exhibit 101?

**A.**    (Witness examines document.)    Yes.

        **MR. LABGOLD:**    I'd like to move the admission of PX-101.

        **MR. OWENS:**    No objection.

        **THE COURT:**    101 is admitted.

    (Plaintiffs' Exhibit 101 received in evidence)

**BY MR. LABGOLD:**

**Q.**    And what is 101?

**A.**    (Through interpreter)    This is the product specification for the lens 4922.

**Q.**    And if you'd look at -- at the top of each one of these

pages there's an indication of "Messrs." and then a name, this one, Sharp Corporation.  What does that indicate?

THE INTERPRETER:  And the question is what is?

BY MR. LABGOLD

Q.   What is that indicating?

A.   (Through interpreter)  That identifies the customer to which this lens would be delivered.

MR. LABGOLD:  And we'd like to move the admission of PX-111.

THE COURT:  111 is admitted.

MR. OWENS:  This is 101.

THE COURT:  101 was already admitted.  111 is also admitted.

(Plaintiffs' Exhibit 111 received in evidence)

BY MR. LABGOLD:

Q.   Please look at 111, please.

A.   (Through interpreter)  Yes.

Q.   And which lens was this?

A.   That would be the lens 9845.

Q.   And who is the customer for that lens?

A.   Seoul Semiconductor.

Q.   And was this the first lens you'd ever made?  "You" being collectively Enplas EDD.

A.   No.

MR. LABGOLD:  Now, if I could approach, Your Honor.

THE COURT:  Yes.

MR. LABGOLD:  I'm showing the witness Plaintiff's Exhibit 116.

Q.    Can you identify that?

A.    (Through interpreter)  This is lens 9845.

Q.    Are you sure that's what's in there?

A.    Yes, I am, because I put the lens into that bag and identified the number on the bag.  I wrote the number on the bag as well.

MR. LABGOLD:  I'd like to give the witness -- if I can move the admission of Plaintiff's Exhibit 116.

THE COURT:  How many -- is it one bag?

MR. LABGOLD:  It's going to be several of them. PX-122 is going to be the lens 9853A.  The next one is Plaintiff's Exhibit 128, which is the lens 9854D; Plaintiff's Exhibit 134, which is the 9854E; and Plaintiff's Exhibit 140, which is the 9879.

MR. OWENS:  Your Honor, no objection subject to the conditional relevance of the accused lenses.

THE COURT:  Thank you.

Exhibits 116, 122, 128, 134, and 140 are admitted.  They are physical exhibits.

(Plaintiffs' Exhibits 116, 122, 128, 134, and 140 received in evidence)

MR. LABGOLD:  May I publish them?

THE COURT:  Yes.

BY MR. LABGOLD:

Q.   And are those all lenses that you've been involved in the development of?

A.   (Through interpreter)  That's right.  Yes.

Q.   Now, to just do one of these, if you could pull up Plaintiff's Exhibit 132.

A.   Yes.

MR. LABGOLD:  I'd like to move the admission of Plaintiff's Exhibit 132.

MR. OWENS:  No objection, Your Honor.

THE COURT:  132 is admitted.

(Plaintiffs' Exhibit 132 received in evidence)

BY MR. LABGOLD:

Q.   Now, is this a document that you are involved in the preparation of during your development activities?

A.   (Through interpreter)  Yes, I am involved.

Q.   And is your name indicated anywhere on the document?

A.   Yes, I see that.  I see my name next to the box that states "Approved By" and also in the box adjacent to the box titled "Checked By."

MR. LABGOLD:  I'm just asking him to bring up the English translation version for the rest of us.

Q.   Now, this document, is this something that -- well, is it accurate?

A.    (Through interpreter)  Yes, it's accurate.

Q.    Is there any time during the process where EDD checks to see whether lenses being manufactured meet the measurement design tolerances that are set forth here?

A.    (Through interpreter)  Most naturally, yes.

Q.    Now, in addition to this, is there profile information that is required to manufacture the lenses?

A.    Yes.  Yes.  That is required.  With respect to the graphic information that is shown here, sometimes the graphic information, the shape alone, may not be entirely accurate as depicted on this form.

Q.    And do you know what upper lens surface this lens, the 9854E, uses?

A.    Yes, I do know what that upper lens surface is.  It is known by the letter L.  Our parlance would be L for that shape.

Q.    And is that indicated anywhere on the document?

A.    Yes.  If you were to look at item number 1 under notes, that would be shown there.

Q.    And so where it says a "File Name" and then paren "L shape for the S1 surface," is that what you're referring to?

A.    Yes.

Q.    And is the B3 the lower lens shape?

A.    That's right.  Yes.

        MR. LABGOLD:  Just housekeeping, I'd like to move the admission of Plaintiff's Exhibit 117, 129.

MR. OWENS:  No objection, Your Honor.

THE COURT:  129 is already in.

MR. LABGOLD:  Oh.  And I have 114, 115, 120, 121, 133, 138, and 139.

THE COURT:  Any objection?

MR. OWENS:  No objection, Your Honor, subject to conditional relevance of the accused products.

THE COURT:  117 is in, as are 114, 115, 120, 121, 133, 138, and 139.

(Plaintiffs' Exhibits 114, 115, 117, 120, 121, 133, 138, and 139 received in evidence)

THE COURT:  You may proceed.

MR. LABGOLD:  And I have no further questions at this time.

THE COURT:  Thank you.

Examination by SSC.

**CROSS-EXAMINATION**

BY MR. OWENS:

Q.   Good morning, Mr. Akiyama.  It's good to see you again.

A.   (Through interpreter)  Likewise.  Nice to see you.

Q.   Okay.  So please turn in the binder in front of you to PX-135.  I think it's the first tab.

A.   (Witness examines document.)

Q.   This is already in evidence.  So, Chris, can you pull it up there?

Mr. Akiyama, this is the product specification for the 9879 lens; correct?

A.   Yes, that's correct.

Q.   And the 9879 lens is used in direct backlighting of LCD televisions; correct?

A.   That's right.

Q.   And EDD designed the 9879 lens for LG Innotek; correct?

A.   That's right.

Q.   And you provided the specification to LG Innotek; correct?

A.   That's right.

Q.   And if you turn to page 5 of this document that has the Bates Number EDD 023450.

A.   Yes.

Q.   And let's go down to Table 5-1.  Do you see that?

A.   Yes.

Q.   That table does not identify a specific LED to use with the 9879 lens; correct?

A.   The information that is given is that the LED would be manufactured by LG Innotek.

Q.   But LG Innotek makes many different types of LEDs; correct?

A.   That's right.

Q.   The specification does not identify a specific LED to use with the 9879 lens, does it?

A.   What really happened is that we were given the actual LED

to be used by LG Innotek, so we had the actual LED, but they did not inform us as to what the model number is with that particular LED.

Q.   So that model number is listed nowhere in this document; correct?

A.   That's correct.

Q.   And let's go down to 5-2, that whole area, the table.

A.   Yes.

Q.   The information in the table under 5-2 was provided by Enplas Display Device; correct?

A.   That's correct.

Q.   And this table includes the configuration EDD recommends when the 9879 lens is used; correct?

A.   That's correct.

Q.   And for this lens EDD recommends that the LED layout be a lattice layout; is that correct?

A.   That's right.

Q.   And that lattice layout is shown in Figure 5-2-1?

A.   That's correct.

Q.   And going back to the table, EDD recommends the use of a diffusion panel; is that correct?

A.   That's correct.

Q.   And Figure 5-2-2 shows an example of a diffusion panel; correct?

A.   This is simply a conceptual view but, indeed, an example

of a diffusion panel is shown in this conceptual view.

Q.   Let's go back up to the table again under 5-2.  EDD recommends the use of at least one optical sheet; correct?

A.   The recommended configuration would have the three optical sheets, not a minimum of one.

Q.   And the table lists BEF as a type of optical sheet that is recommended; correct?

A.   Yes.

Q.   And "BEF" stands for brightness-enhancing film; correct?

A.   That's correct.

Q.   So let's turn to the end of this document, EDD 023460.

A.   (Witness examines document.)

Q.   And I want you to look under "Attached Data" at the end.

A.   (Witness examines document.)  Yes.

Q.   All these attachments were provided to LG Innotek; correct?

A.   That is correct, except for the fact that some of the materials that have been provided to us by LG Innotek are also listed here.

Q.   Let's turn to DTX-1070.  It's the next tab.

A.   (Witness examines document.)

Q.   And this is already -- it's already in evidence.

        THE INTERPRETER:  Sorry.  I'm speaking over you.

        MR. OWENS:  My apologies.

Q.   And this is the product specification for the 9854D lens;

is that correct?

A.   (Through interpreter)  Yes.

Q.   And the 9854D lens is used in direct backlighting of LCD televisions; correct?

A.   That's correct.

Q.   And EDD provided the specification to I-Chiun Precision Industry; correct?

A.   That's correct.

Q.   And this lens, the 9854D, was designed for I-Chiun; correct?

A.   That's correct.

Q.   Let's turn to DTX-1070-04.  It's the fourth page.

A.   Yes.

Q.   And let's look at Table 5-1 again.

A.   Yes.

Q.   This table does not identify a specific LED to use with the 9854D lens; correct?

A.   You said LED?

Q.   Right.  A specific LED.

A.   Just as in the earlier example, we know here that the LED would be manufactured by OSRAM, but OSRAM did not disclose to us the specific model number.

Q.   And OSRAM makes a lot of different LEDs; don't they?

A.   That's correct.  But with respect to the particular lens, we were provided by them the specific LED, the actual thing.

So it is not the case that our lens can be used with their many LEDs.

MR. LABGOLD:  Your Honor, I move to strike that answer as nonresponsive.

THE COURT:  Overruled.

A JUROR:  Your Honor, I can't hear you.

MR. OWENS:  You can't hear me?

A JUROR:  No, sir.

MR. OWENS:  Really?  I need to be closer?  Okay.  I apologize.  Sorry about that.

A JUROR:  Thank you.

THE COURT:  Thank you.

BY MR. OWENS:

Q.   Nowhere in the specification does it identify a specific LED to use with the 9854D lens; correct?

A.   (Through interpreter)  That's correct.

Q.   And let's go to Table 5-2.

A.   Yes.

Q.   The information under this table or in this table is provided by Enplas Display Device to I-Chiun; correct?

A.   Yes.

Q.   And this table includes the configuration EDD recommends when the 9854D lens is used; correct?

A.   That's correct.

Q.   And let's turn to DTX-1070-14 at the end.

**A.**   (Witness examines document.)  Yes.

**Q.**   And let's look at the attached data.

**A.**   Yes.

**Q.**   All that attached data was provided to I-Chiun; correct?

**A.**   That's correct.

**Q.**   And let's turn to DTX-1037 in your binder.

**A.**   (Witness examines document.)  Yes.

**Q.**   And this is the product specification for the 9854E lens; correct?

**A.**   Yes.

**Q.**   And this lens is used in direct backlighting of LCD televisions; correct?

**A.**   That's correct.

**Q.**   And EDD provided the specification to I-Chiun?

**A.**   That's correct.

**Q.**   And, again, if we turn to DTX-1037, page 4.

**A.**   (Witness examines document.)  Yes.

**Q.**   And let's look at Table 5-1.

**A.**   (Witness examines document.)  Yes.

**Q.**   This does not identify a specific LED to use with the 9854E lens; correct?

**A.**   That's correct, but in the manufacturing of the lens, we were given the specific actual LED, the LED being manufactured by Everlight and having a luminous size of the diameter of 1.8.

**Q.**   But nowhere in the specification does it actually identify

the specific LED that you used; correct?

A. That's correct.

Q. And in Table 5-2, that was provided to I-Chiun by EDD; correct?

A. That's correct.

Q. And the attachments to this document were also provided to I-Chiun; correct?

A. Yes.

Q. Let's turn to DTX-1106 in your binder.

A. (Witness examines document.) Yes.

Q. And this is the product specification for the 4922 lens; correct?

A. Yes, that's correct.

Q. And this was provided to Sharp Corporation; correct?

A. Yes.

Q. And then if we go to Table 5-2 on 1106, page 4?

A. (Witness examines document.) Yes.

Q. All that information was provided to Sharp Corporation; correct?

A. That's right, yes.

Q. And at this time that was provided by Enplas Corporation; is that correct?

A. That's right.

Q. And the 4922 lens was designed for an LED with a dome-shaped top; correct?

**A.**   I don't quite remember that fact, but it could have been. That could have been the case.

**Q.**   And all of the attachments to this document listed on DTX-1106, page 16, were also provided to Sharp Corporation; correct?

**A.**   (Witness examines document.)  That's right, yes.

**Q.**   And let's turn to DTX-1080, last one.

**A.**   (Witness examines document.)  Yes.

**Q.**   And this is a product specification for the 9853A lens; correct?

**A.**   Yes.

**Q.**   And this lens is used in direct backlighting of LCD televisions?

**A.**   Yes.

**Q.**   And this specification was provided to Advanced Optoelectronic Technology?

**A.**   Yes.

       **MR. OWENS:**  Your Honor, it seems, although we have this list as being in evidence, it may not have been in evidence.  Just for the record, could we move DTX-1080 into evidence?

       **THE COURT:**  I have it as being in, but in an abundance of caution, 1080 is admitted.

       **MR. OWENS:**  Okay.  I thought it was in.

**Q.**   Okay.  If we turn to DTX-1080, page 4, we see Table 5-2

again.

A.   (Through interpreter)  Yes.

Q.   All that information was provided to Advanced Optoelectronic Technology; right?

A.   Yes.

Q.   And this table includes the configuration that EDD recommends when the 9853A lens is used?

A.   That's right, yes.

Q.   And all the attachments listed on DTX-1080, page 13, were provided to Advanced Optoelectronic Technology; correct?

A.   (Witness examines document.)  Yes.

Q.   And you know that EDD has provided lenses for use in LG televisions; correct?

A.   Yes.

Q.   And you know EDD lenses have been used in Panasonic televisions; correct?

A.   Yes.

Q.   And before this litigation, you do not recall ever testing whether there was total internal reflection in the 9854D lens when used with an LED; correct?

A.   We did confirmations but not testing.

Q.   What's the difference between a confirmation and a testing?

A.   By testing, I would mean to do the actual measurements to see whether or not total internal reflection is taking place.

When I say "confirmation," that would be work done in advance, including simulations on that point.

Q.   You would agree you did not -- you do not recall ever testing whether there was total internal reflection in the 9854D lens when used with an LED; correct?

A.   You're asking me did we ever do an evaluation?  I think there's a semantic issue between the term "testing" and "evaluation."

Q.   Sir, do you recall your deposition taken on June 10th, 2015?

A.   Yes.

Q.   Do you recall you swore under penalty of perjury to tell the truth at that deposition?

A.   I do.

Q.   And there was a court reporter present to take your testimony at that deposition?

A.   Yes.

Q.   Sir, at the back of that binder is the transcript of your deposition.  If you turn to page 100 and lines 10 through 16.

A.   (Witness examines document.)  Yes.

Q.   I asked you this question:  (reading)

        "Did you in any way test whether there was total
        internal reflection in the 9854D lens when used with an
        LED?"

        And you said:  (reading)

"Well, I don't remember."

A.   Yes.

Q.   Did I ask that question and you gave that answer?

A.   Yes.

Q.   Before this litigation, you do not know if anyone else at EDD has tested whether there was total internal reflection in the 9854D lens when used with an LED; correct?

A.   When I hear the term, I mean that term to be evaluation; and on that point, I do not know.

Q.   And before this litigation, you do not recall if anyone at EDD had ever done a ray tracing on the 9854D lens; is that correct?

A.   Prior to this litigation, I know about that since I heard about that prior to this litigation.

Q.   Okay.  We'll go through this again.

You recall you had your deposition on June 10th, 2015, and let's go to your transcript again.

A.   Yes.

Q.   The same page you're on, page 100, lines 22 through 24.

A.   Yes.

Q.   And I asked you this question:

"Do you know if anyone at EDD has ever done a ray tracing on the 9854D lens?"

And you provided the answer:  (reading)

"No, I can't recall it."

Did I ask that question and did you provide that answer?

**A.**   Yes.  Back then at this point in time I didn't know about that.

**Q.**   And if I asked you the same question for every other lens in this case, would you have the same answer, that you don't remember whether simulations or tests for total internal reflection were performed for those other lenses?  Correct?

**A.**   That's right.

**Q.**   So you recall testifying today that you and your customers agree on a specific LED to design the lens for; correct?

**A.**   What do you mean by the phrase "agreed," "that you and your customers agreed"?  I'm not sure what you mean by "agreed."

**Q.**   Did you testify that you design lenses for a particular LED identified by customers?  Correct?

**A.**   Yes.

**Q.**   And you did not bring to court a single communication with a client that describes a specific LED to be used with a particular lens; correct?

            **MR. LABGOLD:**  Objection, Your Honor.

            **THE COURT:**  Sustained.

       Next question.

**BY MR. OWENS:**

**Q.**   Mr. Akiyama, you've been with Enplas since 1993; right?

**A.**   (Through interpreter)  That's right.

Q.   So you, of course, have a very strong interest in having EDD win this case; right?

A.   That's right.

Q.   You want EDD to win this case; right?

A.   That's right.

        MR. OWENS:   No further questions.

        THE COURT:   Thank you.

     Redirect by EDD.

                    **REDIRECT EXAMINATION**

BY MR. LABGOLD:

Q.   Mr. Akiyama, do you personally perform ray traces?

A.   (Through interpreter)  No.  I can't do that.

Q.   Who does ray tracing?

A.   My subordinates.  My subordinates by the name of Takashio and Takatoi do that.

Q.   Now, in several of the specifications which you were shown both on direct and on cross, there's an indication of an N/A for the specific LED.  Do you recall that?

A.   Yes.

Q.   Is it common for manufacturers to not provide you with the model number of an LED they're using?

A.   I would say that is the case in virtually all cases.

Q.   And do you have any reason -- do you know why they don't tell you this?

A.   My understanding is that typically there would be customer

LEDs or LEDs which are not yet commercially sold.

**Q.**   Now, you mentioned -- you responded with regard to Panasonic?

**A.**   Yes.

**Q.**   Did you make any lenses for Panasonic prior to working with SSC?

**A.**   That's right.

**Q.**   And do you happen to know if those were dome-type or flat-type LEDs?

**A.**   I do.  They were flat, flattops.

      **MR. LABGOLD:**  I have no further questions.

      **THE COURT:**  Thank you.

   Any further cross-examine?

      **MR. OWENS:**  No, Your Honor.

      **THE COURT:**  All right, ladies and gentlemen, we'll take a ten-minute break.  Return at 10:30.  If during that time period, you have written questions for the witness, you may pose them.

   We'll see you at 10:30.

   (Proceedings were heard out of the presence of the jury:)

      **THE COURT:**  You may step down, Mr. Akiyama.

   All right.  Let's remain on the record.  The jurors are not present.

   There were some other -- everyone may be seated.

   Counsel on issues may come forward.  What were the other

evidentiary issues pertaining to today?

MR. GOTTS: Okay. Thank you, Your Honor.

The two primary issues -- there are some others on the graphics. I'm hoping we can work through that and not have to get Your Honor in the mire on that.

THE COURT: Graphics concerning?

MR. GOTTS: Dr. Pollock.

THE COURT: Dr. Pollock.

MR. GOTTS: So I'm hoping we can resolve those. I'm not going to raise those now, but I may still have to come back before he takes the stand on those, if we could.

But there's two primary issues, Your Honor. The first one, again, harks back to our Yamaguchi motion, and that relates to the '679 patent. The '679 patent has been listed as an exhibit for Dr. Pollock; and we met and conferred on this, and I understand they intend to examine him on the '679.

In Dr. Pollock's expert report and deposition, what Dr. Pollock said was that -- he explained that the -- his understanding that the '679 patent is designed to avoid TIR. Whether or not that's true or not, that's his position.

Obviously, you know, their noninfringement position in the case is that they don't have TIR, and that they are now trying to equate their product to what's in the patent and use that to try to prove the absence of TIR rather than looking at the product itself. So it goes right to the infringement issue.

Dr. Pollock went one step further.  He actually said -- I don't want to misquote it, but I think basically -- it was in our brief -- he said that -- oh, thank you.

THE COURT:  When you say "it was in our brief," what brief are you referring to?

MR. GOTTS:  The Yamaguchi brief.

I asked him -- or actually Mr. Owens asked him:  (reading)

"Do you know if the accused products practice the '679 patent?"

His answer was:  (reading)

"I have no reason to accept they don't.  I have no reason to accept they don't.  I asked them if their design -- if in their design TIR was avoided, and they said that that was one of their criteria, to avoid TIR."

Then he goes:  (reading)

"So whether they use that specific algorithm or not, I do not know.  It was a goal."

Hold on a second.

(Pause in proceedings.)

MR. GOTTS:  And then I -- but then I said, "So" -- then Ryan said -- Mr. Owens said:  (reading)

"So you don't know whether or not the accused lenses were designed using any of the principles within the '679 patent?

"A.  I do not."

Okay.  So he's not even -- I think it would be improper to do it anyway, but he hasn't even been able to connect the dots between the '679 patent and the accused products, so I think it would be highly improper and I think it's going to really confuse the jury if they start now trying to point to a patent which hasn't even been linked up by expert testimony to the accused products and then say, "The syllogism is the '679 avoids TIR.  We're -- it's our patent and, consequently, we avoid TIR."  So we think that whole thing ought to come out, Your Honor.

And this is the -- one of the, you know, two issues where I've been making -- trying to make various conditional relevance objections because I do think this is going to really take the jurors off the rails if they have to start analyzing this.  They can prove no TIR if they can.

**THE COURT:**  All right.  What's the other issue?

**MR. GOTTS:**  The second issue, Your Honor, is the 9845.  There is an exhibit in their slides that -- maybe can we pull up -- do we have their slides to pull up?  I don't know if I have the current slides, but we have --

**THE COURT:**  This is a demonstrative?

**MR. GOTTS:**  It's a demonstrative but it's also in Dr. Pollock's expert report, so it's in evidence, too, where they are -- where they analyze the 9845, which is not one of the accused lenses.  And what they do is they go through and in

that lens they change the gap and they try to show that there's no TIR at various gap changes.

Well, they didn't do that for any of the accused lenses. They only did it for the 9845, and now they're trying to prove essentially noninfringement across the range of gaps by looking at a lens that's not in the case. It's a different lens. It's never -- and I think that's improper because it's not the lenses that are at issue in the case.

They could have done the same analysis on the lenses in the case. They chose not to. And there's no way you can link up what happens on one lens with the accused lenses. So, again, it's highly prejudicial and confusing to the jury.

And this is really the kind of thing, the crux of which I've been making the conditional relevance. I think we all should be able to talk about the story. We can't pretend this is a world where this didn't happen, but they shouldn't be proving infringement by looking at a lens that's not in the case, not even proven to be the same lens -- it's certainly not the same lens -- and then using that evidence to prove infringement. So that's the other concern.

So this is an example that's up on the screen now, Your Honor. This is the 9845 lens, and what they do is they go through a series of slides where they change the gap. It goes from zero to sort of -- go back -- 0.1, .2, .3, and they're trying to show there's no TIR. But this isn't the product at

issue in the case.

THE COURT: All right. I got it. Thank you.

Mr. Labgold.

MR. LABGOLD: Yes.

THE COURT: Why don't you take them one at a time.

MR. LABGOLD: If we can do it in reverse order.

THE COURT: You may.

MR. LABGOLD: With regard to changing the gap, this was one ray trace that was done. It's not for the purposes of proving infringement. It's demonstrating what the effect of changing the LED height has on how the lens receives the light.

At the time this was done, the 9845 was still in play. So when Dr. Pollock had all of these ray traces done, this one, because it's a general explanation of how the LED can affect it, it was only done on 9845; and they're at this point trying to keep it out simply because we don't have the equivalent with any of the others.

This is a -- again, it's not for a matter of the infringement of any one lens or not. This is basing why he says there's a problem with the methodology of not using the actual gap.

And so this is going to a real-world -- you know, what he can explain is how changing the gap changes the light, and that's what it's going to.

If they want to block out the number that it says 9845, I

think it's less prejudicial if they keep it in, but if they want that out.  But, again, this is a demonstrative.  He supervised it, and he can explain what they -- they can cross-examine him on the details of it, but the jury should be able to understand from this work that this is an objective test.  They could have done a countertest, but instead now they're just trying to seek to exclude it because they dropped the 9845.

THE COURT:  All right.  Pause.

Do you have any objection to --

MR. GOTTS:  I do, Your Honor.

THE COURT:  -- whiting out the 9845?

MR. GOTTS:  Yeah.  Your Honor, every one of these lenses are different.  That's why we got it narrowed down to three lenses in this case.  That was their argument that they're not all the same.  This one doesn't show TIR.  The other ones do show TIR.

MR. LABGOLD:  But --

THE COURT:  One moment.  One at a time.

MR. GOTTS:  This is a lens where they go through each of these ranges they don't show TIR, but all of the lenses are different.  Even among the accused lenses they're different.  That's why they're forcing us to prove infringement.

This proves absolutely nothing about the accused lenses in this case.  Absolutely nothing.  They have never linked up and

said, "All of our lenses function the same way."  Had they done that, we probably wouldn't be subject to this limitation we are right now on being limited to the accused lenses.

The reason we are so limited is because they said, "They're all different and we can't tell you how -- what the similarities or differences are, and it's all burdensome."

And now they want to lump them all together, and we've been narrowed down to three lenses and they want to treat them as if they all do the same thing.  You know, they can't have it both ways, Your Honor.  That's how we got where we are.  They created this world we're in.

THE COURT:  Pause.  Mr. Labgold?

MR. LABGOLD:  Yes.  If we can go through the slides, it actually says something completely different than what he's saying.  If we go to -- go the other way.  Start at .3.

At .3, this is a 300-micron gap between the emission surface and the bottom of the LED.  This is what you're seeing in this lens.

Now go to .2.  That's 200 microns, no TIR.  Go to .1, TIR.  Go to 0, TIR.

So they do show TIR in the lens.  This actually shows that -- how the light gets affected by changing the gap, that it just necessarily is going to change how the light reacts by where it starts its angle of incidence.

It is going to be different in each one of the lenses

because it's going to be unique, but this is to demonstrate the general effect of, yes, it does make a difference the size of the gap and why it makes a difference.

MR. GOTTS:  Your Honor, we -- we dispute that point.

THE COURT:  I need to use the jury's time, and I'm not sure we're using it particularly well this morning so far.

Please address the '679 issue.

MR. LABGOLD:  He's not going to address it.

MR. GOTTS:  Okay.

THE COURT:  All right.  Do you guys have any more to say, Mr. Gotts?

MR. GOTTS:  I was going to say that I don't have any problem with the witness saying, without the exhibit, that the gap -- size of the gap impacts -- we all agree that the size of the gap impacts whether there's a TIR.  The lower the gap, the more TIR.  That's fine.  I don't think he should be doing it with this exhibit.

THE COURT:  All right.  Here's my ruling on the discussion we've just had:

On '679, it's been proffered that Dr. Pollock is not going to make an issue of infringement or not based on the '679 patent.  So the objection does not need to be ruled on, in a sense, given the proffer, and I will expect the evidence to follow what's been proffered.

On the use of this demonstrative, the topic of the gap and

measuring the gap is permissible within Dr. Pollock's testimony as being an issue in the case and something that's been discussed before trial. I'm going to exclude the use of the demonstrative under Rule 403 as being confusing to the jury, having a product that's not in the case being presented here, and potentially confusing them about what products they are deciding, and because I think there are -- the witness can still talk about it without using those demonstratives.

I considered -- and I think that's a close call -- as to whether taking off the 9845 and having him use the same slide without that would be sufficient, but I think in fairness and in the interest of not confusing them and knowing that it's been offered, that each of these lenses is different, I'm going to exclude the use of the demonstratives but not prevent Dr. Pollock from talking about the topic. And there may be other ways he can do it without use of that particular demonstrative. That's my ruling.

MR. LABGOLD: And, Your Honor, if I --

THE COURT: I have a question, which is, there were -- I was expecting verdict forms to be submitted this morning, and I don't see them. What is the status of the verdict forms?

MR. SHAW: Your Honor, we've been making progress on the verdict forms. I think there are two or three questions, if we can address at the charge conference, that will allow us to coalesce into a very small number of final issues and do so

very quickly.

MS. WOODHOUSE:  We would agree with that, Your Honor. We met and conferred and made substantial progress last night; however, there are just a few remaining issues that we think certain guidance will be helpful.

THE COURT:  All right.  What I'd like you to do is at lunchtime file what you've agreed on so far so I can at least have a template of what you've agreed on, and maybe it says, "Here's four things we disagree on," or at least give me a list of what's agreed and what's disagreed, whatever is -- I know I'm rushing you in a sense, but I can't react to it without knowing it, and we do have very little time to get that done because I want to get this case over.

MR. SHAW:  Your Honor, if it would work for you, it might be easier to submit a list of the three questions.

THE COURT:  That will be fine.  Just kind of I just want to set the agenda so I know what we're coming to.

All right.  We'll take a couple-minute break and we'll seat the jury.

MR. GOTTS:  Your Honor?

THE COURT:  Yes.

MR. GOTTS:  Mr. Sanders has one more issue that's going to come up with the next witness.

THE COURT:  Next meaning?

MR. GOTTS:  Mr. Murano.  That's EDD's next witness, so

I wonder if we have two more minutes.

THE COURT:  I'll tell you that the time meter is running through all this.

Yes, Mr. Sanders.

MR. SANDERS:  Yes.  We have an objection.

Can you pull up PX-175, please.

There are a few meeting minutes that were made after this litigation was filed by Mr. Murano, and we object to those meeting minutes under Rule 408 because they are discussing potential resolution of the dispute after the lawsuit has been filed.

My understanding is that EDD would offer them to go to its good faith belief, and that's an element of the claim that goes to the validity of the claim under Rule 408.

MR. SHAW:  Your Honor, very quickly.

THE COURT:  Yes.

MR. SHAW:  The meeting minutes that will be used would be DX-174, not 175.

The issue is this:  Rule 408 clearly prohibits use of negotiations for things like amount, are we liable, are we not liable; but Rule 408 also very clearly says that statements made during settlement discussions, if they go to issues like good faith or bad faith or notice, are permissible and admissible.  And those are laid out right in the comments to Rule 408 itself, and notice and bad faith are two of the

examples in the rule comments, and that's what they would be asked -- or used for.

THE COURT:  All right.  So 174 is the only one in that category you're seeking?

MR. SHAW:  Yes.

THE COURT:  All right.  I will rule on that in a moment.

Let's take a few-minute break, and we'll check with our jurors and see if they have any questions.

MR. GOTTS:  Thank you, Your Honor.

(Recess taken at 10:34 a.m.)

(Proceedings resumed at 10:41 a.m.)

(Proceedings were heard out of presence of the jury:)

THE COURT:  We are back in action.  The jury is not present.  We have a proposed question number 5.

What are the parties' reactions to those questions?

MR. GOTTS:  Your Honor, I think this question is exactly what I was concerned about.  And I am concerned about answering the question, and I actually think that we may have the problem I was concerned about already and was, I think, foreshadowed by some of the earlier questions, that perhaps it is time to instruct the jury about the irrelevance of a party's own patents.

It doesn't need to be -- I'm not looking for anything biased, but we just want to get the jury back on the rails

because this is a concern.

THE COURT:  What specifically do you want to say?

MR. GOTTS:  We had proposed in the Yamaguchi motion an instruction that said:  First, during the questioning of Dr. Pelka yesterday -- let me strike this.  I'm not going to put that in there, because it's -- I'm going to try to work on the fly here.

It says -- we could say, Your Honor, the Court has held that EDD's own patents are not relevant to the question of infringement.

I'm sorry, Your Honor. I was reading the wrong part.  Here is the instruction.

Quote:  "EDD's questions of Dr. Pelka on Tuesday referenced EDD's own '679 patent.  You are hereby instructed that EDD's own patents are not relevant to the question of infringement in this case."

I would only do the second sentence:

"You are hereby instructed that EDD's own patents are not relevant to the questions of infringement in this case."

THE COURT:  Mr. Labgold.

MR. LABGOLD:  Well, I don't agree with the -- I don't disagree with the principle of law.  I think that in this circumstance the jury can be, you know, advised that we can't -- this witness should not answer the question, and we'll

have to address that and be able to say that the existence of Enplas' patents, whether or not they exist, what they cover, is not a basis for concluding that it does not infringe.  However, it does go to other issues with regard to subjective intent, willfulness, and such.

So that's the trick that's involved in that.  Because these products are actually marked, and there's evidence which is on Defendant's exhibit list which goes and has lists of patents that -- Enplas patents which actually cover them.

So I'm open to the instruction as long as it's going -- it just ends up being a neutral factor.

**MR. GOTTS:**  So one moment, Your Honor.

We did talk about this in one of the prior hearings.  They had never disclosed the fact of their patents as a basis for non-infringement on inducement or for non-willfulness, so they shouldn't be relying on that.

**THE COURT:**  I'm inclined to say that I'm not going to ask the witness this question because EDD's own patents are not relevant to questions of infringement in this case, and leave it at that.  One sentence.

Any objection to that?

**MR. GOTTS:**  No objection, Your Honor.

**MR. LABGOLD:**  I think that's a good.

**THE COURT:**  Call our next witness.

I'm sorry.  On Mr. Murano, what is the probative value of

Exhibit 174?  What are you seeking to use it for?

Everyone else may be seated.

MR. SHAW:  So there's a discussion about whether the notice letter should have been sent, and a statement by SSC that the patent people jumped the gun, and they want to still keep talking about business resolutions, business solutions.

Could you highlight the -- it's this portion right here (indicating).

THE COURT:  So this establishes or provides what?

MR. SHAW:  Good faith -- non-willfulness and subjective good faith.  Willful inducement and willful infringement.

MR. SANDERS:  Your Honor, respectfully, whether SSC sent the letter too early or later has nothing to do with whether EDD has good faith belief or not, so it's not relevant to that point.

I would also point out that later on this page, and I hope this won't become an issue, but it says:  "Enplas has the patents on diffusion lens."  So I just wanted to alert Your Honor to that issue, given the discussion that we've just had.

MR. SHAW:  And Your Honor, the second point of the -- second bullet point is SSC's statements that the products of the two companies are different.

THE COURT:  All right.  I'm excluding this document. The danger of confusing the jury substantially outweighs the

probative value from my perspective, and I'm excluding it on that basis.

Under 408, I think it could be used. It's not establishing the amount of damages in the case. It's not establishing or rebutting liability, so I think there's an exception to 408 that could apply, but I'm keeping it out under the balancing factors of relevance.

**MR. SHAW:** Your Honor, may I ask the witness without looking at the document to talk about the first two items that are there on the --

**THE COURT:** You may.

**MR. SHAW:** Thank you, Your Honor.

**THE COURT:** Under 408.

Thank you. Let's bring in the jury.

(Proceedings were heard in the presence of the jury:)

**THE COURT:** All right. Welcome back to our jurors. Everyone may be seated. The jurors did propose question number 5 to Mr. Akiyama. And as I told you at the beginning, your questions sometimes do cause the parties to have to -- we have a discussion about whether the question is proper and how to respond to it, and that's what occurred in this situation.

After conferring with the parties, they have agreed that we should not ask this witness this particular question; and the reason why is a legal reason, which is that EDD's own patents are not relevant to the question of whether there is

infringement in this case.

So I'll say that again.  EDD's own patents are not relevant to the question of infringement in this case, and that's why we're not going to ask this question to this witness, because it might suggest that it is a defense to infringement whether or not EDD owns patents.

So with that, I'll ask EDD to call its next witness, please.

MR. LABGOLD:  Mr. Shaw will be calling the next witness.

MR. SHAW:  Your Honor, our next witness is Mr. Murano from Enplas Display.

THE COURT:  Thank you.

Mr. Murano, will you come forward?

THE CLERK:  Please raise your right hand.

**TAKESHI MURANO**,

called as a witness for the **PLAINTIFF**, having been duly sworn, testified as follows:

THE WITNESS:  Yes, I do.

THE CLERK:  Please be seated.  Please state your name for the record.

THE WITNESS:  I'm Takeshi Murano.

MR. SHAW:  Your Honor, may I give two or three sentences?

THE COURT:  You may.

MR. SHAW:  Mr. Murano, will talk to you this morning about EDD's interactions with Seoul Semiconductor.

THE WITNESS:  Yes.

### DIRECT EXAMINATION

BY MR. SHAW:

Q.   Good morning, Mr. Murano.

Could you please state your full name for the jury?

A.   I'm Takeshi Murano.

Q.   Mr. Murano, could you tell the jury, please, the name of your employer and also your job title?

A.   I work at Enplas Display Device Company, Limited.

As for my title, I am the head of the TV business sales.

Q.   Mr. Murano, how long have you worked in the sales function?

A.   Could I hear the question once again?

Q.   Sure.  For any company, how long have you worked in sales?

A.   About 25 years.

Q.   Mr. Murano, who was your employer in 2010?

A.   Back in 2010, I was working at a company called Enplas Shanghai Hy-cad, which is a company located in Shanghai.

Q.   Mr. Murano, in 2010 did you have business meetings with Seoul Semiconductor?

A.   Yes, I did.

Q.   And why did you have business meetings with Seoul Semiconductor?

**A.**   I visited them for the purpose of finding out whether Seoul Semiconductor had any wish, intent to use our diffusion lenses that we were selling known by the name of LE-cap.

**Q.**   When did this first meeting occur, Mr. Murano?

**A.**   My memory is that it was sometime around September, 2010.

**Q.**   Did you have a meeting with Mr. Ryu in May of 2010?

**A.**   Yes, there was a meeting back in May.

**Q.**   All right.  Could you please turn in your binder to DTX-1023?

**A.**   Yes.

**Q.**   All right.  Could you tell us, please, generally, what this document is?

**A.**   This would be a document that would be prepared by an Enplas employee upon paying a visit to a customer site.  And this report would be prepared for submission to that Enplas employee's superior, as well as to be shared by the employees within the company generally.

        **MR. SHAW:**  Your Honor, I believe DTX-1023 has been admitted, so I can publish it now.

        **THE COURT:**  Yes, it has.

BY MR. SHAW:

**Q.**   And do you create reports like this when you meet with customers, Mr. Murano, on a regular basis?

**A.**   Yes, I do.

        **MR. SHAW:**  Mr. Murano -- Your Honor, may I approach

and pass the witness the pointer?

THE COURT:  You may.

BY MR. SHAW:

Q.   Could you please point out for the jury on the document when the meeting occurred that's reported here?  It might not be turned on.

A.   (Witness complies.)

MR. SHAW:  And could you call up the English, please, Mr. Harper?

THE WITNESS:  (indicating) the date of the meeting is indicated where I just pointed.

And with respect to this particular meeting, that happened on May 25th and 26th, 2011.

BY MR. SHAW:

Q.   And when did you prepare the report, Mr. Murano?

A.   It states that the date of creation by myself of this report was June 11th --

Q.   And where is --

A.   -- 2011.

Q.   -- and where is that shown in the document, Mr. Murano?

A.   (indicating) it would be right here at the upper right corner, the date of preparation.

Q.   And are those dates the same on all -- those data fields are the same in all your meeting reports?

A.   Yes, there would be fields provided to enter such

information.

Q.   All right.  And could you tell us, Mr. Murano, the general purpose of this meeting?

A.   The purpose of this meeting and how the meeting came out to be was that I-Chiun, the Taiwanese manufacturer, was going to be introduced to SSC, since SSC did not have the lens-mounting technology, which I-Chiun did.

Q.   And is there a location on the report that summarizes or provides an overview of the meeting topics?

A.   There is.

Q.   And could you point that out for us, please, on the screen?

A.   (Indicating) It will be right here in the English version.

Q.   All right.  And you mentioned a company, I-Chiun.  How many companies are at this meeting?

A.   There were three companies:  Our company, I-Chiun, and Seoul Semiconductor.

Q.   And why was it that I-Chiun was going to be introduced to Seoul Semiconductor?

A.   As I said earlier, Seoul Semiconductor admired the technology or the equipment for doing the mounting of the lens into the light bar, which I-Chiun had.  So under the request by Seoul Semiconductor that they be introduced to I-Chiun, this meeting turned to be.

Q.   And how much of the meeting was spent discussing this

topic?

A.   I'd say virtually the entire meeting was devoted to discussing that topic.

Q.   Did SSC talk about anything else during the meeting?

A.   Yes.  There were a number of things that they provided to us as information.

Q.   Are those additional items reported somewhere in this exhibit?

A.   Yes, that's reported here.

Q.   And where in this report can we find these additional items?

A.   (indicating)  It's very far, the screen is.

Q.   Right.

A.   It's hard to see.

Q.   Could you point to the general location?

A.   It should be around there (indicating).

Q.   And what did SSC tell you in these other parts of the meeting?

A.   The first matter they stated that -- was that they had sent a letter to Sharp asserting patent infringement of the U.S. Patent 6,473,554.

In addition to that, they stated that there were internal talks taking place within the company regarding the possibility of filing a suit with LED manufacturers other than Sharp, that they were not adverse to filing such a lawsuit.

In addition, they stated that with respect to the U.S. Patent 6,473,554, that they have no intent to file a suit against Enplas, that they would not file suit against Enplas.

Q. Did you respond to these comments from SSC?

A. No, I did not.

Q. Why didn't you respond?

A. As I just stated, we accepted what SSC had to say as being an information. That was not an information that they requested a response from us, nor did we feel that we needed to respond to that information at that spot.

Q. Were you concerned about this conversation or these statements from SSC?

A. No. There was nothing that they stated that warranted myself being concerned.

Q. Now, was Enplas selling diffusion lenses to other companies at the time of this meeting?

A. Yes, we were.

Q. And did SSC know that?

A. I think they knew that.

Q. And why do you think they knew that?

A. During the very first visit of mine to SSC, I did a presentation of our lenses, and included that was in the presentation was photographs of the Sharp TV, which have been on sale since 2008, and these were photos that show the Sharp TVs disassembled that showed the use of our lenses in the Sharp

TV.  So based on that, I believed SSC knew that our lenses have been used in the Sharp TVs.

Q.   Mr. Murano, in 2011, did SSC tell you that selling lenses to other companies infringed any SSC patent?

A.   That was not stated to me even once.

Q.   And in 2012, did SSC tell you that selling lenses to companies other than SSC infringed any SSC patent?

A.   No, that did not happen, I don't think.

Q.   Mr. Murano, did SSC tell you anything at other times that caused you to believe Enplas lens technology was different than SSC's '554 Patent?

A.   My understanding is that that specific point was raised in 2013.

Q.   Okay.  We'll go to 2013 in a minute.

Before we do that, could you look at six exhibits for me, please, very quickly.  DTX-1016?

A.   Yes, I have it.

Q.   And DTX-1017.

A.   Yes.

Q.   And DTX-1018.

A.   Yes.

Q.   And DTX-1019.

A.   Yes.

Q.   And DTX-1020.

A.   Yes.

Q.   DTX-1021.

A.   Yes.

Q.   Mr. Murano, are these minutes from meetings with SSC that you participated in in 2010 and 2011?

A.   Yes, they are.

MR. SHAW:  Your Honor, I'd like to move the admission of DTX-1016, 1017, 1018, 1019, 1020, and 1021.

MR. SANDERS:  No objection, Your Honor.

THE COURT:  And all the translation issues have been resolved as to those issues?

MR. SHAW:  Yes, Your Honor.

MR. SANDERS:  Yes, Your Honor.

THE COURT:  Those exhibits are admitted:  1016, 1017, 18, 19, 20 and 21.

(Defendant's Exhibits 1016-1021 received in evidence)

THE WITNESS:  Yes.

BY MR. SHAW:

Q.   All right.  Now I'd like to go to 2013, Mr. Murano.

A.   Yes.

Q.   Did SSC ask to meet about a new lens in 2013?

A.   Yes.

Q.   And what kind of lens did SSC want to meet about?

A.   The request for a meeting came from SSC based on a request from them to us that we develop total internal reflection lenses for use in thin TVs.

Q.   Now, had Enplas or Enplas Display at that point in time been making a total internal reflection lens for SSC?

A.   No.

Q.   Were TIR lenses -- do you know that TIR means total internal reflection?

A.   I understand that term to refer to what we generally refer to as total reflection lenses.

Q.   Okay.  Mr. Murano, were total internal reflection lenses already being used in direct-lit LED televisions in 2013 when SSC asked for this meeting?

A.   Yes, they were being used.

Q.   And do you know what companies were using them?

A.   I believe LG Electronics, a Korean TV manufacturer, was using such lens.

Q.   And what did LG Electronics call this lens?

A.   The product name for their lens was Pola.

Q.   And was SSC concerned about LG's use of this lens?

        MR. SANDERS:  Objection, Your Honor, speculation.

        MR. SHAW:  I can rephrase the question, Your Honor.

        THE COURT:  Sustained.  Rephrase.

BY MR. SHAW:

Q.   Mr. Murano, did you have any understanding about whether SSC was concerned about LG's use of the lens?

A.   Yes.

Q.   And was that understanding formed from something SSC told

you?

A.    Yes, that is a part of my understanding.

Q.    And what did SSC tell you?

A.    Since I'm more familiar with the term total reflection, I like to use that term instead of total internal reflection. But they stated that they had a pattern that covered the total reflection lenses, but they were also stating that LG Electronics was -- had done the development earlier, that SSC was late, and that that was a source of concern for them, the fact that they were late.

Q.    Was there any advantage to LG in using this Pola lens?

A.    Yes.

Q.    And what was that advantage?

A.    My understanding is that the diffusion lenses which we have been providing to them were effective lenses in terms of inexpensive TVs.  But with respect to TVs which were thinner, that was not a lens that was very strong for that application, and that the solution for that need would be a total internal reflection lens.

Q.    Okay.  And the Pola lens, just to be clear, that was not a lens made by EDD?

A.    That's correct, they were not.

Q.    All right.  Now, did you have an understanding as to why SSC came to Enplas Display to talk about this new total reflection lens?

**A.**   I did.

**Q.**   And what was that understanding?

**A.**   My understanding is that they came to us requesting development for the reason that, first, we have the optical design technology and the knowhow.

In addition to that, Enplas and EDD are known as companies having the capability to manufacture high-precision molds and molded parts.

**Q.**   All right.  Now, Mr. Murano, did you have meetings with SSC about this new lens through the summer of 2013?

**A.**   Yes.

**Q.**   Now, a couple minutes ago you indicated that SSC had told you something in the summer -- or in 2013 about Enplas' technology that caused you to believe it was different than SSC's patents.

Did those statements come during those meetings?

**A.**   That's right.

**Q.**   And what did they tell you?

**A.**   SSC itself understood that the diffusion lenses of ours and the TIR lenses to be developed were two different technologies.  But toward the end of the series of these meetings, even though they had the understanding that the two lens types were different technologies, it was stated to us that the IP department of SSC came to have the view that our diffusion lenses were covered by their total internal

reflection patents.  In other words, they -- their position changed.

Q.   And did that position change occur somewhere in September 2013?

A.   That's right.

Q.   And who was it from SSC that communicated this to you?

A.   That was Mr. Nam, who was the person responsible for development work.

Q.   Did you have a meeting with Seoul Semiconductor in early September 2013 in Seoul?

A.   Yes.

Q.   Could you please turn to DTX-1027 in your binder?

A.   Yes.

Q.   And could you tell us what this document is, generally?

A.   This is a minutes that reflects a meeting between ourselves and SSC.  Even though the document is titled "MOU," this is a minutes -- its purpose was to confirm what transpired during that meeting.

          MR. SHAW:  Your Honor, I'd like to move the admission of DTX-1027.

          MR. SANDERS:  Your Honor, I just want to be clear that there's foundation here that this witness understands English. He's identified an English document.

          MR. SHAW:  Could you turn to the second page -- I can do that, Your Honor.

Q.   Could you turn to the second page of the document, please, in your notebook?

A.   Yes.

Q.   Did you sign the document?

A.   Yes.

Q.   And did you write something under your name, title, and the date?

A.   Yes.

Q.   And what did you write?

A.   The date of the meeting is provided there as well.  But the writing that is made there states that the substance of the September meeting was understood, but that when it comes to the details, they would have to be separately worked out.

Q.   And why did you write that under your name?

A.   Well, for one, I don't read English.  And even though I did ask Mr. Nam that the substance of this minutes reflected the meeting that had just transpired, and was told so by Mr. Nam because this was in minutes, I felt that there would be a need to go back to the company with this material to work out a separate agreement.

        MR. SHAW:  Your Honor, again, move the admission of DTX-1027.

        MR. SANDERS:  Your Honor, no objection.

        THE COURT:  1027 is admitted.  Proceed.

    (Defendant's Exhibit 1027 received in evidence)

MR. SHAW:  Could you publish this exhibit to the jury, please, Mr. Harper, and blow up the first page just so the jury can see it?  And then go to the second page, please, and again blow it up so that it's a little more visible?  Thank you.

Q.   Mr. Murano, could you point out, please, with a laser pointer where your signature is and then where the text is?

A.   (indicating)  So I see my name there, also the title, that being title of the sales department, and also the date, and the note that I just commented on.

Q.   And your name, that's circled?

A.   Yes, it's circled.

Q.   Okay.  Could you please look at PX-170?  And once you found it, please tell us what it is.

A.   This is the contents of a MOU to be the final agreement that came out to be as an upshot of the meeting I just talked about.

Q.   And was this document sent back to SSC?

A.   It was sent to them.

MR. SHAW:  Your Honor, I'd like to move the admission of PX-170.

MR. SANDERS:  No objection, Your Honor.

THE COURT:  170 is admitted.  Proceed.

(Plaintiff's Exhibit 170 received in evidence)

BY MR. SHAW:

Q.   And Mr. Murano, when was PX-170 sent to SSC?

**A.** That would have been shortly after the meeting we just talked about, so it would have been sometime in September.

**Q.** All right. Could you look at the first page and see if there's a date there for us?

**A.** I see September, but as for the date, that's a blank.

**Q.** Could you look at the cover letter, please?

And does that have a date on it?

**A.** It says September 24th.

**Q.** Okay. Mr. Murano, I'd like to move forward again in time.

Did Enplas Display receive some form of notice or warning letter from Seoul Semiconductor in mid-October?

**A.** Yes, that happened.

**Q.** Now, when that letter came in, did Enplas Display stop filling existing purchase orders for Seoul Semiconductor?

**A.** No, we did not.

**Q.** And did Enplas Display stop taking new purchase orders from Seoul Semiconductor?

**A.** After October, I think conditions for accepting orders were changed. That happened.

**Q.** All right. Well, let me first ask. In October, did Enplas Display stop taking purchase orders from Seoul Semiconductor?

**A.** No, we did not stop taking orders from them.

**Q.** And how did the conditions of the purchase order change?

**A.** For one, the price was increased; secondly, previously the

payment terms was payment one month later.  The payment terms was changed to advanced prepayment.

Q.   Now, do you know the approximate selling price of the average Enplas lens in October 2013?

A.   I think in terms of dollars, it would have been about 6.5 cents per lens or something less than seven cents per lens.

Q.   And what was the new price to Seoul Semiconductor?

A.   I don't quite recall the precise number, but my best memory is that it was about 6.2 cents or 6.3 cents per lens.

Q.   Now, let's move forward to 2014.

     Did you have a business meeting with Seoul Semiconductor in 2014 -- January 2014?

A.   Yes, there was.

Q.   And who did you meet with from Seoul Semiconductor?

A.   I met and spoke with President Lee of Seoul Semiconductor.

Q.   And what did Mr. Lee discuss with you during that meeting?

A.   At the very beginning, President Lee offered an apology to us stating that the sending of the warning letter was a mistake, that that was the IP department jumping the gun in so doing, and that the person responsible in the IP department had been fired.

Q.   And did Mr. Lee tell you anything about the two companies' products?

A.   Is my microphone working?

          THE CLERK:  It turned off, Your Honor.  Hold on.

(pause in proceedings.)

THE COURT:  Proceed.

THE WITNESS:  What was the question again, please?

BY MR. SHAW:

Q.   Did Mr. Lee tell you anything about the products of the two companies?

A.   My recollection is that they stated that -- or my recollection is that he stated that SSC was an LED manufacturer, that Enplas was a lens manufacturer, and that the two companies need not be in a confrontational relationship, that the two companies can work together, collaborate.

MR. SHAW:  Your Honor, with that, I will tender the witness for cross-examination.

THE COURT:  Thank you.  Now would be SSC's opportunity to ask questions.

CROSS-EXAMINATION

BY MR. SANDERS:

Q.   Good morning, Mr. Murano.

A.   Good morning.

Q.   EDD's LE-cap lenses are used for direct backlighting; right?

A.   Yes.

Q.   And just to be clear, those lenses are used for direct back-lit LED TVs, not edge-lit LED TVs; correct?

A.   That's correct.  LE-caps are not used in edge-lit LED TVs.

Q.   Mr. Murano, you attended several meetings with Seoul Semiconductor; correct?

A.   That's right, yes.

Q.   Let's focus on the early period, 2010.

You discussed the '554 Patent with Ms. Kayoto Watai in 2010; right?

A.   Yes.

Q.   Ms. Watai was in the Intellectual Property Department of Enplas Corporation at that time; right?

A.   Yes.

Q.   You knew about the '554 Patent, because SSC had told you about the '554 Patent; correct?

A.   I knew -- I came to know of the existence of the '554 Patent, because SSC had told me that they owned the patent, the '554 Patent.

Q.   To be clear, SSC never told you during the meetings that it believed Enplas did not infringe the '554 Patent; right?

A.   Not in 2010, that's my understanding.

Q.   Mr. Murano, you recall that you had a deposition in this case?

A.   Yes.

Q.   And you recall that you were under oath at your deposition, as you are today; correct?

A.   Yes.

Q.   And you tried to tell the truth at your deposition;

correct?

A.   Yes.

Q.   Could we have page 42 of the deposition at lines 3 to 6, please?

        MR. SHAW:  Your Honor, may I have a chance to look at it before it's published?

        THE COURT:  Yeah.  And me too.

        MR. SHAW:  What lines?

        MR. SANDERS:  Page 42, lines 3 to 6.

        THE COURT:  One moment.

                (pause in proceedings.)

        MR. SHAW:  Your Honor, I don't believe there's any impeachment here.  This is consistent with the testimony.

        MR. SANDERS:  It's inconsistent, Your Honor.

        THE COURT:  You may read.

        MR. SANDERS:  Thank you, Your Honor.

Q.   Do you see during the deposition you were asked the question:

    "Q.  During these meetings did SSC tell you that it
    believed Enplas did not infringe the '554 Patent?"
    You answered:
    "A.  No."

        MR. SANDERS:  Could you read that to the witness, please?

                (Interpreter complies.)

Q.   Now, Mr. Murano to the best of your knowledge, no one at Seoul Semiconductor ever told anyone at EDD or Enplas Corporation that their lenses did not infringe the '554 Patent; correct?

A.   I didn't quite get the question.  Could I hear it once again?

Q.   To the best of your knowledge, no one at SSC ever told anyone at EDD or Enplas Corporation that their lenses did not infringe the '554 Patent; right?

A.   No, that is not correct.

Q.   Go now to the deposition at page 55, line 23 through page 56, line 8.

THE COURT:   Proceed.

MR. SANDERS:   Could we have that brought up on the screen, please?   Thank you.

You were asked first the question:

"Q.   Are you aware if anyone at SSC ever told anyone at EDD that EDD's lenses did not infringe the '554 Patent?"

You answered:

"A.   No, I don't recall."

You were next asked:

"Q.   Are you aware if anyone at SSC ever told anyone at Enplas Corporation that Enplas Corporation's lenses did not infringe the '554 Patent?"

You answered:

"A.  No, I don't recall."

BY MR. SANDERS:

Q.  Now let's focus on your meetings with Seoul Semiconductor in 2010.

Your impression was that Seoul Semiconductor was an important LED maker; correct?

A.  Yes, that's right.

Q.  At that time, Seoul Semiconductor was working on developing the optimal LED to help Enplas expand sales of its lenses; right?

A.  I think we were providing information to them as to what an optimum LED would be, and that they were developing LEDs based on that information.

Q.  And Enplas recognized that the strength of the LED was necessary to achieve the desired thinness of the display panel and make it economically attractive; right?

THE INTERPRETER:  Counsel, may I ask you what you mean by "strength" here?  Like a physical strength, mechanical strength?  I'm having a hard time here as the interpreter.

MR. SANDERS:  Let's just go to the document, and then you could translate from there.  I think that will --

THE INTERPRETER:  Do you want me to translate that question verbatim as is?

MR. SANDERS:  I'll reask with the document in front of us to make it easier.

Q.   Could we go to DTX-1016, please?

A.   Yes.

Q.   This is meeting minutes of a meeting that occurred between you and Seoul Semiconductor in September of 2010; correct?

A.   That's correct.

Q.   And in the summary line you wrote the meeting minutes reflect:

"Will provide a lens and after they study the optimal LED will receive a proposal."

Do you see that?

A.   Yes, I see that.

Q.   And in the manager's comment section at the bottom, the manager commented:

"The strength of the LED is necessary for future thinness and providing low cost, so please work to create a good relationship."

Do you see that?

A.   I see that.

Q.   And that comment came from Mr. Yamaguchi; correct?

A.   I see the name Yamaguchi.  I think it's attributed to Yamaguchi.

Q.   And then in the impressions area of the meeting minutes, one of the impressions that Enplas had was that SSC was an important LED maker; correct?

A.   That's right, yes.

Q.   At this time in 2010 EDD was getting few inquiries for its direct-lit LED backlighting; correct?

A.   With respect to mass production, we were mass producing lenses for both Sharp and Panasonic.

With respect to inquiries, we were receiving inquiries from companies other than SSC.

Q.   If you now turn to the section content of the report, the fifth comment, do you see it says:

"Regarding the status of inquiries from the LED makers, most recently there have been few inquiries for direct-lit LED."

A.   I see that.

Q.   In 2010, you recognized that Seoul Semiconductor was at the top of the industry in terms of its technical strength; right?

A.   My understanding -- my understanding was that their technical strength was quite high.

Q.   Now let's talk about your meetings with SSC in 2011.

Now, Enplas knew that it needed Seoul Semiconductor's expertise in developing high-efficiency LEDs to work with Enplas' lenses; correct?

A.   High efficiency would be a required element in making the backlights inexpensive.  So high efficiency was something that we were seeking, not just from SSC only, but from any LED manufacturer.

Q.   Mr. Murano, just so I'm clear on your testimony, you're saying that you could get high-efficiency LEDs from other LED manufacturers?

A.   We had made the same development requirements to other LED manufacturers, and I believe we were in a situation to be able to obtain LEDs from those other LED manufacturers.

Q.   Direct you now, Mr. Murano to DTX-1018.

A.   Yes.

Q.   This document is meeting minutes you created of a meeting with Seoul Semiconductor on January 18th, 2011; correct?

A.   That's right, yes.

Q.   And you see the heading is "Early development of LEDs for LE-Cap."?

A.   Yes.

Q.   And just to be clear, LE-Cap refers to Enplas' lenses; correct?

A.   That's right.  It's a product name of ours.

Q.   And I'd like to direct your attention down to the first line of the remarks.  Do you see there it states:

        "Seoul Semiconductor cannot be removed from the

        development of high-efficiency LEDs."

A.   Yes.

Q.   Enplas was able to establish a sales route to sell its lenses for use with built-in LEDs through its partnership with Seoul Semiconductor; correct?

A.   I don't think that's correct.

Q.   Let's turn to DTX-1021, please.

And this is meeting minutes of a meeting that you and others from Enplas had with Seoul Semiconductor on April 27th, 2011; correct?

A.   Yes.

Q.   I'd like to direct your attention to the impressions section.  It states there in the first three sentences:

"An important manufacturer who may cooperate on development.  We will continue deepening our relationship even further.  We were able to establish a sales route for built-in LED through a partnership with Seoul Semiconductor."

Do you see that?

A.   I'm not sure what you mean -- what the phrase built-in LED means.

Q.   This is meeting minutes that are available to Enplas Corporation.  They're maintained by Enplas Corporation; correct?

A.   That's correct.

Q.   Now I'd like to direct your attention to the supervisor comments area.

Although Enplas was "able to establish a sales route through its partnership with Seoul Semiconductor," the supervisor commented:  "Move forward while also building

relationships with other LED manufacturers;" correct?

A.   I need to say no, since there was no partnership with Seoul Semiconductor that resulted in our being able to expand our sales channel, so that expansion of sales channel based on that did not happen.  So I need to say no.

Q.   Mr. Murano, just to be clear about your testimony.  Are you saying that Enplas did not expand its sales as a result of working with Seoul Semiconductor?

A.   That's right.  There is no fact that working with Seoul Semiconductor resulted in a significant sales route expansion.

Q.   We'll come back to that, Mr. Murano.

At this April 27th, 2011 meeting, SSC also asked Enplas to provide assurance with respect to a patent; correct?

A.   That's right.

Q.   And Enplas refused to accommodate that; right?

A.   The answer that was given was that there had never been a customer in the past that requested that, and that we had never done that in the past, and for that reason we refused to do that on that occasion.

Q.   Now, in 2011 you also learned, as we saw on Direct, that Seoul Semiconductor was considering bringing patent infringement lawsuits against other LCD manufacturers; correct?

A.   That's right.

Q.   But Seoul Semiconductor wanted to cooperate with Enplas; right?

CASE 3:13-cv-05038-NC  Document 453  Filed 03/25/16  Page 85 of 221  930

**A.**   According to minutes, that point was not raised by Seoul Semiconductor in that -- on that occasion.

What happened was that Seoul Semiconductor told us certain information that's reflected in the minutes.

**Q.**   Well, let's take a look at the minutes, DTX-1023.

These are many meeting minutes that you wrote regarding a meeting in mid-2011; correct?

**THE INTERPRETER:**  Excuse me.  I think I mistranslated. Let me correctly translate.

**THE WITNESS:**  That's right.

**BY MR. SANDERS:**

**Q.**   I'd like to direct your attention to the report substance section.

There's a section that begins "Seoul Semiconductor patents."

**A.**   There is a section that states regarding the Seoul Semiconductor patents.  I see that portion.

**Q.**   And you see there that it states in the second line under "Seoul Semiconductor patents, now making arrangements within the company of possibly suing liquid crystal manufacturers in addition to Sharp."

**A.**   I see that.

**Q.**   And you wrote that SSC has no intent of suing Enplas in mid-2011; right?

**A.**   That is written there.

Q.   You also wrote that SSC "strongly desires collaboration involving Seoul Semiconductor's patents, and to prevent entry by other companies."

Do you see that?

A.   What is written here is that Seoul Semiconductor let it made known its desire to combine SSC's patents and the diffusion lens patents we had, and thereby prevent the entry by other companies.

Q.   Do you see there it also states:

"Seoul Semiconductor strongly desires a top-level meeting with Enplas and a decision in the direction of collaboration."

A.   Yes, I see that.

Q.   Now, your notes do not reflect saying anything back to Seoul Semiconductor about whether Enplas' lenses were infringing the '554 Patent; correct?

A.   There is no comment of mine that is shown in this document.

Q.   Now, let's turn back to the issue of market expansion.

In 2012, Enplas was expecting the market for direct-type backlighting for LED TVs to grow substantially in the market for larger LED TVs; correct?

A.   Did you say 2012?

Q.   Yes.

A.   No.  We did not expect a significant growth.  Rather, we

were expecting the growth to become saturated, and that there would not be much growth rate left, that the growth would start to get blunted.

Q.   Now, by 2012, Enplas already believed it had a 30 percent share of the global market; correct?

A.   I think we had a share in the neighborhood of 30 percent. That's my understanding.

Q.   And Enplas believed it had become the global number 1 in the area of direct-type backlighting; correct?

A.   As to the definition of the term "number 1," that is unclear to me.  But at that point in time the TIR lenses as a thin solution was coming out.

And with respect to diffusion lenses, there were the two big players.  We may have had a slightly larger share than the other big player.

Q.   And you mentioned that LG had this TIR lens?

A.   Yes.

Q.   I'd like to direct your attention to DTX-1111.

A.   Yes.

Q.   And do you recognize, Mr. Murano, that this first page identifies this document as coming from Enplas Corporation?

Or let me know if you need a translation.

A.   I can see the company logo.  I believe this would be our company's document.

Q.   I'd like to direct your attention forward to DTX-1111 at

page 9.

MR. SANDERS:  And I ask you to translate, please, for the witness the box on the lower right, the text that appears in that box that says in English:

"Design in for Samsung and LGE TV (Achievement of stable high-volume mass production in Global No. 1.)"

And my question to the witness is whether he disagrees with that.

(Interpreter translates.)

THE WITNESS:  I'm not quite sure I'm getting your question.

Can you show me this document in Japanese?

MR. SANDERS:  My question is just whether he disagrees with the statement that you translated for him.

(Interpreter translates.)

THE WITNESS:  I see.  I see.  Could I hear the question once again?

BY MR. SANDERS:

Q.   The question is do you disagree with the statement?

A.   So could I hear the Japanese translation of the English writing here once again?

Having listened to the Japanese translation, I think this is simply an aspiration that was there that the company wanted to achieve.  It's an aspirational statement, is the way I look at it.

Q.   Now, Mr. Murano, turning back to the patent issues.  After telling you about the '554 Patent back in 2010 and 2011, Seoul Semiconductor told you about the '554 Patent again in 2013 or 2014; correct?

A.   Yes.

Q.   Dr. Nam was the one who told you about the '554 Patent in 2013 or 2014; correct?

A.   On the matter of the '554 Patent, Dr. Nam initially stated that total internal reflection technology and diffusion technology were different.  That is what he stated.  Later in September he stated that it became the view of the patent team at SSC that the TIR patent encompassed the diffusion lenses.

     In addition to that, in January of 2014, President Lee stated the view that the diffusion lenses were covered by the total internal reflection patent.

Q.   Let's talk about what Dr. Nam actually told you.

     Dr. Nam told you that Seoul Semiconductor believed that its '554 Patent was a basic or fundamental patent; right?

A.   That was the position that emerged after mid-September after there was a change in the position he held.

Q.   Dr. Nam also told you that Enplas' products fell under the '554 Patent; correct?

A.   He stated something to that effect, together with his statement that there was no intent on the part of SSC to sue Enplas.

Q.   Now, EDD received a letter from SSC about the '554 and '209 patents in October of 2013; correct?

A.   Yes.

Q.   Now, in none of the meeting minutes that you recorded or meetings that you attended that someone else recorded did anyone at EDD put in writing any belief by SSC -- excuse me -- any belief by EDD that it purportedly did not infringe; correct?

        MR. SHAW:  Objection, Your Honor.

        THE COURT:  Sustained.  Could you restate the question so the witness can understand it clearly?

BY MR. SANDERS:

Q.   Sure.

     In none of the meeting minutes --

        MR. SHAW:  Your Honor, same objection.  This was discussed earlier.

        THE COURT:  I want to hear the question.

BY MR. SANDERS:

Q.   In none of the meeting minutes that you recorded or that someone else recorded, prior to the time that EDD received the letter from SSC in October 2013, did you or someone else record any supposed belief that EDD does not infringe?

        MR. SHAW:  Same objection, Your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  I have a recollection of that matter

being discussed orally, but I'm not sure whether there was a written recording made of that or not.

**BY MR. SANDERS:**

**Q.** After EDD received the letter from SSC in October of 2013, EDD did stop selling lenses to SSC; correct?

**A.** No. Sales continued.

**Q.** I'd like to direct you to your deposition, page 97, at lines 22 to 24.

**MR. SANDERS:** Could we have 97 at 22 to 24 brought up, please?

You were asked the question:

**"Q.** After that letter did EDD ever stop selling lenses to SSC."

You answered:

**"A.** Yes."

New topic.

Generally speaking, when a new TV is advertised with new technology, EDD would disassemble the TV to investigate that technology; right?

**A.** The disassembly and investigation of TVs would be done, but as to whether it would be done in the context you said, it would depend on the nature of the -- of what is advertised.

**Q.** Now, you've received photos of disassembled televisions more than once; correct?

**A.** Yes, that's right. I received them on more than one

occasion.

Q.   For example, you received photos of Sony television that EDD disassembled?

A.   I don't think, not with a Sony TV.

Q.   You're aware that EDD disassembled a Sony television?

A.   I don't know everything about every television that has been disassembled, so I'm not sure.

Q.   I'd like to direct your attention to your deposition at 66, lines 14 through 22.

THE COURT:   You may proceed.

And Mr. Sanders, you need to be ending your examination soon.

MR. SANDERS:   Thank you, Your Honor.

Q.   You were asked:

"Q.   Do you know if EDD has ever disassembled a Sony television?"

And you answered:

"A.   Yes."

Do you see that?

(no response)

Q.   You've met with employees of Sony; correct?

A.   Yes, I have.

Q.   And are you aware that Sony sells televisions in the U.S.?

A.   Yes, I think most naturally Sony TVs are being sold in the U.S.

Q.   All right.  You also testified in Direct, if you recall, that you've seen a disassembled Sharp television?

A.   Yes.

Q.   You've met with employees of Sharp; correct?

A.   I have.

Q.   And you're aware that Sharp sells televisions in the U.S.?

A.   I think Sharp TVs are being sold in the U.S.

Q.   And you've met with LG Electronics to discuss EDD's lenses; correct?

A.   Ever in the past, is your question?

Q.   I'm sorry.  I didn't hear that.

A.   Ever in the past, is your question?

Q.   Yes.

A.   Yes, I have.

Q.   And EDD has designed its lenses for use in LG Electronics TVs; correct?

A.   We don't design for use in LG Electronics TV.  What we do is to manufacture lenses for the LED manufacturers, and the LED manufacturer would sell their product to LG Display, which is a display-manufacturing LG entity, and from there the sales would be made to LG Electronics.  So it is not the case that we sell directly to the LG Electronics.

Q.   Understood.  But you've met with LG Electronics to discuss issues such as supply, scheduling, and pricing; correct?

A.   My understanding is that there has never been a meeting of

that sort with LG Electronics that resulted in a mass production.

Q.   Are you aware that LG Electronics sells its televisions in the U.S.?

A.   And when you said sells its television, what would the "its" be?

Q.   LG Electronics.

A.   So the question is are LG Electronics TVs being sold in the U.S.?

Q.   Yes.

        MR. SANDERS:  Is he aware of that, yes.

        THE WITNESS:  Just looking at the share of LG Electronics TV, I can imagine that their TVs are being sold in the U.S. as well.

     As a factual matter, I am not sure about that, but I would think they're being sold in the U.S.

        MR. SANDERS:  Now, last question, Your Honor.

Q.   EDD has never told its customers not to sell products that incorporate EDD's lenses in the U.S.; right?

A.   I don't think we have ever told them where to sell or where not to sell.

        MR. SANDERS:  Thank you.

        THE COURT:  Ladies and gentlemen, we'll take a lunch break now.  Please return at 1:15.

     During the lunch break, please don't discuss the case with

anyone or do any investigation.  If you have any written question for this witness, you may pose them, and we will ask them upon your return from the lunch break.  Again, you're not required to have questions, but we'll ask them upon your return.  Thank you very much.

(Proceedings were heard out of presence of the jury:)

THE COURT:  You may step down.

All right.  Everyone may be seated.

By my calculation, with 15 hours being the max, SSC has less than five hours remaining total in the case, and Enplas has just over six hours remaining total.  That's with some modifications stipulated to by the parties as to the read-ins and introductions from both parties for the argument on objections this morning.  So that's your remaining time max.

By my assessment, there was several hours of uncontested information presented to the jury today that could have been stipulated to in a much more efficient fashion.  So I will keep that in mind if there's any concern later that there was not enough time to present the information in the case.

(Luncheon recess was taken at 12:34 p.m.)

**Afternoon Session**                                    **1:19 p.m.**

(Proceedings were heard out of the presence of the jury:)

THE COURT:  Good afternoon.

ALL:  Good afternoon, Your Honor.

THE COURT:  Please be seated.

Our jurors have no questions for the witness.  Will EDD have further examination?

MR. SHAW:  Yes.  That was an adverse direct, Your Honor, but I -- five minutes I hope.  The lawyers badly promise, it might go seven to eight but I hope five.

THE COURT:  All right.

MR. GOTTS:  Your Honor, before we bring the jurors back in, there are still a handful of issues on demonstratives.

THE COURT:  For?

MR. GOTTS:  For Pollock who's coming up.

MR. SHAW:  Before we have Dr. Pollock, we have deposition read-ins, and there two issues with those as well.

MR. GOTTS:  Okay.

MR. SHAW:  So those probably should be addressed first.

THE COURT:  All right.  Let's talk about the deposition read-ins first.

MR. LABGOLD:  Since you're up there.

MS. WOODHOUSE:  Sure.  Thank you, Your Honor.

The first objection we have is to Plaintiffs' Exhibit 13. This is actually a document that the Court excluded with respect to Mr. Ryu's testimony.  We -- the Court said that it goes to this other lenses issue that the Court already found is not relevant.

I have a copy if you'd like.

THE COURT:  Yes.  Thank you.

(Pause in proceedings.)

THE COURT:  All right.  And?

MR. LABGOLD:  The relevance, Your Honor, on page again 120, so 45120 --

THE COURT:  Yes.

MR. LABGOLD:  -- is a discussion of the 3528 package, that there was directing -- there was the testimony about.

And then if you look at the next two pages, there's going to be the discussion of the second optic type.  That's an Enplas lens.  It's actually a Sharp Enplas lens.  And then the inner lens package type.  All of this testimony -- testimony on both of these subjects and these two lenses and the 3528 packet was allowed in.

We had the issue with them saying that there was no foundation for it, and we said we would be putting in Mr. Kim's testimony, and so we'd like to be able to -- actually, Mr. Seo, 30(b)(6), so we'd like to admit that in the context as it goes to the entire development history.

THE COURT:  What does Seo say about it?

MS. WOODHOUSE:  He says -- Your Honor, he says nothing about the page that was just cited.  He's directed to 121. Nothing about 120.

MR. LABGOLD:  He talks about the second optic lens type.  (reading)

"And do you see two in the right-hand column under key features?

"Yes.

"Do you see the sentence that states it maximizes the effects of light diffusion by optimizing of the bending?

"Yes.

"And what is meant by 'light diffusion' in that sentence?

"Literally light diffuses.  I think that's what it means.

"And then this is a document that SSC provides to its customers and potential customers.  What is characterizing the lens in this chart?

"As a lens, it maximizes the effects of light diffusion, yes."

**MS. WOODHOUSE:**  That's not --

**THE COURT:**  I'm ruling the objection is sustained under Rule 401/403.  The testimony may be read if it's not objected to, but the document is excluded.

**MS. WOODHOUSE:**  And we have no objection to the testimony, Your Honor.  Just the document.

Our next objection is Plaintiffs' Exhibit 7.  This, again, is another issue about the other lenses.  It's a spreadsheet that discloses the lenses that SSC purchases.  We also have objections to the underlying testimony that refers to this

document as, again, irrelevant based on the other lenses decision.

MR. LABGOLD:  Your Honor, we're happy to blank out the lenses.  I've -- actually, this one is not one where we should blank out the lenses.  We could blank out some of the lenses.

This goes to the whole issue where they say there was a single supplier.  They made a big deal about it, all the damages that are involved, and that there's -- we were the only lens supplier in the market.

And these are all the suppliers for their Enplas-type lenses.  They answered an interrogatory answer -- interrogatory which requested, "Please provide all sales information, purchase information of any Enplas lens," and this is the information that came back.  So they were able to, you know, obviously buy lenses from other sources, and this is testimony that was given by a 30(b)(6) witness.

MS. WOODHOUSE:  And if I may briefly respond, Your Honor.

Your ruling on Tuesday limited to, you know, the story of the bad divorce, and I think you were very explicit.

THE COURT:  Sorry.  Say it again.

MS. WOODHOUSE:  Sorry.  On Tuesday your ruling limited this story of the bad divorce, and I think you've excluded testimony as Mr. Labgold had the opportunity and did cross-examine Mr. Ryu on the testimony and whether or not we

were able to procure other lenses.  This is just not relevant.

MR. LABGOLD:  Well, again, testimony today was going primarily to this interaction and what was said in the background and far more than any issue of infringement or validity, and we would respectfully request that we be able to put in the evidence to suggest this is something SSC has produced and affirmatively shows there were other sources for diffusion lenses.

THE COURT:  You have the objection -- you have put it in, but the objection is sustained under 401 and 403 as being cumulative and irrelevant.

Next?

MS. WOODHOUSE:  That's it for our objections to the read-ins, Your Honor.

MR. GOTTS:  Your Honor, I'm going to try to be very brief because I am very sensitive to the jury waiting.

There are some slides in the back end, which I think we can probably take -- I don't know if we'll get to them before a break, so I only have two issues on the front end because I think we will get to them.

The first slide relates to, if we can -- you'll probably remember this graph -- demonstrative (indicating), Your Honor.

THE COURT:  Yes.

MR. GOTTS:  This is -- they have it in here for Dr. Pollock.  It never was addressed in his report.  Totally

new.  It came up -- it was actually probably created by counsel.  It looks like a bunch of Magic Marker, but it's not been addressed by the witness, and so I think it should be excluded.  It's beyond the scope of his report.

And we have one other for now that's beyond the scope of the report.

**THE COURT:**  What is that?

**MR. GOTTS:**  This is another slide here, Your Honor.  It's slide -- well, here's a picture of it (indicating), Your Honor.  Mr. Owens can probably address this better.  I don't even know what it is, Your Honor, because I've never seen it before.

**MR. LABGOLD:**  Your Honor, this is directly responsive to the slide --

**THE COURT:**  We're going to have one person at a time.

**MR. OWENS:**  Your Honor, just to explain that document very quickly, this is a new position.  It doesn't appear anywhere in Dr. Pollock's supplemental expert report.  We met and conferred twice, asked them to explain where in his report this was.  They were never able to identify any specific discussion of this anywhere.

**THE COURT:**  All right.  So the objection is beyond the scope of the report?

**MR. OWENS:**  Yes, Your Honor.

**MR. GOTTS:**  Yes.

THE COURT:  What is the response from EDD?

MR. LABGOLD:  This one here particularly you recognize red and blue lines, this is responsive to the slide that they put up showing that there was a difference with the red and blue lines.  We should be able to respond to Dr. Moore's allegation.  It was not an allegation that had ever been presented before, and at the same time this, again, it's responsive.

With regard to the other slide, it's a matter of the issue that was raised in court, and both parties agreed that the evidence would go in demonstrative, and he's going to -- I'd like to have him comment.

THE COURT:  And this is a demonstrative as well?

MR. LABGOLD:  Yes.

THE COURT:  The objection to both his -- overruled as being responsive to things that came up with Dr. Moore and other witnesses, but I'm not going to allow new opinions beyond the response to come in.

All right.

MR. LABGOLD:  Understood.

THE COURT:  Let's call in our jurors.

(Proceedings were heard in the presence of the jury:)

THE COURT:  All right.  Good afternoon.  Everyone may be seated.

And if Mr. Murano will retake the stand for a few more

minutes of questioning by EDD.

**REDIRECT EXAMINATION**

**BY MR. SHAW:**

Q.   Good afternoon again.

Mr. Harper, could you call up DTX-1016, please.  And could you go to the English version, please.

All right.  Now, Mr. Murano, could you look at 1016 in your binder, the Japanese version?

A.   (Through interpreter)  Yes.

Q.   Mr. Murano, in the section in the center here "Content of the Report," are those things that you told SSC or SSC told you?

A.   (Witness examines document.)  What is written there is the information we provided to SSC as to what an optimum LED would be like.

Q.   Okay.  Now, do you remember questions about the patent assurance document?  It was in DTX-1021.

A.   (Witness examines document.)  Yes.

Q.   Do you remember whether in June Enplas Corporation's Legal Department was working on a patent assurance document?

A.   And this would be June of which year?

Q.   I'm sorry.  2011.

A.   And so what was the question having to do with a patent that was happening in June of 2011?

Q.   The question was:  Do you remember whether or not Enplas

Corporation's Legal Department was working on a patent assurance agreement?

**A.**   I don't think they were doing that work.

**Q.**   All right.  I want to hand you an e-mail.  I just want you to see if this refreshes your memory, please.

        **MR. SHAW:**  May I approach, Your Honor?

        **THE COURT:**  You may.

        **MR. SANDERS:**  Your Honor, does this have an exhibit number?

        **MR. SHAW:**  It does not have an exhibit number.  If you want to see it, you're welcome to.

        **MR. SANDERS:**  Your Honor, we have an objection then.

        **THE COURT:**  Have you seen it?

        **MR. SANDERS:**  If it's not an exhibit in the case, Your Honor, we object.

        **THE COURT:**  No.  He can refresh with the document; and then if you want to cross-examine the witness with it, you may.

                (Pause in proceedings.)

**BY MR. SHAW:**

**Q.**   And, Mr. Murano, I don't need you to read the document, but I want you to look at the June --

        **THE COURT:**  We're not going to read the document into the record.

        **MR. SHAW:**  We're not going to read the document.

        **THE COURT:**  Including you're not going to read the

document into the record.

MR. SHAW: And I'm not going to read the document.

Q. I just wanted you to look at the June 1st, 2011, e-mail and point number 3, and ask if that refreshes your memory what the Legal Department was doing on this patent request.

A. (Through interpreter) Yes.

Q. I'm sorry --

THE COURT: If his memory has been refreshed, then you have to take the document back.

MR. SHAW: Yes. I'm happy to take it back.

Q. And was the Enplas Legal Department working on a response to SSC on the patent assurance agreement?

A. (Through interpreter) They were.

Q. And were you informed -- did you inform SSC of that?

A. Yes, I did.

Q. And who asked for the agreement from Enplas?

A. So you're asking me who at Enplas requested that agreement?

Q. No. I'm sorry. Who at SSC requested the agreement?

A. I think it was Mr. Ryu.

Q. And was the agreement requested by SSC to cover SSC's patents, or what was the purpose of this agreement that was requested?

A. My recollection is that they wanted a patent assurance from Enplas.

**Q.** And what did they want Enplas to assure?

**A.** My understanding is that they wanted an assurance with respect to the diffusion lenses we would be supplying.

**Q.** And an assurance as to whose patents?

**A.** My understanding was that they wanted to have an assurance with respect to Enplas' diffusion lenses based on Enplas' patents.

**Q.** All right. And were they asking you to assure them that -- anything about SSC's patents?

**A.** No, there wasn't.

**Q.** All right. I want to have a couple quick questions about when EDD stopped selling lenses to SSC to make sure the record's clear.

**A.** Yes.

**Q.** Was there a time when Enplas Display stopped selling lenses to Seoul Semiconductor?

**A.** That's right, yes.

**Q.** Did that occur in October 2013?

**A.** No, it was not.

**Q.** Did it occur in December 2013?

**A.** No, it was not.

**Q.** When is the last time you remember selling lenses to Seoul Semiconductor?

**A.** That was June of 2014 by my memory.

**Q.** All right. Now, I asked you some questions about what SSC

told you about infringement. I have two more of those to ask.

A.   Yes.

Q.   In 2010, did SSC ever tell you that selling lenses to other companies infringed an SSC patent?

A.   No, that didn't happen.

Q.   And in 2013, before you and SSC started to meet about this total reflection lens, did SSC ever tell you that selling diffusion lenses to other companies infringed any SSC patent?

A.   No, that didn't happen.

Q.   And all through 2012 and through 2013, Enplas Display was selling lenses to Seoul Semiconductor?

A.   That's correct.

        MR. SHAW:  That's all I have, Your Honor.

        THE COURT:  Thank you.

        MR. SANDERS:  No recross, Your Honor.

        THE COURT:  Thank you.

    Mr. Murano, you may step down.  Thank you very much.

                    (Witness excused.)

        THE COURT:  And if EDD will call its next witness, please, or present its next information.

        MR. CASTELLANO:  Good afternoon, Your Honor.  Jeff Castellano for EDD.

        THE COURT:  Good afternoon.

        MR. CASTELLANO:  We have some deposition read-ins that we'd like to proceed with.  I and my colleague Mr Russell, will

be handling the read-ins.

THE COURT:  Very well.  And will one of you be playing the role of the witness?

MR. CASTELLANO:  Yes.  Mr. Russell will be playing the role of the witness.

THE COURT:  All right.  So just a reminder to the jury, these are of a similar nature to what you heard earlier in the case.  We are going to read into the record portions of deposition testimony from witnesses in the case.

As a reminder, depositions are taken under oath under penalty of perjury, and you should consider the information that you're getting by way of these depositions just as you consider all the other evidence in the case.  It's a type of evidence.  You should give no emphasis to the manner of it being presented here.  There is no bold and italics or sort of emphasis that's in the transcripts.  Any such emphasis is being provided by the actors here, so to speak, and is not in the original.

If both counsel and witness will identify which role you're playing, and make sure you speak into the microphone to aid the jury in hearing you.

MR. CASTELLANO:  Yes, Your Honor.

Before we get started, I'd like to move for the admission of a few exhibits that will come up during the testimony and so we can publish them to the jury as we go through.

THE COURT:  Yes.  They are?

MR. CASTELLANO:  That would be PX-4, 6, and 16.

MS. WOODHOUSE:  No objection.

THE COURT:  All right.  4, 6, and 16 are admitted.

(Plaintiffs' Exhibits 4, 6, and 16 received in evidence)

MR. CASTELLANO:  And good afternoon, ladies and gentlemen.  As I said, my name is Jeff Castellano, one of the lawyers representing EDD.

Mr. Russell is on the stand.  I will be -- we'll be reading in two -- excerpts from two depositions.  The first is the deposition of Won Cheol Seo who was the corporate representative of SSC, the person that SSC designated to speak on its behalf in this case.  And I will be reading the part of Mr. Labgold, the questioner, and Mr. Russell will be reading the part of Mr. Seo.

THE COURT:  And this was taken June 23rd, 2015?  I don't know if you said that.

MR. CASTELLANO:  I did not, but I believe that is correct.  June 23rd, 2015.

THE COURT:  You may proceed.

                    WON CHEOL SEO,

called as a witness for the Plaintiffs, having been duly sworn, was examined and testified through DEPOSITION TESTIMONY as follows:

(Transcript of deposition testimony as read by Jeffrey

**Castellano and Andrew Russell:)**

"Q.   Could you please state your full name for the record?

"A.   My name is Won Cheol Seo.

"Q.   Now, you understand that you're here testifying on behalf of SSC?

"A.   Yes.

"Q.   And do you understand that since the deposition is of the corporation, you have been designated to testify on its behalf?

"A.   Yes.

"Q.   Now, you understand that SSC purchased Enplas lenses in the past?

"A.   Yes.

"Q.   And when was the first time SSC purchased Enplas lenses?

"A.   My understanding is that it was year -- November, year 2011.

"Q.   What is your general understanding of the relationship between Enplas -- any Enplas entity and SSC prior to that first purchase?

"A.   My understanding is that the relationship was joint development.

"Q.   What was SSC's role in the -- what you've identified as a joint development?

"A.   Anyway, developing optical lens for a backlighting

unit, BLU, for direct backlighting type.

"Q. What was Enplas' role?

"A. Jointly designing lens pursuant to SSC specification.

"Q. And did SSC have a particular experience that it brought to the project?

"A. I think there is or was -- there were.

"Q. And what was the expertise or areas of expertise?

"A. SSC has experience in developing direct backlighting. What I mean by that is that they develop -- SSC developed the package that direct backlighting goes in. That's -- they have experience in that area, LED packaging for direct backlighting.

"Q. Anything else?

"A. No.

"Q. And did Enplas have an expertise that it brought to the joint development project?

"A. My understanding is that Enplas has a deep understanding about lenses itself.

"Q. Is your understanding it had expertise in lenses in general or specifically for backlighting?

"A. Expertise in lenses itself.

"Q. Let me mark as Plaintiffs' Exhibit 13 a copy of a document bearing Production Number SSC 0045116 through 126.

        "And this is another document that you brought with

you; correct?

"A.  Yes.

"Q.  And what is the purpose for why this document was prepared?

"A.  This document was to -- was used to introduce direct-type LED package to customers.

"Q.  Did you ask anyone in your preparation to provide you a complete list of intermediaries between SSC and each customer for each sale?

"A.  Yes.

"Q.  And is this the list that was given to you?

"A.  Yes.

"Q.  SSC is not sure of the identity of each intermediary entity between SSC and the ultimate end user?

"A.  Correct, not exactly.

"Q.  Could you estimate, please, the number of intermediary entities between SSC and the ultimate end users.

"A.  I cannot.  There are too many.

"Q.  Are there more than 10?

"A.  Well, I'm not exactly sure; but if we're saying the ultimate end user as those individuals who purchase television, if that is the definition, it's too many to identify those channels where these individual end users will purchase their television from.

"Q.   Can you identify the number of intermediaries between SSC and the point of importation of the products into the United States?

"A.   I cannot tell the numbers.

"Q.   How difficult is it for SSC to track that information?

"A.   It is not easy because, first, we have to identify our customer companies located in China, Japan, and Korea; and thereafter, we need to find out whether or not those manufactured TV sets are exported to the U.S. or not.

"Q.   Is anyone within SSC able to identify the number of intermediary entities between SSC and the importer of products with SSC light bars into the United States?

"A.   I would have to investigate, but I don't think there is anyone.

"Q.   Does Plaintiffs' Exhibit 4 represent information provided by SSC to Enplas so that Enplas' products match SSC's specifications?

"A.   Yes, that's my understanding.

"Q.   And do Plaintiffs' Exhibits 6 and 13 represent all of the information you identified about the intended use of SSC's products that was provided to SSC from purchasers or customers of the SSC light bars?

"A.   Well, my understanding is that that is -- that those are the extent.

"Q.  What information in Plaintiffs' Exhibit 6 was created by Enplas and provided to SSC?

"A.  I believe the information regarding lens under parts lists -- list would have been provided by Enplas.

"Q.  And that information is found on page SSC 005 -- I'm sorry -- SSC 0045131?

"A.  Yes.

"Q.  Without guessing, can you identify any specific information in Plaintiffs' Exhibit 13 that was provided by Enplas to SSC?

"A.  No, I don't have any."

MR. CASTELLANO:  And, Your Honor, we'll be now reading from the second volume of Mr. Seo's 30(b)(6) testimony.  That's June 24th, 2015.

THE COURT:  Proceed.

**(Transcript of deposition testimony as read by Jeffrey Castellano and Andrew Russell:)**

"Q.  In preparing for the deposition, did you find any SSC marketing materials that were distributed by SSC to its customers or potential customers in which Enplas encouraged adoption of direct lens-type BLU packages?

"A.  I believe the specification is that.

"Q.  The specification is Plaintiffs' Exhibit 6 that we talked about yesterday?

"A.  Yes.

"Q.  And is the portion of the specification that you were referring to found on page 4 in the row that begins with the word 'lens'?

"A.  Yes.

"Q.  Leaving aside Plaintiffs' Exhibit 6 and document other specifications, did you find in preparing for the deposition any other SSC marketing materials in which Enplas encouraged adoption of direct lens-type BLU packages?

"A.  No, I did not find any.

"Q.  In preparing for this deposition, did you find any SSC marketing materials that describe Enplas as anything other than a supplier of lenses to SSC?

"A.  No, I did not find any.

"Q.  What was the purpose of -- what is the purpose of Plaintiffs' Exhibit 16?

"A.  When I look at the title, this is a recommendation of using two different lenses, 9857E and 9845, in one -- one product.

"Q.  Did SSC create this document?

"A.  Yes.

"Q.  Did Enplas participate in creating this document?

"A.  I presume so.

"Q.  Is there any page in this document that gives credit to Enplas?

"A. No. Enplas is not mentioned.

"Q. Could you please pull out Plaintiffs' Exhibit 13. And Plaintiffs' Exhibit 13 is a document you identified as marketing materials SSC provides to its customers?

"A. Yes.

"Q. Could you turn, please, to the page Bates numbered SSC 0045121. And do you see the row in the chart where the left-hand column states 'Second Optic Lens Type'?

"A. Yes.

"Q. And do you see number two on the right-hand column under "Key Features"?

"A. Yes.

"Q. And do you see the sentence that states, 'Maximizes the effects of light diffusion by optimization of the bending'?

"A. Yes.

"Q. And what is meant by light diffusion in that sentence?

"A. Literally light diffuses. I think that's what it means.

"Q. Did you understand the meaning of this document, including that paragraph, as part of your preparation for this deposition?

"A. Yes.

"Q. And was -- in this document that SSC provided to its

customers and potential customers, was it characterizing the lens in this chart as a lens that maximizes the effects of light diffusion?

"A.  Yes."

MR. CASTELLANO:  And that concludes the reading from the Seo deposition.

The next deposition read-in -- the next and final is of Won-Il Kim, an engineer at SSC.

THE COURT:  Proceed.

**WON-IL KIM,**

called as a witness for the Plaintiffs, having been duly sworn, was examined and testified through **DEPOSITION TESTIMONY** as follows:

**(Transcript of deposition testimony as read by Jeffrey Castellano and Andrew Russell:)**

"Q.  Could you please state your full name for the record?

"A.  It's Won-Il Kim.

"Q.  And by whom are you currently employed?

"A.  I am employed by Seoul Semiconductor Company.

"Q.  And what is your current title or position?

"A.  I'm an engineer.

"Q.  And prior to that, what was your position?

"A.  Business general manager in television development.

"Q.  And just simply, that type of technology involves using edge-mounted LEDs where the light is injected into a

waveguide?

"A.   Yes, that's correct.  I think when you said 'waveguide' you were actually referring to lightguide panel.

"Q.   So a piece of acrylic -- a sheet of acrylic or some kind of transparent material in which the light is propagated; correct?

"A.   Yes, that's correct.

"Q.   Do you understand how the Enplas lenses performed?

"A.   Yes.

"Q.   And what is your understanding of the function that they performed?

"A.   The light from LED is propagated through infraction and/or total refraction by going through a lens."

        MR. CASTELLANO:  And that concludes the Kim readings, Your Honor.  That's all we have.

        THE COURT:  Thank you very much.

     And if EDD will present its next information or call its next witness.

        MR. LABGOLD:  Yes, Your Honor.  We'll be calling Dr. Clifford Pollock.

        THE COURT:  All right.  Dr. Pollock may come forward.

     And, ladies and gentlemen, Dr. Pollock is another of the expert witnesses who, because of his experience, education, skills, is permitted to give his expert opinion to the jury.

MR. LABGOLD:  Your Honor, as a procedural matter, we have Rule 50(a) motions.  I think that's the close of their case.

MR. GOTTS:  No.  Actually Dr. Pollock is on our list.

THE COURT:  We'll take them on a later occasion.

MR. LABGOLD:  Okay.  I just wanted to make sure.

THE COURT:  Dr. Pollock, we'll swear you in.

And before he begins, Mr. Labgold, if you'll tell the jury the purposes of the expected testimony so they have that framework, please.

MR. LABGOLD:  Yes.  Thank you, Your Honor.

Dr. Pollock is going to be testifying in two general subject matter areas.  The first we're going to deal with noninfringement issues, and the second part we'll be dealing with the invalidity.  So when we deal with the invalidity issue, we've prepared a binder of the prior art.  I think that will be helpful like having the patents; but first things first, we'll be dealing with the noninfringements.

THE COURT:  Thank you.  We'll swear you in.

MR. LABGOLD:  Thank you.

                    **CLIFFORD POLLOCK**,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

THE WITNESS:  I affirm.

THE CLERK:  Please be seated.

MR. LABGOLD:  And if I may, I was given the responsibility of handing these up.

THE CLERK:  Please state your full name for the record.

THE WITNESS:  I'm Clifford Pollock.

**DIRECT EXAMINATION**

BY MR. LABGOLD:

Q.   Good afternoon, Dr. Pollock.

A.   Good afternoon.

Q.   Can you please introduce yourself to the jury with what your current position is?

A.   I'm Cliff Pollock.  I'm a professor of electrical and computer engineering at Cornell University.

Q.   And can you please tell us your education starting with college?

A.   I went to Rice University.  I got a Bachelor of Science in electrical engineering in 1976, a Master's in '79, and a Ph.D. in 1981 all at Rice.

Q.   And did you prepare a master or a doctor's -- doctoral thesis?

A.   Yes, I did.

Q.   And what were the general subject matters?

A.   The Master's thesis was on tunable diode lasers, and the Ph.D. was on color center lasers and spectroscopy.

Q.   And did you do any post-doctoral work?

**A.**   Yeah.  I was a post-doc at the Bureau of Standards for two years.

**Q.**   And what was the nature of your work there?

**A.**   We --

**Q.**   What is the Bureau of Standards first?

**A.**   Oh, the National Bureau of Standards, it's now called NIST.  They maintain the standards for the nation, the time, the length of the meter, the mass, all those things.

I worked on the -- determining the frequency -- high-frequency measurements, and this was the establishment of the new standard for the meter.  So we developed a new way to -- well, in fact, based on our measurements, the meter was redefined.  And so it was pretty cool, a lot of fun.

**Q.**   And does that have anything to do with optics?

**A.**   Oh, yeah.  They use a laser to -- well, here's the deal. It used to be you had a meter bar and you'd try and figure out the speed of light.  Einstein said the speed of light is constant.  So we said, "Okay.  Smart guy.  Let's just accept that."  And so we defined the speed of light, and a meter is the distance light travels in one over the speed of light seconds.

And so that then says, "Well, how do you measure that?" So time we can measure to infinite -- not -- we can measure to very good accuracy, and so the wavelength and the frequency of a laser can be related through the speed of light.  So if you

can measure the frequency, you know the wavelength.  The wavelength is the length.  It's a long answer, but that's what I did.

Q.   What is your current position?  Do you have any titles?

A.   I'm the department chair.  I'm called the Director of the School of Electrical Engineering.  It's effectively a department chair.

Q.   And how long have you held that position?

A.   Currently I'm in my second round, so I'm into my third year of my second tour.

Q.   And how long have you been at Cornell?

A.   I joined in 1983.  So that's about 33 years.

Q.   Do you belong to any professional associations?

A.   Yes.  I'm a member of the Optical Society of America.  I'm a fellow in that.  And I'm a member of the Institute of Electrical and Electronic Engineers, and I'm a fellow in that.

Q.   Do you -- do you or have you conducted research during the course of your professional career?

A.   Sure.  That's what we do.  I've had grad students all the time, and we do research.  My research has been in lasers, fiberoptics, sensors, and waveguides.

Q.   And does any of that relate to the subject matter in this case?

A.   A lot does, yes.

Q.   Now, do you teach any classes?

A.    I do.

Q.    And what types of courses have you taught?

A.    Over the years, I've taught lasers, fiberoptics, circuits, electronics, spectroscopy, nano-optics.  A lot of things.

Q.    And have you created any courses?

A.    I've created two.  One was the nano-optics, and one was the fiberoptic course.

Q.    And would the subject matters that we're dealing with here, waveguides or total internal reflection, does that relate on any of the courses that you teach?

A.    It's right on the heart of my course.

Q.    Are you -- do you have any courses this semester?

A.    I'm teaching the fiberoptic course this term.

Q.    Do you have any publications?

A.    I have about 80 publications.

Q.    And in what areas are you published?

A.    Again, optics, fiberoptics, lasers, solid-state lasers, spectroscopy, optical sensors, a variety of things.

Q.    And do you do any editorial review?

A.    I'm a topical editor for *Optics Letters*, which is a journal of the Optical Society of America.

Q.    Have you received any grants for your research?

A.    Oh, yeah.  That's what we do.  We go out and try and find research money.

Q.    And what agencies or entities have you received grant

money from?

A.   More recently it's been DARPA.  It used to be Naval Research Lab, Air Force Scientific Office of Research, and the National Science Foundation.

Q.   And do you have any patents?

A.   I have five patents.

Q.   And what general area do they relate to?

A.   Three were in new lasers we invented, one was in a fiberoptic sensor, and one was in a fiberoptic switch.

Q.   Okay.

MR. LABGOLD:  We would offer -- it's stipulated, but we offer Dr. Pollock as an expert with regard to the subject matter presented in this case.

THE COURT:  Pursuant to the stipulation, I'll permit Dr. Pollock to testify within the confines of his previously disclosed opinions.

You may proceed.

BY MR. LABGOLD:

Q.   And what is your -- what do you understand is your role in this case?

A.   I am an expert witness.

Q.   And with regard to what type of subject matter?

A.   Total internal reflection.  Primarily we're looking at two patents, patent '554 and '209, and I've been asked to offer opinions on infringement and invalidity.

Q.   Are you a lawyer?

A.   No, I am not.

Q.   So are your opinions limited to technical areas?

A.   Yes, they are.

Q.   Now, in preparing your opinions -- well, let me ask you.
What subjects have you rendered opinions on, generally?

A.   Invalidity and infringement.

Q.   Okay.  And what types of information did you review in forming your opinions?

A.   Oh.  Of course, I read the patents in question.  We did a lot of looking for prior art, so I looked at a lot of former patents.  I've looked at expert reports from SSC.  I've talked to people at EDD about their work.  I've looked at a lot of technical documents concerning the materials we've been seeing. That comprised a lot.  I've looked at the lenses, played with those.  So...

Q.   Did you review any light bars?

A.   No, I did not.

Q.   Is there any reason why you didn't?

A.   They don't have any impact on my analysis of whether these lenses are infringing.

Q.   Do you have an understanding as to whether EDD makes light bars?

A.   I do.

Q.   And what is your understanding?

A.   They do not make light bars.

Q.   Now, let's go to the first slide.  And just briefly, what is depicted here?

A.   That's a copy of my textbook.

Q.   And is this a textbook that you've used in your coursework?

A.   Yeah.  I wrote this book based on the course I developed.

Q.   Okay.  And we'll see some figures from that shortly.

Turning to the next slide, first we're going to talk about infringement.  So with regard to the '554 patent, what opinions do you have with regard to noninfringement?

A.   I've -- in my opinion, EDD lenses 9854D, 9854E, and 9879 do not infringe Claims 1, 6, 33, 34, or 35 of the '554 patent.

Q.   And with regard to the '209 patent, we're going to come back to those because first we're going to go through the '554 patent.

Now, turning to our next slide, in general terms, what is at the core of the '554's patent technology?

A.   The '554, the core technology is total internal reflection.  It's basically using total internal reflection to couple light into a planar structure for display.

Q.   Now, total internal reflection, is that something that Dr. Pelka invented and his colleague invented?

A.   It's a fact of nature that's been known for a long time.

Q.   Now, can you explain briefly what Snell's law is?

**A.**    Sure.  We have a slide which illustrates some rays here.

So I've drawn three vectors here.  One is -- when light travels and it hits a dielectric -- or a refractive index change, such as glass, it changes direction, and that's called refraction.  And so on the left there, the green arrow, that shows a light ray inside of a high-index material striking the boundary and then leaving it and it's refracting.  It's changing direction.

Snell's law relates those angles.  So if you know the index refraction and you know the input angle, you can predict how it goes out.  So Snell's law just gives you a way to accurately predict rays.

At the other extreme, what's relevant in this case is we have refraction and we have total internal reflection.  As you increase that angle theta 1, the transmitted angle gets steeper and steeper, and it eventually reaches what's called the critical angle.

And beyond that, you have total internal reflection, and so light hits that interface and bounces and all of the power reflects.  And so total internal reflection is when you hit from a high-index surface at an extreme angle, and it's beyond the critical angle and it will totally internally reflect.

So that critical angle defines the boundary between when we go from refraction to reflection.  And I should not, if you come in the other way, if you go from a low index to a high

index, you do not get total internal reflection but you do get refraction.  So TIR only occurs when you're inside a high-index material.

Q.   And what are indicated by the black arrows in the first two?

A.   Oh.  Those are -- those are called Fresnell reflections. So when light hits glass -- you've probably seen this at home. You're looking out the window at night and you see a reflection of yourself.  About 5 percent of the energy going through glass reflects, and that's the Fresnell reflection.  So that ray, that green ray, would have a slight little ghost reflection off of it.

Q.   Can you give us an example of something that uses -- in everyday life that takes advantage of refraction, a practical application?

A.   Refraction.  Oh, the glasses.  Of course, eyeglasses.  I was thinking of a prism, but there's lots of examples.

Q.   And can you give us some ideas about with total internal reflection -- let me look at the next slide and just --

A.   Yeah.  I mean, the classic --

Q.   -- give me a basic concept of what you're depicting here?

A.   Yeah.  The classic example of TIR is the fiberoptics.  So this outlines a waveguide, and what I've shown is a ray waveguide.  So the ray goes in and out.  It's a high-index material surrounded by low-index.  If that ray is above the

critical angle, it will zigzag along and never get out.

What the really cool thing about this to me is it's total. It's the beast reflector in the world. I like to always ask my students a trick question on the exam. I'll put that up and then I'll put another one with silver coating. And I say, "Go to the bathroom, get really good silver, make a really nice mirror out of this. Which is better?" And it turns out the silver will kill it, and you won't get 2 meters with this. If it's coated with silver, it will -- it won't transmit at all, and it's because there's about, you know, a 3 or 4 percent loss per balance on the silver.

Whereas, on the glass, this total internal reflection, it is total. There's no loss. So you can go 60 miles in an optical fiber and still have fiber, light coming out the other end. It's a very impressive phenomenon.

Q.   And what's shown on the next slide?

A.   Oh, just -- just a schematic of a fiberoptic. It can go around corners and bend and travel long distances. So it's the classic -- that's the big commercial application of TIR right now.

Q.   And what's another application?

A.   Another one is the next slide shows jewelry. Here's a diamond. And the only reason I included that is just I wanted to show that this has been around for a long time. People have known about total internal reflection and have exploited it for

various applications, whether it's jewelry or fiberoptics and high tech.  So it's just -- it's a classic phenomena of optics, and optics is one of the oldest fields and it's well-established.  It's a wonderful, wonderful technology. Still exciting, but it's been around a long time.

Q.   Now, turning to the first Claims 1 and 6 of the '554 patent, are there any -- now, the '554 patent, a copy of it will be in the bigger binder.  It will be DXT-1004 should you need to refer to it.  Careful lifting the binder.

A.   Wow.  Okay.

Q.   And then I think the other binder just has your slides.

Now, starting with Claim 1, do you have any opinions as to whether or not the Enplas lenses 9854D, 9854E, and 9879, whether they infringe Claims 1 and 6?

A.   They do not infringe Claims 1 and 6.

Q.   And with regard to those claims, can you tell us one of the reasons why they do not infringe?

A.   One of the reasons -- there's a couple issues in Claim 1. Can you put Claim 1 up?  Do you have it?

Q.   Oh, yes.  I'm sorry.  I should have moved to the next slide.

A.   There's a couple issues.  One is it requires generally parallel top and bottom surfaces, and I don't believe these lenses display that.

And at the bottom, the last line it says:  (reading)

"The light rays which would otherwise pass out of said waveguide are captured for propagation between said top and bottom surfaces."

And I don't think that happens.  So, in my opinion, this is -- those two issues are -- those are two elements of the claim which are not being met.

Q.  Okay.  And with regard to TIR, do you have any opinions with regard to Claims 1 and 6?

A.  Oh, I'm sorry?

Q.  With Claims 1 and 6, whether or not --

A.  1 and 6.  That was 1.  That's Claim 1.  Oh, Claim 6.

(Witness examines document.)  Oh.  Claim 6 says it's made of one piece.

Q.  Okay.

A.  And, yeah.

Q.  Turning to your first issue that you raised with "do not have generally parallel top and bottom surfaces," if we can turn to the next slide.

A.  Yeah.

Q.  First we've got -- before we go on, you understand the Court has defined certain of the terms?

A.  Absolutely.

Q.  And in forming your opinions, did you use those definitions?

A.  I did.

Q.    Okay.  And we have them.  I think there's a tab that you'll be able to find them in your binder should you need them?

A.    I've got them right here, yeah.

So the ones that are critical in Claim 1, the major one is waveguide, an optical device.  We'll use that as we go through this claim.

Q.    Now, turning to the next slide, with this first point about generally top -- parallel top and bottom surfaces, what is that referring to in Claim 1?

A.    In Claim 1, it talks about -- I should probably read it.

What we're doing is taking light and directing it into basically a waveguide structure, and that's the top and bottom surfaces you'd find is where this light is to be guided into.

Q.    Okay.  And looking at the next slide so we can see a picture of the lens --

A.    So this is a picture of one of the lenses.

Q.    Okay.

A.    It's an example.  It's about three-quarter-inch diameter. I think you've probably seen them.

And what it's got is the top part, the dome, is very shiny.  It's got that specular reflection.  That's the optical surface.  That's where light comes out.  And then the other surfaces have roughened surfaces, an unpolished seam, roughened pads and tabs, and so forth.  So the optical active area is

that rounded dome with the dimple in the top.

Q.   Okay.  And what's shown on the next slide?

A.   This is just a schematic mechanical drawing of the lens and it's just a top view, and it shows the round structure.  So it's circularly symmetrical ends.  And it's got these little tabs sticking out in three places, and those are mainly for mechanical mounting and holding.

And then it's got some of the details.  There's a gate.  A gate is where the plastic got injected in, and so it's a defect which is not necessarily in the way optically so they just leave it there.  And then some specs, such as the upper surface of flange is blasted to roughen it.

So it's technical details on how this thing is manufactured.

Q.   Now, comparing this to one of the lens profiles that was used -- presented by SSC for the purposes of infringement on the next slide, what is your opinion with regard to what they're referring to as generally parallel top and bottom surfaces?

A.   Well, what they used was the -- does this thing work?  I'm a little nervous of blinding someone.

Okay.  So what they used was these little surfaces right there (indicating) as a general top and bottom.  But if you look at this thing, you know, they've got them symmetrically.  There's one there (indicating) and there (indicating) and

they're symmetric.

But if you take a slice here (indicating), you know, go through there (indicating), you've got a big tab on one side and almost nothing on the other.  If you try and go through here (indicating), you have almost nothing on either side.  So depending on how you slice it, you're probably not going to get something that looks like that exactly.  So there's a little bit of, you know, imagination, I think, in that cross-section there.

Q.   Is there any way that looking at the figure on the left corresponding to the Enplas lenses that you could say they have a generally parallel top or bottom surface?

A.   I don't see it, no.

Q.   And is that -- turning to the next slide, is that the same for all three of the lenses accused of infringing Claims 1 and 6?

A.   Yeah.  These are drawings -- same similar type of mechanical drawing for each of them showing the same geometry, same issues.

Q.   Now, moving on to your second issue that you raised on the next slide, can you please explain what your second issue is?

A.   So the last -- the last kind of element of this clause here reads:  (reading)

"Such that light rays which would otherwise pass out of said waveguide are captured for propagation between

said top and bottom surfaces."

So "captured" means it's going to be -- they've got these two surfaces, and light is going to be trapped between them. Kind of like that waveguide picture I showed initially. That's what that implies. And I don't see that happening in this structure.

**Q.** Okay. Did we see any slides that had -- presented by Dr. Moore --

**A.** Yes.

**Q.** -- SSC, that showed propagation of any kind?

**A.** Yes. Well, we showed -- can you pull one up? I think we have one which shows total internal reflection coming off a surface.

**Q.** Okay. Next slide.

**A.** Yes. And so what we have here -- and I don't necessarily agree with the results of these curves, but I'm going to use them just as kind of worst case. But let's say -- let's say these are accurate. They don't show propagation.

And the issue is what's happening here, we've got the extreme sources of the LED are giving off light; and a few of the rays -- they're giving off light in all directions, but just some of the rays are going up and reflecting, they come down and they stop. They stop. And if they were going to propagate, they would reflect and go off, but they're not. They're stopping.

Now, is that an artistic thing?  No.  That surface has been roughened, that surface has intentionally been killed, and so a light ray coming down and hitting that surface cannot -- you can't use Snell's law to define how that light ray goes on.  They're no longer propagated.  So that's the issue.

And the claim calls for light rays to be propagated.  The surface has been intentionally roughened to kill that propagation, so there's just simply no way light will propagate in there.

Q.    And with regard to any of the ray traces that we've seen from BRO that Dr. Moore relies upon, do any of those, what he's referring to as his initial reflections, do any of them go between what they are calling a generally parallel top and bottom surface?

A.    No.  They don't even -- if we were, you know, to assume those were there, they don't even reach that point.  They're terminated before they get there.

Q.    Now, turning to the next slide, with regard to the lenses, do you have any fault with the testing that had been done by Dr. Moore --

A.    Yeah, I had some --

Q.    -- and BRO?

A.    I had some concerns.  They -- we're going to find it's possible to get a little bit of TIR in a lens, but I can get TIR in my eyeglasses right now.  You can always get TIR in an

optic.

It has to meet the claim, so we're going to be dealing with TIR as defined by the claim. But -- and so in my opinion, these do not exhibit TIR as defined by the claims of the patent.

Q.   Now, let's turn to the next slide, and I'd like you to discuss what issues you have with the BRO methodology.

A.   All right. So we got a first report earlier in the year, and in my opinion it didn't have properly performed ray traces, and we found some inconsistencies, which I'll go into in a minute.

We pointed these out, and a corrected report came back. And we looked at those, and the answer that was provided for why the original inconsistency occurred didn't really make sense. It was inconsistent.

And so -- and then, finally, even with all this adjustment, they're still creating trace -- ray traces which, in my opinion, have data which is irrelevant. And so that's my challenge. That's my problem with this.

Q.   Okay. So let's look at the first issue on the next slide.

A.   Yes.

Q.   What is your opinion with regard to the gap?

A.   The gap. The gap is defined as that space between the bottom of the lens and the LED, and it's a design parameter in how you make your optic work.

And the gap, as you might have heard today or a couple days ago, the gap is a critical dimension in designing performance of the lens, and so EDD designs these things at a certain gap.

The gap was measured allegedly, but we never saw the data. We don't have a clue what the data was. We've been told it has a range, but I never saw it. And so they used a fixed gap of 75 microns, which is not relevant to any of the lenses by design.

Q.   Okay.  Now, I'd like to go to Slide Number 25.

A.   So this is just a summary of what we got out of the table. We have three lenses in question, and we're making ray traces of them to see if they're doing TIR.  And the gaps should have been for those three lenses described on the left-hand -- or the right-hand column, that's the design parameters, but what was used was 75 microns.  I don't know why.

And then they did measure, but they never showed us the data, which also has troubled me.  I -- I would like -- if I do measurements and I publish something, I put the data in the paper.  I say, "This is my data so you can reproduce it."  We were not shown the data.

Q.   Now, other than being frustrating or personally troubling, which I can understand, but does changing --

     MR. GOTTS:  Objection, Your Honor.

**BY MR. LABGOLD:**

**Q.**   -- the gap --

THE COURT:  Overruled.

**BY MR. LABGOLD:**

**Q.**   -- have any effect on what would be observed as how the light would travel through the lens?

**A.**   Absolutely.  You know, this is a classic lens.  When you're taking a picture of something, you move the lens back and forth to focus it.  This is no different.  So it's very critical.  It has an impact on the quality of the light you're producing and maybe extraneous things.

Could you go back to the other slide?  I'll just --

**Q.**   Yes.

**A.**   -- quickly with this laser pointer.

**Q.**   We'll go back to 20.

**A.**   Yeah.  So, I mean, imagine if we put the light source up high -- I'm shaking -- if you put the light source high and it's giving off light in all sorts of directions, light going this way (indicating) will very easily hit that critical angle and totally internally reflect.  If I put the light source -- I'm exaggerating like mad, but if I put it way down here, light has to go up and it will refract, but it's less likely to hit a total internal reflection.

So as a broad characteristic, as you raise the LED higher, the probability that total internal reflection might occur

increases.  And so by making the gap less than it's designed for, you're exaggerating the impact, the defect of what you're looking for.  You're exaggerating the possibility that TIR might exist.

Q.   Now, going back to Slide 25, we heard testimony that the measured gap was somewhere between 25 and 125.  Would using 75 present a difference as to what -- maybe what one of those accurate measurements might have been?

A.   Yeah.  It will affect every one, and I don't -- I couldn't tell you if it makes it better or worse, but it's going to affect them.

Q.   And --

A.   All we just want to do is see what's -- what's the product really doing, what's the alleged product actually doing.

Q.   And with regard to the design gap, the number on the right, going from those numbers to 75, do you have an opinion as to whether that would impact the -- the appearance of TIR?

A.   Based on what I've done -- and I've run a bunch of test runs to see this -- reducing the size of the gap increases the amount of TIR.

Q.   Now, the second issue --

A.   That's in one particular lens.  So I've not done an exhaustive study for every lens out there, but it makes sense. So that would be my estimation.

Q.   With regard to the second issue, turning to the next

slide, can you explain what your problem is here?

**A.**   All right.  This also troubled me.  The size of the LED, you can -- it depends on the lens as you heard today, it depends on the manufacturer's choice, and it goes from 2.1 to 2.5.  And so as you go to a wider position -- so I'll try and do this without shaking -- as you move this point (indicating) further out from the origin, you increase the slope and you make it much more likely the total internal reflection will occur.

And so you again exaggerate the total impact of TIR by moving further out.  So, fair enough, if the LED is designed for a 2-and-a-half-millimeter LED, you should test it at 1.25. But several of the lens were not designed or operated with a 2-and-a-half-millimeter LED, but we still have ray traces.

All the ray traces exhibit that, and so it's added additional noise -- not noise, but it's corrupted the data by adding additional TIR lines, which are -- you know, they make the situation look much more dramatic than it really is.

**Q.**   Now, looking at the next slide, what is your understanding of what is represented here?

**A.**   These are some of the LEDs which have been used for the design of lenses by EDD.

**Q.**   Okay.

**A.**   And they have various sizes, and I think the bottom one is about 2 and a half millimeter.  I think -- well, I can read it.

This is 2.2 (indicating). This is 2.1 (indicating). So these are realistic devices. I mean, these are not numbers that are made up. These are real products with sizes, and they can be measured and put into the analysis if you're trying to figure out if a lens is TIRing.

Q.   And so on the following slide, what have you summarized from?

A.   Well, again, I was troubled that at least two of these lenses don't have -- they've not been designed for LEDs which are larger than 2 and a half, and yet they were tested and plots made for those spots at that range. We know it's not accurate. It doesn't reflect reality.

Q.   And on the next slide looking at Dr. Moore's data in these, the captured ray traces, what are these supposed to be depicting?

A.   What this does is it shows that there's going to be TIR even if you don't have a curved surface. And so it's just showing, again, how the surface can be leaky.

Q.   But now with regard to, for example, the 9854E on the left, by taking all three points, does that overestimate or underestimate what is alleged to be TIR?

A.   That overestimates it. So it looks much more dramatic than it is.

Q.   So with regard to the 9854D, that one has a 2.5-millimeter LED?

**A.**   Designed for it.  That is designed for 2.5.  So that one is not an exaggeration.

**Q.**   Okay.  So looking at the next slide it --

**A.**   I would dismiss those.  The data is not, you know, forthright is what I would say.

**Q.**   Now, with regard to the next slide, looking at Dr. Moore's data with regard to the leaky ray traces --

**A.**   Yes.

**Q.**   -- how does using all three points here affect the conclusions?

**A.**   Well, in two ways.  One, it adds a lot more TIR light coming down.  So the TIR light again is these little -- these little wings coming down (indicating), and that looks significant there.

So there's more of that shown than will actually be there. So, again, it's just -- it's exaggerating the impact when you look at these curves.

**Q.**   Now, we heard that Dr. Moore relied on BRO's testing which incorporated the actual measurements into the ASAP software. Would it be possible with the actual measurements to get the data for a LED less than 2.5 millimeters wide?

**A.**   Oh, absolutely.  Yeah.  So what's -- what we see here is the three data points, you know, at -- you know, I can't hold -- I'm sorry.  I got the shakes.

You know, the center of this thing is zero, so we've got

LEDs out here at 1, 1.1, and 1.25.  There's a lot of data points in between.

For example, every one of these data points you notice the rays go up.  This is common.  There's nothing strange here. They go from zero to about 60 degrees, so you only do half the scan just to see how effective it is.

But for TIR, when I'm on this side (indicating), if I did the scan the other way, all of those rays would just be transmitted so it would have no TIR.  So this is already -- you know, by no fault of anyone, this is just standard process, but this already only includes half the amount of light which would be transmitted.

But if you went in and filled the gap here (indicating) -- we've got three data points, basically one every 10th of a millimeter.  So starting from 2 or minus 1 to 1, we could add 20 more points here at an equal fair density, and every one of those rays going out would couple.  There would be no total reflection drawn from those.  So all that light would go out the top.  So if you did that, it would be very dark, you know, and that picture would be very black up there.

Q.   Now, turning to the next slide, do you have any issues with regard to the BRO lens profiles?

A.   Yes, I do.

Q.   Oh, sorry.  What's your conclusion here?

A.   Well, again, there's two sets of data here I think are

corrupt.

Q. Now, turning to the lens profiles --

A. Yes.

Q. -- what is your issue with the lens profiles?

A. Okay. This was from the first report, and what we noticed was the plots were presented to us as accurate data. We were never given the database of the curves so we have to rely on these plots.

And this is two different lenses, and they look identical, absolutely identical. And so they gave different results, though. And so that was a concern, so we raised that issue.

Q. Well, first of all, what was the explanation for why these were identical? They're two different lenses.

A. Yeah, the explanation was BRO when they were putting the numbers in, put the wrong value for the thickness. The thickness is that gap between the upper surface and the lower surface.

Q. Can we go to the next slide?

A. Yeah. So this total number here, that's the gap. So, you know, this happens. They might have not put the right number in, and so they took these curves and put them together; but instead of updating, I think we saw in one of the slides -- or apparently there's three of the lenses they didn't. And so they computed a profile which was incorrect.

Q. And does -- looking at the data and the corrected data as

in comparison to what came out the first time, does that explanation make sense to you?

A.   Not totally.  We immediately -- we got the corrected data. The next slide shows the new overlay.

And so here is -- this is very hard to see, it's very dim, but these are the new overlays of the two lenses.  And, indeed, if you look in a close up here (indicating) -- I'm sorry about my shaking hands -- you do see that's been adjusted.  So this thickness, this distance has been increased.  That's fine. That's what they said would happen.

But if you look over here (indicating), this is adjusted. That dimension is changed.  If you look over here (indicating), this dimension is changed a bit.  And that isn't a single number.

So I don't know what's going on but, again, it just raises a question:  What's going on?  There's something funny here. It's not just one number that got changed here.  More than one. So it just keeps casting doubts on the quality of this data.

Q.   And by changing that distance in the center, in essence, the lowering the red line down in the center --

A.   Yeah.

Q.   -- is it possible to have just made that movement and make the other line move up?

A.   I can't imagine how.  One goes down, one goes up.  It's like a teeter-totter.  It's just -- I don't know.  I can't

explain this.

Q. And is there any other inconsistencies in the data that leads you to believe there might be something else amiss?

A. Yeah. When we first looked at the first report, we have -- we have these profiles, which allegedly are different lenses but look identical.

Q. Can we go to the next slide?

A. But, in fact, they give different results, and that's really alarming. If they have the same shape and the same size, and all we have to do is change one number to make them correct, why do they give different results? This just is hard to figure out.

So, again, I'm troubled by this. And I would have enjoyed having this data and compared it against ours. I would have loved to run some curves on their data using our tools and vice versa. I think it would have been fun. There's something funny, and I just didn't get my -- I couldn't get my hands around it.

Q. Now, in your opinion looking at Claim Number 1 of the '554 patent, does that claim require TIR?

A. Yes.

Q. And looking at Claim Number 2, what is added by that dependency?

A. Claim Number 2, let me just read it. It says: (reading)

"The elimination device of Claim 1," so it's a

dependent claim, "wherein said illumination coupler comprises a surface configured for total internal reflection of light incident thereon."

In my opinion, it's redundant.  I don't know what it adds.

Q.   Does it add anything in your view?

A.   Not in my view.  I'm not a lawyer, so -- but I don't see the point of that one.

Q.   From a technical perspective, does it add anything?

A.   No change.

Q.   Okay.  So with regard to Claims 1 and 6 that we've already gone through here with regard to Claim 1, what is your opinion as to whether 1 and 6 are infringed by the three lenses 9854D, 9854E, and 9879?

A.   Those three lenses do not infringe Claims 1 or 6.

Q.   Now, let's turn to the next slide and look at Claims 33, 34, and 35.  You understand those are the other asserted claims?

And I make the point that invalidity will be looking at additional claims, so on noninfringement we're just looking at the claims that are asserted.  Okay?

A.   Yes.

Q.   Now, with regard to Claim 33, do you have an understanding as to why it refers to Claim 30?

A.   Yeah.  This is a dependent clause -- claim, dependent claim.

**Q.**   And what is it -- what is your understanding as to -- what have you been advised as to how the dependency works?

**A.**   So the dependency works is that Claim 30 outlines some elements.  All of those elements will exist in 33, 34, and 35.

**Q.**   So did you first look to see if the accused lenses meet the limitations of Claim 30?

**A.**   That's where I started.

**Q.**   And let's take a look at Claim 30.

Now, here again, did you understand that Claim 30, some of the terms have been defined by the Court?

**A.**   Absolutely, yes.

**Q.**   And are there any particular terms you want to focus on as your reasons for why the accused lenses do not infringe Claim 30?

**A.**   This one we can -- there's a lot of words here, but I'll try this.  The TIR surface is the critical -- the critical element which is going to be what I find not met in this claim.

**Q.**   Okay.  Now let's look at the next slide, just so we have it.  What is the Court's interpretation of the TIR surface?

**A.**   I'll read it.  (reading)

       "A surface angled with respect to a light source to
       produce total internal reflection within a device."

**Q.**   And is that the definition that you've used in rendering your opinion?

**A.**   Yes.  Yeah.  That's a very good definition.

Q.   Now, if we turn to the next slide, can you please explain what this is saying with regard to TIR surface?

A.   Okay.  So it's describing this patent -- this idea, and I'll just read it.  It says:  (reading)

"A TIR surface spaced from the bottom side," so it's in the top surface, and it says, let's see, "spaced from the said bottom side and extending from a point above the LED..."

And this is critical.  It has to be a point above the LED toward the edges.  So this thing has got to be coming down and the TIR surface, which we know is reflecting or has some reflection, has to start where the LED start -- it has to be above the LED where it starts and it extends toward the edges.

So do we have a picture we can go to?

Q.   Yes.  We'll see.  Go to the next slide.

A.   Yeah.  So here's, you know, a figure from the patent, Figure 16.  This Figure 80 shows this curve, and in this one it's the -- I'll just do it here -- the LED is this number little 44 (indicating), and then this is the -- this is this curve, this TIR surface, which is starting from above the LED extending out toward the edge.

Q.   Okay.  Let's look at the next element of the claim.

A.   Okay.  First it seems kind of funny:  (reading)

"Said TIR surface curving towards the LED so as to form a cusp above the LED."

So let's look at this picture again.  So now we're just saying this surface starts at the edges and comes in and forms a cusp over the LED.  How is it different?  It's just kind of reemphasizing this.  It's just -- and so this is -- this claim is saying:  This is really an important point.  This is a very serious important aspect of this claim, that this surface exists and it comes in and it comes over the LED.

Q.   And now turning to the last element of Claim 30.

A.   So it says:  (reading)

     "The curving TIR surface totally internally
     reflecting light rays such that reflected light rays
     propagate from the TIR surface towards the edge of the
     optical element."

So that's where the TIR of that claim is going to happen.  It's going to happen on this TIR surface and be reflected out.

Q.   Okay.  Now, with regard to -- let's take a look at Dr. Moore's -- what he's defined as the TIR surface in the accused lenses on the next slide.

And do you have an opinion as to whether or not the upper surface of the accused lenses 9854D, 9854E, or 9879 is a TIR surface?

A.   This is not a TIR surface.  And the reason is because almost all of the light, every photon coming off this LED between those two points is going to go leaking through that surface -- I mean, not leaking.  It's going to transmit right

on through that surface.  There's going to be no TIR at all demonstrated by that.

Q.   Now, is -- with respect to the center -- starting right in the center portion above the LED, is there anyplace on the LED that it can go through that it gets reflected?

A.   No.  Light from the center of that LED will just be uniformly refracted out of the lens.

Q.   And moving in all lateral directions, is there any light that will hit that center portion and be reflected?

A.   No.  There's no place -- no source on that LED will be reflected by that TIR surface as labeled in the middle.

Q.   And looking at the Court's definition, what is a TIR surface?

A.   It's a surface angled with respect to light -- to a light source to produce total internal reflection within a device. It does not meet that definition.

Q.   Now, looking at Claims 33 to 35, what is the core addition?  Is there anything in common that these three claims add to what's already claimed in Claim 30?

A.   Yes.  These three claims modify or add the ability for this surface to be what's called leaky.  So it's not totally reflecting, but it's letting some light pass through.  We heard Dr. Pelka talk about this where he drilled a hole, for example. So this is just some way to let some of the light through.

Q.   Okay.  And then collectively looking at the next slides,

do you have -- what is your opinion with regard to whether or not the accused lenses 9854D, 9854E, and 9879 have a leaky TIR surface?

A.   Well, there's two points.  One is I don't think Claim 30 is infringed.  So that means these cannot be infringed.  But I would like to go further and say, okay, let's assume for some reason 30 is not -- 30 is infringed, what about these?

So I went ahead and explored this.  I said let's assume we actually have a TIR surface and look at 30, and then so let's look at these 33, 34, and 35.

And then I started looking at, well, we have to look at how much light is actually transmitted through this surface and see if that meets any sort of definition for leaky as set forth in the '554.

Q.   And does the '554 patent explain what is intended by the inventors as leaky?

A.   Yeah.  Every patent has a written description, and the '554 has a written description where they do describe what they meant -- what they meant by leaky.

Q.   And did you understand what they set forth?

A.   Yes, I did.  I think it's our next slide.

Q.   Okay.

A.   Yes.  So this is taken from the written description.  This is not a claim.  This is just information, and it's Column 14:58 through 15:3, and it just says -- I'll just kind of start

at the top:  (reading)

"Because the TIR cusp regions reflect substantially all light incident thereon, these regions will appear dark relative to the other."

So the idea is you've got this TIR surface, it's reflecting light away, and then it goes in this waveguide and then gets coupled up.  So it's a nice broad illuminator, broad area illumination scanning up; but right above that TIR surface, there's a hole.  There's no light there.  So this creates this dark spot we kept hearing about.

And so he goes on:  (reading)

"In situations where such dark spots are objectionable, the surface can be contoured," or modified in some way, "to a less than perfect internal reflector."

So he's saying, "Let some light leak through this reflector."  And that's what's -- that's what's meant by leaky.

But the next starting at 65 it says:  (reading)

"The amount of leakage" -- and here's the issue, how much is leaky.  You know, how do we define "leaky" here.

"The amount of leakage should preferably be no more than is necessary to substantially eliminate the dark spots and provide an intensity in the TIR regions substantially equal to that of the surrounding region."

So the problem that is created with this TIR coupler is he's illuminated light which is going up and now has to

backfill.

And so you make it just leaky enough to backfill that light so you've got an even display. And that's what it's saying. So it tells us the amount -- you know, it says -- it tells us exactly -- well, it gives us a projection what he's suggested is leaky. It must be enough to compensate for the light lost by the TIR.

Q. Now, with regard to the lenses, have you seen any evidence and heard any -- seen any of the documents, heard any of the testimony as to how the lenses were designed, and that being the Enplas lenses?

A. Yes. I've listened to all that testimony.

Q. And is there any evidence that they were created with a TIR surface as more like a -- assumed like an inclined cusp and --

A. No. Never.

Q. Was there any problems with their -- them having a dark spot that needed to be corrected by increasing leakiness?

A. No one testified to that, no.

Q. Do you -- have you seen any documents or any evidence to that regard?

A. No.

Q. Now, let's look at Dr. Moore's explanation of leaky on the next slide.

What do you understand he's trying to say here?

**A.**   What he's trying to say is the TIR surface has been configured to allow some light to go through the top.

**Q.**   Now, is the light that's going through in these pictures the amount that's sufficient only just to compensate for what's being reflected?

**A.**   No, not even close.

**Q.**   And looking at this first picture here (indicating), we're assuming for the moment that there's no light coming off the center so --

**A.**   That's right.

**Q.**   -- let's assume that to be the case for the moment.  Would you be able to see this gap (indicating)?

**A.**   If you only had those sources, I believe that would put a bull's-eye ring out there on the field someplace.  That's a gap.

**Q.**   Now, what is not shown in any of these ray traces that he's provided?

**A.**   All the rest of the rays, which are not reflected -- all the rays which were refracted.  So there's a whole bunch of point sources there which are not displayed; and, as I said earlier, each of those points is only showing half so that you would double the number of rays going forward as well.

**Q.**   And while not the epitome of scientific data, I will admit, if we look at the next slide --

**A.**   Oh, yes.  This is Dr. Labgold's ray trace, yeah.

So this is -- but this is not -- this is a cartoon, but if you really did put all those rays in, it was already getting pretty black.

Flip back one.

It's already getting pretty dark there on the bottom where you've only got six points, half of which going.  Add another 20 points and give each one a full fan, it's going to be black.

And so what this shows is you've got a lot of light -- it's unfortunate it's black because all the light's up there (indicating), and then those two little things coming down are the TIR which have been coupled out.  They represent the loss due to TIR.

And so the leak is supposed to compensate and equalize the white for that, and it's just -- it's so obviously not the issue here.  This is not a leaky surface.

Q.  Now, aside from the cartoon, if you will, did you do any further investigation to try and determine if in the actual lenses you could measure any detectable TIR?

A.  Yes, I did.  There's two steps.  I wanted to see if I could compute how much TIR really is in these lenses; and then based on how much there is, if there was, I could then get a sense how much power is in this.  And I would think, "Well, could I measure it?"  I would very much like to physically see this if it really exists.

So I went to -- back to EDD, and I asked them if they

would use -- you know, do a full two-dimensional ray trace of all the light coming out of each of these lenses configured properly, you know, put the gap where it should be, let's be fair about this, and then compute if any -- or find out how much of that light comes back down as a total internal reflection, and give me some data on that.

So they did that, and they found in two lenses there actually was a little bit of TIR based on their profiles. Configured correctly, everything's honest, you know, so there is some TIR.

Q.   Is it TIR as what's claimed in the patents?

A.   No, it's not.  It's not off the TIR surface.  It's just, you know, when you go to any extreme ray, you get a point -- I'm sure my glasses are having TIR right now, you know.  I can't stop TIR because these are extreme rays coming in.  So these are extreme rays which have no impact on the optical process.

Q.   Now, let's look at the next slide, and if you could explain what's shown here and walk the members of the jury through the next couple slides.

A.   Yeah.  So we just asked, I said, "Give us" -- I wanted to look at these three lenses, and so this is the 9854, and I said, "Put a point source at zero in the center and let's just see what happens."

And so here they're spanning the rays from, as I said, you

know, it goes normal and then scans this way out about to about 65 degrees (indicating).  Actually the rays would go that way (indicating) as well, but let's just say it's computation time after that.  So the middle point source there, light all refracts.  You know, nice and simple.

Then I said, "Move it over to the 1 millimeter spot."  And so that's the next trace.  And you see the rays change and the pattern changes, but still there's no total internal reflection.

And the next.  We find here's a 1.1-millimeter, and again changing is going on but no TIR.

Q.   Now --

A.   And that was it because that lens required -- is designed for 2.2-millimeter LED.  So this lens does not display TIR when operated correctly.

Q.   And you said it, but just so we make it clear, is there -- you did not ask them to take a 1.25 measurement for this lens?

A.   I don't think I did.  I don't recall.  I don't think I did because I asked them to use the lenses as designed.

Q.   And so using the lens as designed, would a 1.25-millimeter --

A.   No.

Q.   -- measurement be possible?

A.   It would be -- it would be possible to make the calculation, but it wouldn't -- it wouldn't simulate reality.

Q.   And why is that?

A.   Because this was not designed for a -- what? --
2.5-millimeter LED.

Q.   Thank you very much.  And now if you move to the next
slide.

A.   So this was the next lens.  This is the 9854D, and we just
did the same process and looked at the center.  Again you see
total refraction, 1 millimeter total refraction.  And then the
next one, that was good too.

And this one I don't remember.  Does the next one go -- I
believe we went to a larger LED here.  Yes.  So you go out to
the 2.5-millimeter LED, and you get a little bit of TIR.

Now, why is this not on the TIR surface?  Look where it's
occurring?  So the LED is right in this zone here (indicating),
and the TIR is happening way out here (indicating), way beyond
the LED.  It's not happening above the LED.

The TIR surface converges to a cusp above the LED.  This
is not it.  This is getting into the -- just the extraneous ray
where you're going to get TIR because you're coming in at such
an extreme angle.

So there is TIR, but it's not off the TIR surface, and
that's my key point.

Q.   And if you go to the next slide?

A.   Same thing.  We just ran these again.  Flip through them,
and you can see refraction, refraction, and then a little bit

of TIR at the extreme location there at 1.1.  So 2.2-millimeter diode there gives a little bit of TIR.

Q.   Now, for any -- either of these, is there any propagation?

A.   In these, no, because the surface again is rough.

Q.   And is there -- I know it sounds ridiculous but I just have to ask the question for the record.  While there isn't propagation, is there propagation between a generally parallel top and bottom surface?

A.   No.  For one, there's no top and bottom surface as you can see, but there's also no propagation.  So on both counts, it doesn't work.

Q.   Now, with regard to the amount of TIR that was here, even though you've said it's not coming off of what you're saying is a TIR surface, what did you do next?

A.   So I asked them to do the full two-dimensional ray trace.  You know, put -- light up the LED on all points, compute all the rays coming off of it.  I asked them to make the LED uniform intensity.  I know that's probably not the case, but let's just be honest.  Give it a uniform intensity, you know, 2.2-millimeter area diameter, and compute a full-blown ray trace of this device, and then determine how many rays reflect back.

     So the next slide, I think, shows the two which showed some TIR.  So here's -- this is the screen shot of their tool called LightTools, and this is for the '54 lens.  And there's a

lot of parameters here showing here's the pattern of the light coming on the back and so forth; but the number you get out of this is that it's got .12 percent of the light has been TIR'd. So of the total light they shot 10 million rays up and, whatever that is, 12,000 came back down on TIR and the rest transmitted through.  So the worst case, this is going to couple .12 percent of the light.

And what's -- to put that in perspective, this surface has a Fresnell reflection.  So of those 10 million rays, they all have 5 percent reflection back.  So there's 5 percent reflection from every ray slamming down on top of this .12.  So it's a factor of, you know, 40 overwhelming just from simple reflection.  So it's pretty insignificant.

Q.    Now, looking at the next slide?

A.    Yeah, this is the other lens which showed some TIR, and this one computed even smaller.  This one came to 0.0004.  You know, .04 percent reflection.  That's the total amount of power.  So, again, pretty minuscule.

Q.    And compared to the Fresnell reflection, it's also there?

A.    Two orders of magnitude less.

Q.    Now, looking at the next slide?

A.    So this is just my -- at the end of this I said, "Well, you know, we've done these runs.  We do have some TIR apparently in the lenses, but honestly it's based on simulation.  So it's theoretical.  It's something which we've

done a study on.  It looks like it might be there.  It would be nice to go measure it and observe it."

And that's my problem.  This is a very tough thing.  When you've got such little light, it's going to be almost impossible to measure.  You know, if you were to come to me and say, "I want to see -- you know, I want to see that TIR," I don't know how I could show it to you.  It's just overwhelmed by the light and so it's effectively unobservable, and that's -- that raises another issue, too.

Q.   Are you aware of any technology that you can think of that would allow you to distinguish whether it's there or not in real life?

A.   I cannot.  I cannot.  It's -- there's nothing unique about the wavelength or the polarization or anything about the light coming off.  It's surrounded by orders of magnitude more photons which all have the same RIN characterizations.  Because it's hitting a roughened surface, there's just no way to get a directionality out of it.  I don't know how you would image it.  I just cannot think of a way you can see it.  And it's so small, so you're already looking for the needle-in-the-haystack kind of issue as well.  So it's just a very complex problem.

Q.   Now --

A.   But what that tells me is there's just no impact.

Q.   Now, looking at the next slide where we have the summary of the numbers.  If this is an amount that's reflected, how

much of the light emitted off the LED for the 9854D is, quote, "leaking" through?

**A.**    Well, it would be one minus that, so it would be 99.88 percent.

**Q.**    And with regard to the 9879 lens?

**A.**    It would be 99.96 percent leaking.

**Q.**    And you've already alluded to it, but do you think that this number is an accurate number, an underestimate, or an overestimate?

**A.**    Actually, I think this is an overestimate of the amount of power coming off back as TIR light.

**Q.**    And turning to the next slide, can you explain the context here?

**A.**    Yeah.  This is very commonly known.  If you buy an LED, they will give you specs and they always say measure it at the brightest spot.  They characterize that quite carefully.

And these are -- these are LEDs operated at fairly low power so you can see them glowing, but they're not so bright that they kind of make it hard to look at.

And the LED is actually a chip.  It's a semiconductor chip, and these are always made cubic, and then you bury that chip in a phosphor.  The LED itself puts out blue light, and then you put a phosphor around it like we do with the CFLs here and convert the blue light into red and yellow, a little bit of green, they're not very good in green, but it converts the

wavelength.

And so you put this stuff, this phosphor here, and it absorbs the light and the blue pretty heavily.  The light is not rattling around in here.  The light is leaving and being absorbed by Beer's law; and by the time it gets to this edge here (indicating), it's down very significantly.  And, of course, the amount of fluorescence is proportional to the amount of light it absorbs.

So there's a lot of light coming off the LED above it.  These things are made for surface emission as much as they can, and then the edge emission is quite a bit less.

So if you were to -- you know, what I did, I assumed I had uniform intensity on this LED.  And that's an overestimate because we know that the light is much more concentrated in the middle, much weaker at the edge, and the amount of TIR is coming from these sources at the edge.  So it's an overestimate.  I can't tell you how much.  I just know it's an overestimate.

Q.   And looking at the next slide, whatever the number actually would be is, in your opinion, is this leaky as that term is used --

A.   No.

Q.   -- in the '554 patent?

A.   Not even close.

Q.   So with regard to the 9854D, 9854E, and 9879 lenses, what

is your opinion as to whether or not they infringe, when used in conjunction with an LED, Claims 30, 33, 34, or 35?

**A.**   They do not infringe.

**Q.**   Now, we're going to quickly go to the noninfringement of the '209 patent.

**A.**   Okay.

**Q.**   Here we only have one claim.

**A.**   That's right.

**Q.**   So here, however, we have a couple more lenses.

**A.**   Yes.

**Q.**   So turning to the next slide, have you formed an opinion with regard to whether EDD lenses 4922, 9853A, 9853D, 9853E, and 9879, whether they infringe Claim 20 of the '209 patent?

**A.**   You said those numbers wrong, but --

**Q.**   Oh.

**A.**   You said 9853.  It's 9854D, 9854E, and the rest were correct.

**Q.**   Thank you.

**A.**   And I feel these -- my opinion is these lenses do not infringe.

**Q.**   And I prove once again I'm numerically dyslexic, but thank you.

Looking first at the next slide, can you explain, just in general overview, what is shown from Figure 4 of the '209 patent?

**A.**   So this is the '209 patent where it's discussing making a uniform luminous flat panel display, and it has lights originally running around the perimeter under a little soffit like we have here, and then light is placed in the middle to allow a larger area.

And there was a baffle put over the light so that the scattered -- the light would be scattered, there would be no hotspots, everything was Lambertian and nice and uniform.

**Q.**   Okay.  Now, what is defined as the little squares on the outside?

**A.**   So there's two sets of LEDs here.  These guys are -- these are all LEDs, and they're mounted on the outside of the perimeter, and they are pointed downward toward the bottom surface so that they scatter, and the scattering helps unify the light.  You're not looking at any direct light.  It's all indirect.

And then the ones in the middle, these are Number 13, are other LEDs which are covered with some sort of scattering element, a baffle or something like that, which again takes the light and redirects it out so that the light is uniformly mixed around the box creating a nice uniform illumination within the box.

**Q.**   Now, with regard to the square that forms the background, what do you refer to that as?

**A.**   Well, it's the box, but this is called the aperture, and

this is the place where you would put your LCD panel.  And so that's where the light is coming out.  That's what you want to unify the light on.

Q.   Okay.  Now, looking at the next slide, this is a picture of one of the TVs which has been accused.

A.   Yes.

Q.   This one being the LG.  Now, does this have plural light sources around the perimeter of the aperture in your opinion?

A.   In my opinion, it does not.  It has plural light sources on the bottom, which is what the '209 describes.

Q.   And can you explain why that is your opinion?

A.   Well, as I looked at that figure just a moment ago, flip back, there's two sets of lights.  There's lights on the bottom, these are Number 13, and there's lights around the perimeter.  And if you look at the written statement, the written description of the patent, when they describe around the perimeter, they're speaking about Elements 12 here.  So in my reading of this, these lights are outside of the aperture.

Q.   And looking back at the slide of the TV, did you see that all of the TVs which were presented, they have a similar shape to this?

A.   Yes, I did.

Q.   Can we look at this as a representative?

A.   Yes, that will be fine.

Q.   So where is the aperture here?

**A.**   So the aperture in this case is this broader shoulder right there (indicating).

**Q.**   Okay.  And so where would the lights have to be to be around the perimeter of the aperture?

**A.**   They would have to be beyond the outside edge here (indicating), and there are no lights out there.  So I think this is very simple and straightforward.

**Q.**   And where -- in all of the TVs, where -- on which wall are they all mounted?

**A.**   These are all mounted on the bottom here (indicating).

        **MR. LABGOLD:**  We're at the point now, Your Honor, where we're at --

        **THE COURT:**  Let's take a break.

        **MR. LABGOLD:**   -- transition.

        **THE COURT:**  Let's come back at 3:07.  Thank you.

        **MR. LABGOLD:**  Thank you, Your Honor.

    (Proceedings were heard out of presence of the jury:)

        **THE COURT:**  The jurors have exited.

    Dr. Pollock, you may step down and take a little break.

        **MR. GOTTS:**  Your Honor, we did have the beyond-the-scope objections on some of the slides that we're coming up to now.  Is that something we can take up?

        **THE COURT:**  You're saying you've got objections -- more objections to slides coming up?

        **MR. GOTTS:**  Yes.  Remember I pushed off the ones for

later because I didn't think we'd reach them?

THE COURT:  You have some to the invalidity section is what you're saying?

MR. GOTTS:  Yes, Your Honor.

THE COURT:  All right.  We may take them up in a moment.

I received from the parties your joint submission regarding verdict form.  I ordered last week that there be a joint submission by this morning at 9:00 a.m.  Neither party complied with that order.  Your response proposes that you instead will make a submission at 10:00 o'clock tonight.

What time do you propose we have the hearing?  At 3:00 a.m. or 4:00 a.m. or 4:30?  When is the Court going to actually review what you submit?  What are you contemplating?

MR. LABGOLD:  I'll step aside on this one.

MS. WOODHOUSE:  Sorry, Your Honor.  As I thought we had discussed prior to the break, and I apologize if there was confusion, there are three issues on the verdict form that we flagged.  We think that having a discussion with the Court this afternoon and getting the Court's guidance shall substantially resolve the verdict form in its entirety and will allow us to present a joint proposed verdict form.

THE COURT:  And what if it's not?  What if you don't get resolution?  Then what's going to happen?

MS. WOODHOUSE:  I mean, we're happy to submit a

verdict form earlier than 10:00 p.m. if that's helpful for you. We can submit one right now where we're at if that's helpful as well. Whatever the Court prefers.

THE COURT: All right. And how long do you expect it will take us to get the information to you all that will finalize this process?

The reason I'm asking this question is, we have the jury here now. If it's going to take us two hours to resolve this and the closing instructions, I'm going to let the jury go now, let them go home now, so we can resolve these issues. If it's going to take us ten minutes, then we'll keep going with the evidence.

Any guidance -- my concern about 10:00 p.m. is that if you have the same success that you-all had this morning and you don't get them resolved, then we could have closing arguments without a verdict form. That's not efficient justice.

MR. SHAW: I agree with that, Your Honor. I think that with those three questions, it would probably take about ten minutes to address. If we tried to merge them together now, I don't think we'd actually get the answers to the questions that will let this be done, and I think we can sit down and hammer this out within a half hour of getting the answer to those questions.

MS. WOODHOUSE: A half hour, I agree, Your Honor.

THE COURT: Very good. And how much time is needed on

the closing instructions?

MR. SHAW:  I think there's only three or four issues on those.  We've gone through and annotated.  We talked about all those yesterday.  I believe almost all of them were with Your Honor on the 11th.  There was one instruction that came up on our side, based on the testimony, that we submitted this morning.  We've already passed it over.  They've indicated --

THE COURT:  Yeah, and I've read that.

MR. SHAW:  All right.

THE COURT:  All right.  Then we'll take five more minutes now, we'll go to 3:30, and then we'll pick up with the verdict form and closing instructions to make sure we have those finalized.

MR. SHAW:  Thank you, Your Honor.

MR. LABGOLD:  Your Honor, may I ask --

THE COURT:  You may not.  Back in five.

MR. LABGOLD:  Thank you.

(Recess taken at 3:01 p.m.)

(Proceedings resumed at 3:06 p.m.)

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  Let's bring in our jurors.  Dr. Pollock, you may retake the stand.

(Proceedings were heard in the presence of the jury:)

THE COURT:  We will resume with questioning about invalidity.

BY MR. LABGOLD:

Q.    I just need to do my housekeeping just on Claim 20 of the '209 Patent.

With regard to the RCA TV, the one having the 4922 lens, what is your opinion as to whether it infringes Claim 20 of the '209 Patent?

A.    It does not infringe.

Q.    With regard to the Panasonic TV -- sorry.

With regard to the Sharp TV, having the number 9853A lens, what is your opinion with regard to Claim 20 of the '209 Patent?

A.    It does not infringe.

Q.    And with regard to the Seiki TV having a 9854D lens, what is your opinion with regard to infringement --

A.    It does not infringe.

Q.    -- Claim 20 of the '209 Patent?

A.    I'm sorry.  It does not infringe that claim.

Q.    With regard to the JVC having the 9454E lens, what is your opinion with regard to infringement of Claim 20 of the '209 Patent?

A.    It does not infringe.

Q.    And with regard to the LGE TV having the number --

(reporter asks counsel to repeat)

And with regard to the LGE TV having the number 9879 lens, what is your opinion with regard to infringement of Claim 20 of

the '209 Patent?

**A.**   It does not infringe.

**Q.**   And lastly, with regard to the Sanyo TV having a number 9879 lens, what is your opinion with regard to infringement of Claim 20 of the '209 Patent?

**A.**   It does not infringe.

**Q.**   We're going to shift over now to the issue of invalidity, and I'd like to --

                    (pause in proceedings.)

          **MR. LABGOLD:**   I'd like to move for the admission of the prior art, so we're going to move the admission of the prior art.  And so we could give the jury the binder with the prior art.

     So we'd like to move the admission of Plaintiff's Exhibit 20, the Gleckman Patent; Osawa, PX-216; Takeichi, PX-212; JP161, PX-204; Johnson, PX-200; Stanley, PX-201; and Rohm, PX-205.

          **MR. GOTTS:**   No objection, Your Honor.

          **THE COURT:**   Those are admitted.

     (Plaintiff's Exhibits 20, 216, 212, 204, 200, 201, 205 received in evidence)

          **MR. CASTELLANO:**   Your Honor, may I pass them out to the jury?

          **THE COURT:**   You may.   Thank you.

          **MR. LABGOLD:**   And for the jury's convenience, the

prior art is actually organized in the binder in the order we'll go through as opposed to the numbers.

Q.   Now, Dr. Pollock, with regard to invalidity, we're going to work now, since we're already in the '209 Patent, we're going to start there.  And once again, we only have Claim 20 to deal with.

So do you have an opinion as to whether Claim 20 of the '209 Patent is invalid as obvious?

A.   Yes, I do.  I feel it is invalid due to obviousness.

Q.   Okay.  And I'd like to start with the Gleckman patent.  If we could pull up PX-20.

Is this -- do you recognize this as prior art Gleckman, the '354 patent?

A.   Yes, I do.

Q.   And without much detail, just in general, what's the technology that this is related to?

A.   This is -- it's a little backlit unit just using lights, LEDs to backlight the simple unit.

Q.   And what is it backlighting?

A.   It's backlighting an LCD.

Q.   Now, with regard to the '209 Patent, what is it related to?

A.   The '209 is backlighting a larger LCD panel.  It's just basically a larger version of this.

Q.   Now, does Claim 20 of the '209 Patent have a size

limitation?

A.    No, it does not.

Q.    Now, if you move to the next slide, if you could explain what Figure 13 of the Gleckman patent shows, depicts?

A.    There we go.  Okay.  So this is the Gleckman patent, so this is not the '209, and it shows a light-emitting unit that's got an aperture, and it's got a number of light sources around the perimeter, and it's got -- do we have a plan view or a side view?

Q.    If you turn to your next slide.

A.    Yeah.  And then it has a side view.  And here we've got -- here's the aperture (indicating).  Here's that little soffit (indicating) I was talking about where you've got your LEDs, and it's got a bottom wall (indicating) and a side wall (indicating).

Q.    And what's above the aperture?

A.    Oh, that's where you put the diffuser, the BEF, and your LCD panel ultimately.

Q.    Now, when looking at Gleckman, did you -- in addition to the figures, did you look at its specification?

A.    Yes.

Q.    And did you look at its claims?

A.    Yes.

Q.    And was any of the claims of particular interest with regard to your opinions concerning Claim 20 of the '209 Patent?

**A.** Yes. Claim 16 of Gleckman I thought was very on target.

**Q.** Now, what I'd like to do is switch over to the document projector.

Now, what's shown in the left-hand column -- well, not the far left with the As, Bs, and Cs.

**A.** Oh, you're asking -- I'm sorry. That is Claim 20 from the '209 Patent. That shows every element of the patent, of the claim.

**Q.** And what's shown on the right?

**A.** Similarly, this is Claim 16 of the Gleckman patent showing every element of the claim.

**Q.** Now, as you understand it, in order to find that a claim is invalid, the prior art which you're relying upon either has to show each and every element, or if it doesn't show one, that element has to be obvious for some reason?

**A.** That's my understanding.

**Q.** So looking at it first as we go through the mechanics, the first element of Claim 20 of the '209 Patent is "a method of backlighting a display panel, comprising:"

That being the preamble, did you find any teaching in the Gleckman patent --

**A.** I did.

**Q.** -- of that?

**A.** Claim 16, the first element is literally those words.

**Q.** Now, the second element or the first full element:

"Producing illumination from a substantially Lambertian light source comprising:"

Does the Gleckman patent disclose that?

A.    Literally.

Q.    I'm going to skip C and D for the moment.

A.    Okay.

Q.    With regard to element that we've marked here as E:

"Such that the light exiting the aperture is substantially uniform in intensity and color."

Does Gleckman disclose that?

A.    Literally.

Q.    The next element:

"Using a diffuser to diffuse light from said substantially lambertian light source."

Does Gleckman disclose that?

A.    Literally.

Q.    "Using a brightness-enhancing film to concentrate the diffused light into a predetermined angular range without significantly reducing the uniformity of the diffused light."

Does Gleckman disclose that?

A.    Literally.

Q.    Semi colon "and."

"Directing the concentrated, diffused light onto said display panel."

Does Gleckman disclose that?

**A.**    Literally.

**Q.**    Now, going back to the two other elements that we skipped where we've labeled here as C and D.

Starting with C, Claim 20 of the '209 Patent requires a cavity.

And does Gleckman disclose a cavity?

**A.**    He does.

**Q.**    And the cavity on the -- that's required by Claim 20 of the '209 Patent requires an internal sidewall and an internal bottom wall, and an aperture, and the claims -- I checked it before we got through the whole thing.

Does Claim 16 of Gleckman teach what's literally said on the left-hand side?

**A.**    No, it does not.

**Q.**    Okay.  Now, looking back, if we switch over to slide 77, and this is figure 12 of Gleckman?

**A.**    Of Gleckman.

**Q.**    Claim 16 of Gleckman says, "a cavity with internal walls."

Now, those internal walls of Gleckman, are any of them internal side walls?

**A.**    Yes, they are.  As you can see it very clearly, there's a side wall and there's a bottom wall.

**Q.**    And with regard to an internal bottom wall, does it disclose an internal bottom wall?

**A.**    Yeah.  That's that blue one right there (indicating).

**Q.**   And does it disclose an aperture?

**A.**   It does.

**Q.**   So if we go back to the camera, we will check that box.

And the last element:

"Said step of producing illumination comprising the step of directing light rays."

That part of that element, does Gleckman teach that?

**A.**   That part of the element it does, yes.

**Q.**   Now, the last part of the element is that it's going to be the -- what the light -- we're going to have lights in each one; correct?

**A.**   That's right.

**Q.**   And the light is going to be on Claim 20, the perimeter of the aperture into the cavity?

**A.**   That's correct.

**Q.**   And does Gleckman have that?

**A.**   Yes, it does.

**Q.**   So focusing on what is different, does Gleckman disclose that "the light rays are emitted by plural light sources mounted on said bottom wall and around the perimeter"?

**A.**   It does, yes, it does.

**Q.**   Well, does it say that here?

**A.**   Well, it doesn't literally, no.  The wording is literally not there.  Yes, I'm sorry.

**Q.**   Okay.  So instead we have Gleckman saying that the light

is directed from the perimeter of the aperture; correct?

A.    That's right.

Q.    When we're looking at Claim 20.

Now, Claim 16 versus Claim 20.  So is it fair to say that the difference between what's claimed in Claim 20 of the '209 Patent --

MR. GOTTS:  Your Honor --

MR. LABGOLD:  Yes.

MR. GOTTS:  He checked off the box, and the witness said it wasn't present.

MR. LABGOLD:  Oh, sorry.

MR. GOTTS:  I was a little concerned about that.

MR. LABGOLD:  Okay.  Unchecking.

MR. GOTTS:  Okay.  Thank you.

THE COURT:  Continue.

BY MR. LABGOLD:

Q.    So now with regard to the differences, so I'd like to look side-by-side.  If we could pull up Figure 4 of the '209 Patent and Figure 13 of Gleckman.

Now, what is your opinion as to what the level of ordinary skill would be with regard to the '209 Patent at the time the invention was made?

A.    This is around 1997.  My opinion would be it would be someone with a master's degree in optics, electrical engineering or physics, and with probably three years of

experience.

Q.   Okay.  And do you know Dr. Moore's definition of a person of ordinary skill in the art?

A.   Vaguely.

Q.   Is it higher or lower?

A.   It's a little bit lower.

Q.   Engineering degree or --

A.   I think it was the same basic degrees, but a bachelor degree as opposed to a master's.  I'd have to check.

Q.   Now, with regard to your definition of one of ordinary skill in the art, do you have an opinion as to whether it would have been obvious to one of ordinary skill in the art to add lights to the center based purely on that person's experience and reading what's in Gleckman?

A.   Yes, I do.

Q.   And what is your opinion?

A.   I think it would have been obvious.

Q.   And what do you base that on?

A.   Well, I just look at this, and you see -- basically the one on -- Gleckman's is smaller, and all they're doing is making it a little bigger.  And so I would imagine this person of ordinary skill would say, well, I need to put a little more light in the middle, because there's lighting on the edge, and as this gets bigger, it's going to get dim in the middle.  And how am I going to do that?  Well, actually, I add some light in

the middle.

It's like looking in this room.  And I was amazed when I walked in this room and saw this is the Gleckman patent almost. You've got lighting on the side.  And imagine if the room were narrow, that would be fine.  But as it gets wider, you want to add some light in the middle.

So that's why this strikes me as just obvious.

Q.   And has this type of illumination problem, has this been something that people in optics and illumination have been dealing with for some -- any period of time prior to the date of invention?

A.   Well, I don't know if people in optics.  But yes, everybody who had candles had to worry about distributing light in a room.

So this is just illumination, electrical candle whatever. It's just getting lights spread around.  And this is just a no-brainer to me.

Q.   And if you started off with -- that you didn't know for sure how the placement would be to work, would it be obvious to try it?

A.   Yeah.  Just put some in.  And the baffles, you know, where we used to light shades, so all -- this is something which I think everybody -- you don't even have to be, you know, an experienced illumination person to kind of see a solution to this.  It's a pretty simple idea.

Another thing.  Gleckman also teaches putting single lightbulbs in the box instead of that perimeter lighting, and putting a baffle over it.

So there's a lot of teaching out there which would just kind of lead someone -- my understanding is someone is working this field is aware of all of the literature.  And I think anybody who has been looking at this and saying I want to make it a little bigger and put some light in the middle, hmm, what can I try?  It's just -- there's lots of ideas out there.  It would have been quite obvious to do.

Q.   And they -- what you've alluded to, when you're referring would be aware of, are you talking about a hypothetical person, this person of ordinary skill in the art?

A.   Yes.  Yeah.

Q.   And the jury has not been instructed yet as to that person and their capabilities, but I just want to make sure if we're talking real people or hypothetical?

A.   Hypothetical.

Q.   Now, with regard to -- let's assume for the moment that common sense did not prevail on the person of ordinary skill in the art.

Did you find any prior art that you believe would have been -- there would have been a motivation for a person of ordinary skill in the art to combine with Gleckman on the left to achieve the illumination of a larger panel on the right?

**A.**   Yeah, I found two, which I thought were pretty obvious extensions of this.

**Q.**   Now, let's turn first to Plaintiff's Exhibit 216, and that would be Osawa.

And the English will be at the back, for those of you who are not reading in Japanese.

What is Osawa directed to?  What is the concept here?

**A.**   He's making a little backlighting unit.  He's trying to get uniform light -- maybe it's a "she."  That person is trying to make a backlighting unit with uniform lighting coming out.

**Q.**   And what type of lighting, light-emitting element or device is being used for the lighting?

**A.**   He's using LED.

**Q.**   And if we turn to slide number 81, what are you showing here?

**A.**   So this is a side view and plan view of this invention by Osawa.  And what it shows is a substrate, that's at the bottom, and it has a bunch of lights on it.  Then it's got an aperture. And this median in the middle is a scattering median to kind of make the light more uniform.

And the plan view just shows a plurality of light sources scattered along the bottom in regular sequence.

**Q.**   Now, is there anything that you found in Claim 20 or in reading the '209 Patent which would say that you couldn't have the LED surrounded by some form of diffusing agent as you

referred to?

**A.** No. In fact, it taught some sort of scattering element between the light source and the aperture, which is this is exactly what that is.

**Q.** So if we -- and just looking at the right, what's shown there at the figure?

**A.** The right, that's the plan view.

**Q.** That's looking from top down?

**A.** Yes, right.

**Q.** Now, if we go to the next slide, so --

**A.** So this is just kind of mentally if I'm looking at the Gleckman patent, and I'm looking at -- and I see that (indicating), it's usually a very natural merge in my mind that I might try these together. I need more light in the middle, and there's a distributed plurality of sources.

**Q.** And if we look at the next slide, 83?

**A.** This would be the side view. So same issue. I just slide -- if you take that plurality of sources and slide it in, you're creating a sequence of light sources on the bottom.

**Q.** And I'm going to come back around to the motivation.

But with regard to moving onto our next reference, is there any other reference that you selected that you believed it would have been obvious if one of ordinary skill in the art to combine, again, if common sense hadn't prevailed, for combining with Gleckman?

**A.**    Yes, that would be Takeichi.

**Q.**    And that would be Plaintiff's Exhibit 212.  Again, the English translation is in the back.

And what is Takeichi directed to?

**A.**    Again, he's making a display panel, broad area lighting using LEDs, and trying to make a very nice uniform illumination based on those.

**Q.**    And what is the title of Takeichi?

**A.**    It's called backlight for an LCD.

**Q.**    If we could pull up the next slide, which would be 85.

So can you explain -- these are a little -- the one on the left, Figure 2 of Takeichi, PX-212, what's shown here?

**A.**    This is a side view where, again, you've got a bottom. You've got a light attached to the bottom.  This is a cross-section (indicating).  There's a whole array of these. This is a little cross-section taken right there (indicating). So there's an LED on the bottom.  It's emitting light in all directions.  There's a partially transmitting surface here of mostly blocks.  They've got a baffle to knock the light down. And then you have a scattering medium here to make it a lambertian source.  So each of these little holes here (indicating) has an LED behind it which is glowing and then being scattered randomly just to make a uniform illumination surface.

**Q.**    And what are the lighting elements?

**A.**   LEDs.

**Q.**   And looking at slide -- the next slide, 86?

**A.**   Yeah.  Again, this is just that mental exercise.  If I was looking for a way to enlarge Gleckman and still use that soffit lighting, I would look at something like this and say why don't I just put that in the middle and solve my mid lighting.

**Q.**   So understanding that there has to be some motivation to combine references to find obviousness, did you find that there would be motivation to combine the references that you seek to combine?

**A.**   Yes, I did.

**Q.**   And so looking at Gleckman in view of Osawa, and Gleckman in view of Takeichi, what would be the motivation to combine the references, as you've said?

**A.**   Well, first, they're all backlit LCD units.  So I think someone who has been working in this area would be aware of those things which are going on.  And so we're always doing that in researching.  Find a good idea, apply it to yours.  So I think they would be aware of it, and it's a natural problem.

I think they also addressed the same problem.  You know, everyone is trying to make uniform lighting, and make uniform across a larger and larger area.  They're all doing that in a very nice way.  So that's why I think it would be very natural for these to come together.

**Q.**   And if we go to the next slide.

**A.** This is just everyone had the same issues. Everyone trying to build these things had the same issues of trying to make it uniform. And the size is growing. There had to be some -- everyone is thinking about this problem.

**Q.** So with regard to Claim 20, what is your opinion as to whether Claim 20 of the '209, whether it is invalid as obvious in view of Gleckman?

**A.** It is. I agree it is invalid in view of obvious.

**Q.** In view -- over the Gleckman patent?

**A.** Yes. Yes.

**Q.** And with regard to the claim, would it be obvious, invalid as obvious over Gleckman in view of Osawa?

**A.** Yes, it would.

**Q.** And in your opinion, would it be obvious, invalid as obvious over Gleckman in view of Takeichi?

**A.** Yes, it would.

**Q.** We're now at a point where we're going to transition over to the '554 Patent on invalidity.

**THE COURT:** I think it's a good point for a break.

So ladies and gentlemen, we're going to stop early for you today, so I can discuss some aspects of the closing with the attorneys, and so you could get home safely in the rain, which is falling outside.

So please remember not to begin your discussions of the case until you've been instructed to do so. We'll see you

tomorrow at 9:00 a.m.

And you should leave those binders -- you can leave them in the jury room.  I think that's the best place to go.  Don't take them home with you.  Thank you.

**A JUROR:**  Can we write in them?

**THE COURT:**   You can write in the binders, yes.

(Proceedings were heard out of presence of the jury:)

**THE COURT:**  Dr. Pollock, you may step down.  Thank you.  You also are asked to come back at 9:00 a.m. tomorrow.  Thank you.

Everyone else may be seated.

All right.  So if you want to get your materials together for our discussion of closing instructions and the verdict form.

So I have at docket 404 given you annotated jury instructions.  That's sort of my template.  I have a few matters to direct you to, and then we'll want to hear from each party as to issues, objections, and proposals you have to get us the rest of the way.

Filed at docket 434-1 today was a page entitled "Role of the Claims of a Patent."  I think that was filed by EDD, if I'm not mistaken.

Is there any objection to that suggestion by SSC?

**MS. WOODHOUSE:**  Yes, Your Honor.  We'd object that we don't find it necessary.  Part of it is duplicative of the

instructions that are already provided with regard to the claims.

THE COURT:  And which section are you directing me to as far as duplicativenes?

MS. WOODHOUSE:  Sure.  It's in -- so the interpretation of claims, it mentions that:

(reading) You need to understand the patent claims. As I mentioned, the patent claims are numbered sentences at the end of the patent that describe the founders of the patent's protection.

I believe that's also repeated in EDD's proposal.

THE COURT:  So other than being duplicative, is there any aspect that you think is an incorrect statement of the law?

MS. WOODHOUSE:  Sorry, Your Honor.  Just give me one second, please.

THE COURT:  And while you're thinking about it, let me ask EDD, which now has Mr. Labgold at the podium, where you think this should come.

MR. LABGOLD:  It can actually be inserted -- we wouldn't mind it being put in -- the point that we think is important, especially with the way some of the evidence has come in, is to make sure that the jury doesn't make a mistake of reading a limitation into the claims.

The law is very clear that there are preferred embodiments, and that the claims, unless otherwise stated,

should not be limited to the preferred embodiments.  The only case that I know of where it's -- you're allowed to limit to the preferred embodiment is when that's the only embodiment that's been disclosed.

Now, it doesn't always say, however, that it's a preferred embodiment.  There's other language that has been used, and that courts have actually had to rule on this, and in this patent there's language such as it would be desirable or desirably, preferentially.  And so we believe that in order to ensure that there isn't an error in either parties' favor or to their detriment, it would be best to advise the jury.

THE COURT:  Where, specifically, do you suggest we insert the role of the claims of the patent?  Would you agree in the interpretation of claim section?

MR. LABGOLD:  Yeah, that makes the most sense to me.  And it could be either after the bullet points:  (reading) Before the full claim language which I have not provided you.  That seems like it might be a good place, or it could follow the two --

THE COURT:  I think if I were to insert it, I'd put it after the first paragraph after the sentence saying:

"It is my job as Judge to explain to you the meaning of any language in the claims that needs interpretation."  I might put it there.

MR. LABGOLD:  Which page are you on?

**MS. WOODHOUSE:** So it's on page 9, Interpretation of Claims.

**MR. LABGOLD:** That's where I was. I was looking for the paragraph, and there wasn't any indent. Sorry.

**THE COURT:** We'll add an indent.

Any objection to that placement?

**MS. WOODHOUSE:** No objection, Your Honor.

**MR. LABGOLD:** No objection.

**THE COURT:** All right. So that's where we'll insert the role of the claims of a patent into our closing instructions.

I thought next I might go to the three bullet points raised in the update on the verdict form just to see. I know that's something we need to resolve, and it ties in, I believe, with the closing instructions. So if it makes sense to you, we can discuss that and see if we can get to --

**MR. SHAW:** Sure.

**MS. WOODHOUSE:** Your Honor, I have copies of the verdict form for the clerk.

**THE COURT:** That would be great. Thank you.

**MS. WOODHOUSE:** Copies of SSC's proposal and Enplas' proposal.

**THE COURT:** These are the previously filed?

**MS. WOODHOUSE:** Yes, Your Honor.

**THE COURT:** All right. So jumping to the ones that

are in disagreement, let me start with the first bullet point being the appropriateness of the direct infringement charge.

**MS. WOODHOUSE:**  Yes, Your Honor.

So EDD proposes I think it's about a three-page instruction on direct infringement and a charge for the jury. SSC's position is that it's not necessary to ask the jury to decide direct infringement, asking the jury to decide three pages of something that's not directly relevant before actually deciding on the issues in this case seems a little unnecessary.

**THE COURT:**  All right.  Let me hear from EDD as to the rationale for what I'll call the longer version.

**MR. SHAW:**  I'm not sure it's three pages once we winnow out the claims that are no longer at issue, Your Honor.

The question for the jury is simply this.  They have to decide whether there was direct infringement as part of their deliberations.  The issue comes down to whether Your Honor wants to know their answers to those questions separately for their inducement questions, which have different claim elements that they have to address.  And that's really the question.  Do you want to have separate answers for post-trial purposes to those two or not.  And my experience is better to have both of those pieces, but yours may be different.

**THE COURT:**  And back to SSC.  What would be the error, if any, in using EDD's suggestion, or is this a situation where it's discretionary and I could do either one, and it's just a

matter of efficiency.

**MS. WOODHOUSE:**  So Your Honor, if I may present a verdict form that was issued in *Fujitsu Limited versus Belkin*, it's a Judge Koh decision, where inducement was the only charge.  There was no direct infringement, and there was no direct infringement instruction provided.

**THE COURT:**  You may.

**MS. WOODHOUSE:**  If I could hand that up.

**MR. SHAW:**  Your Honor, I haven't seen that before.  But it's hard to say in the abstract what was going on in that case.  Sometimes there are trials where the only issue is the inducement aspect and not the direct infringement aspect, and sometimes there are trials where both are at issue.  So I can't say that that's necessarily helpful.

**THE COURT:**  I appreciate that.  The Case Number is 10-cv-3972, docket 588, filed 12/17/2012.  It's a case which I'm familiar with, but I don't know the answer to your question as to what position the parties took before this document was filed, and how it got resolved, whether it was through a dispute process or whether they just agreed that this is the way to go.  But I'll look at that a little further.

**MR. SHAW:**  And Your Honor, I think the advantage to having both questions then is so it makes clear for the jury that they have to take two steps.  They need to decide direct infringement first, that's in the instructions, and we get an

answer to that, then they move to inducement.  And it also gives them the benefit if there's no direct infringement they don't have to go through inducement elements.

MS. WOODHOUSE:  And I think it's just as efficient to -- if there is direct infringement, to not make them go again through the inducement elements.

THE COURT:  All right.  I'm going to think about that. And, in part, I'm going to look at this *Fujitsu* a little further before I answer it.

So let's move on to the next one, which was the appropriateness of the inclusion of the elements of indirect infringement.

MS. WOODHOUSE:  Yes, Your Honor.

MR. SHAW:  So Your Honor, I think this second and third question is really the same question.

The Northern District model verdict form includes some repetition of the claim elements from the jury instructions in the verdict form.  I'm not sure which one will come up when I put the iPad on display.

So in this case, it's the inducement instruction.  Here, they repeat the three elements which we were proposing to do. SSC proposed not doing it, and that's possible.  But when we got to the obviousness instruction, they wanted to have the more detailed component.

So our view is it's either a simple question "was there

inducement, was there obviousness," or a more detailed question for all of them.

**THE COURT:** All right. What is SSC's view?

**MS. WOODHOUSE:** So Your Honor, just brief response. I think Mr. Shaw's slightly confusing the issue with respect to our obviousness instruction.

But just addressing the inducement instruction first. Our concern here is that we're truncating the instruction with what's presented on the screen, and the jury is not being directed to look at the jury instruction which should provide the guidance in their decision in how they're finding on this claim. Instead, they're looking to a shortened version on the verdict form that leads to confusion and possible concerns there.

**MR. SHAW:** And certainly, Your Honor, we accommodated that in our proposed form, because we have no opposition and probably think it's useful to refer the jury directly to the page of the jury instruction that has the guiding principles for each question they're asking, and we propose to do that whether it's a very simple question or a more detailed question.

**MS. WOODHOUSE:** And, again, Your Honor, if I could just direct you again to the *Fujitsu* case where they do not list all this --

**THE COURT:** You like the *Fujitsu* model for shortness.

**MS. WOODHOUSE:** I do like that.

**THE COURT:** And not having all of the instructions sort of reinserted into the verdict form, and the verdict form is more of a conclusion rather than a recounting of each of the elements that might get you to the conclusion.

**MS. WOODHOUSE:** Yes, Your Honor. And then if I may just address the third point on the obviousness instruction.

Our concern isn't necessarily trying to truncate it, it's the tense that the claim or the instruction is written in. How it's phrased is whether or not it is obviousness. And what SSC would propose is that the correct question is whether or not it would have been obvious at the time of filing. SSC's proposal actually includes the date of filing, which is undisputed by the parties.

However, if the Court wasn't inclined to put the actual date in, we would be comfortable with saying, you know, was the '209 or '554 Patent obvious. But the tense is important here in order to avoid the hindsight determination.

**THE COURT:** Anything more on that, Mr. Shaw?

**MR. SHAW:** Certainly, Your Honor.

The instructions say "would have been obvious," so the tense isn't the issue to us.

With the miracles of modern wifi, I was given the final jury instructions on the verdict form that you just got on computer, and we'll see if we can get them up here.

THE COURT:  From the *Fujitsu* case?

MR. SHAW:  From the *Fujitsu* case, although it says disputed, but I'm told this was the final.

But the third paragraph:  "It's already been decided that the interface cards infringe."

So I think that issue was already done here.

THE COURT:  All right.  It doesn't mean that I can't have a shorter version, but it's not a situation where the jury was determining that question --

MR. SHAW:  That's right, Your Honor.

THE COURT:  -- in that deliberation.

MR. SHAW:  It's certainly in your discretion to go either direction.

THE COURT:  All right.  I'm going to get back to you on that one in a few minutes.

Next question I have is invalidity.  Of course we're about to hear the testimony from Dr. Pollock about invalidity and which claims are seeking to be validated.

Back on February 17th, which procedurally was some time ago, there were more claims in the case.  And my question is what claims are -- is EDD seeking a finding of invalidity on?

MR. LABGOLD:  Well, Claim 2 will be an issue of law for the Court, because that's simply a question of the improper dependency under 112, fourth paragraph.  Dependent claims have to have additional limitation.  So that's what that little

interlude was earlier.

With regard to the claims --

**THE COURT:**  So you do not need the jury to make a determination on --

**MR. LABGOLD:**  Correct.

**THE COURT:**  Okay.

**MR. LABGOLD:**  So the jury will have Claim 1, Claim 6, Claim 30, Claim 31, 33 to 37, 38 to 43, and 45 to 48, and then Claim 20 of the -- did I miss 39?  Oh, sorry.  It's -- I'm wrong with the numbers.  I'm sorry, Your Honor.  It's 30 through 39.

**THE COURT:**  And 41.

**MR. LABGOLD:**  I'm going to give up on that one.

**THE COURT:**  And 41 through 48.

**MR. SHAW:**  I've pulled up the slide, Your Honor, and I think Claim 6 also needs to be on this slide.

**MR. LABGOLD:**  Yes.

**THE COURT:**  So maybe it's not such a great slide.

(Laughter)

**THE COURT:**  So in sequence, not 32, not 40.

**MS. WOODHOUSE:**  Your Honor, for simplicity, I think if you look at EDD's proposed verdict form and strike out Claim 2 --

**THE COURT:**  That's what I'm looking at, and that's what I've done.  Thank you.

So you're seeking in your remaining time to have evidence invalidating all those remaining claims, other than Claim 2?

**MR. LABGOLD:**  Yes, Your Honor.

**THE COURT:**  And on the '209 Patent Claim 20 only?

**MR. LABGOLD:**  Claim 20.

**THE COURT:**  All right.  Any -- what's the remaining dispute, if any, on willfulness?

**MS. WOODHOUSE:**  With respect to the verdict form --

**THE COURT:**  The verdict form and any instructions, is there any dispute over?

**MS. WOODHOUSE:**  So with respect to the verdict form, we've actually come to an agreement, and we'll propose that together as a little bit of a combination of the two of our agreements or two of our proposals.

**THE COURT:**  All right.

**MS. WOODHOUSE:**  With respect to the jury instruction, there is an outstanding issue regarding -- and it's something that you addressed in your annotated instructions, and the parties had both addressed it in writing.

**THE COURT:**  Here is a few other just issues to raise.  EDD proposed an instruction on obviousness in docket 411.

**MS. WOODHOUSE:**  Yes, Your Honor, we've actually agreed to their instruction, and that's fine with us.

**THE COURT:**  Okay.  And let's talk about damages, the commencement of damages.

Is there still a dispute about commencement of damages?

**MS. WOODHOUSE:**  I think we have come to -- close to an agreement, and I believe we can work it out.

**MR. SHAW:**  Did we propose --

**MS. WOODHOUSE:**  I think we proposed a combination of the two, and we're just getting a final confirmation.  But, again, I don't think that will be an issue.

**MR. SHAW:**  We're okay with that compromise.

**MS. WOODHOUSE:**  Yeah.

**THE COURT:**  You do.

Calculating damages.  EDD proposed language in docket 408, and I'm inclined to adopt EDD's recommendation, and that's following the *France Telecom* case, is my inclination of following it.

Is there further discussion about the calculating damages?

**MS. WOODHOUSE:**  So Your Honor, I don't know if you missed SSC's proposal and you're just inclined to adopt EDD's, but just in case you did, we also submitted a proposal.

**THE COURT:**  I'm inclined to follow theirs.

**MS. WOODHOUSE:**  Just clarifying that.

You know, we're -- I think we're generally okay with this. The one thing that we do think is important to note is that the idea that these -- this inducement can be determined by -- it doesn't need to be direct evidence, it can be circumstantial evidence, and that's from *Lucent*.  And so I think that if we

can work that into the instruction, I think we could probably come to a compromise there.

THE COURT:  Is that a compromise you've discussed?

MR. SHAW:  It is not, Your Honor.  I haven't had time to look, but I believe that concept is already in the damages instructions generally.

THE COURT:  I think it is too.

Well, you have only a limited amount of time to keep conferring about that.  But if you confer and agree to something, I'll give you a chance to confer while I'm doing some conferring myself.

The good faith defense, I'm inclined to use the model instruction without the requisite knowledge, and not to use EDD's drafted language.  But I'll give you a chance to tell me more about why I should be more creative with good faith.

MR. LABGOLD:  And I'm sorry, Your Honor, you were inclined to go with the model version?

THE COURT:  Yes.

MR. SHAW:  Your Honor, actually, I can address this.

THE COURT:  All right.

MR. SHAW:  The model doesn't deal with the good faith point so much, because in large part that's often addressed by the Court, and that's where the disparity between what we've been proposing and what you're proposing to adopt here comes in.

**MS. WOODHOUSE:**  And if I may address that, Your Honor.

**THE COURT:**  Yes.

**MS. WOODHOUSE:**  And we note in our papers that, you know, when we serve an interrogatory response regarding the willfulness, EDD did not raise the issue of a good faith belief of non-infringement, so trying to inject into the jury instruction at this time seems a little late.

**MR. LABGOLD:**  I disagree.  I think there's a general position from the beginning if we don't infringe, I mean, premised by the fact that we were the ones who came to court and filed a complaint and asserted that there was no willful infringement.  So there has been an issue since the beginning of the case.

**MS. WOODHOUSE:**  So I think the language, though, that's at issue is whether -- they're not alleging infringe -- they made a good faith effort to avoid infringing the patent, is what's quoted.

**MR. LABGOLD:**  Well, the reason for this is important, because it's going to put in the jury's mind to make sure that they're understanding, is that infringement itself is an unintentional tort; whereas willfulness clearly brings it over to the other side of the fence.  And when you have the situation where it makes them conscious of the fact that when did they have notice of it, when did they have notice of infringement, and what was their -- you know, the accused

infringers thinking at the time.  And it's relevant to things as to how EDD believed its design worked, how it developed, and the like.

**THE COURT:**  All right.  I'm going to think about that one for a little -- a few more minutes.

Just go back one -- sorry to jump around a little bit.

I know you say you've conferred on the commencement of the damages and also on calculating damages.  I want to get -- and you probably already put in writing various versions of it, but especially if there's been a further conferring and some agreement on some compromise, you're filing this evening, when you are going to redo the verdict form, if you could also put your agreed language.  These are at page 23 at line paragraph calculating damages and dates of commencement of damages.  If you could put your agreed language there or put sections for that as to what you agreed or, if you don't agree, what your current position proposals are.

**MS. WOODHOUSE:**  Certainly.  We could also add in the obviousness instruction that we've agreed to as well.

**THE COURT:**  That would be appreciated.

And if there are any other modifications that you agreed to which aren't reflected in the current document, if you can --

**MS. WOODHOUSE:**  I believe there is one slight modification, but --

**THE COURT:**  What's the other?

**MR. SHAW:**  That's adding the word "literally."

**MS. WOODHOUSE:**  Yeah.

**MR. SHAW:**  So on page 12 of Your Honor's set, on line 17 towards the end of the line between the words "method" and "infringed," we both thought we should add the word "literally" there to direct the jurors to the next instruction which tells them how to figure out infringement.

**MS. WOODHOUSE:**  I think the proposal normally has the doctrine of equivalents language as well.  So since that's not an issue, we --

**THE COURT:**  So in deciding whether the accused products or methods literally infringe, that claim?

**MR. SHAW:**  That's correct, Your Honor.

**MS. WOODHOUSE:**  Correct, Your Honor.

**THE COURT:**  All right.  I've got two other -- just jumping around to things.  I gave a mid-evidence instruction that EDD's own patents are not a defense to infringement, and the question is whether I should give a further instruction on that at the end, if I've already said it and they're considering it.

**MR. LABGOLD:**  I believe there's actually a statement in here.  I just need to find where it is, unless Andrew can find it faster.

**MR. GOTTS:**  I think that was only in the preliminary

and not in the finals, as I recall.

MR. LABGOLD: So we can propose it. I would propose --

MR. GOTTS: I think it --

MR. LABGOLD: It should be consistent with whatever the preliminary was. It should just be carried forward.

THE COURT: I'm inclined to give that as a consistent instruction.

MR. GOTTS: Thank you, Your Honor.

THE COURT: We -- I gave an instruction again about evidence for a limited purpose. There have been a few objections along the way, maintaining that there might be an objection -- or not that there might be. But there is an objection to particular purpose of some evidence in the case. The question now in tying that together is, is there a further instruction to be given to the jury with examples of where there was a limiting instruction given, and if there's some real life application of that that we should be telling the jury about, rather than just the general -- if it was for a limited purpose, consider it only for that purpose.

MR. GOTTS: So my take on it is this, Your Honor. All along I was only concerned about it being improperly used for infringement purposes, but I don't think that's going to happen. So, you know, so I think we're probably okay, as long as the parties don't intend to somehow argue the fact of, you

know, other lenses and the like somehow impacts infringement.

MR. LABGOLD: No. I've got too many lenses and claims right now to deal with already, so I do not want to inject anymore.

THE COURT: So your position then -- I'm saying you but looking at Mr. Gotts -- is that there's not a further instruction needed at this point in time, given the evidence that's come in about evidence being used for one purpose being used to combat the -- not combat, to use on the infringement claims.

MR. GOTTS: I think that's right, Your Honor, with maybe other than more of an instruction to counsel as to what not to do in closing argument might be a better way to handle that.

THE COURT: Thankfully you'll be here to raise any objections if you have one.

MR. GOTTS: I'd hate to do that, of course.

THE COURT: And there will be -- everyone's got limited time left that if everyone is hoping to bring up new arguments, it's probably going to be taking away from your existing arguments, so that will be a consequence, too.

MR. GOTTS: Thank you, Your Honor.

THE COURT: All right. Then I'm not going to, unless EDD has a further idea about particular examples to give the jury of things being for a limited purpose.

**MR. LABGOLD:**  I don't think it's necessary, Your Honor.

**THE COURT:**  I hope that the remaining instructions will be so crystal clear that they'll know what each piece of evidence was used for, and it will be all obvious to them.  But we'll give them the best direction.

All right.  Mr. Shaw, do you have any other -- any further suggestion on the current version of the closing instructions that I should consider?

**MR. SHAW:**  Your Honor, we had one small point that we noted in our filing on the 11th.

You had decided to replace "an alleged infringer's product" and literal infringement instruction with "a direct infringer's product."  We had proposed to add the word "alleged" back in there, so there's no likelihood the jury is thinking that there are direct infringers yet.  And I believe that's also true in one other spot.

**THE COURT:**  Can you direct me to a page as an example?

**MR. SHAW:**  Page 13 of Your Honor's set.  This occurs six times.  First place on line 13.

**THE COURT:**  And your suggestion is?

**MR. SHAW:**  It reads now:

"To decide whether a direct infringer's product or method."  And I'd propose to -- that it say:

"To decide whether an alleged direct infringer's

product or method."

THE COURT:  All right.  So "alleged" before "direct."

MR. SHAW:  That's correct, Your Honor.

THE COURT:  Each indication where "direct" is modifying "infringer."

Any objection to that proposal?

MS. WOODHOUSE:  No, your Honor.

MR. SHAW:  And there may be one other spot where that occurs.  If I may have a moment, Your Honor, to check my notes.

THE COURT:  Yes.

(Pause in the proceedings.)

MR. SHAW:  I'm not seeing it, and no one else is tapping me on my shoulder.

THE COURT:  I'll look at it.

Any other suggestions?

MR. SHAW:  No, your Honor.

THE COURT:  Thank you.

And for SSC?

MS. WOODHOUSE:  No, your Honor.

THE COURT:  Thank you very much for working through it.

Let's take a five-minute recess, and I'll come back with some further guidance on the verdict form to guide us to the next after that.  Thank you.

Oh, I'm sorry.  And I know that there were some further

objections potentially to the demonstratives.  I'll deal with that after we've concluded this.  Thank you.

(Recess taken at 4:00 p.m.)

(Proceedings resumed at 4:08 p.m.)

(Proceedings were heard out of presence of the jury:)

**THE COURT:**  Please be seated.  We're back on the record.  The jury is not present.

All right.  So echoing back a few issues, I've looked further at the instruction on willful infringement and the question of whether there should be a good faith instruction or not.

Considering the argument in part that there was not a pretrial disclosure of information supporting a good faith defense, I'm going to give the version in my current draft on page 14, which has an instruction about reckless disregard, and will allow that issue to be tried to the jury without calling out good faith further.  And that's following the Northern District's model rules to present that information.  So that's what I'm going to do on that issue.

On the question of whether to use the -- this is going to the verdict form -- whether to use the longer or shorter version of the appropriateness -- excuse me -- the appropriateness of the direct infringement charge is the question.  My preference is for the shorter form following the model in Judge Koh's *Fujitsu* case, and I do think we need to

add to it -- so this is the model suggested by SSC -- I think we need to add to the verdict form the question of was there direct infringement or does the jury find direct infringement. So it's adding one question to that, but not the full detail suggested by EDD in its proposed verdict form.

As to the next two bullet points, elements of indirect infringement, the date, I'm going to have you keep conferring about that a little more and see if you could come to some agreement to resolve those.

So my request to you is that by 8:00 o'clock tonight you email to my courtroom deputy a Word document that has either a Joint Verdict Form, if you can get to it in that shape by then, or as much a joint document as you have with any parts that are still in dispute set out as being disputed portions.

Can you do that?

**MS. WOODHOUSE:**  Your Honor, do you want the Jury Instructions along with the Verdict Form?

**THE COURT:**  I do not.  I'll talk about that.

So the Verdict Form is what I'm talking about as far as 8:00 o'clock.

**MR. SHAW:**  We can certainly do the 8:00 o'clock, Your Honor.

**THE COURT:**  Great.

**MR. SHAW:**  I just wanted to clarify to make sure I understand your instructions on the direct infringement.

Do you want a single question for all lenses and all claims or --

THE COURT:  For each.

MR. SHAW:  For each lens.

THE COURT:  For each lens.

MR. SHAW:  So "do you find direct infringement of lens 9879?"

THE COURT:  Yes.

MR. SHAW:  Okay.  Thank you, Your Honor.

THE COURT:  And then as to the Instructions, the portions on commencement of damages, calculation of damages, and obviousness, which were still in discussion, and you may have some further agreement on, if you can also send your proposal for those sections in a Word document, so not the entire Jury Instructions are redone.  And we will make the other changes that we discussed 15 minutes ago in our drafts. So we will plug into our draft the -- we'll consider plugging into our draft what you submit at 8:00 o'clock in a Word document.  We will then turn those around and reissue a revised Verdict Form and Final Instructions after receiving your suggestions.  So we'll have a further kind of final conference after you look at that further document.  That will be our plan.  And if you can send them again to my courtroom deputy in Word version, it will be appreciated, and we will eventually issue them back to you.

All right.  Mr. Gotts, you had something about the further demonstratives and the invalidity section?

**MR. GOTTS:**  Yes, Your Honor, Mr. Owens is going to handle that.

And I do have a question for the Court, maybe while he is seating up, I can ask.  Rule 50 motions.  First of all, does Your Honor have a preference for written motions versus oral motions, and timing?

**THE COURT:**  So I didn't take it immediately, because there's no prejudice to waiting until the break to consider it.

Do you have something in writing that you'd like to make?

**MR. LABGOLD:**  Yes, we do.

**THE COURT:**  All right.  Then I'd say file it, if it's ready to file.  I'm not trying to put extra work on somebody.

**MR. LABGOLD:**  No, it's ready.

**THE COURT:**  If you've got something ready to file, file it, and then we'll have a discussion about it once I've reviewed it.

**MR. GOTTS:**  And of course we'll just do ours before the case is submitted to the jury.

**THE COURT:**  Yes.

**MR. GOTTS:**  Thank you, Your Honor.

**THE COURT:**  That sounds good.

And then on the demonstratives, Mr. Owens.

**MR. OWENS:**  Yes.  If I could use the ELMO here.

So just very briefly, the first issue is with *Johnson*, and this is from Dr. Pollock's expert report, and it's about a limitation of Claim 30, and he's referring here down to -- he's referring to this figure below that shows this red line through it.  Do you see that?  And he talks about this.  He says:

"The annotated Figure 1 below shows the LED is mounted at a predetermined location beneath a central portion (shown by the horizontal red line) such that light for the LED enters the optical element (the region above the horizontal red line)."

So that's what we addressed in our expert report.

We took that figure, and that is what we addressed, and that's what was argued.

Over the weekend we got this, which is a new argument.  We don't have this red line anymore.  They circled this top portion now (indicating).  Then they seemed to treat all of this now as the optical elements.

It's unclear.  We don't know exactly what they're going to say.  We don't have anything in our expert report that responds to this, because it was never previously raised.

**THE COURT:**  All right.  So, yes, Mr. Labgold.

**MR. LABGOLD:**  First of all, with regard to the annotations, the way to make the claim charts more facile, they're actually color coded so that the words of the claim show what the element is.

If you refer to Claim 38, I'll bring it up to the ELMO. Excuse me.  We -- I apologize for what's already marked on here, but this is not an issue that's by any stretch of the imagination a surprise.

"The refractive index having a curved shape that is symmetrical about an axis, and converges to a location in a central portion of the optical element."

The central portion of the optical element is defined specifically in Claim 28, because that's where they converge.

This is the same position that SSC, the party took, when showing where the -- this isn't a surprise.  They said the optical element has two interfaces with curved shapes that are symmetrical about an axis and converge to a central portion of the element.  That's where the central portion has to be.

And when claim terms are used in one claim and another claim, they have to be used consistently.

**THE COURT:**  Why the need for a new demonstrative?

**MR. LABGOLD:**  It's just a matter of when going through the claim, I mean, pointing out where the element is, and that's all we have.  We've got the LEDs circled, because it's the LED.  So pointing out each one.

Both sides have produced demonstratives in a way of showing, you know, what the elements look like.

With regard to their demonstratives, regarding showing like the sheet in red, showing the sheet in green, we've never

seen those before. And they're doing it for the purpose of helping illustrate for the jury what's shown on the screen and what it's corresponding to in the claim language. And that's all that's being done with regard to the claim charts as they're currently constructed. It's not a change in position.

THE COURT: Mr. Owens, I'll give you the final word on this.

MR. OWENS: Yeah. Maybe I'm going crazy, but we were just talking about Claim 30, now we're talking about claim 38, or Mr. Labgold is talking about Claim 38.

This clearly is just not the same position, and it's not what we responded to. We don't have a position that even addresses what they're now putting there. And you could tell by the color coding that they've now put here that, you know, there is no longer this red line (indicating). They're no longer splitting it in half like they used to. They're counting the whole thing.

THE COURT: All right. I will exclude the new demonstrative under the element of surprise. Highlighting of claim language, that's a matter of emphasis, and both parties have done that, and I'm not precluding that. But a new demonstrative with a new analysis I'll exclude.

MR. LABGOLD: So the exclusion -- are we excluding just the circle? Do you want the line back? What would --

THE COURT: I'm excluding what I'm seeing before me.

**MR. LABGOLD:**  No.  I was asking to decide what would make them happy.

**MR. OWENS:**  You don't have to include the line.

**THE COURT:**  We're making a poor transcript.

**MR. OWENS:**  Yes.  Sorry about that.

**THE COURT:**  Anything else, Mr. Owens?  Any other objections?

**MR. OWENS:**  Yeah, I have one more, Your Honor.

**THE COURT:**  Speak now.

**MR. OWENS:**  And I'll try to be really quick.

This objection is to Stanley.  And they made an argument here.  Stanley discloses a lens, an optical element in the form of housing 3.

And this is housing 3 (indicating).  This is all that was ever shown to us.  And the key issue is that's supposed to have a -- in this element that's at the top and bottom opposing sides.  It's actually this one here (indicating).  That optical element has top and bottom opposing sides.

They never drew anything here (indicating), and they never identified any specific new interpretation of that.  We addressed this specifically, how they laid it out, the bottom side is the bottom of the optic element, and the top is the top up there (indicating), and that's what we addressed.

Now, and this came up during the summary judgment hearing, they've taken this new position that we've never seen before

where they arbitrarily draw this bottom line (indicating) just to the top here (indicating).  This is all one unit.  It's all the optical element they're identifying as meeting that element.  They draw this line (indicating).  They drew this line.  This is -- none of this was ever identified in their expert report, and we didn't address anything, because this was never actually in there.

THE COURT:  All right.  So same objection.  Surprise.

MR. OWENS:  Yeah.

MR. LABGOLD:  And Your Honor, I respectfully submit this is not surprise.

As Stanley is very clear in stating that:

"The light-emitting diode has a lens part 31A, which is refractive, and a reflective lens part 31B."

It's actually two lenses.  It's defined as such.  "A refractive lens part 31A, and a reflective lens part 31B."

And with regard to the claim, we're talking about the 31B part, the 31 -- the part that has the TIR surface.  That's obviously where the figure itself is actually delineated.

31B is up here (indicating).  31A is down here (indicating).  This one has refraction.  (indicating).  This one has reflection (indicating).  And we're just clearly delineating what we're talking about.

The patent itself that Stanley referenced describes them as independent, segregable elements.

And paragraph 10 here:

(reading) Since the refractive lens part 31A and the reflective lens part 31B are provided as to be closely adjacent to each other. They're actually determined to be separate.  But if when the two lens parts are coupled, it is desirable to have -- to adjust the joining section to have illumination consistently such that both have the same luminosity.

It's two separate parts.  That's an option of the prior art.

THE COURT:  It's not quite as obvious as both of you thought, because it took several minutes to describe it, and the jury will take more to understand what you're talking about.

I'm going to exclude -- if it was a helpful demonstrative, it would have been appropriate to put in the report, and there would be no element of surprise now.  I'm not precluding the topic, although you've got limited time.  I perhaps am helping you.  I'm going to exclude the demonstrative under the element of surprise.  Same as my prior ruling.

That's my ruling on those two demonstratives.  We'll see you tomorrow morning at 9:00 a.m.

ALL COUNSEL:  Thank you, Your Honor.

(Proceedings adjourned at 4:21 p.m.)

---oOo---

**CERTIFICATE OF REPORTERS**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Monday, March 21, 2016

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter


_____

Rhonda Aquilina, CSR No. 9956, RMR, CRR
U.S. Court Reporter