**Volume 7**

**Pages 1066 - 1306**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

| | |
|---|---|
| ENPLAS DISPLAY DEVICE CORPORATION; ENPLAS TECH SOLUTIONS, INC.; and ENPLAS (U.S.A.), INC., | ) ) ) ) |
| Plaintiffs, | ) ) |
| VS. | ) **NO. C 13-5038 NC** ) |
| SEOUL SEMICONDUCTOR CO., LTD., | ) ) |
| Defendant. | ) ) ) |

San Francisco, California
Tuesday, March 22, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

        NAGASHIMA & HASHIMOTO
        12005 Sunrise Valley Drive - Suite 203
        Reston, Virginia  20191
   **BY:  MARC R. LABGOLD, ATTORNEY AT LAW**
        **PATRICK J. HOEFFNER, ATTORNEY AT LAW**

        SHAW KELLER LLP
        300 Delaware Avenue - Suite 1120
        Wilmington, Delaware  19801
   **BY:  JOHN W. SHAW, ATTORNEY AT LAW**
        **JEFFREY T. CASTELLANO, ATTORNEY AT LAW**
        **ANDREW E. RUSSELL, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
            Rhonda Aquilina, CSR No. 9956, RMR, CRR
            Official Reporters

**APPEARANCES**:   (CONTINUED)

For Defendant:

               LATHAM & WATKINS
               555 Eleventh Street, N.W. - Suite 1000
               Washington, D.C.  20004
       BY:  **LAWRENCE J. GOTTS, ATTORNEY AT LAW**

               LATHAM & WATKINS LLP
               650 Town Center Drive - 20th Floor
               Costa Mesa, California  92626
       BY:  **RYAN R. OWENS, ATTORNEY AT LAW**

               LATHAM & WATKINS LLP
               140 Scott Drive
               Menlo Park, California 94025
       BY:  **MICHELLE P. WOODHOUSE, ATTORNEY AT LAW**

               LATHAM & WATKINS LLP
               John Hancock Tower - 27th Floor
               200 Clarendon Street
               Boston, Massachusetts  02116
       BY:  **CHARLES H. SANDERS, ATTORNEY AT LAW**

Also Present:       **Takaaki Nagashima**
                  **Yukihiko Ohnuki**
                  **Jennifer Jonak**

**I N D E X**

Tuesday, March 22, 2016 - Volume 7

|  | PAGE | VOL. |
|---|---|---|
| Jury Instructions | 1268 | 7 |

| **PLAINTIFF'S WITNESSES** | PAGE | VOL. |
|---|---|---|

**POLLOCK, CLIFFORD (RECALLED)**

| (PREVIOUSLY SWORN) | 1070 | 7 |
|---|---|---|
| Direct Examination resumed by Mr. Labgold | 1070 | 7 |
| Cross-Examination by Mr. Gotts | 1105 | 7 |
| Redirect Examination by Mr. Labgold | 1186 | 7 |

**MOORE, DUNCAN (RECALLED)**

| (PREVIOUSLY SWORN) | 1201 | 7 |
|---|---|---|

| **DEFENDANT'S WITNESSES** | PAGE | VOL. |
|---|---|---|
| Direct Examination by Mr. Owens | 1201 | 7 |
| Cross-Examination by Mr. Labgold | 1240 | 7 |
| Redirect Examination by Mr. Owens | 1256 | 7 |
| Recross-Examination by Mr. Labgold | 1258 | 7 |

**E X H I B I T S**

| PLAINTIFF'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 63 | | 1263 | 7 |
| 81 | | 1105 | 7 |
| 84 | | 1105 | 7 |
| 85 | | 1105 | 7 |
| 86 | | 1105 | 7 |
| 87 | | 1105 | 7 |
| 88 | | 1105 | 7 |
| 89 | | 1105 | 7 |

**I N D E X**

**E X H I B I T S**

| PLAINTIFF'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 90 | | 1105 | 7 |
| 91 | | 1105 | 7 |
| 92 | | 1105 | 7 |

**E X H I B I T S**

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1240 | | 1218 | 7 |

Tuesday - March 22, 2016                          9:07 a.m.

**P R O C E E D I N G S**

**---000---**

(Proceedings were heard out of the presence of the jury:)

THE COURT:  Good morning, everyone.

ALL:  Good morning, Your Honor.

THE COURT:  Our jurors are ready, and let's call them in and call Dr. Pollock back to the stand.

(Proceedings were heard in the presence of the jury:)

THE COURT:  All right.  Good morning to our jurors. Everyone may be seated.

And we return to our case with Dr. Pollock being examined about the invalidity part of his testimony.

**CLIFFORD POLLOCK**,

called as a witness for the Plaintiffs, having been previously duly sworn, testified further as follows:

THE COURT:  Mr. Labgold, proceed.

MR. LABGOLD:  Thank you, Your Honor.

**DIRECT EXAMINATION**  (resumed)

BY MR. LABGOLD:

Q.   Okay.  So turning now to the invalidity of the '554 patent, go to Slide 91.

So the first reference we'll look at is the one we've identified as JP-161, and that will be PX-204 in the jurors' binder.

What is this patent directed to?

A.   This is another distributed light source.  It's taking an LED and it's using total internal reflection to spread the light across a large panel for something like an exit sign.

Q.   Can you give a general explanation looking at Figure 7 here what's going on?

A.   Yeah.  This is a cross-section where you've got an LED, a point source, and it's coupled into a device which has a total internal reflecting surface which redirects the light, which would otherwise just go straight up, into a waveguide where it bounces around and propagates.  And what it does is it spreads the light out into a large area so it broadens the total effective luminous from an LED or area.

Q.   Now, I'm going to start with Claim 1 since this applies to just Claims 1 and 6, and move to the next slide.

Does JP-161 teach the first -- the element and the preamble, an illumination device comprising the wavelength [sic] --

A.   Yes.  I'm sorry.  Yes, it is certainly an illumination device and it has a waveguide.

Q.   If you can go through and explain whether it has -- where the waveguide is?

A.   Yeah.  The waveguide is this shaded portion with crosshatch (indicating).  And you remember our definition for a waveguide was an optical device that redirects light

propagating between its surfaces.  Here are surfaces (indicating) and light is propagating around between them.

Q.   Now, we have -- going to the next slide, the claim goes on:  (reading)

      "Having an illumination coupler embedded in an
      interior region of said waveguide."

A.   So an illumination coupler converts light and redirects it so it goes into the waveguide, and this has a surface here (indicating) and a surface here (indicating), these two light blue surfaces.  So it has an illumination coupler.  They are embedded in the interior region of this waveguide (indicating).

Q.   And just so it's clear, one of the words that patent attorneys use is "said."  It will come up.  Did you understand that it means "the previously stated one"?

A.   Yes.

Q.   Thank you.

     Now, moving on in the claim, the next element is: (reading)

      "Said illumination coupler adapted to receive light
      from a point source within an interior" -- "within said
      interior region."

     Do we have that?

A.   Yes, we do, and the colors kind of illustrate that.  Said illumination coupler -- we've already talked about, that light blue -- is adapted to receive light, so it's angled and such

that the rays of light coming off of this LED are directed against it so it receives it, and these are located within this interior region.

**Q.** (reading)

"And to direct light between generally parallel top and bottom surfaces outside said interior region."

Does JP-161 have that element?

**A.** It does. So it's obviously directing light. The rays are being reflected and redirected, and it's being redirected between these generally top -- there's the top (indicating) -- and bottom (indicating) surfaces outside of the interior region. The interior region is this zone located where the dielectric interface is (indicating). So the rays are being directed outside of that as shown and as claimed.

**Q.** Moving on to the next element: (reading)

"Said illumination coupler comprising a refractive index interface which is inclined relative to at least one of said top and bottom surfaces."

**A.** So the illumination coupler, as I mentioned a minute ago, is this surface here (indicating) which redirects light, and it is comprising the refractive index interface. The waveguide is made of a dielectric -- a refractive index, and then the outside is air -- so there's a change in index across that -- and it is inclined relative to the top surface.

**Q.** And moving on to the next element: (reading)

Said interface being configured to reflect light rays emitted by the point source which propagate along a line that forms less than the critical angle of total internal reflection with respect to a line lying in one of said top and bottom surfaces."

Does JP-161 have all those?

**A.** It does. Let's step through it.

So the interface is that green, light blue thing up there (indicating). It's configured to reflect light rays emitted by the point source. So there's the point source (indicating) and there's light rays coming up, and they are propagating and very nicely they're drawn -- I'm going to blind somebody, I'm afraid -- they're drawn to go up at an angle. And if they went straight up as drawn here, they would strike that interface at less than that critical angle. Remember we talked about that? And so they would propagate through the interface if they continued.

So they are traveling at less than the critical angle. And that this structure (indicating), this said interface, is oriented -- let me just say it is configured such that light which strikes it is redirected into -- let me just read this again.

It's configured to reflect lights -- light rays emitted by the point source which propagate along the line which form less than a critical angle. That it's doing.

And, let's see, with respect to the line lying in one -- yes, so it does all those things.  Sorry.  That's a mouthful of stuff.

Q.   With regard to this language of "which propagate along a line that forms less than the critical angle of total internal reflection with respect to orienting it on the line with one of said top and bottom surfaces," is this total internal reflection?

A.   Yes.  That's what it's referring to.

Q.   We'll see Claim 1 again momentarily.

A.   Many times, yes.

Q.   Referring to the next element:  (reading)

"And it's configured such that light rays which would otherwise pass out of said waveguide are captured for propagation between said top and bottom surfaces."

And does JP-161 do that?

A.   It does.  Those light rays, as you can see, would strike this interface (indicating) at an angle where they would propagate out, but the inclined interface redirects them such that they are now captured and propagate between these top and bottom surfaces.

Q.   Now, Claim 6 is a dependent claim, and it adds the limitation that:  (reading)

"The illumination device of Claim 1, wherein the waveguide and the illumination coupler are integrally

formed from a single piece of material."

And is that present in the JP-161?

A.   Yes, it is.  You can see all of this -- the whole coupler is sitting right here (indicating), and it's entirely made of one unit, and it's all one integrally formed system.

Q.   So what is your opinion with regard to whether JP-161 anticipates Claims 1 and 6 of the '554 patent?

A.   It does anticipate Claims 1 and 6.

Q.   Now, we're going to move to our next reference, because JP-161 is only applied to those two claims, and this would be the Johnson reference, and it's PX-200 in the jury binder.

Moving to the next slide.

Now, Johnson is applied against a lot of claims.

A.   Yes.

Q.   And what is your opinion with regard to the Johnson reference?

A.   The Johnson, in my opinion, anticipates Claims 1, 30, 31, 33 through 39, 41, 42, 43, and 45 through 48 of the '554 patent, and it anticipates them.

Q.   Now turning to the next slide -- we'll move one ahead -- can you give a brief overview of what Johnson is?

A.   Yes.  So Johnson is a device that's got the title of -- the very creative title of "Light Emitting Device," which doesn't say much; but it's designed to take light and using total internal reflection -- take a single light source and

using total internal reflection spread it out into a large flat panel. And it's primarily used for telephones, lighting up the buttons on a telephone. So you use one LED to light up the whole panel so you can see your buttons at night. So it's a distribution system using waveguides and total internal reflection.

Q. And how does -- we see two figures here. The bottom figure, what is that showing?

A. So the bottom figure shows a LED, which is emitting light. It shows a total internal reflection surface and some light rays, and so the light is coming up and being redirected by that surface. And then the top surface shows the waveguide. So the light is being redirected horizontally there into a waveguide, and that's this structure up here (indicating). And then they show the whole thing where it goes out to some sort of illumination device. In this case, it's the button on your telephone.

Q. And how does the thing on the bottom relate to the thing on the top?

A. Oh. It is -- it is an enlarged version of this thing right here (indicating). So the entire system is this (indicating), but it's comprised of a little unit here (indicating) which plugs into that (indicating). So it's made in two parts.

Q. And looking at the next slide, if you can give an

explanation of what's shown there?

**A.**    Yeah.  This is just a broad view of when it's once plugged together, what it really operates as.  And so you've got a light source emitting light.  There's a total internal reflecting surface redirecting it and capturing it and sending it horizontally, and then into a waveguide where it goes off and does its display.

**Q.**    Now, turning to Slide 105, we'll go through Claim 1 with regard to Johnson.

So does Johnson have the -- is it an illumination device?

**A.**    Yes.

**Q.**    And does it have a waveguide having an illumination coupler embedded in an interior region of said waveguide?

**A.**    Yes, it does.  The waveguide is shown here (indicating), this crosshatched kind of blue zone; and the illumination coupler is that little light blue unit right there (indicating), and that is embedded in an interior region of the waveguide.

And this is even outlined in the claim language, which we've coded here on the slide saying explicitly -- you know, Figure 5 is a front section through, it's a cross-section at Figure 4 -- showing the interface coupling the light from the light-emitting device into a lightguide and from the lightguide into a push button to be illuminated.  So it explicitly describes this function.

Q.   And where in Johnson is that found?

A.   Oh, that's on Column 1, lines 45 to 49.

Q.   Now, moving to the next element of the claim:  (reading)

"Said illumination coupler is adapted to receive a

light from a point source within said interior region."

Does Johnson teach that?

A.   Yes, he does.  So we have an illumination coupler, so that's that light blue region here (indicating).  That's the -- we'll get to that in a minute.  It's adapted to receive, so it's locating stuff to receive light from a point source.  And so here's the point source (indicating).  This is the LED (indicating).  This is the LED and it is shining light up, and that is adapted to receive that light.

Q.   And is it in an interior region of the waveguide?

A.   Yes, it is.

Q.   (reading)

"And to direct the light between generally parallel

top and bottom surfaces outside of said interior region."

A.   So --

Q.   Does it do that?

A.   Yes, it does.  The interior region is defined basically where this coupler is (indicating).  And so here's beyond that, and you can see light is directed out of that and into a waveguide.  So it very clearly describes this.

Let me say it more clearly.  It directs it into these --

it directs it to travel between these generally parallel top and bottom surfaces outside of the region.  So that would be that zone there (indicating).

Q.   And does the Johnson -- does Johnson teach "said illumination coupler comprising a refractive index interface which is inclined relative to at least one of said top and bottom surfaces"?

A.   Yes, it does.  We can see in this figure again, the illumination coupler is that surface (indicating).  It's comprised of a refractive index interface.  So we have the dielectric material here (indicating) and air there (indicating).  So that's refractive index interface.  It is inclined with respect to this top surface (indicating).

Q.   And does said interface in Johnson being configured to reflect light rays emitted by the point source which propagate along a line that forms less than the critical angle of total internal reflection with respect to a line lying in one of said top and bottom surfaces?

A.   Yes, it does.  So --

Q.   If you can just show where that is.

A.   -- there's the interface (indicating).  Here's light that's coming up at an angle (indicating), which would be less than the critical angle if it struck that interface; and this interface -- if it struck the blue parallel line; and this interface is inclined to capture those rays and intersect.

Q.   And if we move forward two slides.  First, back here.

So is there, in addition to the figure, another portion that discusses this?

A.   Yes.  The Claim 1, the language right from the claim says: (reading)

"The conically shaped surface having an apex angle such that all of the light incident on the dome, except that essentially at the apex, will be internally reflected and coupled into the sheet."

That directly addresses that issue -- that element of the claim.

Q.   And that's Claim 1 of?

A.   That's Claim 1 of Johnson.

Q.   Okay.  And then the final element, such -- does Johnson teach such that the light rays which would otherwise pass out of said waveguide are captured for propagation between said top and bottom surfaces?

A.   Yes, it does.  And, again, we can see that directly.  The light rays coming straight up would pass out of said waveguide were it not for that interface, and so they are reflected and directed for propagation.  They're captured for propagation between these top and bottom surfaces.

Q.   So what is your opinion with regard to whether Johnson anticipates Claim 1 of the '554 patent?

A.   Johnson clearly anticipates Claim 1.

Q.   Now I'd like to turn to the next slide.   And to orient the jury, we're going to look at Claim 38 first.   That's on the last page on the patent.

Now, starting with Claim 38, we'll move to the next slide. Claim 38 is directed to an optical apparatus which comprises a light-emitting diode, an optical element positioned to receive light from the light-emitting diode.   Are those elements found in Johnson?

A.   Yes.   Very clearly here's the figure again (indicating). We have a light-emitting diode circled in red there (indicating), and an optical element is this blue interface (indicating) which is positioned to receive light from the LED. And the Claim 1 says at least -- this is an important point. Claim 1 says "at least one LED."   So --

Q.   You're referring to Claim 1 of?

A.   I'm sorry.   Claim 1 of patent -- Claim 1 of Johnson says "at least one light-emitting diode."   So this figure sometimes shows two, but one LED would be adequate for all the claims in this system.

Q.   Now, is there any other portion of Johnson that directs that point with whether or not it's limited to the figure as shown with two or if the invention is broader?

A.   There is written description where he says explicitly this is not limited to one LED.

Q.   And where is that?

**A.**    I'd have to look it up.

**Q.**    The prior art binder should be before you.

**A.**    Okay.  Let's just see.  Which tab was Johnson?

**Q.**    200.

**A.**    200.  Okay.

(Witness examines document.)  So the discussion is around -- the discussion is around Column 1 starting about line 49 through 63 where he talks about why there's two LEDs in his particular application, which was for the telephone company.

**Q.**    Will you pull it up?

**A.**    Oh, there we go.  Thank you.

Yeah.  Yeah.  So that's why he's describing there's two.

**Q.**    We need to zoom a little bit.  We need more of the column, please.

**A.**    Yeah.

**Q.**    Actually it's in the middle there.

**A.**    Right.  Yeah.

(Witness examines document.)  So it says:  (reading)

        "There's two LEDs so at least one will be illuminated

        due to the clarity of the DC bias.  This feature is a

        consequence of the particular system and is in no way

        essential to the invention."

So he makes it very clear that while he's showing two LEDs because the phone company at that time needed -- they had --

they didn't know how you were going to plug in your phone, so he wanted to make sure it would work either way, but one LED would be perfectly adequate for the ideas of this claim and invention.

Q.   And if we move on to claim -- the next element of Claim 8 [sic] -- or if we back up a minute.

The optical element -- oh, we have that -- it's positioned to receive light?

A.   Yes.  The optical element is that light blue feature there and it's positioned to receive light from the LED.

Q.   Moving on, does Johnson teach that:  (reading)

"Said element comprised of a refractive index interface having a curved shape that is symmetrical about an axis and converges to a location in a central portion of the optical element"?

A.   It does.  The next slide puts some color to this, but the optical element, again, is that interface, and it has a refractive index interface.  It is a curved shape, it is symmetric, and it is symmetric about an axis -- that little green line is an axis -- and it converges to a location -- it's coming down and it converges to a location in the central portion of the optical element.  So that little circle there (indicating) represents where it has converged to form a central location.

Q.   Now, moving to the next slide -- and we'll move ahead one

more -- does Johnson teach that said location, that being the central -- the location in the central portion and said light-emitting diode lying substantially on said axis?

A.   Yes, he does.  You can see this graphically.  Here's this -- here's this said location we talked about, central portion (indicating), here's the axis (indicating), and there is the LED (indicating).  And, again, they're symmetrically disposed here, but if there were one LED, it would be centered -- centrally located.

Q.   And is there any portion of the Johnson patent that says that if it was at least one LED, it would be lined up with approximately that axis?

A.   Absolutely.  The claim explicitly states that.

     Do we have that claim language?

Q.   Can we pull up Claim 1 of PX-200?

A.   You're going to have to blow that up.

Q.   You can see it closer by you.

A.   Okay.

Q.   It may be a little bit easier.

     But we're going to note that "at least one light-emitting diode."

     And then can you pull down line -- I can't see where it is -- 55?

     We're going to start with the portion "a plastic dome" from line 53 to the end.

A.    Okay.

Q.    If we can zoom in on that.

A.    So this is describing that depression in the top of the unit.  It says:  (reading)

        "The plastic dome having a peripheral geometry

    corresponding approximately to that of the opening in the

    sheet, and when inserted into the" --

    Oh, this is -- no.  I want to go where it's got -- let's go down to about line 61.

Q.    Right there.

A.    So around line 61:  (reading)

        "The conically shaped surface having an apex angle

    such that all the light incident on the dome, except

    essentially at the apex being internally reflected."

    And then right above it, it's talking -- okay.  I'm jumping around.

    Line 57:  (reading)

        "The top surface having a depression therein

    extending toward the light-emitting diode to form an

    approximately conically shaped internally reflecting

    surface."

    So it says right there that this top surface extends toward the light-emitting diode.  So if there's one light-emitting diode, if everything is on axis, this is telling -- this is teaching that that cone is going to be right

above it.

Q.   Referring back to the slides.  So the next element is that:  (reading)

     "Said interface being shaped and positioned relative
     to said LED to reflect a substantial portion of light from
     said LED in a direction transverse to said axis."
     And does Johnson teach that?

A.   Yeah, very clearly.  You can see the said interface in the light blue is shaped and positioned to receive light -- it's shaped and positioned relative to the LED -- the red one right here (indicating) -- to receive light from the LED and direct that transverse to the axis.  It's clearly showing those rays transverse to the axis.

Q.   And is that reflecting a substantial portion?

A.   Oh, yes.  It is substantially -- yeah, it's reflecting a substantial portion.

Q.   And so with regard to Claim 1 -- what is your opinion as to whether Johnson anticipates -- excuse me -- Claim 38?

A.   Claim 38?  Claim 38 clearly anticipates the '554 patent. I'm sorry.  Johnson clearly anticipates Claim 38 of the '554.

Q.   And referring to Claim 39 on the next line, Claim 39 adds: (reading)

     "The element where the optical apparatus of Claim 38,
     wherein said refractive index interface is circularly
     symmetric."

And does Johnson teach a circularly symmetric reflective index interface?

A.    He clearly does.  The figure shows the circle, and I think Claim 2 also outlines a circle, circular symmetry.

Q.    And what is shown in the picture just so you can orient the jury as to what this view is on the right-hand side?

A.    That's the top view of the device.  So we were looking at a cross-section of it.  This is what it looks like looking down from above.

Q.    Now, Claim 41 on the next slide adds an additional element again to Claim 38:  (reading)

        "Wherein said refractive interface surface converges
    to form a cusp which terminates at said location."

    And does Johnson teach that?

A.    Yes, very clearly.  You can see the refractive index interface surface is converging to form a cusp, and the said location we talked about was this central axis located above the LEDs.

Q.    And where is the -- I'm sorry.

    The location in the central portion, where is that?

A.    Oh, that's this circular -- this little purple spot here (indicating).  That's -- they're forming -- it's coming down and converging to form a cusp at the central location.

Q.    Now, with regard to Claims 42 -- does Johnson anticipate this claim?

**A.**    Johnson clearly anticipates this claim.

**Q.**    With regard to Claims 42, 43, and 45, what is added by these three claims?

**A.**    This is where he's showing that there's some light is going to pass through this total internal reflected surface.

**Q.**    And in Claim 42, which is dependent upon Claim 41, it says that:  (reading)

     "The cusp is contoured to permit leakage of light
     through said central portion of said refractive index
     interface."

     And does Johnson teach that?

**A.**    Yes.  In all these figures we've been focusing on these rays which are going up and reflecting horizontally, but there's always been this one ray labeled "A" which is going right on up, and that happens at the interface of this cusp -- near the cusp where it's no longer satisfying the critical angle.

     And Johnson clearly shows that and demonstrates it and has put that in the figure; and, in fact, in Claim 1 it says: (reading)

     "The conically shaped surface having an apex angle
     such that all the light incident on the dome, except that
     essentially at the apex, will be internally reflected and
     coupled."

     So the cusp has been contoured and it permits some leakage

of light through said central portion of the said refractive index interface.

Q.   And Claim 43 adds a further limitation to Claim 42: (reading)

"Wherein the cusp is rounded to permit the leakage of light through said central portion of said refractive index interface."

And does Johnson teach that?

A.   This clearly teaches around a cusp.

Q.   And with regard to Claim 45:  (reading)

"The optical apparatus of Claim 38, wherein the refractive interface is leaky such that some light emitted by the light-emitting diodes is transmitted therethrough."

And does this teach that claim?

A.   This clearly teaches that.  Some of the light emitted by the light-emitting diode does leak through that interface.

Q.   So with regard to Claims 42, 43, and 45 of the '554 patent, what is your opinion as to whether Johnson anticipates those claims?

A.   Johnson clearly anticipates those claims.

Q.   And last but not least, we'll look at Claims 46, 47, and 48.

Claim 46 adds a limitation again back to Claim 38: (reading)

"Wherein said optical element comprises a polymeric

material."

And does Johnson teach that the optical element is made out of a polymeric material?

A.    Yes.  In the written description on Column 1, line 65, he says:  (reading)

"The encapsulate can be any of several optically transparent materials, such as silicone, epoxy, or acrylic resin."

And those are -- and those are polymeric materials.

Q.    Now, 47 further narrows Claim 46 by adding the additional limitation:  (reading)

"Whereas the optical element comprises a material selected from the group comprising acrylic, polycarbonate, and silicone."

And so, sorry to be redundant, but does it show that?

A.    Clearly you can see in that description he mentions silicone and acrylic.

Q.    And Claim 48 is dependent upon 46:  (reading)

"Wherein said refractive index interface comprises an air polymer interface."

And does Johnson teach that?

A.    Yes.  This whole structure where that interface was made between the polymer and the air is the refractive -- that forms the refractive index interface.

Q.    So does Johnson -- what is your opinion as to whether

Johnson anticipates Claim 46, 47, and 48?

A.   It clearly anticipates those three claims.

Q.   Now, I want to go back to Claim 30.  I'd like to go to the next slide.

Starting at the beginning of Claim 30, 30 is directed to: (reading)

"An optical apparatus comprising an LED, a light-emitting diode, an optical element having top and bottom opposing sides, and an edge extending between the top and bottom opposing sides."

And does Johnson teach those elements?

A.   He clearly does.  This is very easy to see.  We have an optical apparatus.  It has a top side (indicating), a bottom side (indicating) -- a bottom.  And let me just say, it has a top, a bottom, it has sides, and it has a light-emitting diode located there (indicating).

Q.   The next element of the claim is that:  (reading)

"Said LED is mounted at a predetermined location beneath the central portion of said optical element such that a light from the LED enters the optical element."

And does Johnson show that?

A.   It does.  So clearly we have an LED.  It's mounted at a predetermined location beneath the central portion.  We've discussed the central portion as this point right where the cusp -- right below the cusp.  It is located below that.  And

light from the LED enters the optical element.

Q.    If we go to claim -- the next element, rather, the next slide:  (reading)

        "Said optical element including a TIR surface spaced from said bottom side and extending from a point above the LED outwardly towards said edges."

    Does Johnson teach that element?

A.    Yes, he does.

Q.    And where is that?

A.    Okay.  So this outlines it.  The element has a TIR surface -- that's that light blue (indicating) -- spaced from the bottom.  So here's the bottom (indicating).  It's clearly spaced from the bottom.  It extends from a point above the LED extending outward (indicating).  So that's that interface.  The TIR surface extends outwardly toward the edges.

Q.    And moving on, the next element is:  (reading)

        "Said TIR surface positioned to receive light emitted by the LED."

    Is that shown?

A.    That's clearly shown.  There's the LED (indicating).  The yellow -- it's red.  The yellow line is the light emitted by it, and they are directed against that TIR surface.

Q.    And said TIR surface curving towards the LED so as to form a cusp above the LED, and does Johnson teach that?

A.    Yes, he does.  Here's this TIR surface (indicating).  It's

curving toward the LED.  It forms a cusp.  There's the LED (indicating), and it's right above -- the cusp is right above the LED.

Q.   And then the final element of Claim 30:  (reading)

     "The curving TIR surface totally internally reflecting light rays such that reflected light rays propagate from the TIR surface towards the edge of the optical element."

Does Johnson teach that?

A.   Yes, it does.

Q.   Where does he say that?

A.   So here we have again -- we'll just find every part of this.  The curving TIR surface is shown in blue (indicating). Totally internally reflecting light rays from -- so these light rays coming up (indicating), and they're reflecting on this dielectric interface.  So that's TIR.  So that's from the TIR surface toward the edge.  There's the edge (indicating).  These rays are going toward that edge.

Q.   And so what is your opinion as to whether Johnson anticipates Claim 30?

A.   Johnson clearly anticipates Claim 30.

Q.   Moving to the next slide, Claim 31, the language is familiar:  (reading)

     "The optical apparatus of Claim 30 wherein said TIR surface is circularly symmetric."

**POLLOCK - DIRECT / LABGOLD**

Does Johnson teach a circularly symmetric TIR surface?

**A.**   Yes, he does.

**Q.**   And where is that?

**A.**   As shown in the figure and also in Claim 2.  This is a top view of the cross-section.  It's clearly a circularly symmetric structure.

**Q.**   And where else did you say?  I'm sorry.

**A.**   I believe it's in Claim 2.

**Q.**   Of which one?

**A.**   Of Johnson.  Shall we look?

**Q.**   Just to clarify, yeah.

**A.**   (Witness examines document.)  Yes.  Okay.  Claim 2: (reading)

"The faceplate of Claim 1 in which the transparent plastic dome encapsulating the diode has a cylindrical shape with a depression formed into the top surface."

**Q.**   And where are you reading from?

**A.**   This is Column 5, line 1 through 3, and it's Claim 2 of the Johnson patent.

**Q.**   Are you referring to Figure 2?

**A.**   I was referring to Claim 2.

**Q.**   The claims are all the way at the end.

**A.**   Yeah.  I just read the Claim 2.

**Q.**   Okay.  So what is your opinion as to whether Johnson anticipates Claim 31 --

**A.**   It does anticipate.

**Q.**   -- in the '554 patent?

**A.**   I'm sorry.  It does anticipate.

**Q.**   Looking next at Claims 33 to 35, here we have a common element again, and Claim 33 is:  (reading)

"The optical apparatus of Claim 30, wherein the TIR surface is leaky such that some of the light emitted by the LED is transmitted therethrough."

And does Johnson teach that?

**A.**   Johnson does.  Again, we can just step through this quickly.  We have a TIR surface shown in blue (indicating).  Some light is going through it.  So it is leaky such that some light emitted by the LED shown here transmits through the surface.

**Q.**   And what is the reference to Claim 1 of Johnson here?

**A.**   Oh, yes.  So we did this a moment ago.  Claim 1 describes this very clearly:  (reading)

"The conically shaped surface having an apex angle such that all of the light incident on the dome, except that essentially at the apex, will be internally reflected and coupled into the sheet."

**Q.**   And, quickly, Claim 34 where the cusp is contoured to permit leakage of light through said TIR surface, and Claim 35 further dependent where the cusp is rounded to permit the leakage of light through the TIR surface, are those two claims

anticipated?

A.   Yes.  This figure clearly shows both claims.  It shows the cusp, and it shows the cusp is contoured from leakage of light because that ray goes through it, and it shows that it is a rounded shape.

Q.   So with regard to Claims 33, 34, and 35, what is your opinion as to whether it's anticipated by Johnson?

A.   They are clearly anticipated by Johnson.

Q.   And the last two claims we have to deal with for Johnson are Claims 36 and 37.  36 saying that:  (reading)

        "The optical apparatus comprises an optical element
     of Claim 30 comprising polymeric material."
     Does Johnson anticipate that?

A.   Yes, he does.

Q.   And where?

A.   In the written description on Column 1, lines 65 through 67, he says:  (reading)

        "The encapsulate can be formed of several materials,
     including silicone, epoxy, or acrylic resin."

Q.   And 37, again, is similar to the claim we saw before where it adds the further dependency:  (reading)

        "Wherein the material selected from a group
     comprising acrylic, polycarbonate, and silicone."
     And is your opinion that that's the same?

A.   It's the same reasons, same text.

Q.    So with regard -- what is your opinion with regard to whether Johnson anticipates Claims 36 and 37?

A.    Johnson does anticipate those two claims.

Q.    And that will conclude Johnson.

Now, moving on to our last primary reference, it's going to be Stanley, and that will be Plaintiffs' Exhibit 201.

A.    (Witness examines document.)

Q.    This is a Japanese reference.  The English translation will be at the back.

Move to the next slide, please.

So can you briefly summarize which claims we're looking at here with regard to Stanley?

A.    Primarily Claims 30 and 31 of the Johnson -- of the '554 and refer to Stanley against that one as being directly anticipated.  Then we'll look at 33 through 35 of the '554 and look at Stanley in combination with Rohm and see that they're obvious.

Q.    Okay.  Now, turning to the next slide, can you give a brief explanation of what is Stanley directed to?

A.    So Stanley, again, like all of these devices, it's -- or we've talked about is taking a single LED and trying to disperse the light over a broader area.

And so this is a light display device, and what it consists of is an LED sitting on these two electrodes.  It's emitting light, and light goes up, then again hits a TIR

surface.  So it's using total internal reflection to disperse the light horizontally and send it out dramatically in that direction.

This also has -- this has two units in the system. There's -- Number 31B is the top part.  The lower part, 31A, is a lens, and so it uses light in a refractive sense there and takes a combination of both.

Q.   And looking at the next slide?

A.   Yes, this is a little more same detail but just points out there's two elements here, 31A and 31B.  31A is this lower section (indicating).  31B (indicating) is the upper section. They are -- they can be merged or they can be separate, but they are -- they're drawn together in this situation here.

Q.   Now, let's go to Slide 141.  So going through Claim 30, does Stanley teach an optical apparatus comprising a light-emitting diode, an LED, an optical element having top and bottom opposing sides, and an edge extending between the top and the bottom opposing sides?

A.   Yes, he does.

Q.   We'll go to the next slide.

A.   So the light-emitting diode is this little red thing sitting on top of these two electrodes (indicating).  That's the LED, and you can see the light rays coming out of it.  It has -- the optical element is composed of a top side (indicating), a bottom side (indicating) -- which would be --

you can see it right there on that side view (indicating), so the bottom side would be right through there (indicating) -- and an edge extending between the two.  So there's an edge (indicating) and there's an edge (indicating).

Q.   Moving on to the next element, does Stanley teach that said LED is mounted at a predetermined location beneath a central portion of said optical element such that the light from the LED enters the optical element?

A.   Yes, it does.  So recall this central portion is where these cusps come down and meet on an axis.  So there's these two cusps coming down -- or these two not cusps -- these surfaces coming down to meet on the axis.  There's an LED. It's mounted directly below the central portion of that element.  And the light from that LED is directed up and enters into that optical element.

Q.   And moving to the next element, does Stanley teach that said optical element including a TIR surface spaced from said bottom side and extending from a point above the LED outwardly towards said edges?

A.   Yes, he does.  So, again, we have an LED in red.  The TIR surface is this light blue surface (indicating).  It is above the bottom side, and it extends from a point above the LED outwardly toward the edge.

Q.   And moving to the next elements, does Stanley teach that said TIR surface is positioned to receive light emitted by the

**POLLOCK - DIRECT / LABGOLD**

LED and said TIR surface curving towards the LED so as to form a cusp above the LED?

A.   He clearly does.  The rays -- there's the LED again (indicating).  The yellow rays correspond to the light emitted by the LED, and the TIR surface is positioned to receive that light.  The TIR surface curves down toward the LED and forms a cusp right above the LED.

Q.   And, finally, with regard to Claim 30, does Stanley teach the curving TIR surface totally internally reflecting light rays such that reflected light rays propagate from the TIR surface towards the edge of the optical element?

A.   He clearly does.

Q.   Where is that?

A.   There's the curving TIR surface as shown by that blue curve on the top, and the rays are coming up from below and they are all being totally internally reflected, and they are directed toward the edge right there (indicating) of the optical element.

Q.   So what is your opinion as to whether Stanley anticipates Claim 30?

A.   I feel Stanley does clearly anticipate Claim 30.

Q.   Moving to the next slide with regard to Claim 31, does Stanley anticipate Claim 31, which adds that the TIR surface is circularly symmetric?

A.   Yes.  Stanley -- these drawings here show -- this is kind

of a top view, a semi-top view -- I don't know what you call it from the side -- where you can see it's a circularly symmetric structure.

Q.   Now, moving to Claims 33 to 35, does Stanley teach leakage?

A.   He does not.

Q.   Okay.  So with regards to 33, 34, and 35 which have the leakage, where did you find that element in such a way that you think one of ordinary skill in the art would combine with Stanley to render it obvious?

A.   We found one -- well, there's several, but we've looked at Rohm, which is a patent of an LED which is also made for backlighting and distributing light from an LED over a broad area, and it had a lot of elements which are very similar to Stanley but we felt it would be very obvious for someone working in this field to be aware of both and see the connection.

Q.   And does the Rohm reference in combination with Stanley teach a TIR surface which is leaky such that some of the light emitted by the LED is transmitted therethrough?

A.   It does.  So Rohm -- here's a picture of the Rohm diode right below (indicating), and it's an LED and it's a -- actually it's a very ugly structure.  But, anyway, imagine this is a cross-section.  It's a cone.  It's a bullet shape with a dip in the middle.

And what he teaches is that some light is refracted.  So here's a ray (indicating).  It hits a TIR surface and refracts out.  But he also says you can change the curvature and form a middle -- a lens right in the middle.  So he teaches explicitly that there's -- by changing that interface shape, you can get reflection for TIR and you can get dispersion by changing the shape and spreading light.  So he teaches a leaky surface.

Q.   And so, quickly, does Stanley teach the additional -- Stanley in view of Rohm, would that render obvious a TIR surface which is leaky such that some light emitted by the LED is transmitted therethrough?

A.   It does.

Q.   And would it render Claims 34 and 35 obvious as well?

A.   In my opinion, it would.

Q.   Now, turning to the next slide, what would be the motivation for one of ordinary skill in the art to combine these two references?

A.   Well, as I said, they're both working on LEDs for broad emission of light, spreading it out for display.  So they both address the same problem, and they both are attacking it slightly different ways.  But this is a -- Rohm attacks it by using a slightly rounded cusp here (indicating), and he's letting light go out the front as well as the sides.  Stanley was primarily just going sideways.

So I think it's purely -- and -- but they're both using

total internal reflection off of a surface to couple light from the LED horizontally and spread it around.

Q.   So in your opinion, would one of ordinary skill in the art be motivated to combine these references?

A.   They would.

MR. LABGOLD:  We have no further questions, Your Honor.

THE COURT:  Thank you.

Cross-examination?

MR. GOTTS:  Thank you, Your Honor.

THE COURT:  And a reminder to the jury, the cross-examination is permitted as to both the infringement and invalidity parts of Dr. Pollock's testimony.

MR. GOTTS:  Just give me a moment to set up here, please, Your Honor.  I have a lot of binders.

MR. LABGOLD:  As a housekeeping matter, may I admit a couple of exhibits?

THE COURT:  You may if you speak into a microphone as you do it.

MR. LABGOLD:  We'd like to move to admit PX-180 -- excuse me -- PX-81, which is the Pollock CV; PX-84, 85, 86, 87, 88, 89, 90, 91, and 92, and those are the ray traces.

MR. GOTTS:  No objection, Your Honor.

THE COURT:  All right.  81, 84, 85, 86, 87, 88, 89, 90, 91, and 92, are admitted into evidence.

(Plaintiffs' Exhibits 81, 84, 85, 86, 87, 88, 89, 90, 91, and 92 received in evidence)

**CROSS-EXAMINATION**

**BY MR. GOTTS:**

**Q.**    Okay.  Good morning, Dr. Pollock.

**A.**    Good morning.

**Q.**    We met in the hallway.  I'm Larry Gotts.

**A.**    Yes.

**Q.**    So we're going to talk this morning -- we'll talk first about the infringement issues, and then we'll move on briefly on the invalidity issues.  Okay?

Dr. Pollock, you agree the '209 patent relates to television backlighting; right?

**A.**    The patent is for backlighting of LCD displays.

**Q.**    For displays, right.  Thank you.

**A.**    Yeah.

**Q.**    You never designed an LCD television; right?

**A.**    I have never designed an LCD television.

**Q.**    Never took one apart?

**A.**    I've not taken one apart.

**Q.**    And you've never designed backlights for LCD televisions; have you?

**A.**    That is correct.

**Q.**    And in 1997, you weren't in the trenches confronting the problems associated with backlighting of LCD televisions;

right?

A.   That's correct.

Q.   So it's fair to say you can't really speak from one with personal experience or knowledge back in '97 as to the sort of problems that were confronting those working in the art; right?

A.   I don't necessarily agree with that.

Q.   Let me say it this way:  You can't speak from personal knowledge.  You're analyzing it now and putting yourself back in that time frame; right?

A.   Well, the issues are of uniform illumination.

Q.   Right.

A.   They don't mean you have to have been in the trenches building a TV to understand that concept of uniform illumination.

Q.   Right.  But you weren't dealing with uniform illumination in TVs back in '97; right?

A.   No.

Q.   Okay.

A.   It's very specific.

Q.   Yeah, it is.

     Now, you said in your direct examination the '554 patent, in your view, deals with lenses.  That was your reason for not having looked at a light bar ever in this case; right?

A.   That was not the reason I did not look at a light bar.

Q.   Well, actually, sir, I think that is what you said in your

testimony, but are you now saying that you did not testify that the reason "I chose not to look at a light bar because this patent relates to lenses"?

A.   I chose not to look at a light bar because it just was irrelevant.

Q.   A light bar is irrelevant, okay.

A.   To the analysis of the lens.

Q.   Okay.  Good.

And you never designed a custom-made lens, did you?

A.   I've never designed a lens which was made.

Q.   Right.

THE COURT:  Mr. Gotts, you are commenting on each of the answers and that's argument, which is not proper for questioning.  So ask questions.  You can make your argument soon in the case when it's the time for argument.

MR. GOTTS:  Sorry about that, Your Honor.

Q.   Now, you did hear that Dr. Moore has been designing lenses for over 40 years; right?

A.   Yes.

Q.   And this is a case about lenses at least; right?  You would agree with that?

A.   Yes.

Q.   You also don't have any direct experience in measuring surface profiles of lenses; right?

A.   That's not true.

**POLLOCK - CROSS / GOTTS**

**Q.** You've never measured lenses with a coordinate measuring machine, have you?

**A.** No.  I've used a zone plate.

**Q.** So you do know about ray traces; right?

**A.** I do.

**Q.** You've used them?

**A.** I have.

**Q.** You've used a software package back in the 1980s called Code 5; right?

**A.** That's correct.

**Q.** You've never used the ASAP software before; right?

**A.** That's correct.

**Q.** Never worked with Breault?

**A.** That's correct.

**Q.** Never used the LightTools software that's been used in this case by EDD; right?

**A.** That's correct.

**Q.** You certainly never used the Japanese version of LightTools software?

**A.** Correct.

**Q.** You relied solely on EDD to enter the data into the software and run the ray traces; right?

**A.** That's correct.

**Q.** You didn't supervise that data entry, did you?

**A.** I did not.

Q.   And you weren't present when the data was entered?

A.   No.

Q.   You didn't input the parameters; right?

A.   I gave them what I wanted them to -- what do you mean by "input parameters"?

Q.   You didn't load the software --

A.   I didn't do the keyboard, no.

Q.   Right.  Did you actually give them each of the parameters they should put into LightTools?

A.   We gave them the general problem.  You know, put a light source at this position, and tell us what the display would -- what the rays would be from that source.

Q.   Right.  Did you -- but did you tell them exactly what data to enter into LightTools?

A.   I did not tell them how to implement the LightTools software.

Q.   So you're critical of Dr. Moore in this case because he didn't adequately supervise the ray traces; right?

A.   No, sir.

Q.   Okay.  I take it in your view, your view of your criticisms you have of Dr. Moore, you were careful about reviewing all the data that was entered into the EDD LightTools program; right?

A.   My concern was that there were errors which were obvious to me, and I was not involved, and it seems it should have been

obvious to someone other than me if I could see the error.

Q.   Did you check the data that was entered in LightTools after the fact with regard to the ray traces and analyses that were done by EDD?

A.   What I did do was look at the screen shots of the input data they put into LightTools.  So we have screen shots of their input data for most of these curves, so we can confirm most of the positions of the points and so forth and the parameters they put into the scan, but all I have is a screen shot of that and then the output.

Q.   Okay.  If you take a look at Plaintiffs' Exhibit 91 in your book, please.

A.   (Witness examines document.)

Q.   Is Plaintiffs' Exhibit 91 the attachment from your expert report that shows all these screen shots and the input parameters that were put into LightTools?

A.   It shows many of them.  There may be more, but this certainly is the majority.

Q.   Well, these are the ones you looked at; right?

A.   I looked at a bunch, but this is -- these are the ones we included.

Q.   Well, there was nothing else produced in this case, and you were supposed to provide us everything you looked at.  So did you look at something in addition to these?

A.   Well, I'm trying to remember.  I don't know if they're --

there might have been some traces in other spots, which we --

I'm not sure if this includes all of -- I don't think this

includes -- for example, I don't think this has --

Q.   Well, let me clarify.  I'm not asking about the traces.

I'm talking about the input parameters.  Does Exhibit I provide

all the input parameters that you looked at for LightTools?

A.   Let me look.

     (Witness examines document.)  There's one in particular

I'm thinking of which I don't see here.

Q.   What's that?

A.   The parameters we asked for for the total internal

reflection data.

Q.   That's the output; right?

A.   Yeah, but that included -- that had screen shots of the

inputs for those analyses.

Q.   All right.

A.   Am I confusing?  I'm sorry.  I misunderstood you, sir.

Q.   And you carefully reviewed the underlying profile data

that was put into the LightTools software; right?

A.   I looked at the data they gave me.  I did review the input

data of the profiles.

Q.   And when you -- when the profiles were created in

LightTools, did you compare them from lens to lens to make sure

they appeared correct?

A.   I did.

**Q.**   And did you compare those to the engineering drawings to make sure they appeared correct?

**A.**   Yes, I did.

**Q.**   Uh-huh.  Did you get training on LightTools?

**A.**   No.

**Q.**   Did somebody explain to you how to read the LightTools inputs?

**A.**   I just looked at the translations of all the parameters they gave us here.

**Q.**   Right.  So, for example, if you look at page -- the second page of Exhibit 91 -- let's go to the third, 3 of 65 in Exhibit 91.

**A.**   Okay.

**Q.**   If you look at that.

If we can pull it up Chris, please.  Hold on a second.

        **MR. GOTTS:**  Your Honor, I move the admission of PX-91.

        **MR. LABGOLD:**  I think I already did.

        **MR. GOTTS:**  Did you just move that in?

        **THE COURT:**  It's already in evidence.

        **MR. GOTTS:**  Thank you.

So, for example, if we go to -- can we go to the next slide?  This isn't lining up with what's in my book.  Go the other direction.  I'm sorry.  Other direction.

Well, we'll come back to that.  I think we'll be able to show it in the next exhibit.

Q.   In any event, sir, you did supervise the entry of that data into LightTools; right?  Not supervise it, you reviewed it after the fact?

A.   I reviewed the data.

Q.   Okay.  Now, your involvement with EDD directly and the engineers was limited to a two-hour Skype call that you had prior to your report and deposition; right?

A.   My direct interaction was two two-hour Skype calls, and then I would send information to Dr. Labgold -- Mr. Labgold and ask for information, and he would contact them and come back to me with responses.  So I had two direct interactions by a Skype, and then I had numerous interactions where I requested information and it was obtained for me.

Q.   Sir, could you go to your deposition, which is in the front of the binder I just handed to you?

A.   Okay.

Q.   Do you recall, sir, that your deposition was taken October 21st of 2015 in this case?

A.   Yes.

Q.   And you were asked a series of questions and gave a series of answers under oath?

A.   Yeah.

Q.   I'd like to direct your attention to page 26 of your deposition, lines 11 through 14.

A.   (Witness examines document.)  Yes.

MR. GOTTS:  Your Honor, may I publish?

THE COURT:  You may.

BY MR. GOTTS:

Q.   And you were asked the question:  (reading)

"Q.  Did you have more than one discussion with EDD?

"A.  I personally had one discussion by Skype with EDD and only one."

Were you asked that question and did you give that answer?

A.   I asked that -- you asked that question -- or I was asked that question and I gave that answer, and it was true on October 20 whatever this date was.

Q.   And that was the time at which you had completed your report and analysis; right?

MR. LABGOLD:  Objection, Your Honor.  There's a procedural issue here.

THE COURT:  Overruled.

THE WITNESS:  Yes, my first report.

BY MR. GOTTS:

Q.   Now, you say that the light bar was irrelevant to your analysis; right?

A.   The light bar, yeah.  My analysis was the '554 patent and the lens, did this lens infringe the '554 patent.

Q.   Right.  And, for example, the '554 patent, the claims are directed to not just the lens but to an LED and a lens and the relationship of the LED and the lens; right?

**A.**    That's correct.

**Q.**    And to understand the relationship of the LED and the lens, you have to look at a light bar, don't you?

**A.**    You can -- yeah.

**Q.**    But you didn't look at one, did you?

**A.**    To analyze, you do not need to look at a light bar.  How they're -- how the LED and the lens are configured with respect to each other, that's a mechanical issue and it could be done any way -- many numerous ways.  A light bar is a common way it's done.

But the relationship between the LED and the light bar does not change if I put it on a PCB card, a light bar, I put it on this piece of board right here (indicating).  The relationship, the analysis of the optics is completely irrelevant to what I've mounted these two things on.

**Q.**    Well, the analysis of the optics is governed in part by the gap between the LED and the lens; right?

**A.**    The gap does not -- it is not determined by the light bar.

**Q.**    It's not?

**A.**    No.  It's determined by the legs, the thickness of the LED, the glue, the solder, all sorts of things, which could be -- I could put it here (indicating).  I could put it on this piece of wood (indicating).  I could put it on a printed circuit board and make a light bar.  It doesn't matter.

**Q.**    Where's the solder?

**A.**   The solder goes between the LED and the printed circuit board.

**Q.**   And the printed circuit board is part of the light bar; right?

**A.**   So what?

**Q.**   Where's the glue?

**A.**   The glue is what holds the LED to the printed circuit board.

**Q.**   Okay.  And where is the hole?  Is there a hole in the printed circuit board?  Is there a hole in the printed circuit board to mount the lens?

**A.**   To mount the lens?

**Q.**   Yeah.

**A.**   No.

**Q.**   There's not?

Okay.  So --

**A.**   There's a hole in the solder mask perhaps.  Are you talking about the solder mask or the solder or the PCB board?

**Q.**   Is the solder mask part of the printed circuit board?

**A.**   Sure.  Do you know what a solder mask is?

**THE COURT:**  One moment.

Mr. Gotts, we're attempting to make a transcript of today's proceedings.

**MR. GOTTS:**  I'm sorry.

**THE COURT:**  To help that process, if you'll both allow

the other to finish the question and answer to finish before
the next, then we'll have a proper record.

Next question.

MR. GOTTS:  Thank you, Your Honor.

Q.   We'll get back to this in a moment.

But you never measured the gap in a light bar between the
lens and the LED, did you?

A.   I did not, but that's not the issue.  The issue is:  Given
the -- given this gap, does it perform as it should?  The gap
is not the problem of EDD.  The person who puts this thing
together has to put this thing together to meet these
performance specs, but that has nothing to do with whether or
not this lens is going to act as a TIR surface or not.

Q.   Okay.  So you had no -- let's turn to lenses now.  You had
no independent involvement in measurement of lenses, did you?

A.   What do you mean by "measurement"?

Q.   Did you measure any lenses yourself?

A.   I played with them.  I looked at them.  I put calipers on
them.  I measured them in many ways.

Q.   You put calipers on them?  Do you recall in your
deposition you said all you did was shine a laser light through
them?

A.   That's what I said.  Yeah, I did that too.

Q.   You didn't mention the calipers, did you?

A.   Well, you said "measure."  There's a lot of things you can

do to measure.

**Q.**   Did you put a lens on a coordinate measuring machine and analyze the profile to see what it looked like?

**A.**   No, I did not.

**Q.**   Did you ask any independent organization to put a lens on a coordinate measuring machine to analyze what it looked like?

**A.**   No.

**Q.**   Okay.  Now, you had your deposition taken October 2015 as we mentioned.  You indicated that you grilled EDD on how they know the shape of their lenses, didn't you?

**A.**   I did.

**Q.**   And in that -- that was during that Skype conversation that you had; right?

**A.**   Correct.

**Q.**   -- two-hour call, you and Mr. Yamaguchi and Mr. Akiyama, a translator, and counsel; right?

**A.**   That's correct.

**Q.**   And you talked about a whole host of things; right?

**A.**   Mainly about that.

**Q.**   Mainly about the measurement process?

**A.**   Yeah.

**Q.**   You spent most of the two hours talking about the measurement process?

**A.**   Yes.

**Q.**   And you were then supplied with a series of ray traces --

I'm sorry -- a series of profile data, which is in the book. If you want to open it up, we can just quickly scroll through it. I want to make sure we have that in the record.

But the profiles I'm going to -- that you were provided with are PX-102 and 103 for the 4922 lens; is that right?

A.   (Witness examines document.)  Yes.

Q.   And PX-112, 113 for the 9845 lens; right?

A.   (Witness examines document.)  What was the number?  I'm sorry.  I've got --

Q.   118, 119.  Sorry.

A.   118, 119.  Okay.  Thanks.

MR. LABGOLD:  For the record, the exhibits in the books are just the first page of these exhibits.

MR. GOTTS:  Yeah, that's fine.  These are the screen shots that counsel supplied, and I'm just trying to confirm that these are the documents he looked at.

THE WITNESS:  These are -- yeah, these are the documents.

BY MR. GOTTS:

Q.   Okay.  And, likewise, PX-124, 125 for the 9854D?

A.   Okay.

Q.   And likewise PX-130, 131 for the 9854E; right?

A.   That's right, yes.

Q.   Okay.  And these -- this is the profile data that you used to create the ray traces that you referred to in your direct

**POLLOCK - CROSS / GOTTS**

examination.  So, for example, if we can pull up your Slides 52 through 61, did you create these ray traces with the profile data that we -- some of the profile data that we just referenced?

**A.**   I didn't do it, but I asked EDD to do it, yes.

**Q.**   Well, they used that data; right?

**A.**   They used this data.

**Q.**   Correct.  And there's also -- there's power analysis of Slides 62 and 63, if we could pull those up.

You used this data to do the power analysis; right?

**A.**   Yes, I did.

**Q.**   And there was no other profile data, was there?

**A.**   There was no other profile data.

**Q.**   Now, you testified in your deposition that you were told by EDD that they used a profilometer to measure an actual sample to generate this data, didn't you?

**A.**   They said they used a profilometer to generate the data to describe their curves.

**Q.**   And you testified that it was an actual sample that was measured, didn't you?

**A.**   They have measured an actual sample.

**Q.**   You testified that this data came from the measurement of an actual sample, didn't you?

**A.**   I did.

**Q.**   And you testified this data came from the measurement of

an actual sample with a profilometer; right?

A.   I did.

Q.   And you understood at the time of your deposition that this was final manufactured lenses that were measured here; right?

A.   I did.

Q.   And you said you did a number of calculations with ray tracings using actual data with actual lenses; right?

A.   That's correct.

Q.   And you grilled them on this --

A.   I did.

Q.   -- for two hours?

A.   Yes.

Q.   Now, you were in the courtroom when Mr. Yamaguchi testified last Friday; right?

A.   Yes, I was.

Q.   Can we pull up Mr. Yamaguchi's testimony at transcript page 832?

Do you recall when I asked Mr. Yamaguchi:  (reading)

    "Q.   Did you ever tell Dr. Pollock that this was actual

    data that was measured using a profilometer?"

Do you remember I asked him that question?

A.   Yes, I do.

Q.   And he answered:  (reading)

        "I don't remember that.  I think that means that I

never told him that."

Right?

If you could turn to 633, please.  I'm sorry.  833.

Remember we talked about it -- I also talked with Mr. Yamaguchi, I said:  (reading)

"So that also couldn't possibly be actual measured date, could it?"

And he said:  (reading)

"These are design values."

Right?

A.    Correct.

Q.    Do you disagree with Mr. Yamaguchi?

A.    I do not.

Q.    Were you just confused after that two-hour Skype call as to what the source of the data was?

A.    No, I'm not.

Q.    Was this actual measured data?

A.    Yes, it is.

Q.    It's actual measured data with a profilometer?

A.    It's been fit.  So this is the actual measured data of what they produced, and what you do with the data is you fit it to a 20th order polynomial as BRO did, and that is that data they're using.

Q.    If we can go back to 632 again -- 832.  I'm sorry.

Let's just see it again here:  (reading)

"Did you ever tell Dr. Pollock that this was actual data that was measured using a profilometer?

"I don't think -- I don't remember that. I think that means I never told him that."

Is he lying?

A. No, I doubt he's lying. Did you ask that of Mr. Akiyama?

Q. Did Mr. Akiyama come and testify to anything else?

A. He was at the phone call.

Q. In fact, Mr. Akiyama testified in his deposition, didn't he, that he didn't even know whether this was measured data or not. Do you recall that?

A. I do.

Q. Right. And you're saying now Mr. Akiyama told you it was measured data?

A. Could I explain?

Q. I just -- just answer my question.

A. He did. I think there was a -- there was a very -- it was a very interesting process. Is it measured or designed? It's yes. It's one of these situations where it's both. It took us awhile to get to that, but this is actual physical profiles of the lens, and it is what they use to design their lenses.

Q. This data is not prepared by measuring a final -- a final manufactured lens, is it?

A. It is.

Q. This data is not prepared by measuring an actual lens, is

it?

A.    It is.  This is a manufactured lens.  Millions of them are made.  Every one must meet that spec.  That's what -- that's what's different here.

Q.    It's a design spec; right?

A.    Designs with the actual physical parameter.

Q.    Nobody took and measured a lens -- took a lens and measured it and came up with this data, did they?

A.    They did.  That's where this data came from.

Q.    This data came from measurements from design.  It didn't come from an actual lens, did it, sir?

A.    Do you know how he does design?

Q.    Okay.

A.    He uses the actual profiles to make design.  Notice this has a profile of M or K or L.  When he does design, he's not changing the curve.  He's taking this profile and moving it up or down, and that profile is what's established.

Q.    Can I direct your attention to your deposition, page 101, question and answer lines 10 through 13?

        THE COURT:  One moment.

                (Pause in proceedings.)

        THE COURT:  You may proceed.

        MR. GOTTS:  Okay.

Q.    Dr. Pollock, again this is your deposition October 2015. You were under oath; right?

**A.**   As I am now.

**Q.**   You were asked the question:  (reading)

   **"Q.**   But they used a profilometer to measure an actual

   sample to get the data?  Is that your testimony?

   **"A.**   Yes."

   Did you -- were you asked that question and give that

answer?

**A.**   Yes.

**Q.**   Okay.  So let's -- you would agree, sir, that if you were

measuring an actual sample, no two samples of two different

lenses could have the identical data, could they?

**A.**   I would agree.

**Q.**   In fact, it would be remarkable if two separate

measurements on two distinct lenses would yield exactly the

same profile, wouldn't it?

**A.**   I'd agree.

**Q.**   In fact, it would be more than remarkable.  It would be

unbelievable; wouldn't it?

**A.**   It would be.

**Q.**   Can we pull up, Chris, the profile data first for the

lower emission lenses that we used with Mr. Yamaguchi?

   These are the profiles for the five lower surfaces that

are in the profile data that you have; right?

**A.**   That's correct.

**Q.**   And that's the very same profile data that you say is

measured data from actual lenses?

A.    That's correct.

Q.    And all five of those things are -- six of those things are identical; aren't they?

A.    They're identical.

Q.    Right.  Do you want to show that, Chris?

They're identical.  When did you first notice they were identical?

A.    Day one.

Q.    Okay.  And you noticed they were identical and -- but yet, they're identical for all these lenses and yet you say that it's not remarkable that two separate measurements on each of these things would be identical?  It's unbelievable, isn't it?

Let's go back, Chris.

This is identical to this, is identical to this, is identical to this, is identical to this, is identical to this. They can't be separate lenses that are measured, can they?

A.    These do not represent a particular individual lens. These represent a collective measurement of many lenses.

Q.    Okay.  So let's go back to your deposition, page 101.  You said they represent -- they use a profilometer to measure an actual sample.  You didn't say a collection of samples.  You didn't say they were all the same and they averaged them.  You said it was an average sample, didn't you, sir?

A.    I did.

Q.   Okay.

A.   I did.

Q.   Thank you very much.

Now, let's move on to something else.  Let's pull up the data for the top three lenses -- the top lenses.

As Mr. Yamaguchi said, three of these lenses were identical; right?

A.   Yes.

Q.   So they couldn't have been separate lenses that were actually measured with a profilometer, could they?

A.   They were measured with profilometers.

Q.   This is one lens measured, this is one lens measured, and this is one lens measured, and you got the exact same data?

A.   I have to explain, sir.

Q.   That's remarkable, sir, isn't it?

A.   I have to explain this.

Q.   You'll get a chance to explain later.  Answer my question.  That's remarkable, isn't it?

A.   No, it's not.

Q.   Okay.  Fine.

A.   This is manufactured specs.  Every lens --

THE COURT:  One moment.

Mr. Gotts, I asked you not to comment on the answers, and you've been unable or unwilling to follow the instruction.  So I'll remind the jury that what the attorneys say has zero,

Z-E-R-O, evidentiary value.  The attorneys are not under oath.

They're not witnesses to what occurred.  What witnesses say and

the exhibits in the case that are admitted are evidence.  What

the attorneys say is not evidence, and you are not to consider

the comments by counsel, the questions by counsel, the reaction

of counsel to the answers in your deliberations in the case.

Let's have questions, Mr. Gotts.

**MR. GOTTS:**  Thank you, Your Honor.

Let's also turn now to the demonstrative we have, Chris,

on the slide that showed that the -- that shows the title on

the slides.

**Q.**   Do you remember I went through this with -- this

demonstrative here with Mr. Yamaguchi, and we showed that for

all four of these emission surfaces, they were all labeled

9879?

**A.**   Correct.

**Q.**   Did you notice that at the beginning?

**A.**   I did not.

**Q.**   Okay.  Which one is 9879?

**A.**   Which particular, I don't know, but the data is accurate

for 9879.

**Q.**   Well, it's accurate, but it's not measured from a 9879

because they all can't be measured from a 9879, can they?

**A.**   This is -- this is manufacturing data.

**Q.**   It's manufacturing data or is it measured data like you

said in your deposition?

**A.**   It's both.  It doesn't leave the factory if it doesn't fit that curve.  This is not one element.  Every element they measure will come in -- there will be a little bit of plus or minus; but if you measure a thousand, you will get that curve, and that's what's really at point here.

It's not one particular lens that doesn't quite hit that. They've got design specs, but that is the design spec which all -- every single one of their elements meets and that's why it's not -- it's not relevant that they didn't particularly measure it out.  Every lens they put out meets that spec or it doesn't leave the house.

**Q.**   Let's move now to your supervision of the data entry into the LightTools database.  I think you testified you checked the entries afterwards; right?

**A.**   I did.

**Q.**   Let's pull up a demonstrative...

(Pause in proceedings.)

**MR. GOTTS:**  Your Honor, here's a copy of the demonstrative.

I'll give a copy to counsel too.

May I approach?

**THE COURT:**  Yes.

**BY MR. GOTTS:**

**Q.**   If you could also -- let's first turn to PX-91.  And,

again, this is the exhibit that has the data entry that we talked about; correct?

A.   That's correct.

Q.   Right.  And we've created a demonstrative with some screen shots from PX-91 just to help us walk through this, if you don't mind, so you'll be able to see it on the screen here. Okay?

A.   Sure.

Q.   So why don't we first go -- let's go to the demonstrative, Chris, please.

PX-91 was Exhibit I to your expert report.  I don't know -- do you recall that?

A.   Yes.

Q.   Okay.  So here's a picture of page 51 of PX-91.  Do you see that?

A.   Yes.

Q.   Okay.  And if you look at page 51 -- you might want to look at it in your book too so you can see it better, Exhibit 91.

This is the 9854E lens; right?

A.   What page was this?  51?

Q.   Page 51 of 65.  You'll see the numbers on the bottom.

A.   (Witness examines document.)  Okay.

Q.   Do you recognize that?

A.   Yes.

Q.   Now, if you look at page 51, you'll see there's a series of coordinates there, X and Y coordinates; right?

A.   Yes, I see them.

Q.   That's the data that is input here from the profile data we just talked about; right?

A.   That's correct.

Q.   Right.

     Okay.  So -- sorry, Your Honor.

     The --

A.   That's correct.

Q.   Okay.  So why don't we go to the next slide.  I think I might be able to drive these slides; right?

     All right.  We've blown up that profile data there just so you can see it a little bit better.

A.   Okay.

Q.   And if you look, the first two data points there are zero, and you can see the numbers 4.3042 and 4.3173.  Do you see that?

A.   I do.

Q.   And this is for the 9854E, and the profile data that corresponds to that is in your book at PX-130.

A.   (Witness examines document.)

Q.   Do you see that?

A.   Okay.

Q.   Now, just for the record -- and we'll update the screen

shot here -- I want to let you know that this screen shot has more of the data than the previous screen shot supplied by counsel. This is a long spreadsheet; right?

A.   Yeah.

Q.   And we just captured a bigger chunk of it so you can get all the relevant data here.

A.   Okay.

Q.   So if you look at PX-130, are you able to identify or find these two data entries, the zero and the .10001 entry in PX-130? And I'll help you out a little bit, but I want you to confirm they're there if you could.

A.   Thank you.

Q.   Okay.

A.   I can confirm they're there.

Q.   Oh, you see them. Okay. Very good.

Now, so in the 9854E, the data in the LightTools software matches up with the data in PX-130; right?

A.   That's correct.

Q.   Let's now turn -- and we'll show that here -- now let's turn to PX-91 at page 59. It's 59 of 65, I believe.

A.   (Witness examines document.) To page 59 of the same exhibit?

Q.   Yes. And this is the LightTools data page for the 9879 lens.

A.   Okay.

**POLLOCK - CROSS / GOTTS**

Q.   Right?

A.   I think so, yeah.

Q.   And, again, we have the data on the right-hand side, which we'll pull up in the demonstrative just so you can see a little better.

This is why they don't usually give me the clicker.

So we pull it up, right?  And there let's look at the first two data entries again.  Do you see those?

A.   Yeah.

Q.   Now I'd like to direct your attention to PX-136, which is the expanded profile data screen shot.

Now, can you tell me, sir, do you see anywhere -- and this is for the 9879; right?

A.   Uh-huh.

Q.   Do you see anywhere in here the data for the 9879 LightTools data points in the profile data in PX-136 for 9879?

A.   (Witness examines document.)  I do.

Q.   You do?

A.   Yes.

Q.   Can you point that out?

A.   Point it out on 136?

Q.   Uh-huh.

A.   I'm pointing at it.  I don't know what you want me to do. What are you asking?

Q.   I just want to -- I'm trying -- I'm just going through the

process of trying to confirm how you entered this data?

**A.**   You're asking me if these numbers on PX-136 are identical to what's shown over there?

**Q.**   Yes.

**A.**   No, they're not.

**Q.**   Okay.  So was PX-136 used to generate the LightTools table at page 59 of Exhibit 91?

**A.**   Okay.  Let's see.  Page 59.

(Witness examines document.)  Yes, it is.

**Q.**   So the two entries on PX-91 at page 59 are -- the first two entries are these two entries here (indicating); right?

**A.**   Yes.

**Q.**   3.13 and 3.323?

**A.**   That's right.

**Q.**   And do those two entries appear in PX-136?

**A.**   They appeared in an offset version of that.  So if I take PX-136 and apply an offset to it, they match exactly.

**Q.**   And what's the offset?

**A.**   The offset would be the difference between them.  Let's look at -- well, I can't do this, but there's an offset button as well for adjusting the location of that front surface; and if you put the offset in, you would find it matches.  The profile -- did you take the difference -- I shouldn't ask you questions.

**Q.**   Sir, I'd like you to tell me where the offset is.  Is it

reflected in the drawings, the engineering drawings?

**A.**   It would be in the file.  It's in the LightTools file, and it's -- I don't know if I got a screen shot of that offset, but we can look at examples of offsets.

**Q.**   Well, wait a minute.  I asked you earlier whether this was all the data you looked at.  Are you saying you looked at other data that you didn't supply to us?

**A.**   No.  I -- I noticed the difference, and I asked them what's going on.  And they said, "Oh, that's the offset."

**Q.**   Did you look at a document to see the offset?

**A.**   There are examples which have offsets on them, so there is a button here which is offset and there's parameters illustrating the offset like on LightTools.  I'd love to show it to you.

**Q.**   Where is the offset?  What was the offset I mean?

**A.**   I don't remember physically.  It's the difference between those two because you'll find the numbers.  Take the difference between that column (indicating) and that column (indicating), it's an equal offset all the way.

**Q.**   Between which columns?

**A.**   The columns you're showing here and you're saying it's not equal to the other column, take the differences.  Just start going down, take the difference between those two, and you'll find it's an identical difference.

**Q.**   Well, here's the problem.  Can you tell me where in this

exhibit -- and I may need to get my glasses out -- there is an X value of .1 with six zeros?

THE COURT:  Mr. Gotts, let me stop you there.  This is fascinating.  The jury can't see what you're describing.

MR. GOTTS:  We'll bring it up, Your Honor.

THE COURT:  So they have -- and we're here for them, so --

MR. GOTTS:  So perhaps is it -- when is it Your Honor would like to break so we can pull up the exhibit?

THE COURT:  If that would help, let's take a ten-minute break if you're going to continue to ask questions of what the jury can't see.

So we'll come back at 10:45.

MR. GOTTS:  Thank you, Your Honor.

(Recess taken at 10:35 a.m.)

(Proceedings resumed at 10:45 a.m.)

(Proceedings were heard out of presence of the jury:)

THE COURT:  We are back on the record.  And we will bring in our jurors to continue the examination of Dr. Pollock.

(Proceedings were heard in the presence of the jury:)

THE COURT:  Our jurors have returned.  Everyone may be seated.  And the examination continues.

MR. GOTTS:  Thank you, Your Honor.

So Chris, could you call up Plaintiff's Exhibit 136, please.

Q.   Dr. Pollock, Plaintiff's Exhibit 136 is the profile data for the 9879; right?

A.   It's profile data for the top surface of that lens, yes.

Q.   Correct.  Thank you.

        MR. GOTTS:  Now, for starters, can you show me -- Chris, if we could pull it up to the entry that says .100001, right here (indicating).  Could we highlight that, please?

Q.   So Dr. Pollock, there was an entry of .10001 and data; right?

A.   That's correct.

Q.   Now, if you go to the Light Tools software data page, at page 59 of Exhibit 91, which entry on page 59 corresponds to 10001?

A.   Okay.  That looks like the second entry.

Q.   So -- well, the second entry is 10000.  So was it rounded?

A.   Oh, it might have been, yeah.

Q.   Do you not know?

A.   There was some rounding error we noticed in this these, yeah.

Q.   Okay. so --

A.   The issue was -- we heard in one of the readings this is Excel format, and yet the Light Tools uses a different format, and so there's sometimes a format loss when you transfer it over.

Q.   Well, who changed the numbers?  Is that done manually?

**A.**   Who changed the numbers?

**Q.**   In Light -- in the profile data there's 10001, and here it's 10000, so is that the same data point?

**A.**   You know, I don't know.  I'm sure it's an issue of the file transfer from the design software into Excel.  I'm sure there's an issue there.  I think it corresponds to the same point.

**Q.**   So help us out here.  Where is that offset in Exhibit 91 that you're referring to?

**A.**   Exhibit 91.

**Q.**   For any of the lenses?

**A.**   Oh, well, could I call up a slide?

**Q.**   Please.

**A.**   If you look at page 3.

**Q.**   Okay.  Here somewhere (indicating), this is page 3?

**A.**   Oh, my 3 of 65, maybe I'm in the wrong exhibit.  I'm in PX-91, page 3 of 65.  There we go.

So there's a whole lunch of buttons, you know, up here on the congii, but one is called "geometry," and one is called "coordinates," and I think it's the geometry one.

**Q.**   This (indicating)?

**A.**   This one (indicating), when you click into that.  Wait a minute.  I'm sorry.  It's coordinate.  It's coordinate.  If you click on that -- and if you'd like to look at an example of that, I'll show you on another page -- that lets you position

that particular surface up or down.

Q.   So what's the coordinate for the page 59 of Exhibit 91 for the 9879?

A.   I'm not sure.

MR. GOTTS:  And the difference between -- go back, please, Chris -- to the demonstrative.

Q.   It's true, isn't it -- and I saw you doing some calculating during the break?  It's true, isn't it, that the difference between point number one here (indicating) and point number one on the Exhibit 136 is not the same between points 1 and 2, is it?

MR. LABGOLD:  Objection.

THE COURT:  Sustained.  And the jury will disregard the comment of something seen during the break, because what happens during the break is not evidence.  And you've been instructed that already.  I'll instruct you again.  And I'll remind Mr. Gotts that we only want to have evidence presented to the jury, not improper commentary.  Next question.

MR. GOTTS:  I've rephrase the question, Your Honor.

THE COURT:  I've already stricken.  Next question.

BY MR. GOTTS:

Q.   What is the difference between the PX-136 data for point one, do you know?

A.   I did do some calculations by hand.

Q.   And when you did the calculations, are the differences

identical?

**A.** To the accuracy of rounding numbers, they're identical. I got 1.0936 or 1.094.

**Q.** So they differ at the fourth significant digit right here (indicating)?

**A.** Well, don't hold me to that. Give me a calculator before you hold me to that.

**Q.** Okay. Did you provide the offset data?

**A.** Oh, no. This is part of the design. The design takes the surface -- this coordinate surface, and the design is moving that up or down, the whole set, and that's the offset perimeter.

**Q.** Did you look at the offset data?

**A.** No, I did not.

**Q.** Okay. Let's move on to another topic.

Now, I believe you indicated that you looked at the engineering drawings to confirm the accuracy of the profile data that you had -- the profiles that you had come up in Light Tools; right?

**A.** I looked at the spec sheets. They identified what shapes were, so it was consistent on that degree.

**MR. GOTTS:** Pull up the next to last, Chris, please.

**Q.** Let me direct your attention to two exhibits first, Plaintiff's Exhibit 132, and Plaintiff's Exhibit 126, they're both in your book.

**A.**   Okay.

**Q.**   Plaintiff's Exhibit 132 relates to the 9854E lens.  It's the engineering drawing; right?

**A.**   It's one of the drawings, yeah.

**Q.**   And Plaintiff's Exhibit 126 is the 9854D drawing.  Those are two accused lenses; right?

**A.**   Yes.

**Q.**   Now, if you look at Plaintiff's Exhibit 132 in the upper middle front view, you'll see that there's a thickness called out for the flange of 2.115.

Do you see that?

**A.**   I do.

**Q.**   And if you look at Plaintiff's Exhibit 126, the corresponding thickness for the flange there is 2.103.

Do you see that?

**A.**   Let me just confirm that.  So this is --

**Q.**   Plaintiff's Exhibit 126.

**A.**   Yes, I see it.  This is much better.  Thank you.

**Q.**   So now, so between the 9854E and D lenses, the difference in that flange thickness is .012 millimeters or 12 microns; right?  That's 2.115 minus 2.103.

**A.**   I agree.

**Q.**   Okay.  Now, that's a .6 percent difference; right?

**A.**   Okay.

**Q.**   And if we look at the inner diameter of that lens -- I

think that's what's called, in PX 91, the other diameter -- the
top lens is 14.778, that's from the side view of the figure;
right?

A.   Correct.

Q.   And likewise, the diameter is 14.778 in the PX-126.  They
have the same diameter; right?

A.   That's correct.

Q.   Now, let me direct your attention to -- first, I'm showing
Plaintiff's Exhibit 54, which is one of your slides, and that's
a slide for the 9854E; right?

A.   Yes.

Q.   And let's just take a quick look at -- now, slide 57,
which was your slide which shows the profile of the 9854D;
right?

A.   Okay.

Q.   And these things are intended to be -- I won't say they
have to be to scale, but they're intended to be accurate in
shape; right?

A.   Yes.

Q.   They need to be in order to do ray tracing; right?

A.   This is a graphic depiction.  I don't know how accurate
the graphics is.  But certainly you're right, the ray trace
analysis has to be done on the exact shapes.

Q.   Right.  Okay.  So let me -- so this is 9854E (indicating),
and this is 9857D (indicating), and we've got them so that the

diameters are the same; right?  So they're scaled to the same diameter.

A.   Okay.

Q.   Sorry.  And they're -- would you agree there's a fairly significant change in the size of that flange from 54 to 57?

A.   I would.

Q.   You would?

A.   I would agree there's a noticeable change there.

Q.   Right.  Okay.  So let me see.  So -- and that change is supposed to be 12 microns; right?

A.   No.  Not necessarily -- well, let's see.

Q.   Let's go back.

A.   The flange, yeah, the flange is different.

Q.   Yeah.  And so -- and I think we looked at this before.  In Plaintiff's 132 to 136, the flange diameter change is supposed to be 12 microns.

A.   The flange is 12 microns, I'll accept that, because that's what the spec shows.

So why does it look thicker; is that the question?

Q.   I'll ask the questions, and you can explain in a moment.

But it does look thicker, though; right?

A.   It does.

Q.   Now, let's just do something to make sure that it's not a scaling issue between the two photos, if you can?

A.   All your time.

**Q.** And in Light Tools here, we now have the 9854E lens up; right?

**A.** Yes.

**Q.** And we know that that lens is supposed to be 54E and 54D, and we know they're both supposed to be 14.778 in diameter; right?

**A.** Correct.

**Q.** Now, if we go to page 51 of 65, 9854E, we can scale -- we know that 14.778, we can -- we know that's also what's entered in here; right?

**A.** Yeah.

**Q.** We can scale that. This is one millimeter each (indicating), and you would agree that's roughly 14 points. Well, it is 14.77, or 14.78. That looks about right, doesn't it?

**A.** Looks great.

**Q.** And if we look at the other, 9854D, also scale it, same diameter, 14.777?

**A.** Yes.

**Q.** 14.8 millimeters. And this (indicating) is supposed to be the profile of the lens; right?

**A.** That's correct.

**Q.** Now, if you overlay those two, the 9854D and 9854E -- and we're looking at the flange portion; right?

**A.** Yes.

Q.   And if we color those flange portions in and we bring them together, they're different; right?

A.   That's correct.

Q.   Just like in the other figure.  This is right out of Light Tools, isn't it?

A.   Your dimensions are, sure.

Q.   So if we blow that up, that's a one-millimeter square, and the difference between the two is roughly 200 microns; right?

A.   Um-hm.

Q.   Whereas the difference in the drawings is 12 microns?

A.   Yeah.

Q.   And if we look at the difference between the two drawings themselves, this is the same kind of overlays that were done with Dr. Moore.  You could see the diameters line up, and there is a difference in the flange; right?  Roughly 200 microns?

A.   Yeah.

Q.   So to summarize, the engineering drawings show a 12-micron difference, and you're showing a 200-micron difference here (indicating); right?

A.   That's correct.

Q.   Let's go to PX-84, please, in your book.

So in PX-84 was an attachment to your expert report; right?

A.   It was.

Q.   And in PX-84, there's a table that you used prior to your

**POLLOCK - CROSS / GOTTS**

deposition to calculate the gap that we've been talking about; right?

A.    That's correct.

Q.    Did you calculate this or was that done by EDD?

A.    That was done by I think the attorneys for EDD.

Q.    The attorneys did it, okay.

So did you -- was it presented to you or did you work with the attorneys to do that?

A.    I worked with them.

Q.    All right.  So if we look, for example, the way the gap was calculated in Plaintiff's Exhibit 84 was to think about a light bar, think about the height of the LED on the light bar; right?

A.    Correct.

Q.    And think about the height of the legs, and you subtract the difference between the leg height, which is the second to the last column, and the height of the LED, which is the second column, and that gives you the gap; right?

A.    That's correct.

Q.    At the time of your deposition to now, you hadn't looked at an actual light bar to see whether or not the gap is truly reflected by purely the difference of the leg length and the surface height length; isn't that right?

A.    This is the design gap.

Q.    Let's talk about that for a minute.

There's no document that you've come forward with in this case that shows any design specification for a gap, is there?

A.   Hmm, I don't know where we got the gap numbers.  I don't recall.

Q.   Well, we do know where you got the gap numbers.  You calculated from the leg length minus the surface height; right?

A.   Oh, yeah, in this case, yeah.  That's where we got it in this case.  Yeah, that's right, that's how we got.

We knew what the LED was designed for, and we knew the -- yeah, that's how we did it.

Q.   But there's no spec.  The only number you use in all your analysis is this calculation that you got by just subtracting the legs and the LED height; right?

A.   Yeah.

Q.   There's no spec.  You've never seen a spec on the gap, have you?

A.   The spec is on the, you know, the perimeter of the variation of the leg length, that would be the spec for the manufacturer.

Q.   Well, that would be the spec for the leg, but not the spec for the gap; right?

A.   If you know the leg length and you know the LED you're designing it for, you know the gap.

Q.   Well, let's see.  So the calculation you did was you took the -- you wanted to know this gap right here (indicating), and

we've got a demonstrative up from PX-84, you wanted to know the gap from the top of the LED and the bottom of the lens; right?

A.   That's correct.

Q.   And to do that you look at Exhibit 84 and you figured out the leg height; right?

A.   Correct.

Q.   And you subtracted out the height of the LED; right?

A.   Correct.

Q.   And you thought that was the gap; correct?

A.   Correct.

Q.   Now, it came out in your deposition, though, that there were other parameters that were not factored into your Exhibit 84; right?

A.   That's correct.

Q.   There is a solder -- there is solder that is used to attach the LED to the PCB board; right?

A.   There is.

Q.   And you estimated in your deposition that solder was 100 microns?

A.   I also said I don't know.  That was a wild guess at the moment.  I said it might be a hundred microns.  It's actually -- well --

Q.   And you actually also said that there was a variance that could be -- in your deposition -- a variance that could be up to .1 millimeters, or 100 microns, without even talking about

the solder; right?

A.    Could you show me where I said that and what I was talking about.

Q.    Sure.  If you could turn to page 43 just to refresh your recollection.

You indicated in your deposition there was a margin of error; right?

A.    Yes.

Q.    And you said there could be a variance.  So if the height changed by a tenth of a millimeter or thereabouts, that would have no operation on the impact of the lens; right?

A.    Show me the lens.  Where did I say a tenth of a millimeter?

Q.    If you look at lines 20 through 22, you gave an example of a tenth of a millimeter variance.

A.    (Witness examines document.)  Okay.

Q.    Right?

A.    So I was overstating that.  But there's -- but they have designed them for variance.

You asked me about why I had a second phone call.  The second phone call was based on this conversation.  I called them to ask what are the details on solder thickness, glue, and variance.

Q.    And in that second phone call you were told by Mr. Akiyama that the variance associated with the solder -- let's hold

that, because I want to add one more thing I didn't want to get to yet.

There's also a variance associated with the hole that's in the PCB; right?  In other words, this lens (indicating) doesn't sit on the top surface, it sits down into a hole?

A.   It sits on a hole in the solder mass, yeah.

Q.   Right.  Which is on the PCB board; right?

A.   Yes.

Q.   And when we go back to PX-84, you didn't factor in the hole or the solder, did you?  You just looked at the height of the lens and the height of the LED?

A.   Right.

Q.   And you later learned there was solder, and there were leg holes, and you had to take into account?

A.   And there was glue.  Let's not forget the glue.

Q.   Fair enough.  So the -- what we -- you did talk to Mr. Akiyama, I understand that, and Mr. Akiyama told you that the difference or the variance could be equal to the tolerance of the legs; right?  The tolerance in the legs.

A.   I believe so, yes.

Q.   Do you want to see your supplemental report on that, or are you comfortable with that answer?

A.   I'm comfortable.

Q.   Okay.  So let's go to PX-84.

PX-84 includes the engineering drawings that were reviewed

by you in connection with your report; right?

A.    Correct.

Q.    And actually, there are no other engineering drawings referenced in your materials considered in your report.  Is that consistent with your recollection?

A.    That's correct.

         MR. GOTTS:  So if you look at PX-84 -- and why don't we pull up the drawings from the 9854D in PX-84, Chris.

Q.    If you look at the legs on PX-84, they're not separately called out, do you see that, on this drawing?  They're not measured.  You have to subtract out to find out the leg height; isn't that right?

A.    That's right.

Q.    It's not a controlled dimension in this drawing; right?

A.    It's not an overtly dimensioned dimension, yes.

         MR. GOTTS:  Okay.  Let's go back out, Chris.

Q.    So that means it's a -- the general tolerance of the drawing is what applies to that dimension; isn't that fair?

A.    That, I don't know.

Q.    Well, let's look here in the corner.  It says the general tolerances, that's in the right-hand corner, you understand that's the tolerance, that means how much that leg can vary; right?

A.    Right.

Q.    Plus or minus.  And it's .1, or a hundred microns; right?

A.   That's what it says, yeah.

Q.   The same hundred microns that you referenced in your deposition about the overall variance; right?

A.   That's correct.

Q.   So Mr. Akiyama told you that it can vary about a hundred microns or this general tolerance, and you said the same thing in your deposition; right?

A.   I did.

Q.   Okay.  Let's go back to the demonstrative.

So it's fair to say that when you calculate your gap, you originally calculated with only looking at the legs and the surface height of the LED, but that number could vary by a hundred microns; right?

A.   Let me go back.  I'm looking at this drawing, and these legs are dimensioned like 5.23.  So they're dimensioned -- they're dimensioned down to the 10-micron level in the spec.

Now, honestly, I don't know what the fluff on that is, but I can't imagine that it's not .523 plus or minus .1.  It just isn't that loose.

Q.   That's what the tolerance is on the drawing; right?

A.   That's what the -- the general tolerance -- and I don't know what general tolerance means.

Q.   And that's what Mr. Akiyama told you.  He said use the tolerance on the legs; right?

A.   Let's see.  There was another tolerance.

Well, I am confident to say that is not the tolerance on that dimension, but I'm not sure I can show you on this document right now.

Q.   You're just guessing?

A.   Well, when you specify something into two -- that's specified two dismal points, 5.23, that would be 5.23 plus or minus .1.  Usually the tolerances in that -- you don't go to that precision.

So I'm just logically thinking I would need to find what the tolerance is on these.  I don't know.  But I think the tolerance is much tighter than a hundred microns, much tighter.

Q.   All you know, though is that -- all you said in your report is that Mr. Akiyama told you the tolerance is the same as the tolerance on the leg; right?

A.   He said there was a tolerance, and I don't know if he said -- you know, we're in translating.  I don't know if he said it was the general tolerance or something else.

MR. GOTTS:  Don't bring it up yet.

THE WITNESS:  You can bring it up.  But, you know, I -- what I understood was there's a tolerance.  I don't remember the numbers, but it was -- it was a reasonable number. It was a number consistent with the precision we're seeing on those numbers there.

BY MR. GOTTS:

Q.   I'm going to hand you, sir, the supplemental report.

You prepared this on January 19th, 2016; right?

A.    That's correct.

Q.    And this reflected your conversation with Mr. Akiyama; right?

A.    Yes.

Q.    Direct your attention to paragraph 63 of your supplemental report.

MR. GOTTS:  Your Honor, is it appropriate to bring it up on the screen?

THE COURT:  Any objection?

MR. SHAW:  To bring up the report, no objection.

THE COURT:  You may.

MR. GOTTS:  Thank you, Your Honor.

Q.    So it says -- you said on paragraph 63 -- and this is based on your conversations with Mr. Akiyama?

A.    Yeah.

Q.    -- that the gap variance or the gap changes caused by the PCB copper layer, the solder, the adhesive, the depth of the holes results in a gap measurement within the standard manufacturing tolerances.

Do you see that?

A.    I do.

Q.    And what are the standard manufacturing tolerances in the Exhibit of the drawing in PX-84?

A.    Sir, I don't know.  I don't believe it's the general

tolerance, though.  It's much tighter than that.

Q.    Is there any other tolerance shown on their engineering drawings which are the drawings that they used to make their product?

A.    That's what I'm looking for.  I don't know.  But I got, you know, 3.491.  They're spec-ing dimensions to a micron.  You don't do that and then have plus or minus a hundred microns on top.

Q.    So let's summarize here.

You understand that Dr. Moore analyzed, based on his measurements from 25 to 125, a gap in the range from 0 to 125.

You understand that; right?

A.    I do.

Q.    Your gap calculated originally, not taking into account the holes, the solder, the glue, you came up with a gap of 170, 220, and 250 for the accused products; right?

A.    I thought one was bigger than that, but we could look.  I understand your point.

Q.    Well, we could check if you need to check.  I want to get it right.

A.    That's fine.

Q.    Okay.  You don't disagree with that, right?

A.    Well, you can pull it back up.

        MR. GOTTS:  Let's pull up PX-84.

        THE WITNESS:  Maybe I'm wrong.

MR. GOTTS:  I'm sorry, yeah.  But the page that has the table in the beginning of PX-84.

Q.   So 9854D was .22, that's 220 microns; 9854E was .17, that's 170 microns.

A.   You're correct.

Q.   9879, .25, which is 250 microns; right?

A.   That's correct.  I was thinking of the 45.

Q.   Now, if you take into account the deviation, which by all accounts appears to be hundred microns from the drawing, now your gap would be as low as 70 microns for the 9854E, and as low as 120 microns for the 9854D, and as low as 150 microns for the 9879; right?

A.   If you subtract a hundred microns from my numbers, those numbers are correct.  I disagree on the source of the hundred microns.

Q.   Well, you said in your deposition -- and it comes out of your supplement report, because that's the tolerances; right?  Would you disagree?

A.   I think there's different tolerances.  This general tolerance is not the tolerance of the --

Q.   What were you talking about when you submitted your report?

A.   I was talking about the manufacturing tolerances discussed in the -- but, you know, honestly, I wasn't aware that there's general -- you know, I didn't realize there's seven categories

of tolerances.

Q.   This is the only drawing that you had seen at the time of your report; right?  These are the only drawings, PX-84?

A.   That's right.

Q.   So you couldn't have been basing it on some other drawing that you hadn't seen; right?

A.   It's based on conversation we had.

Q.   And Mr. Akiyama didn't get on the stand and talk about any of this, did he?

A.   I don't believe so.

Q.   He didn't talk about the tolerances.  He didn't talk about which tolerance he was referring to in his conversations; right?

A.   No.

Q.   Let's go back to PX-84, please, the table.

     PX-84, if you look at the 9854E lens, we're moving, switching directions now to the diameter of the LED, which is another parameter, because that shows how far you go out with the rays; right?

A.   Um-hm.

Q.   And the diameter that was measured by EDD for the 9854E is 2.3 millimeters, is that --

A.   Yes.

Q.   Which corresponds to a radius of half that, 1.15; right?

A.   Correct.

**Q.**    If we turn to slides 53 and 54 of your slides, can you pull those up?

These are the ray traces you did for the 9854E; right?

**A.**    Yes.

**Q.**    And you did -- you showed two of them in your direct testimony, one of them had a -- was based on a radius of 1 millimeter or a diameter of 2 millimeters; right?

**A.**    Correct.

**Q.**    And the next one, next slide, slide 54, was based on a radius of 1.1 millimeters or a diameter of 2.2 millimeters; right?

**A.**    Correct.

**Q.**    You didn't run 2.3 millimeters, did you?

**A.**    I did not.

**Q.**    And 2.3 millimeters is what's shown in the table of PX-84; right?

**A.**    That's correct.

**Q.**    So you have no ray trace for 2.3 millimeters, do you?

**A.**    I do not.

**Q.**    Okay.  Now, you accused Dr. Moore of using fictitious data.

Where is your 2.3-millimeter data?

**A.**    I don't have it.

**Q.**    Was it run by EDD?

**A.**    No.  I asked them to run at 1, 1.1, 1.25 to reflect the

measurements you made.  I was curious why our calculations were different from your calculations, so that was the major purpose of that.

I think you're right.  I probably should have gone to 1.15 on that.

Q.   And so there's no data in this case right now of -- from you of any ray trace at the specified -- what you claim is the specified diameter for the LED, for the 9854E; right?

A.   Correct.

Q.   And I think we agreed, although you disagree about the amount, but your own analysis found TIR for the other two lenses, didn't it?

A.   It did.

Q.   So you found TIR for the 9854D; right?

A.   I don't know if we disagree on the amount.  You never gave --

Q.   You got TIR for the 9854D; right?

A.   I had TIR, yes.  I saw that.

Q.   And you found TIR for the 9879?

A.   Correct.

Q.   And you didn't run the 9854E; right?

A.   That's correct.

Q.   So the only two that you ran at the right dimension you found TIR, and you didn't run the third?

A.   Correct.

MR. LABGOLD:  Objection, Your Honor.  To the extent it's misstating the burden of proof.

THE COURT:  Overruled.

BY MR. GOTTS:

Q.   Now, going back to the PX-84, on the table.

It's also true that the only gap ranges you ran for the 9854D, E, and 9879 were the ones you originally calculated that didn't take into account the solder, the glues, the holes, and the like; right?

A.   These are the design parameters.

Q.   We already went down there.  There is no design parameter.  There is no design document for those; right?

A.   No.  Akiyama told me that they include in their calculations estimates on the glue thickness and solder thickness.

Q.   You've never seen documents that have these as design specifications, have you, these gaps?

A.   No.

Q.   And the gaps that are calculated that were used don't take into account in their math the solder, the hole or the glue, because we saw the calculation.  All you did was subtract the lens from the LED height; right?

A.   Yeah.  And then the glue and the solder raise it up.  It's almost an offset.

Q.   Okay.

**A.**    The glue raises it, and the solder raises it.

**Q.**    So you never ran -- let's just make sure we understand what you ran.

You never ran any adjusted number to reflect the variance that you say could occur that we agreed to maybe up to a hundred microns; right?

**A.**    We didn't agree to a hundred microns.  Akiyama said there is a tolerance, and he said they compute the tolerance of the glue thickness and solder, and that's part of their analysis, and it stays within a reasonable gap range.

**Q.**    You never ran any reasonable gap range.  You ran one number for each of these; right?

**A.**    That's a reasonable gap range I ran.

**Q.**    Well, it seems to me I remember you complaining that Dr. Moore used the 75 microns as an example, and you said that's fictitious because he didn't run the whole range.

So is your data fictitious?

**A.**    No.

**Q.**    So now you also never ran Dr. Moore's gaps, did you?

**A.**    I did not run explicitly 75.

**Q.**    And you didn't run zero, and you didn't run 125, did you?

**A.**    I ran zero.

**Q.**    You didn't run -- no, you did not.  You ran zero for 9854DE?

**A.**    Oh, no.  I did that on another lens.

Q.    Right.  You chose not to do it on the accused lenses; right?

          MR. LABGOLD:  Objection, Your Honor.

          THE COURT:  Sustained.

          THE WITNESS:  I didn't want to waste anyone's time.

          THE COURT:  Sustained.  One moment.

          THE WITNESS:  Sorry.

          THE COURT:  All right.  We need to slow down, both so that the jury can hear the question, Dr. Pollock --

          THE WITNESS:  Sorry.

          THE COURT:  -- and so that we can make a transcript of the proceedings, please.

      Next question.

BY MR. GOTTS:

Q.    Did you run Dr. Moore's zero or 125 gaps on any of the accused products?

A.    No.

Q.    Did you run corrected gaps, other than your one gap that you calculated of PX-84, on any of the accused products?

A.    Those are the corrected gaps.  That's what I ran.

Q.    You think -- okay.  Did you run a range?

A.    No.

Q.    But you know there will be a variance; right?

A.    Not on those three.  I did run a range on the other one.

Q.    You know there will be a variance --

**A.**   Absolutely.

**Q.**   -- from lens to lens; right?

**A.**   Not in lens, but particularly in manufacturing tolerances there will be a range.  These are accommodated.

**Q.**   And if you want to know what the range is, you'd look at a light bar; right?

**A.**   Or I'd talk to someone who manufactures parts for them.

**Q.**   And that someone didn't tell you what the range was, did they?

**A.**   He told me what the variances were in glue thickness and solder thickness.  They deal with the manufacturer.  They don't make these either, but they talked to the person who does, and the person who does said these are my issues, and they get the specs from them.

So these things are not done in a vacuum.  These thicknesses and solder thicknesses are part of the thinking.

**Q.**   My point exactly.

EDD doesn't make these things, do they?  They don't make light bars.

**A.**   They do not, but they work with the manufacturer who does to deliver a product the light bar manufacturer wants.

**Q.**   So if you want to know what the gap is, why wouldn't you just look at a light bar and measure it?

**A.**   The gap -- it depends on the manufacturer who put the gap there.

These things are designed to have an optimal gap.  If the manufacturer chooses to choose another gap, he spoils his performance.  And I don't know why they would want to do that.  There's no motivation for not achieving the design gap.

But part of the discussion of the design is the mounting, the thickness, what glue they're going to use.  One of the discussions -- I don't know if this was in testimony or not -- they talk about working with the manufacturer, and they discovered the glue thickness was too thick.  They talk about the process.  And there's iterations, this ten-fold iteration we heard about.  So all these things are built in.

Q.   You understand that infringement in this case is supposed to be based on the actual products, not what EDD thinks the gap ought to be based upon some conversations with customers; right?

A.   Is this the induced infringement?  These are legal issues. I don't know.

Q.   This is not a legal issue.

You're here to testify with regard to infringement of *the* products that are at issue in this case which are *the* products which are sold in the United States; right?

A.   Yes.  And I do it based on the claims.

Q.   But you didn't do it based on the gap in those documents -- in those products, did you?

A.   My assessment of infringement had nothing to do with

**POLLOCK - CROSS / GOTTS**

these -- these numbers didn't play a role in it.

Q.   Your assessment of infringement had nothing to do with the gap?

A.   Well, I found -- I found that the accused element did not have certain surfaces, did not display a TIR surface, did not propagate rays.

Q.   You did ray traces; right?

A.   I looked at the ray traces that you provided.

Q.   And you did your own ray traces?

A.   I did my own.

Q.   And your own ray traces were based on an assumed gap; right?

A.   Yes.

Q.   So your analysis does depend on the gap, doesn't it?

A.   My analysis -- I was just seeing if these things had TIR.

Q.   Based on your assumption of the gap?

A.   Correct.

Q.   Okay.  Now, go to slide 62 and 63 from the presentation.

     Slide 62 and 63 were the slides you used to do the power analysis on two out of the three lenses; right?

A.   Correct.

Q.   You did it for the 9854D and the 9879; right?

A.   Correct.

Q.   Those power analyses are based on the very same ray traces we just talked about; right?

**A.**   Correct.

**Q.**   And they're based upon the same gaps you chose to use; right?

**A.**   Correct.

**Q.**   And you don't have one for 9854E, because you never ran that at the right diameter; right?

**A.**   Correct.

**Q.**   And you never ran a power analysis at the correct -- or at the other gaps that we've talked about; right?

**A.**   Correct.

**Q.**   And one of the other things about your power analysis is it's looking at the total light coming out of the LED relative to the -- the total amount of TIR you found; right?

**A.**   Correct.

**Q.**   It's not looking at just the percentage of TIR for the light that's incident on that inner cusp, is it?  It's the whole thing; right?

**A.**   It's the total amount of TIR that came off that surface when illuminated by uniform lumen sizing, yeah.

**Q.**   But you don't know the percentage of TIR of the light rays that are just impinging upon the TIR surface in the middle, do you?

**A.**   You'll have to show me a drawing.  I don't know what you're talking about.

**Q.**   Okay.  Let's go to -- let's pull up Exhibit -- it's this

one (indicating).  It might be different.  This one right here (indicating).

When you did your light ray power analysis, you were looking at all of the light that's coming off the entire lens; right?

A.  Correct.

Q.  And you're comparing that to the amount of TIR that you believe, based on data you input, is coming off of this inner cusp section, region (indicating), right, the portions inside of here (indicating); right?

A.  It's coming off somewhere off the top surface of the lens, yeah.

Q.  You never compared only the light that's hitting that inner cusp region, the total light to the TIR light there.  You only looked at the total light everywhere else and compared it to the TIR; right?

What percentage of the light hitting that cusp is TIR?

A.  You're asking --

Q.  Do you know?

A.  Well, yeah, it's .04 percent.  I mean, that's --

Q.  No.  .04 percent is the percentage of *all* the light; right?

A.  Yeah.

Q.  I want to know what percentage of the light rays hitting the cusp -- what percentage of the light rays hitting the cusp

**POLLOCK - CROSS / GOTTS**

are TIR?

**A.**   Hmm, when I look at an aggregate thing like this, the only thing I can say is we did the ray traces, and we saw the rays which indicated TIR, so I had a rough idea where they were hitting way outside, you know, near the tangent line of the plan.  That's where the TIR was coming from.  There was none coming through the middle.  I mean, there's no TIR at all in the middle of that plan.  It blasted right on through.

That but I got an aggregate solution.  I couldn't tell you where any one of those photons came from at the end of the day, but I just know they're TIR.  Based on the earlier plots, I have a pretty good idea what rays they followed.

**Q.**   Let's go back to -- let's go back a couple slides.

So if I only wanted to know what percentage of the light rays are hitting this TIR surface are actually reflecting by a total internal reflection, that's not answered by your power analysis, is it?

**A.**   What I'll do, I'll tell you this, I looked at the ray trace, and I know where they're hitting.  I know where the TIR is originating.  I know the place where the rays are hitting.  I know it's well outside the diameter of the LED.  So it's no longer the TIR surface, it's just hitting on a tangent plane of the lens.  So the amount of light going through the TIR surface is one hundred percent in my calculation.

**Q.**   Sir, the -- I'm asking you about this region of the lens

**POLLOCK - CROSS / GOTTS**

(indicating), in other words, I want you to ignore --

A.    Well, you called it a TIR surface.

Q.    -- the outer surface of the lens.  What's called the TIR surface in slide 46, whether you agree or not, I just want to ask the question about that region, okay?

A.    Okay.

Q.    In that region labeled "TIR surface" in Exhibit 46, what percentage of the light impinging from the LED on that TIR surface is reflected by total internal reflection; do you know?

A.    That is -- that is not my drawing.  That is not my definition of TIR surface.  So what I measured was not consistent with that dimension or drawing.  And I can tell you there's no TIR surface.  All I can tell you is I have .04 percent reflection.

Q.    Let's just call it the yellow surface in slide 46, okay?

A.    Okay.

Q.    What percentage of the light coming out of the LED that impinges upon the yellow surface in slide 46 is reflected by total internal reflection?

A.    It's a silly question.  I don't know.  That's not even my plot.  I could tell you what *my* lens did.

Q.    Your lens?

A.    The one -- my lens.  The one I ran the calculation on. The two data plots we just showed.

Q.    With your gaps?

**POLLOCK - CROSS / GOTTS**

**A.**   With the proper gaps.

**Q.**   So let's move on to the '209 Patent, just a few questions there.

Let's take a look at Claim 20.

I think you testified in Direct that you think Claim 20 is not infringed because the LEDs are not outside of the perimeter; is that fair?

**A.**   Correct.  Correct.

**Q.**   Could you tell me, sir, where in Claim 20 it says that the LEDs need to be outside of the perimeter?

**A.**   It says, (reading) plural lights mounted on said internal bottom wall and around perimeter of the aperture.

I see two plural light source definitions there.

**Q.**   And where does it say outside of the perimeter?

**A.**   It says around the perimeter.

**Q.**   Around the perimeter.  If I put you in an empty room and I ask you to walk around the perimeter of the room, would you go out the door and walk outside?

**A.**   If I said put some chairs around the perimeter of that table, would you put them under the table?

**Q.**   Let's answer my question.

**A.**   It's a very vague term.

I agree with you.  Inside this room -- it depends on the context.

**Q.**   It does depend on the context; right?

**A.**    Yeah.  So you go to the written definition, you go to the written description, and look and see how that inventor described it.

**Q.**    Let's turn to '209, invalidity.

You were here for Dr. Pelka's testimony; right?

**A.**    Yes, I was.

**Q.**    And Dr. Pelka explained how a key aspect of his patent, '209 Patent was redirecting the light rays from the LEDs on an internal bottom wall of the cavity, so those light rays would all bounce around and achieve uniformity; right?

**A.**    Yes.

**Q.**    And he described certain mechanisms of the '209 Patent for doing that, the baffles and reflectors and the like are all describing the patent; isn't that right?

**A.**    That's correct.

**Q.**    And the '209 Patent was filed in 1997; right?

**A.**    Yes.

**Q.**    And we've already established you weren't working in the field of display backlighting in 1997; right?

**A.**    I was -- no, I was just merely working in photonics.

**Q.**    And you understand, don't you, that for purposes of obviousness, this is what we're talking about for Claim 20, you can't apply hindsight; right?

**A.**    That's correct.

**Q.**    In other words, hindsight is 20/20, isn't it?

**A.**    Absolutely.

**Q.**    So when you look at something after the fact and you say, you know what, this seems pretty simple to me; right?

**A.**    Yeah.

**Q.**    When you get the answer to a question on a test, you say *I knew that*; right?

**A.**    Correct.

**Q.**    But you still might have gotten it wrong on the test; right?

**A.**    That's right.

**Q.**    You're a professor, that happens all the time; right?

**A.**    It's happened.

**Q.**    So if you want to look at and have the best evidence, the best evidence is to look at what was actually done; right?

**A.**    Sure, yeah.

**Q.**    That tells you how people were thinking about these problems in 1997; right?

**A.**    Yes.

**Q.**    So what thing we do know is that the Gleckman prior art you referenced didn't put lights in the middle at all; right? On the bottom or the middle.

**A.**    Well, actually, he put one lightbulb in the middle on the bottom with a baffle.  That was in the Gleckman patent.

**Q.**    You say Gleckman shows a light in the middle on the bottom of the cavity?

A.   It does.

Q.   Okay.  So why -- so what's missing in Gleckman?

A.   In my opinion nothing.  I think I said I think this patent is obvious.

Q.   It's obvious, okay.  But let's -- you rely upon --

MR. LABGOLD:  Objection, Your Honor.  We have a procedural issue here.

MR. GOTTS:  I'm not raising it.  Go ahead.

THE COURT:  Overruled.

BY MR. GOTTS:

Q.   First of all, let's go to your slide, I think it's 76. It's a claim term.

So in your own slide you indicated, I believe, that what was not present in Gleckman was the plural light sources mounted on said internal bottom wall and around the perimeter; right?

A.   Correct.

Q.   So if you want to know whether mounting plural light sources on an internal bottom wall was obvious, one way to look at it is to see what did other people do to try to solve the problem in 1997, or before; right?

A.   Correct.

Q.   And that's where your prior art comes in.  You say *oh, I know what I would do.  I would look at this Osawa reference and see, and that will tell me how to do this*; right?  That's one

of your accommodations.

A.   I wouldn't directly to go to that and see an answer.  I'm aware of all the technology out there.  I know what everyone is doing in backlighting, and I'm seeing that, and that and a couple other things, and that one stands out.

Q.   Let's go to Osawa, and let's see what Osawa did.

The Osawa prior art was at slide 81; right?

So Osawa seems to show LEDs on the bottom; right?

A.   Correct.

Q.   That's your point; right?

A.   Yes.

Q.   But what did he do when he put the LEDs on the bottom?  He didn't redirect them with shielding mechanisms or something else.  He filled the entire cavity with epoxy resin, didn't he?

A.   That was filled with scattering particles.

Q.   Right.  So if I were to take what I know from Gleckman, which is these LEDs on the side, and I'm going to try now to use Osawa to figure out how I would change Gleckman, what I would do is I'd take all these LEDs on the bottom and stick them in the bottom of Gleckman and I'd fill the whole thing up with epoxy resin.  And then guess what?  I no longer have a cavity, do I?

A.   You have an optical cavity.  Did it say air cavity?  It said a cavity.  A cavity is defined by four walls.

Q.   So you think a cavity could be something that's filled in?

A.   Oh, absolutely.

Q.   If I dig a hole in the ground; right --

THE COURT:  Wait a minute, Mr. Gotts.  You have to let him finish one answer before you ask the next question, if you like the questioning to continue.

BY MR. GOTTS:

Q.   Okay.  Do you have an answer?

A.   Yeah, A laser cavity.  A laser cavity, it's a volume of active gain with mirrors and all sorts of stuff, and that's an optical cavity, and this is an optical system.

Q.   Are there any laser cavities talked about in this patent?

A.   This is an optical cavity.  You just asked -- you were trying to tell me that cavities couldn't be filled.  Of course they could be filled with optics all time, and even in 1997 we had filled cavities.

Q.   So if I take a shovel, right, and I dig a hole right in front of me right here --

A.   Okay.

Q.   -- I think we can agree I've got a cavity there; right?

A.   You have a hole.

Q.   I got a hole.  Now I go and put all that dirt back in; right?  Do I still have a cavity?

A.   You don't have an optical cavity, no.

Q.   Do I have a cavity?

A.   You don't have an optical cavity.  You don't have a

cavity.

Q.   Please answer my question.

Do I have a cavity?

A.   No.

Q.   So now let's talk about -- so what we know is Osawa, back in 1997, he didn't have the idea of taking LEDs and putting them in the bottom, directing them, and having them bounce around in the cavity.  He didn't have that idea, did he?

A.   He did.  He put a scattering median in there.

Q.   So let's go to the next piece of prior art, Takeichi. That's at slide 85.

So Takeichi is trying to do the same thing too.  He wants LEDs on the bottom also, doesn't he?

A.   Yes.

Q.   So he doesn't just put them on the bottom with shielding elements and then have them scattered around in the cavity.  He goes and he creates this entire honeycomb of hundreds and hundreds or dozens and dozens of mini cavities, doesn't he?

A.   Well, number 14 is a shielding element.

Q.   I didn't ask you anything about shielding elements, so let's try to stick to my questions.

He does not create a cavity.  He creates dozens and dozens of cavities, one cavity per each LED; right?

A.   Again, same argument.  This is an optical cavity, and it's made to be a Lambertian source.

**Q.**   So two people in the prior art addressing this problem, which you say is painfully obvious, rather than just putting LEDs on the bottom and redirecting them like taught in the '209 Patent, they come up with these clues devices where they code, they create cavities, they fill it with epoxy, and they come up with something that would weigh a ton if you hung it on the wall; right?

**A.**   That's not the issue.  Gleckman -- you're looking at the Gleckman and saying how can I make this thing bigger?  Well, a lot of people put lights on the bottom.

**Q.**   Let's turn to the '554 invalidity, briefly.

   If we pull up slide 112, please.

   This is Johnson; right?

**A.**   Excuse me, yes.

**Q.**   We spoke at length about Johnson in your Direct Examination.

   I think we can agree that the LEDs in Johnson are fully encapsulated; right?

**A.**   Yes.

**Q.**   They're buried in this resin, aren't they?

**A.**   They're encapsulated as all LEDs are.

**Q.**   And these LEDs are encapsulated in the optical element; right?

**A.**   Yes.

**Q.**   Not all LEDs are encapsulated in the optical element, are

they?

A.   Well, what's the optical element.

Q.   The accused products, the LEDs are not encapsulated in the optical element, they're separated and spaced apart by a gap, aren't they?

A.   No.

Q.   They're not?

A.   Well, in the accused, you're talking about?

Q.   Yeah.  Yeah.

A.   Okay.  The Enplas lens with an LED on the ground, yeah, there's an air gap there.

Q.   So when you said that all LEDs are encapsulated, that's not true, is it?

A.   I'm sorry.  What I meant was the LEDs that even Enplas uses, or whoever, those are encapsulated.

Q.   But they're not encapsulated, fully encapsulated into the waveguide or the optical element, are they?

A.   Not necessarily.

Q.   Well, so next thing is, let's turn to slide 105, which is this Claim 1, for a moment.

    Slide 105 has an element that you talked about, and it says that the waveguide has an illumination coupler embedded in an interior region of the waveguide; right?

A.   Correct.

Q.   And you say that the illumination coupler is this piece 17

in the middle, and it's embedded inside this blue waveguide in slide 105; that's fair?

A.    17 is that blue surface, it's that TIR surface, and that is embedded in that waveguide, if you look at it, yes.

Q.    So you're saying that the element, I don't recall -- 10, is embedded in the waveguide; right?

A.    I'm seeing 17 is embedded in a waveguide.

Q.    Okay.  Thank you.  I'm not sure which number corresponds to that, so that's helpful.

       Let's -- could we pull up --

A.    I'm not sure if that's even the right number.  Sorry.  But the blue surface, just so we know, it's that refractive index surface, that's what we're talking about.

       MR. GOTTS:  Could we pull up the Johnson patent, and that's Exhibit No -- does it have an Exhibit number PX-200, okay.

Q.    So we looked at one set of figures in the Johnson patent, but let's look at another set of figures that you didn't show in your report.

       Do you understand that Figures 3B and 3C are showing the relationship between the illumination coupler and the waveguide?  This is the illumination coupler (indicating), and that's the waveguide (indicating)?

A.    Yes.

Q.    And they're showing an air gap between the two, aren't

they?  Yes or no.

A.   That's diagrammatically they're showing two surfaces there.  That gap physically is -- as it says in the patent, they are inserted together.

Q.   Actually, it says in the patent that there can be a space, and depending on the space it tells you how efficient the optical coupling is; is that right?

A.   Could you show me?

Q.   Let's pull up Johnson.

Is there a reason, by the way, that you didn't show Figures 3 in your -- 3B and 3C in your direct testimony?

A.   Sure.  They're very -- they don't add anything to the argument.

Q.   They detract from the argument; right?

A.   No.

Q.   Because they show an air gap?

A.   No.  This just has to teach, and this teaches very well. But there's no air gap in the --

Q.   Go ahead.

A.   There's no -- it's not designed for an air gap.  It's designed to be, you know, plugged into another plastic plate, probably glued in.

Q.   So you said it just has to teach.  What it has to teach is embedding the illumination coupler in the waveguide; right?

A.   That's what it looks like in that figure.  I don't see an

air gap in that figure.

**Q.** If I take a hat and hold it over my head so the sides don't touch, is my head embedded in that hat?

**A.** Oh, gosh. Your head is within the hat, that's what I would say.

**Q.** It's within the hat. Is it embedded in the hat?

**A.** I wouldn't use that term.

**Q.** Now, if I take the hat and I shift it aside so maybe it touches on one spot, is that all of a sudden my head is embedded in that hat?

**A.** No.

**Q.** Embedded means something, doesn't it?

**A.** To me, this is a functional embedding. Yeah, it's embedded. It means it's optically -- to me it's the optical system. You've got a waveguide -- a waveguide is defined by the optics, and this is embedded in the waveguide. So the optical function is it's clearly embedded, and it's physically embedded too.

**Q.** Let's pull up slide 41.

This is Stanley; right?

**A.** Correct.

**Q.** Can we agree that the LED in Stanley is also fully encapsulated in the optical element?

**A.** Absolutely.

**Q.** Could we also agree there's no teaching anywhere in

Stanley of leaky TIR to eliminate dark spots?

A.   That's correct.

Q.   No teaching of leakiness at all; right?

A.   There's -- he mentions the output beams only coupled 5 degrees and beyond.  So he mentions there's nothing going straight up, he doesn't mention it.  But he only talks about reflecting from 5 to 90 degrees, and not beyond that.

MR. GOTTS:  Let's go to Rohm, which is slide 149.

What's the Exhibit number for Rohm?  Defendant's Exhibit 205.

Q.   So you showed one figure of Rohm in your slide.  This is this figure in the upper right-hand corner.  It's labeled Figure 3 in Rohm; right?

A.   That's correct.

MR. GOTTS:  Why don't we pull up Rohm, please, the actual exhibit.

And if we -- I think it was in one of my notebooks.

Now, if we scroll through and pull up the whole patent, 205, and if you turn to the patent -- and we can get rid of this slide 149 for now so we'll have more room.

Q.   If you turn to the patent on page 6 of the translation, there's a brief description of the drawings, it tells you that Figure 3 -- do you have Rohm in front of you?

A.   No.  What?

Q.   It's in your prior art notebook from your Direct

Examination, if you have it there.

**A.**   Do you remember which one?

**Q.**   205.   So we go to page 6, please.

Let me know when you have it, sir.

**A.**   Sorry.

**Q.**   It's okay.   Take your time.

**A.**   Okay.

**Q.**   So Figure 3 is described as the conventional example. It's the prior art; right?

**A.**   That's correct.

**Q.**   And the invention is what's shown in Figure 1; right?

**A.**   That's correct.

**Q.**   And Figure 1 in Rohm is -- well, let's go back.   If you then turn to page 4 of Rohm, there's a paragraph that starts "however."   Let me know if you find it.

**A.**   Yes.

**Q.**   And this is describing Figure 3; right?

**A.**   Yeah.

**Q.**   That's the conventional or the prior art to the Rohm invention; right?

**A.**   Right.

**Q.**   Okay.   And it says that this prior art, when you use this conventional LED as a lighting source, it says because the light is going straight in a front direction, which means it's leaking; right?

**A.**   Yeah.

**Q.**   There's a problem.  Do you see what it says, there's problem when you do that, and the problem is that it ends up being illuminated particularly brightly; right?

**A.**   Yeah.

**Q.**   So what Rohm is telling the reader is don't use this prior art approach, because it's too leaky, and the light goes right through; right?  That's what it's telling you.  It's teaching that, isn't it?

**A.**   But that's not the point.  That's not why we used it.

**Q.**   I understand.  But you agree with me; right?

**A.**   Yeah, yeah, but that's not --

**Q.**   You agree with me that Rohm tells you that don't use the conventional leaky approach, right, of TIR; right?

**A.**   He suggests there's a problem.  But his problem is another man's solution.

**Q.**   Well, only if you appreciate the problem, though; right? Only if you appreciate the solution.

**A.**   If I'm looking for a leaky source, well, look at this.

**Q.**   Yeah, because you could pick something from here and you could pick something from here, and with the benefit of hindsight being 20/20, you put it together and you say *lo and behold, I got the invention*; right?

**A.**   I'm glad you put this figure up, because --

**Q.**   No, this is my question --

THE COURT:  Mr. Gotts, he's answering your question.

Go ahead, Dr. Pollock.

THE WITNESS:  Okay.  This is not a hindsight, because if you look at that figure, it looks very much like Stanley. And so in my opinion someone working on the Stanley profile would see this Figure 1, this new invention, and then they would look down, and that would have drawn them to this patent. And then they see Figure 3 and say, *oh, this is leaky*.

So I view the connection as very strong here.

BY MR. GOTTS:

Q.   Well, the motivation to combine is to get uniform lighting; right?

A.   Yeah.

Q.   What does Rohm tell you about Figure 3?  It says when you do this, it's not uniform.

A.   But we're talking about combining Stanley with -- I'm not saying Rohm is the answer, but combining Stanley with Rohm.

Q.   So if I want to fix the uniformity problem in Stanley, because it's a total internal reflection, I'm going to look to a description in a piece of prior art that says don't use me, because I'm not going to make it uniform?  Is that your testimony?

A.   I'm going to look at this and say, *oh, he's got leaky* -- I'm going to see this -- this is teaching.  I look at this to say, *oh, that's a clever way to get light out of this thing*.

Q.   And it's teaching that Rohm gives you a non-uniform output and don't use it; right?

A.   It's saying it's coupling out of the top surface, is what it's teaching me, which was the problem I'm trying to address.

MR. GOTTS:   No further questions, Your Honor.

THE COURT:   Thank you.

Further examination from EDD.

**REDIRECT EXAMINATION**

BY MR. LABGOLD:

Q.   As long as you're -- as long as you're still there, if you haven't moved it, I'd like to turn to the text of Rohm at page 4, and in the paragraph "in the manner," which is one of the ones you had cited earlier?

A.   Yes.

Q.   What is that explaining?

A.   Well, it reads:

"In this manner, according to LED 10 shown in Figure 3, it is possible to brightly illuminate a part surrounding the display surface 12 of the panel by achieving wide directionality."

Q.   And how does that relate to uniformity?

A.   So Stanley is only sending light outside to the sides, and this is saying this is going to give you light in all directions.

Q.   And does it say -- which figure is it referring to that?

**A.**    Figure 3, the one we put in our -- or in the presentation yesterday.

**Q.**    Now, with regard to Osawa, you were asked questions about whether the cavity that was filled was no longer a cavity?

**A.**    Correct.

**Q.**    Do you recall that?

**A.**    The dirt.  The dirt.

**Q.**    Right.

**A.**    Yes.

**Q.**    And did you -- in forming your opinions, again, you're not a patent attorney; correct?

**A.**    That's absolutely true.

**Q.**    So you were given the -- some of the legal guidelines that you had to follow, including, for example, the constructions that were rendered by the Court?

**A.**    Correct.

**Q.**    And do you have an understanding from that what the word "comprising" means?

**A.**    Yes.

**Q.**    And what is the understanding that you apply?

**A.**    It includes that, but can have more.

        **MR. LABGOLD:**  Okay.  And with regard to -- if we refer to -- can we pull up Claim 20 of DTX-1001?  We just need the beginning portion so we don't have to do both columns.

**Q.**    So the method of backlighting a display, does this

claim -- is this claim a comprising claim?

A.    Yes, it is.

Q.    Now, with regard to what you were talking about concerning an optical cavity, can you explain what in the field of optics a cavity means?

A.    A cavity means light can move back and forth and not be interrupted.  So a piece of glass could be a cavity; air could be a cavity; two mirrors looking at each other.  Obviously, a pile of dirt would not be a cavity, because light can't get through that.

Q.    Now, in the context of the Claim 20, it says that the -- you're producing illumination from a substantially lambertian light source comprising a cavity, which is then defined by its walls.

      And what is a lambertian light source?

A.    That's a source where light gets scattered uniformly in all directions.  So when light hits the surface, it scatters in all directions, and light is coming off it uniformly.  So the ceiling, all of the surfaces in here are basically lambertian.

Q.    Now, when -- in the Osawa instance, prior art, which we saw, which is PX-216, if you took that cavity as they did and you filled it with resin, would that be a lambertian light source?

A.    Yes, it would.

Q.    And why is that?

**A.**    Because they filled it with epoxy, which adds cerium oxide particles.  And so it's a very light -- it would look white. It would look like a bathroom window which is frosted, would have that look, which is lambertian.  Lambertian means light hits it and scatters.

**Q.**    And is there any example in that patent where they filled it with dirt?

**A.**    No, there's not.

**Q.**    Now, we got to go through some of the math.  Let me look first with regard to the figure -- could we pull up PX-126?  It will be in your binder.

        **MR. LABGOLD:**  And I'd like to zoom in, if we could, Mr. Harper, right over here (indicating).

**Q.**    And do the design specifications include a leg length? And just to orient --

**A.**    Oh, they do.

**Q.**    You might want to look at it closer if you actually look at it in the drawing.

**A.**    It looks to me -- I'll just point at it.  It looks to me like that's a leg length right there (indicating).

**Q.**    Now, before we get to the leg length -- I know we're all excited to get there -- if we can look at from this line (indicating), which is the top tangent line, to this line (indicating), which is the bottom of the foot (indicating), you started making a point with regard to the dimensions in the

tolerances for that.  What was that?

A.    You don't -- you don't list more decimals in your -- what am I saying?  You don't have more decimal points very well -- you don't put more digits in your answer than you need, basically, so --

Q.    And what did you understand that this number right here (indicating) 5.54 plus or minus .02 is referring to?

A.    Well, that's clearly the height of the lens, 5.54 milliliters, and it's plus or minus 20 microns.  That's what it means.  That's very clearly shown.

Q.    And if -- and then what number did you find for the -- is indicated for leg length?

      It's easier to see if you actually look at it, probably?

A.    Is that the -- yeah, okay.  It's 1.02 plus or minus 0.02, so it's plus or minus 20 microns.

Q.    And just so there's no confusion, looking at this number (indicating), there's a 3 and a dash before it.  How many legs are on the lens?

A.    That says there's three legs.

Q.    Now I'd like to pull up PX-126.  Sorry wrong one.

      We were looking at a series of numbers, columns of numbers, and I'd like you to pull up PX-124.

      Now, this is the -- you'll have it in your binder as well.

A.    I could see it here.

Q.    This is the surface, upper surface for the 9854D?

**A.**   Yes.

**Q.**   And this one was not shown.

Now, I can also tell you that if we were to go -- just so the jury understands, if they were to go to PX-91, which is where you were going through looking at all the screen shots --

**A.**   Yes.

**Q.**   -- and there's another table that's listed there for the number 9854D, and those numbers I'll represent for the moment --

**MR. GOTTS:**   Objection.   Leading, Your Honor.

**THE COURT:**   Overruled.

**BY MR. LABGOLD:**

**Q.**   -- are going to be the same?

**A.**   That's correct.

**Q.**   And how does someone looking at these numbers -- what is the jury going to have to do when they sit down with this document, and this is page 41 of 65 of Exhibit PX-91, and looking at this number right here (indicating), how do they make some sense out of that?   What other information is provided in this?

**A.**   There are other dimensions, such as the offset and the flange thickness which also accommodate that.   This list of numbers you've got is a profile, and so it gives you the shape of the lens, where that is with respect to the bottom goes up and down.   And so the designer when he's designing the lens

takes that profile and raises it up with an offset and moves it down.  The flange will, of course, raise it up.  So depending on the dimensions of the flange and the offset, that's where it locates in space where that profile is.

So if some of those numbers -- one is the -- I believe -- and I don't do Japanese, but I believe that's the flange thickness, but I'd have to confirm this.

Q.   And so if you take those two numbers, the ones that you pointed to, and the top number, is it your suspicion that it reflects what's shown in the screen?

A.   Yes.

Q.   Now, there was some discussion as to whether they were design numbers or measured numbers?

A.   Yes.

Q.   And can you explain what you mean, that they were design numbers that were measured or measured numbers that were designed?

A.   Thank you.  Yeah.  Honestly, this -- I struggled with this initially as well.

The key of this -- this is a manufacturing company.  When they make a lens, it's, you know, they make it today, and a year from now it's got to be the same shape.  So this is the shape of the lens as it leaves their floor.  If it doesn't have that shape, it doesn't go out the door.

So these numbers -- this profile is a standard profile

which has been developed, they've measured, they've made their dyes work, they make a lens, it meets these specs. I don't know what they're told quality control is, but they routinely check the lenses going out the door to make sure they meet that spec.

So that was -- that's why that design data is the same as the measured data. When they design a lens, they take that curve, and they move it up or down so the designer is using the same physical dimensions and just literally moving it up and down, bringing the other curve from below up or down.

Because there is tolerance, every one of these lenses within the tolerance of their manufacturing -- I'm not sure if the signatures will be the same lens -- so if you measured it, if you measured a thousand lenses, you would get that set of numbers.

Any particular lens will have a deviation from that table we've shown -- that was shown, but on average that would be the statistically descriptive and accurate description of the shape.

Q.   And when you say that they're fit to a curve, can you explain why you have to fit something to a curve if you put it into a computer program?

A.   Yeah.  The profilometers, which everyone uses, they measure a height at a point, so you get a bunch of points. But Snell's law has to go through a line, and so a point -- if you

one that ray to a point, it doesn't know what to do.  It's got to know what connects these points.  And so you take this data, you fit it, so you get a least squares fit, so you have an equation which kind of describes the best fit of all these points.  So now you've got a line, and now you raise those lines that computes Snell's law.  So that's the fitted data.

Q.    Now, with the questions you were asked, do you have any doubt in your mind that the ray traces that were done conform to the lenses as they were designed to be used?

A.    I have no doubt.

Q.    Now I'd like to ask you a question with regard to Johnson PX-200.  And you were asked some questions about Figures 3A, 3B and 3C?

A.    Yes.

Q.    And in the field of optics, what does "mating" refer to, if mating two different surfaces?

A.    It just means putting them together so they fit.

Q.    And what happens if they're not mated with regard to loss or deviations?

A.    You would have a reflection, and you'd have an air gap, which is something you don't want in such a system, because that causes the Fresnel reflection, leaking surface.

Q.    And if you refer to column three, there's a paragraph at this point starting at line 7.  If you could take a moment to read that.  It will probably be easier if you read the real

version.

A.    Let me see if I could find it.  I've got so much stuff up here.

Q.    There should be a small binder that just has the prior art, hopefully.

A.    Thank you.

        MR. LABGOLD:  Can we pull up that paragraph, please.

Q.    Take a moment to read the paragraph.

        THE COURT:  Mr. Labgold, you have eight minutes remaining max.

        MR. LABGOLD:  That's my last question, Your Honor.

        THE COURT:  Outstanding.

        THE WITNESS:  (witness examines document).

BY MR. LABGOLD:

Q.    And so --

A.    (Witness examines document.)  Okay.

Q.    And so do you see where it's talking about mating the materials between the beveled edge and the sidewall?

A.    Yes.

Q.    And then the last sentence, what is it referring to?

A.    It's referring to how well you fit -- it says interface between elements will result in the optical loss depending on the care in the matching geometry of these surfaces.

    So you want to make it that close.

Q.    Someone in optics, what would that mean to them?

**A.**    That means you want to make a nice, close fit with no air gap.

          **MR. LABGOLD:**  No further questions.

          **THE COURT:**  Thank you.  Any further cross-examination?

          **MR. GOTTS:**  No, your Honor.

          **THE COURT:**  Thank you.  Ladies and gentlemen, we're going to take a lunch break now.  Please return at 1:00 o'clock.

     If, during that time period, you wish to write any questions for the witness, you may do so.  You're not required to.

     We will resume with testimony at 1:00 o'clock.  Thank you.

          **MR. LABGOLD:**  Thank you, Your Honor.

     (Proceedings were heard out of presence of the jury:)

          **THE COURT:**  Dr. Pollock, you may step down.

     And everyone else may be seated.  Our jurors are not present.  A few procedural matters.

     We issued revised the verdict form and closing instructions this morning, which I know the parties have been reviewing and will later have an opportunity to respond to.  So I wanted to make sure that was drawn to your attention.

     There was a Rule 50A motion for directed verdict filed by EDD.  I am open to having some argument about that now or later today.

     And also I wanted to speak about the exhibits which are

going to be presented to the jury not today, but likely tomorrow.  We have been keeping track, as to which of the exhibits are in evidence.  There are some that have some particular further attention needed from the parties with the screen shots.  And I know you were working on that yesterday to make sure which agreements, which screen shots were captured and which are going to be shown to the jury.

I also suggested that it might be appropriate to reduce the amount given to the jury as to some documents in evidence so as to reduce the total amount of information presented to the jury.  Since I made that observation, many more exhibits have been admitted into evidence, and my observation is that the jury is at this point oversaturated with information already.

So what I want to do is to see if there's been any further conferring and resolution of the idea of reducing the amount of information presented to the jury in exhibit form; and then secondly, to direct that the parties are going to be responsible for collating the exhibits in evidence to be presented to the jury.  I'm directing you to have that ready at the moment that the deliberations begin.  So you can start that preparation process now.

I think it's also helpful, given the number of exhibits, and there are more than 50 from each side, would be to have an annotated index agreed to by the parties using the list of

exhibits you already have, and not to be used as an argument tool interpreting the evidence, but just identifying; and so that the jury, when going through it, will be able to track what evidence is what.  I think that will help them in understanding what they are processing.

So to summarize my orders, the parties are responsible for agreeing to and putting together the exhibits for the jury, and to creating an index that will help them understand what's being presented to them, and that's all due by the end of the closing arguments.

Would you like, SSC, to talk about the Rule 50A motion now?

**MR. GOTTS:**  Your Honor, I haven't even had a chance to review it, unfortunately.

**THE COURT:**  All right.  Take a look at that, and I will take it up later this afternoon.

I intend that -- and given the amount of time remaining, that we will conclude the evidence this afternoon and have closing arguments tomorrow morning.  And so we will be fitting in Dr. Moore's expected further testimony and any further examination of Dr. Pollock within the time remaining this afternoon.

See you at 1:00 o'clock.  Thank you.

(Luncheon recess was taken at 12:12 p.m.)

PROCEEDINGS

**Afternoon Session**                                                   **1:00 p.m.**

(Proceedings were heard out of the presence of the jury:)

THE COURT:  Good afternoon.

We're back on the record.  Everyone may be seated.

The jurors had no questions for Dr. Pollock.  So will there be any further witnesses from EDD?

MR. LABGOLD:  We have no further witnesses, so at this time we'll turn the case back over.

And we've prepared another Rule 50 based on the invalidity positions.  Do you want us to hand that up or do you want us to just file it?

THE COURT:  Is that a motion that is already prepared to be filed?

(Pause in proceedings.)

THE COURT:  Then you may file it if there's a further motion.

MR. LABGOLD:  Yes.

THE COURT:  All right.  And next up will be back to SSC's side to call Dr. Moore?

MR. GOTTS:  Yes, Your Honor.

We will be getting our Rule 50 motion on file at some point today.  Is that okay?

THE COURT:  That is fine.

MR. GOTTS:  Even if it's after?

THE COURT:  Yes.

MR. GOTTS:  All right.  We'll be calling Dr. Pollock, Your Honor -- Dr. Moore, Your Honor.  Too many Pollocks on the mind.

THE COURT:  We can bring them both up at the same time, and it will be more exciting and we'll be breaking some new ground, but let's try the old-fashioned method of one at a time.  Our court reporter will probably appreciate that.

Let's bring in our jury.

(Proceedings were heard in the presence of the jury:)

THE COURT:  All right.  Good afternoon to our jurors. Everyone may be seated.

Dr. Pollock has been excused, although he might be recalled later in the case at a further stage.

(Witness excused.)

THE COURT:  At this point the baton of litigation is returning to the SSC side, and that is to respond on the issue of invalidity and also to rebut on the issue of infringement or noninfringement, and for that I turn it back to SSC.

MR. GOTTS:  Thank you, Your Honor.  SSC re-calls Dr. Duncan Moore, and Mr. Owens will be handling the examination.

THE COURT:  All right.  Dr. Moore, come on forward. You remain under oath from your prior testimony.  Welcome back.

**DUNCAN MOORE**,

called as a witness for the Defendant, having been previously duly sworn, testified further as follows:

THE COURT:  And you may proceed, Mr. Owens.

MR. OWENS:  And please let me know if you can't hear me.  Okay?

**DIRECT EXAMINATION**

**BY MR. OWENS**

Q.   All right.  Professor Moore, it's good to see you again.

So let's jump right in.  We're going to respond to some of the things that were brought up yesterday and today by Dr. Pollock.

So we'll start with infringement.  And you remember this yesterday from Dr. Pollock's testimony, he was talking about and criticizing your methodologies.  Why don't we start by going through that, and maybe we can start by talking about this table that was in his testimony yesterday.

They have question marks for BRO measured gaps.  Is that true?

A.   Well, they were measured in the range of 100 -- of 25 to 125 microns.

Q.   Okay.  And they call your 75 gap a fictional gap.  Is that true?

A.   It's not fictional.

Q.   Why isn't it fictional?

**A.**    Because we did the analysis from 0 to 125 to show that at 75 it was a perfectly okay one to use.

**Q.**    Okay.  In Dr. Pollock's reports and analysis, did you ever see a document that actually had the gaps listed in that right-hand corner?

**A.**    I did not.

**Q.**    And if we go to -- this is the 9879.  This is in evidence. This is DTX-1056.  Maybe you can explain how you did that 0 to 125 gap analysis.

**A.**    Yeah.  This is a fairly complicated plot, but it actually shows when you get total internal reflection.  And only look at the tops of the mountains because that's all you care about. Wherever the tops of the mountains are, you have total internal reflection.

And you notice that from 0, which is on the lower left-hand corner, to 75, which is in the upper middle, to 125, which is in the bottom right, they're essentially the same.  So there is no difference between whether you do it at 75, 125, or 0.

**Q.**    And that was consistent along the lenses; is that right?

**A.**    Yes.

        **MR. LABGOLD:**  Objection, Your Honor.  None of these slides were provided to us.  This was not in the information that was provided.

        **MR. OWENS:**  Your Honor, what we listed in our

disclosures to them were that we could use any of the prior exhibits.  We're just -- these are the prior exhibits -- I'm sorry -- the prior documents.  They said we could use any prior documents.

THE COURT:  What does "prior documents" mean?

MR. OWENS:  Any document that was in evidence.

THE COURT:  Is this document in evidence?

MR. OWENS:  Yes.

THE COURT:  As?

MR. OWENS:  As DTX-1056, Your Honor.

MR. LABGOLD:  This is a demonstrative.

MR. GOTTS:  No.  What we said, Your Honor, was --

THE COURT:  No.  One at a time.

MR. OWENS:  Sorry.

THE COURT:  Is this document in evidence?

MR. OWENS:  Yes.

THE COURT:  Yes or no.

MR. OWENS:  Yes.

THE COURT:  All right.  Then, what is the objection?

MR. LABGOLD:  We were not provided copies of the demonstratives so we could review them beforehand.

MR. OWENS:  Your Honor --

MR. LABGOLD:  The agreement was that --

MR. OWENS:  -- we provided all the demonstratives.  We just said -- instead of having to call Chris up and have him

put up the exhibit page each time, we just built them in.  They have all of our new demonstratives that we created.  We've just built in the actual document pages.

THE COURT:  The objection is that there's new information being presented?

MR. LABGOLD:  Yeah.  It's never been presented in this form, and we weren't given the agreement like the other demonstratives we've dealt with.  They haven't been disclosed, and they haven't had a chance to be objected to and addressed.

THE COURT:  Sustained.  Next question.

BY MR. OWENS:

Q.   Okay.  So going to this chart, what is your view on the ranges that you analyzed?

A.   The ranges I analyzed was 0 to 125 microns.

Q.   And where were Dr. Pollock's gap calculations?

A.   As shown there, they're at 170, 220, and 250 microns.

Q.   Okay.  And why don't we compare what you measured to what Dr. Pollock's gap calculations were.

A.   Yeah.  This is showing graphically where mine is 0 to 125, and the red dots are where Dr. Pollock used his calculations.

Q.   And this is a slide from Dr. Pollock's analysis from yesterday; correct?

A.   Yes.

Q.   And here he was criticizing your use of phantom emission points?

A.    Yes.

Q.    Okay.  And it says here "BRO measured LED widths," and they just have a question mark.  Did BRO actually measure the LED widths?

A.    I believe they did.

Q.    And what was the range?

A.    It was 2.2 to 2.5.

Q.    And when you did the analysis, did it -- was it at least 2.5?  Is that correct?

A.    No.  It does not say -- it was less than 2.5.

Q.    And what was the range?

A.    It was 2.2 to 2.5.

Q.    And the widths on this other side, are those consistent with your measurements?

A.    Yes.

Q.    And what does this show?

A.    This shows when the diameter of the LED is 2.0.

Q.    And you see that right there (indicating)?

A.    Yes, I do.

Q.    And when you presented your analysis last Thursday to the jury, did you separately explain that you did 2.0 and 2.2 and 2.5?

A.    Yes, I did.

Q.    And when you went through all of your claim infringement analysis for the 9854D and 9854E, what analysis were you

showing the jury?

A.    I showed them all of the possibilities from 2.2 to 2.5.

Q.    Okay.  And then when you did your specific claim infringement analysis just for the 9854E and '54D, which of the diameters were you using for those two?

A.    I used all of them again.

Q.    Okay.  So when you come to this chart, what ranges did you analyze of the diameters?

A.    I analyzed from 2.0 to 2.5.

Q.    And are Dr. Pollock's diameters within that range?

A.    Yes, they are.

Q.    Okay.  And why did you do that whole range?

A.    Because I wanted to be able to see what the effects were for different size LEDs because there was some uncertainty in some products about what the LEDs might be for a given lens. They may have varied from manufacturer to manufacturer.

Q.    Okay.  And you remember this from Dr. Pollock's testimony yesterday where he was pointing to this (indicating) and this (indicating) information as somehow being unreliable because it showed the full range.  Do you disagree with that?

A.    I do disagree with that.

Q.    And why do you disagree with that?

A.    Because it does show that -- I mean, for every single one of them it shows where the TIR -- or where the light is actually propagating from the LED.

Q.   Okay.  So let's go to issue three, which is another thing that Dr. Pollock brought up yesterday where he was again bringing up this issue we discussed before of how at your deposition these black and white transparencies were overlaid and they looked pretty similar to you.

A.   Yes.

Q.   And we went through this before, so we'll just show it before again.

Were they actually identical?

A.   No, they were not.

Q.   Okay.  Maybe at this -- it's churning.  There we go.

So they're not identical, are they?

A.   That's correct.

Q.   And you think Dr. Pollock knows that?

A.   I don't know.

Q.   So we go back down and we go to this slide (indicating).  This was in Dr. Pollock's analysis from yesterday.  He says this is inconsistent.  Do you disagree with that?

A.   Well, it shows that the -- that emission -- emission aperture of 2.0 millimeters, which is smaller than any of the LEDs in question here, we have total internal reflection on 9845 and not on 9879.

Q.   But these profiles are not identical; right?

A.   That's correct.

Q.   Okay.  We saw this yesterday as well in Dr. Pollock's

analysis.  Did you ever see this before in Dr. Pollock's expert reports?

A.   Not till -- I didn't see it at all until yesterday.

Q.   Yeah, okay.

So he provided this.  Which lens is this for?

A.   Well, this is -- for one lens it's 9845, which is not even in this case.

Q.   Okay.  So did they provide anything for the accused lenses?

A.   No.

Q.   Does that tell you something about this?

MR. LABGOLD:  Objection, Your Honor.  This is something he's never spoken about.

THE COURT:  Sustained.  Next question.

BY MR. OWENS:

Q.   And what is shown here?

A.   This is showing the original ray trace before the corrections were made for the thickness error and the ones after the correction was made for 9879.

Q.   And what happened?

A.   What happened was there was still TIR.  In fact, there was slightly more TIR after the corrections were made.

Q.   And what about the 9854D?

A.   There was no change there because that thickness was entered correctly.

Q.   So let's look at your analysis.  Why did you go about this analysis here?

A.   Well, it was a step-by-step way of getting to all the data that we needed in order to actually do the computer simulations.

Q.   Okay.  And who did you work with?

A.   I worked with three companies:  Breault, these -- ACT, and J.A. Woollam, all of which are specialists in their subfield for actually doing spectrology.  So that's their business, is to work on these particular measurements.

     And I guess I should say --

Q.   And --

A.   Just let me finish.

Q.   Sure.

A.   -- I think it's really important to use third-party people to do this that have no vested interest in the result of this. They're just doing it as professionals.

Q.   And how many hours did you spend just working on the infringement analysis with Breault?

A.   About 60.

Q.   And did you ever meet in person?

A.   I did.  I met him in Tucson in July, and we spent time working through the measurements that were made.  I actually measured some gaps in some light bars just to get some handle on doing that.

Q.   And how many other calls did you have with Breault before you issued your report?

A.   Oh, I don't know.  Six to ten.  I'm not exactly sure.

Q.   Okay.  So would you agree with Pollock's criticisms of your methodology?

A.   I would not.  I think I have a fairly sound way of doing this.

Q.   Okay.  Let's turn to infringement.  And as you recall from your testimony last week, you testified that Claims 1 and 6, all the elements were met by these light bars.  Do you recall that?

A.   Yes, I did.

Q.   So yesterday Dr. Pollock raised a few things that he thought were not met in the claims, and the first one was this "do not have generally parallel top and bottom surfaces."  Do you agree with that?

A.   I do not.

Q.   Okay.  So this is another exhibit they showed, and it showed the roughened edges -- roughened surface on the edge and a picture of one of their lenses; right?

A.   Yes, it is.

Q.   And they also showed you this top view of an engineering drawing of the lens, and then they compared it to our cross-section on the right.  Do you see that?

A.   Yes, I do.

**Q.**   And then they said for all three, there was no generally parallel top and bottom surfaces?

**A.**   I don't agree.

**Q.**   Okay.  So if we go from the top down in these engineering drawings to the cross-sections here, and these are in the same documents, what do these show?

**A.**   It shows at the very edge, so outside of the central region, on the top and the bottom, they're parallel surfaces.

**Q.**   Okay.  And then if you go to their specifications for these same lenses, what do those show?

**A.**   You see them -- see the generally parallel surfaces also at the outside of the optic.

**Q.**   So does it seem pretty consistent?

**A.**   Yes.

**Q.**   And here is a slide from your slide deck where you're showing those surfaces; right?

**A.**   Yes.

**Q.**   Okay.  So do you agree with Dr. Pollock's position?

**A.**   I do not.

**Q.**   So let's go to this next one, "Do not capture light rays for propagation between generally parallel top and bottom surfaces."  This is a slide from Dr. Pollock's deck.

     And he showed you this:  (reading)

         "BRO ray traces show only an initial reflection.

     There is no propagation."

And you may recall from yesterday he was saying that when the light comes down, it gets killed or dies on that surface. Does that make any sense to you?

A.    It would only make sense if it was black.

Q.    Okay.  And is it black?

A.    It is not black.

Q.    So what happens -- let's assume that's a smooth surface to begin with.  What's going to happen when it hits that surface?

A.    If it's a smooth surface, then it will totally internally reflect.

MR. LABGOLD:  Your Honor, objection.  He's presented no evidence of this, and there's nothing in his report about it.

MR. OWENS:  This is rebuttal and he has testified and provided his opinion that it goes towards the edges.  If he's not allowed to explain that in response to new testimony from Dr. Pollack, I'm not sure when he's going to be allowed the opportunity to do that.

THE COURT:  Sustained as to lack of foundation.

BY MR. OWENS:

Q.    Why don't we go back and establish the foundation.

How could you know what's going to happen?  And when you looked at these initially and you formed your opinion as to why this limitation is met, can you just explain to us why you believe that there is propagation between generally parallel

top and bottom surfaces?

MR. LABGOLD:  Same objection, Your Honor.

THE COURT:  Sustained.  The foundation does not include the conclusion.  It's a foundation from which you build.  So if you have a foundation, you can seek to establish it.  If it's a new conclusion, I'm going to be excluding it.  So maybe it will save your time, but I will allow you to try to establish a foundation.

BY MR. OWENS:

Q.   Okay.  Let's go to the next and final, "Do not exhibit TIR."  Do you agree with Dr. Pollock that these do not exhibit TIR?

A.   No.  They definitely do have TIR.

Q.   Okay.  And what do you think shows that?

A.   Well, shown there, you see the light bouncing off the surface.

Q.   And you see that there again?

A.   Right.  So you see the light propagating from the LED, and so -- oops.

You see the light propagating, say, from the left-hand side of the LED up to the right.  It TIRs off that surface and then heads down to the right and finally striking the bottom surface.

Q.   So what's your conclusion on Claims 1 and 6?

A.   The Claims 1 and 6 are infringed.

Q.   Okay.  Let's go to '554 patent, Claims 33 through 35.

And your opinion from last week was that these were met by the light bars.  Do you recall that?

A.   I do.

Q.   And Professor Pollock said that these did not contain a TIR surface, and above here is the Court's construction of the TIR surface.  Do you agree with Dr. Pollock's view?

A.   I do not.

Q.   And why not?

A.   Because it clearly shows total internal reflection.

Q.   Okay.  Now, let's walk through the construction there: (reading)

"A surface angled with respect to a light source to produce total internal reflection within a device."

Is that a surface angled with respect to a light source?

A.   Yes, it is.

Q.   And in your opinion, does it produce total internal reflection within a device?

A.   Yes, it does.

Q.   Okay.  Maybe you can explain.  Does it require, in your view -- and you heard Dr. Pollock yesterday -- does it require, in your view, for the entire surface to produce total internal reflection?

A.   No.  Only a subsection.

Q.   And why do you believe that?

A.   Because that's what I see.

Q.   Okay.  And what about the claims could help you understand why you would believe that whole surface would not be?

A.   Well, the claims only say some light must be totally internally reflected.  It doesn't -- it's silent on how much light has to be TIR'd.

Q.   So the other criticism that they had was that we did not show leakiness.  So that was the only -- the TIR surface was the only thing for Claim 30.

Turning to leakiness, which is to Claims 33 through 35, they said that the '554 patent defines "leakage" and they highlighted this portion down at the bottom (indicating).

Now, we've put lines over the top there.  What about that passage do you think helps us understand what "leaky" means in this context of the patent?

A.   Well, as Dr. Pelka said, the function of that upper surface is to eliminate the dark spots --

Q.   Okay.

A.   -- and the surface should be contoured in order to do that.

Q.   And how much light could pass through that surface in order to do that?

A.   Well, a significant portion of the light that's incident on the TIR surface.

Q.   Okay.  And in your view, could that reflect what you see

in the actual products?

A.    In this case, some of the light is emitted by the LED and hits that TIR surface and then leaks out.

Q.    And you'd agree that Claim 33, does it meet the "some light emitted by the LED" in your opinion?

A.    Yes, it does.

Q.    Okay.  So we had this, which was shown to -- if I can put it on the ELMO as well.  And this is Plaintiffs' Exhibit 321 for the record, and --

        MR. LABGOLD:  Objection, Your Honor.  I don't understand how this is rebuttal.  He was the first witness asked about it.

        THE COURT:  Overruled.

BY MR. OWENS:

Q.    So this was discussed during Dr. Pollock's testimony, and do you think this accurately reflects -- if we had light coming out of all area that's shown there, does this accurately reflect the amount of total internal reflection that's occurring?

A.    No.  It looks like what's happening is he's limited the amount of area in which TIR comes through maybe a single point, and then -- but he's taken light from the entire LED to make that black area.

Q.    Do you want to show us what happens?

        MR. OWENS:  With the Court's permission, Your Honor.

THE COURT:  What is the question, show us what happens?  Can you be more specific?

BY MR. OWENS:

Q.   Well, could you explain your answer by drawing on this what TIR you believe would be observed here?

THE COURT:  You can answer that.

THE WITNESS:  Do you want me to step down there?

MR. OWENS:  Sure.

THE COURT:  Now, this is plaintiffs' trial exhibit, so if you're going to mark plaintiffs' trial exhibit, you have to make a new exhibit.

Hold on a second before you mark it.  Are you making a new exhibit?

MR. OWENS:  Yeah.  We'll make a new exhibit, Your Honor.

THE COURT:  All right.  Is this the only copy of the existing exhibit we have?

MR. OWENS:  No, Your Honor.  It's a photocopy.

THE COURT:  All right.  Proceed.

MR. LABGOLD:  Thank you, Your Honor.

THE WITNESS:  (Witness drawing.)

BY MR. OWENS:

Q.   And would that account for all of the TIR you would observe?

A.   I'd have to go back and run a computer simulation to get

the exact number.

Q.   You'd agree it would be a lot more than what they showed?

A.   Yes.

Q.   And could even be a lot more than what's on this demonstrative?

A.   Could be.  I don't know.

        MR. OWENS:  Your Honor, we move this into evidence as DTX-1240.

        MR. LABGOLD:  I have some objection.

        THE COURT:  1240 is admitted.

     (Defense Exhibit 1240 received in evidence)

BY MR. OWENS:

Q.   Okay.  Let's go back to the slides.

     So you heard Dr. Pollock talk about how he observed no TIR in some of his analysis.  Looking at how the analysis was done, that was done at 170-micron gap?

A.   That's right.

Q.   In your measurements, did you ever find a gap that high?

A.   I didn't, nor did BRO.

Q.   Okay.  And what about this gap (indicating)?  Was that -- was the gap ever measured in any of the measurements that was that high?

A.   They were not.

Q.   And what about that gap (indicating)?

A.   They were not either.

Q.   Okay.  What was the highest gap you ever found in any of the light bars you measured?

A.   About 125.

Q.   So going to Slide 64 of Dr. Pollock's slide presentation from yesterday, he also said that the apparent total internal reflection simulation was theoretical, not measurable, and unobservable.  Do you agree with that?

A.   I do not.

Q.   And why not?

A.   Well, the ray trace analysis has been a well-established method of determining what the properties of an optical element are.  They've been around for decades -- well, actually, more than a century now, and so the idea that you can simulate exactly what's going on is well established.

Q.   And you heard about the power analysis that Dr. Pollock did where he came up with these numbers here.  What's the -- did the claims actually require a specific amount of total internal reflection?

A.   It does not.

Q.   Okay.  None of the asserted claims do?

A.   That's correct.

Q.   Are there other claims of the '554 patent that talk about the amount of TIR?

A.   Yes, there are.

Q.   And what's an example of those claims?

A.    38.

Q.    So assuming this was relevant, if -- do you think this accurately describes the amount of -- the percentage of TIR you would actually be concerned about in looking at how much TIR is coming off the TIR surface?

A.    I don't know.  I've never done the calculation.

Q.    So this particular calculation, though, do you know, on page 65 of Pollock's slide deck and from PX-92, does this actually reflect the amount of light that's just directed at the TIR surface?

A.    I don't know.  I've never done the calculation.

Q.    Okay.  So looking at this, what was your position on Claims 30 through 35 -- 33 through 35?

A.    My position is they are infringed.

Q.    So let's go to the '209 patent, Claim 20.  And what was your position on these?

A.    That all five of the -- or, actually, six using the same lenses are infringed.

Q.    And Dr. Pollock from PX-92 showed you -- Slide 70 -- he showed you a figure from the '209 patent; correct?

A.    Yes.

Q.    And do you believe that Claim 20 is limited to just this embodiment?

A.    No, it's not.

Q.    Okay.  And you testified during your examination about the

aperture.  Do you recall that?

A.    Yes, I did.

Q.    And what did you say about the aperture?

A.    The aperture is -- I don't know how I'm going to point to it.  Do we have --

Q.    Maybe this would help (indicating).

A.    Yes.  That's the aperture.

Q.    Okay.  And what did you base that understanding on?

A.    Basic understanding of optics.

Q.    Is that consistent with what one of ordinary skill at the time would have understood?

A.    Yes, it is.

Q.    Okay.

A.    More specifically, it's where the light comes out of the display.

Q.    And the criticism in particular that Dr. Pollock raised was these particular LEDs and light sources weren't around the perimeter of the aperture.  Do you recall that?

A.    Yes.

Q.    And is there anything about the claims that talks about the location -- inside or outside -- whether those LEDs and light sources are inside or outside the perimeter?

A.    Not in this claim.

Q.    Okay.  Are there other claims?

A.    There are other claims that specifically have the LEDs

outside of the aperture.

Q.   Okay.  So having LEDs around the perimeter aperture as you show here, is that consistent with your understanding of Claim 20?

A.   Yes, it is.

Q.   If we looked at the '209 patent, is there portions of that that talk about the flexibility in defining that aperture?

A.   Yes.  It says it can have many different apertures in part of the display sizes.

Q.   So what's your final opinion on this?

A.   My final opinion is all six televisions infringe.

Q.   And you disagree with Dr. Pollock's view?

A.   I do.

Q.   Okay.  So let's turn to validity.  And here is the '209 patent, and let's go to this chart here (indicating).  This is DDX-6-021.

And let's talk about Gleckman first.  What is Gleckman missing that the '209 patent requires?

A.   He's missing a series of lens surfaces on the back surface -- on the bottom surface.

Q.   Okay.  And Dr. Pollock agrees that even Gleckman doesn't explicitly disclose that; right?

A.   Multiple ones, yes.

Q.   So Dr. Pollock put up the claims side by side and compared them and showed the similarities there; is that right?

A.   Yes.

Q.   And the distinctions are in C and D.  And in D in particular, the difference is emitted by plural light sources mounted on said internal bottom wall and around the perimeter.  Is that -- how important is that distinction?

A.   That's the key distinction for this claim.

Q.   And is it important for the patent?

A.   Absolutely.  It's the underlying principle here in order to -- in order to achieve large displays.  Without that, you're not going to get a large display with uniform distribution.

Q.   So let's talk about Gleckman in particular.  What did Gleckman disclose?

A.   He did lighting shown in yellow around the perimeter outside of the aperture.

Q.   Okay.  And this is DDX-6, page 23, and we're looking at Gleckman, Figure 13, PX-20.

A.   Right.

Q.   Is there anything larger than this described in Gleckman?

A.   You mean physical size?

Q.   Uh-huh.

A.   I think the biggest one was about an inch.

Q.   Okay.  And let's first talk about Dr. Pollock talked about how just using Gleckman alone based -- combined with the common understanding of one of ordinary skill back in 1997, it would have just been obvious to put lights on the back in some way.

Do you agree with that?

A.   There's no reason to put lights on the back.  You've already solved the problem with perimeter lights for a very small display.  Remember, this display is going to be mounted on your head, so it's not like you need a display this big (indicating) to do it.  So for a display that's only an inch in aperture, perimeter lighting alone is good enough.

Q.   Well, why don't we expand this a little bit and think about if -- and we've been talking about the ceiling quite a bit, so why don't we try to use that like the plaintiffs have; and they've been talking about creating a large display, and this is a perfect example of that.

So if we put a diffuser panel and brightness-enhancing film across this whole thing and you had something this size, not the middle lights but the lights along the edge, and you tried to practice Gleckman doing that, what problems would you have?

A.   Well, you'd have exactly what you see here.  You see the light coming out from the perimeter maybe 18 inches; and after that, it's quite dark.  So if you really wanted to make a really large display for virtual reality or something, it definitely wouldn't work.

Q.   So here we kind of show -- we're expanding that up to the size of an actual display.  Just having that hollow and nothing in there, do you agree that that would work very well?

A.   No.  You'll see exactly what you see here, just different scale.

Q.   Okay.  And Dr. Pollock said that you could fix that -- so back up.

Would you agree -- just based on Gleckman alone combined with the ordinary skill in the art, would you agree with Dr. Pollock that that would be something obvious?

A.   I do not.

Q.   So the other option that we had was -- that Dr. Pollock described -- and this is the art he selected -- is taking Osawa and combining that with Gleckman.  What's the problem with Osawa?

A.   Well, they're filling the whole cavity with resin, and so you're going to make the thing a whole lot heavier than it was. So if you imagine filling this whole ceiling with resin, you might not want to stand underneath it.

Q.   Right.  Are there any televisions today that use resin fill like that?

A.   Not that I'm aware of.  I don't know why you would.  It would cost you more.  It would be heavier.  I'd see no reason you'd ever do it.

Q.   And Dr. Pollock talked about how it says "cavity" here, but he said that could be an optical cavity.  Does that make sense to you?

A.   The only optical cavity I'm aware of is a laser cavity.

**Q.**   Is there anything in the patent that tends to support that the cavity would encompass an optical cavity?

**A.**   No, there's nothing in there.

**Q.**   Okay.  How is that cavity described throughout the patent?

**A.**   It's described as having four sides and a bottom.

**Q.**   And as having openness there describes --

**A.**   It's all air.

**Q.**   Okay.  So going from Slide DDX-6, page 26 to 27, what does that show with Osawa?

**A.**   Well, that's showing you top section and cross-section what happens if you fill with resin.  So the resin now has scattering particles -- scattering materials in it so that when it comes out of that surface, it's diffused through reflecting, so there would be no need for the diffuser.

**Q.**   Okay. And this is PX-216.

**A.**   Okay.

**Q.**   So going to Slide 28 of the demonstratives, Takeichi.  Is Takeichi any better than Osawa?

**A.**   Not really.  It's got the same problems.

**Q.**   What are those problems?

**A.**   Well, now what you have is a multiplicity of cavities, each one -- over each one of the LEDs.  So you don't have the sidewalls in the same way as you have sidewalls in '209.

**Q.**   So do any of these combinations appear to be something that one of ordinary skill in the art would have motivation to

combine?

A.    I would not think so.  It doesn't make any sense to do it.
It doesn't even -- it doesn't make sense today even in
hindsight.

Q.    Okay.  And at that time even if you had combined them, do
you think you'd actually be practicing the '209 patent?

A.    The '209 patent?

Q.    Uh-huh.

A.    With these --

Q.    With combining these two.

A.    No.  No, no.

Q.    Okay.  So your overall opinion is as it is here; is that
correct?

A.    That's correct.

Q.    And your view is that one of ordinary skill would not
combine these references?

A.    That's correct.

Q.    So let's go to the '554 patent, and this -- let's start
with Johnson.  And, as you know, as you saw this morning,
Johnson is being asserted against Claims 1, 30, 31, 33 through
39, 41 through 43, and 45 through 48.

A.    Yes.

Q.    And this is a slide, Slide 101, from Dr. Pollock's
presentation, and he opined that those were invalid.  And what
do you think that Johnson is missing?

A.   He's missing the illumination coupler, which the coupler is a key invention of the '554 patent where you're going to be having a second surface.  So you have the LED, it's in air, then it's refracting into the device.  When it refracts in, it's diverging the light so that when the light strikes the second surface, it will disperse more readily.  That doesn't happen when you have encapsulation.

Q.   So going from Slide 34 of our presentation to Slide 107 of Dr. Pollock's presentation, what is he pointing to here as being the illumination coupler?

A.   He's showing just the top surface as the illumination coupler.

Q.   Okay.  And this is a Slide DDX-4, page 100, from your original presentation.  What's important about the illumination coupler?

A.   The important thing is that the LED and the optic are separated from one another, and that there's a refracting surface that's allowing light to be diffused -- to be refracted.  As you enter -- the light coming from the bottom from the LED is entering there, so you're getting refraction to spread the light out more.

Q.   And let's talk a little bit about what Johnson is.  What is the purpose of Johnson?

A.   Johnson is a very old patent.  It's from the '70s, 1973, and those of us who are old enough to remember phones at that

MOORE - DIRECT / OWENS

time, they were very different than the phones we carry around with us today.  But we had to -- they wanted to have phones so that you could see the dial in the darkness, and so this was part of that whole era, if you will.

Q.   And going from Slide 35 to 36, you see this is a figure -- PX-65, this is Figure 4 of Johnson on the left there.  Does this show where what Dr. Pollock was calling the illumination coupler is located?

A.   Yes.  So you see the numbers would be in little circles that are just circles, so those would be numbers 1 through 0 and pound sign, and the source is in the middle, but you'll notice those sources are behind the faceplate.  So you never saw those sources in the television -- I'm sorry -- in the telephone unless you took the thing apart.

So now the key element here -- the thing that's not here is the illumination coupler.

Q.   Okay.

A.   And we don't have that refracting surface to take the light and spread it out.  Also, we've got the LED encapsulated in the material, so we've got the whole issue of heat going on.  That wasn't a big deal in 1973 because the LEDs were, frankly, not very bright.

Q.   Do you think Johnson in general, based on what you think, is very helpful for displays?

A.   No, it wouldn't, unless the display was extremely small.

Q.    So --

A.    And even then -- I should have finished.  Even then, it's going to have a dark spot in the middle.

Q.    Right.  So let's go to Slide 42 of your slides.  Does this summarize your opinion on Johnson, Claim 1?

A.    Yes, it does.

Q.    And your opinion is?

A.    That it is not anticipated.

Q.    Okay.  So let's turn to Claim 30.  What is the problem with Johnson in Claim 30?

A.    Well, in Claim 30 it requires the LED to be beneath the optical element.  It's in the middle of the optical element, not beneath it.

Q.    Is that something that is, as you said before, important for the '554 patent?

A.    The '554 patent, as I said before, that's a very important part of the device.

Q.    So "beneath the optical element" is a part of Claim 30?

A.    Yes.

Q.    And also Claim 30 talks about "beneath the central portion of the optical element."  What do you think about that limitation?

A.    Well, in that case the LED -- it's actually two LEDs in this case, are mounted to the left and the right of the centerline.

Q.   Okay.  So you would disagree with Professor Pollock's view that Claim 30 is anticipated; correct?

A.   I agree.

Q.   So let's turn to Johnson, Claim 30; Dr. Pollock, Claim 38.

A.   Okay.

Q.   And he opined that Claim 38 was anticipated by the Johnson patent.  Why do you disagree with that?

A.   Well, it says "a light-emitting diode lying substantially on said axis," and it's not on said axis.

Q.   Okay.  Sorry.  Let me go back.

     This is Slide 127 of Dr. Pollock's report.  And this is talking about the axis he drew; correct?  The green line?

A.   About the axis, that's right.

Q.   Okay.  And you recall from today Dr. Pollock was citing to parts of the specification to try to say that even though it shows the LEDs to the side, it could be in the center.  Does that make sense to you?

A.   My understanding is when there's only one, it's to the left or right.

Q.   And why is that?

A.   I think that's according to the specification.

Q.   Okay.  And why do you think that would be important given where those little what they call illumination couplers are located?

A.   Well, you're trying to direct the light out in two

separate directions from two different sources.

Q.   Right.  And where are those illumination couplers located?

A.   They're between the 4 and 5 -- 4 and 5, 5 and 6, and 7 and 8, and 8 and 9.  They're right in the middle.

Q.   Can you even see them?

A.   No.  No.  That would be -- that's -- you know, having it be dark there makes no difference.

Q.   Okay.  So is it important either way -- or would it make sense to have light coming out of the top of the Johnson illumination coupler?

A.   It wouldn't.  There would be no reason to do that.

Q.   Okay.  So let's turn to Claims 33, 42, 43, and 45 of the '554 patent, and these are claims that discuss leakiness.  And as you recall, Dr. Pollock opined that Johnson demonstrated this.

A.   Uh-huh.

Q.   Do you agree with that opinion?

A.   I do not.

Q.   Okay.  And why do you disagree with that opinion?

A.   Well, the whole system was designed for the purpose of sending the light out left and right, if you will, because there was no reason to have light come out the top.  And so the design goal was to get them to go out in a circumference way, and so there would be no reason to design in leaky.

Q.   And is that shown in Slide 40 of DDX-6?

A.    Yes.   The jury is probably getting tired of seeing the black dots and the white dots, but here we are again with the black dots.  You see that it's black in the center now.

Q.    And this is from PX-65, the Johnson patent.

A.    Yes.

Q.    And this is another figure from Dr. Pollock's analysis. Is this also demonstrating the same point you were raising?

A.    Yes, it is.

Q.    And what does this show?

A.    It shows the dark spot again.

Q.    Okay.  And what's on the left there?

      MR. LABGOLD:  We've never been provided this.

      THE COURT:  Is that an objection?

      MR. LABGOLD:  Objection, Your Honor.

      THE COURT:  What's the foundation?  Where is it coming from, Mr. Owens?

      MR. OWENS:  This is just an annotated version of --

      THE COURT:  Sustained.

      MR. OWENS:  Okay.

Q.    DDX-6-041, Slide 44, DDX-6, does this support your view that Johnson does not disclose a leaky TIR surface?

A.    That's correct.

Q.    Okay.  Is it for the same reasons we've been discussing before?

A.    Yes.

Q.   So let's summarize on Johnson in Claims 1, 30, 31, 33 through 39, 41 through 43, 45 through 48 of the '554 patent. In your view, based on what we discussed, does Johnson anticipate any of those claims?

A.   No, it does not.

Q.   Okay.  So let's talk about Stanley.  This is Slide 44 of the demonstratives, and does this slide summarize your view as to why Stanley does not anticipate Claims 30 and 31?

A.   This summarizes it does not.

Q.   And what are the reasons that you believe Stanley does not anticipate those claims?

A.   Well, we need a top and bottom opposing sides.  We need the LED mounted at a predetermined location behind the central thing -- the central portion, and said optical element such as light from the LED enters the optical element.  So it has to enter it.

Q.   Okay.  And when they talked about Stanley, I think even Dr. Pollock agreed that LED was encapsulated.  Is that important?

A.   It's important for this particular claim, yes.

Q.   And they did -- I think it was in passing he just argued that it could be just that top portion.  Did you see that?

A.   Right, but the optical element is the entire device as shown here.

Q.   Would it make sense to just treat that top portion, in

your view of Stanley, just as the optical element?

A.   No.   There's a top and bottom surface.

Q.   And what's described in Stanley as the optical element?

A.   In Stanley the optical element is defined as the -- everything that's enclosed in the red.

Q.   Okay.  So just as an example -- and we'll go through these quickly -- if we had a top side there (indicating), sort of an imaginary -- going from Slide 50 -- 49 to 50, if we had -- drew a line there -- and this is through the surface; is that right?

A.   Yes.   That line is not in the drawing.

Q.   Do you agree that would be a bottom surface of the optical element?

A.   No.   The bottom surface is down there at the bottom.

Q.   Okay.  So that's your view of what makes sense is the bottom surface; correct?

A.   That's correct.

Q.   And this is page 51 of our slides; right?

A.   Yes.

Q.   So this is just an example of arbitrarily dividing up bottom sides and top sides.  Would it make any sense, for example, on a chair leg, to just slice through it arbitrarily to define that as a bottom side?

A.   It doesn't make any sense to me.

Q.   Okay.  So in sum, this is page 83 of your slides, what's your view on whether Stanley anticipates Claims 30 and 31?

A.    It does not anticipate.

Q.    All right.  And it doesn't anticipate Claim 31 because it doesn't anticipate 30?

A.    That's correct.

Q.    Okay.  So you heard Dr. Pollock talk about Stanley and Rohm.  Do you recall that?

A.    Yes.

Q.    So let's go from Slide 57 to Slide 58.  This slide, does this slide summarize your view as to why Stanley and Rohm would not be combined?

A.    Yes.

Q.    Okay.  So let's walk through this.  Slide 148 of Dr. Pollock's presentation he showed that -- on the top on the right I believe is Stanley, and then he showed this Figure 3 from Rohm on the bottom.  Do you see that?

A.    I do.

Q.    And let's go to Rohm.  In Rohm what's shown in Figure 1?

A.    Figure 1 is showing what the invention is for the Rohm patent.  That's what they're trying to get to, in the same way as Stanley is trying to get all the light to go this way (indicating) and not having light come out the back -- out the top, rather.

         MR. LABGOLD:  Objection, Your Honor.  Lacks foundation again.

         MR. OWENS:  I believe you have the slide.

MR. LABGOLD: I'm not talking about the slide. I'm talking about the opinions. The opinions in his report vary from this.

MR. OWENS: He's talking about what the patent describes, Your Honor.

THE COURT: Overruled. Proceed.

BY MR. OWENS:

Q. And what does the patent say about Figure 3?

A. Figure 3 says you don't want to do this.

Q. Why not?

A. The light is too bright coming out the front. It's acting like a negative lens, so the light coming out the front is very, very bright.

Q. So what does Rohm tell you to do?

A. Rohm told you to put a V in the top and send all the light out to the right and the left.

Q. Okay. And what would that look like from the top?

A. It would be, once again, a dark spot.

Q. And what would Figure 3 look like from the top?

A. It would be back to your bright spots.

Q. All right. Do you think Rohm ever talked about finding the happy medium?

A. They did not.

Q. So this is what Rohm actually disclosed; is that right?

A. Yes.

Q.   Okay.  So do you believe there would be any motivation to combine Rohm and Stanley to create a leaky TIR surface?

A.   No.

Q.   So what's your overall opinion on whether Stanley and Rohm could render obvious Claims 33 through 35 of the '554 patent?

A.   It does not render them obvious.

Q.   Okay.  So going from Slide 44 -- I'm sorry -- DDX-66 -- page 6 of DDX-6, let's turn to JP-161.  And does this summarize your view as to why you believe JP-161 does not anticipate Claims 1 and 6?

A.   Yeah.  The key element is, again, no illumination coupler. You don't have that refracting surface at the bottom which allows the light to be refracted at that surface as we talked about earlier today.

Q.   And can you remind us about the illumination coupler?

A.   Again, you see the LED is separated from the surface with an air gap which causes the refraction into the illumination coupler.

Q.   So JP-161, if you look at that, what is -- why is JP-161 missing an illumination coupler?

A.   It's missing the air gap in the refracting surface.

Q.   So what's happening down at that bottom where that LED is?

A.   I'm not understanding what you're asking me.  What's happening?  The light is coming out of the LED.

Q.   Okay.  Well, how is it integrated with that lightguide

there?

**A.**    Well, it's formed into it.

**Q.**    So we turn from Slide 67 to 68.  There's very little description in JP-161 of this particular embodiment.  We have this figure.  What's your interpretation of the dotted lines and the other lines here?

**A.**    You're right, there's very little description, like it's all in one or two sentences.

**Q.**    Right.

**A.**    So the yellow light is designating the light coming off the LED.  It strikes the surface in the V.  Okay.  It totally reflects off that.  Then it propagates to the top surface where the red arrow and the yellow meet.

There is a dashed line after that that's highlighted in red, which would indicate some of the light is refracting out of the surface.  So some light is escaping at that point.  Some of it seems to be reflected because it's going down.  As the yellow ray is going down to the right, it strikes the bottom surface, then heads up to the right striking the right-hand surface, and then going back up towards the top surface where, again, when it strikes that surface, part of the light seems to be reflected down and some seems to be transmitted out.

**Q.**    So is that total internal reflection?

**A.**    It is not if the light is coming out.

**Q.**    Okay.  And what is that called?

**A.**    It's called Fresnel reflection for the light going down, and it's refraction when it goes out.

**Q.**    So that is not using total internal reflection to capture?

**A.**    Not if the light is escaping.

**Q.**    Okay.  So in summary, does Slide 70 of your slide deck summarize your positions on why JP-161 does not anticipate Claims 1 and 6?

**A.**    That's correct.

**Q.**    And what is your view as to whether JP-161 anticipates Claims 1 and 6 of the '554 patent?

**A.**    It does not.

        **MR. OWENS:**  Just one second, Your Honor.

                (Pause in proceedings.)

        **MR. OWENS:**  All right.  Thank you, Professor Moore. No further questions.

        **THE COURT:**  Cross-examination.

        **MR. LABGOLD:**  Thank you, Your Honor.

                **CROSS-EXAMINATION**

**BY MR. LABGOLD:**

**Q.**    Good afternoon, Dr. Moore.

**A.**    Good afternoon.

**Q.**    Let's start with JP-161 while it's fresh in all of our minds.  If you could open -- oh, do we have a binder for him? It's on its way.

        And for the jury, PX-204.  We're going to look at PX-204.

A.    I'm sorry?

Q.    PX-204.

A.    (Witness examines document.)

Q.    And did you read the entire reference?

A.    At some points I've read the whole thing.

Q.    Okay.  Let's take a quick look at page 6.  This is the JP-161.

A.    Page 6 or Column 6?

Q.    Page -- no, no.  204.  That's JP-161.

A.    Sorry.  DTX-104?

Q.    No, no.  I want PX-204.

A.    PX.

Q.    And we're going to look at the paragraph that bridges the two pages and the next paragraph after that.

A.    (Witness examines document.)  I'm sorry.  What page now?

Q.    Page 6 of the English.

A.    Okay.

Q.    Do you see at the bottom where it says -- the last paragraph that's going to say:  (reading)

        "Furthermore, it is possible in one in which the light from the light-emitting diode is totally reflected by the translucent member at the central area thereof, as shown in Figure 7..."?

A.    Yes.

Q.    Does that clarify for you that JP-161 is talking about

total internal reflection?

A.   (Witness examines document.)  I'm a little confused by the use of the word "translucent" as opposed to "transparent."

Q.   I'm asking about the "totally reflected" part.

A.   It says "totally reflected."

Q.   Right.  And Figure 7 is the figure which we've been talking about?

A.   Yes.

Q.   And you said that you thought that the LED was molded into this?

A.   No.  I believe it's inserted into.

Q.   It's inserted into?

A.   Right.

Q.   And if you want to make sure that there's no air gap, you can use some kind of a transparent optical adhesive?

A.   That's correct.

Q.   And it discusses that as an option; correct?

A.   I'm sorry?

Q.   It discusses that option in here?

A.   It discusses that as a way to do it.

Q.   Now, with regard to the emission, you seem -- I think we're saying that that was Fresnel reflection is the only way the light is getting out?

A.   The only way light can get out is Fresnel reflection, and so the light that's not reflected then refracts out.  So some

of the energy that's striking the surface, some can be reflected, that's called a Fresnel reflection, and the part that goes out is called a Fresnel refraction, the part that escapes.

Q.   Okay.  Well, let's take a look at page 4 of the English and the paragraph under "Operation and Effect."  And about halfway down we're going to see all the way on the right-hand side it's going to start talking about:  (reading)

        "A part of the reflected light is again repeatedly
        transmitted and another is reflected a number of times at
        the reflective layer..."

     Do you see that?

A.   Yes.

Q.   (reading)

        "... and then the reflected light, which has been
        reflected at the translucent member exits from the front
        surface."

     Do you see that?

A.   Yes.  And before that it said it's repeatedly transmitted. A part of the reflected light is again repeatedly transmitted and part is reflected.

Q.   And after the portion that's been reflected, some of that is going to be allowed to escape; correct?

A.   Some of it will escape.

Q.   Right.  Because that says after it's reflected a couple

times, it will then be able to leave?

A.   It's got to leave sometime in order to illuminate anything.

Q.   Now, going back in the order in which we started, very quickly on the infringement issues, with regard to BRO, you were asked if they measured the -- on the 0.75, the -- you still don't know what the actual gap is for --

A.   We know it's in a range.  Depending on the light bar, it's in the range of 25 to 125 microns.

Q.   For an individual TV, the one that had the 4922 in it, what is the gap?

A.   I do not know for that particular lens.  I don't know the range, but it's within 25 to 125.

Q.   Okay.  For any of the specifics, if I go through the exercise, will you know what the specific one was measured at?

A.   I will not.

Q.   Now, with regard to the LEDs, what is the specific diameter that was used in the model that you examined that had the 9879?

A.   That's either 2.2 or 2.3.

Q.   Okay.  Which one is it?

A.   I don't remember.

Q.   And what is the actual measurement for the 9853A?

A.   '53A is not in this case anymore.

Q.   Okay.  What about for the 9854D?

**A.**   That's 2.5.

**Q.**   And what about for the 9854E?

**A.**   It would be the other one.  The one that was before when I wasn't sure whether it was 2.2 or 2.3, it would be the other one.

**Q.**   Now, you said that on the testimony that you were told there were variances from manufacturer to manufacturer; is that correct?

**A.**   Variances of what?

**Q.**   Of the LED that might be used.  That was part of the reason for using a wider range?

**A.**   That's correct.  Different manufacturers will have different LEDs.

**Q.**   But with the same lens?

**A.**   They could have -- there could be different LEDs coupled with the same lens.

**Q.**   So unless we actually look at the individual TV, we won't know what LED is being used in it; correct?

**A.**   We would have to tear them apart.

**Q.**   And you've seen no indication of any systematic way we can make that determination, do you, other than tearing them apart?

**A.**   Sitting here, I don't know of a way to do that.

**Q.**   One of the things that you've told us is that BRO did the measurements.  So in number one they measured the gap; correct?

**A.**   Yes.

MOORE - CROSS / LABGOLD

Q.   And then in step seven, they entered that value into the software; correct?

A.   As I've said to you many times, we did an analysis of 0 to 125, and we then entered 75 microns.

Q.   Okay.  So this is clearly not true with regard to number one, this being your Slide DDX-7-013.  They didn't enter that value; correct?

A.   What we did is we did an analysis of everything from 0 to 125 and found no difference.  So I could put 75 in, I could put 50 in, I could put 100 in, but we chose one value of 75.

Q.   Fair enough.

Now, you removed the lens from the light bar and you measured the LED diameter; correct?

A.   Yes.

Q.   And then it says that you entered those results into the software; correct?

A.   Correct.

Q.   Okay.  So now for one of them, which we're not sure, 9879 or 9853A, that's going to be 2.2; correct?

A.   That's -- I'll assume you're right.  Well, I don't know which one.  I've forgotten which one's 2.2 and which one's 2.3.

Q.   Okay.  And I'm just going to say -- we'll just accept for the moment that one of them is 2.2.

A.   I'll accept that.

Q.   Now, that's entered into the software?

**A.**   Yes.

**Q.**   And that's supposed to be a realistic simulation of what's happening in real life; correct?

**A.**   Yes.

**Q.**   And the software doesn't change things from reality; correct?  If you want to take something that's not in that system as you've measured it, you'd have to add that by hand; correct?

**A.**   I'm not sure what you're saying.

**Q.**   Well, you put the profile data in there and you're expecting it doesn't change; correct?

**A.**   The profile of the surface?

**Q.**   Yeah.

**A.**   Yes.

**Q.**   Okay.  And so you put the gap in, and you're expecting it doesn't change; correct?

**A.**   That's correct.

**Q.**   So how did you guys get the ray trace for the lens that has a 2.2?  How did you get an illumination point at 2.5 if it doesn't actually exist?

**A.**   What you do is when you enter the data, you enter what's called the object height, and then you can do fractions of the object height.  So, say, for example, you put 2.5 in.  Then what you would say is, okay, I don't need to trace every object point from 2.5 to 2.0.  You then say -- you enter in I'm going

to trace it at 80 percent of 2.5 or 50 percent of 2.5 or 95 percent of 2.5, and you just trace those points.  And when you trace those points, you then can understand what's going on between all of the points, so it gives you a measurement of all of those.

Q.    But that couldn't be based on what was actually measured and put into the software; correct?

A.    Yes, it is.  That's exactly what happens.

Q.    Now, you said on your testimony just now on direct that you believe it's a TIR surface because it has TIR; correct?

A.    Yes.

Q.    And so if that has TIR, it's a TIR surface; correct?

A.    That is defined as a TIR surface.

Q.    Now, in these slides that you did, these have a completely flat top; correct?

A.    That's correct.

Q.    So it's like a sheet of glass; correct?

A.    That's correct.

Q.    There's no cusp whatsoever, there's no incline; correct?

A.    No, but there is a refracting surface at the bottom.

Q.    I'm focusing on the pink line at the moment.

A.    That's right.

Q.    And are we correct to understand that at the top here (indicating), the light is hitting this black surface, which is just like it's a piece of glass, and we're getting total

internal reflection; correct?

A.   Yes.

Q.   So that's a TIR surface; correct?

A.   It is TIR, yes.

Q.   You also said that the leakiness in the '554 patent is for a purpose.  It's to correct for the dark spots; correct?

A.   That's correct.

Q.   Now, what documents have you seen about these little lenses that EDD makes that shows that there was ever a dark spot?

A.   We traced the rays to show there was a TIR surface.  We're not -- I'm not -- I don't think there is a dark spot in this lens.

Q.   That's because 90 -- at least 95 percent -- I know you're not going to give us an exact number; but, come on, you know that 95 percent plus is coming through, don't you?

A.   I do not know that.  I've never done the calculation.

Q.   90 percent plus?

A.   I don't know the answer.

Q.   80 percent plus?

A.   I don't know the answer.

Q.   Now, but just to clarify, you haven't seen any documentation that ever showed that EDD had a lens that had a cusp or a deep incline where anything ever showed a dark spot that needed to be corrected; correct?

A.   All I know is it's got total internal reflection.  I don't know it doesn't have -- I assume it doesn't have a dark spot.

Q.   Now, let's start talking about some of the validity positions.  Claim 20 of the '209 patent talks about a method; correct?

A.   Yes.

Q.   And you're saying that the cavity, first of all, has to be an air cavity; correct?

A.   Yes.

Q.   Where in the claim does it say "air"?

A.   I think one would understand from the diagrams that it's an air cavity.  There's no concept of filling the thing up with anything other than air.

Q.   And so when -- well, let me ask you this:  How many times in the '209 patent does it say the word "air"?

A.   I have no idea.  I never -- I've never counted it.  I've never looked.

Q.   Would it surprise -- you didn't look.  Would it --

A.   I never bothered to count the number of times any word was used.

Q.   Would it surprise you to know it's never used once?

A.   Okay.  I accept that.

Q.   Now, let me give you a hypothetical.  Let's say you take one of the accused TVs, one of the TVs that you believe is infringing -- okay?

A.   Yes.

Q.   -- any one of them with the cavity just like we've seen, and you fill it in with a resin.  Will that still be infringing?

A.   So you're filling the whole thing in with resin.  I think it would.

Q.   That's because the claim says "comprising"; correct?

A.   My understanding "comprising" means that plus other things.

Q.   So the claim requires that the accused device, or in this case accused method, someone practice each and every step; correct?

A.   Yes.

Q.   But if they practice other steps, that doesn't mean that it stops falling within the claim; correct?

A.   That's correct, because there are other -- for example, there are other films that are added to it.

Q.   So if it infringe -- if it would infringe with the resin before -- I mean, now, in current time, if it would be infringing, you do understand that if it existed before the patent, it would anticipate?

A.   You're going to have to restate the question.  I don't quite understand.

Q.   Well, what in Claim 20 are you pointing to when you say that it has to be an air cavity if filling it in, it will still

be infringing?

A.   I don't believe there's any description anywhere in the patent that describes anything other than it being a void. There's no description -- written description that says it's going to have resin or water or glass.

Q.   Now, let's see, let's talk about Stanley.  With Stanley the only issue you have concerning whether -- we're not here anymore.  That's right.  We dropped that.

So here we have Stanley.  The position is that the LED has to be below the entire device?

A.   That's correct.

Q.   And you're basing that on the language of Claim 30; correct?

A.   Yes.

Q.   Does Claim 30 say that the LED has to be below the entire optical element?

A.   It says "beneath."

Q.   Well, I should say, does it say that it has to be below the entire optical apparatus?

A.   See, it says "it must be beneath the central portion of said optical element."

Q.   "Beneath the central portion."  That is exactly where we want to go.

Now, you also have opined with regard to Claim 38; correct?

**A.**    Yes.

**Q.**    We're going to see that again in the context of Johnson, but in Claim 38, we have, "a curved shape that is symmetrical about an axis and converges to a location in a central portion of the optical element"; correct?

**A.**    Yes.

**Q.**    And the central portion of that optical element is not below the entire device; correct?

**A.**    I'm not sure -- I didn't understand what you said.

**Q.**    The central portion of the optical element is not below the entire device?

**A.**    The central portion is the central portion of the thing. Think of it being a core of an apple.

**Q.**    Do you recall at your deposition when we talked about where the central portion was?

**A.**    This is a copy of the patent.

**Q.**    Yes.  Do you remember we were talking at your deposition about Figure 16A, and I asked you --

            **MR. OWENS:**  Objection, Your Honor.

            **THE COURT:**  To?

            **MR. OWENS:**  He needs the deposition in front of him, Your Honor.  Could he have the deposition in front of him, Your Honor?

            **MR. LABGOLD:**  Absolutely.

**Q.**    It's right in the front of your binder.  You're going to

want to go to page 64.  I'm not going to use it yet, though.

A.   (Witness examines document.)

          THE COURT:  Mr. Labgold, you've got about ten minutes
left max with this witness.

          THE WITNESS:  Sorry.  You want me to look at what
line?

BY MR. LABGOLD:

Q.   Do you recall that during your deposition I asked you
where the central portion of this was --

A.   Right.

Q.   -- "this" being Figure 16A, and you circled it?

A.   Yeah.  So I -- let me read the context of it.  What line
was I -- was I asked to do it?

Q.   64, line 23, and it's going to go over to the next page to
65:06.

A.   (Witness examines document.)  So that's -- was this the
area where the cusp was?

Q.   It's specifically the central portion.  As you clarify,
"The curved shape that is symmetrical about an axis and
converges to a location in the central portion of the optical
element"; correct?

A.   So what -- I don't know how good a -- I'm not a good
graphics person.  When you have that circle, I mean the whole
section going downward.

Q.   Did you make the circle?

**A.**    I did.

**Q.**    And are those your initials because we wanted to make sure?

**A.**    Yes.

**Q.**    Thank you.

Now, let me ask you about Johnson.  You say the Johnson reference doesn't anticipate; correct?

**A.**    That's correct.

**Q.**    And the reason why you say the Johnson reference doesn't anticipate, one is because it doesn't have a single LED on an axis; correct?

**A.**    That's correct.

**Q.**    Now, you are aware that in Johnson, the claim language is that it has at least one light-emitting diode; correct?

**A.**    Can you focus?  Yes.  Yes.

**Q.**    So the invention is not limited to two; correct?

**A.**    That's correct.

**Q.**    And it says that "the conically shaped" -- "the top surface having a depression will extend towards the light"; correct?

**A.**    Yes.

**Q.**    And so that depression in the top is extending toward the LED; correct?

**A.**    (Witness examines document.)

**Q.**    That's what it says; correct?

A.    (Witness examines document.)  I'm trying to see if it's --
if the LED needs to be on the axis.  I don't see where that's
the case, but let me reread it.

Q.    Do you see where it says "a top surface having a
depression therein extending toward the light-emitting diode to
form an approximately conically shaped internally reflecting
surface with respect to the LED"?  Correct?

A.    (Witness examines document.)  That's what it appears to
say.

Q.    And you also don't dispute the fact that the conically
shaped surface has an apex angle such that all of the light on
the dome, except that at essentially the apex, will be
transmitted -- will be reflected; correct?

A.    Yes.

Q.    So the part that hits the apex is going to be leaky.  It's
going to be a leaky TIR surface; correct?

A.    So the light that hits directly on that surface will leak
out by one -- a few rays.

        MR. LABGOLD:  I have no further questions, Your Honor.

        THE COURT:  Any --

        MR. OWENS:  Really brief redirect.

        THE COURT:  Very.

                    REDIRECT EXAMINATION

BY MR. OWENS:

Q.    All right.  You talked about the cavity in Claim 20, and

we talked about filling that cavity up with resin.  In your view, if you filled up the cavity of 20 with resin, would you still have a cavity as that term is used in the '209 patent?

A.   No, you wouldn't.

Q.   Okay.  So if you took a television and you filled it up with that resin, in your view, would that infringe Claim 20?

MR. LABGOLD:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  So the question is:  If it's --

BY MR. OWENS:

Q.   Will you still have a cavity?

A.   No.  You won't have a cavity.

Q.   Okay.  So can that type of television infringe Claim 20?

A.   Then, no.

Q.   Okay.  We talked about "beneath a central portion of said optical element."  That was in Claim 30.  And counsel talked about your view as to whether -- well, let me withdraw that.  I think you handled that just fine.

The deposition, page 64:18, you were asked about this drawing you made to an exhibit.

And I don't know if we can get that exhibit up here.  Thanks.

So if you look earlier in your deposition, can you explain were you're actually being asked to circle the central portion of the optical element?  I want you to look at the context

here.

**A.**    (Witness examines document.)

**Q.**    If you go back up in this, were you just being asked to circle where those curves were converging?

**A.**    That's what I thought I was doing, but I couldn't find the text when I was on the cross.

**Q.**    And on page 65, your answer, were you actually identifying what you circled as being the central portion?

**A.**    (Witness examines document.)

**Q.**    So look up there.  Were you intending when you drew that to be circling the central portion?

**A.**    No.

        **MR. OWENS:**  Okay.  No further questions, Your Honor.

        **MR. LABGOLD:**  Your Honor, if I may just impeach him on that.

        **THE COURT:**  You may.

        **MR. LABGOLD:**  Thank you.

                        **RECROSS-EXAMINATION**

**BY MR. LABGOLD:**

**Q.**    Turning to your transcript, if we can pull that up, page 64, line 23.  And I asked you:  (reading)

        **"Q.**  Can you" --

        Oh, first of all, your deposition in this case was given on October 23rd, 2015.  Do you recall that?

**A.**    Yes.

**Q.**  And that was in Rochester?

**A.**  Yes.

**Q.**  And you were under oath at the time?

**A.**  Yes.

**Q.**  And the question was asked:  (reading)

**"Q.**  Can you -- going back to 16A, can you just circle

that location?  Okay.  So that's the location where the

two -- well, that's the location where the curved shape

that's symmetrical about an axis converges."

And you clarified:  (reading)

"Converges to a location in a central portion of the

optical element.  Right."

And that was your testimony; correct?

**A.**  Yes.

**MR. LABGOLD:**  Thank you.  No further questions.

**THE COURT:**  Ladies and gentlemen, we are going to take
a ten-minute break now.  We'll return at 2:40.  Thank you.

(Proceedings were heard out of presence of the jury:)

**THE COURT:**  Back on the record.  Everyone may be
seated.

You may step down.  Thank you.

(Witness excused.)

**THE COURT:**  There were objections raised at the
beginning of Dr. Moore's testimony to two demonstratives.  I
wanted to elaborate on the reasons for my sustaining the

objections.

Throughout this trial, we've had, before a witness takes the stand, exhibits and demonstratives shared between the parties pursuant to a stipulation; and there have been at various times objections to those, which have been resolved mostly through agreement and occasionally through order of the court where there's disagreement.

At the beginning of Dr. Moore's testimony this most recent time, there was not a new stack of demonstratives presented to the Court or, according to the objection by EDD, shared with them.  So that differed from the prior witnesses, including Dr. Moore's first pass-through.

So the reason I sustained the objection was that based on the objection and the lack of a response from SSC that there had been a sharing of the demonstratives, it was a surprise and different than the approved practice in the trial up until today.

Furthermore, this is not in the record, so I'm just putting it in the record.  The first demonstrative was derived, it appeared, from something that is in evidence, and that's Docket -- excuse me, Document Number 1056.  1056 is in evidence, but the demonstrative put on the board was not the document itself.  It was something derived from it.  And the reason I sustained the objection is, not knowing what might come next as far as animation that might change or some

PROCEEDINGS

explanation given by the expert witness providing a new explanation, I sustained the objection at that point in time.

So that's the reason that I sustained the objection to the demonstratives.  Even though it may be that those demonstratives were going to go on and be well within the confines of what had been previously testified to, it was preventing a potential error of new opinion or surprise that I sustained the objection.

MR. OWENS:  Your --

THE COURT:  I'm still speaking.

There was also an objection to what I perceive to be a new opinion outside the scope of the report and outside the testimony of Dr. Moore's first passage on the stand and Dr. Pollock's testimony about reflection off the bottom surface, and I sustained that objection.

So that was the elaboration on those issues.

Back in a few minutes.  Will SSC have any further evidence to present in this phase of the case?

MR. GOTTS:  No, Your Honor.

THE COURT:  All right.  And what is EDD's intention as to its next phase?

MR. LABGOLD:  We have three witnesses -- no.  I'm just kidding.  Sorry, Your Honor.

THE COURT:  I appreciate the comedy.

MR. LABGOLD:  Yes.  We have no witnesses to call.

THE COURT:  All right.  So you're not going to call Dr. Pollock back to the stand?

MR. LABGOLD:  No need.  Thank you.

THE COURT:  All right.

Okay.  I've got to do some other business, so I'll be back in five minutes to talk about what we're going to do next then.

MR. LABGOLD:  Thank you, Your Honor.

THE COURT:  Thank you, Your Honor.

(Recess taken at 2:33 p.m.)

(Proceedings resumed at 2:41 p.m.)

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  We are back on the record. Jurors are not present.

So my question to counsel is if you are ready now to review the final -- everyone may be seated -- review the Final Jury Instructions and Verdict Form, because that will be the next phase of the case, absent there being any further evidence.

MR. LABGOLD:  Can I just move in the one exhibit for the record?

THE COURT:  Yes, you may.

MR. LABGOLD:  It's Plaintiff's Exhibit 63.  And I apologize for giving it the Moore.  It's the handwritten copy of the patent, but it's the one that has handwritten --

THE COURT:  Any objection to Plaintiff's 63?

**MR. OWENS:**  No, your Honor.

**THE COURT:**  Plaintiff's 63 is admitted.

(Plaintiff's Exhibit 63 received in evidence)

**MR. LABGOLD:**  Thank you, Your Honor.

**MR. GOTTS:**  Your Honor, we also will expect -- I think we're going to want to put all the various demonstratives into the record.  I think we'll be collecting those and marking those accordingly, if that's okay with Your Honor.

**THE COURT:**  That was part of my earlier question, is to collect them and identify them, which doesn't put them into evidence, but it makes a good record.

**MR. GOTTS:**  Thank you, Your Honor.

**MR. LABGOLD:**  Thank you, Your Honor.

**THE COURT:**  All right.  The Final Instructions and Verdict Form?

**MR. SHAW:**  Yes.  So to respond to your question Yes, Your Honor, we're ready.

**THE COURT:**  Outstanding.  And these are at docket 438 is the revised Instructions, and 439 is the Verdict Form.

Starting with SSC, what comments do you have further to the revised Instruction and the Verdict Form?

**MS. WOODHOUSE:**  For the Verdict Form, Your Honor?

**THE CLERK:**  Hold on.  Audio.

**THE COURT:**  One moment.

(pause in proceedings.)

**MS. WOODHOUSE:** So Your Honor, there was one remaining issue. We see that you elected to go with EDD's proposal, and we're okay with that. The only thing we do note is that, and the parties discussed this, that we do think that there's just a slight typographical error, that it should say "a person or corporation."

**THE COURT:** This is at?

**MS. WOODHOUSE:** I'm sorry. This is Verdict Form Question One.

**THE COURT:** Question One.

**MS. WOODHOUSE:** And also Question Seven, is just the same issue.

**THE COURT:** So you're just adding the word "a" before "a person?"

**MS. WOODHOUSE:** Yes, Your Honor.

**THE COURT:** Any objection?

**MR. SHAW:** No, your Honor.

**THE COURT:** All right. We'll add the word "a" before "person" in One and Seven.

All right. Any other comments from SSC?

**MS. WOODHOUSE:** Unless you want to hear arguments about your selection of EDD's proposal, which I'm sure you don't, no other comments.

**THE COURT:** Very good. Thank you.

And from EDD's side?

MR. SHAW:  No, your Honor.  Verdict Form or Jury Instructions?

THE COURT:  Both.

MR. SHAW:  Okay.  There may be one word or one letter typo in --

THE COURT:  Now is the time to bring them up.  What's your suggestion?

MS. WOODHOUSE:  So claim construction?

MR. SHAW:  On the claim construction, there appears to be an extra "s."

MS. WOODHOUSE:  I think there's an extra "and."

MR. SHAW:  Charles indicated it was not an extra "and."

MR. CASTELLANO:  Michelle is correct, the "and" should be removed.

THE COURT:  We have multiple voices here.

Which page are you referring?

MR. SHAW:  Page 9, line 16.

THE COURT:  So the question is whether to strike an "and" before "angles" or strike the "s" on "angles;" correct?

MR. SHAW:  It's one of those two.  And I'm informed by Mr. Castellano it should be striking the "and."

MS. WOODHOUSE:  That was how it was in the Joint Claim Construction chart, Your Honor.

THE COURT:  Let's go with that.

**PROCEEDINGS**

So I have stricken the word "and" in line 16.

Any others?

MR. SHAW:  No, your Honor.

THE COURT:  Anything further from SSC?

MS. WOODHOUSE:  No, your Honor.

THE COURT:  Thank you for working on that.

What I will do then is we will make those changes now, given that there are not many of them, and we will reprint the document so the jury can read it during the reading of the Final Instructions; and I will read it to them in a few minutes, because it will take some time to get through all of it.  And then we'll have the closing arguments tomorrow at 9:00 a.m., does that work?

All right.  Then let's bring in the jury to advise them of the schedule, so they're not wondering.

(Proceedings were heard in the presence of the jury:)

THE COURT:  And our jurors have returned.  Everyone may be seated.

Does EDD have any further evidence to present in its final phase of the case?

MR. LABGOLD:  No, we don't, Your Honor.  We rest.

THE COURT:  Thank you.  And does SSC have any further evidence to present in this phase of the case?

MR. GOTTS:  We do not, Your Honor.  But we will be submitting our Rule 50 motion.  I assume it's timely.

THE COURT:  That will be considered timely.  Thank you.  As well as further briefing and motion from EDD.

MR. LABGOLD:  Thank you, Your Honor.

THE COURT:  And we will schedule that at a neutrally agreeable time.

So ladies and gentlemen, we've reached a next milestone in the case, which is close of the evidence.  And what's going to occur next is I'm going to instruct you on the law, the closing instructions, which we referenced at the beginning of the case.

It's going to take me a few minutes to copy those instructions and get them to you, so we're going to take a five-minute recess while we get our materials together and get them to you.  I will then read them to you.  There are more pages at the close than there were at the beginning, and that will be the end of today.  So as soon as I finish the closing instructions, I'll excuse you today to return tomorrow at 9:00 a.m. for the closing arguments of the attorneys.  Once they have given their closing arguments, then the case will be turned over to you for your deliberations.

So the closing arguments and the deliberations will begin tomorrow.  We'll be done sooner than 4:00 o'clock today, but we'll take a further five-minute recess now while we put our materials together for the reading of the closing jury instructions.

So thanks for your patience.  Be back in five minutes.

(Recess taken at 2:47 p.m.)

(Proceedings resumed at 3:00 p.m.)

**JURY INSTRUCTIONS**

(Proceedings were heard out of presence of the jury:)

**THE COURT:**  Everyone may be seated.  I'm actually going to read from the podium, because I'm tired of sitting.

We can get our jurors.

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  Everyone may be seated.  I'm tired of being in my chair, so I'm going to stand for this final part where I get to read.  It's a lot of reading.

First, a matter of serious business, this morning we were all shaken by the news of what occurred in Brussels.  And I appreciate everyone's attention to the matters here in the courtroom, although there are important and sadder things going on in other parts of the world.

A few minutes ago the President of the United States sent out a proclamation to the courts and to the citizens of the country, and I'm going to read that so that you know that we're paying attention to what's going on outside the courtroom as well.

This is from the President of the United States, Barack Obama.

The American people stand with the people of Brussels and will do whatever it takes working with nations and peoples

around the world to bring the perpetrators of these attacks to justice, and to go after terrorists who threaten our people.

As a mark of respect for the victims of the senseless acts of violence perpetrated on March 22nd, 2016 in Brussels, Belgium by the authority vested in me as President of the United States by the Constitution and laws of the United States of America, I hereby order the flag of the United States shall be flown at half-staff at the White House upon all public buildings and grounds, at all military posts and naval stations, on all naval vessels of the Federal Government of the District of Columbia and throughout the United States and its Territories until sunset of March 22nd -- excuse me, March 26th, 2016.  I also direct the flag to be flown at half-staff for the same length of time at all U.S. embassies, legations, consular offices, and other facilities abroad, including all military facilities and naval vessels and stations.

From the President

And our flag is being flown at half-staff outside the courthouse.

All right.  Now, returning to our Final Jury Instructions. And a copy has been provided to you.

Members of the jury:  Now that you have heard all the evidence, it's my duty to instruct you on the law of the case.

Each of you has received a copy of these instructions that

you may take with you to the jury room to consult during your deliberations.

You must not infer from these instructions or from anything I may say or do as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so at the beginning of the case.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

The Burden of Proof

There are two standards of proof that you will apply to the evidence in this case, depending on the issue you are deciding. On some issues, you must decide whether something is more likely true than not. On other issues, you must use a higher standard and decide whether it is highly probable that something is true.

You should base your decision on all of the evidence regardless of which party presented it.

Evidence

Evidence You May Consider

The evidence you are to consider in deciding what the facts are consists of:

First, the sworn testimony of any witness;

Second, the exhibits which are received into evidence;

And third, any facts to which the lawyers have agreed.

Things You May Not Consider

In reaching your verdict, you may consider only testimony and exhibits received in evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will now list for you things that are not evidence.

First, the arguments and statements by the lawyers are not evidence.  The lawyers are not witnesses.  What they say in their opening statements, what they will say in their closing arguments tomorrow, and what they've said at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of the facts controls.

Second, the questions and the objections by the lawyers are not evidence.  The attorneys have a duty to their clients to object when they believe a question is improper under the

rules of evidence.  You should not be influenced by an objection or by my ruling on the objection.

Third, testimony that has been excluded or stricken or that you have been instructed to disregard is not evidence and must not be considered.  In addition, sometimes testimony and exhibits were received only for a limited purpose.  If I gave you a limiting instruction, you must follow it.

Fourth, and finally, anything you might have seen or heard when the Court was not in session is not evidence.  You must decide this case solely on the evidence received at the trial.

Taking Notes.

You may have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of the evidence.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

Stipulations of Fact

The parties have agreed to certain facts that have been read to you.  You should treat those facts as having been proved.

Charts and Summaries Not Received in Evidence.

Certain charts and summaries not received in evidence were shown to you in order to help explain the contents of books, records, documents, or other evidence in the case.  You may have heard these charts and summaries referred to as

"demonstratives" or "demonstrative evidence."  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

Charts and Summaries In Evidence

On the other hand, certain charts and summaries were received into evidence to illustrate information brought out in the trial.  Charts and summaries are only as good as the underlying evidence that supports them.  You should, therefore, give them only such weight as you think the underlying evidence deserves.

Types of Evidence

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did.  For example, direct evidence that it was raining would be a photo showing that it was raining on a given day.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  For example, circumstantial evidence that it was raining would be testimony of a witness who said they believed it was raining, not because they saw rain, but because they saw a person entering a building with a wet umbrella.  You should consider both kinds of evidence, direct and circumstantial. The law makes no distinction between the weight to be given to

either direct or circumstantial evidence.  It is for you to decide how much weight to give, if any, to any evidence.

Use of Interrogatories of a Party

Evidence has been presented to you in the form of answers of one of the parties to written interrogatories submitted by the other side.  These answers were given in writing and under oath before the trial in response to questions that were submitted in writing under established court procedures.  You should consider the answers, insofar as possible, in the same way as if they were made from the witness stand.

Use of a Request for Admission of a Party.

Before trial, each party had the right to ask the other party to admit in writing that certain facts are true.  If the other party admits those facts, you must accept them as true and conclusively proved in this case.

Use of Physical Evidence During the Deliberations.

Certain physical exhibits have been admitted for demonstrative purposes so that you can better understand and appreciate the products that are at issue in this case.  You may hold and view these physical exhibits.  However, you must not alter or modify the physical exhibits in any way, and you must not attempt to put them into operation or perform any testing or analysis on them to test, prove, or disprove any theory or principle that was discussed during the trial.

The Court's Ruling on Objections

There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it's not permitted, that lawyer may object.  When I sustained an objection, you must ignore the question and must not guess at what the answer might have been or what the document might have said.  My rulings are not intended to influence your decision.  Your decisions must be based entirely on the testimony and documents that were received into evidence.

Sometimes I ordered that evidence be stricken from the record, and that you should disregard or ignore that evidence. That means that when you decide the case, you must not consider any information that I told you to disregard.

Bench Conferences and Recesses

From time to time it was necessary for me to talk with the attorneys outside of your hearing, either by having a conference at the bench when the jury was not present, or by calling a recess.  The purpose of these conferences was to keep -- excuse me.  Back up.  The purpose of these conferences was *not* to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

I may not have always granted an attorney's request for a conference.  Do not consider my granting or denying a request

as an indication of my opinion of the case or what your verdict should be.

Witnesses and Evaluation of Their Testimony

In deciding the facts of this case, you may have to decide which testimony to believe and which not to believe.  You might believe everything one witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account the following:

(1)  The opportunity and ability of the witness to see or hear or know the things testified to;

(2)  The witness's memory;

(3)  The witness's manner while testifying;

(4)  The witness's interest in the outcome of the case, and any bias or prejudice;

(5)  Whether other evidence contradicted the witness's testimony;

(6)  The reasonableness of the witness's testimony in light of all the evidence; and

(7)  Any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

Impeachment Evidence

The evidence that a witness lied under oath or gave

different or inconsistent testimony on a prior occasion may be considered, along with all the other evidence, in deciding whether or not to believe the witness and how much, if any, weight to give to that witness's testimony.

English Translation

Languages other than English were used during this trial. Each witness has the right to testify in his or her native language.  In this case, someone witnesses testified in Japanese and some in Korean, through the use of an official court interpreter.

When a witness testifies in a language other than English, the evidence to be considered by you is only that provided through the official court interpreters.  Some of you may know Japanese, Korean, or other languages, but it's important that all jurors consider the same evidence.  Therefore, you must accept the English interpretation that was provided by the official interpreters.  You must disregard any different meaning.

Do not make any assumptions about a witness or a party based upon their use of an interpreter to assist that witness or party.

Expert Witnesses

Some witnesses, because of their education or experience, are permitted to state opinions and the reasons for those opinions.

Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for their opinion, and all the other evidence in the case.

Deposition Testimony

A deposition is the sworn testimony of a witness that was taken before the trial. The witness was placed under oath to tell the truth, and the lawyers for each side were allowed to ask questions. The questions and answers were then recorded by the written transcript and sometimes by a video recording. When a person is not available to testify at trial, the deposition of that person may be used during the trial.

You should consider deposition testimony, presented to you in court in place of live testimony, in the same way as if the witness had been present to testify.

If testimony is read rather than played back from a recording, do not place any significance on the behavior or tone of voice of any person reading the questions or answers.

You have heard or viewed only a portion or a series of portions of the depositions that were taken by the parties in this case. Do not make any inferences about the fact that you are not hearing or seeing the deposition in its entirety or that what you are hearing or viewing has been edited.

Impeachment Evidence

The evidence that a witness lied under oath on a prior occasion may be considered, along with all the other evidence, in deciding whether or not to believe that witness, and how much weight to give to the testimony of the witness and for no other purpose.

Summary of the Contentions

I will now give you a summary of each side's contentions in this case.  I'll then tell you what each side must prove to win on each of its contentions.

As I previously told you, EDD seeks a declaration that it does not infringe any valid claim of the '554 or '209 patent, and that the claims of the patents are invalid.

SSC, on the other hand, seeks monetary damages from EDD for actively inducing infringement by others of Claims 1, 6, and 33 through 35 of the '554 Patent, and Claim 20 of the '209 patent.

The products that are alleged to infringe the '554 patent are Enplas Light Enhancer Cap Lenses with model numbers 9854D, 9854E, and 9879.  The products that are alleged to infringe the '209 patent are Enplas Light Enhancer Cap Lenses with model numbers 9854D, 9854E, 9879, 9853A and 4922.

You will also be asked to decide whether Claims 1, 6, 30, 31, 33 through 39, 41 through 43, and 45 through 48 of the '554 patent are invalid, and whether Claim 20 of the '209 patent is invalid.

Although the parties may have referred to other claims or lenses, you will only be asked to decide on infringement and invalidity of the claims and lenses listed above.

If you decide that any asserted claim of the patents-in-suit has been infringed and has not been valid, you will then need to decide any money damages to be awarded to compensate for the infringement.

You will also need to make a finding as to whether the infringement, if any, was willful.  If you decide that any infringement was willful, that decision should not affect any damage award you make.  I will take willfulness into account later.

You may have heard evidence that EDD's parent Enplas Corporation has its own patents or that EDD improved on the '554 and/or '209 patents.  A party can still infringe even if it has its own patents in the same area.

Patent Claims

Before you can decide many of the issues in this case, you will need to understand the role of patent claims.

So let me talk about the role of patent claims.

The patent claims are the numbered sentences at the end of each patent.  The claims are important because it is the words of the claims that define what a patent covers.  The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims,

but it is the claims that define the breadth of the patent's coverage.  Each claim is effectively treated as if it were a separate patent, and each claim may cover more or less than another claim.  Therefore, what a patent covers depends in turn on what each of its claims covers.  The claims are not limited by the patent specification's description of preferred embodiment or description of a desirable way to implement the invention.

By understanding the meanings of the words in a claim and by understanding that the words in the claims set forth the requirements that a product or process must meet in order to be covered by that claim, you will be able to understand the scope of coverage for each claim.  Once you understand what each claim covers, then you are prepared to decide the issues that you will be asked to decide, such as infringement and invalidity.

Interpretation of Claims

It is my job as judge to explain to you the meaning of any language in the claims that needs interpretation.  I have interpreted the meaning of some of the language in the patent claims involved in this case.  You must accept these interpretations as correct.  My interpretation of the language should not be taken as an indication that I have a view regarding the issues of infringement and invalidity.  The decisions about infringement and invalidity are yours to make.

You should apply the following constructions to the claims of the '554 Patent:

The term "total internal reflection" means the total reflection that occurs when light strikes an interface at angles of incidence (with respect to the normal) greater than the critical angle.

The term "the critical angle of total internal reflection" means "the angle of incidence (with respect to the normal) above which total internal reflection occurs."

The term "cusp" means "an area where two curves meet."

The term "totally internally reflecting" means "reflecting by total internal reflection."

The term "illumination coupler embedded in an interior region of said waveguide" does not require a construction.

The term "TIR surface" means "a surfaced angle -- a surface angled with respect to a light source to produce total internal reflection within a device."

The term "waveguide" means "an optical device that redirects light propagating between its surfaces."

For claim language where I have not provided you with any meaning, any meaning, the claim language's plain and ordinary meaning to a person of ordinary skill in the art at the time of the invention applies.

For all claim language of the '209 Patent, you should apply the claim language's plain and ordinary meaning to a person of ordinary skill in the art at the time of the invention.

Infringement and

The Burden of Proof

I will now instruct you on the rules you must follow in deciding whether SSC has proven that EDD has actively induced infringement of one or more of the asserted claims of the patents-in-suit.  To prove induced infringement of any claim, SSC must persuade you that it is more likely than not that EDD has actively induced another to directly infringe that claim.

Inducing patent infringement.

SSC argues that EDD has actively induced another to infringe the '554 and '209 patents.  In order for EDD to have induced infringement of the '554 patent, EDD must have induced the direct infringement of the claim of the '554 Patent.  In order for EDD to have induced infringement of the '209 patent, EDD must have induced the direct infringement of a claim of the '209 patent.  If there is no direct infringement by anyone, then there could be no induced infringement.

In order to be liable for inducing the infringement of the '554 patent, EDD must:

        Have intentionally taken action that actually induced direct infringement;

Have been aware of the '554 Patent, and

Have known that the acts it was causing would infringe the '554 patent.

In order to be liable for inducing infringement of the '209 patent, EDD must:

Have intentionally taken action that actually induced direct infringement;

Have been aware of the '209 patent, and

Have known that the acts it was causing would infringe the '209 patent.

EDD may be considered to have known that the acts it was causing would infringe the '554 patent, and/or the '209 patent if it subjectively believed there was a high probability of direct infringement and nevertheless deliberately took steps to avoid learning that fact, in other words, if EDD willfully blinded itself to the direct infringement.

Induced infringement does not require any activity by the indirect infringer in the United States, as long as the direct infringement occurs in the United States.

Direct Infringement

A patent's claims define what is covered by the patent.  A product or method directly infringes a patent if it is covered by at least one claim of the patent.

Deciding whether a claim has been directly infringed is a two-step process.  The first step is to decide the meaning of

the patent claim.  I've already made this decision, and I've already instructed you as to the meaning of the asserted patent claims.  For those terms that I have not provided a definition, you are to rely upon the evidence presented concerning the plain and ordinary meaning to persons of ordinary skill in the relevant technologies.

The second step is to decide whether an individual or entity has made, used, sold, offered for sale, or imported within the United States a product covered by any of the asserted claims of SSC's patents, or performed a method within the United States covered by one or more claims of SSC's patents.  If it has, it infringes.  You, the jury, make this decision.  Whether or not the alleged direct infringer knew its product infringed or even knew of SSC's patents does not matter in determining direct infringement.  Here, SSC asserts that EDD induced infringement, not that EDD directly infringed.  Therefore, EDD cannot be the alleged direct infringer.

With one exception, you must consider each of the asserted claims of the patents individually, and decide whether the accused products or methods literally infringe that claim.  The one exception to considering claims individually concerns dependent claims.  An independent claim is one that stands alone without reference to any other claim.  A dependent claim includes all the requirements of a particular independent claim, plus additional requirements of its own.  As a result,

if you find that an independent claim is not infringed, you must also find that its dependent claims does not infringe.  On the other hand, if you find that an independent claim has been infringed, you must still separately decide whether the additional requirements of its dependent claims have also been infringed.

You have heard evidence about both SSC's commercial products and the accused products.  However, in deciding the issue of infringement, you may not compare the accused products to SSC's commercial products.  Rather, you must compare the accused product to the claims of the patents-in-suit when making your decisions.

Literal Infringement

To decide whether an alleged direct infringer's product or method literally infringes a claim of the '554 or '209 patents, you must compare that product or method with the patent claim and determine whether every requirement of the claim is included in that product or method.  If so, an alleged direct infringer's product or method literally infringes that claim. If, however, an alleged direct infringer's product or method does not have every requirement in the patent claim, an alleged direct infringer's product or method does not literally infringe that claim.  You must decide literal infringement for each asserted claim separately.

If the patent claim uses the term "comprising," that

patent claim is to be understood as an open claim.  An open claim is infringed as long as every requirement in the claim is present in an alleged direct infringer's product or method. The fact that an alleged direct infringer's product or method also includes other parts or steps will not avoid infringement, as long as it has every requirement in the patent claim.

Willful Infringement

In this case, SSC argues that EDD willfully infringed SSC's patents.

To prove willful infringement, SSC must persuade you -- back up.

To prove willful infringement, SSC must first persuade you that EDD induced infringement of a valid and enforceable claim of SSC's patent.  The requirements for proving such infringement were discussed in my prior instructions.

In addition, to prove willful infringement, SSC must persuade you that it is highly probable that EDD acted with reckless disregard of the claims of SSC's patents.

To demonstrate such "reckless disregard," SSC must persuade you that EDD actually knew, or it was so obvious that EDD should have known, that its actions would result in the direct infringement of a valid patent.

In deciding whether EDD acted with reckless disregard for SSC's patents, you should consider all the facts surrounding the alleged infringement, including but not limited to the

following factors.

Factors that may be considered as evidence that EDD was not willful include whether EDD acted in a manner consistent with the standards of commerce for its industry.

Invalidity

Burden of Proof

I will now instruct you on the rules that you must follow in deciding whether EDD has proven the Claims I, 6, 30, 31, 33 through 39, 41 through 43, and 45 through 48 of the '554 patent, and Claim 20 of the '209 patent are invalid.  Before discussing the specific rules, I want to remind you about the standard of proof that applies to this defense.  To prove invalidity of any patent claim, EDD must persuade you that it is highly probable that the claim is invalid.

Now, during this case, EDD had submitted prior art that was not considered by the U.S. Patent and Trademark Office, the PTO, during the prosecution of the patents-in-suit.  EDD contends that such prior art invalidates certain claims of the patents.  In deciding the issue of invalidity, you may take into account the fact that the prior art was not considered by the PTO when it issued the patents-in-suit.  Prior art that differs from the prior art considered by the PTO may carry more weight than the prior art that was considered and may make EDD's burden of showing that it is highly probable that a patent claim is invalid easier to sustain.

Anticipation of the '554 Patent Only

A patent claim is invalid if the claimed invention is not new.  For the claim to be invalid because it is not new, all of its requirements must have existed in a single device or method that predates the claimed invention, or must have been described in a single publication or patent that predates the claimed invention.  In patent law, these previous devices, methods, publications or patents are called "prior art references."  If a patent claim is not new, we say it is "anticipated" by a prior art reference.

The description in the written reference does not have to be in the same words as the claim, but all of the requirements of the claim must be there, either stated or necessarily implied, so that someone of ordinary skill in the field of the invention looking at that one reference would be able to make and use the claimed invention.

Here is a list of the ways that EDD can show that a claim of the '554 patent was not new:

If the claimed invention was already patented or described in a printed publication anywhere in the world before September 24th, 1997.  A reference is a "printed publication" that is accessible to those interested in the field even if it is difficult to find;

If the claimed invention was already described in another issued U.S. patent or published U.S. patent

application that was based on a patent application filed before September 24th, 1997.

Obviousness

Not all innovations are patentable.  A claim of the '554 patent is invalid if the claimed invention would have been obvious to a person of ordinary skill in the field as of September 24, 1997.  A claim of the '209 patent is invalid if the claimed invention would have been obvious to a person of ordinary skill in the field as of March 19, 1997.  This means that even if all the requirements of the claim cannot be found in a single prior art reference that would anticipate the claim or constitute a statutory bar to that claim, a person of ordinary skill in the field of the invention who knew about all this prior art would have come up with the claimed invention.

The ultimate conclusion of whether a claim is obvious should be based upon your determination of several factual decisions.

Level of Ordinary Skill in the Art

First, you must decide the level of ordinary skill in the field that someone would have as of the effective filing date of the claimed invention.  In deciding the level of ordinary skill, you should consider all the evidence introduced at trial, including:

The levels of education and experience of persons working in the field;

The types of problems encountered in the field, and

The sophistication of the technology.

SSC contends that the level of ordinary skill in the field of both the '554 and '209 patents would be someone with an undergraduate degree in optical engineering, electrical engineering, or physics with at least three years of relevant experience in optical design for LEDs.  On the other hand, EDD contends the level of ordinary skill in the field of the '554 patent would be someone with a master's degree in physics, optics, or electrical engineering, and five years of experience in waveguide research or design, or a Ph.D. in physics, optics, or electrical engineering, and three years of experience in waveguide research or design, and a level of ordinary skill in the field of the '209 patent would be someone with at least a master's degree in optics, electrical engineering, or physics with at least three years of relevant experience in design of optical systems.

Scope and Content of the Prior Art

Second, you must decide the scope and content of the prior art.  In order to be considered a prior art patent, these references must be reasonably related to the claimed invention of that patent.  A reference is reasonably related if it is in the same field as the claimed invention or is from another field to which a person of ordinary skill in the field would look to solve a known problem.

Difference Between Claimed Invention and Prior Art.

Third, you must decide what differences, if any, existed between the claimed invention and the prior art.

Secondary Considerations

Finally, you should consider any of the following factors that you find have been shown by the evidence in the case:

    (1)  Commercial success of a product due to the merits of the claimed invention;

    (2)  A long felt need for the solution provided by the claimed invention;

    (3)  Unsuccessful attempts by others to find the solution provided by the claimed invention;

    (4)  Copying of the claimed invention by others;

    (5)  Unexpected and superior results from the claimed invention;

    (6)  Acceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention;

    (7)  Other evidence tending to show non-obviousness;

    (8)  Independent invention of the claimed invention by others before or at about the same time as the named inventor thought of it; and

    (9)  Other evidence tending to show obviousness.

The presence of any of factors 1 through 7 as appropriate may be considered by you as an indication that the claimed

invention should not -- back up.  Going too fast.

The presence of any factors 1 to 7 as appropriate may be considered by you as an indication that the claimed invention would not have been obviousness as of the effective filing date of the claimed inventions, September 24th, 1997 for the '554 patent, and March 19th, 1997 for the '209 patent.  And the presence of the factors 8 and 9 may be considered by you as an indication that the claimed invention would have been obvious at such time.  Although you should consider any evidence of these factors, the relevance and importance of them to any of your decision on whether the claimed invention would have been obvious is up to you.

Obviousness Guidance

A patent claim composed of several elements is not proved obvious merely by demonstrating that each of its elements was independently known in the prior art.  In evaluating whether such a claim would have been obvious, you may consider whether EDD has identified a reason that would have prompted a person of ordinary skill in the field to combine the elements or concepts from the prior art in the same way as in the claimed invention.  There is no single way to define a line between true inventiveness on the one hand (which is patentable) and the application of common sense and ordinary skill to solve a problem on the other hand (which is not patentable).  In considering whether a claimed invention is obvious, you may

take into account such factors as:

1. Whether the change resulted from design incentives or other market forces, rather than true inventiveness;

2. Whether the change was merely the predictable result of using prior art elements according to their known functions, rather than true inventiveness;

3. Whether there is some teaching or suggestion in the prior art to make the modification or combination of elements claimed in the patent;

4. Whether the innovation applies a known technique that had been used to improve a similar device or method in a similar way; and

5. Whether the claimed invention would have been obvious to try, meaning that the claimed innovation was one of a relatively small number of possible approaches to the problem, and with a reasonable expectation of success by those skilled in the art.

However, you must not -- back up.

However, you must be careful not to determine obviousness using the benefit of hindsight; many true inventions might seem obvious after the fact. You should put yourself in the position of a person of ordinary skill in the field as of the effective filing date of the claimed inventions, which again was September 24th, 1997 for the '554 patent and March 19th,

1997 for the '209 patent.  And you should not consider what is known today or what is learned from the teaching of the patent.

Damages

I will now instruct you about the measure of damages.

By instructing you on damages, I'm not suggesting which party should win on any issue in the case.  If you find that EDD induced infringement of any valid claim of the '554 and/or the '209 patent, you must then determine the amount of money damages to be awarded to SSC to compensate it for the infringement.

The amount of those damages must be adequate to compensate SSC for the infringement.  A damages award should put the patent holder in a approximately the same financial position it would have been in had the infringement not occurred, but in no event may the damages award be less than a reasonable royalty. You should keep in mind that the damages you award are meant to compensate the patent holder and not to punish the infringer.

SSC has the burden to persuade you of the amount of its damages.  You should award only those damages that SSC more likely than not suffered.  While SSC is not required to prove its damages with mathematical precision, it must prove them with reasonable certainty.  SSC is not entitled to damages that are remote or speculative.

Reasonable Royalty Entitlement

SSC seeks a reasonable royalty in the form of a one-time

lump sum for all past and future infringement of its patents. If you find that SSC has established induced infringement, SSC is entitled to at least a reasonable royalty to compensate it for that infringement.

Reasonable Royalty - Definition

A royalty is a payment made to a patent holder in exchange for the right to make, use or sell the claimed invention.  This right is called a "license."  A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the patent holder and the infringer taking place at the time when the infringing activity first began.  In considering the nature of this negotiation, you must assume that the patent holder and the infringer would have acted reasonably and would have entered into a licensed agreement.  You must also assume that both parties believed the patent was valid and infringed.  Your role is to determine what the result of that negotiation would have been.  The test for damages is what royalty would have been resulted -- not would have been -- would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

One way to calculate a royalty, as SSC has intended is appropriate here, is to determine a one-time lump sum payment that the infringer would have paid at the time of the hypothetical negotiation for a licenses covering all sales of a

licensed product both past and future.  When a one-time lump sum is paid, the infringer pays a single price for a license covering both past and future infringing sales.

It is up to you, the jury, to decide based on the evidence to decide what type of royalty is appropriate in this case for the life of the patent.

Reasonable Royalty Relevant Factors

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors that you may consider in making your determination are:

1.  Royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove established royalty.

2.  The rates paid by the licensee for the use of other patents comparable to the patent in suit;

3.  The nature and scope of the license as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

4.  The licensor's established policy and marketing program to maintain his or her patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5.  The relationship between the licensor or licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promotor.

6.  The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales.

7.  The duration of the patent and the term of the license.

8.  The established profitability of the product made under the patents, its commercial success, and its current popularity.

9.  The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

10.  The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits of those who have used the invention.

11.  The extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

12.  The portion of the profit or of the selling

price that may be customary in the particular business or in a comparable business to allow for the use of the invention or analogous inventions.

13.    The portion of the realizable profits that should be credited to the invention as distinguished from non-patented elements in the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.    The opinion and testimony of qualified experts.

15.    The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee - who desired as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive, and you can and should consider the evidence that has been presented to you in this case on each of these factors.  You may also consider any other factor which in your mind would have increased or decreased the

royalty the infringer would have been willing to pay and the patent holder would have been willing to accept acting as normally prudent business people.  The final factor establishes the framework which you should use in determining a reasonable royalty, that is, the payment that would have resulted from a negotiation between the patent holder and the infringer taking place at a time prior to when the infringement began.

Calculating Damages in Cases of Inducement

If you find infringement, you may award damages only where SSC has proved that a third party has directly infringed within the territory of the United States.  SSC must prove the extent of such infringing use with reasonable certainty because the amount of awardable damages must be correlated with the extent the accused product or method has been used in the United States.  In other words, you should award only those damages that SSC establishes that it more likely than not suffered.

The Date of Commencement of Damages

In determining the amount of damages, you must determine when the damages began.  Damages cannot be awarded for any time prior to the date that EDD has been notified of the alleged infringement.

Damages that SSC may be awarded by you for EDD's inducing the infringement of the '554 patent commences on the date that: (1) EDD was notified of the '554 Patent; and (2) began inducing infringement of the '554 Patent.

Damages that SSC may be awarded by you for EDD's inducing the infringement of the '209 patent, commenced on the date (1) that EDD was notified of the '209 patent, and (2) began inducing infringement of the '209 patent.

Conduct of the Jury During Deliberations

Use of Electronic Technology To Conduct Research or to Communicate about The Case

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic media or device like your telephone, cell phone, smart phone, iPhone, Blackberry, computer Internet, Internet service, text, instant messaging, Internet chat room, blog, Facebook, MySpace, LinkedIn, You-Tube or Twitter, or any other similar feature on the web, or to communicate to anyone any information about this case, or to conduct any research about this case until after I accept your verdict.  In other words, don't talk to anyone on the phone, correspond, or electronically communicate with anyone about this case.  You can only discuss this case in the jury room with your fellow jurors during the deliberations.  And I expect you'll inform me as soon as you become aware of anyone -- of any other juror's violations of these instructions.

You may not use these electronic means to investigate or communicate about the case because it's important that you decide the case solely on the evidence that was presented here

in court.  Information that you might find on the Internet or through social media might be wrong, incomplete, or inaccurate. And you're only permitted to discuss the case with your fellow jurors during deliberations because they have seen and heard the same evidence that you have.  In our judicial system, it's important that you're not influenced by things that did not take place in the courtroom.  Otherwise, your decision might be based on information known only to you and not by your fellow jurors and by the parties in the case.  If you're exposed to outside information, this would unfairly and adversely impact the judicial process.

The Duty to Deliberate

When you begin your deliberations, which will be tomorrow, you should elect one member of the jury as your presiding juror.  That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict must be unanimous.  That means you must all agree.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion with your fellow jurors persuades you you should.  Do not come

to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Conduct of the Jury.

This is a bit of a reminder.

Because you must base your verdict only on the evidence received in the case, don't be exposed to any other information about the case.

So except for discussing the case with your fellow jurors, don't communicate with anyone in any way electronically.  This part is a reminder.  Don't watch the news.  Don't do your own investigation.  And a final reminder, don't take apart your own TV to explore what is inside.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence.  And if any juror is exposed to information about the case that was not presented here in court, please notify me immediately.

Communicating With the Court

If it becomes necessary during the deliberations phase to communicate with me, you may send a note through my courtroom deputy, signed by the presiding juror, or by one or more members of the jury.  No member of the jury should ever attempt

to communicate with me except through a signed writing.  And I will communicate with any member of the jury on anything concerning the case only in writing or here in open court.  If you send out a question during the deliberations phase, I will consult with the parties before answering it, and that might take a little bit of time.  Do not conclude from any time delays that the question is difficult to answer, and do not speculate that the time delay gives an indication as to what the answer is.  You may continue your deliberations while waiting for an answer to one of your questions.

Remember that you are not to tell anyone, including me, how the jury stands numerically or otherwise, until after you have reached a unanimous verdict or have been discharged.  So in any note to the Court, do not disclose a vote count in your note.  That's very important instruction.

Return of Verdict

A verdict form has been prepared for you, and a copy has been provided to you.  After you have reached a unanimous agreement on a verdict, your presiding juror will then fill in the form given to you, sign and date it, and advise my courtroom deputy that you are ready to return to the courtroom.

That is the conclusion of the final jury instructions. Thank you for your patience in listening.

And that concludes today's proceedings.  Thank you to our jurors.  We'll see you at 9:00 a.m. tomorrow

(Proceedings were heard out of presence of the jury:)

THE COURT:  All right.  Jurors are not present.

Procedural question for each party.  How long do you anticipate for your closing arguments?

MR. GOTTS:  Your Honor, I'm thinking perhaps 75, 80 minutes, something like that.

MR. LABGOLD:  I'm thinking the same.

THE COURT:  All right.  And I would intend to have SSC go first, as you open first, and have the principal burden in the case, and I would allow you first to go first and last given that.

Do you have in mind how you'd like to split your time if I gave you 75 minutes?

MR. GOTTS:  I would say 65/10.

THE COURT:  All right.  I will grant each side up to 75 minutes of closing argument time with an expected 65/10 split.  I think that both sides would probably be more efficacious if you made it under an hour, but I'll leave that -- it's your case, and you have to gauge the juror's reaction as you go along, but they'll be hopefully fresh-faced tomorrow.  So I'll set 75 minutes as the time.

I think we could take up the arguments as to the Rule 50 motions once the jury has begun their deliberations.  I'll tell you my tentative views, I'm not going to grant them right now.  If I intended to grant them right now, I wouldn't have read all

those directions and given them the verdict form.  But I think we can use some of our time while they're deliberating to talk about that.

Anything else we should take up before tomorrow?

**MR. GOTTS:**  I don't think so, Your Honor.

**THE COURT:**  All right.  Thank you for your persistence and patience.

So we've got, I know, some work in getting the exhibits together also for tomorrow in their index form to give to the jurors tomorrow morning.

See you in the morning.

**ALL COUNSEL:**  Thank you, Your Honor.

(Proceedings adjourned at 3:55 p.m.)

---oOo---

**CERTIFICATE OF REPORTERS**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, March 22, 2016

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter

_____

Rhonda Aquilina, CSR No. 9956, RMR, CRR
U.S. Court Reporter