**Volume 8**

**Pages 1307 - 1430**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

| | |
|---|---|
| ENPLAS DISPLAY DEVICE ) <br> CORPORATION; ENPLAS TECH ) <br> SOLUTIONS, INC.; and ENPLAS ) <br> (U.S.A.), INC., ) <br> ) <br>     Plaintiffs, ) <br> ) <br>   VS. ) <br> ) <br> SEOUL SEMICONDUCTOR CO., LTD., ) <br> ) <br>     Defendant. ) <br> ) | **NO. C 13-5038 NC** |

San Francisco, California
Wednesday, March 23, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

NAGASHIMA & HASHIMOTO
12005 Sunrise Valley Drive - Suite 203
Reston, Virginia  20191
BY:  **MARC R. LABGOLD, ATTORNEY AT LAW**
     **PATRICK J. HOEFFNER, ATTORNEY AT LAW**

SHAW KELLER LLP
300 Delaware Avenue - Suite 1120
Wilmington, Delaware  19801
BY:  **JOHN W. SHAW, ATTORNEY AT LAW**
     **JEFFREY T. CASTELLANO, ATTORNEY AT LAW**
     **ANDREW E. RUSSELL, ATTORNEY AT LAW**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported by:       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                   Rhonda Aquilina, CSR No. 9956, RMR, CRR
                   Official Reporters

**APPEARANCES**:   (CONTINUED)

For Defendant:
                              LATHAM & WATKINS
                              555 Eleventh Street, N.W. - Suite 1000
                              Washington, D.C.   20004
                         BY:  **LAWRENCE J. GOTTS, ATTORNEY AT LAW**

                              LATHAM & WATKINS LLP
                              650 Town Center Drive - 20th Floor
                              Costa Mesa, California   92626
                         BY:  **RYAN R. OWENS, ATTORNEY AT LAW**

                              LATHAM & WATKINS LLP
                              140 Scott Drive
                              Menlo Park, California 94025
                         BY:  **MICHELLE P. WOODHOUSE, ATTORNEY AT LAW**

                              LATHAM & WATKINS LLP
                              John Hancock Tower - 27th Floor
                              200 Clarendon Street
                              Boston, Massachusetts   02116
                         BY:  **CHARLES H. SANDERS, ATTORNEY AT LAW**


Also Present:              **Takaaki Nagashima**
                           **Yukihiko Ohnuki**
                           **Jennifer Jonak**

**I N D E X**

Wednesday, March 23, 2016 - Volume 8

|                                      | PAGE | VOL. |
|--------------------------------------|------|------|
| Closing Argument by Mr. Gotts        | 1315 | 8    |
| Closing Argument by Mr. Labgold      | 1357 | 8    |
| Rebuttal Argument by Mr. Gotts       | 1403 | 8    |
| Jury Begins Deliberations            | 1410 | 8    |
| Rule 50 Motions                      | 1420 | 8    |

Wednesday - March 23, 2016                              9:04 a.m.

**P R O C E E D I N G S**

**---000---**

(Proceedings were heard out of the presence of the jury:)

THE COURT:  Good morning.

ALL:  Good morning, Your Honor.

THE COURT:  Our jurors are here.  Are we all ready for our closing arguments?

MR. GOTTS:  We have one issue, I guess, Your Honor.

THE COURT:  All right.  What is it?

MR. GOTTS:  Ms. Woodhouse will address it.

THE COURT:  Okay.

MS. WOODHOUSE:  So, Your Honor, we have one issue with respect to exhibits that EDD proposes be sent back to the jury. As I think you'll recall, we've said it in open court several times, the parties had this agreement that when it came to native spreadsheets, what would be handed to the jury was screen shots of what was actually shown to the jury.  It's in our joint pretrial statement, which I have copies of, and it explicitly says that neither native versions nor printouts will be provided to the jury.

Last night when we got EDD's exchange, they added something about 650 pages of native printouts of spreadsheets. We don't think it's proper to have them go to the jury.

THE COURT:  From which exhibit is that?

**MS. WOODHOUSE:**  They're the spreadsheets of the profilometry data.  So I can give you the numbers if you'd like, but it starts at --

**MR. LABGOLD:**  102, 103.

**MS. WOODHOUSE:**  So it's PX-102, PX-103, PX-112, PX-113, PX-118, PX-119, PX-124, PX-125, PX-130, PX-131, PX-136, and PX-137.

And, Your Honor, if I could just pass up the agreement we had with respect to these spreadsheets.

**THE COURT:**  You may.

**MS. WOODHOUSE:**  And I can direct your attention to page 3, paragraph 9, and I've highlighted it in pink for you.

(Pause in proceedings.)

**MS. WOODHOUSE:**  And this same provision also occurs with respect to the parties' joint pretrial statement, so it's been twice.

**THE COURT:**  All right.  Mr. Labgold?

**MR. LABGOLD:**  Yes.  We had intended to actually do this as just a cover page until yesterday when they made a big issue out of -- these are the spreadsheet data that we saw counsel for SSC using with Dr. Pollock where it was the columns of numbers, and that they didn't match what was put into the LightTools.

And after making such a big deal, "If you go through all these numbers, none of these numbers are going to match up," as

it turns out, when you go through the spreadsheet, as we saw, you have to page down quite a bit because each one of the numbers in the LightTools is, when it comes to an even number, so 0, .1, .2, .3.

So our concern is after they've made the issue that none of this data matches, we have one of two problems.  One, we would clearly need SSC to agree that they're waiving any arguments regarding this data; and, number two, we would have to inform the jury that there is no argument over the data so when they go looking for it, they'll understand why they haven't found it.

MS. WOODHOUSE:  And, Your Honor, if I can respond to that.

Mr. Labgold had the opportunity to redirect his witness with respect to these data points.  He could have added additional print screen shots if he thought it was necessary. The problem is we actually weren't even informed that this was their intention or this was an issue until about 1:30 in the morning last night.

MR. LABGOLD:  We didn't raise the issue.  You know exactly what you've done with the data.

There is no way that I could have gone back and redirected with spreadsheet after spreadsheet after spreadsheet and covered every number.  I think that, quite honestly, Your Honor would have rightfully cut me off after I'd gone through the

first six or seven pages of the first spreadsheet, let alone going through all of these.

THE COURT: All right. The objection by SSC is sustained. The parties will be bound by their pretrial stipulation and the pretrial order.

And there's an equitable aspect of this as to whether there's been a change in direction of the argument from both parties as to whether they're being surprised and being unfairly prejudiced, and I think EDD is not being unfairly prejudiced because the screen shots and the substantial evidence that's in the exhibits that are in evidence will allow sufficient, and I think more than sufficient, information to rebut this argument made by SSC.

I think that the exhibits, the face of them and the screen shots that they will be viewing, will allow EDD to make their arguments about the data. And I think that there is a danger of further confusion of the jury if we added 650 pages or hundreds additional pages of data, that that would just be more confusing to the jury than the record they presently have. So that objection is sustained.

Let's bring in the jury.

MS. WOODHOUSE: So just one other housekeeping matter is that the parties have presented demonstratives throughout the trial, and we think they should somehow be part of the trial record, and we're just wondering if the Court would like

us to e-file them, or lodge them, or if you had any preference there.

THE COURT:  I agree they should be part of the trial record, and it depends on the format of them as to the sort of storage of them.  If they are e-fileable, I think that would be appropriate.  And so if there's, for example, a photograph of something that was a board, the Clerk's Office is resistant to having large volumes of materials stored forever.  So if there's a way to reduce them to a photograph or to something smaller, that would be the preference.

MS. WOODHOUSE:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

MR. LABGOLD:  Thank you.

(Proceedings were heard in the presence of the jury:)

THE COURT:  All right.  Good morning to our jurors.  Everyone may be seated.

This morning we will have the closing arguments of each party.  I've allotted each party 75 minutes maximum for their closing arguments.  SSC has the burden to establish infringement in the case, so they will go first, and they'll also get the last word.  So SSC will go first, followed by EDD, and then SSC will get the final word.  Then the case will be presented to the jury for your deliberations.

SSC, Mr. Gotts, you may proceed.

MR. GOTTS:  Thank you, Your Honor.

### CLOSING ARGUMENT

**MR. GOTTS:**  Good morning, ladies and gentlemen.

Well, we finally got here.  We spent a lot of work this week getting the evidence in.  You've all been terrific and incredibly attentive, and it comes in in these kind of cases piece by piece.  So this is our chance to pull it all together for both sides so you get both stories and you can go back and sort it out, and that's what we're going to try to do today here.

And to start out, we know how this all began.  It began with Dr. Pelka, our first witness.  Dr. Pelka is a brilliant optics physicist, came up with a number of inventions, and got us -- we're here because of the '209 and the '554, of course, and we talked about -- and he talked about what is the problem that he was addressing with his two patents.

The '209 patent, the first of the two, addresses this bright spot problem, and that's because he came up with the concept of backlighting, direct backlighting, with the optimal solution of redirecting the light so it bounces around in the cavity and the diffusers, and the like; but, yet, when he did that, he created this bright spot problem.

The goal is uniformity.  And he then came up with his what he described first as the black hole lens, if you recall.  That was his description for the dark spot lens.  And that's the lens that sort of did too good a job, if you recall, because it

took all the light that was in the center, directed it all out to the sides. And as you can imagine, you know, all the light is going that way, you've got the dark spot in the middle. So he had to come up with a solution to that.

So the '554 patent addressed the dark spot problem and other issues that came about as he began to contemplate how to make a much better display.

So we know the '209 eliminates bright spots. It says it right in the patent, Column 1, line 51. And you'll see the exhibit numbers here. You'll have all these exhibits back with you; and so where, you know, appropriate, feel free to make notes, and you can see what exhibits you want to take a look at now that you'll have a chance to get a closer look at some of these documents when you deliberate.

Dr. Pelka was ahead of his time because the inventions he came up with really predated the need in the sense of the brightest LEDs hadn't come about yet. As you'll recall his story, that he was -- he learned about sort of the development of brighter LEDs and developed a concept of how he could use them by what he'd have to do to fix the problems and the concerns. LCD TVs didn't even exist at that point in time.

So he foresaw the bright spot problem, as you can see as summarized by the testimony. He says he understood you could imagine -- you can imagine if you, like, shine a flashlight through a piece of paper or a screen, you'd see what the bright

spot issue would be.

And what was his solution?  His solution was to backlight and redirect the light within a cavity, basically move the light so that it would reflect all of the bounce-around within the cavity a number of times to create this uniform light distribution.

Well, in other words, his invention wasn't just sticking lights in the back of an LED.  That's a gross oversimplification.  And in hindsight today you can think about it, but his invention was recognizing, number one, you're going to do this through a cavity; number two, you're going to redirect it in a cavity; number three, you're going to want to make sure you have this uniformity in order to get rid of bright spots.

So that's the '209 in a nutshell.  We'll obviously be talking quite a bit more in the near term.

But the '554 patent, again, is the one that has the elimination-of-dark-spots concept.  Here's Figure 15 and 16. These are the black hole, if you will, embodiments; right? These are not the leaky TIR embodiments, and they're not the -- we'll talk in a moment about the illumination coupler, but they're also not the illumination coupler embodiment.

As you remember, the illumination coupler, we'll show you in a moment, had something else here (indicating); but in the Figure 15 and Figure 16 embodiments, as we'll see, you have the

embedded LED, not the air gap LED.

So the point being that different figures of the patent and different places relate to different inventions. This was the black hole. So not to be confused with leaky TIR or illumination coupler. And it's very important, and you'll be able to read the patent and you'll be able to see that when we got to talking about illumination coupler, we're talking about Figures 24, 25 of the patent, and the text at Column 14. And when we get to the illumination coupler, we're also talking about that embodiment.

So what Dr. Pelka realized, though, was his Figure 15 black hole embodiment -- that's the one that did too good a job. You can see we've shaded how the darking -- darkened area would give you this sort of black hole in the center, and that's why he came up with the concept of this leaky TIR or a leaky black hole, as he described in his testimony.

And the idea was to round that cusp so that you can intentionally permit the light to leak through in order to give you an even distribution of light.

Now, that's described in Column 14 of the patent towards the bottom, and that description -- that description describes rounding off this cusp (indicating), contouring the cusp -- right? -- in order to allow the light to pass through that would otherwise be totally internally reflected off to the sides.

So leaky TIR, as Dr. Pelka explained, had the effect of eliminating the dark spots giving you uniform light distribution.

So the other invention of many in the patent is the illumination coupler invention.  Again, this now is with reference to Figure 24 of the patent, and the description of Figure 24 in the patent, for example, starting at Column 16.  That's the illumination coupler.  Illumination coupler is not just anything that connects an LED to a device.  It is this type of device where you have the air gap and the lens combined with an upper refractive surface to ensure good coupling, good diffraction, ease of assembly, and separation.

And we saw a lot of prior art, and we'll talk about some later, that had what he called sort of fully encapsulated or fully integrated LEDs, without the air gap, without the space.  That's the way it was done in the past.

Dr. Pelka came up with the concept of the illumination coupler.  It's his term, and it has a meaning, and it has a meaning that he described based upon the specification.  So that's Dr. Pelka's invention:  Why are we here?

As you recall, Dr. Ryu described how SSC learned about the '554 patent, considered it important for its development and its initiatives; and respecting IP, decided to take a license, later on purchasing the patent as they got closer to the development concepts of developing or working to develop their

direct backlighting.

SSC considered both the '554 and '209 patents important. They took the license to the '209, and they ultimately also later on purchased that patent.

So that's why we have Dr. Pelka here. Just to remind you, ladies and gentlemen, that's why SSC is now here with the patent itself.

So in 2010, SSC had already decided that it was interested in developing a backlighting solution. SSC is an LED company, an LED maker, but they also have made light bars for them, which they in turn sell. So they're in the light bar business. It's a big, big part of their business. Well, they wanted to get into the light bar business and subsequently did.

EDD, on the other hand, also had a great interest in getting to know and working with SSC. As the deposition read-ins made clear, EDD wanted to expand its sales, and they wanted to work with SSC and they approached SSC to work.

At that point in time, EDD already had a lens that they were trying to enter the market with for backlighting. That was the Sharp lens we talked about, and there was some testimony they may have been doing that with Panasonic as well. So we don't have the details on that, but those are the two things.

But what is clear is they had got no traction in the marketplace as of that point in time. Why? They make very

good lenses.  They had a lens.  They needed virtually no changes.  SSC didn't make the changes to the lens.  SSC didn't recommend the changes to the lens, but they brought the other piece of the puzzle, the peanut butter and jelly.  SSC had the peanut butter, EDD had the jelly, and they put it together for the ideal sandwich.  Right?  The problem was EDD didn't have the peanut butter before.  They had LEDs.

But you heard testimony that was never rebutted that when they went with the SSC-proposed solution, the performance doubled, and the price, which corresponds to a reduction in the price of one half, which -- made the difference between direct backlighting being competitive and not being competitive, and we'll see in a moment what that did in the marketplace.

At the very same time that SSC approached EDD, they also informed them of the '554 patent.  Why?  Not to threaten them, but they wanted to let them know that, "We have a patent that covers our technology."  And they wanted to let them know that this is in the marketplace.

And, frankly, as you'll see later on, SSC really wanted to work collaboratively.  They weren't going after EDD.  They wanted EDD to benefit in this collaboration from the fact that they could keep other competition out.  And so long as SSC was working -- or EDD was working with SSC, no problem.  Of course, SSC wouldn't have an issue or want to sue EDD for that.

But the very first meeting, September 10 -- EDD admits

this; there's no dispute on this point -- right after that, as the testimony of Mr. Murano made clear, EDD went to their Patent Department and they told them about this patent.  They went to Ms. Watai at the Intellectual Property Department to talk about the patent.  This was not a big secret.  There was no surprise.  They knew about the patent.  They talked to their patent people.

So to be clear, SSC was not just some other customer of EDD.  Sure, they were -- they didn't have an exclusive agreement.  In a sense, their patent was their exclusive agreement; right?  Because so long as EDD was working with SSC, there was no problem.  But they did have a patent position, and they did have their view that the patents covered the products.

What was clear, though, is that although SSC certainly wanted to work with Enplas -- that's why they followed up and selected Enplas as their vendor -- and EDD certainly wanted to work with SSC, what we know from EDD's own minutes -- and there's a sequence of these minutes, which I think you'll, ladies and gentlemen, want to look at when you have a chance very carefully.  They're in the DTX-1016 range, but there's a series of these.

What we do know is that even as early as 2010, after the meeting between SSC, Mr. Murano -- SSC's Mr. Lee and Mr. Murano and Takashio, it was clear that there was very little activity in the LCD marketplace at that point in time.  It was clear

that EDD wanted SSC to propose an optical LED solution to expand those sales. It's clear that they thought SSC was an important LED maker, and they knew that the strength of the LED is necessary to improve their product.

That's exactly what we were saying before. They knew they needed a better LED solution to get the thin product, the low-cost product, and they knew they needed a good relationship with SSC to make that happen.

Everybody was happy. Everybody wanted this to happen. Okay? Everybody wanted to see -- we wanted to get a good lens and marry it up. We wanted the jelly. They wanted the peanut butter. All right? So we all wanted to work together, and that's what happened; and we did, in fact, propose the product that made that happen.

So EDD, on the other hand, Mr. Murano now seeks to rewrite history. He says he could get high-efficiency LEDs from other LED manufacturers. At trial he says this. He says, "We were in a situation where we were able to obtain these LEDs from any other source or any other LED manufacturers." That was his trial testimony. He said that on the stand.

But what did they say in January 2011 in their meeting minutes? These are their minutes, DTX-1021. They said, "Seoul Semiconductor cannot be removed from the development of high-efficiency LEDs." It doesn't say, "We've got lots of sources. Don't worry about it." They wanted us and they

wanted to work with us.  They knew we were bringing value, our patents and our technology.

In April 2011, a few months later, again meeting minutes.  These are EDD's documents.  The meeting minutes say -- 4/27/2011 minutes say, "An important manufacturer.  We were able to establish a sales route for built-in LED through partnership with Seoul Semiconductor."  They admitted that we were the ones that helped them grow this business.

It was a two-way street.  We got lenses.  We wanted to work with them.  We wanted to collaborate.  We wanted to share the benefit of our patent so that we could all protect ourselves in the marketplace.

And, in fact, we strongly wanted to collaborate.  We made that clear in May of 2011.  This is DTX-1023.  We wanted a top-level meeting to establish this direct collaboration.  And this is the same memo that you'll see later -- well, you may see where we talked about our patents, but we didn't threaten EDD.  We simply said, "As long as you're working with us, no problem, but we can use our patents to protect ourselves in this collaborative effort."  We wanted to work together.

Now, you'll recall, or perhaps you will recall, Mr. Murano took the stand and again took a different position.  He said "Seoul Semiconductor" -- we asked him:  (reading)

> **"Q.**  It's true, isn't it, that Seoul Semiconductor wanted
>     to cooperate with Enplas?

"**A.**   According to minutes, that point was not raised by Seoul Semiconductor."

Those very minutes proved exactly the opposite point. 1023:  (reading)

"Strongly desires a top-level meeting with Enplas and a decision in the direction of collaboration."

We wanted to work together.  We wanted an agreement.  We didn't have an agreement, but we had -- we were being supplied by them.  It was an understanding.  It was a relationship of mutual trust, mutual fairness.  Remember we talked about fairness in the opening?  It was the first thing I said that came out of my mouth was fairness.

Throughout this process, SSC reminded EDD of its patents, at least three to five times according to Mr. Ryu.  We have EDD themselves talking about it I think at least three times: 2010, 2011, and 2013.  So it happened multiple occasions.  This was no secret.

And throughout that time, not a single time did EDD come forward and say, "We disagree.  These patents don't cover these products."  Never once.  Never once until this lawsuit was brought.

Throughout this time, SSC working -- hoping to be working collaboratively with EDD, invested very heavily in the process: Five engineers full-time, 10,000 hours of effort.  This is complicated stuff, and we brought it to the table, and we were

happy to do it because we developed this solution with them. We all benefited from the joint solution.

And according to Mr. Murano, by 2012 -- remember they had virtually no sales, that was their own minutes -- by 2012 now, they already believed they had a 30 percent market share. This is their documents that talk about it. This is his testimony that talks about it. The collaboration was successful. EDD benefited from it. SSC was benefiting from it. EDD knew about the patents. SSC told them about the patents. EDD never disputed anything about the patents.

But then EDD got greedy. Rather than do the work together with SSC that they worked so hard and invested so much to do, rather than working together to build this market -- they already had 30 percent of the market, I guess they wanted more -- they then -- we find out in the marketplace we're finding the lenses in other products, other companies, Lumens, our major competitor, with EDD lenses that infringe our patents.

SSC was understandably upset, felt betrayed. So what did they do? Well, they didn't write a letter to EDD right away. EDD is still their partner. Not in a partnership-sense agreement, but they felt they were in partnership with EDD. They wanted to resolve this issue with the actual direct infringer.

By the way, we'll talk about this later, but EDD is not a

direct infringer.  As you know, we'll talk, they are an inducer of infringement, and they don't sell into the U.S.  So the very first recourse would be, let's go after the people who are doing it in the U.S., the Best Buys of the world, or the people who are making the whole light bar, the Lumens of the world. And if we do that, then we don't necessarily ruffle EDD's feathers because we're really kind of worried about that. Because if we ruffle their feathers, they may cut off our supply, increase our price, whatever is going to happen, and then we're really stuck.  Because, sure, can we buy new lenses eventually?  Yeah, but it's a long process, and we have orders to fill.

So what do we do?  We go and we write letters.  And, by the way, we write lawyer letters.  The lawyer letter said, "We'd like to talk.  We'd like amicable resolution, a friendly resolution."  But, you know, walk softly but carry a big stick as they say; right?  If you can't -- you have to at least have some threat out there that says what are you going to do if you don't talk to me, so they write the letters but they clearly were looking to resolve this issue with Lumens, with Best Buy, and that's why they went to them.

And Mr. Nam explained that; right?  There's nothing nefarious.  There's only desire to work it out.  We didn't want to fight.  We weren't looking for a fight.  We were looking for people to respect our IP, to respect our patents.  We put a lot

of money into this development effort, we put money into our patents, and we just wanted respect.  We just wanted our patents to be respected in the industry, and we wanted EDD to honor at least the moral commitment even if there wasn't a contractual commitment to work with us.

And, as I said, EDD was worried about EDD -- I'm sorry -- SSC was worried about how EDD might react.  And, indeed, when we finally did send a letter in October of 2013, as Mr. Nam testified, right after they sent the letter, EDD stopped supplying them.  They stopped, they started, they stopped again, and then they raised the price over twofold.

But throughout that process, SSC just wanted to talk.  He wanted to reach a resolution.  This is -- the October 2013 letter was designed to talk.  We couldn't get them -- the Lumens people weren't talking.  The Best Buy people weren't talking.  We knew they were sending this stuff out.  We wanted to talk.

But EDD had a different approach.  When we sent the letter, they did exactly what we were afraid of.  They cut off our supply on October -- on the 21st.  According to Mr. Nam, he said after -- then again they started again, then they reincreased the price by two and a half times, and this continued to happen over and over again and put SSC in a very difficult position.  Because, as he said, Mr. Nam explained, this is 30 percent of their business.  They had orders to fill,

and they were getting strong-armed and threatened.

And in the end, EDD sues SSC.  EDD sues SSC.  And rather than talk, they sue.  And why did they do that?  Because they wanted to bring to bear all the pressure they could.  They wanted to hope -- threaten supplies.  They wanted to increase price.  They brought a lawsuit because they were hoping that SSC would just capitulate and say, "Okay, guys, use our patents.  You can sell to our competitors."

But SSC couldn't walk away.  That's why we're here.  SSC had to defend itself, had to defend its intellectual property and patent position.  That's why we're here.

So that takes us into the patents itself, a little segue. We've now talked about how we got here, what EDD knew, when they knew it.  Let's start with the '209 patent because that comes up first in terms of sequence of development.

Claim 20 of the '209 patent is the one that's involved in this case.  Let's talk about infringement of Claim 20 of the '209 patent.

And the instructions you received yesterday talk about burden of proof.  Burden of proof.  Who has to prove what and by how much, in essence?  You know, the classic scales of justice; right?

Now, the case of infringement, the burden of proof is to prove more likely than not.  SSC needs to prove that the act of -- the direct infringement induced infringement by more

likely than not.

So if you think about the scales, slightly tipped, 51 percent, whatever the flavor. That's the amount. So if there's any uncertainty -- there can be uncertainty but you still have to find more likely than not, but ever so slightly is all that's required. That's the burden for infringement. We'll talk about other burdens of proof a bit later, but for infringement, that's the burden of proof.

So what do we know? For the Claim 20 we know that SSC obtained televisions in California for these six -- from these six companies. We know those six companies were selling products to purchasers. We know those purchasers aren't buying them to be giant paperweights. They're purchasing them to turn them on and use their television sets; right? There's no mystery there.

And SSC took apart those televisions and analyzed them to see if they infringed the '209 patent, and then they hired Dr. Moore. Dr. Moore is not a professional witness. Dr. Moore is a brilliant scientist. It's who NASA looked to to help fix the Hubble Space Telescope. It's who the Clinton Administration hired by sending an appointee to be a technical adviser, but he's not a professional witness; but he is somebody who did a thorough and detailed job, as we'll talk about, for analyzing these products, and I'll go into that a little bit later.

And what did Dr. Moore do here with respect to Claim 20 of the '209 patent?  He looked at the patent to see is there infringement, and he found each and every element of that claim was met by each and every element -- by each and every display of the six displays.

Now, at trial there seemingly was only -- there's only one dispute, and that is:  Are these LEDs around the perimeter?  That's the only dispute that was raised throughout the course of the trial.  You need to find infringement, of course.  We have to prove it, but that's where the rubber meets the road on Claim 20 of noninfringement.

All of these TVs have a light source around the perimeter.  They all have LEDs that go around the perimeter of the cavity, and Dr. Moore identified those and he talked about the around the perimeter.  He gave the example of skating around the hockey rink; right?  You can skate around the perimeter of the hockey rink from the outside or the inside.

It doesn't say "outside the perimeter."  It says "around the perimeter."  And when it comes to infringement, you look at the words, you look at the products, and you see do the words meet the product.  If so, it's direct infringement.

Of course, that's all governed by the Court's constructions if those constructions in some way put some different interpretation or gloss on the words, but there are no such constructions here for "around the perimeter" so you

get to decide what's "around the perimeter."

And Dr. Pollock disagreed about what "around the perimeter" means; but, yet, when I asked him, he had to admit that when I put him in an empty room and asked him to walk around the perimeter of the room, that would include walking around the walls.  He didn't want to answer that question, but he answered that question, and it's because that is the common understanding of the term.  So as Dr. Moore testified, as Dr. Pollock really couldn't meaningfully disagree, the LEDs are around the perimeter.

So what about Claim 20 for validity?  Validity has a different burden of proof.  For validity -- for EDD to prove invalidity of the claims, that the claims are invalid, should never have been issued, EDD must prove that it's highly probable.  Not just the 51 percent, highly probable.  You must persuade it's highly probable that the claim is invalid, a significantly higher burden of proof.

So what do they say?  First they talk about this Gleckman prior art.  As you may recall, Gleckman worked with Dr. Pelka, and he came up with this '354 patent, which was -- the disclosed embodiment is this tiny little LCD display that's used in, you know, goggles, glasses, and that thing was edge-lit.  We heard a lot about edge-lit LEDs.  That's the old way of doing it; right?  You edge light the LEDs.  And for a small display that works just fine because the light can be

projected inwards, it does the trick, but it doesn't scale very well. You couldn't edge light a big old screen because you'd end up having dark spots in the middle. So he's got this picture, which looks just like displays looked back then, and he shows his edge-lit LEDs around there.

But to an iPad, it's fundamentally different. Sure, when you look at it, to an iPad it's a big display. Gleckman is this tiny little thing, or at least that's one of the disclosed embodiments.

Dr. Pelka conceived of, "Let's move the LEDs into the center," but that's not all he did. He said, "Let's find ways to redirect the light. Let's put it in a cavity, and understand that cavity will allow the light to bounce around, and let's create this uniformity here that is required by the claims."

And, you know, as Dr. Pelka indicated, it's a fundamental difference to see change from what was being done before. You would never do that in Gleckman in that little display. Why would you put a bunch of little LEDs in the middle for this little display anyway? There's no motivation to do that.

But hindsight is 20/20. We'll see that in this case the real-world evidence proves that what Dr. Pelka came up with, the elegantly simple invention that Dr. Pelka came up with isn't what the other folks in the prior art came up with. They came up with a solution that was silly, quite frankly, and

certainly not something that would ever be adopted in a television.

And what was that?  EDD and Dr. Pollock say that you would take this Osawa reference and this Takeichi -- or this Takeichi reference, and you would take the LEDs that are shown on the bottom of those things, and you would say, "Oh, that teaches me to go ahead and put LEDs on the bottom of Gleckman; and, lo and behold, we've got the invention."

But what did Osawa and Takeichi do when they decided they wanted to have LEDs on the back?  They didn't take those and then find some sort of element in there to redirect the light and put them in an open cavity to let the light bounce around. They went an entirely different direction, and they sort of say, "Okay.  We're going to put the LEDs in here, and we're going to fill this thing up with plastic, with epoxy; and we're going to put this one here.  It's even more complicated.  We're going to take it and we're going to fill up in between each of these things with epoxy and create not one cavity but dozens and dozens of cavities."

What does that tell you?  It tells you that this is unobvious because if you could have automatically known that you can do this without filling it up with epoxy and without creating a bunch of cavities and going through these processes and creating this whole heavy display, you would have done it.

But hindsight is 20/20.  It's real easy.  It's like I

think I indicated to Dr. Pollock, as I recall, when you already know the answer to the test, the answer is easy; right?

Dr. Moore made it clear that Claim 20 is not obvious by Gleckman alone -- either Gleckman alone or Osawa and Takeichi together. You have to put yourself in the shoes of prior to the invention, what would one of ordinary skill in the art have done. And here we actually know what one of ordinary skill in the art would have done. It's what they did. And even if you combined Osawa and Takeichi together with Gleckman, what would you get? You'd get Gleckman filled with resin and filled with LEDs, and that's not the invention.

So let's turn next to the '554 patent. Infringement. Again, the same burden of proof, preponderance of the evidence for infringement. In this case, SSC purchased -- three of the TVs SSC purchased had lenses that SSC concluded infringe the '554 patent.

And, again, the direct infringers are the sellers of those lenses -- of those products with lenses and, of course, ultimately the users.

So there's two sets of claims in the '554 patent that are at issue for infringement. The first set is Claim 1 and 6, which are the illumination coupler set of claims; and the second set are Claims 33 through 35, which are the leaky TIR claims. So let's separate those out and deal with those.

And as you'll recall, Dr. Moore went through each and

every element of these claims and found that they were infringed by the three accused products in the same way.

At trial EDD raised three issues with regard to the Claims 1 and 6, the illumination coupler claims, three primary issues.  First, they said there's no generally parallel top and bottom surfaces; second, they said there's -- they argued about whether there's total internal reflection; third, they say the waves are not captured for propagation between the top and bottom surfaces.  So let's look at those in turn.

Turning first to generate parallel top and bottom surfaces, EDD's own specifications show generally parallel top and bottom surfaces.  This is their document.  This is their specification.  We'll look at this again some more.  And the profiles themselves that were done by BRO show generally parallel top and bottom surfaces.

One thing I want to point out about BRO is -- and you'll want to juxtapose this, and we'll talk some more about this, but I don't want to forget because it's here -- you'll see among the evidence a series of comprehensive BRO reports. Remember Breault Research Organization, they're the ones that were called out for in the patent?  The patent says, you know, you can use BRO, and that's who SSC used working with Dr. Moore to prove infringement.

But these reports, you'll see -- we haven't actually thumbed through the reports, but you'll have them to thumb

through, and you'll see they're detailed, and they show in detail what was done by BRO working with Dr. Moore.

They show the different LED light sources.  I'll talk about that.  They show the different gaps that were used.  They show TIR was -- where TIR was obtained.

And you'll also see in PX-91 and a few of the other ray trace exhibits, what Dr. Pollock relied upon; and what you'll see is he was handed the outputs, he was handed a list of the inputs, and that's what he did.  EDD -- not BRO, not an independent organization -- EDD ran the data, ran the numbers, and handed it to Dr. Pollock to testify about.

Now, BRO has no interest in the outcome of this litigation.  EDD, of course, does.

Turning next to the TIR point.  Before we get to the slide, you'll recall I examined Mr. Yamaguchi; and when I examined Mr. Yamaguchi, he said that there's all diffusion, no TIR.  I explained to him, "Don't you think you'll get TIR in the middle, that's why you have that cusp in the middle that causes TIR?"  And he said, "No, no, no.  No TIR."  I said, "Well, maybe we'll talk to Dr. Pollock about that."

Well, Dr. Pollock, he admits that even notwithstanding all the issues we have with his data -- we'll talk about some of those -- even then he still found TIR in two of the three lenses, and the only way he didn't find TIR was with the one where he didn't run the right configuration himself.  So he has

no evidence of no TIR.  He quibbles about how much, we'll talk about that, but he admits there's TIR even though Dr. Yamaguchi said there is no TIR.

Dr. Yamaguchi says, "We designed these lenses to avoid TIR."  Well, obviously they don't design them to avoid TIR because there is TIR, and that was also shown by the BRO reports.

And we'll talk a bit about it, but these reports show TIR at the very LED dimensions and diameters that EDD says are used with these products.  There's no phantom or fictitious data.  You heard about that.  They told us what diameters, and that's where the TIR is exemplified, is shown.

The last issue for the Claims 1 and 6, capturing light for propagation between top and bottom surfaces.  The light rays are explained.  They bounce up (indicating), they go up here (indicating), they hit the surface (indicating), they bounce down (indicating), and they go towards the bottom surface there (indicating).

Now, it's true that nobody in this case showed what happens to the light next.  We're always looking at the first bounce, but nobody disputes what happens next either, as made clear by Dr. Moore.

When the light hits this surface (indicating) -- which, by the way -- oops, sorry -- what did I do?  Oh, here we go.

When the light hits this surface right here (indicating),

which is a flat surface not a roughened surface, Snell's law tells you it's got to bounce. It's got to bounce. And so -- and Dr. Moore made it clear in his testimony that the only way that light would get extinguished and killed and not bounce, is if the surface was black, and these surfaces aren't black.

So propagation between top and bottom surfaces, of course. It's a matter of basic physics. It's Snell's law. And even if it was diffuse, even if it scattered, if it scatters all around, the light still goes through.

So Claims 1 and 5 -- 1 and 6 of the '554 patent are infringed.

MR. LABGOLD: Your Honor, do you want objections now or after?

THE COURT: If you have an objection.

MR. LABGOLD: This was an objection that was sustained about the black surface with Dr. Moore. There is no data to that effect.

THE COURT: Overruled. You can address it in your closing.

MR. GOTTS: So Claims 1 and 6 are infringed.

Next comes Claims 33 to 35. As you recall, those claims are dependent claims of Claim 30, so you first have to look at Claim 30. That's why we're putting that up even though the infringement analysis is of Claims 33 to 35 because those claims include Claim 30.

As to Claim 30, the primary dispute -- after Dr. Moore said everything was met, the primary dispute is around this so-called TIR surface. Remember, Dr. Pollock admitted there's TIR on two of the three lenses, and that he didn't test the third. And remember that Dr. Moore showed all of them had TIR.

So this TIR surface, that's a construed term: (reading)

"A surface angled with respect to a light source to provide total internal reflection within a device."

This is the surface angled (indicating). It provides total internal reflection as shown by the BRO data on all the lenses at the LEDs as specified.

Now, lest there be any doubt, there's some -- the position seems to be that these surfaces aren't angled or curved, but this is the profile data that we talked about quite a bit with Dr. Pollock (indicating), and this is the curve of one half of that side from their profile data (indicating). This is EDD's own document. This is curved at every single point. Of course, it's angled. So Claim 30 is infringed. Every element of Claim 30 is met by all the accused products.

So now we turn to Claims 33 through 35, which, as you can see, incorporate Claim 30 because 35 includes 34, 34 includes 33, and 33 includes 30. So you have to go through this whole chain, but the real primary issue is: Is it a leaky surface, leaky TIR? We talked about that.

And it's leaky, of course. We saw the BRO data, and the

BRO data shows not only the TIR and the TIR surface, but the leakage going out from there.

Now, we're going to talk some more about this later, but claims -- the fact that the claim -- the fact that the product does something that's in addition to what's claimed is irrelevant. You're going to get it -- you'll see the instruction, and I'll explain that to you.

The fact that some of that other light, even if it's a large amount of light, makes its way out to the sides and elsewhere through the top has nothing to do with whether or not there is TIR and whether or not there is leakage. Doing something more doesn't make it not infringe, and I'll talk about that a little bit more in a moment.

The patent -- and EDD's position is they don't dispute that it leaks. They say it leaks too much. They say it can't be leaky because it's a small amount of TIR and a large amount of leakage.

Well, what's too much? This contour, this isn't an accident. If they wanted a round lens, they would have made a round lens. On the outside it's round because they want -- they told you -- Mr. Yamaguchi explained he wants this spreading out out here (indicating). I mean, this contour has got a purpose. And what's that purpose? It gives you TIR and it gives you leakage; and in the end, you get what we know is a uniform distribution because it's a successful lens. It's been

a very successful lens.

And the patent itself tells you significant portion of the light can leak through.  It doesn't say a little bit.  It doesn't say a dribble.  A significant portion to give you this uniformity.

So Claims 33 through 35, as Dr. Moore said, infringed.

So this goes to the point I was hinting at before I got ahead of myself, and that is that regardless of the fact that there's additional features, they still infringe.  There's going to be a lot of talk, I'm sure -- there has been a lot of talk, and I bet there will be more -- that these are diffusion lenses.  These aren't TIR lenses.

And no doubt, no doubt -- hold on.  Let me jump ahead.

There is diffusion going on on the outside, but there's also TIR and leaky TIR in the middle.

So what the claim -- what the judge -- Your Honor's jury instructions tell you is an open claim, a claim that uses the word "comprising," like these claims, is infringed so long as every requirement of the claim is present.  You look for inclusiveness of the element of the claim.  But it also tells you if that's true, we know that -- and in this case if there's TIR and leaky TIR, there's infringement.

Now, what the instruction further tells you, though, is the fact that there are other parts or steps does not avoid infringement.  The fact that there is diffusion does not avoid

infringement.  It's not a defense to infringement.

This lens has TIR.  It's got leaky TIR and, yes, it's got diffusion on the outskirts.  It's a hybrid.  It's designed to spread that light on the outside and do TIR and leaky TIR in the middle.  The leaky TIR and the TIR is what's the claim -- this claim is about.  It's not focusing on what's happening in the other parts.  Okay?  And we'll talk about that.

Remember there was a power analysis that Dr. Pollock did. He said it's only like .2 percent, or whatever.  I forgot the exact number, but it's less than a percent, a fraction of a percent.  And he said, "Oh, that proves it's not the invention."  Well, there's a couple problems with that.  First of all, we'll talk about the problems with his data.

But even accepting that, he's looking at all the light from here (indicating) to here (indicating), every light. Think about this lens from the top.  The center where it's leaky TIR is really a small point in the middle.  Surface area-wise it's a big area going out the other parts of that lens.

If you look down on the top, you know, you think about as a circle with a little hole in the middle, area-wise it's a small part; but the part we're interested in knowing is how much -- what's going on in that little small part in the middle.  We don't care what's going on on the outsides.

His power analysis compares all of the power -- all of the

light going out of this thing from there to what's happening for the TIR in the middle.  That's not even the question here.  The question here is:  What is going on in the middle?  What's the impact of TIR in the middle?

He didn't run that calculation.  We didn't run it either because we think it's irrelevant.  The claim only requires TIR and leaky TIR; but even if you were to determine -- if you wanted to know how much, he did the wrong calculation, and that's even assuming his data was correct.

Let's talk briefly about Dr. Moore's analysis.  Dr. Moore was involved -- I'm not going to go through each of these steps, but one of the things I think you would point out, you would note is he measured the gaps.  He looked at actual light bars.  He removed the lenses and he measured the LED diameter itself.  He measured the profile.  He -- well, ACT, the people he worked with, measured the profiles.  In each instance, by the way, this isn't SSC doing the work.  This is independent organizations and ASAP BRO, the one that's called out in the patent.

All these things were done, the data was entered into the ASAP software, the very software that's mentioned in the patent, the ray traces were run, and Dr. Moore analyzed the results.

He didn't come in at the end of the process and have them just hand it to him.  He didn't go to SSC and say, "Tell me

what the answer is."  They went and they had the data done analyzed by an independent organization, and that's where his results came from.  He relied on independent testing of BRO and other organizations.

And what did he find?  At each of EDD's admitted diameters -- this is PX-84.  EDD tells us what their diameter -- what did they say the LED diameters were?  At each of these diameters, Dr. Moore reports -- which you'll have, these are the BRO reports -- point out -- and ray traces -- that there was TIR.  There's no phantom data here or fictitious data.  There's some discussion about that.

Dr. Moore did analyze several ranges of data -- 2.0, 2.2, and 2.5 -- to do that, but subsumed within that is the very dimensions that EDD says those diameters are for the data.  And at those very diameters, he found infringement, TIR.

Likewise, the gap.  Dr. Moore working with BRO measured the gap.  They found the gap ranged from 25 to 125.

Now, counsel sort of poked fun at Dr. Moore by saying, "Oh, you don't know which light bar had which range and where was it?"  That wasn't the point.  The point was that this whole fluctuation and variability occurred in all the light bars.  So he wanted to establish that within the full range of variability, there was infringement.  And that's what the BRO reports did.  The BRO reports analyzed TIR -- you'll have them, you'll have them -- at 0, at 75, and at 125, and they found

there was TIR at all those places and all those levels, and then he shows in his report 75.  Not because that's the only thing that was measured.  It's because he couldn't show every single point in there.  But the reports which he says he relied upon show it at 0, 75, and 125, and that's the measured dimensions.  That's infringement.

Now, you'll hear about the mistake.  BRO made a mistake.  They put the wrong data.  They did the first lens correctly, then they put in the wrong -- they didn't change the thickness value for the later lenses.  And that came out and Dr. Moore, when he found out about it, did the responsible thing.  He went back to BRO, said, "Rerun the data."  When they reran the data, they dropped one of the lenses and the other ones actually improved, or stayed roughly the same or improved in terms of the data.  It was a mistake but he did the scientifically, intellectually honest thing.  He corrected the data and he only -- to be clear, all he relies upon in this case is the corrected data.  Nothing else.  Nothing else.  And that's what you're going to see.

And he wasn't happy about it.  As he said, "I'm not a happy camper."  Who would be?  He's a brilliant scientist.  He was upset, but he fixed it.  We all make mistakes.

So what is Dr. Moore's analysis?  He measured actual products.  Actual products.  Remember what's in issue here is, actual products, the things that are in the U.S.  Not what you

think they might be, not what you'd like to make, but actual products.

He went to an independent third party to do the testing. He was involved hands on. He was doing measuring. He was looking at the data. He met for a long day with BRO and had many, many conversations with BRO after that. He did hands-on work. He was a scientist. He wasn't a conduit. He wasn't here just to pass on the information from somebody else. He was a scientist. He is a scientist. When he made a mistake, he owned it, and he corrected it, and he only relied on the corrected data.

So what did Dr. Pollock do? Dr. Pollock is a very good witness. He's articulate. He is accustomed to speaking on the stand, as you can tell. But in this case -- and he's, I'm sure, a very good scientist, but here he was a conduit. Here he was passing along what was handed to him from EDD.

He had one Skype telephone call, one two-hour call, before he prepared his expert report in this case with Mr. Yamaguchi and Mr. Akiyama in Japanese translated. We saw how slow that goes. That's what he had. That was his background.

Compare that -- so he had a two-hour call. They send him the ray traces. He said he told them what concepts he wanted, but they sent him the ray traces, and then he comes and talks about them.

And, incredibly, he never looked at a light bar. Even

more incredibly, he says a light bar is irrelevant.
Irrelevant.  I mean, we talked about the gaps.  We talked about
the LEDs.  We talked about how these things are put together.
The gaps are very important.  They claim the gaps are important
because they complained about our gap data.  He never looked at
a light bar.

EDD has got a lot of light bars.  You heard Dr. -- you
heard Mr. Murano -- I'm sorry -- Mr. Akiyama talk about the
process where they get light bars back and forth.  How hard
would it be to show Dr. Pollock a light bar, measure one up?

And we also saw that there was a discrepancy even in the
data that was generated under LightTools.  This discrepancy was
that under LightTools this one, as we showed, these two lenses
here (indicating), were supposed to have only a 12-micron
difference; and as Dr. Pollock had to admit, there was a
200-micron difference.

Remember, the error in the Hubble Telescope was 8 microns.
Remember, the gaps here range from 0 to 125 microns.  Even
Dr. Pollock's gaps range from, I don't know, if I remember,
220, 170, and 250 microns.  This is a huge mistake.

I don't know what happened.  I'm not suggesting that
Dr. Pollock did something intentionally wrong.  I'm suggesting
he accepted the data that was provided to him.  I'm not even
suggesting to you necessarily that EDD did something
intentionally wrong.  All I know is the data is suspect at best

and unexplainable.

We saw this, the 12-micron difference.  Remember, these are the lenses scaled properly from their LightTools device, and you can see, if you go there, they're the same diameter like they should be -- right? -- in that other drawing.  But if we go forward, look and we can see what happens.  This is a 200-micron difference.  Dr. Pollock didn't disagree with that.  That's a lot.

Dr. Pollock also said -- he talked a lot about the gaps.  He first tried to say that the gaps were specified as a specification, but he later had to admit there was no specification and that the gap numbers that he used, which he calculated without taking into account the solder and the glue and the holes in the light bar, which he didn't even know existed because he never looked at a light bar, he says, "I don't know where the gap numbers came from."  He ran his gap numbers and he says, "I don't know where they came from."

And he never ran Dr. Moore's gap numbers, and he never ran corrected gap numbers when he recognized that there was at least going to be some variation in the gaps.  Why?  I don't know.  Maybe they did run them.  I'm not saying Dr. Pollock ran them, but maybe EDD ran them.  Because, remember, Dr. Pollock only gets what EDD gives to him.

So how do you compare the two?  Dr. Pollock never expected actual products.  EDD did the testing, not an independent lab.

His work was a two-hour translated Skype call.  He relies on flawed data, and the flawed data still showed TIR.  After all of this going on, even then his data still shows TIR on two out of the three lenses, and he didn't bother to check the third properly with his gaps -- with his LED diameters I should say.

So that takes us through infringement, and you'll have the chance to consider who did the more thoughtful analysis here, who did the science, who worked with an independent organization and who worked without.

I want to talk briefly about the '554 patent invalidity.  Same burden of proof, highly probable.  This is really pretty easy.  There's a hodgepodge of prior art, but you'll see that the prior art, as different as it all looks, all falls into the same category of prior art we talked about, which is this encapsulated prior art.

It's all got the LEDs buried in the middle, and here (indicating) it's buried in the bottom, not removable with an air gap.  All of that's -- Johnson, Stanley, and the Japanese prior art, JP-161, all have encapsulated LEDs.  That alone answers almost all the questions here on invalidity.

And Dr. Pollock had to admit that the LEDs in Johnson are fully encapsulated, in Stanley fully encapsulated, and in JP-161 he explained -- he acknowledged that air gap isn't there.  It's integrated.  All of that prior art is not anticipated.  It doesn't anticipate Claims 1 and 30 for that

reason alone.

Claim 30 doesn't have the illumination coupler *per se*, but it's got another very important limitation because it talks about the LED mounted at a location beneath a central portion of the optical element -- so it's got to be mounted beneath -- and such that the light from the LED enters the optical element.

If you're already inside the optical element, if you're already fully encapsulated, you can't enter it.  If I'm already in this room, I can't enter the room.  If the light -- if the LED is already in the encapsulant, it can't enter the encapsulant.

So it very much -- it's a very similar limitation to the illumination coupler, and it's not met by Johnson.  And for that reason the encapsulated prior art, all that encapsulated prior art -- Johnson, Stanley, and JP-161 -- does not anticipate either Claims 1 and 30 or Claims 6 and 33 through 37 of the '554 patent.

Remember, anticipation means each and every element of the claim has to be present.  It's not obviousness.  It's each and every element.  You've got to be able to find each one there.

Johnson also, they say, discloses a leaky TIR surface.  It discloses no such thing.  Johnson isn't trying to avoid dark spots.  Johnson isn't trying to achieve leakage.  Well, there's no perfect lens.  To have no single light ray ever escape you'd

have to have a point that was totally perfect.  So there's no perfect lens, but he is not teaching leaky TIR.  He's not teaching elimination of dark spots.

In fact, on this telephone, as was pointed out, this touchpad goes underneath a telephone as they described.  These are the LEDs (indicating).  They're blocked here.  There's no reason to avoid -- to allow light to go through for leaky TIR.  You want all the light to go sideways out to light up these buttons.  This is addressing an entirely different problem.  So Johnson does not disclose a leaky TIR surface.

The next thing they do is they talk about Stanley, the Stanley prior art.  Stanley is the one over here (indicating), and it's a -- this is just like that Figure 14 to 15 kind of concept, which is a perfect TIR surface.  It deflects all the light.  In other words, it would have a black spot on the top, a dark spot.

Rohm, the real invention in the Rohm prior art, same thing.  The prior art invention in Rohm, the real invention was the same kind of thing.  It was just like Stanley.  No teaching suggestion in Stanley or in the primary embodiment of Rohm for a dark spot -- to eliminate dark spots.

So what do they point to?  EDD points to Rohm and says, "Ah, but there's this other invention embodiment, Figure 3.  That one shows light coming through the center."

But remember now we're talking obviousness, and Stanley

doesn't teach leaky TIR.  So now you've got to say:  Would one of ordinary skill in the art back in 1997 looking at this prior art have said, "I'm going to modify Stanley to make it leaky TIR"?  That's the question you have to ask:  Would one skilled in the art do that?

And then you go and you look at would it modify in view of Rohm?  Does Rohm tell me to make Stanley leaky TIR?  And the answer is no because Rohm teaches away.  It tells you don't let the light through the center.  No.  It tells you -- strike that.  It tells you that too much light goes through the center, so you shouldn't use me.  That's what it tells you.  So there's no anticipation; and, likewise, for the other claims.

Let me just briefly, because I'm going to run out of time here, hit a couple of quick points.  This is on the inducement point, you've been instructed, you'll see.

EDD understood where its lenses were going.  It admitted that.  It new that it was participating in the world market.  It knew that since April 2012 LCD televisions were going into the United States.  EDD is deeply involved in the participation of developing these lenses, as it made clear when it tested with Akiyama.  He had a long description of how he was involved with the customers.  They send you the LEDs.  They work on the light bars.  They go back and forth.  They're deeply involved in the entire process.

EDD then has a spec which they put together and work with

their customers, tell them exactly what to do, and you'll see all these spec documents. DTX-1070 is one of them, but there's several of them, one for each accused product. And that spec tells that they want to get rid of bright spots, luminescent spots. It tells you you want to use this particular kind of lens, in this case the 9854D. It tells you you want to use -- put those lenses in a certain interval in the back. It looks a lot like the '209 patent, I might add. And it tells you that there's a diffusion panel. Remember that's claimed by the '209. It tells you there's BEF, brightness enhancement filters required by the '209 patent. And then finally it tells you how to put it all together. They tell you the lens, and they attach to all these things their lens drawings.

And EDD admits they've been aware of the patent since 2010; and lest their be any doubt, we notified them in October 2013 of their infringement of both patents.

There has to be direct infringement as well, but there is direct infringement of both patents. We already showed that. Direct infringement is not what EDD does. It's what the folks in the U.S. are doing. And we say -- and you have to look and see and you'll have to decide did EDD induce the infringement as required by -- as set forth in the Court's instructions.

Last point, damages. You heard from Ms. Davis, damages expert. EDD had no damages expert. Ms. Davis explained how the patents have been licensed by numerous parties already

before this.  They're important patents.  She explained that in the pragmatic approach, the parties would have agreed to a lump sum license which gave EDD the freedom of movement, and she told us that that would result in a lump-sum payment of 2 to $4 million for the '554, 70,000 for the '209.

And, ladies and gentlemen, you get to decide if that's the right number or if some other number is supported by the evidence in the record.  You get to tell.

So in summary, we'll ask that you find for the plaintiff -- I mean, for SSC.  And you'll be getting the verdict form, and that verdict form will have a number of questions, and you can see, we've shown here, how that should be filled out if you agree with us that SSC should prevail.

You'll be asked the question whether or not claims were directly infringed, and there's separate boxes for answering "yes."

You'll be asked the question:  Has SSC proven that EDD induced infringement for each of the claims?  We believe the answer should be "yes."

You'll be asked the question:  Are the patents -- all the claims invalid that are identified here by anticipation?  We think they are not.

You'll be asked the question:  Are the three claims that are at issue for obviousness invalid for obviousness?  We believe they are not.  This is all for the '554.

Finally, you'll be asked for the lump sum damages, should there be damages, for all of EDD's products or just the accused products, and what the amount should be; and, again, that's entirely up to you.

The same set of questions are there for the '209 patent.

Lastly, you'll be asked the question of willfulness. We believe, based on the Court's instructions, they meet willfulness.

In the interest of time, I won't go through it again for the '209, but the form is identical for the '209.

And, again, I'll have a chance to stand up again, but I thank you for your attention, not only just now but throughout the course of the week, and we'll talk a bit in a little bit. Thank you very much.

THE COURT: Thank you, Mr. Gotts.

MR. GOTTS: Thank you, Your Honor.

THE COURT: For your planning purposes, you have nine minutes remaining.

MR. GOTTS: Thank you, Your Honor.

THE COURT: We'll take a break now, ladies and gentlemen, come back in ten minutes for EDD's closing argument. Thank you.

(Recess taken at 10:17 a.m.)

(Proceedings resumed at 10:26 a.m.)

(Proceedings were heard out of the presence of the jury:)

**THE COURT:**  Mr. Labgold, are you ready?

**MR. LABGOLD:**  Yes, sir.

**THE COURT:**  All right.  Let's bring in the jury.

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  All right.  Everyone may be seated.

And it is now EDD's opportunity for their closing argument.

Mr. Labgold, you may proceed.

**MR. LABGOLD:**  Thank you, Your Honor.

### CLOSING ARGUMENT

**MR. LABGOLD:**  Good morning, everybody.  Thank you very much for your patience sitting through this.  It's been a long time and a lot of things have been discussed.

Ironically, for a patent case, you've actually heard far less about the patents themselves, the actual language of the claims, and the technology at issue than we usually do.  I don't know if that's a good thing or a bad thing for you because at least it makes it a little more interesting maybe at times, but the real focus of what's here is not on the bad divorce.  It's not on how he said and she said.  It's about what does the patent claim and what's being done.

Now, the patent, as you know, you've been instructed and you saw the video, the patent in the United States gives the owner a right to exclude others from making, using, selling, offering for sale or importing the claimed device or using the

method.  This is a monopoly that's given in a country that abhors monopolies; and so because of that, there's real guidance in making sure that the only thing that's excluded is what's actually claimed.

Now, one of the things that you're not allowed to claim in a patent are concepts of nature.  You can trust me on this, but if you're not sure, you can give it a try.  Go try and file a patent on gravity.  The Patent Office will tell you, "That's not patentable.  You didn't make something."  You have to actually contribute.  You have to actually add to the art.  You heard that during the video that you watched in the beginning.

Now, what counsel has said -- counsel for SSC has said is TIR equals the '554 patent.  Well, TIR, you've already heard and nobody's disputed, is a phenomenon of nature.  It happens when light leaves one refractive index interface and hits at an angle greater than the critical angle with respect to the normal, it will automatically be reflected.

So TIR does not equal infringement.  If it was equal to infringement, the Court's job would have been a lot easier because the Court wouldn't have had to interpret the claims.

Now, the Court has provided you with very specific definitions with regard to TIR, and one of them that's very critical to this case is the concept of a TIR surface because Dr. Pollock absolutely did not deny that there was TIR that he found measured in the lenses.  It just is not the TIR that's

claimed.  And what we will see is that Dr. Moore's definition of "TIR," as he admitted on the stand that he used, is not what the Court said had to be followed.

Now, before I get into the details, and I'm going to come back around, we need to understand two things about infringement more.  We need to understand direct infringement. Direct infringement is the infringement by another, in this case in the United States.  So that's going to be related to the TVs.  And, yes, Dr. Moore was required, if he was providing the analysis, to analyze whether or not that direct infringement occurs.

The other kind of infringement that you heard about, and it's the one you have to decide with regard to my client, is inducement.  You've been given an instruction on inducement, and we'll go through it in just a little bit, but the key here is that they have to knowingly and actively induce another to infringe the claim.

So in that regard, it is important not just to look at the product -- which is outside of their hands when they sell the lenses and give those to a bar maker, who sells them to a distributor, who sell them to a light bar maker or to a display maker and whoever down the line -- you have to understand what they are designing, what their intent is.  Are they intending to infringe?  And that's what's really important about the design.

Now, I'd like to pull up the first slide, quickly for your observation here, PX-101, PX-117, PX-123, and PX-129, and 135. These are the specifications for each of these lenses. You've heard them referred to, and I'm not going to read the rest of the numbers; but what is summarized here is, what you'll find is following the specification in numerical order, you're going to find the surface profiles for the upper surface, the lower surface, the design drawings ending with the lens itself. So this will help you navigate through some of the documentation that's been provided.

Now, I want to talk about the actual infringement first before we talk about some of the interplay. Turning to the next slide.

These are the products which are accused of infringement, and on the next slide we'll see two of those are not accused of infringing the '554 patent. You'll have the specification. You can see the detail. Some of them share exact same profiles with some of the others, and that's important that those two don't infringe because it goes to the subjective belief by Enplas that all of its lenses do not infringe.

Now, continuing forward, we have another issue that kind of narrows the issues that I believe you have to decide. Dr. Moore had two TVs which had a 9879 lens to analyze. However, he didn't know which one was actually measured, and no data has been provided on that.

As you've been told by Mr. Gotts, the balance that you have to weigh is 50 percent plus.  It just has to fall 50 percent plus.  But if we go back to the previous slide, with regard to these two 9879s, the best that you can do on those is a coin toss.  You can't get greater than 50 percent.  So with regard to the 9879, I submit that there can be no proof of infringement because you don't know which of those two was actually measured, and Dr. Moore admitted that it varies from manufacture to manufacture.

Now, let's look at the infringement analysis.  With regard to -- forward, please -- with regard to the noninfringement of Claims 1 and 6 of the '554 patent, I'm going to go through the '554 patent infringement/invalidity because it's the more detailed first; and the one thing -- there's a couple things wrapped into this, but the significant point to focus on is this "captured for propagation between said top and bottom surfaces."

Now, if we look to the next slide, every single data point that was shown, the only data that is shown by Dr. Moore in proving infringement all terminate at these walls (indicating).  There is no propagation.

Now, there can be no doubt about this because on the next slide when asked:  (reading)

"Q.  But that's not what you said.  You said it doesn't disclose a waveguide at all because the light is not

captured for propagation and leaves after the first reflection; correct?

"A.   That's correct."

The other thing you heard Dr. Moore say is that: (reading)

"Q.   But there has to be more than one reflection; correct?  That's what I'm saying.  You can't just have one reflection and leave.  You have to be able to have multiple reflections.

"A.   That's correct."

Dr. Moore admitted that for propagation to meet this limitation, you have to show more than one reflection; yet every piece of data that they have, there's only the reflection off the top and then it stops.

And there is evidence besides Dr. Moore saying that, "Well, everybody would know you have to paint it black." Dr. Pollock testified that it's not just for artistic purposes. For a scientific fact, it would not go past that point.

If we could switch over to the ELMO briefly.

Dr. Pollock, during his testimony, said:  (reading)

"Q.   Now, is that an artistic thing?

"A.   No.   That surface has been roughened, that surface has intentionally been killed, and so a light ray coming down and hitting that surface cannot -- you can't use Snell's law to define how that light ray goes on.  They're

no longer propagating.  So that's the issue."

There is no evidence to the contrary.

Now, what's important here, as you heard, without a doubt, they used BRO.  BRO did the test that Dr. Moore wanted run.  If it propagates, why didn't they show it?  It's their burden of proof.  They're in complete control over what tests are performed and put before this court.  They didn't put any.  Whatever the reason, you don't have to figure.  The bottom line is Dr. Moore admitted it's not propagation unless there's more than one bounce.

Now, while -- one more slide.

Again, you'll look through the data, but he confirmed: (reading)

**"Q.**  Have you provided any ray traces with more than one reflection?  Yes or no.

**"A.**  As I said, I have not."

Turning to the next slide, we have evidence of propagation because the propagation has to be between generally parallel top and bottom surfaces.

Now, as you saw and heard from the witnesses -- Mr. Akiyama, Mr. Yamaguchi -- the design drawings are meant to be representative.  It's the measurements that are important; and if they get changed, you'll see there's cross-outs, and they don't change the form.  There's some basic template aspect to that because the dimensions when it comes to the profile,

those come in the other forms.  Those have to be accurate for the dimensions.  Now -- for the contours.

The design drawings are a relational document.  They show how the surfaces move up and down and with respect to each other how high they are.

Now, even assuming, as they do, that these are generally parallel top and bottom surfaces, and you'll look at the ray traces that are performed by EDD, and you'll see there actually is nothing beyond that, but you'll actually have the lenses so you can look at them.  And you take -- in your own mind, you decide whether there's a generally parallel top and bottom surface that some light is supposed to be coming out of here (indicating) and going between.  You'll see that there's surfaces.  They're roughened.  They're not optical.  The optical portions are the clear ones where they're highly polished and they're like a lens.

But assume for the moment that they're right.  Assume that there is a generally parallel top and bottom surface.  None of the ray traces you'll ever see does that light ever even hit between those generally parallel top and bottom surfaces.

So while I let you decide whether or not they're there, at the end of the day, it will be for your own personal satisfaction because there's not a single light ray you'll ever see that goes between them.

And when we look at the next slide, you just see a

close-up of what's there, and you'll have the actual data.

So for those reasons, at a minimum -- I'm not going to go through and criticize BRO's data anymore.  I think you've heard the answers.  I think you've heard the questions.  I think you've heard what the conclusions are.  Things had to be changed.  The person who made the mistake was the person who fixed it.  There was no checking or following up.  Actual values were not put into a computer program.  That's not the way science is supposed to be done, but we'll leave that for your decision.

And, suffice it to say, that with regard to Claims 1 and 6, you don't have to go any further than this, and you can leave all the rest of the difficulties and differences and using the wrong data.  While it's all true, if you need that, you have all that information, but this is enough to find noninfringement.

Now, turning to the next slide, the other asserted claims are Claims 33 to 35.  So, as you've already heard, you've got to go through Claim 30 because Claim 30 is the independent claim.  Now, for reasons I'll never understand, and you don't have to decide, they don't assert that this claim is infringed.  I'm not sure why because we have to go through the analysis anyway; but you don't have to make that determination, but you have to determine whether all the elements are there.

And what they said in theirs -- this is their document,

each one of these charts where the Xs are -- we find that what we're going to focus on is the TIR surface.

Now, what is a TIR surface?  The Court has given you a construction:  (reading)

> "A surface angled with respect to a light source to produce total internal reflection within a device."

If we can go back just one moment to the previous slide.

I know this sounds like a crazy exercise, but I would advise you do it at least once, if not orally if you don't write it out.  Every time it says "TIR surface," that's what -- the definition can actually be plugged in there because we're saying that that word actually has this meaning, and it becomes very clear what's going on.  Because, as Dr. Pollock explained, there's certain elements of this claim with regard to the TIR surface that are very important.  It starts above the LED.

If we go to the next slide and following.

And it's going to go outwardly.  The claim language explicitly says it.  So you remember, every single word of the claim counts.  And then it says you start on the outside and you move from the edges down towards the center over the LED.  This claim twice says what would seemingly be redundant language to make sure that you know that this TIR surface is above the LED and extending outwards towards the edges from there.  There's no dispute about that.  There's no contrary evidence.

Now, with regard to Dr. Moore's TIR surface on the next slide, we have this whole surface here (indicating) shown in blue. He's saying that that's the TIR surface. That's where TIR is occurring. But, yet, he admits that the only thing that occurs is if you go all the way to the extreme points of the LED, a little portion of it is going to be reflected off that surface where it starts to flatten and starts to go the other side.

Now, remember, it's not just what the definition of a TIR surface is. It has to start at the edge and go outward and come out and come in. By the time you get down to the other side, not even Dr. Moore says that's part of the TIR surface.

But looking at what we have here, these are his TIR surface (indicating), although he admits, and it's undisputed, that all the light that comes from every other place on this one -- this is a 9854D -- every other location that's all going to go through.

Now, we're going to come back with regard to leakiness in a moment.

But as we heard Dr. Moore say, that every point, at every location we are actually able to see it's going to be going through that surface. And going back one slide, he says it's going to be refracted at those two interfaces.

Remember, we have a first refraction and then we have a second. And so for every other place on this LED, that light

is going one refraction (indicating), two refraction (indicating), out of the lens.

Now, when asked, "What do you mean 'TIR surface,'" this is where we get a little problem with Dr. Moore's definition. Because despite the fact that the Court has told you what you have to use as a TIR surface, I asked him:  (reading)

"Q.  Now, you said in your testimony just now on direct that you believe it's a TIR surface because it has TIR; correct?

"A.  Yes.

"Q.  So if it has TIR, it's a TIR surface; correct?

"A.  That is defined as a TIR surface."

That's not the definition of "TIR surface."  There can be TIR and it not be a TIR surface.  But just to prove that maybe we were misunderstanding what he was saying, if we look at the next slide, he testified and he told you that this surface (indicating), which is perfectly flat -- it's not curving in, it's not curving out -- this is what he was testifying to when he was saying that this flat surface is a TIR surface because it has TIR.  This is not the Court's definition of a tire surface, and it's because he's applied that that he says that there's TIR.

And, as I said, Dr. Pollock doesn't dispute the fact that when he actually ran the measurements -- had EDD run the measurements, excuse me, he was actually comforted by the fact

that it did show some TIR.  Because if you're going to cook the books, I mean, make sure you at least clean it up.  I mean, if EDD was going to run ray traces at Dr. Pollock's request, I would think that these people who design lenses could have at least fixed the game so that it showed no TIR.

What is the motivated value for EDD showing that data?  Because Dr. Pollock said, "I want you to run these data points, and I want you to run it like this, and I want to see the data regardless of what it shows."

And what's important is, that TIR, which is reflected -- and you'll see this in the demonstratives that you have, the ray traces that you have -- it's not on the incline.  It's not at the TIR surface.  It's the same as these flats.

Now, go to the next slide, please.

Now, let's look at Claims 33 to 35, and we start talking about the actual concept of leakiness.  Each one of these claims adds to Claim 30.

Now, as we look through these, I'm not going to say it every time, suffice it to say, my argument's the same.  There's still no TIR surface, but we're going to look at it just because.

So these claims would not be infringed because you can't infringe a dependent claim if you don't infringe the independent claim.  That's actually in your instructions.

But let's assume for the moment, just to show belt and

suspenders, looking at Claims 33, 34, and 35, we're looking at the concept of leakage.

Now, the '554 patent discusses leakiness, and you've heard this.  You heard it with Dr. Moore.  You heard it with Dr. Pelka.  You've heard it with my opposing counsel.  It's all about these dark spots.  You've created this problem because you've done something too well.

I mean, there's no question, the '554 patent is directed to TIR.  They say TIR is infringement.  So, again, this is not something that Dr. Pelka is wanting to avoid.  He's trying to achieve TIR, and that's great; and he did it so well, he created these dark spots.

Now, he understands, as he told you in the explanation, there's some circumstances you may not want that dark spot.  So what you're going to do is you're going to allow a little bit of light to leak through to even it out.

Now, if you think about it from a commonsense standpoint, if you didn't have any further instruction, all of you I'm sure have used a garden hose and all of you know that you take the garden hose, you hook it up to the spigot, you turn on the water and, lo and behold, the water comes out the other end. It's a magical and mysterious device, but it works.  We don't have to understand why.  And all the water comes out in one direction.

None of us would say that that's leaky because the light

that's leaking through, in that case the water, is what's supposed to go through.  But now if we get a hole somewhere else and a little bit comes out, that's leaky.  And in California, because I grew up here, sometimes you put out the soaker hoses.  Those would actually be, in my view, kind of more leaky because you put those little holes in it along the way and it kind of like makes it so kind of like the water leaks out as opposed to flowing out.  But here we get a full definition.  We're trying to solve a problem.

And looking at the next slide, this is talking to Dr. Moore:  (reading)

"Q.  You also said that the leakiness in the '554 patent is for a purpose.  It's to correct for the dark spots; correct?

"A.  That's correct.

"Q.  Now, what documents have you seen about these little lenses that EDD makes that shows that there was ever a dark spot?"

And he says:  (reading)

"A.  We traced the rays to show there was a TIR surface. We're not -- I'm not -- I don't think there is a dark spot in this lens."

Remember, the leakiness is a corrective measure.  It's because the TIR worked so well.  Here they're not trying to make this lens leaky.  They're trying to make this a refractive

lens.

Dr. Yamaguchi explained to you what the basis of his design was; and while not perfect -- I think he's still working on perfection, and I think he still wants to know why Mr. Gotts thinks that his lens has TIR, but we've only allowed him to come today if he agreed not to try and ask Mr. Gotts the question.  And, again -- but the goal was to achieve refraction, not to achieve TIR.  So there was no TIR to correct for.

In his, Mr. Yamaguchi's, testimony, he said, and it was unrebutted:  (reading)

"Q.  Is your lens design based upon total internal reflection?

"A.  No, that is not the case.  As I mentioned earlier, refraction is the only principle used."

Now, that doesn't mean, and I'm not saying, that there isn't that little bit of total internal reflection that's measured out there at the same place it would happen if it was a completely flat surface, but that's not a TIR surface as the Court has defined it and the patent uses it.

Now, going to the next slide, we see how the corrective measure of leakiness is supposed to be taken.  And for reasons I don't understand, Mr. Gotts said to you that it was -- the leakiness didn't relate to the figure he was showing to you with the encapsulation.  That's Figure 16.

You will see that this language regarding leakiness is Column 14, line 58, to 13 -- this is 15 -- excuse me -- to Column 15, line 3, this is relating to Figures 15 to 18.  It relates exactly to the figure that we were looking at.

Now, in the EDD measurements, the ray traces, and Dr. Pollock asked for the power calculation, he explained that there's 10 million light rays.  You can look at it and you can -- you'll have the data, and you can see how many rays are taken.  It's over the entire area.  And you'll see there's a little box in the top and it will have a little circle.  And so, yes, it was how much total internal reflection occurs from across the entire lens and the entire surface of the LED.  The data's all there.

And using it in that fashion -- it says the LED size so you can see the entire one for that lens -- the amount transmitted for the 9854D is 99.88 percent.  That is leaky under anybody's definition, but it doesn't matter under everybody's definition.  It's under the '554 patent.  That clearly can't be compensating for anything.  That's not what this concept of leakiness is all about.

And with regard to the 9879, here we have an issue -- aside from the fact that, again, I don't think they have any evidence that can get them over that coin flip -- 99.96 percent of the light goes through.

Now, you may remember Dr. Pelka, I asked him the

question -- and one thing I have to say. Dr. Pollock, he's a professor, and I suspect he's probably a really enjoyable professor to listen to because he actually tells a good story, tells it in a colorful way, tries to, you know, illustrate what he's saying. He just doesn't come in and, you know, give you the curt answers. He's not a professional expert. You have his résumé. This isn't something that he does like Ms. Davis for a full-time job. Instead we have him opining on his technologies, optics, Snell's law, total internal reflection. He teaches a course in this stuff. He knows what he's talking about. And the one thing you have to give him credit for, he never refused to answer a single question.

Now, Dr. Pelka, when I asked him, "Is it more than 50 percent that's allowed to be leaked through," I don't get an answer, and I go through the ranges. But the one thing he will admit is when I asked him: (reading)

"**Q.** Are there circumstances where it, the leakiness, could be -- in your experience of your invention, where it's over 90 percent? Have you had that experience?

"**A.** No."

Because that's not what leakiness is in his regard. That's making a refractive lens that just happens to maybe reflect a little bit of light. That's not making a TIR lens that leaks a little.

And then I asked Dr. Moore. I mean, this should be an

easy question.  This is the guy who supposedly fixed the Hubble Telescope within 8 microns from right here on the ground, which I have to say is an impressive task.  But when you ask somebody who's got those kind of credentials:  (reading)

"Q.  You have to admit that this lens, the TIR lens, if it was designed to be a TIR lens, they failed miserably?

"A.  I'm not going to comment on that."

Why not?  I mean, that should be something he should be able to freely and fairly say and explain why or why not it doesn't make a difference.

And then on the next page I asked him:

"Q.  Is it 90 percent?  95 percent?

"A.  Never done the calculation.  I don't know.

"Q.  90 percent plus?

"A.  I don't know the answer.

"Q.  80 percent plus?

"A.  I don't know the answer."

Maybe he doesn't know the answer, but I find that kind of hard to believe because it's pretty clear from looking at this, after he went back to the less-than-artistic graphic of the black that's drawn in with all the light that would go through, he did seem to know that there should be just a little bit more coming back down.  And he, I think in his professional estimate, could have told you how much that little bit is actually coming down, at least have given you a range, but he

refused to give you that answer.

So now turning back, the first two lenses, 4922 and 9853A, we're only going to see those now in '209.

With regard to the second two lenses, the evidence, in my view, clearly shows there's no propagation.  There's none of the leakiness.  There's none of the TIR surface.

With regard to the 9879, the arguments and the evidence are the same; but, again, these are those two where you don't even have enough evidence to get past a coin flip on 50 percent.

Now, let's look at the invalidity questions.  Invalidity in a patent case is usually a place where we spend a lot of time.  We didn't spend a lot of time because we spent a lot of time apparently at the beginning of the case, and we heard very little from Dr. Moore in rebuttal.  But using his charts, fortunately we're able to see exactly what he's saying is not taught by the prior art.  This makes it really convenient for both of us.

So with regard to Claim 1 and Claim 6, we're missing an illumination coupler and we're missing, ironically, "such that light rays that would otherwise pass out of said waveguide are captured for propagation between said top and bottom surfaces."

Now, remember how he interpreted these claims with regard to the lens, please.

Turning to the next slide.

This is the JP-161 art.  This is PX-204.  Now, we have a waveguide, undisputed.  We have top and bottom parallel surfaces, undisputed.  We have a light, which counsel again characterized as being embedded.  I'm going to tell you why the embedding doesn't matter, but Dr. Moore admitted it was not embedded.  It was -- actually it's inserted.  The LED is not embedded.  It's inserted.

And you'll see when you read the patent that there's -- actually it says and if you want to ensure good coupling, you can also use one of those optical adhesives, but it's optional.

So it takes into account that there's an air gap here (indicating) that you can fill if you choose, and there is obviously TIR going on.

First Dr. Moore said there wasn't.  Then he said, "Okay.  There is."  And we clearly have propagation because these things bounce, bounce, bounce, bounce, bounce.  There's no question.  This even fits Dr. Moore's definition of "propagation."

And he admitted that eventually it will bounce, and it will leave because it will actually -- it will get to a point where it hits a surface that it didn't expect to hit, change its angle, and now it goes out.  Of course, otherwise it can't be an illumination panel.

Now, turning to the next slide, this is where he says that what's missing is the air gap on direct.

And then on the next slide:  (reading)

"Q.  And you said that you thought that the LED was molded into this?

"A.  No.  I believe it's inserted into.

"Q.  And if you want to make sure there's no air gap, you can use some kind of transparent optical adhesive?

"A.  That's correct."

And you'll see it puts it in those terms in the prior art, and there's no question with regard to propagation.

Now, if you go to slide, I believe it's going to be 36, the next claim chart, so you'll see that when it comes to illumination coupler, although I don't believe that's the proper definition for reasons I'll tell you, JP-161 fits it to a T, every single element.  The rest is uncontested.  So the question is whether it has that illumination coupler with an air gap and whether or not there's propagation between those surfaces; and the reference clearly shows that it is, and Dr. Moore admitted it on cross.

Now, JP-161 is only applied to Claims 1 and 6 because it is a flat waveguide, and it doesn't have a curved surface.  Its incident, its refractive index interface is like a deep V, so they're straight lines.  So when we look forward, we're going to look into the other prior art for those curved surfaces.

Now, the next reference we're going to talk about is Johnson.  Johnson is applied across the claims.  Johnson is a

great piece of prior art because you don't have to, like, imagine in your mind how that could possibly be happening because most of Johnson actually uses the same words as the claims do.

Here the only reason why Johnson does not anticipate Claim 1 is because they're saying it doesn't have an illumination coupler.

Now, you don't have to find -- you don't have to take the time. If you already find that JP-161 takes care of Claim 1 and 6, you don't have to look at Johnson for Claim 1. It's not like a multiple exercise. You can only invalidate the claim once, so you can save your time on that.

But I want to talk about this concept because it's going to come up on some of the other claims.

If you go to the next slide, there's nothing in the '554 patent that says anything about encapsulation is bad. We heard Dr. Pelka talk about the wires and the heat. There's nothing in there. I don't know if you've had the opportunity to read it, you will, there's nothing in there about that.

There's nothing to the contrary -- well, maybe there is. When we look at Figure 16A, and you'll see the way it's described, and this is in the patent at Column 13, lines 39 to 47: (reading)

"The LED 44 is embedded in a correspondingly shaped hole, channel, or recess. A transparent optical coupling

agent, such as an adhesive or gel (not shown) may be used to fill any air gaps between the LED and the waveguide."

Now, clearly we can't be eliminating the fact that encapsulation is encompassed within the scope of this patent when the teaching of the patent expressly tells you how to encapsulate it.  This clearly is a teaching that encapsulation is included and it's contemplated.

Now, with regard to their concept of illumination coupler and that we can't have embedding and embedding somehow immediately eliminates the art, what they turn to is they turn to Column 16, lines 27 to 38, and they say:  (reading)

"The illumination coupling element 136 desirably includes a lens element 90."

And it goes on.

Now, this language you'll see in the jury instructions, the use of the word "desirably," that's actually been decided by the courts.  That's an indication that this is a preferred embodiment.  If it's not in the claims, the claims are broader than that, we're not allowed to limit the claims to specific embodiments unless the claims themselves are so limited.  So in this case, they're trying to interpret the illumination coupler to be limited to a specific embodiment.  That embodiment is Figure 24.

THE COURT:  One moment.

MR. GOTTS:  Your Honor, I just object to the extent

we're getting legal conclusions beyond the Court's instructions.

THE COURT:  Overruled.  Proceed.

MR. LABGOLD:  Thank you, Your Honor.

So when you look at it, look at which embodiments show what.  It's very interesting how they'll refer to Figure 16 when it's convenient and creating a dark spot and for leakiness, but then all of a sudden, encapsulation is bad.

So with regard to Johnson and Claim 1, everything is there.  It does what it's supposed to do.  Their only reason is because it doesn't have an air gap, and you can see from the '554 it doesn't exclude an air gap.  It's purely a legal argument.

Now, looking at Johnson against Claim 38, they argue, and Dr. Moore actually argued this, that the reason why Johnson doesn't anticipate Claim 38 is because it does not have a curved shape that is symmetrical about an axis and it does not have a light-emitting diode lying substantially on said axis.

Now, let's go to the next slide.  This is the curved shape (indicating).  You can look at it in Johnson.  The refractive index interface is, in fact, curved.  It says that it's actually a parabolic curve.  And then we have it's lying on an axis.

And as you heard Dr. Pollock say, while this figure, this embodiment, it's discussed in the patent, you'll see it in

Column 1 right after the description of the figure, it will say that the figures show the use of two LEDs; but that's because of the specific example that they use, and their invention is in no way limiting.

And, more important, when they went to define their invention, what they were claiming, what they said was is that it had at least one light-emitting diode -- this is Johnson; it's at Claim 1 -- and the top surface of that little dome, having a depression therein extending toward the light-emitting diode to form an approximately conically shaped internally reflecting surface with respect to the light-emitting diode.

Obviously if you can have one LED and that surface is curving toward it, it has to be substantially on the axis, and the claim doesn't say "exactly on the axis."  It says "substantially on the axis."  Why?  Because that's the way manufacturing tolerances in reality works.

So you'll see that Johnson does teach the two elements that they say are missing from Claim 38 on the next slide.

Now, on the next slide, Claims 39, 41, 46, 47, and 48, they offered no opposition.  Dr. Moore's only reason for saying that they're not invalid is because Johnson doesn't teach Claim 38.

With regard to 42, 43, and 45, it's because he says that Johnson doesn't teach leaky.

Now, we have an important feature here because the curved

shape -- if we can back up to Claim 38 for just a second -- the curved shape of Johnson is such that it is symmetrical about an axis and converges to a location in a central portion of the optical element.

What's very important about Claim 38 is that it actually gives a definition for you that's not found anywhere else in the claims or anywhere else in the patent explicitly for where the central location is intended to be with respect to the claims.  So that's where the curved shape converges.

Now, Dr. Moore had no problem understanding where that curved shape was when he was asked at his deposition and he confirmed here -- we'll come back to that.  Excuse me.  First we've got to hit the leaky:  (reading)

"The cusp in 42 is contoured to permit leaky through central portion of the refractive index interface."

Well, clearly the cusp is rounded -- it's contoured to allow the leaky.  And Claim 1, again, tells you -- Claim 1 gives you most of your information as you need it in the words, is that "the conically shaped surface having the apex angle such that all of the light incident on the dome will be internally reflected and coupled into the sheet" -- and that's the waveguide out there -- "with the exception of that light that hits at the apex."  That's right at that curved portion, right at that contoured portion, and it actually gives you a line saying that light leaks out at the apex.  And Dr. Moore

agreed: (reading)

"Q. So the part that hits the apex is going to be leaky?

It's going to be a leaky TIR surface; correct?

"A. So the light that hits directly on that surface will

leak out by one -- a few rays."

You already heard from opposing counsel, the claim doesn't impose how many rays. In this one they're saying that Johnson doesn't show enough leakiness. But, again, by their definition, by the patent's definition, the light is leaking through and it's specifically telling you that it's allowing it to be through that contoured surface because it's rounded and not a point.

Now, that takes care of Claims 42, 43, and 45 because you'll see Johnson shows leaky.

Now, turning to Claim 30, their only basis for 30 not being invalid, Dr. Moore's only argument is that "LED mounted at a predetermined location beneath a central portion of said optical element." What Dr. Moore's definition is, is it's got to be beneath the entire element. It has to be outside of and can't be encapsulated, but the claim doesn't say "beneath the entire element." It says "beneath a central portion."

So I just ask you, pay close attention as you're looking at the claim language, and this is one where their whole defense to invalidity is based on whether it's below the element or what's actually claimed, below a central portion.

Now, as I alluded to -- the next slide -- Dr. Moore didn't have any difficulty identifying where the central portion was, and this was asked at his deposition.  I asked him the question, there was redirect, and I had to ask the question again, and the question was:

"Q.  And the question was:  (reading)

'Q.  Can you, going back to 16A, can you just circle that location?  So that's the location where the two -- well, that's the location where the curved shape that's symmetrical about an axis converges?'.

"And you clarified, quote, 'converges to a location in a central portion of the optical element.'  Right."

And he confirmed that was his testimony.  So he knows exactly where the central portion is, and it's right there where those two curves converge.

And when we look at Johnson in the next slide, there's no question that Johnson has the LEDs below where those two curves converge, and it tells you in Claim 1 the whole purpose of it is so that that's curving towards it so it can internally reflect the light.

So on the next slide we see that.  There's no question Johnson teaches an LED below a central portion, and that's the only point that's contested.

Turning to the next slide, Claim 31 will automatically fall.  It wasn't even challenged.  It wasn't even written down.

But focusing on 36 and 37, those two fall with Claim 38 as well. There's no opposition to the fact that there's polymeric materials.

So 33, 34, and 35 come right back to that same leaky argument, which I'm not going to make you listen to; but suffice it to say, Johnson's still leaking for the same reason it was with respect to Claim 38 as we see on the next slide.

Oh, no, we don't. I spared you it.

On the next slide, please. So -- next slide.

That takes care of all the claims with regard to Johnson.

Now, Stanley, Stanley is a different reference. And in the course of this litigation, the parties will assert a variety of different references. Some of them come through all the way to the end, some of them don't, and some of them are there to force the other side to take positions.

And it's very curious how Stanley ended up working out. While Johnson anticipates all the claims, including the ones that Stanley is applied to, it's actually the response to the Stanley assertion that's actually more interesting.

Stanley with regard to claim -- Stanley is a two-lens system. Actually in the spec of the Stanley reference, which is not PX-200, it's -- we'll get you the number. That's mislabeled -- we have lens part 31A, which is a refractive lens part, and 31B, which is a reflective lens part. And while you look at it and you say, "Wow, it makes a lot of sense to mold

this as one piece," it actually defines in this paragraph 10, which is page 5 of the English:  (reading)

"Since the refractive lens part 31A and the reflective lens part 31B are provided so as to be closely adjacent to each other, the light distribution by the two lens parts can be continuous without interruption.  Also, when they're separate is what it's going to refer to here, when the two lenses are coupled, it is desirable to adjust the joining section to have illumination consistency."

Well, you don't have to discuss the joining section unless they're two separate parts.  So there's no question that it's talking about two separate lenses, and you'll see in the context how 31A and 31B are discussed.

Now, turning to the next slide, when you start with the prospect that this upper lens 31B is the optical element that we're talking about, it has top and bottom opposing sides.  It has an edge extending between them.  It's got the TIR surface. And you'll see -- going on, please -- that the LED is mounted at a predetermined location beneath a central portion of said optical element.

It doesn't matter how you define "central portion" for this one because even under their definition, Stanley is below that central portion, but it's -- clearly the central portion doesn't change.  It still has to be where the two curves converge.

Moving on to the next slide.

Now, Stanley doesn't teach leakiness, and that's why it was actually applied. And Rohm, you'll go through and you'll see, it actually teaches kind of a dial-in-the-leakiness-you-want kind of approach. Because it will tell you by changing the curvature of this surface, you can get TIR right here (indicating), that's the 30-degree line; and then you'll see the 40-degree line (indicating), and the 50-degree line (indicating). Those are actually totally internally reflecting and come back. And it talks about how you would change those curvatures and it would change at what dimension.

So at this point in this figure, 0 to 20 degrees is the leakiness, with the rest of it either being refracted out and so many of it being totally internally reflected.

But what's curious is, for some reason Dr. Moore doesn't think that this is a TIR surface curving towards the LED, even though it has TIR. Basically Dr. Moore takes positions that are convenient for SSC's positions. How can you say, when he's already told you in infringement land that any TIR makes that a TIR surface, but this surface, which has a curve, slight recess, is not a TIR surface curving towards the LED?

I respectfully submit that that is not taking a genuine position, and that Dr. Moore basically takes positions as convenient in this case. Because what you see, it does look a lot like what he says is TIR when it's convenient for SSC and

it achieves their goal.

So for these reasons as set forth, and you'll have a chance to go through -- and I'm not going to go through the jury form and show you how to answer the questions. I'm very confident that all of you can actually read. I see most of you can write, probably some of you have good penmanship. You won't get graded on that.

But when you go through the form, I suspect you will read, and I'll leave those choices to you to work out how to answer yes and no to whether the claims have been proven to be invalid.

We do bear a burden of proof, which is clear and convincing -- excuse me -- the way it's described here is highly probable. So it's a higher burden, but none of the prior art that we've been looking at has been before the Patent Office. So the instructions will discuss how that gets handled.

Now let's talk about '209. '209, the only thing it doesn't teach is mounting lights on the bottom wall.

Go to the next slide.

As we showed you, if you line up Claims 20 of the '209 patent, which is the claim that's asserted, to the prior art Claim 16, you'll notice a lot of similarity here. It could have just been a really -- it was just a coincidence. I mean, there clearly is some knowledge of what's going on with the one

and the other, but it doesn't matter because it's what it discloses.

This is one of the easiest invalidity analyses I've ever had to ask someone to go through because for almost every element, all you had to do was just look and the language was literally there.

Now, the only one that's contested is whether you would put light sources on the bottom wall.  And we look at the next slide.  Uncontested on our part Gleckman is not disclosing lights on the bottom wall.  So the question is:  Would it be obvious to one of ordinary skill in the art to add a little light in the middle?

Now, you heard the discussion about a room.  I talked about it during opening.  Dr. Pollock talked about it.  You immediately -- we all immediately see what the problem is.  And we heard Dr. Moore saying that, "Well, yes, but as you were getting bigger, you know, you would start to have these problems, and Gleckman doesn't solve that problem."

Exactly.  That's why we're saying it's obvious and not anticipated.  But when we build on the prior art, this is one of the -- this is a hypothetical person of ordinary skill in the art, and this person has access to all of the prior art, and they have their skill set.

Now, let's look at what their level of skill is moving two slides ahead.  Move on further.

SSC's position is that the person of ordinary skill in the art -- it's not a real person.  It's this hypothetical person.  For reasons I can't tell you, patent attorneys, we have hypothetical people, hypothetical negotiations, and you get to deal with the real claim language that nobody really understands.

But SSC's position is that someone with an undergraduate degree in optical engineering, electrical engineering, or physics with at least three years of relevant experience in optical design for LEDs.  That's the standard which you're supposed to look at, not whether you think it's obvious as your skill.  It's this person having that skill set.

Again, it's obvious to all of us, but we'll put ourselves in the shoes of this person who's got one of these degrees and at least three years of experience in optical design with LEDs.  It doesn't matter that we contest the level of ordinary skill.  I think that somebody who's been working in optical design clearly is going to find these things obvious.

More importantly, that is the evidence that was put in, and Dr. Pollock explained why it would be from a practical sense, and you'll see from the instructions "obvious to try."  I mean, that's the standard you have to meet:  Would it be obvious to try to make this?

And I think the evidence makes it pretty clear that as that screen's getting bigger and it's getting a little darker

in the middle, let's try and put a little light there.  And for that basis, we believe that Gleckman by itself renders Claim 20 obvious.

Now, in the event that that person did not get there just by looking at Gleckman and their level of skill, Dr. Pollock has also provided you with some opinions with regard to some of the prior art.

And just briefly looking at Osawa, Osawa is an LCD backlight.  It's a backlight for an LCD display, and its entirety is lights mounted on the bottom wall.  And, yes, it has a cavity that's filled with a resin.

But you'll also hear that what happens is that -- going back just a moment -- this claim comprising is open claim language.  It was read to you and you'll see that.  So the inclusion of something else doesn't mean that it's not covered. And as Dr. Moore even answered, if you took the TV and you filled it with resin, if he thinks it's infringing before, it would still be infringing after, which is the right answer.

But when one of ordinary skill in the art builds on the prior art, the entire reason why our patent system is set up is so that it's public, it's open so that when the patent expires, people get to use it.  They don't have to use all of it.  They get to improve upon it.

And so when you look at the prior art, you don't have to say, "I'm taking everything from here (indicating) and

everything from here (indicating) and putting it together," because they say that you wouldn't get to this baffled structure or the way that Pelka said redirecting light.

Look carefully. Claim 20 doesn't have any redirecting. It doesn't have an air gap cavity and it doesn't have any redirecting. All the other claims of the '209 patent have the redirecting, but what one of ordinary skill in the art would be looking at when they looked at Gleckman, look at Figure 8 and you'll see that the baffled light structure is going to be disclosed in Figure 8 of Gleckman.

I'll leave it for you. Take a note. You'll see it's there, and there's no question the idea of putting them in the center based on Gleckman and Osawa, the evidence shows it would be obvious to one of ordinary skill in the art.

So with regard to invalidity, we believe that Claim 20 is probably about as obvious as it can get.

Now, we're looking at noninfringement. Noninfringement, going to -- there you go. We have this series of lights. We have an aperture. We have these perimeter lights, and it says that they're around the perimeter. Now, the example that Dr. Moore used was the hockey rink. And besides the fact that I'm a hockey fan, I thought it was a really good example because where are the fans? The fans are around the perimeter. The hockey players are inside. Yeah, the hockey players are inside the aperture with the perimeter being the glass, and the

fans are in the stands.

That's our position.  When you look through the embodiments of the '209 patent, it's not a matter of there's a preferential embodiment that shows it.  There's not a single embodiment of the '209 patent that says that the lights are inside of the perimeter of the aperture.

So please look at the embodiments, look at the examples, look at what he's teaching, and see if there's any time where Dr. Pelka suggests that these perimeter lights can simply be at some edge but still showing through the aperture.

Now, let's take a look at the next picture.

It's not -- the top picture we've put the gold square to show the outside of the aperture.  This is the aperture in red (indicating).  That is not the configuration in any of the accused devices.  The lights would have to be on the outside.

And the logical question is:  Well, why would I put the lights on the outside?  It's not a question of whether the lights -- not everything falls within the scope of a patent. The patent doesn't cover what you want it to cover.  It covers what the claims say it covers.  And so in this case, these devices do not infringe because they don't meet that limitation.

Go to the next slide, please.

When asked about the justification, Dr. Moore said in answer to the question:  (reading)

"Q.  Around the perimeter.  If I put you in an empty room" -- oh, excuse me, this is Dr. Pollock -- "If I put you in an empty room and I ask you to walk around the perimeter room, would you go out the door and walk outside?"

And his answer before he talked about the room was: (reading)

"If I said put some chairs around the perimeter of that table, would you put them under the table?"

It's clearly a contextual question.  It depends on where you're coming from.

Go to the next slide.

Dr. Moore said, with regard to why he declared some of those lights in the bottom perimeter lights versus being center lights, is just because of their location.  And I asked: (reading)

"Q.  There's no difference in intensity; correct?

"A.  That's correct.

"Q.  They're no different in structure; correct?

"A.  That's correct."

They're just arbitrarily picking the ones on the outside and saying those are around the perimeter, and then they put the ones on the inside and say those are in the center.  If you look at the patent, you'll see it requires a little more.

Now, moving ahead to inducement.  You'll see the

instructions with regard to inducement, and there has to be a direct infringement in order to be induced.  EDD is not the direct infringer, so we are being accused of having intentionally -- EDD is being accused of having intentionally taken action that actually induced direct infringement, and it has to have known that the acts it was causing would infringe the '554 patent.

And as I said at the beginning, this is why it's important to look at what the parties' intent was and what actions they take with regard to their products.

The first thing that we see is, again, going back to Mr. Yamaguchi's design which he drew for you:  (reading)

"Q.  Is your lens design based on total internal reflection?

"A.  No, that is not the case.  As I mentioned earlier, refraction is the only principle used."

There's no evidence to the contrary and there's no evidence that EDD ever said to anybody, "These lenses have TIR," before they knew about the '554 patent.

Remember, they're getting accused and you're going to be asked if you found infringement to award damages, and you look at the benefit received.  So if they were receiving a benefit, you would think before they knew about the '554 patent, if their customers wanted this, they would have advertised it. There's no evidence of that.  They've always said these are

diffusion lenses.  There's only refraction.

If we go forward.

Now, when the developer at SSC was asked about the Enplas lenses during his deposition, and this was read in:  (reading)

"Q.  Do you understand how the Enplas lenses performed?

"A.  Yes.

"Q.  And what is your understanding of the function that they performed?

"A.  The light from LED is propagated through infraction and/or total refraction by going through a lens."

This is the engineer who actually is purported to have been working on the co-development of the lens at SSC, and his answer, uncontested, was that it was entirely refraction.

Now, in contrast, Dr. Pelka doesn't deny the goal of the '554 patent is not to avoid TIR; it's to use it to your advantage.  He admitted that proudly.  There's nothing to see that EDD did anything but avoid it, not for the purpose of avoiding the patent but because it didn't work with Mr. Yamaguchi's design.

And with regard to the data that ends up being used, there was criticism over the fact that it wasn't looking at that light bar.  EDD doesn't make light bars.  And while it was reported that Mr. Akiyama said there were light bars going back and forth between the customers, that's not the testimony.

The testimony that you heard was that they send the lenses

to the customer.  They do test in-house because they have the LED.  They're not mounted on light bars.  They then send the lenses to their customer.  They get complaints.  They adjust things.  It goes back and forth and back and forth; and finally, hopefully, for Mr. Akiyama the customer says okay.

But EDD doesn't make light bars.  EDD makes lenses.  And so the testing that was done, and which Dr. Pollock relied upon:  Is how is the lens designed?  How is it intended to perform?  What are you telling your customers to do?  What do you expect them to do?  And EDD goes to great lengths to make sure that its lenses perform as they were shown within their design specifications.

There was also this question about -- move on one more, please -- whether or not it was measured or whether or not it was calculated, and this is truly a chicken-and-an-egg kind of a situation.  Because as you heard the design process going, how it works, they start with what they call a reference lens, and on the design drawings you'll see whether it's like an M type or an L type or a K type.  And then if they go to change it, because the L type was the first one -- or, not, the M -- excuse me -- the M type was the first one, but they evolve and make a new lens type.

As this process goes on, they will have to measure the surface, as Dr. Pollock explained, and then they see if it's working, and then they go through more iterations.  And as they

go through that process, they're measuring curve fitting, and it becomes the design spec.

So the point being is that if you -- when you think about it, it is truly a chicken-and-egg kind of a problem, because which one came first, the design spec or the measurement when the measurements go in?

And as Dr. Pollock testified, that the key thing is that millions of these lenses are going to go out, and they don't go out unless they meet those design tolerances.  So the numbers are real numbers.  They're not hypothetical numbers.  They're the numbers that EDD relies upon for its manufacture.

Now, just to go over the distributor chain briefly -- and you'll find this in DTX-1092 -- for each of the lenses, you'll see that when you look at the specification, you'll see who it was supposed to have been sold to.  Each lens is only sold to an individual customer.

Who imported it?  There's no evidence of importation. You'll see EDD's design document as to who they sold it to.

No information here (indicating).  There's a distributor that's identified from looking at the pictures.  There's a retailer and for each of these brands.

You'll have to decide whether there's evidence that EDD actively induced and intended for any of these people to be infringing, but that's something that you need to consider and you need to see if there's any evidence that was provided to

meet that burden.

The only thing I'm going to say with regard to damages is that you heard Ms. Davis.  She's really good at what she does.  $900 an hour, good for her.  But the one criticism to take into account is that this RCA TV, according to the database that she relies upon entirely for her calculation, as you'll recall, did not exist.  In her calculation of damages, 750,000 of those TVs would have to have been sold in the United States; and according to the IHS database, there were none sold in that year.

Now, there obviously had to have been at least one, but there's a big difference between a database that she's relying upon as the sole basis for her damages saying 0, and she's saying it's 750,000 of them.

A couple of last points that relate to the concepts that went into this back story.  And if we move ahead.

One of the questions that has got to be one of the burning questions, let's assume for the moment that EDD and SSC are actually entering into this joint development agreement.  The question is:  If they were actually working on a lens which was a TIR lens, as they accuse EDD's lenses to be, why wouldn't you consult with Dr. Pelka?  He's the inventor and he's a hired paid consultant.  That's what he's doing.  They're already paying for him.

And Mr. Ryu's answer was:  (reading)

"At that time, at that time of development, we felt that it was not necessary to obtain advice or consultation from Dr. Pelka, and maybe that is why he was not consulted."

A convenient answer I would say.  He didn't know the reason.  But the real question is:  Why wouldn't you?  If it was a TIR lens, he's right there.  And you should think about those things because when you're thinking about these complex issues, your commonsense goes a long ways.

The other thing you should think about, please take a look at the '053 patent, which is PX-34, this patent filed by Dr. Pelka for SSC as part of his consultation, and what you'll see is we have the lens that he designed.  It's a refraction lens.  You'll see some similarities with some of the other lenses you've seen.

Ironically, for a company that's spent all that time on a flat LED, his LED in all these pictures is a bullet LED.  That's all he shows.  He explains how this design is a refraction design.  No TIR by design.  That's the intent.

And just a last little point, as far as the software that he uses to analyze the lens -- well, to design the lens, you'll see it's LightTools.  And you've heard all this stuff about BRO's software ASAP, it's in the patent, it's the recommended software for testing the lenses.  You'll see, look carefully, the language of the patent says if you're modeling these

lenses, so if you're trying to design a lens, this software could be very convenient.  It doesn't say it's the recommended lens for how to analyze a lens and see whether it falls within the scope of this patent.  Nowhere, no how.

THE COURT:  It's time for your conclusion.

MR. LABGOLD:  On that point, I'd like to thank you very much for your time.  And on behalf of my client, who really appreciates all that you're doing and taking the time out of your lives to be here, thank you very much.  All I can ask is that, please look at the evidence, use your common sense, and I trust that you'll use good penmanship when you fill out that form.

Thank you very much.

THE COURT:  Thank you, Mr. Labgold.

Would the jurors like a few-minute break before our last nine minutes of closing argument?

A JUROR:  I would.

THE COURT:  Good with a break or good to stay?

A JUROR:  Five minutes.

THE COURT:  Good.  Five-minute break.  You've got it.

(Recess taken at 11:41 a.m.)

(Proceedings resumed at 11:45 a.m.)

(Proceedings were heard out of the presence of the jury:)

THE COURT:  Let's see if our jurors are ready to return.

**MR. GOTTS:**  May I take the lectern?

(Pause in proceedings.)

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  Everyone may be seated.

And Mr. Labgold -- excuse me.  Mr. Labgold is done. Mr. Gotts returns to the stand for the final word.

**MR. GOTTS:**  Thank you, Your Honor.

### REBUTTAL ARGUMENT

**MR. GOTTS:**  Ladies and gentlemen, I'm just going to run through a few issues, and then you're on your way.  I think you've heard more than you care to hear from me at this point in time.

But, first call up Slide 54, please, Chris.

So we heard testimony -- we heard argument from Mr. Labgold on his propagation limitation.  Lest there be any doubt, Dr. Moore made clear that the light rays propagate after they hit the first bounce, then they go down, and that they would not be killed unless the surface is black.  And, of course, the surface isn't black.  You'll be able to see that. You have those lenses yourself.  And, most certainly, Snell's law, that law of physics that Dr. Pollock talked about, applies here.

Second point, Chris, if you could please pull up Slide 113.

Dr. Yamaguchi apparently is still denying that there's TIR

in his products, notwithstanding that Dr. Pollock showed it, notwithstanding that we showed it.  But ask yourselves, ladies and gentlemen, first of all, if not, why is there a cusp there at all?

And if you see the '679 patent, which they -- which was asked about -- that's the patent of EDD, that's Mr. Yamaguchi's patent -- you'll see they have two embodiments.  They have one embodiment, which is Figure 2 there, which is a total spherical rounded lens.  Then they have another one, Figure 1, which has a cusp.  The cusp is where the TIR occurs.  Ask yourselves why did they put a cusp there.  They have refraction on the other outer edges and a cusp in the middle.  That's for leaky TIR. And Mr. Yamaguchi knows how to make a lens without a cusp.

Slide 59, please.

You heard a lot of talk about TIR surface and whether it's on the flat part or not.  The Court's claim construction makes it clear it's a surface angled.  There's really no doubt that this is not a flat surface.  Of course, it's a TIR surface.

Slide 63, please.

Counsel for EDD mentioned in his remarks that we point to -- that I pointed to Figures 15 through 18 and said it's not a TIR lens, and he asked how can I possibly say that because the spec itself talks about Figure 15.

To be clear, Figure 15 itself of the patent shows the non -- it shows the pointy cusp.  What the patent tells you is

you can modify Figure 15 by putting in the curve.  That's in Column 14, line 58 through 64.  So it's not Figure 15.  It's Figure 15 after you modify it to put in the curve.  That's the leaky TIR.

The next point is we talked -- we heard this talking once again about the power curves, those power.  I just want to reiterate one more time, those power curves, first of all, are based upon Dr. Pollock's ray traces to begin with, as he indicated on the stand.  We know the issues with those ray traces at this point in time.

More importantly, those power curves, as I indicated earlier, are looking at all of the light in the LED, not the light -- not that very small amount of light that goes up through the center.

We've got no calculation from Dr. Pollock as to what percentage of the leaky TIR -- of TIR you would have if you look only at the light impinging on the TIR surface.

And if you look, for example, at Column 14 of the patent, it's the same language up there, it talks about the light incident on the TIR cusp.  It's not looking at the light on the entire lens.

So the point being here that Dr. Pollock's calculation is looking at the entirely wrong part of the lens; and if you only look through that small part in the center, I'm certain there's quite a bit of TIR.

Slide 112, please.

There was talk about the illumination coupler.  When you get back and are able to deliberate and look at this more, I think it's important to note that although Mr. Labgold talks about Figure 16 and refers to that as an illumination coupler, please take a look at the discussion of Figure 16 and you'll see the "illumination coupler" language nowhere appears there.

When you get to Figure 24 and the column describing Figure 24, which I unfortunately don't have the quote on --

**MR. OWENS:**  16.

**MR. GOTTS:**  -- Column 16, you'll see that that is where the illumination coupler is described.

So this is not an illumination coupler (indicating).  This is an illumination coupler (indicating).  This is in the prior art (indicating).  This is not in the prior art (indicating).  Nowhere.  There is not an illumination coupler anywhere in the prior art.  Once again, EDD assumes away the invention.

Slide 82, please.

EDD seeks to trivialize the distinction between the patent and the prior art.  The prior art is all encapsulated prior art.  Even 161 is integrated there.  It's not separated by an air gap.

Claim 1 requires illumination coupler.  Claim 30 requires that the lens -- that the LED be beneath the optical element and the light enter.  Remember, you can't enter if you're

already in.  You can't enter the room if you're already in.  This is a critical part of the invention.  Counsel tries to assume it away, but it's not an accident that it's not in the prior art and that it is in the claim of the patent.

So counsel indicated that Claim 20 of the '209 patent never talks about redirecting.  Counsel's right.  The word in the claim is "directing."  It's right there.  You'll see it, and that's the exact point.  It says "directing the light such that it goes into the cavity for uniformity."  You'll see it.  It's in Claim 20.

Now, finally, with regard to the Osawa and Takeichi prior art and Gleckman -- as modified by Gleckman, counsel suggests that you would take part of Osawa and part of Takeichi and then put it into Gleckman.

Now we're really digging deep because certainly Osawa and Takeichi never tell you, "Just take this part but leave the resin and the cavity behind."  That's the ultimate in hindsight.  It's saying, "I can pick and choose -- I can pick and choose anything if I look hard enough and find a small enough piece."

But that's not what Osawa or Takeichi teach.  They teach a resin-filled cavity or a series of resin-filled cavities.  No matter what you do with that prior art with Gleckman, you still don't get the invention.  So that's all there is to it.  There's no teaching anywhere of the invention, even if we

combine as they propose.

I will make one last point because I have about a minute left, I think, and that is the Rohm prior art, it would -- it does teach away from prior art, teach away from total internal reflection.  It says -- and you'll see it, and I believe it's in Column 4, if I recall, but it's either on page 4 or page 6 -- it says you don't want total internal reflection because it's going to send all the light up the center and make it too bright.  So what that tells one skilled in the art is: I wouldn't modify Stanley in view of Rohm to put in total internal reflection because total internal reflection is a bad thing.  That's the argument.

Okay.  So, ladies and gentlemen, thank you so much for your attention.  We ask when you deliberate, you give careful consideration and certainly would hope you return a verdict for SSC.

Thank you so much.

THE COURT:  Thank you, Mr. Gotts.

Ladies and gentlemen, we've now reached the next milestone in the case, and that's the milestone where we turn the case over to you for your deliberations.

One of the first decisions we will ask you to make, this was not in the closing arguments or instructions, was when you will take your lunch break.  From here on out, while you are deliberating, the attorneys will be close by and I will be

close by to see if you have any questions and to take your verdict when it's returned.  When you are not deliberating, then we will be doing other things.

And, as a reminder, all of you need to be present in the jury room for your deliberations, so you can't have some jurors go take a lunch break and others stay behind to do your deliberations.

So I'll have my courtroom deputy come in in a few minutes to check as to what your lunch schedule will be, when you are going to leave and when you plan to return, so I can communicate that to the parties.  So if you can do that.

Now, as to the end of your deliberations, that is up to you with some limitations, and that is that we will keep the 9:00 to 4:00 schedule.  So if you don't have a verdict by 4:00 o'clock today, we will end the proceedings at 4:00 o'clock today and return at 9:00 a.m. tomorrow to continue the deliberations, and that will be the Court's schedule.

You may hear my voice out here.  We'll be doing some other things with the attorneys, and I may have some other cases; but that will be your schedule between the hours of 9:00 to 4:00.  It will be up to you as you deliberate.

We will be putting together the exhibits and the index of those to bring in to you.  That will take us a few minutes to get them in to you, so bear with us on that.  And from that, that will be my final communication to you before your return

of a verdict.

So thank you again, and I return you to the jury room to begin your deliberations.

(Jury beginning deliberations at 11:57 a.m.)

(Proceedings were heard out of the presence of the jury:)

THE COURT:  Everyone may be seated.  The jurors are not present.

Let me talk about some logistics with the parties.  First, everyone can take a deep breath.  Thank you for your presentation of the case and for getting it done on time.  I've previously commented, but will again, that the presentation was very well managed, and I want to give special thanks to those who didn't get a speaking role in getting everything prepared and presented in a way that the jury could see it, and so that was particularly outstanding.

Secondly, I appreciate that both parties were able to have this be more than just a two-man show and that other attorneys got to participate both in presentation and behind the scenes in putting on the case.  Other judges in the district have commented that in patent cases, it tends to be a top-heavy presentation where some of the other attorneys don't get a chance to participate during the trials; and I think this case did not fall down that hole, and I appreciate that both parties permitted more than one attorney to participate in the trial, and I'm glad that we got to do that.

When we get a jury verdict, I will permit the jurors to return to the courtroom if they wish to give feedback to the parties -- to the attorneys on the presentation. So I'll give them the opportunity to either come back into the courtroom afterwards to talk with you; or if they wish to, to exit through the gift shop in the other direction.

If they decide to not come in to speak with you, I ask you not to hassle them as they leave the building because they're making a decision that they don't want to chat with you about it. I hope that some of them will come talk with you to give you further feedback, but that will be up to them, and their admonition to no longer discuss the case will at that point be terminated. So that will happen at the end of the case.

Some other logistics. You each have one or more copies of the jurors' questionnaires which they filled out way back during the beginning stages of the case. I can't remember if I said this or not, but I'll give you a week to have those after trial if you have some further reason to investigate what occurred during the trial, but my order will be that you destroy every copy of those jury questionnaires within a week after the verdict absence of further court order. So if there's some reason -- if there's some jury issue that needs us to keep those for longer, you can make a request for it; but in the absence of a further order, please destroy every copy within a week so as to preserve the privacy of the jurors.

**MR. LABGOLD:**  I'll just note for the record, not that I expect it to be a problem, but we had spoken afterwards, we've already destroyed all of our copies.

**THE COURT:**  No objection to that.  And I will be keeping a copy -- just so you know, I will be keeping a copy for a week just in the abundance of caution -- you know, abundance of there being some concern, but I will destroy my copy also within a week, and there will not be a copy retained. So if somebody, you know, thinks that there is an issue that is going to come up on appeal where there's a need for those, then you need to speak up within a week to say, "Here's the issue and here's why they should be retained."

I just want to get --

**MR. LABGOLD:**  Thank you.

I just wanted -- with the comment "in the absence of a further order," I just wanted to let you know I couldn't comply with a further order.  So thank you.

**THE COURT:**  Very good.

Exhibits will be going back to the jury in a moment, and I'll ask the parties to retain their own set of the admitted exhibits.  Also, there are many exhibits that were marked for identification that were not admitted into evidence.  If the parties wish to keep a complete set of those, and you very well may, I leave that to you.  The court will not be retaining a complete set of all the marked exhibits going forward, so that

is up to you to retain.

Let's reconvene at 3:00 p.m. today to argue the Rule 50 motions. I think there's three of them that have been filed.

We can also at the same time talk about the posttrial briefing schedule, one of the issues being the invalidity of Claim 2, sort of what further proceedings we're going to have about that; and to start preparing for the inequitable conduct hearing on April 8th, to figure out what we need to do in advance of that hearing.

So we've got other work to do. I hope you get a good lunch break.

Let me see if we have feedback yet.

THE CLERK: They're going to lunch now, and they will resume at 1:00 o'clock.

THE COURT: All right. So we'll have a break until 1:00 o'clock as far as the deliberations go. You'll let my deputy know how to reach you if you're not in the courtroom; and if nothing else, reconvene at 3:00 o'clock. Thank you very much.

MR. GOTTS: Thank you.

MR. LABGOLD: Thank you, Your Honor.

(Luncheon recess taken at 12:02 p.m.)

**Afternoon Session**                                    **2:07 p.m.**

(Proceedings were heard out of the presence of the jury:)

THE COURT:  Good afternoon.

MR. GOTTS:  Good afternoon, Your Honor.

MR. LABGOLD:  Good afternoon.

THE COURT:  You may be seated.

And counsel addressing the jury questions may come forward.

So we have Questions 6 and 7 dealing with the evidence that's back with the jury for their deliberations.  6 is asking how the slides, example DDX7.020, corresponds to the tabs in the evidence books.  I don't know, because I didn't see how you have the index tabbed, so I don't know what the answer is.  So what do you think the answer is?

MR. GOTTS:  Well, Your Honor, I think -- well, we don't have -- they don't correspond other than the fact that we referenced the exhibits on the slides.  But, interestingly, 7-020, happened to be -- I even noticed it while I was saying it -- was one of the slides that failed to include an exhibit number.  So I don't know if that's the issue or not because we do have the corresponding evidentiary exhibit number.

THE COURT:  What is 7.020?

MR. GOTTS:  It's a -- oh, here we go, Your Honor. It's up on the screen now.  And it's a quote from this exhibit, which is Defendant's Trial Exhibit 1021.

THE COURT:  Which is in evidence?

MR. GOTTS:  It is, Your Honor, yeah.

THE COURT:  All right.  So what do you suggest that we tell the jury in response to that question?

MR. GOTTS:  I think that we could tell them that DDX-7.020 is DTX-1021.  Beyond that, I'm not sure what else the question would be.

THE COURT:  All right.  And, Mr. Labgold, how do you suggest we respond to the question?

MR. LABGOLD:  Well, my concern is that since these are demonstratives and they're being taken out of context, I think it's kind of -- I think it was a generic question because it just says "example."  So to give one and not give the others, I think they need to understand that what's presented in the demonstratives, unfortunately, are not evidence and so it would give unfair weight because it says only just an exemplary.  So I think they should -- they're going to have to look at the evidence.

THE COURT:  All right.  Let's use that as a transition point to Question 7, which is:  (reading)

"Can we have the demonstratives from the closing arguments from both SSC and EDD?"

My instinct there is that the demonstratives from the closing are not evidence and not to provide them, but I take your feedback as to what you suggest.

**MR. GOTTS:**  We would have no objection, Your Honor. Of course, I understand it probably would have to be by agreement.

**MR. LABGOLD:**  Yeah.  And my concern is that because it does provide selective portions of the transcript, I think there's a risk of error.  I mean, it's not that I don't want to help them deliberate, but I think you end up having the entire trial distilled down into -- there's just too great of a risk of error.

**THE COURT:**  I don't know if it creates error or not, but they have been instructed in the closing instructions that the arguments of counsel are not evidence, and that includes the slides given during the arguments; and it might suggest that the slides are themselves evidence, and I don't know that that favors one party or the other.  Both parties had slides during their closing arguments.

But my instinct is to tell them, no, they may not have the demonstratives from the closing arguments in response to that question.

And in response to the -- I want to give a more general response to the question about the slides, so let me come up with some language that I can give them, and I'll come back in a few minutes to run it by you.

**MR. GOTTS:**  Thank you, Your Honor.

**MR. LABGOLD:**  Thank you.

**THE COURT:**  Thank you.  We're off the record.

(Recess taken at 2:11 p.m.)

(Proceedings resumed at 2:19 p.m.)

(Proceedings were heard out of the presence of the jury:)

**THE COURT:**  All right.  The jury is not present.

In response to Questions 6 and 7, my suggestion is that I will provide Ninth Circuit Model 3.4 as to any question from the jury.  That provides that:  (reading)

"At this point I will give you a further instruction. By giving a further instruction at this time, I do not mean to emphasize this instruction over any other instruction.  You are not to attach undue importance to the fact that this was read separately to you.  You must consider this instruction together with all the other instructions that were given to you."

And at the end to say:  (reading)

"You will now retire to the jury room and continue your deliberations."

Inserted in the middle there will be the instruction responding to Number 6 and 7, which I propose to be:  (reading)

"No, you cannot have the demonstratives from the closing because those slides are not evidence, and you have been instructed to return a verdict based only on the evidence admitted during the trial.  The slides used by both parties during the trial were demonstratives.  I do

not have an index linking all the slides shown during the trial with particular evidence.  As to the example you asked about, DDX-7.020, SSC asserts that it corresponds to Defense Exhibit Number 1021."

Does that work for SSC?

**MR. GOTTS:**  Yes, Your Honor.  No objection.

**THE COURT:**  And does that work for EDD?

**MR. LABGOLD:**  I still think it should be just the generic response because they said it was an example, which indicates to me it's more than one, so we're singling out one over the other, but I understand the Court's position.

**THE COURT:**  I'm singling it out because they've identified it and I do want to be responsive to their question, but I think the general response will hopefully address their concerns that go beyond that particular example.

So I will be giving that instruction.  Let's call in the jurors and we will --

**MR. LABGOLD:**  I think we should take that one down.

**THE COURT:**  I agree.  Thank you.

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  Good afternoon to our jurors.  Everyone may be seated.

All right.  This is in response to questions from the jury Numbers 6 and 7.  And in response to those questions, I will now give you a further instruction.

By giving this further instruction at this time, I do not mean to emphasize this instruction over any other instruction that I've already given you. Do not attach undue importance to the fact that this instruction is being read separately to you. You must consider this instruction together with all the other instructions that were given to you previously.

In response to your particular questions, no, you cannot have the demonstratives from the closing arguments because those slides are not evidence, and you have been instructed to return a verdict based only on the evidence that was admitted during the trial. The slides used by both parties during the trial were demonstratives. I do not have an index linking all the slides shown to you during the trial with particular evidence.

As to the example you asked about in your question, DDX-7.020, SSC asserts that it corresponds to Defense Exhibit Number 1021.

You will now please retire to the jury room and continue your deliberations. Thank you very much.

(Jury continuing deliberations at 2:24 p.m.)

(Proceedings were heard out of the presence of the jury:)

THE COURT:  And we're in recess.  Thank you.

MR. GOTTS:  Thank you, Your Honor.

(Recess taken at 2:24 p.m.)

(Proceedings resumed at 3:04 p.m.)

(Proceedings were heard out of the presence of the jury:)

**THE COURT:**  Good afternoon.

**MR. GOTTS:**  Good afternoon, Your Honor.

**THE COURT:**  Please be seated.

All right.  Back on the record with the jurors not present here for hearing on the motions for directed verdict under Rule 50.  And for the record, those are -- Docket Number 436 is EDD's motion on noninfringement of the '209 and '554 patent claims that there was no inducement, that there is no willful infringement, and that there are no damages; 440 is their motion as to the invalidity of the '209 and '554 patents asserted, the claims asserted in those patents.

And then SSC has in Docket 444 more recently filed a motion addressing both invalidity and noninfringement -- or infringement in their case, as well as damages, sort of all put together in one motion.

No one has filed an opposition to any of those briefs yet, and I previously deemed all the filings being timely.  So it's not a question of procedural timeliness, and the question is whether a reasonable jury could find for the other party on those motions interpreting the evidence against the movant.

I've already opined yesterday my tentative view that I would take those under submission and not grant them on the papers under the current posture of the case, but that I would entertain further argument today that might change my mind on

that.

So why don't I hear from SSC first in response to the two motions filed by EDD, and I think you can pivot whatever point you wish and also speak in support of your motion for Rule 50, and then we'll hear from EDD second.

MR. GOTTS:  Thank you, Your Honor.

May I ask point of order, which is I don't know how much detail Your Honor wants under the circumstances given that we're reserving.  I'm prepared to argue as much as you'd like, Your Honor, although, frankly, having not slept last night, I'm not in a hurry to do that.

THE COURT:  Then let's go nine or ten hours.  How long can you go?

(Laughter)

THE COURT:  No.  My view -- and I will not try to waste your time or to force repeat effort, I did listen to your closing argument, and the legal issues are the same.  And, of course, the motions are not supported by the -- they're not -- the Court is not to consider the slides and the closing arguments, but the legal issues I've considered; and given my tentative view, you may not need to say anything more.

MR. GOTTS:  Okay.

THE COURT:  But, you know, I think most helpful would be if there are parts of your motion or in response to EDD's motions that you think you've not emphasized before the jury,

these may be perhaps more technical legal issues where you think that I should right now, and I could, right now we can say, "Jurors, we submitted to you this issue, but we're now taking away willfulness from you," or, you know, some aspect of the case.  If there's something that you have not focused on in your jury presentation that you think I should focus on in particular, I would welcome that rather than a repeat of every argument you've made in the entire case because I have been listening to those.

**MR. GOTTS:**  That's helpful guidance.  Thank you, Your Honor.

Let me do it this way, by starters, in saying I believe that our motion is very much the mirror image of plaintiffs' motion, so I would incorporate by reference my arguments in our written motion.  And although I would not want it to be deemed our full written response, I actually believe it sort of is responsive on virtually every point.

I do believe we've made a legally sufficient basis for every aspect of infringement inducement on all of the issues of invalidity and willfulness and damages and for all the reasons incorporated by reference both in our closing argument and the associated evidence and in our response.

The only additional issue I would say that is not covered there is the Claim 2/112 issue.  And, Your Honor, if I have missed an issue, I hope you'll let me know, but that's my

understanding.

THE COURT:  I'm not trying to hide the ball from you. I view it that the briefs do correspond to each other, and there's not an issue that one party addressed and the other party failed to address.

MR. GOTTS:  Okay.

THE COURT:  And I'm not going to say, "Gotcha.  You forgot to mention, you know, Claim 19."

MR. GOTTS:  On the Claim 2, Your Honor did ask the question about briefing, and we would be prepared to sort of address that in the posttrial briefing.

THE COURT:  That's when I would suggest it being done.

MR. GOTTS:  Yeah.

THE COURT:  That's not an issue we'd be taking away from the jury, so the urgency of resolving it right now, if there were a basis to resolve it, is not present.

I think -- well, so I'll take your suggestion, first, as to when you would like to do that, but I think that a responsive brief -- not just a responsive brief, maybe further briefing, if that's desired from EDD's end, as well as a responsive brief would be appropriate.

MR. GOTTS:  Thank you, Your Honor.  In that case, I'll tender the floor and I'm happy to respond as necessary.  Thank you.

THE COURT:  All right.  Then let me hear from

Mr. Labgold as to any further pointed arguments he would like to make.

MR. LABGOLD:  Can I rotate this?

THE COURT:  You may rotate that, as long as you don't hurt yourself or cut off any cables.

MR. LABGOLD:  I'll try.

(Pause in proceedings.)

MR. LABGOLD:  I will be unsuccessful for that.  I'm going to move over to that side, if I may.

THE COURT:  That sounds like a sensible solution.

MR. LABGOLD:  Thank you, Your Honor.

I think Mr. Gotts framed the issues up.

With regard to Claim Number 2, if we're going to have briefing on it, I mean, I would suggest that our opening brief be only like four pages, something --

THE COURT:  I was going to give you five, but if you want to limit it to four, I accept.

MR. LABGOLD:  So I think, quite honestly, I mean, it's a simple principle of law.  I mean, Claim 12, fourth paragraph, says that the dependent claim has to add an additional limitation, and it's just pro forma.  There's no additional limitation.  There's evidence on it now, and so we're happy --

THE COURT:  You've already cited one case, as I recall -- I can't remember the name of the case -- I think in support of your proposition, but I'm not going to resolve that

right now.  If you can limit your further submission to five pages, then we'll get a response from SSC, I think that will be a good way to address Claim 2.

**MR. LABGOLD:**  The only -- as I say, if we have all the evidence that's in the closing, which I understand Your Honor has taken into account, the issue that's come up since the filing of our motion is that we have the additional -- you know, we've closed the evidence.  There is no propagation in our view.

And the one thing that is significant is Dr. Moore's additional testimony as to how he is -- in our motion we said he's misapplying TIR surface.  In his testimony yesterday, he clearly indicated that he is not following the Court's construction, and his definition as applied is a misapplication of the law.  So I just reemphasize that.  Otherwise, I think everything is the same.

**THE COURT:**  All right.  Then I will take each of Dockets 436, 440, and 444 under submission pending further proceedings.

And I will suggest, because I know you otherwise will have nothing to do, I would suggest that we get a further five-page submission from EDD by Thursday, March 31st; and a five pages or less response from SSC by Tuesday, April 5th; and we'd be prepared to discuss that at the hearing on April 8th in San Jose if we need further discussion about it.

Does that work for both parties?

MR. LABGOLD:  For which issue?

THE COURT:  That's on the Claim 2 issue.

MR. LABGOLD:  Okay.  That works.

THE COURT:  All right.  And then one of the other logistical issues I wanted to talk about --

THE CLERK:  What time is the hearing?

THE COURT:  I think we set it at 1:00 p.m. on the 8th. Is that consistent with everyone's memories?

MR. GOTTS:  Is that the inequitable conduct?

THE COURT:  That's the inequitable conduct.

MR. GOTTS:  I don't recall a time being set, but whatever Your Honor would like, that's fine with me.

THE COURT:  We're all here together now.  We can talk about it.  It's in my calendar for that time, but I couldn't remember if we actually --

MR. GOTTS:  That's fine.  I just didn't have a time, yeah.

MR. LABGOLD:  Neither one of us are the ones who are qualified or competent at the moment.

THE COURT:  So let's formulate our plan right now. How much testimony do the parties anticipate needing for that hearing?

MR. GOTTS:  We haven't discussed it, but I certainly assume Dr. Pelka is the only witness unless you have another

witness.

MR. LABGOLD: He is the only witness.

THE COURT: Of course, we're taking -- you know, we already have his testimony from this trial, and we'll have transcripts of that available so the question is additional testimony from Dr. Pelka.

MR. GOTTS: If I had to guess, I would be surprised if we had more than an hour of testimony, Your Honor.

MR. LABGOLD: I would think it would be about the same.

THE COURT: All right. So I was envisioning in my head two hours for that and less potentially. Do you wish to have -- is there a need for further briefing on what's going to be heard at that hearing, or --

MR. GOTTS: I think the only thing that would be useful, Your Honor, is some sort of disclosure of exhibits. I feel like everything else is pretty well pretried, frankly, unless you have a different view.

MR. LABGOLD: I have no objection to that. I think we should have some kind of an abbreviated -- I think all the documents are out there, but I'm happy to --

MR. GOTTS: Yeah.

THE COURT: So here's what I'll ask: Let's keep the hearing at 1:00 o'clock on Friday, April 8th, "keep" meaning I'll keep it, you didn't know what the time was before, but

we'll set the hearing for that time.

MR. LABGOLD:  Thank you, Your Honor.

THE COURT:  And I'll ask you by Wednesday the 6th to give me a short joint report as to what your plans are, what exhibits you're going to use, if you have a dispute about the exhibits in some way, tell me what the dispute is so potentially we could resolve it ahead of time.

MR. LABGOLD:  So kind of an abbreviated pretrial?

THE COURT:  Abbreviated pretrial statement.  Sort of give me an explication of what's going to happen; and if there's a dispute, let me know what the dispute is.

MR. GOTTS:  I think I asked this last time, Your Honor, but we've all learned a lot about the case.  Do you still want sort of opening, closing, and testimony; or do you think maybe just a little -- whatever Your Honor would like.

THE COURT:  Well, I think that can be pretty -- we won't need to have the story of the divorce and the back story.  If you have a joint framing of what's going -- you know, why we're doing this, you could put that in your statement on the 6th.  Certainly if you each want to have a short opening statement before we hear from Dr. Pelka, that will be fine, too.

MR. GOTTS:  Okay.  Thank you, Your Honor.

THE COURT:  Does that make sense?

MR. LABGOLD:  Yes.

**MR. GOTTS:** It does.

**MR. LABGOLD:** Thank you.

**THE COURT:** All right. So I think that can be the plan, then, for that hearing assuming that the jury is not still deliberating on April 8th, in which case we'll have to have a continuance. I shouldn't make jokes during deliberations.

**MR. GOTTS:** We hope it's a joke.

**THE COURT:** All right. I think that's it for the immediate procedural questions that I had.

**MR. LABGOLD:** The only --

**THE COURT:** Yes.

**MR. LABGOLD:** I guess the one we should address, we don't have to address it at this moment, and we haven't spoken about it, but you had mentioned a schedule for pretrial briefing.

**THE COURT:** Well, that was talking about April 8th, sort of what we wanted to have before that.

**MR. LABGOLD:** Okay.

**THE COURT:** And I've set that schedule, which is to have you give a joint report on the 6th --

**MR. LABGOLD:** Perfect.

**THE COURT:** -- highlighting any things that are in dispute.

I'm just brainstorming here. The only other question, are

PROCEEDINGS

there posttrial briefs that somehow need to be resolved before that hearing on any issue other than directed verdict?

          MR. LABGOLD:  I don't believe so, no.

          MR. GOTTS:  I don't think so.

          THE COURT:  I don't think so either.

     Okay.  Then I won't set any deadlines for those.

     Very good.  We'll stand by until 4:00 o'clock.  Thank you.

          MR. LABGOLD:  Thank you, Your Honor.

          MR. GOTTS:  Thank you, Your Honor.

               (Recess taken at 3:17 p.m.)

     (Proceedings adjourned at 4:00 p.m.  Jury returning at 9:00 a.m.)

                    **CERTIFICATE OF REPORTER**

          I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Wednesday, March 23, 2016




_____

          Jo Ann Bryce, CSR No. 3321, RMR, CRR
                    U.S. Court Reporter